## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ X
                            :

In re:                                :       Chapter 11
                            :

MACH Gen, LLC, *et al.*,[1]       :       Case No. 14-_____ (__)
                            :
                            :       (Joint Administration Requested)
                            :
                Debtors.         :

------------------------------------------------------------------ X

## DECLARATION OF GARRY N. HUBBARD IN SUPPORT OF
## MACH GEN'S CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Garry N. Hubbard, hereby declare under penalty of perjury:

1.       I am the Chief Executive Officer of MACH Gen, LLC, a limited liability company organized under the laws of the State of Delaware, and each of the other above-captioned debtors and debtors in possession (each, a "MACH Gen Entity," and collectively, "MACH Gen") and have served in such capacity since May 21, 2010, through a consulting agreement between MACH Gen and Willow Bend Capital Management, LLC ("Willow Bend").[2] I have also served on the board of directors of MACH Gen, LLC since August 2006. Prior to joining MACH Gen, I co-founded Willow Bend in 2004 to work with hedge funds and private equity firms on evaluating investments in the power sector. From March 1999 to December 2003, I was senior vice president of development, construction, and acquisitions at Panda Energy International, Inc., where I developed merchant power projects in the United States and oversaw the construction and startup of over 9,000 megawatts of combined cycle power projects. I have

---

[1]    The debtors in these chapter 11 cases and the last four digits of each debtor's taxpayer identification number are as follows: (a) MACH Gen, LLC (6738); (b) MACH Gen GP, LLC (6738); (c) Millennium Power Partners, L.P. (6688); (d) New Athens Generating Company, LLC (0156); and (e) New Harquahala Generating Company, LLC (0092). The debtors' principal offices are located at 9300 US Highway 9W, Athens, New York 12015.

[2]    The services provided by Willow Bend to MACH Gen are described below.

over 35 years of experience in the operation, maintenance, development, and financing of power generation and other energy businesses.

2.        Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), each of the MACH Gen Entities has filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code").  MACH Gen is also filing concurrently with this Declaration the *Joint Prepackaged Chapter 11 Plan of Mach Gen, LLC and Its Affiliated Debtors and Debtors in Possession*, dated as of January 21, 2014 (as it may be amended, supplemented, restated, or modified from time to time, the "Plan"), as well as a disclosure statement for the Plan (as it may be amended, supplemented, restated, or modified from time to time, the "Disclosure Statement").  These chapter 11 cases are being commenced following the solicitation of the Plan, which MACH Gen seeks to have confirmed by the Court.  As described below, all holders who voted on the Plan have voted unanimously to accept the Plan, and the Plan provides for all non-voting classes, including general unsecured creditors, to be paid in full or otherwise rendered unimpaired.

3.        To operate effectively and minimize certain of the potential adverse effects of the commencement of these chapter 11 cases, MACH Gen has requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings").  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of MACH Gen's chapter 11 petitions for relief and the First Day Pleadings.

4.        Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of MACH Gen's senior

management, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning MACH Gen's operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of MACH Gen.

5.       As described below, MACH Gen seeks by the First Day Pleadings to, among other things, (i) establish certain administrative procedures to promote a seamless transition into and through these chapter 11 cases, (ii) ensure the continuation of its business operations and cash management system without interruption, (iii) obtain debtor-in-possession financing and use cash collateral in the operation of its businesses, (iv) preserve valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired by these chapter 11 cases, and (v) schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of MACH Gen's prepetition solicitation procedures, and confirmation of the Plan. I am familiar with the contents of each of the First Day Pleadings, and I believe MACH Gen would suffer immediate and irreparable harm absent the ability to continue its business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings will be critical to MACH Gen's efforts to reorganize through these chapter 11 cases efficiently and with minimized disruptions to its business operations, thereby permitting MACH Gen to preserve and maximize value for the benefit of all of its stakeholders and successfully emerge from chapter 11 as a more competitively-positioned going concern.

6.       Parts I through III of this Declaration provide an overview of the businesses, organizational structure, and capital structure of MACH Gen. Part IV provides an overview of

the circumstances leading to the commencement of these chapter 11 cases, and Part V

summarizes the First Day Pleadings and the bases for the relief sought therein.

## I.      Formation and Organizational Structure

7.      MACH Gen, LLC, a Delaware limited liability company, was formed for the

purposes of owning and operating certain natural gas-fired electric generating facilities,

including the Facilities (as defined below).  Prior to MACH Gen's formation, the Facilities were

developed and owned by PG&E National Energy Group indirectly through GenHoldings I, LLC

("GenHoldings").  On May 29, 2003, following certain debt defaults by GenHoldings, the

secured lenders of GenHoldings formed MACH Gen, LLC in anticipation of a restructuring

transaction, pursuant to which MACH Gen, LLC would assume certain indebtedness of

GenHoldings and acquire certain generating facilities from GenHoldings.[3]  On August 16, 2004,

GenHoldings and MACH Gen, LLC consummated the restructuring, and MACH Gen, LLC

acquired the Facilities through newly-created "project company" subsidiaries New Athens

Generating Company, LLC ("New Athens"), New Harquahala Generating Company, LLC

("New Harquahala"), and Millennium Power Partners, L.P. ("Millennium Power" and, together

with New Athens and New Harquahala, the "Project Companies").  Each of the Project

Companies has filed a voluntary chapter 11 petition on the date hereof.

8.      A chart showing MACH Gen's organizational structure as of the Petition Date is

attached hereto as **Exhibit A**.

## II.     Businesses and Operations

9.      *MACH Gen's Generating Facilities*.  MACH Gen owns and manages a portfolio

of three natural gas-fired electric generating facilities located in the United States (collectively,

---

[3]      In addition to the three Facilities owned by MACH Gen as of the Petition Date, MACH Gen also acquired from
GenHoldings a generating facility near South Haven, Michigan.  MACH Gen divested its interest in the
Michigan facility to an affiliate of Tenaska on October 3, 2008.

the "Facilities"):  (i) a 1,080 MW facility located in Athens, New York, that achieved

commercial operation on May 5, 2004 (the "Athens Facility"), owned by New Athens; (ii) a

1,092 MW facility located in Maricopa County, Arizona, that achieved commercial operation on

September 11, 2004 (the "Harquahala Facility"), owned by New Harquahala; and (iii) a 360 MW

facility, located in Charlton, Massachusetts, that achieved commercial operation on April 12,

2001 (the "Millennium Facility"), owned by Millennium Power.  Each of the Facilities utilizes

advanced frame "501G" combustion turbine generating technology and equipment supplied by

leading manufacturers, making them among the most competitive gas-fired generating facilities

in their respective markets.

   10.  The Facilities dispatch electricity into three geographically-diverse power

markets, two of which are managed by independent system operators ("ISOs").  Specifically,

(i) the Athens Facility dispatches power into the region managed by the New York ISO, (ii) the

Harquahala Facility dispatches power into the region served by the Western Electricity

Coordinating Council, and (iii) the Millennium Facility dispatches power into the region

managed by ISO New England.

   11.  *Operations and Management*.  MACH Gen does not have its own employees and

instead relies upon third parties for its operations and management.  NAES Corporation provides

day-to-day operations and maintenance of the Facilities pursuant to service agreements with each

Project Company.  For planned and unplanned outages at the Facilities, Siemens Energy, Inc.

(f/k/a Siemens Power Generation, Inc.) provides repairs, maintenance, parts, labor, and materials

to all three Facilities.

   12.  NAES Corporation and Siemens Energy, Inc. both act under the management of

Competitive Power Ventures, Inc. ("CPV"), which provides MACH Gen with certain asset

management services, including budgeting, planning, cost control, contract management, power

sales and fuel contract oversight, maintenance management, community relations, accounting,

tax, finance, insurance, regulatory, investor relations, information technology, capital

management, and other operational needs.  CPV reports directly to me as MACH Gen's Chief

Executive Officer.

13.     As noted above, I serve as MACH Gen's Chief Executive Officer through Willow

Bend's consulting agreement with MACH Gen.  As a consultant to MACH Gen, Willow Bend

provides MACH Gen with critical administrative and management services and executive-level

personnel, including myself.

14.     *Sales and Revenues*.  As an energy merchant, MACH Gen does not directly sell to

retail customers but, instead, generates revenues through the sale of energy, capacity, and

ancillary services into wholesale power markets in the Facilities' respective regions.  In some

cases, the Facilities' energy is sold directly into the relevant power markets and, in other cases, it

is sold pursuant to energy management agreements between the relevant Project Company and

an energy manager (the "Energy Managers").  The Energy Manager for the Athens and

Millennium Facilities is currently Consolidated Edison Energy, Inc., and the Energy Manager for

the Harquahala Facility is currently Twin Eagle Resource Management, LLC.

15.     The Energy Managers, on behalf of the applicable Project Company, solicit and

enter into energy transactions, schedule, bid, and dispatch energy from the Facilities into

distribution systems and coordinate with transmission providers, as directed by CPV and me as

MACH Gen's Chief Executive Officer.  The Energy Managers have been engaged to assist

MACH Gen in identifying commercial strategies to maximize the value of the Facilities'

generation capacity and identifying, soliciting, and executing transactions beyond the day-ahead

market that comply with agreed-upon parameters provided by MACH Gen.  In an effort to procure fuel for the Facilities at the lowest cost possible, the Energy Managers are engaged to deal with all market participants, for and on behalf of each Facility, from a credit standpoint and act as the applicable Project Company's counterparty in purchasing natural gas.

16.     As of December 31, 2013, MACH Gen generated approximately $350 million in operating revenue for the prior 12-month period at a net loss of approximately $120 million.

**III.    Prepetition Indebtedness**

17.     As of December 31, 2013, MACH Gen's unaudited balance sheet reflected assets of approximately $750 million and liabilities of approximately $1.6 billion.  MACH Gen's material long-term debt obligations consist of two secured debt facilities, each described below. These facilities have been restructured, amended, and/or restated several times since they were first put into place in connection with MACH Gen's formation in 2004.

18.     *First Lien Credit Facility*.  MACH Gen, LLC, as borrower, and MACH Gen GP, LLC ("MACH Gen GP") and the Project Companies, as guarantors, are party to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012 (as amended, supplemented, restated, or modified from time to time, the "First Lien Credit Agreement"), with Beal Bank USA and Beal Bank, SSB, as lenders and revolving issuing bank (collectively, the "First Lien Lenders"), and CLMG Corp., as first lien collateral agent and administrative agent (the "First Lien Agent").

19.     As restated in 2012, the First Lien Credit Agreement provided for (i) a term loan facility (as amended, the "First Lien Term Loan") of up to $450 million in principal amount and $40 million in capitalized interest and (ii) a $160 million revolving credit facility (as amended, the "First Lien Revolver" and, together with the First Lien Term Loan, the "First Lien Credit Facility") of which $120 million was available for the issuance of letters of credit.

20.    On January 15, 2014, in connection with the execution of the RSA (as defined below), MACH Gen entered into an amendment of the First Lien Credit Agreement that, among other things, increased the aggregate principal amount of the First Lien Term Loan by $23 million to approximately $483 million and temporarily increased the commitment under the First Lien Revolver by $40 million to $200 million (the letter of credit sub-facility limit was also temporarily increased by $40 million to $160 million).

21.    As security for the obligations arising under the First Lien Credit Agreement, MACH Gen granted first priority liens and security interests in substantially all of its assets and property, including the property of and the equity interests in MACH Gen GP, Millennium Power, New Athens, and New Harquahala.

22.    As of the Petition Date, approximately $483 million in aggregate principal amount is outstanding under the First Lien Term Loan, and approximately $144 million in aggregate principal amount (including issued letters of credit) is outstanding under the First Lien Revolver.

23.    *Second Lien Credit Facility*.  MACH Gen, LLC, as borrower, and MACH Gen GP and the Project Companies, as guarantors, are party to that certain Second Lien Credit and Guaranty Agreement, dated as of February 22, 2007 (as amended, supplemented, restated, or modified from time to time, the "Second Lien Credit Agreement"), with the lenders from time to time party thereto (the "Second Lien Lenders") and The Bank of New York Mellon, as second lien collateral agent and administrative agent (the "Second Lien Agent"), which provides for a term loan facility (the "Second Lien Credit Facility") that was, at the time of issuance, in the aggregate original principal amount of approximately $839 million.

24.     As security for the obligations arising under the Second Lien Credit Agreement, MACH Gen granted second priority liens and security interests in substantially all of its assets and property, including the property of and the equity interests in MACH Gen GP, Millennium Power, New Athens, and New Harquahala.

25.     As of the Petition Date, approximately $1.03 billion in aggregate principal amount is outstanding under the Second Lien Credit Facility.

26.     *Intercreditor Agreement*.  MACH Gen, the First Lien Agent, and the Second Lien Agent are party to (i) that certain Collateral Agency and Intercreditor Agreement, dated as of December 5, 2006 and as amended, supplemented, or modified from time to time, that, among other things, sets forth relative lien and payment priorities in connection with the obligations arising under MACH Gen's secured debt facilities, and (ii) that certain Security Deposit Agreement, dated as of December 5, 2006 and as amended, supplemented, or modified from time to time, that, among other things, contains a project financing account "waterfall" where all of MACH Gen's cash flows are tightly controlled pursuant to various secured accounts that are pledged to the secured parties.

**IV.     Circumstances Leading to Commencement of Chapter 11 Cases**

27.     MACH Gen's balance sheet first came under pressure in the early 2000s, shortly after the original financing for the Facilities was put into place.  As noted above, the original financing for the Facilities went into default after the original owner was unable to continue the required equity contribution to complete construction and, as a result, the original lenders took ownership of the Facilities in 2004 through MACH Gen.  In late 2006, when the energy and capital markets improved, a refinancing of the remaining debt was completed.  This refinancing was completed while asset values were high, allowing for a high level of leverage.

28.      In 2008, MACH Gen went through an auction process to test the market for asset sales.  The resulting purchase offers led to the sale of one facility located in Michigan in late 2008, and the proceeds were used to pay off MACH Gen's then-existing first lien term debt. Although this sale provided MACH Gen with additional liquidity and borrowing capacity adequate to meet all of its current obligations, MACH Gen's leverage remained high, with a significant level of second lien payment-in-kind debt, with a maturity in February 2015 and interest continuing to accrue and augment the loan balance.

29.      While purchase offers for the three remaining Facilities would have allowed MACH Gen to pay off all of its debt at that time, the owners decided not to move forward, due to the belief that asset values would continue to improve, and because the purchase offers indicated an enterprise value lower than the enterprise value implied at the time by over-the-counter markets for MACH Gen's debt and equity securities.

30.      Since 2008, energy margins for natural gas combined cycles in the regions where MACH Gen operates – New England, New York, and the desert Southwest – have generally contracted due to shrinking power demand stemming from the economic recession and loss of an industrial base, lower gas prices due to surge in gas supply from unconventional sources, and an increase in supply of zero marginal cost renewable wind and solar power, particularly in Arizona.  In addition to energy margins, New York generators in 2011 and 2012 experienced lower and more volatile capacity prices due to a surge in demand side management resources and imports from other regions.

31.      The lower energy and capacity margins in the spot market also drove down the forward energy markets making hedging forward margins less attractive than in past years.  With

lower spot markets and lower forward markets, the value of generation assets have declined since pre-recession levels.

32.     Due to the challenging operating environment that has adversely impacted both MACH Gen and its competitors, MACH Gen has experienced a significant decline in its operating revenues since 2009, despite the advanced capabilities of the Facilities.  Specifically, MACH Gen's consolidated annual operating revenues have declined from approximately $452 million in 2009 to $347 million in 2012, and operating income declined from a profit of $22 million to a loss of $16 million during the same period.  At the same time, MACH Gen has faced significant interest expenses due to the leveraged nature of its balance sheet, which, in combination with declining revenues, has impacted MACH Gen's ability to service its long-term debt.

33.     In attempts to address these issues, MACH Gen took a number of actions, including efforts to significantly reduce overall future interest expenses.  In furtherance of these efforts, in February 2012, MACH Gen refinanced its then-existing first lien credit agreement.  In June 2012, MACH Gen engaged in additional refinancing, entering into a transaction whereby certain of MACH Gen's then-existing second lien lenders chose to tender certain term loans outstanding under the then-existing second lien credit agreement in exchange for cash at a discount to par using the proceeds of the First Lien Term Loan.

34.     In addition, in the latter half of 2012, MACH Gen explored a potential sale of the Harquahala Facility or the membership interests in New Harquahala, the proceeds of which would be used, among other things, to reduce MACH Gen's long-term debt-load and debt-service expenses.  In connection with these efforts, MACH Gen retained a financial advisor and engaged in a marketing process, which culminated in MACH Gen's entry into a purchase and

sale agreement with Saddle Mountain Power, LLC, pursuant to which it would purchase 100% of

MACH Gen LLC's equity interests in New Harquahala (the "Proposed Sale").  In October 2012,

the parties filed an application with FERC seeking approval of the Proposed Sale.  On March 7,

2013, a panel of FERC Commissioners issued an order denying regulatory approval of the

Proposed Sale.  In light of this decision, the Proposed Sale could not be consummated, and the

benefits thereof were not realized by MACH Gen.

35.    *RSA and Plan*.  Subsequent to that time, MACH Gen has continued to explore

various alternatives to effectively resolve its balance sheet and address potential future liquidity

constraints.  In connection with this process, MACH Gen entered into discussions in late 2013

with certain of its key stakeholders regarding a comprehensive solution to its balance sheet and

related liquidity issues.  These efforts culminated in MACH Gen's entry into that certain

Restructuring Support Agreement, dated as of January 15, 2014 (the "RSA"), with all of the First

Lien Lenders, in excess of 75% of the Second Lien Lenders, and in excess of 85% of the holders

of the equity interests in MACH Gen, LLC.

36.    The RSA contemplates the consensual restructuring of MACH Gen pursuant to

the Plan, which will, among other things, significantly reduce MACH Gen's long-term liabilities

by approximately $1 billion, improve its overall financial condition and creditworthiness, and

ensure MACH Gen's continued operations as a competitively-positioned going concern.

Pursuant to the Plan, all of the Second Lien Lenders' claims will be exchanged for 93.5% of the

equity interests in reorganized MACH Gen, with existing equity holders retaining 6.5% of the

equity interests in reorganized MACH Gen.  In connection with the RSA, the First Lien Lenders

agreed to (i) provide MACH Gen with immediate access to an additional $40 million in

committed principal amount under the First Lien Revolver, as described above, continuing

Case 14-10461-MFW    Doc 4    Filed 03/03/14    Page 13 of 38

throughout these chapter 11 cases in the form of postpetition debtor-in-possession financing and, (ii) following consummation of the Plan, have the debtor-in-possession financing and First Lien Term Loan rolled into a new first lien exit facility on a dollar-for-dollar basis, with the total exit revolving commitment being reduced by $40 million sixty (60) days after the effective date of the Plan.

37.     _Solicitation_.  In accordance with the RSA, on January 21, 2014, MACH Gen began soliciting votes on the Plan by instructing its voting agent, Prime Clerk LLC ("Prime Clerk"), to distribute a solicitation package containing the Disclosure Statement, including the Plan and other exhibits thereto, and one or more ballots, as applicable, to each holder of an impaired claim or interest[4] – i.e. the First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Claims, and Interests in MACH Gen, LLC (each as defined in the Plan) – determined as of the voting record date selected by MACH Gen, January 15, 2014.

38.     Following the occurrence of the voting deadline on February 19, 2014, Prime Clerk informed MACH Gen that the overwhelming majority of solicited holders had timely submitted a ballot and that each impaired class had voted unanimously to accept the Plan:[5]

| Class | | Timely received ballots | | Percentage of timely received ballots | |
|---|---|---|---|---|---|
| | | Accepting _(% of total solicited)_ | Rejecting | **Accepting** | **Rejecting** |
| **First Lien Revolver Claims** | $ amount[6] | $200,000,000.00 _(100%)_ | None | **100%** | **0%** |
| | # of holders | 2 _(100%)_ | None | **100%** | **0%** |

---

[4]     I understand from my discussions with MACH Gen's advisors that none of the Plan's impaired classes are deemed to have rejected the Plan for purposes of the Bankruptcy Code.  Accordingly, MACH Gen directed Prime Clerk to solicit votes on the Plan from all holders of impaired claims and interests, and only holders of claims and interests in the Plan's unimpaired classes did not receive a solicitation package for the Plan.

[5]     In accordance with the prepetition solicitation procedures, because the Plan is considered a separate chapter 11 plan with respect to each MACH Gen Entity, the votes in each class, other than Interests in MACH Gen, LLC, were counted with respect to each MACH Gen Entity's chapter 11 plan.

[6]     The amount indicated for the First Lien Revolver Claims reflects the total loan commitment, including both outstanding and undrawn amounts as of the voting record date.

| Class | | Timely received ballots | | Percentage of timely received ballots | |
|---|---|---|---|---|---|
| | | Accepting *(% of total solicited)* | Rejecting | **Accepting** | **Rejecting** |
| **First Lien Term Loan Claims** | $ amount | $483,209,285.14 *(100%)* | None | **100%** | **0%** |
| | # of holders | 2 *(100%)* | None | **100%** | **0%** |
| **Second Lien Claims** | $ amount | $907,149,530.54 *(90%)* | None | **100%** | **0%** |
| | # of holders | 44 *(81%)* | None | **100%** | **0%** |
| **Interests in MACH Gen, LLC** | # of units | 963,994 units *(96%)* | None | **100%** | **0%** |
| | # of holders | 18 *(72%)* | None | **100%** | **0%** |

39.     Contemporaneously herewith, MACH Gen is filing a motion, described in greater detail below, seeking entry of (i) an order approving the Disclosure Statement, approving MACH Gen's prepetition solicitation of the Plan, and confirming the Plan, and (ii) an order scheduling a combined hearing with respect to such relief, with the goal of emerging from these chapter 11 cases as soon as practicable following the anticipated receipt of applicable regulatory approvals and, in any case, within the milestones contemplated by the RSA.

## V.     First Day Pleadings

40.     Concurrently with its chapter 11 petitions, MACH Gen is filing the following First Day Pleadings:

a.     MACH Gen's Motion for Entry of Order Directing Procedural Consolidation and Joint Administration of Chapter 11 Cases ("Joint Administration Motion");

b.     MACH Gen's Motion for Entry of Order Authorizing MACH Gen to File Consolidated List of Creditors in lieu of Submitting Separate Mailing Matrix for Each MACH Gen Entity ("Creditor Matrix Motion");

c.     MACH Gen's Application for Entry of Order Authorizing Employment and Retention of Prime Clerk LLC as Claims and Noticing Agent, Effective *Nunc Pro Tunc* to the Petition Date ("Prime Clerk Application");

d.     MACH Gen's Motion for Entry of Interim and Final Orders (i) Authorizing MACH Gen to (a) Continue Operating Cash Management System, (b) Honor

Certain Prepetition Obligations Related Thereto, (c) Maintain Existing
Business Forms, and (d) Continue Performing Intercompany Transactions,
and (ii) Extending Time to Comply with Section 345(b) of Bankruptcy Code
("Cash Management Motion");

e.   MACH Gen's Motion for Entry of Order Authorizing MACH Gen to Pay
Unpaid Prepetition Premiums Associated with Prepetition Insurance Policies
in Ordinary Course of Business ("Insurance Motion");

f.   MACH Gen's Motion for Entry of Interim and Final Orders (i) Determining
Adequate Assurance of Payment for Future Utility Services, (ii) Prohibiting
Utility Companies from Altering, Refusing, or Discontinuing Services, and
(iii) Establishing Procedures for Determining Adequate Assurance of Payment
("Utilities Motion");

g.   MACH Gen's Motion for Entry of Order Authorizing MACH Gen to Remit
and Pay Certain Prepetition Taxes, Governmental Assessments, and Fees
("Taxes Motion");

h.   MACH Gen's Motion for Entry of Interim and Final Orders Authorizing
Payment of Certain Prepetition Claims in Ordinary Course of Business ("All-
Trade Motion");

i.   MACH Gen's Motion for Entry of (i) Order (a) Scheduling Combined
Hearing on Adequacy of Disclosure Statement and Confirmation of Plan,
(b) Approving Form and Manner of Notice of Combined Hearing and
Commencement of Chapter 11 Cases, (c) Establishing Procedures for
Objecting to Disclosure Statement or Plan, and (d) Conditionally Waiving
Requirement to File Statements and Schedules, and (ii) Order (a) Approving
Prepetition Solicitation Procedures, (b) Approving Adequacy of Disclosure
Statement, and (c) Confirming Plan ("Scheduling and Confirmation Motion");
and

j.   MACH Gen's Motion for Interim and Final Orders (i) Authorizing MACH
Gen to Obtain Postpetition Financing, (ii) Authorizing Use of Cash Collateral,
(iii) Granting Liens and Super-Priority Claims, and (iv) Granting Adequate
Protection to Prepetition Secured Lenders ("DIP Motion").

41.    As noted above, the relief sought in the various First Day Pleadings would allow

MACH Gen to, among other things, (i) establish certain administrative procedures to promote a

seamless transition into and through chapter 11, (ii) ensure the continuation of its business

operations and cash management system without interruption, (iii) obtain debtor-in-possession

financing and use cash collateral in the operation of MACH Gen's businesses, (iv) preserve

valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired by these chapter 11 cases; and (v) schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of MACH Gen's prepetition solicitation procedures, and confirmation of the Plan.

42.     I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe MACH Gen would suffer immediate and irreparable harm absent the ability to continue its business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to MACH Gen's efforts to reorganize through these chapter 11 cases efficiently and with minimized disruptions to its business operations, thereby permitting MACH Gen to preserve and maximize value for the benefit of all stakeholders and successfully emerge from chapter 11 as a more competitively-positioned going concern.

43.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am told by MACH Gen's advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, MACH Gen has limited its requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to MACH Gen and its estates.  Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

44.     Any capitalized term used in this Part V but not defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

### a.  Joint Administration Motion

45.     MACH Gen seeks entry of an order directing the procedural consolidation and joint administration of these chapter 11 cases.  Specifically, MACH Gen requests that the Court maintain one file and one docket for all of the jointly-administered cases under the case of MACH Gen, LLC, and that each of the MACH Gen Entities' chapter 11 cases be administered under a consolidated caption.  MACH Gen further requests that the Court determine that the consolidated caption satisfies the requirements set forth in section 342(c)(1) of the Bankruptcy Code.  MACH Gen also requests that an entry be entered on the docket of each of the MACH Gen Entities' chapter 11 cases, other than the chapter 11 case of MACH Gen, LLC, to reflect the joint administration of these chapter 11 cases.

46.     Given the integrated nature of MACH Gen's operations and the fact that the MACH Gen Entities have jointly proposed a prepackaged chapter 11 plan, I believe joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each MACH Gen Entity.  I believe the entry of an order directing the joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

47.     Moreover, I do not believe joint administration will adversely affect the MACH Gen Entities' respective constituencies, because MACH Gen seeks only administrative, not substantive, consolidation of MACH Gen's estates.  I believe parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with joint administration.

### b.  Creditor Matrix Motion

48.     MACH Gen seeks entry of an order authorizing MACH Gen to file a consolidated list of creditors in lieu of a separate mailing matrix for each MACH Gen Entity.

49.     I believe that requiring MACH Gen to segregate and convert its computerized records to an entity-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.  Further, because of the prepackaged nature of these chapter 11 cases and MACH Gen's planned short stay in bankruptcy, I do not believe that any party in interest will be prejudiced or otherwise materially impacted.

### c.  Prime Clerk Application

50.     MACH Gen seeks entry of an order authorizing the employment and retention of Prime Clerk as the Claims and Noticing Agent in MACH Gen's chapter 11 cases, effective nunc pro tunc to the Petition Date, as set forth in section 156(c) of the Judicial Code and the proposed order.

51.     MACH Gen has obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Based on all engagement proposals obtained and reviewed, MACH Gen determined that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

52.     MACH Gen anticipates that there will be in excess of 2,000 entities to be noticed. In view of the number of anticipated claimants and the complexity of MACH Gen's businesses, I believe that the appointment of Prime Clerk is both necessary and in the best interests of MACH Gen's estates and creditors because MACH Gen will be relieved of the burdens associated with the Claims and Noticing Services.  Accordingly, MACH Gen will be able to devote their full

attention and resources to maximize value for its stakeholders and facilitate the orderly administration of these chapter 11 cases.

53.     Pursuant to MACH Gen's request, Prime Clerk has agreed to serve in its capacity as Claims and Noticing Agent from the Petition Date with assurances that MACH Gen would seek approval of its employment and retention, effective nunc pro tunc to the Petition Date, so that Prime Clerk may be compensated for its pre-application services.  I believe that no party in interest will be prejudiced by the granting of the nunc pro tunc employment, because Prime Clerk will provide valuable services to MACH Gen's estates in the interim period.

### d. Cash Management Motion

54.     MACH Gen seeks entry of interim and final orders:  (i) authorizing MACH Gen to (a) continue operating the Cash Management System, (b) honor the Prepetition Bank Fees, (c) maintain existing business forms, and (d) continue performing Intercompany Transactions consistent with historical practice; and (ii) extending the time to comply with section 345(b) of the Bankruptcy Code.  In addition, MACH Gen requests that the Court grant administrative expense priority to all payments between or among the MACH Gen Entities on account of a postpetition Intercompany Transaction.

55.     In the ordinary course of its business, MACH Gen uses a cash management system to collect, transfer, and disburse funds generated from its operations, and to facilitate cash monitoring, forecasting, and reporting (the "Cash Management System"), comparable to the centralized systems used by similarly-situated companies to manage the cash of several operating units in a cost-effective, efficient manner.

56.     The Cash Management System comprises 29 deposit, disbursement and investment accounts maintained by MACH Gen (collectively, the "Bank Accounts") at multiple banking and financial institutions (collectively, the "Banks").

57.    The flow of funds among the Bank Accounts is subject to the terms of that certain Security Deposit Agreement, dated as of December 5, 2006, by and among MACH Gen, LLC as Borrower, the other MACH Gen Entities as Guarantors, CLMG Corp. as First Lien Collateral Agent, the Bank of New York Mellon as Second Lien Collateral Agent, and Citibank, N.A. as Depositary (as amended, the "Security Deposit Agreement").

58.    Pursuant to the Security Deposit Agreement, all revenues and cash receipts generated by the MACH Gen Entities, including, without limitation, from the sale of power, capacity or electrical energy, the resale of fuel, interest and other income earned on amounts in the Bank Accounts or proceeds from positive financial settlements under hedging arrangements, are ultimately deposited into the Revenue Account, which functions as MACH Gen's primary operating account.  In addition, subject to certain exceptions, borrowings under MACH Gen's secured credit facilities generally enter the Cash Management System by way of wire transfers into the Revenue Account.

59.    On a periodic basis, funds from the Revenue Account are electronically transferred to other Bank Accounts as directed by a withdrawal certificate delivered by MACH Gen, LLC to the First Lien Collateral Agent, the Second Lien Collateral Agent, and the Depositary under the Security Deposit Agreement, including, without limitation, into special purpose accounts, such as the Debt Service Accounts, the Debt Service Reserve Account, the Prepayment Account and the O&M Account.

60.    The O&M Account is the primary account from which MACH Gen funds costs relating to the maintenance, administration and operation of the Facilities.  Costs funded from the O&M Account include, without limitation, major maintenance expenses, expenses under long-term service and spare parts agreements, fuel costs, transmission costs, taxes and fees, payments

under MACH Gen's asset management and energy management agreements, payments under leases, personnel costs, insurance costs, and other expenses incurred in the ordinary course of MACH Gen's business (collectively, "O&M Costs").  In addition, transfers from the O&M Account are made into the Local Accounts maintained in connection with each of the Facilities, as directed by a withdrawal certificate.  Funds in the Local Accounts may be used to fund O&M Costs, state and local taxes and certain repair, rebuilding or restoration costs for the associated Facility.  The balance on deposit in any Local Account may not exceed $1 million at any time, and transfers into each account are limited to an aggregate of $1 million in any calendar month.

61.     On a nightly basis, any funds remaining in the non-Local Accounts are swept into corresponding Overnight Investment Accounts.  The Overnight Investment accounts currently invest solely in the GS Financial Square Prime Obligations Fund, Administration Class (463), a fund that primarily invests in US asset-backed commercial paper and in short term debt obligations of the United States government.

62.     MACH Gen's personnel maintain daily oversight over the Cash Management System and implement cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions among the MACH Gen Entities. Additionally, MACH Gen's personnel regularly reconcile MACH Gen's books and records to ensure that all transfers are accounted for properly.

63.     In the ordinary course of business, the Banks charge, and MACH Gen pays, honors, or allows the deduction from the appropriate Bank Accounts, certain service charges, and other fees, costs, and expenses (collectively, the "Bank Fees").  During 2013, MACH Gen estimates that it paid approximately $5,870 in Bank Fees on average each month, depending on transaction volume.  MACH Gen estimates that there was approximately $10,200 in prepetition

Bank Fees outstanding on the Petition Date (collectively, with any other prepetition Bank Fees for prepetition transactions that are charged postpetition, the "Prepetition Bank Fees").  MACH Gen's inability to pay the Prepetition Bank Fees or to continue to pay the Bank Fees in the ordinary course of business postpetition could hinder its ability to manage the Cash Management System to the detriment of MACH Gen's estates.

64.     MACH Gen utilizes numerous preprinted business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, invoices, and checks), including in connection with its Cash Management System.  I understand from my discussions with MACH Gen's advisors that MACH Gen would be required under the U.S. Trustee Guidelines to incur the expense and delay of ordering entirely new business forms referencing the MACH Gen Entities' status as debtors in possession absent relief from the Court.  I believe MACH Gen's continued ability to use its pre-existing business forms without such a reference would minimize expenses to its estates.

65.     In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between certain MACH Gen Entities, at any given time there may be intercompany claims owing by one MACH Gen Entity to another.

66.     MACH Gen tracks all fund transfers in its accounting system and can ascertain, trace, and account for all intercompany transactions (the "Intercompany Transactions").  Items recorded in the intercompany accounts include: (a) receivables from the asset manager invoices; (b) cash deposits; (c) insurance payments; and (d) draw requests.  Under the current systems, MACH Gen will be able to track and segregate postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and MACH

Gen's operations would be unnecessarily disrupted, to the detriment of MACH Gen and its estates.

67.    I understand from MACH Gen's advisors that the U.S. Trustee Guidelines require a debtor in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.  Given that MACH Gen's business and financial affairs require the collection, disbursement, and movement of funds through its 29 Bank Accounts, enforcement of this provision of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt MACH Gen's operations.

68.    Continued use of the Cash Management System will facilitate MACH Gen's chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  I do not believe that parties in interest will be harmed by the maintenance of the existing Cash Management System because MACH Gen employs appropriate mechanisms and internal control procedures to prevent unauthorized payments on account of obligations incurred before the Petition Date.  As such, I believe maintaining the Cash Management Systems is in the best interests of MACH Gen's estates.

69.    In the ordinary course of business, MACH Gen conducts transactions through electronic wire transfers and other similar methods.  In addition, MACH Gen's customer receipts are routinely received through wire transfer payments.  If MACH Gen's ability to conduct

transactions by debit, wire, ACH transfer, or other similar methods is impaired, MACH Gen may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, and its estates will incur additional and unnecessary costs.

70.     I do not believe that parties in interest will be prejudiced if MACH Gen is authorized to continue to use its business forms, substantially in the form existing immediately before the Petition Date, because parties doing business with the MACH Gen Entities will likely be aware of their status as debtors in possession and, thus, changing business forms would be unnecessary and unduly burdensome.

71.     Based on my discussions with MACH Gen's advisors, I believe the benefits of extending MACH Gen's time to comply with section 345(b) of the Bankruptcy Code by sixty (60) days (or such further time as the U.S. Trustee may agree) will outweigh any harm to MACH Gen's estates.  During the extension period, MACH Gen will contact each Bank that is a party to a Uniform Depository agreement with the U.S. Trustee, provide such Banks with each of the MACH Gen Entities' tax identification numbers, and identify each of its Bank Accounts at such Banks as being held by a debtor in possession.  For Banks that are not party to a Uniform Depository agreement with the U.S. Trustee, MACH Gen will use its good-faith efforts to cause such Banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee. MACH Gen's deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds deposited or invested, taking into account the safety of such deposits and investments.  MACH Gen operates sophisticated businesses that are highly regulated at the federal, state, and local levels, and MACH Gen holds its funds at reputable, stable banking institutions and monitor their cash flows and position on a daily basis.

72.     Requiring MACH Gen to modify its Cash Management System to strictly adhere with the deadline to comply with the requirements established by section 345(b) of the Bankruptcy Code will only distract the company's management, slow MACH Gen's forward-motion, and cause its estates to incur potentially substantial costs unnecessarily to the detriment of creditors, all while MACH Gen is preparing to prosecute a prepackaged plan with substantial support.

73.     MACH Gen tracks (and will continue to track) all fund transfers in its accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and MACH Gen's business would be disrupted to the detriment of MACH Gen's estates.  Accordingly, MACH Gen respectfully submits that the continued performance of Intercompany Transactions in the ordinary course is in the best interest of  its estates and, therefore, MACH Gen should be permitted to continue such performance without need for further Court order.

    e.  **Insurance Motion**

74.     MACH Gen seeks entry of an order authorizing, but not directing, MACH Gen to pay any unpaid prepetition premiums associated with the prepetition Insurance Policies in the ordinary course of business, effective nunc pro tunc to the Petition Date.

75.     In the ordinary course of business, MACH Gen maintains approximately 22 insurance policies that were obtained from multiple third-party insurance carriers (collectively, the "Insurance Carriers").  These policies provide coverage for, among other things, MACH Gen's property, general liability, automobile liability, pollution, terrorism, umbrella coverage, directors' and officers' coverage, and excess liability (each an "Insurance Policy," and collectively, the "Insurance Policies").  For the twelve (12) months ended December 31, 2013,

the total annual premiums due under the Insurance Policies were approximately $6.3 million for

MACH Gen.

76.     MACH Gen does not finance any premium payment(s) owed on the Insurance

Policies through a premium financing program.  It is MACH Gen's business practice to pay the

entire premium owed on each Insurance Policy as it becomes due upon binding of the Insurance

Policy.

77.     Continuation of the Insurance Policies is essential to the preservation of the value

of MACH Gen's business, properties, and assets.  Moreover, I have been advised that, in many

cases, coverage provided by the Insurance Policies is required by the regulations, laws, and

contracts that govern MACH Gen's commercial activities, including the operating guidelines

issued by the Office of the United States Trustee for the District of Delaware.  Given this

backdrop, I believe that it is essential that MACH Gen be able to maintain the Insurance Policies,

including by paying any associated premiums that are unpaid as of the Petition Date, assume its

policies in the ordinary course of its business, and amend, revise, extend, supplement, change,

and enter into new insurance coverage needed in its business judgment without obtaining further

order of the Court.

78.     I believe failure to maintain the Insurance Policies would have a material adverse

effect on MACH Gen's businesses and the value of its estates.

79.     I submit that the relief requested is particularly appropriate where, as in MACH

Gen's case, a debtor has solicited and received unanimous support for a prepackaged chapter 11

plan that (if confirmed) would provide for all unpaid prepetition premiums to be paid in full,

irrespective of how such premiums are ultimately classified (e.g., as general unsecured claims,

administrative expenses, or priority claims).  Thus I believe, at most, the relief requested would

only affect the timing of the payments and not the amounts that are ultimately paid.

   **f.   Utilities Motion**

80.    MACH Gen seeks entry of an interim order and a final order:  (i) determining

adequate assurance of payment for future utility services; (ii) prohibiting utility companies from

altering, refusing, or discontinuing services; and (iii) establishing procedures for determining

adequate assurance of payment.

81.    In connection with the operation of its business, MACH Gen obtains electricity,

telephone, water, waste disposal, and other similar services (collectively, the "Utility Services")

from a number of utility companies or their brokers (collectively, the "Utility Companies").

82.    To the best of MACH Gen's knowledge, there are no defaults or arrearages with

respect to MACH Gen's undisputed invoices for prepetition Utility Services.  On average,

MACH Gen pays approximately $240,000 each month for third party Utility Services, calculated

as a historical average over a twelve-month period.  Accordingly, MACH Gen estimates that its

cost for Utility Services during the next thirty (30) days (not including any deposits to be paid)

will be approximately $240,000.  To the best of my knowledge, only one Utility Company holds

a deposit.  Arizona Public Service, which provides electricity services to one of the Facilities,

currently holds a deposit in the amount of $149,000.  Further, under certain for the current utility

contracts, two Utility Companies are prepaid for Utility Services.

83.    MACH Gen intends to pay postpetition obligations owed to the Utility Companies

in a timely manner.  I believe cash held by MACH Gen and the cash generated in the ordinary

course of business will provide sufficient liquidity to pay MACH Gen's Utility Service

obligations in accordance with prepetition practice.

84.     To provide additional assurance of payment, MACH Gen proposes to deposit into a bank account $120,000 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of MACH Gen's approximate monthly payment for all Utility Services, calculated based on MACH Gen's historical average expenses over a twelve-month period.  The Adequate Assurance Deposit will be held in the account for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies.  Based on my discussions with MACH Gen's advisors, I believe that the Adequate Assurance Deposit, in conjunction with MACH Gen's ability to pay for future utility services in accordance with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

85.     I believe the Utility Companies are adequately assured against any risk of nonpayment for future services.  The Adequate Assurance Deposit, coupled with MACH Gen's ongoing ability to meet obligations as they come due in the ordinary course, provides assurance of MACH Gen's payment of its future obligations.  Moreover, termination of the Utility Services could seriously hamper MACH Gen's electric generation capabilities.

### g.  Taxes Motion

86.     MACH Gen seeks entry of an order authorizing, but not directing, MACH Gen to remit and pay certain prepetition taxes, governmental assessments, and fees.

87.     In the ordinary course of business, MACH Gen incurs franchise taxes and fees, property taxes, and other taxes, fees, assessments, and charges described in this Motion (collectively, the "Taxes and Fees").  MACH Gen remits the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Governmental Authorities").  Taxes and Fees are remitted and paid by MACH Gen through

checks and electronic transfers that are processed through its banks and other financial institutions.  MACH Gen estimates that approximately $1.5 million in Taxes and Fees relating to the prepetition period will become due and owing to the Governmental Authorities after the Petition Date.

88.      MACH Gen incurs federal and state income tax liability in the ordinary course. MACH Gen is required to remit the federal and state income taxes to the relevant Governmental Authorities on a periodic basis.  MACH Gen estimates that approximately $100,000 in federal and state income tax relating to the prepetition period will become due and owing after the Petition Date.

89.      MACH Gen also incurs state and local taxes imposed on the purchase of certain out-of-state goods and services and various other state or local taxes, charges, fines, penalties, and fees, including, without limitation, any amounts required to be incurred, or collected pursuant to applicable law ("Other Charges").  MACH Gen is required to remit the Other Charges to the relevant Governmental Authorities on a periodic basis.  MACH Gen estimates that approximately $100,000 in Other Charges relating to the prepetition period will become due and owing after the Petition Date.

90.      MACH Gen has property tax obligations to Governmental Authorities for its real and personal property holdings (the "Property Taxes").  MACH Gen estimates that approximately $1.3 million in Property Taxes relating to the prepetition period will become due and owing after the Petition Date.

91.      MACH Gen's ability to pay the Taxes and Fees is critical to its continued and uninterrupted operations.  If certain Taxes and Fees remain unpaid, Governmental Authorities may seek to recover such amounts directly from MACH Gen's directors or officers, thereby

distracting them from the administration of MACH Gen's chapter 11 cases.  I believe any

collection action on account of such claims, and any ensuing liability, would distract MACH Gen

to the detriment of all parties in interest.  I believe the dedicated and active participation of

MACH Gen's officers and personnel operating the Facilities and in steering MACH Gen through

this prepackaged plan process is integral to MACH Gen's continued operations, essential to

MACH Gen's orderly administration and, ultimately, the success of the Plan.  Moreover, because

these claims will be paid in full if the Plan is confirmed, only the timing of the payments is at

stake.

> **h.  All-Trade Motion**

92.      MACH Gen seeks entry of an interim order and a final order authorizing, but not

directing, the payment of the liquidated, noncontingent, and undisputed prepetition Payable

Claims of the Prepetition Creditors who will be treated as unimpaired for purposes of the Plan

and permitted payment in full in cash, including trade vendors, common carriers, and service

providers, as they come due in the ordinary course of business.

93.      In the ordinary course of its business, MACH Gen incurs numerous obligations to

various creditors that provide MACH Gen with a variety of resources and services that are

necessary for the continued operation of MACH Gen's business.  MACH Gen estimates that, as

of the Petition Date, it owes a total of approximately $1,150,090 on account of liquidated,

noncontingent, and undisputed prepetition claims (the "Payable Claims") of third-party creditors

who will be treated as unimpaired for purposes of the Plan,[7] including, without limitation, trade

---

[7]      MACH Gen believes that the only unimpaired claims outstanding as of the Petition Date are, and that all
Payable Claims constitute, "General Unsecured Claims" (as defined in the Plan).  See Section I.B. of the
Disclosure Statement, "Summary of Classification and Estimated Recoveries of Claims and Interests Under
Plan."  Nonetheless, the relief sought in the All-Trade Motion is with respect to all Payable Claims, irrespective
of any Payable Claim's actual or deemed classification under the Plan, so long as such Payable Claim's status
as unimpaired and entitlement to payment in full in cash under the Plan is not in dispute – i.e., as a General

vendors, common carriers, and service providers (the "Prepetition Creditors").[8]  Further, MACH

Gen estimates that an additional $2,638,000 in Payable Claims will become due and owing

during the pendency of these chapter 11 cases.  MACH Gen seeks authority to pay the Payable

Claims as they become due in the ordinary course of MACH Gen's business.

94.      Given the highly regulated industry in which MACH Gen operates its business, I

believe it is essential that MACH Gen maintain and develop relationships with certain vendors

that supply unique or essential resources and services to MACH Gen, especially given the

remoteness of the location of some of the Facilities.  I believe authorization to pay the Payable

Claims in the ordinary course of business is necessary in order to minimize disruption to MACH

Gen's operations and to ensure uninterrupted operations and to allow for a seamless transition

through these chapter 11 cases, for the benefit of all parties in interest.

95.      Moreover, MACH Gen has solicited and received from each of the classes

impaired under the Plan unanimous acceptance for the Plan.  In light of the overwhelming

support for the Plan demonstrated by its stakeholders, I am optimistic that the Plan will be

confirmed within 60 days of the Petition Date.  Because the Payable Claims are unimpaired

under the Plan, the relief requested would merely expedite the treatment and distribution to the

Prepetition Creditors that they would otherwise be entitled to receive upon consummation of the

Plan.  Given the strong likelihood that holders of the Payable Claims will be paid in full anyway,

I believe the mere timing difference is warranted in order to avoid the risk of deteriorating

relationships with suppliers, vendors and others.

---

Administrative Expense, Priority Non-Tax Claim, Other Secured Claim, or General Unsecured Claim (each as defined in the Plan).

[8]      For the avoidance of doubt, the scope of the All-Trade Motion and the relief requested therein does not apply to any prepetition claim for which MACH Gen seeks authority to pay pursuant to a separate "first-day" motion filed by MACH Gen; such claims shall not be considered "Payable Claims" for purposes of the All-Trade Motion.

96.     I believe the relief sought is vital for MACH Gen's successful reorganization.  If MACH Gen cannot pay the Prepetition Creditors, the negative impact would be almost immediate.  I believe certain of the Prepetition Creditors, on whom MACH Gen depends, would immediately withdraw services and cease to provide necessary resources.  Such an occurrence would impair a successful reorganization and hamper viability following MACH Gen's emergence from chapter 11.  The uninterrupted supply of resources and services, on current trade terms, and the continuing support of its vendors, are imperative to the ongoing operations and viability of MACH Gen.

97.     I believe the relief requested preserves the value of MACH Gen's estates by: (i) ensuring that MACH Gen has access to the resources and services that it needs to continue operations and (ii) enabling MACH Gen to maintain good relationships with the Prepetition Creditors; which inure to the benefit of the reorganized MACH Gen Entities when they emerge from chapter 11.

98.     So long as the Prepetition Creditors agree to continue supplying MACH Gen postpetition under current trade terms, I believe MACH Gen will avoid unnecessary expense during these chapter 11 cases.  Current trade terms will help MACH Gen maintain its liquidity and will facilitate its ability to sustain operations while reorganizing.  I believe such terms also allow MACH Gen to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for numerous vendors that might require cash in advance or shorten their trade terms to less than a week.

99.     I believe paying the Payable Claims in the ordinary course of business renders a benefit to MACH Gen's estates both monetarily and operationally by preserving liquidity and enabling MACH Gen to operate smoothly during these chapter 11 cases.  Further, because the

Payable Claims are unimpaired under the Plan, the relief requested simply provides the treatment

the Payable Claims are entitled to under the Plan on an expedited timetable.  Because MACH

Gen hopes to reorganize as efficiently as possible and minimize its duration in chapter 11, I

believe that under these circumstances, approval of the requested relief is appropriate and

necessary.

100.    Given the backdrop of these prepackaged chapter 11 cases, I believe the relief

requested is appropriate inasmuch as such relief will enable MACH Gen to move towards

expeditious confirmation of the widely-supported Plan with the least possible disruption or harm

to its business.  I believe that no parties in interest will be prejudiced by the relief requested, as

the Payable Claims are limited to claims that are to be unimpaired under the Plan.  I believe the

relief requested merely expedites the treatment and distribution that is afforded to Payable

Claims under the Plan and protects MACH Gen's business and preserve the value of MACH

Gen's estates.  Based on the foregoing, I believe the relief requested is necessary and

appropriate, is in the best interests of its estates and creditors, and should be granted in all

respects.

### i.    Scheduling and Confirmation Motion

101.    MACH Gen seeks entry of the Scheduling Order:

(a)    scheduling the Combined Hearing on the adequacy of the Disclosure Statement and confirmation of the Plan;

(b)    approving the form and manner of the Combined Notice of the Combined Hearing and commencement of these chapter 11 cases;

(c)    establishing the procedures for objecting to the adequacy of the Disclosure Statement or to confirmation of the Plan; and

(d)    conditionally waiving the requirement that MACH Gen file the Schedules and Statements.

102.    Specifically, MACH Gen requests that the Court schedule certain key dates and deadlines related to the Combined Hearing consistent with the following proposed schedule:

| Key Dates and Deadlines | Proposed Schedule |
|---|---|
| Deadline to mail Combined Notice | March 7, 2014 |
| Objection Deadline | April 4, 2014 |
| Combined Hearing | April 10, 2014 |
| Deadline for Schedules and Statements (only if Confirmation Order has not been entered)[9] | May 17, 2014 |

103.    Based on my discussions with MACH Gen's advisors, I believe that a combined hearing is appropriate in these chapter 11 cases.  First, a combined hearing will promote judicial economy.  Second, an expedient chapter 11 process will maximize the benefits of MACH Gen's restructuring to its stakeholders, by (a) enabling MACH Gen to minimize any adverse effects the chapter 11 filings may have upon MACH Gen's businesses and going-concern value, (b) allowing for prompt distributions, and (c) minimizing administrative expenses to its estates.

104.    MACH Gen seeks to move these chapter 11 cases forward as expediently as possible.  I believe setting the Combined Hearing no later than approximately April 10, 2014 will maximize the likelihood that the Confirmation Order will have become final and non-appealable under Bankruptcy Rule 8002 by the time all other conditions to consummation of the Plan are expected to be satisfied,[10] enabling MACH Gen to promptly consummate the terms of the Plan,

---

[9]    As discussed below, MACH Gen is requesting that the Scheduling Order provide that MACH Gen be permanently excused from filing the Schedules and Statements to the extent the Confirmation Order is entered on or before the deadline for such filing (as extended by the Scheduling Order).

[10]    As indicated in the Plan, regulatory approval from the New York State Public Service Commission (the "Commission") is required as a condition to consummation of the Plan.  See Article X.B.4 of Plan.  MACH Gen has requested that the Commission consider MACH Gen's application at the Commission's session meeting on April 24, 2014.  MACH Gen expects that all other conditions to consummation, including approval from the

minimize the disruption to MACH Gen's business, and avoid the costs and business risks

associated with a more protracted chapter 11 process.

105.    MACH Gen's significant stakeholders, who voted to accept the Plan,

overwhelmingly support scheduling the Combined Hearing as soon as possible.  While MACH

Gen does not expect objections given the broad support among MACH Gen's stakeholders for

the Plan and the fact that many classes are unimpaired, I believe the proposed period of time

within which to object to the Disclosure Statement or Plan will provide parties in interest with

ample time to file objections, to the extent they wish to do so.

106.    I believe that the proposed manner of distributing the Combined Notice will

provide adequate notice of the time for filing and serving objections to, and the date and time of

the hearing on, the adequacy of the Disclosure Statement or confirmation of the Plan, and,

accordingly, MACH Gen is requesting that the Court approve such manner of notice as adequate.

107.    I believe that the proposed schedule for the Combined Hearing, including the

establishment of the Objection Deadline, is in the best interests of all parties in interest in these

chapter 11 cases.  This schedule is intended to minimize the disruption to MACH Gen's

businesses and avoid the costs associated with lengthy chapter 11 proceedings.

108.    As noted above, MACH Gen has already negotiated and solicited the Plan, which

provides for all holders of allowed general unsecured claims (and other non-voting claims) to be

paid in full, and all holders who voted on the Plan have voted unanimously to accept the Plan.

Based on my discussions with MACH Gen's advisors, I believe these chapter 11 cases are likely

to result in a widely supported, confirmed Plan in short order and that no bar date for filing

proofs of claim will be necessary.  Preparation and filing of the Schedules and Statements would

---

Federal Energy Regulatory Commission, will have been satisfied or will be capable of immediate satisfaction by such date.

require MACH Gen to expend considerable time and resources, which expenses would have

been unnecessary if MACH Gen is able to have the Plan confirmed on its intended timetable and

ultimately excused from filing the Schedules and Statements.  I believe no harm to other parties

in interest will be engendered by a conditional waiver of the requirement to file the Schedules

and Statements or an extension of the deadline for the Schedules and Statements to May 17,

2014 should the Plan not be confirmed prior to that time.

109.    Given the substantial burdens already imposed on MACH Gen's management by

the commencement of these chapter 11 cases, and the time and attention MACH Gen must

devote to completing the restructuring process, MACH Gen may be unable to complete its

Schedules and Statements by the current deadline imposed by the Bankruptcy and Local Rules.

### j.  DIP Motion

110.    MACH Gen seeks entry of interim and final orders (i) authorizing it to obtain

postpetition financing, (ii) authorizing the use of cash collateral, (iii) granting liens and super-

priority claims, and (iv) granting adequate protection to its prepetition secured lenders.

111.    MACH Gen has set forth the material terms of the Interim Order in compliance

with the Local Rules.  MACH Gen believes, having consulted with its advisors, that the DIP

Facility represents the best option available to address its immediate liquidity needs because, in

part, it is an essential component of a broader restructuring transaction contemplated by the RSA

and the Plan, which has the support of the First Lien Lenders, the Consenting Second Lien

Lenders, and a majority of the Borrower's equity holders, and represents the only viable

financing available that would not require MACH Gen to seek to prime the Prepetition Liens on

a nonconsensual basis in what would likely have been a costly extended, contested hearing.

112.    The DIP Facility, together with use of Cash Collateral, will enable MACH Gen to

operate its business in the ordinary course and seek to obtain confirmation of, and implement, the

Plan.  I believe that this will preserve and enhance the value of MACH Gen's estates for the benefit of all parties in interest.  I believe implementation of postpetition financing will be viewed favorably by MACH Gen's customers and vendors, thereby promoting a successful reorganization.

113.    Without access to the proposed DIP Facility and use of Cash Collateral, I believe MACH Gen will be forced to cease operations and will not be able to consummate the Plan.  In contrast, the value of the Prepetition Secured Parties' interest in their Prepetition Collateral will be preserved, if not increased, by the DIP Facility and use of Cash Collateral because it ensures the uninterrupted continuation of MACH Gen's operations and its continued upkeep of the Prepetition Collateral.

114.    MACH Gen believes that the stay modifications set forth in the motion are ordinary and standard features of postpetition debtor financing facilities and reasonable and fair under the present circumstances.

115.    Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, MACH Gen will be immediately and irreparably harmed.  Accordingly, I believe the interim relief requested is critical to preserving and maintaining the going concern value of MACH Gen and facilitating their reorganization efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 3, 2014

 /s/ Garry N. Hubbard
Garry N. Hubbard
Chief Executive Officer
MACH Gen, LLC, et al.