THIS SOLICITATION IS BEING CONDUCTED BY MACH GEN, LLC AND ITS SUBSIDIARIES MACH GEN GP, LLC, MILLENNIUM POWER PARTNERS, L.P., NEW ATHENS GENERATING COMPANY, LLC, AND NEW HARQUAHALA GENERATING COMPANY, LLC (COLLECTIVELY, "MACH GEN") TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT PREPACKAGED CHAPTER 11 PLAN *PRIOR TO* THE FILING OF VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE.[1] BECAUSE NO CHAPTER 11 CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS BEEN NEITHER FILED WITH ANY BANKRUPTCY COURT NOR APPROVED BY ANY BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF CHAPTER 11 CASES, MACH GEN EXPECTS TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

## DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11 PLAN OF MACH GEN, LLC AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

**January 21, 2014**

Solicitation of votes from the holders of outstanding
**First Lien Revolver Claims**
**First Lien Term Loan Claims**
**Second Lien Claims**
**Interests in MACH Gen, LLC**

---

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT(S) TO ACCEPT OR REJECT THE PLAN MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT AT BALLOT PROCESSING, C/O PRIME CLERK LLC, 830 3RD AVENUE, 9TH FLOOR, NEW YORK, NY 10022, PRIOR TO <u>5:00 P.M. (PREVAILING EASTERN TIME), ON FEBRUARY 19, 2014</u>, UNLESS EXTENDED BY MACH GEN. YOU SHOULD REFER TO THE ENCLOSED BALLOT(S) FOR INSTRUCTIONS ON HOW TO VOTE ON THE PLAN.**

---

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES. IN THE CASE OF ANY INCONSISTENCY BETWEEN THE

---

[1] The anticipated debtors and the last four digits of their respective federal tax identification numbers are as follows:  MACH Gen, LLC (6738), MACH Gen GP, LLC (6738), Millennium Power Partners, L.P. (6688), New Athens Generating Company, LLC (0156), and New Harquahala Generating Company, LLC (0092). MACH Gen's principal offices are located at 9300 US Highway 9W, Athens, New York 12015.

SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

## IMPORTANT INFORMATION FOR YOU TO READ

**MACH GEN HAS NOT YET COMMENCED ANY CASES UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE, AND NO BANKRUPTCY COURT HAS APPROVED THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. MACH GEN EXPECTS TO COMMENCE CHAPTER 11 CASES AFTER THE SOLICITATION OF VOTES ON THE PLAN.**

UNDER THE PLAN, HOLDERS OF "ALLOWED GENERAL UNSECURED CLAIMS" (EACH AS DEFINED IN THE PLAN) ARE ANTICIPATED TO BE PAID IN FULL, SUBJECT TO BANKRUPTCY COURT APPROVAL, IN THE ORDINARY COURSE OF BUSINESS DURING THE PENDENCY OF THE CASES OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS, OR TO RECEIVE SUCH OTHER TREATMENT TO RENDER HOLDERS OF SUCH CLAIMS UNIMPAIRED UNDER THE BANKRUPTCY CODE.

MACH Gen has prepared this disclosure statement (this "Disclosure Statement") for use in connection with the solicitation of votes on, and confirmation of, the *Joint Prepackaged Chapter 11 Plan of MACH Gen, LLC and Its Affiliated Debtors and Debtors in Possession*, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"),[2] and the information set forth herein may not be relied upon for any other purpose. MACH Gen has not authorized any entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, MACH Gen has not authorized any entity to make any representations concerning MACH Gen or the value of its property, other than as set forth in this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding MACH Gen's operations, its financial history and forecasts, the need to seek chapter 11 protection, significant events that are expected to occur during its chapter 11 cases, and the anticipated organization, operations, and liquidity of MACH Gen upon its successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims or interests entitled to vote under the Plan must follow in order for their votes to be counted.

MACH Gen does not presently have the resources to pay all of its existing long-term debt obligations. However, MACH Gen has entered into a Restructuring Support Agreement (attached hereto as **Exhibit B**) with the Support Parties, who comprise a majority of MACH Gen's first and second lien debt and existing equity interests, in order to effectuate a balance sheet recapitalization of MACH Gen pursuant to the terms of the Plan. The proposed restructuring will eliminate approximately $1 billion in debt from MACH Gen's balance sheet

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

and thereby improve MACH Gen's financial condition and overall creditworthiness and help ensure MACH Gen's continued operations. MACH Gen is seeking votes in favor of the plan *prior* to the commencement of "prepackaged" chapter 11 cases, which MACH Gen believes will minimize disruption to its day-to-day operations, reduce the cost of the proposed restructuring, and ultimately be in the best interests of all of its stakeholders.

**MACH Gen therefore recommends, with the support of the Support Parties, that all holders of Claims or Interests who are entitled to vote on the Plan, after having reviewed all of the information contained in this Disclosure Statement, Plan, and other documents incorporated by reference thereto, vote to accept the Plan.**

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND MACH GEN URGES ANY HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS FOR ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

UNLESS OTHERWISE STATED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT OR ACCURATE AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE, REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COMPLETE COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED HEREIN, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

MACH GEN'S MANAGEMENT, IN CONSULTATION WITH MACH GEN'S PROFESSIONAL FINANCIAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED

IN THIS DISCLOSURE STATEMENT. WHILE MACH GEN HAS PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, IT HAS NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND REORGANIZED MACH GEN'S CONTROL. MACH GEN CAUTIONS THAT IT CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO REORGANIZED MACH GEN'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED AND, THUS, MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO DESCRIPTIONS OF LITIGATION OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER MACH GEN OR REORGANIZED MACH GEN.

**IRS CIRCULAR 230 NOTICE**: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY MACH GEN OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state

securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under the applicable state securities law ("Blue Sky Law"). MACH Gen intends to rely on section 1145(a) of the Bankruptcy Code and equivalent state law registration exemptions to exempt both the offer and issuance of new securities of MACH Gen in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law. The solicitation of votes on the Plan is being made in reliance on the exemption requirements of the Securities Act provided by section 3(a)(9) thereof.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives thereof, as well as any similar or comparable language. You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to holders of allowed claims and interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

# TABLE OF CONTENTS

SECTION I. INTRODUCTION AND OVERVIEW ................................................................. 1

    A.    Overview of Proposed Restructuring.................................................. 2
    B.    Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan ................................................................................. 4
    C.    Plan Solicitation ................................................................................ 5
        1.    Parties Entitled to Vote on Plan .......................................... 5
        2.    Voting Procedures, Ballots, and Voting Deadline ................ 6
    D.    Anticipated Restructuring Timetable ................................................ 6

SECTION II. HISTORICAL INFORMATION ......................................................................... 7

    A.    MACH Gen's Businesses and Operations ......................................... 7
    B.    Selected Financial Information ........................................................ 8
    C.    Corporate History and Organizational Structure ............................. 8
    D.    Management and Operations ............................................................ 8
    E.    Prepetition Indebtedness and Capital Structure ............................... 9
        1.    First Lien Credit Facility..................................................... 10
        2.    Second Lien Credit Facility ................................................ 11
    F.    Events Leading up to Chapter 11 ..................................................... 11
        1.    Concerns Stemming from Industry-Specific Events............... 11
        2.    Company-Specific Events..................................................... 11
        3.    Restructuring Support Agreement ....................................... 13

SECTION III. ANTICIPATED EVENTS DURING CHAPTER 11 CASES............................ 15

    A.    Overview of Chapter 11 ................................................................... 15
    B.    First-Day Relief ............................................................................... 16
    C.    DIP Facility...................................................................................... 18
    D.    Confirmation .................................................................................... 19

SECTION IV. JOINT PREPACKAGED CHAPTER 11 PLAN............................................. 19

    A.    Summary of Plan.............................................................................. 19
    B.    Summary of Capitalization of Reorganized MACH Gen ................... 51
        1.    Description of New Common Units ...................................... 51
        2.    Description of New First Lien Facilities................................ 52

SECTION V. VOTING PROCEDURES AND REQUIREMENTS ......................................... 53

    A.    Voting Deadline ............................................................................... 53
    B.    Voting Record Date ......................................................................... 54
    C.    Parties Entitled to Vote .................................................................... 54
    D.    Ballots ............................................................................................. 55
    E.    Agreements upon Furnishing Ballots................................................ 55

  1. Special Consents by Holders of Interests in MACH Gen, LLC upon Furnishing Ballots ................................................................. 56
F. Withdrawal or Change of Votes on Plan ............................................ 56
G. Fiduciaries and Other Representatives ............................................... 56
H. Waivers of Defects, Irregularities, etc. ............................................. 56
J. Further Information, Additional Copies ............................................. 57
K. Requirements for Acceptance by Impaired Class ............................... 57
  1. Class of Claims .......................................................................... 57
  2. Class of Interests ....................................................................... 57

SECTION VI. CONFIRMATION OF PLAN ............................................................ 57

A. Confirmation Hearing ...................................................................... 57
B. Requirements for Confirmation of Plan – Consensual Confirmation .............. 58
  1. Feasibility .................................................................................. 58
  2. Best Interests Test ...................................................................... 59
C. Requirements for Confirmation of Plan – Non-Consensual Confirmation .......... 60
  1. Unfair Discrimination ................................................................. 60
  2. Fair and Equitable Test .............................................................. 60

SECTION VII. PROJECTED FINANCIAL INFORMATION AND VALUATION ANALYSIS .................................................................................................. 61

A. Consolidated Financial Projections .................................................... 61
B. Reorganized MACH Gen Valuation Analysis ..................................... 62
  1. Valuation Methodologies ............................................................ 64
  2. Valuation Considerations ............................................................ 66

SECTION VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 66

A. Certain U.S. Federal Income Tax Consequences to MACH Gen ............ 67
  1. Cancellation of Debt and Reduction of Tax Attributes ................ 67
  2. Limitation of NOL Carry Forwards and Other Tax Attributes ...... 68
  3. Alternative Minimum Tax ........................................................... 70
B. Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims and Interests ........................................................................... 70
  1. Consequences to Holders of Claims ............................................ 70
  2. Consequences to Holders of Interests in Class 7(a) ..................... 72
  3. Information Reporting and Backup Withholding .......................... 72

SECTION IX. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS ............................................................................... 73

A. Exemption from Registration Requirements for New Common Units ......... 73
B. Subsequent Transfers of New Common Units ..................................... 73

SECTION X. RISK FACTORS .................................................................................... 74

    A.      Certain Bankruptcy Law Considerations ............................................. 75
    B.      Business-Related Risks ......................................................................... 77
    C.      Regulatory Risks .................................................................................. 81
    D.      Risks Related to New Common Units ................................................... 82
    E.      Other Risks ........................................................................................... 84

SECTION XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
    PLAN ................................................................................................................ 85

    A.      Liquidation Under Chapter 7 or Chapter 11 ........................................ 86
    B.      Alternative Plans of Reorganization .................................................... 87

SECTION XII. CONCLUSION AND RECOMMENDATION ................................... 87

EXHIBIT A    Plan

EXHIBIT B    Restructuring Support Agreement (with redactions)

EXHIBIT C    Projections

EXHIBIT D    Liquidation Analysis

EXHIBIT E    Consolidated Financial Statements

## SECTION I.
## INTRODUCTION AND OVERVIEW

MACH Gen, LLC and its subsidiaries MACH Gen GP, LLC, Millennium Power Partners, L.P., New Athens Generating Company, LLC, and New Harquahala Generating Company, LLC, as debtors and debtors in possession (each, a "MACH Gen Entity" and, collectively, the "MACH Gen Entities" or "MACH Gen"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Joint Prepackaged Chapter 11 Plan of Mach Gen, LLC and Its Affiliated Debtors and Debtors in Possession*, dated as of January 21, 2014, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan").[3]  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.  In the event of any inconsistency between the terms of the Plan and the description of such terms in this Disclosure Statement, the terms of the Plan shall control.

This Disclosure Statement is part of the "Solicitation Package," which contains the following:

- a transmittal letter,

- this Disclosure Statement,

- the Plan (as Exhibit A to this Disclosure Statement),

- the Restructuring Support Agreement (redacted) (as Exhibit B to this Disclosure Statement),

- the Projections (as Exhibit C to this Disclosure Statement),

- the Liquidation Analysis (as Exhibit D to this Disclosure Statement),

- the Consolidated Financial Statements (as Exhibit E to this Disclosure Statement), and

- if you are entitled to vote to accept or reject the Plan, one or more ballots, as applicable, including instructions describing where and when to submit your ballot(s) and a postage-paid, pre-addressed return envelope, to be used by holders of Claims and Interests entitled to vote on the Plan.

If you are a holder of a Claim or Interest entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot, please contact Prime Clerk LLC (the "Voting Agent") by e-mail at machgeninfo@primeclerk.com or by phone at (212) 257-5490.

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

For your vote to be counted, your ballot(s) must be **actually received** by the Voting Agent no later than 5:00 p.m., prevailing Eastern Time, on February 19, 2014 (the "Voting Deadline").

After the solicitation of votes with respect to the Plan, MACH Gen anticipates commencing a case under chapter 11 of the Bankruptcy Code for each MACH Gen Entity (collectively, the "Chapter 11 Cases") and seeking confirmation of the Plan by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

A.      *Overview of Proposed Restructuring*

MACH Gen is pleased to announce that the Plan provides for a restructuring of MACH Gen (the "Restructuring") that will eliminate approximately $1 billion in debt from its balance sheet.  As a result, MACH Gen will emerge from the Chapter 11 Cases (as "Reorganized MACH Gen") a stronger company, with a sustainable capital structure that is better aligned with MACH Gen's present and future operating prospects.

MACH Gen is commencing this solicitation on the Plan following extensive discussions with certain of its key stakeholders.  The discussions have resulted in significant majorities of its stakeholders agreeing to support the Restructuring and vote to accept the Plan pursuant to a Restructuring Support Agreement, dated as of January 15, 2014 (as it may be amended from time to time, the "Restructuring Support Agreement"), among MACH Gen and:

- holders of 100% of the First Lien Revolver Claims and First Lien Term Loan Claims (the "Consenting First Lien Holders");

- holders of in excess of 75% of the Second Lien Claims (the "Consenting Second Lien Holders"); and

- holders of in excess of 85% of the Interests in MACH Gen, LLC (the "Consenting Equity Holders" and, together with the Consenting First Lien Holders and Consenting Second Lien Holders, the "Support Parties").

**For additional information regarding the Restructuring Support Agreement, please refer to the discussion in Section II.F.3 herein entitled, "Restructuring Support Agreement."**  A redacted copy of the Restructuring Support Agreement is attached hereto as Exhibit B and incorporated herein by reference.  In the event of any inconsistency between the terms of the Restructuring Support Agreement and the description of such terms in this Disclosure Statement, the terms of the Restructuring Support Agreement shall control.

As a result of the Restructuring provided in the Plan:

- the Allowed First Lien Revolver Claims, in the aggregate principal amount of approximately $119,395,609.52 (including issued letters of credit and subject to adjustment for any additional borrowings or repayments occurring after January 15, 2014 and up to the Petition Date) out of a total loan commitment of $200 million, will be exchanged for obligations under, or paid with the proceeds of, the

2

New First Lien Revolver (as defined below), in an equal aggregate principal amount;[4]

- the Allowed First Lien Term Loan Claims, in the aggregate principal amount of approximately $483,209,285.14, will be exchanged for obligations under, or paid with the proceeds of, the New First Lien Term Loan (as defined below), in an equal aggregate principal amount;

- the Allowed Second Lien Claims, in the aggregate principal amount of approximately $1 billion, will be exchanged on a Pro Rata basis for 93.5% of the New Common Units (as defined below);

- the Allowed Interests in MACH Gen, LLC will be exchanged on a Pro Rata basis for 6.5% of the New Common Units; and

- all other Claims, including all Allowed General Unsecured Claims, will be paid in full or otherwise rendered Unimpaired.

In order to fund the above-described distributions, in connection with consummation of the Plan, (1) Reorganized MACH Gen will enter into new first lien facilities with Beal Bank USA or one or more of its affiliates (the "New First Lien Lenders"), comprising a term loan in the approximate amount of $483 million (the "New First Lien Term Loan") and a $200 million revolving credit facility (the "New First Lien Revolver" and, together with the New First Lien Term Loan, the "New First Lien Facilities") and (2) MACH Gen, LLC or a newly-formed holding company (in either case, "New Holdco") will issue 10 million common units representing 100% of the membership interests therein (the "New Common Units"). **For additional information on MACH Gen's post-Restructuring capitalization, please refer to the discussion in Section IV.B herein entitled, "Summary of Capitalization of Reorganized MACH Gen."**

MACH Gen, with the support of the Support Parties, believes that consummation of the proposed Restructuring under the Plan will provide MACH Gen with the capital structure and liquidity to continue operating as a going concern as a result of, among other things: (1) reduction of MACH Gen's total prepetition long-term debt by approximately $1 billion; (2) elimination of approximately $82 million per year of additional interest currently being capitalized under payment-in-kind interest provisions in MACH Gen's current Second Lien Credit Agreement; and (3) elimination of a pending February 2015 maturity date under the Second Lien Credit Agreement.  MACH Gen believes the realization of these transactions on the terms outlined in the Plan will enable MACH Gen to emerge from the Chapter 11 Cases appropriately capitalized and competitively positioned within the wholesale power markets.

---

[4]    As described further herein, MACH Gen currently anticipates that the First Lien Revolver Claims will be repaid in full from the proceeds of, or replaced with obligations under, a debtor-in-possession credit facility, subject to Bankruptcy Court approval.  The First Lien Revolver Claims are nonetheless classified for purposes of, and will receive the treatment specified in, the Plan, to the extent such claims are not satisfied in full in connection with the anticipated debtor-in-possession credit facility.

In connection with developing the Plan, MACH Gen conducted a careful review of its current business operations and compared its projected value as an ongoing business enterprise with its potential value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims and Interests thereunder.  MACH Gen concluded that the potential recoveries to holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern.  MACH Gen believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation analysis described herein and other analyses prepared by MACH Gen and its advisors, MACH Gen believes the value of its assets would be considerably greater if MACH Gen operates as a going concern and continues to generate revenues by selling energy, capacity, and ancillary services, while awaiting better market conditions for the sale of its assets, as opposed to immediately liquidating.  **For additional information on estimated recoveries under the Plan as compared to estimated recoveries in liquidation, please refer to the discussion in Section VI.B.2 herein entitled, "Best Interests Test."**  Moreover, MACH Gen believes that any alternative to the Restructuring contemplated by the Plan, such as an out-of-court restructuring, a liquidation, or attempts by another party-in-interest to file an alternative plan of reorganization, could result in significant delay, litigation, execution risk, and/or additional costs and, ultimately, could lower the recoveries to holders of Allowed Claims and Interests.  Accordingly, MACH Gen, with the support of the Support Parties, strongly recommends that you vote to **accept** the Plan, if you are entitled to vote.

B.      *Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan*

The following table summarizes the classification and estimated recoveries to holders of Allowed Claims and Interests under the Plan.  Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates.  The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary from the estimates in this Disclosure Statement.  As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries realized.  In addition, the ability to receive distributions under the Plan depends upon, among other things, the ability of MACH Gen to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement.  **For additional explanation regarding the terms of the Plan and treatment of Allowed Claims and Interests thereunder, please refer to the discussion in Section IV.A herein entitled, "Summary of Plan," as well as the Plan itself, attached hereto as Exhibit A.**

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Amount[5] | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept | $0 | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept | $0 | 100% |
| 3A | First Lien Revolver Claims | Impaired | Entitled to vote | $119,395,609.52[6] | 100% |

---

[5]     Amounts listed are in principal amount only and estimated as of January 21, 2014.

[6]     This amount includes issued letters of credit and is subject to adjustment for any additional borrowings or repayments occurring after January 15, 2014 and up to the Petition Date.  The total loan commitment, including undrawn amounts, is $200 million in aggregate principal amount.  As described further herein,

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Amount[5] | Estimated Recovery |
|-------|---------------------|--------|---------------|-----------------|--------------------|
| 3B | First Lien Term Loan Claims | Impaired | Entitled to vote | $483,209,285.14 | 100% |
| 4 | Second Lien Claims | Impaired | Entitled to vote | $1,010,317,757.49 | 50–65%[7] |
| 5A | General Unsecured Claims | Unimpaired | Deemed to accept | $15,000,000 | 100% |
| 5B | Lease Rejection Claims | Unimpaired | Deemed to accept | $0 | 100% |
| 6 | Intercompany Claims | Unimpaired | Deemed to accept | $269,000,000 | 100% |
| 7(a) | Interests in MACH Gen, LLC | Impaired | Entitled to vote | N/A | N/A |
| 7(b)-(e) | Intercompany Interests | Unimpaired | Deemed to accept | N/A | N/A |

C.    *Plan Solicitation*

As indicated above, MACH Gen intends to implement the Restructuring through the Chapter 11 Cases and confirmation of the Plan by the Bankruptcy Court.  The solicitation is being conducted at this time in order to obtain sufficient votes accepting the Plan to permit the Plan to be confirmed by the Bankruptcy Court.  **For further information and instructions on voting on the Plan, please refer to Section V herein entitled, "Voting Procedures and Requirements."**

1.    Parties Entitled to Vote on Plan

Under the Bankruptcy Code, only holders of Claims or Interests that are "Impaired" under the Plan are entitled to vote to accept or reject the Plan.  Holders of Claims or Interests that are not Impaired under the Plan (i.e., "Unimpaired") are, in accordance with section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan, and the solicitation with respect to such holders is not required.  MACH Gen is therefore soliciting votes only from holders of Impaired Claims or Interests and not from any holders of Unimpaired Claims or Interests.

---

MACH Gen currently anticipates that the First Lien Revolver Claims will be repaid in full from the proceeds of, or replaced with obligations under, a debtor-in-possession credit facility, subject to Bankruptcy Court approval.  The First Lien Revolver Claims are nonetheless classified for purposes of, and will receive the treatment specified in, the Plan, to the extent such claims are not satisfied in full in connection with the anticipated debtor-in-possession credit facility.

[7]    The estimated range of recovery to holders of Second Lien Claims assumes, for purposes of this estimation only, that approximately $545–715 million in value may be ascribed to the New Common Units, based on the projected enterprise value of Reorganized MACH Gen described herein, which valuation is premised on certain estimates and assumptions that are inherently subject to uncertainties, and adjusted for certain balance sheet items as of December 31, 2013.  The actual value of the New Common Units may materially vary from the assumed valuation set forth herein, and there can be no assurance that the valuation of Reorganized MACH Gen or the New Common Units set forth herein (or the estimated recovery to holders of Second Lien Claims) will be realized.  MACH Gen does not make any representation or warranty as to the actual value of Reorganized MACH Gen or the New Common Units (or the actual recovery to holders of Second Lien Claims).  **For further information on valuation, please refer to Section VII herein entitled, "Projected Financial Information and Valuation Analysis."**

Holders of Claims or Interests in Class 3A (First Lien Revolver Claims), Class 3B (First Lien Term Loan Claims), Class 4 (Second Lien Claims), and Class 7(a) (Interests in MACH Gen, LLC) are Impaired under the Plan and therefore entitled to vote to accept or reject the Plan.

Holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 5A (General Unsecured Claims), Class 5B (Lease Rejection Claims), Class 6 (Intercompany Claims), and Class 7(b)-(e) (Intercompany Interests) are Unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

2.     Voting Procedures, Ballots, and Voting Deadline

If you have received a ballot and are entitled to vote on the Plan, you should read the materials supplied to you in the Solicitation Package in their entirety, including the instructions set forth in the ballot(s).  These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.  After carefully reviewing the Solicitation Package, please indicate your acceptance or rejection of the Plan on the ballot by voting for or against the Plan.  MACH Gen will not count any executed ballot that (a) does not indicate either acceptance or rejection of the Plan, or (b) indicates both acceptance and rejection of the Plan.  The ballots being sent to the Classes entitled to vote explicitly provide holders who vote to reject the Plan or who do not cast a vote to accept or reject the Plan with the ability to opt-out of the third-party releases set forth in the Plan.

For your vote to be counted, you must complete and sign your original ballot(s) and return it via first class mail in the return envelope provided (or by overnight courier or hand-delivery).  Copies, faxes, and e-mails will not be accepted or counted as votes.  Each ballot has been coded to reflect the Class of the Claim(s) or Interest(s) it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot(s) sent to you with this Disclosure Statement.

For your vote to be counted, your ballot(s) must be **actually received** by the Voting Agent no later than the Voting Deadline, which is 5:00 p.m., prevailing Eastern Time, on February 19, 2014.  Any ballot received after the Voting Deadline will be counted only in the discretion of MACH Gen.  Do not return any debt instruments or equity securities with your ballot(s).

If you have any questions about the procedure for voting your Claim(s) or Interest(s), the packet of materials that you have received, or the amount of your Claim(s) or Interest(s), or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its exhibits, please contact the Voting Agent, by e-mail at machgeninfo@primeclerk.com or by phone at (212) 257-5490.

D.     *Anticipated Restructuring Timetable*

In accordance with the Restructuring Support Agreement, MACH Gen anticipates commencing the Chapter 11 Cases (such commencement date, the "Petition Date") within fifteen (15) calendar days of the Voting Deadline and, as soon as practicable thereafter, seeking entry of an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (1) the adequacy of this Disclosure Statement and solicitation of votes in connection therewith and

(2) confirmation of the Plan.  MACH Gen expects that notice of the Confirmation Hearing will be published in USA Today National Edition or another nationally-circulated newspaper and will be mailed to all known holders of Claims and Interests at least twenty-eight (28) days before the date by which objections to confirmation must be filed with the Bankruptcy Court.  **For additional information regarding the Confirmation Hearing, please refer to Section VI.A herein entitled, "Confirmation Hearing."**

Assuming the Bankruptcy Court approves MACH Gen's scheduling request, MACH Gen anticipates that the Confirmation Hearing will be held within approximately thirty (30) to sixty (60) days after the Petition Date.  MACH Gen does not currently anticipate any significant objections to confirmation of the Plan.  However, if any such objections are raised, the expected timing for confirmation may be significantly delayed.  **For additional information regarding the anticipated Chapter 11 Cases, please refer to Section III herein entitled, "Anticipated Events During Chapter 11 Cases."**

MACH Gen also intends to file certain regulatory notices and applications concerning the Restructuring on or around the launch of this solicitation.  MACH Gen is hopeful that all necessary regulatory approvals will be obtained within approximately ninety (90) days of their filing.  To the extent the Plan has been confirmed by the time such regulatory approvals are received, MACH Gen currently intends to consummate the Plan as soon as practicable thereafter.

**SECTION II.**
**HISTORICAL INFORMATION**

A.    *MACH Gen's Businesses and Operations*

MACH Gen owns and manages a portfolio of three natural gas-fired electric generating facilities located in the United States:  (1) a 1,080 MW facility located in Athens, New York that achieved commercial operation on May 5, 2004 (the "Athens Facility"); (2) a 1,092 MW facility located in Maricopa County, Arizona, that achieved commercial operation on September 11, 2004 (the "Harquahala Facility"); and (3) a 360 MW facility, located in Charlton, Massachusetts, that achieved commercial operation on April 12, 2001 (the "Millennium Facility," and collectively with the Athens Facility and the Harquahala Facility, the "Facilities").

MACH Gen generates revenues through the sale of energy, capacity, and ancillary services from the Facilities through various arrangements, including directly into relevant power markets and pursuant to energy management agreements (each, an "Energy Management Agreement") with reputable energy managers, currently Consolidated Edison Energy, Inc. (for the Athens and Millennium Facilities) and Twin Eagle Resource Management, LLC (for the Harquahala Facility).  The Facilities dispatch electricity into three power markets, two of which are served by independent system operators ("ISOs") and similar transmission interfaces across a geographically diverse area.  Specifically, the Athens Facility dispatches power into the region managed by the New York ISO, the Harquahala Facility into the region served by the Western Electricity Coordinating Council, and the Millennium Facility into the region managed by ISO New England.  Each of the Facilities utilizes advanced frame "501G" combustion turbine generating technology and equipment supplied by leading manufacturers, making them among the most competitive gas-fired generating facilities in their respective markets.

B.    *Selected Financial Information*

As of December 31, 2012, MACH Gen generated approximately $347 million of operating revenue for the prior 12-month period at a net loss of approximately $130 million. Its unaudited balance sheet reflected assets of approximately $762 million and liabilities of approximately $1,587 million as of September 30, 2013. Additional financial information regarding MACH Gen can be found in the audited consolidated financial statements for MACH Gen as of December 31, 2012 and 2011, attached hereto as Exhibit E.

C.    *Corporate History and Organizational Structure*

Prior to the formation of MACH Gen, LLC, each of the Facilities was owned by "project company" subsidiaries of GenHoldings I, LLC ("GenHoldings"). MACH Gen, LLC was formed on May 29, 2003 by certain of GenHoldings' former secured lenders in connection with a restructuring transaction consummated on August 16, 2004 (the "2004 Transaction"). Specifically, MACH Gen, LLC was formed to assume certain indebtedness of GenHoldings and acquire its assets (namely, the Facilities) through several newly-created "project company" subsidiaries of MACH Gen, LLC, including:[8] (1) New Athens Generating Company, LLC ("New Athens"), the current owner of the Athens Facility; (2) New Harquahala Generating Company, LLC ("New Harquahala"), the current owner of the Harquahala Facility; and (3) Millennium Power Partners, L.P. ("Millennium Power" and, together with New Athens and New Harquahala, the "Project Companies"), the current owner of the Millennium Facility. New Athens and New Harquahala are both wholly and directly owned by MACH Gen, LLC. Millennium Power is also wholly owned by MACH Gen, LLC, in part directly and in part indirectly through MACH Gen GP, LLC (a wholly and directly owned subsidiary of MACH Gen, LLC) ("MACH Gen GP"). Each of the Project Companies, MACH Gen LLC, and MACH Gen GP will file Chapter 11 Cases pursuant to the Restructuring.

D.    *Management and Operations*

MACH Gen is party to various consulting, asset management, operations, maintenance, and other similar agreements, under which third parties provide essential services and personnel to meet the business, commercial, and technical needs of MACH Gen and the Facilities. Among these agreements is a consulting agreement with Willow Bend Capital Management, LLC ("Willow Bend"), pursuant to which Willow Bend provides critical administrative and management services and executive-level personnel to MACH Gen, including the services of MACH Gen's CEO. The consulting agreement with Willow Bend, dated as of January 14, 2014, requires, among other things, MACH Gen to pay: (1) quarterly consulting fees to Willow Bend; (2) incentive compensation to consultants who meet certain performance targets; and (3) incentive fees to Willow Bend upon occurrence of certain events, including a sale of Harquahala and the closing and funding of a replacement for the First Lien Credit Agreement that provides for the exchange of second lien debt at a discount. The consulting agreement with Willow Bend, which expires in May 2015, will be assumed under the Plan.

---

[8]    At the time of the 2004 Transaction, GenHoldings' assets also included a generating facility near South Haven, Michigan, which was acquired by newly-formed subsidiary, New Covert Generating Company, LLC, as part of the 2004 Transaction. MACH Gen, LLC subsequently divested its interest in New Covert Generating Company, LLC to an affiliate of Tenaska on October 3, 2008.

In addition, MACH Gen is party to an asset management agreement with Competitive Power Ventures, Inc. ("CPV"), pursuant to which CPV provides asset management services to MACH Gen, with respect to MACH Gen's budgeting, planning, cost control, contract management, power sales and fuel contract management, maintenance management, community relations, accounting, tax, finance, insurance, regulatory, investor relations, information technology, capital management, and other operational needs. The Willow Bend and CPV teams have been providing management services to MACH Gen since 2009 and 2005, respectively, and therefore are able to provide valuable continuity of management to MACH Gen with their knowledge of MACH Gen's businesses and their relationships with key MACH Gen contract counterparties, regulators, and other stakeholders. Under the asset management agreement with CPV, MACH Gen pays CPV monthly management fees, as well as transaction-based fees upon the transfer of certain percentage interests in MACH Gen, the Facilities, or a Project Company. The consulting asset management agreement with CPV, which expires in December 2015, will be assumed under the Plan.

Under agreements with each Project Company, daily operations and maintenance of the Facilities is handled by NAES Corporation, and maintenance, parts, labor, and material for combustion turbine and generators planned and unplanned outages at the Facilities are provided by Siemens Energy, Inc. (f/k/a Siemens Power Generation, Inc.), under the management of CPV. In addition, under the Energy Management Agreements, the energy managers, on behalf of the applicable Project Company, solicit and enter into energy transactions, schedule, bid, and dispatch energy from the Facilities into distribution systems and coordinate with transmission providers, all as directed by CPV. The energy managers assist MACH Gen in identifying commercial strategies to maximize the value of the Facilities' generation capacity and identifying, soliciting, and executing transactions beyond the day-ahead market that comply with agreed-upon parameters provided to them by CPV. In an effort to procure fuel for the Facilities at the lowest cost possible, the energy managers deal with all market participants, for and on behalf of each Facility, from a credit standpoint and act as the applicable Project Company's counterparty in purchasing natural gas.

E.    *Prepetition Indebtedness and Capital Structure*

As of January 21, 2014, MACH Gen's long-term material debt obligations consist of two secured facilities, each described below. Since the 2004 Transaction, these obligations have been restructured, amended, and/or restated, including in 2007 and most recently (other than in connection with the proposed Restructuring) as of June 26, 2012, pursuant to a series of transactions by which certain of MACH Gen's then-existing Second Lien Lenders chose to tender certain term loans outstanding under the then-existing Second Lien Credit Agreement in exchange for cash at a discount to par using the proceeds of the First Lien Term Loan (collectively, the "2012 Transaction").

MACH Gen, the First Lien Agent, and the Second Lien Agent are party to a Collateral Agency and Intercreditor Agreement that, among other things, sets forth relative lien and payment priorities in connection with the obligations arising under the First Lien Credit Agreement and the Second Lien Credit Agreement, as well as a Security Deposit Agreement that contains a project financing account "waterfall" where all of MACH Gen's cash flows are tightly controlled pursuant to various secured accounts that are pledged to the secured parties.

1.      First Lien Credit Facility

MACH Gen, LLC, as borrower, and MACH Gen GP, Millennium Power, New Athens, and New Harquahala, as guarantors, are party to the First Lien Credit Agreement with CLMG Corp., as first lien collateral agent and administrative agent (the "First Lien Agent"), and Beal Bank USA and Beal Bank, SSB, as lenders and revolving issuing bank (collectively, the "First Lien Lenders").  As amended and restated in connection with the 2012 Transaction, the First Lien Credit Agreement provided, among other things, (a) a term loan facility in the aggregate principal amount of up to $450 million and up to $40 million in "capitalized interest" in connection with such term loans, and (b) a $160 million revolving credit facility that includes a $120 million sub-facility which is available for the issuance of letters of credit.  As security for the obligations arising under the First Lien Credit Agreement, MACH Gen granted first priority liens and security interests in substantially all of its assets and property, including the property of and the equity interests in MACH Gen GP, Millennium Power, New Athens, and New Harquahala.

On January 15, 2014, in order to fund the costs of the Restructuring and as provided in the Restructuring Support Agreement, MACH Gen entered into an amendment of the First Lien Credit Agreement (the "Prepetition Amendment") which, among other things, increased the aggregate term loan principal amount by approximately $23 million to approximately $483 million and temporarily increased the commitment under the revolving credit facility by $40 million to $200 million until, absent breach or termination of the Restructuring Support Agreement, the earlier of June 30, 2014 or the commencement of the Chapter 11 Cases.  In connection with the Restructuring Support Agreement and Prepetition Amendment, MACH Gen, the First Lien Agent, and the Second Lien Agent also entered into that certain Amendment No. 2 to Collateral Agency and Intercreditor Agreement (the "Intercreditor Amendment").  **The forms of the Prepetition Amendment and Intercreditor Amendment are attached as Exhibits B and C to the Restructuring Support Agreement.**

As discussed below, the First Lien Lenders have agreed to continue providing MACH Gen with access to revolving credit during the Chapter 11 Cases in the form of a debtor-in-possession revolving credit facility of up to $200 million, which MACH Gen intends to use to fund its costs during the Chapter 11 Cases and, subject to Bankruptcy Court approval, repay and permanently reduce the balance of the First Lien Revolver Claims.  **For additional information regarding the debtor-in-possession revolving credit facility, please refer to Section III.C herein entitled, "DIP Facility."**

Under the First Lien Credit Agreement, as of January 21, 2014, (a) First Lien Term Loan Claims of approximately $483,209,285.14 in aggregate principal amount and approximately $1.6 million in accrued interest remain outstanding, (b) First Lien Revolver Claims of approximately $119,395,609.52 in aggregate principal amount (including issued letters of credit and subject to adjustment for any additional borrowings or repayments occurring after January 15, 2014 and up to the Petition Date) out of a total loan commitment of $200 million, and approximately $0.33 million in accrued interest remain outstanding, and (c) approximately $80,604,390.48 in revolving credit facility commitments remain unused.

10

2.      Second Lien Credit Facility

MACH Gen, LLC, as borrower, and MACH Gen GP, Millennium Power, New Athens, and New Harquahala, as guarantors, are party to the Second Lien Credit Agreement with The Bank of New York Mellon, as second lien collateral agent and administrative agent (the "Second Lien Agent"), and the lenders from time to time party thereto (the "Second Lien Lenders"), which provides for a term loan facility that was, at the time of issuance, in the aggregate principal amount of approximately $839 million.  This amount was subsequently reduced in connection with the 2012 Transaction, pursuant to which approximately $478 million in aggregate principal amount of term loans under the Second Lien Credit Agreement were effectively exchanged for $430 million in aggregate principal amount of First Lien Loans.  As security for the obligations arising under the Second Lien Credit Agreement, MACH Gen granted second priority liens and security interests in substantially all of its assets and property, including the property of and the equity interests in MACH Gen GP, Millennium Power, New Athens, and New Harquahala.

Under the Second Lien Credit Agreement, as of January 21, 2014, approximately $1 billion in aggregate principal amount and approximately $10 million in accrued interest remains outstanding.

F.      *Events Leading up to Chapter 11*

1.      Concerns Stemming from Industry-Specific Events

Energy margins in New England, New York, and the Desert Southwest for natural gas combined cycles have generally contracted since 2008 due to shrinking power demand stemming from the economic recession and loss of an industrial base, lower gas prices due to surge in gas supply from unconventional sources, and an increase in supply of zero marginal cost renewable wind and solar power particularly in Arizona.  In addition to energy margins, New York generators in 2011 and 2012 experienced lower and more volatile capacity prices due to a surge in demand side management resources and imports from other regions.

The lower energy and capacity margins in the spot market also drove down the forward energy markets making hedging margins forward less attractive than in past years.  With lower spot markets and lower forward markets, the value of generation assets have declined since pre-recession levels.

2.      Company-Specific Events

MACH Gen's balance sheet first came under pressure in the early 2000s shortly after its inception.  The original financing to build MACH Gen's four initial generating facilities[9] went into default when their original owner (PG&E National Energy Group) was unable to continue the required equity contribution to complete construction.  As a result, the original lender group took over ownership of the assets through the 2004 Transaction and thereafter completed construction of the four initial generating facilities.  In late 2006, when the energy and capital

---

[9]      This includes a plant which has subsequently been divested; please refer to footnote 8 above.

markets improved, a refinancing of the remaining debt was completed. This refinancing was completed while asset values were high, allowing for a high level of leverage.

In 2008, MACH Gen went through an auction process to test the market for asset sales. The resulting purchase offers would have allowed MACH Gen to pay off all of its debt at that time. One facility was sold in late 2008, and the proceeds were used to pay off MACH Gen's then-existing first lien term debt. This sale provided MACH Gen with liquidity and borrowing capacity adequate to meet all of its current obligations but left a significant level of second lien PIK debt with a maturity in early 2015, with interest continuing to accrue and augment the loan balance. The owners decided not to move forward with sales of the three remaining facilities, however, due to the belief that asset values would continue to improve, and because the purchase offers indicated an enterprise value lower than the enterprise value implied at the time by over-the-counter markets for MACH Gen's debt and equity securities.

Since 2009, and concurrent with industry-specific events that have created a challenging operating environment that has adversely impacted MACH Gen and its competitors, MACH Gen has experienced a significant decline in its operating revenues. Specifically, MACH Gen's consolidated annual operating revenues have declined from approximately $452 million in 2009 to $347 million in 2012, and operating income declined from a profit of $22 million to a loss of $16 million during the same period. At the same time, MACH Gen has faced significant interest expenses due to the leveraged nature of its balance sheet, which, in combination with declining revenues, has impacted MACH Gen's available liquidity. Additional financial information regarding MACH Gen can be found in the audited consolidated financial statements for MACH Gen as of December 31, 2012 and 2011, attached hereto as Exhibit E.

In attempts to address these issues, MACH Gen has taken a number of actions, including efforts to significantly reduce overall future interest expenses. In furtherance of these efforts, in February 2012, MACH Gen refinanced its then-existing First Lien Credit Agreement. In June 2012, MACH Gen engaged in additional refinancing, entering into the 2012 Transaction whereby certain of MACH Gen's then-existing Second Lien Lenders chose to tender certain term loans outstanding under the then-existing Second Lien Credit Agreement in exchange for cash at a discount to par using the proceeds of the First Lien Term Loan.

In addition, in the latter half of 2012, MACH Gen explored a potential sale of the Harquahala Facility or the membership interests in New Harquahala, the proceeds of which would be used, among other things, to reduce MACH Gen's long-term debt-load and debt-service expenses. In connection with these efforts, MACH Gen retained a financial advisor and engaged in a marketing process, which culminated in MACH Gen's entry into a purchase and sale agreement with Saddle Mountain Power, LLC, pursuant to which it would purchase 100% of the equity interests in New Harquahala (the "Proposed Sale"). In October 2012, the parties filed an application with FERC seeking approval of the Proposed Sale. On March 7, 2013, a panel of FERC Commissioners issued an order denying regulatory approval of the Proposed Sale. In light of this decision, the Proposed Sale was not consummated and the benefits thereof not realized by MACH Gen.

Subsequent to that time, MACH Gen has continued to explore various alternatives to effectively resolve its balance sheet and address potential future liquidity constraints. In

12

connection with this process, MACH Gen entered into discussions with certain of its lenders regarding a potential restructuring, which culminated in MACH Gen's negotiation of the Restructuring and entry into the Restructuring Support Agreement.

On January 8, 2014, (a) the Board of Directors of MACH Gen, LLC executed a written consent and resolution, which, among other things, authorized MACH Gen, LLC and each of New Athens, New Harquahala, and MACH Gen GP to enter into the Prepetition Amendment, enter into the Restructuring Support Agreement, commence solicitation of the Plan, and, consistent with the terms and conditions of the Restructuring Support Agreement, commence their respective Chapter 11 Cases; (b) MACH Gen, LLC and MACH Gen GP, in their capacities as sole limited partner and general partner, respectively, of Millennium Power, executed a written consent and approval of, among other things, Millennium Power's entry into the Restructuring Support Agreement and, after obtaining the requisite consents under the Restructuring Support Agreement, commencement of its Chapter 11 Case; and (c) the Board of Control of Millennium Power executed a written consent and resolution, which, among other things, authorized Millennium Power to enter into the Prepetition Amendment, enter into the Restructuring Support Agreement, commence solicitation of the Plan, and, consistent with the terms and conditions of the Restructuring Support Agreement and with the consent of its general and limited partners, commence its Chapter 11 Case.

3.     Restructuring Support Agreement

On January 15, 2014, each of MACH Gen and the Support Parties entered into the Restructuring Support Agreement, pursuant to which the Support Parties agreed, subject to the terms and conditions set forth therein, to support the Restructuring and vote to accept the Plan. Specifically, each Support Party agreed, among other things, to:

- support and cooperate with the MACH Gen Entities to take all commercially reasonable actions necessary to consummate the Restructuring in accordance with the Plan and the terms and conditions of the Restructuring Support Agreement (without limiting consent and approval rights provided in the Restructuring Support Agreement);

- not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan;

- not object to, delay, impede, or take any other action to interfere, directly or indirectly, with the Restructuring, or propose, file, support, or vote for, directly or indirectly, any restructuring, workout, or chapter 11 plan for any of the MACH Gen Entities other than the Restructuring and the Plan; and

- support and not object to, delay, impede, or take any other action to interfere, directly or indirectly, with the entry by the Bankruptcy Court of the DIP Orders, or propose, file or support, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in the DIP Orders.

13

Pursuant to the Restructuring Support Agreement, MACH Gen agreed, among other things, to:

- support and complete the Restructuring and all transactions set forth in the Plan and the Restructuring Support Agreement;

- negotiate in good faith all definitive documentation contemplated by the Restructuring Support Agreement and take any and all necessary and appropriate actions in furtherance of the Plan and the Restructuring Support Agreement;

- make commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring; and

- complete the Restructuring and all transactions set forth in accordance with each of the following milestones, among others:

  - commence solicitation of the Plan within seven (7) business days of the Restructuring Support Agreement becoming effective;

  - subject to the receipt of accepting votes satisfying certain thresholds, commence the Chapter 11 Cases within fifteen (15) calendar days of the Voting Deadline;

  - obtain entry of the DIP Interim Order within four (4) business days of the Petition Date;

  - obtain entry of the DIP Final Order within thirty (30) calendar days of the Petition Date;

  - obtain confirmation of the Plan within ninety (90) calendar days of the Petition Date; and

  - consummate the Plan on the later of fifteen (15) calendar days after confirmation of the Plan and the first business day immediately following receipt of all necessary regulatory and other approvals.

In addition to certain specified termination events that would, upon occurrence, permit MACH Gen or one or more of the Support Parties to terminate their own respective obligations under the Restructuring Support Agreement, the Restructuring Support Agreement will automatically terminate on June 30, 2014 if the Plan has not been consummated by such date. However, if on or before June 30, 2014, all conditions to consummation of the Plan, other than receipt of applicable regulatory approvals, have been satisfied or are capable of immediate satisfaction, then such termination date will be automatically extended by seventy-five (75) calendar days, provided that MACH Gen has diligently used all commercially reasonable efforts to obtain such regulatory approvals.

On January 15, 2014, the Restructuring Support Agreement became effective, having been executed by (a) each MACH Gen Entity, (b) Consenting First Lien Holders representing at least two-thirds in principal amount of all First Lien Revolver Claims and at least two-thirds in principal amount of all First Lien Term Loan Claims and more than one-half in number of all holders of all First Lien Revolver Claims and more than one-half in number of all holders of First Lien Term Loan Claims, (c) Consenting Second Lien Holders representing at least two-thirds in principal amount of all Second Lien Claims, and (d) Consenting Equity Holders representing at least 75% of the voting rights of all issued and outstanding Interests in MACH Gen, LLC and at least one-half in number of all holders of the Interests in MACH Gen, LLC.

**A redacted copy of the Restructuring Support Agreement is attached hereto as <u>Exhibit B</u>.**

## SECTION III.
## ANTICIPATED EVENTS DURING CHAPTER 11 CASES

A.    *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and estates.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets.  In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for, upon the filing of a petition for relief under chapter 11, an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case.

The commencement of a case under chapter 11 creates an estate comprising all of the debtor's legal and equitable interests as of the petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor.  Confirmation of a plan by the bankruptcy court makes the plan binding, subject to the occurrence of an effective date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

The Bankruptcy Code expressly authorizes a debtor to solicit votes for the acceptance of a plan prior to the filing by the debtor of a chapter 11 case.  Certain holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate

information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.

Because no chapter 11 cases have yet been commenced, this Disclosure Statement has not yet been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  If the Chapter 11 Cases are subsequently commenced as currently contemplated, MACH Gen expects to promptly seek entry of an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and determining that the solicitation of votes on the Plan by means of this Disclosure Statement was in compliance with section 1125(a) of the Bankruptcy Code.

B.      *First-Day Relief*

Upon commencement of the Chapter 11 Cases, MACH Gen expects to seek entry of an order authorizing procedural consolidation and joint administration of the Chapter 11 Cases. Joint administration will provide significant administrative convenience without harming the rights of any party in interest.

MACH Gen intends to continue to operate its businesses throughout the Chapter 11 Cases in the ordinary course, as it had prior to the commencement thereof, and expects to seek certain "first-day" relief from the Bankruptcy Court for authority to do so.  The following are descriptions of the "first-day" motions that MACH Gen currently expects to file upon commencement of the Chapter 11 Cases.  As a result of further consideration, however, MACH Gen may, subject to its obligations under the Restructuring Support Agreement, determine to file other motions or omit certain motions. The following list should therefore not be considered final or exhaustive.

**Motion for Entry of Order Authorizing MACH Gen to File Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrix**

MACH Gen expects to seek entry of an order granting authority to maintain a single consolidated list of creditors, instead of filing a separate matrix for each MACH Gen Entity. MACH Gen believes that preparing separate lists of creditors in an entity-specific matrix format would be unnecessarily burdensome and result in duplicate mailings.

**Motion for Entry of Order Authorizing MACH Gen's Continued Use of Its Existing Cash Management Systems**

MACH Gen expects to seek entry of an order authorizing it, subject to the requirements of the DIP Orders, to continue using its existing cash management system, bank accounts, business forms, and to continue conducting intercompany transactions in the ordinary course. Absent the Bankruptcy Court's authorization of the continued use of its prepetition cash management system, MACH Gen would face unnecessary difficulty in managing its cash flow and operations during the course of the Chapter 11 Cases, potentially to the detriment of its estates.

16

***Motion for Entry of Order Authorizing Ordinary Course Payment of Prepetition Claims of General Unsecured Creditors***

In the ordinary course of its businesses, MACH Gen relies on a range of materials, equipment, and services from a limited number of vendors and contractors. Although MACH Gen expects to pay all such obligations in full pursuant to the Plan, some of its vendors and contractors may nonetheless seek to terminate their relationship with MACH Gen or alter payment terms, to the detriment of MACH Gen's estates, in the event that MACH Gen fails to timely honor outstanding obligations as they become due. To avoid the potentially detrimental effects of any such party's efforts to terminate its relationship with MACH Gen and to ensure uninterrupted operations and a seamless transition through the Chapter 11 Cases, MACH Gen expects to seek entry of an order authorizing it to pay, in the ordinary course of business, the allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims of holders of unsecured claims.

***Motion for Entry of Order Authorizing Payment of Taxes and Regulatory Expenses in Ordinary Course of Business***

Although MACH Gen expects to pay all taxes and regulatory obligations in full pursuant to the Plan, in order to minimize the potential disruption to its businesses during the Chapter 11 Cases, MACH Gen expects to seek entry of an order authorizing it to pay prepetition sales taxes, use taxes, and property taxes, regardless of when incurred, to the appropriate taxing, licensing, and other governmental authorities and to continue to honor related obligations (including the posting of additional collateral, if necessary) in the ordinary course of MACH Gen's businesses and consistent with its past practices.

***Motion for Entry of Order Authorizing Payment and Adequate Assurance to Utilities and Prohibit Alterations or Discontinuance of Utility Services to MACH Gen***

MACH Gen obtains electricity, natural gas, water, telephone, and other services from several utility companies or their brokers, which are essential to the everyday operations of the Facilities. MACH Gen expects to seek entry of an order (i) approving, as adequate assurance of payment for the utility companies, a cash deposit equal to approximately half of MACH Gen's average aggregate monthly cost for utility services, (ii) authorizing MACH Gen to continue to pay the prepetition and postpetition claims of the utility companies as they become due in the ordinary course of business, and (iii) prohibiting utility companies from altering, refusing, or discontinuing services to MACH Gen.

***Motion for Entry of Order Authorizing MACH Gen to Maintain and Honor Insurance Policies in Ordinary Course of Business***

MACH Gen maintains various insurance policies, essential to its ability to conduct its operations and to preserve the value of its business, properties, and assets. Maintenance of insurance is also required under the laws of the various states in which MACH Gen operates and pursuant to the terms of material agreements to which the MACH Gen Entities are parties. Accordingly, MACH Gen expects to seek entry of an order authorizing it to continue to honor

obligations under and related to its insurance policies, and to renew, replace, extend, supplement, modify, or obtain its insurance coverage.

***Motion for Entry of Order (i) Extending the Deadline by Which MACH Gen Must File Schedules of Assets and Liabilities and Statements of Financial Affairs and (ii) Permanently Waiving Requirement to File Such Schedules and Statements upon Confirmation***

In general, a debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules and Statements") permit parties in interest to understand and assess a debtor's assets and liabilities and, thereafter, negotiate and confirm a plan of reorganization. When, as in the case of MACH Gen, the debtor has already negotiated a prepackaged plan of reorganization that lacks any need for proofs of claim to be filed, the Schedules and Statements will also lack the central benefit of assisting creditors with determining whether they should filed a proof of claim. As such, requiring the Schedules and Statements to be filed notwithstanding confirmation of the Plan would only impose an additional administrative burden on and expense to MACH Gen's estates, without any corresponding benefit to parties in interest. MACH Gen expects to seek entry of an order (i) extending the deadlines to file Schedules and SOFAs by ninety (90) days and (ii) permanently waiving the requirement to file Schedules and SOFAs if the Plan is confirmed before such extension expires.

C.    *DIP Facility*

In connection with the Restructuring Support Agreement, and after arms-length negotiations with MACH Gen and the Consenting Second Lien Holders, the Consenting First Lien Holders agreed to provide a senior secured superpriority debtor-in-possession revolving loan credit facility in an aggregate principal amount not to exceed $200,000,000, of which not more than $160,000,000 may be used for the issuance of revolving letters of credit (the "DIP Facility"), which will be provided on substantially the same economic terms as those contained in the First Lien Credit Agreement (as amended by the Prepetition Amendment), except that it will contain (i) modified default interest rates (as indicated in footnote 10 of Exhibit D to the Restructuring Support Agreement) and (ii) such other terms and conditions as are customary for a debtor-in-possession financing facility. MACH Gen, LLC will be the borrower under the DIP Facility, which will be guaranteed by each of the other MACH Gen Entities. Subject to approval by the Bankruptcy Court, the proceeds of the DIP Facility will be used to, among other things, (i) permanently reduce the balance of the First Lien Revolver Claims and (ii) for general corporate purposes during the pendency of the Chapter 11 Cases, in accordance with the terms of the DIP Orders and a debtor-in-possession credit and guaranty agreement (the "DIP Credit Agreement") and subject to a budget.

Moreover, as the DIP Facility has been agreed in connection with the Restructuring, a failure to meet certain milestones under the Restructuring Support Agreement, among other things, could trigger an event of default and the payment of default interest as specified under the terms of the DIP Facility. Consistent with the terms of the Restructuring Support Agreement, MACH Gen expects to file a motion on the Petition Date seeking entry of two orders, in the forms attached as Exhibits D and E to the Restructuring Support Agreement (collectively, the "DIP Orders"), approving, on an interim basis and a final basis, respectively , (i) MACH Gen's entry into the DIP Facility and (ii) MACH Gen's use of the cash collateral of the First Lien

Lenders and Second Lien Lenders during the pendency of the Chapter 11 Cases.[10]  In addition, by this motion, MACH Gen will seek approval of certain superpriority liens and claims to be granted to the DIP Agent pursuant to the DIP Orders, as well as certain adequate protection liens and claims for the benefit of the First Lien Lenders and Second Lien Lenders, whose prepetition liens will be "primed" by those granted to the DIP Agent in connection with the DIP Facility. The motion will also seek the scheduling of a hearing to consider approval of the DIP Facility on a final basis.

**Additional information regarding the DIP Facility may be found in the forms of DIP Orders attached as Exhibits D and E to the Restructuring Support Agreement.**

D.    *Confirmation*

MACH Gen expects to file, on the Petition Date, a motion for entry of an order scheduling a combined hearing on the adequacy of this Disclosure Statement, approval of the prepetition solicitation procedures and related notices and objection deadlines, as well as confirmation of the Plan.  **For additional information regarding the confirmation process and requirements, please refer to the discussion in Section VI herein entitled, "Confirmation of Plan."**

**SECTION IV.
JOINT PREPACKAGED CHAPTER 11 PLAN**

A.    *Summary of Plan*

    1.    Administrative Expenses and Other Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

    a.    General Administrative Expenses

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, then in MACH Gen's ordinary course of business), unless otherwise agreed by the holder of such General Administrative Expense and MACH Gen, with the consent of the Majority Second Lien Holders.

---

[10]    As of January 21, 2014, the DIP Credit Agreement remains subject to negotiation and completion in accordance with the Restructuring Support Agreement.  MACH Gen expects to attach a final form of the DIP Credit Agreement to its motion seeking approval of the DIP Facility.

b.    Professional Fees

(i)    Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on Reorganized MACH Gen no later than forty-five (45) days after the Effective Date, unless Reorganized MACH Gen, with the consent of the Majority Second Lien Holders, agrees otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on Reorganized MACH Gen and the applicable Professional no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and MACH Gen is permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of MACH Gen's businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation.

(ii)    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized MACH Gen shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by Reorganized MACH Gen on and after the Effective Date.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized MACH Gen may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

c.    DIP Claims

Pursuant to the terms of the DIP Facility, each holder of an Allowed DIP Claim shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed DIP Claim, either (1) receive payment in full from the proceeds of the New First Lien Revolver or (2) be replaced with obligations under the New First Lien Revolver, as contemplated by the terms of the DIP Facility.  Pursuant to the Restructuring Support Agreement, each holder of an Allowed DIP Claim shall be deemed to have consented to receive treatment for such DIP Claim that is different from the treatment set forth in the Bankruptcy Code, on the terms set forth in the Restructuring Support Agreement.

d.      Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

2.      Classification and Treatment of Claims and Interests

a.      Classification of Claims and Interests

Claims and Interests, except for Administrative Expenses, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

The Plan constitutes a separate chapter 11 plan of reorganization for each MACH Gen Entity.  Pursuant to section 1122, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3A | First Lien Revolver Claims | Impaired | Entitled to vote[11] |
| 3B | First Lien Term Loan Claims | Impaired | Entitled to vote |
| 4 | Second Lien Claims | Impaired | Entitled to vote |
| 5A | General Unsecured Claims | Unimpaired | Deemed to accept |
| 5B | Lease Rejection Claims | Unimpaired | Deemed to accept |
| 6 | Intercompany Claims | Unimpaired | Deemed to accept |
| 7(a) | Interests in MACH Gen, LLC | Impaired | Entitled to vote |

---

[11]      First Lien Revolver Claims are expected to be repaid in full from the proceeds of, or replaced with obligations under, the DIP Facility, subject to Bankruptcy Court approval (including, in the DIP Final Order, approval of the roll-up in full).  First Lien Revolver Claims are nonetheless classified for purposes of, and will receive the treatment specified in, the Plan, to the extent such Claims remain outstanding as of the Effective Date. Accordingly, holders of First Lien Revolver Claims are being provisionally solicited in connection with the Plan.

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 7(b)-(e) | Intercompany Interests | Unimpaired | Deemed to accept |

      b.      Treatment of Claims and Interests

      *(i)*      Class 1 – Priority Non-Tax Claims

*Classification*:  Class 1 consists of all Priority Non-Tax Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 1(a)), MACH Gen GP (Class 1(b)), Millennium Power (Class 1(c)), New Athens (Class 1(d)), and New Harquahala (Class 1(e)).

*Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

*Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

      *(ii)*      Class 2 – Other Secured Claims

*Classification*:  Class 2 consists of all Other Secured Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 2(a)), MACH Gen GP (Class 2(b)), Millennium Power (Class 2(c)), New Athens (Class 2(d)), and New Harquahala (Class 2(e)).

*Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim shall (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

*Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

      *(iii)*      Class 3A – First Lien Revolver Claims

*Classification*:  Class 3A consists of all First Lien Revolver Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 3A(i)), MACH Gen GP (Class 3A(ii)), Millennium Power (Class 3A(iii)), New Athens (Class 3A(iv)), and New Harquahala (Class 3A(v)).

22

*Allowance*:  Class 3A Claims are expected to be repaid in full from the proceeds of, or replaced with obligations under, the DIP Facility, subject to Bankruptcy Court approval; in such case, Class 3A shall be deemed not to include any Allowed Claims and deemed not to exist.  To the extent Class 3A Claims remain outstanding on the Effective Date, such Claims shall be deemed Allowed in the aggregate amount of $119,395,609.52 (subject to adjustment for any additional borrowings or repayments occurring after January 15, 2014 and up to the Petition Date), plus any interest and reasonable fees and expenses due and owing pursuant to the First Lien Credit Agreement as of the Effective Date.

*Treatment*:  Except to the extent previously paid in full from the proceeds of, or replaced with obligations under, the DIP Facility, each holder of an Allowed Class 3A Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, from proceeds of the New First Lien Revolver or (ii) its Pro Rata share, relative to all Allowed Class 3A Claims and Allowed DIP Claims, of the New First Lien Revolver.

*Voting*:  Except to the extent previously paid in full from the proceeds of, or replaced with obligations under, the DIP Facility, Class 3A is Impaired under the Plan.  Therefore, holders of Class 3A Claims are provisionally entitled to vote to accept or reject the Plan.

> *(iv)*    Class 3B – First Lien Term Loan Claims

*Classification*:  Class 3B consists of all First Lien Term Loan Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 3B(i)), MACH Gen GP (Class 3B(ii)), Millennium Power (Class 3B(iii)), New Athens (Class 3B(iv)), and New Harquahala (Class 3B(v)).

*Allowance*:  Class 3B Claims are deemed Allowed in the aggregate amount of $483,209,285.14, plus any interest and reasonable fees and expenses due and owing pursuant to the First Lien Credit Agreement as of the Effective Date.

*Treatment*:  Each holder of an Allowed Class 3B Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share, relative to all Allowed Class 3B Claims, of the New First Lien Term Loan.

*Voting*:  Class 3B is Impaired under the Plan.  Therefore, holders of Class 3B Claims are entitled to vote to accept or reject the Plan.

> *(v)*    Class 4 – Second Lien Claims

*Classification*:  Class 4 consists of all Second Lien Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 4(a)), MACH Gen GP (Class 4(b)), Millennium Power (Class 4(c)), New Athens (Class 4(d)), and New Harquahala (Class 4(e)).

*Allowance*:  Class 4 Claims are deemed Allowed in the aggregate amount of $1,010,317,757.49, plus any interest and reasonable fees and expenses due and owing pursuant to the Second Lien Credit Agreement as of the Effective Date.

*Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share, relative to all Allowed Class 4 Claims, of 93.5% of the New Common Units.

*Voting*:  Class 4 is Impaired under the Plan.  Therefore, holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

*(vi)*     Class 5A – General Unsecured Claims

*Classification*:  Class 5A consists of all General Unsecured Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 5A(i)), MACH Gen GP (Class 5A(ii)), Millennium Power (Class 5A(iii)), New Athens (Class 5A(iv)), and New Harquahala (Class 5A(v)).

*Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 5A Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of MACH Gen's business (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by MACH Gen with the consent of the Majority Second Lien Holders or ordered by the Bankruptcy Court) or (ii) such other treatment, acceptable to the Majority Second Lien Holders, that renders such holder Unimpaired.

*Voting*:  Class 5A is Unimpaired under the Plan.  Holders of Class 5A Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

*(vii)*     Class 5B – Lease Rejection Claims

*Classification*:  Class 5B consists of all Lease Rejection Claims against MACH Gen (if any), separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 5B(i)), MACH Gen GP (Class 5B(ii)), Millennium Power (Class 5B(iii)), New Athens (Class 5B(iv)), and New Harquahala (Class 5B(v)).

*Allowance*:  The Allowed amount of each Class 5B Claim shall be subject to section 502(b)(6) of the Bankruptcy Code.

*Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 5B Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to  the Allowed amount of such Claim, in Cash, on the Effective Date (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by MACH Gen with the consent of the Majority Second Lien Holders or ordered by the Bankruptcy Court) (ii) such other treatment, acceptable to the Majority Second Lien Holders, that renders such holder Unimpaired.

*Voting*:  Class 5B is Unimpaired under the Plan.  Holders of Class 5B Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(viii)    Class 6 – Intercompany Claims

*Classification*:  Class 6 consists of all Intercompany Claims against MACH Gen, separately classified by MACH Gen Entity, namely MACH Gen, LLC (Class 6(a)), MACH Gen GP (Class 6(b)), Millennium Power (Class 6(c)), New Athens (Class 6(d)), and New Harquahala (Class 6(e)).

*Treatment*:  Each holder of an Allowed Class 6 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by MACH Gen with the consent of the Majority Second Lien Holders, or (ii) receive such other treatment, acceptable to the Majority Second Lien Holders, that renders such holder Unimpaired.

*Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(ix)    Class 7(a) – Interests in MACH Gen, LLC

*Classification*:  Class 7(a) consists of all Interests in MACH Gen, LLC.

*Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 7(a) Interest shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Interest, its Pro Rata share, relative to all Allowed Class 7(a) Interests, of 6.5% of the New Common Units.

*Voting*:  Class 7(a) is Impaired under the Plan.  Therefore, holders of Class 7(a) Interests are entitled to vote to accept or reject the Plan.

(x)    Class 7(b)-(e) – Intercompany Interests

*Classification*:  Classes 7(b)-(e) consist of all Interests in MACH Gen other than in MACH Gen, LLC, separately classified by MACH Gen Entity, namely MACH Gen GP (Class 7(b)), Millennium Power (Class 7(c)), New Athens (Class 7(d)), and New Harquahala (Class 7(e)).

*Treatment*:  Each holder of an Allowed Interest in Classes 7(b)-(e) shall (i) have its Interest be reinstated or (ii) receive such other treatment, acceptable to the Majority Second Lien Holders, that renders such holder Unimpaired.

*Voting*:  Classes 7(b)-(e) are Unimpaired under the Plan.  Holders of Interests in Classes 7(b)-(e) are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

c.  Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect MACH Gen's rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims.

3.  Acceptance or Rejection of Plan

a.  Voting Classes

Classes 3A, 3B, 4, and 7(a) are Impaired under the Plan; therefore, holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

An Impaired Class of Interests shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, holders of at least two-thirds in amount of the Allowed Interests held by holders who actually voted in such Class have voted to accept the Plan.

b.  Presumed Acceptance of the Plan

Classes 1, 2, 5A, 5B, 6, and 7(b)-(e) are Unimpaired under the Plan.  Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

c.  Non-Consensual Confirmation

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, MACH Gen may request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  MACH Gen reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, subject in each instance to the Restructuring Support Agreement.

d.  Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, Reorganized MACH Gen reserves the right to re-classify, with the consent of the Majority Second Lien Holders, any Allowed

Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.       Means for Implementation of Plan

a.       General Settlement of Claims and Interests

As discussed in detail in this Disclosure Statement and as otherwise provided the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  All distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.

b.       Restructuring Transactions

On the Confirmation Date, subject to and consistent with the terms of its obligations under the Plan and the Restructuring Support Agreement, and subject to the rights of the Support Parties under the Restructuring Support Agreement, MACH Gen shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of MACH Gen, or to reincorporate or reorganize certain of the MACH Gen Entities under the laws of jurisdictions other than the laws of which such MACH Gen Entities currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, liquidations or dissolutions, as may be determined by MACH Gen to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the MACH Gen Entities vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions").  In each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a MACH Gen Entity, such surviving, resulting or acquiring Entity will perform the obligations of such MACH Gen Entity pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such MACH Gen Entity, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another MACH Gen Entity will perform such obligations.

In effecting the Restructuring Transactions, MACH Gen shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2)  execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or

27

appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the MACH Gen Entities. The Plan may be effected by, or include, a taxable sale of some or all of the MACH Gen Entities' assets to one or more new holding companies that are (1) owned in whole or in part by or for the holders of the Second Lien Claims and (2) either taxable as corporations or are owned directly or indirectly by one or more Entities that are taxable as corporations for U.S. federal income tax purposes.

c.      Sources of Consideration for Plan Distributions

(i)      Issuance of New Common Units

On the Effective Date, New Holdco shall issue 10,000,000 units of New Common Units. All of the securities issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid, and non-assessable. Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(ii)      Cash

Reorganized MACH Gen shall fund distributions under the Plan required to be paid in Cash with Cash on hand, including Cash from operations and any Cash received on the Effective Date.

(iii)      New First Lien Facilities

Pursuant to Article III.B of the Plan, distributions to holders of Allowed Class 3A and Class 3B Claims shall be made in form of new debt issued pursuant to the New First Lien Facilities. On the Effective Date, Reorganized MACH Gen shall enter into the New First Lien Facilities. Confirmation shall be deemed approval of the New First Lien Facilities, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by MACH Gen or Reorganized MACH Gen in connection therewith) and Reorganized MACH Gen is authorized to execute and deliver those documents necessary or appropriate to obtain the New First Lien Facilities, including the New First Lien Facilities Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized MACH Gen, the DIP Lenders, the Required First Lien Lenders, the Majority Second Lien Holders, and the New First Lien Agent may mutually agree to be necessary to consummate the New First Lien Facilities.

d.      Corporate Existence

Except as otherwise provided in the Plan (including with respect to the New Holdco LLC Agreement), each MACH Gen Entity shall continue to exist after the Effective Date as a separate limited liability company, limited partnership, or other form, as the case may be, with all the powers of a limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable MACH Gen Entity is incorporated or formed and pursuant to the respective limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

e.      Vesting of Assets in Reorganized MACH Gen

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action (other than Excluded Actions) and any property acquired by MACH Gen pursuant to the Plan shall vest in each respective Reorganized MACH Gen Entity, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, Reorganized MACH Gen may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

f.      Cancellation of Loans, Securities, and Agreements

Except as otherwise provided in the Plan, on the Effective Date:  (1) the obligations of MACH Gen under the DIP Credit Agreement, the First Lien Credit Agreement (subject to the effectiveness of the New First Lien Facilities Documents and the New First Lien Facilities and satisfaction of all conditions precedent, including all conditions precedent regarding the perfection of liens and security interests, to the obligations of the New First Lien Lenders to make extensions of credit thereunder), the Second Lien Credit Agreement, the Interests in MACH Gen, LLC, its intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, MACH Gen giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, MACH Gen that are reinstated pursuant to the Plan), shall be cancelled as to MACH Gen, and Reorganized MACH Gen shall not have any continuing obligations thereunder; and (2) the obligations of MACH Gen pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, MACH Gen (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in MACH Gen that are specifically reinstated pursuant to the Plan, including indemnification obligations assumed pursuant to the Plan) shall be released and

discharged; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan; provided further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to Reorganized MACH Gen.

g.    Corporate and Other Entity Action

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including:  (1) appointment of the New Boards pursuant to Article V.I of the Plan and any other managers, directors, or officers for Reorganized MACH Gen identified in the Plan Supplement; (2) the issuance and distribution of the New Common Units; (3) entry into the New Organizational Documents; (4) entry into the New First Lien Documents; (5) implementation of the Restructuring Transactions; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate or other Entity structure of MACH Gen or Reorganized MACH Gen, and any corporate or other Entity action required by MACH Gen or Reorganized MACH Gen in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of MACH Gen or Reorganized MACH Gen.  On or before the Effective Date, the appropriate officers of MACH Gen or Reorganized MACH Gen, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of Reorganized MACH Gen, including any and all agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article V.G of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

h.    New Organizational Documents

On or immediately prior to the Effective Date or as soon thereafter as is practicable, each of the Reorganized MACH Gen Entities will, to the extent such New Organizational Documents were included in the Plan Supplement, file its New Organizational Documents (if so required under applicable state law) with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized MACH Gen Entities may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the Plan, the laws of their respective state, province, or country of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

i.    Managers and Officers of Reorganized MACH Gen

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of MACH Gen shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each of the Reorganized MACH Gen Entities shall be appointed in accordance with the respective New Organizational Documents.  The members of the New Boards will be identified in the Plan Supplement, together with biographical information.  If any such director, manager, or officer of Reorganized MACH Gen is an "insider" under the Bankruptcy Code, MACH Gen also will disclose the nature of any compensation to be paid to such director or officer.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized MACH Gen.

5.    New Holdco Board

The New Holdco Board shall consist of seven (7) initial members appointed as follows on the Effective Date: (i) three Angelo Gordon Managers appointed by Angelo Gordon; (ii) one Solus Manager appointed by Solus, which director will initially be Christopher Pucillo; (iii) one ECP Manager appointed by DB or ECP, as the case may be; (iv) one Equity-Holder Seat manager appointed by the Majority Equity Holders; and (v) the CEO Manager.

After the initial appointment of directors to the New Holdco Board on the Effective Date, the New Holdco Board will be appointed according to the following:

a.    Angelo Gordon.

For so long as Angelo Gordon owns (directly or indirectly) at least 24% of the Pro Forma Equity, Angelo Gordon will be entitled to designate three individuals to serve on the New Holdco Board.

For so long as Angelo Gordon owns (directly or indirectly) less than 24% of the Pro Forma Equity but at least 16% of the Pro Forma Equity, Angelo Gordon shall be entitled to nominate two individuals to serve on the New Holdco Board.

For so long as Angelo Gordon owns (directly or indirectly) less than 16% of the Pro Forma Equity but at least 8% of the Pro Forma Equity, Angelo Gordon shall be entitled to nominate one individual to serve on the New Holdco Board.

b.    Solus.

For so long as Solus owns (directly or indirectly) at least 8% of the Pro Forma Equity, Solus shall be entitled to designate one individual to serve on the New Holdco Board.

c.    DB/ECP.

For so long as DB, or following a TRS Termination, ECP, owns (directly or indirectly) at least 8% of the Pro Forma Equity, it shall be entitled to designate one individual to serve on the New Holdco Board.

d.    Equity-Holder Seat.

SVP shall designate the director holding the "Equity-Holder Seat" until the first to occur of (i) the date that is eighteen months after the Effective Date and (ii) the date on which SVP owns (directly or indirectly) less than 50% of the Pro Forma Equity that it received on the Effective Date (such date, the "Equity-Holder Manager Transition Date").

After the Equity-Holder Manager Transition Date:

(w) for so long as each of Solus and DB, or following a TRS Termination, ECP, holds at least 8% of the Pro Forma Equity, Solus and DB shall jointly designate the Equity-Holder Seat;

(x) if (1) one of Solus and DB, or following a TRS Termination, ECP, continues to hold at least 8% of the Pro Forma Equity, (2) the other's ownership of the Pro Forma Equity falls below 8% of the Pro Forma Equity, and (3) Angelo Gordon holds less than 16% but at least 8% of the Pro Forma Equity, then for so long as Angelo Gordon holds such amount of Pro Forma Equity and either Solus or DB, or following a TRS Termination, ECP, as applicable, holds at least 8% of the Pro Forma Equity, Angelo Gordon and Solus or DB, or following a TRS Termination, ECP, as applicable, shall jointly designate the Equity-Holder Seat;

(y) if (1) one of Solus and DB, or following a TRS Termination, ECP, continues to hold at least 8% of the Pro Forma Equity, (2) the other's ownership of the Pro Forma Equity falls below 8% of the Pro Forma Equity, and (3) Angelo Gordon holds (A) at least 16% of the Pro Forma Equity or (B) less than 8% of the Pro Forma Equity, then for so long as Solus or DB, or following a TRS Termination, ECP, as applicable, holds at least 8% of the Pro Forma Equity, such holder of at least 8% of the Pro Forma Equity shall designate the Equity-Holder Seat; and

(z) at such time as neither Solus nor DB, or following a TRS Termination, ECP, holds at least 8% of the Pro Forma Equity, the Equity-Holder Seat shall be an independent manager appointed in accordance with the New Holdco LLC Agreement; provided, however, that for so long as Angelo Gordon holds at least 8% of the Pro Forma Equity but no more than 23.9% of the Pro Forma Equity, then Angelo Gordon shall designate the Equity Holder Seat.

e.    Vacancies.

Except as described below and Article V.I.1.d of the Plan, in the event that any Designated Manager for any reason ceases to serve as a member of the New Holdco Board, the resulting vacancy on the New Holdco Board shall be filled by a person designated by the party who designated such Designated Manager.  In the event that the CEO Manager for any reason ceases to serve as a member of the New Holdco Board (including as a result of ceasing to be Reorganized MACH Gen's chief executive officer), the CEO Manager board seat shall remain vacant until Reorganized MACH Gen's chief executive officer is next appointed by the New

Board.  Following the loss of any party's right to appoint a Designated Manager, such party will cause its Designated Manager to promptly resign, and the board seat formerly occupied by such Designated Manager will thereafter be subject to a one-year term, with the vacancy resulting from such loss of designation rights initially filled by a vote of the holders of the New Common Units (determined by plurality) at a special meeting called for such purposes and, thereafter, shall be elected annually by the holders of the New Common Units.

6. New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

a. Effectuating Documents; Further Transactions

On and after the Effective Date, Reorganized MACH Gen and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of Reorganized MACH Gen, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

b. Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

c. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX of the Plan, Reorganized MACH Gen shall retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Preserved Causes of Action, whether arising before or after the Petition Date, including any actions specifically identified  in the Plan Supplement, and Reorganized MACH Gen's rights to commence, prosecute, settle, or assert as a defense such Preserved Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  Reorganized MACH Gen may pursue such Preserved Causes of Action, as appropriate, in accordance with the best interests of Reorganized MACH Gen.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Preserved Cause of Action against it as any indication that MACH Gen or Reorganized MACH Gen, as applicable, will not, or may not, pursue any and all available Preserved Causes of Action against it.  MACH Gen or Reorganized MACH Gen, as applicable,

expressly reserves all rights to prosecute any and all Preserved Causes of Action against any Entity.  Unless any Preserved Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized MACH Gen expressly reserves all Preserved Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Preserved Causes of Action upon, after, or as a consequence of, the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Preserved Causes of Action that a MACH Gen Entity may hold against any Entity shall vest in Reorganized MACH Gen.  The applicable Reorganized MACH Gen Entity or Entities, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Preserved Causes of Action.  Reorganized MACH Gen shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Preserved Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

7.    Treatment of Executory Contracts and Unexpired Leases

a.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise ordered by the Bankruptcy Court, provided in the Plan, or identified in the Plan Supplement as being rejected, all Executory Contracts and Unexpired Leases of MACH Gen, including the CPV Agreement and Willow Bend Agreement, shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  The pendency of any motion to assume or reject Executory Contracts or Unexpired Leases shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to Article VI.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, Reorganized MACH Gen in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

At least fourteen (14) days prior to the Confirmation Hearing, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, MACH Gen shall provide notices of any Executory Contracts or Unexpired Leases to be rejected to the applicable contract and lease counterparties, together with procedures for asserting any rejection damages claim.  Any rejection damages claim that is not timely asserted in accordance with the noticed procedures shall be deemed waived and release with respect to the relevant MACH Gen Entity.

34

b.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized MACH Gen or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

At least fourteen (14) days prior to the Confirmation Hearing, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, MACH Gen shall provide for notices of assumption and proposed cure amounts to be sent to applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a contract or lease counterparty to a proposed assumption or related cure amount must be filed, served, and actually received by MACH Gen prior to the Confirmation Hearing (or such other date as may be provided in the applicable assumption notice).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

c.      Indemnification Obligations

On the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, MACH Gen shall assume (and be deemed to have assumed), (1) all indemnification obligations in place on the Petition Date (whether in operating agreements, limited liability company agreements, limited partnership agreements, board resolutions, indemnification agreements, or employment contracts) for the former and current directors and officers of MACH Gen (other than any indemnification obligation that arises under or relates to gross negligence, fraud, willful misconduct, or illegal acts of, or by, any indemnified party) and (2) all director and officer insurance policies in place as of the Petition Date.  The foregoing indemnification obligations that are assumed, deemed assumed, honored, or reaffirmed by MACH Gen shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in

any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

d.      Insurance Policies

Each of the insurance policies of MACH Gen and any agreements, documents, or instruments relating thereto, are deemed to be and treated as Executory Contracts under the Plan. On the Effective Date, MACH Gen shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

e.      Payment of Management Incentive Compensation

All Management Incentive Compensation earned as of, but not paid prior to, the Effective Date shall be paid upon (1) the Effective Date, if such Management Incentive Compensation has already come due, or (2) if such Management Incentive Compensation was not yet due, then when such Management Incentive Compensation comes due in accordance with the terms thereof, as such terms were in effect immediately prior to the Effective Date, and in the ordinary course of MACH Gen's business.  Any modification to the terms of Management Incentive Compensation earned after the Effective Date shall be determined by the compensation committee of the New Holdco Board within ninety (90) days of the Effective Date.

f.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by MACH Gen during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

g.      Reservation of Rights

Nothing contained in the Plan shall constitute an admission by MACH Gen that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that MACH Gen or Reorganized MACH Gen has any liability thereunder.

h.      Non-occurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

i.      Contracts and Leases Entered into after Petition Date

Contracts and leases entered into after the Petition Date by any MACH Gen Entity, including any Executory Contracts and Unexpired Leases assumed by a MACH Gen Entity, will be performed by the applicable MACH Gen Entity or Reorganized MACH Gen Entity, as the case may be, liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

8.      Provisions Governing Distributions

a.      Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan (including payments made in the ordinary course of MACH Gen's business to holders of Claims in Class 5A) or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII of the Plan.

b.      Application of Distributions

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

c.      Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  If the Disbursing Agent is one or more of the Reorganized MACH Gen Entities, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized MACH Gen.

d.      Rights and Powers of Disbursing Agent

*(i)*      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan;

(b) make all distributions contemplated by the Plan; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

*(ii)*　　Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized MACH Gen.

e.　　Delivery of Distributions and Undeliverable or Unclaimed Distributions

*(i)*　　Delivery of Distributions to Holders of First Lien Claims and DIP Claims

Upon the execution of the New First Lien Facilities Documents on the Effective Date, all distributions to holders of First Lien Claims and DIP Claims shall be deemed complete in accordance with the Plan and all obligations thereafter shall be governed by the New First Lien Facilities Documents.

*(ii)*　　Delivery of Distributions to Second Lien Agent

No later than two (2) Business Days after the Confirmation Order is entered, the Second Lien Agent shall provide to counsel to MACH Gen a list of all holders of Second Lien Claims as of such date and such additional information as reasonably requested by counsel to MACH Gen or the Disbursing Agent required to make distributions under the Plan.  All distributions to holders of Allowed Second Lien Claims shall be governed by the Second Lien Credit Agreement and shall be made to each holder of an Allowed Second Lien Claim or such holder's authorized designee for purposes of distributions to be made under the Plan.  All reasonable and documented fees and expenses of the Second Lien Agent incurred after the Effective Date as part of Article VII.E.2 of the Plan shall be paid by Reorganized MACH Gen.

*(iii)*　　Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests as of the voting record date, January 15, 2014, at the address for each such holder as indicated on MACH Gen's records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized MACH Gen.

*(iv)*　　Minimum Distributions of New Common Units

No fractional New Common Units shall be distributed, and no Cash shall be distributed with respect to such fractional amounts.  When any distribution pursuant to the Plan would

otherwise result in the issuance of a number of New Common Units that is not a whole number, the actual distribution of New Common Units shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized New Common Units to be distributed to holders of Allowed Claims and Allowed Interests shall be adjusted as necessary to account for the foregoing rounding.

*(v)*    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date; provided further, that MACH Gen or Reorganized MACH Gen, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to Reorganized MACH Gen automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred.

f.    Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Units as contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of securities.  In addition, under section 1145 of the Bankruptcy Code, the New Common Units will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the New Organizational Documents.

g.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Reorganized MACH Gen shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, Reorganized MACH Gen and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

Reorganized MACH Gen reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

> h.      No Postpetition Interest on Claims and Interests

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

> i.      Setoffs and Recoupment

MACH Gen and Reorganized MACH Gen are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that MACH Gen or Reorganized MACH Gen may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by MACH Gen or Reorganized MACH Gen of any such claim they may have against the holder of such Claim.

> j.      Claims Paid or Payable by Third Parties

> (i)      Claims Paid by Third Parties

MACH Gen or Reorganized MACH Gen, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a MACH Gen or Reorganized MACH Gen Entity.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a MACH Gen or Reorganized MACH Gen Entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable MACH Gen or Reorganized MACH Gen Entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized MACH Gen Entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

> (ii)      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of MACH Gen's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of MACH Gen's insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers'

agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

*(iii)*    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that MACH Gen or any Entity may hold against any other Entity under any insurance policies, including against insurers, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

9.    Procedures for Treating Disputed Claims and Interests Under Plan

a.    Disputed Claims and Interests Process

Except as otherwise specified in the Plan or required by an order of the Bankruptcy Court, holders of Claims or Interests need not file proofs of claim or interest with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan.  If a proof of claim or interest is filed, and if MACH Gen or Reorganized MACH Gen dispute any such Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided, however, that MACH Gen or Reorganized MACH Gen may elect to object to any proof of claim or interest, and to have the validity or amount of any Claim or Interest adjudicated by, the Bankruptcy Court; provided further, that holders of Claims or Interests may elect to resolve the validity or amount of any Claim or Interest in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply applicable bankruptcy law and the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  Notwithstanding anything to the contrary in the Plan, (1) Reorganized MACH Gen shall retain all defenses to Claims and Interests under applicable law and (2) notwithstanding anything to the contrary in the Plan, on the Effective Date, any proof of claim or interest filed by an Entity whose Allowed Claim or Allowed Interest is otherwise addressed, resolved, paid, or satisfied by the Plan shall be automatically expunged without further notice to or action, order, or approval of the Bankruptcy Court.

b.    No Distributions Pending Allowance

Notwithstanding anything to the contrary in the Plan, if any portion of a Claim or Interest is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

c.    Distributions after Allowance

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or

judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

    10.      Settlement, Release, Injunction, and Related Provisions

    a.      Compromise and Settlement

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of MACH Gen, its Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  In addition, the allowance, classification, and treatment of any Allowed Claims and Allowed Interests of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between MACH Gen and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan.  The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant to the Plan. Nothing in Article IX.A of the Plan shall compromise or settle, in any way whatsoever, any Causes of Action that MACH Gen or Reorganized MACH Gen, as applicable, may have against any Entity that is not a Released Party.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, Reorganized MACH Gen may, in its sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in MACH Gen (if any), and (2) claims (including Causes of Action) against other Entities.

    b.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Plan Supplement), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by Reorganized MACH Gen), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in MACH Gen or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), (h), or (i) of the Bankruptcy Code.  The Confirmation Order shall be

a judicial determination of the discharge of all Claims and Interests as set forth above subject to the occurrence of the Effective Date.

      c.      Release of Liens

**Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New First Lien Facilities Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New First Lien Facilities Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized MACH Gen Entities and each of their successors and assigns.**

      d.      Releases of Released Parties

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article IX.D of the Plan and shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by Article IX.D of the Plan; (3) in the best interests of MACH Gen and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including MACH Gen) asserting any claim or Cause of Action released pursuant to Article IX.D of the Plan.**

      *(i)*      Releases by MACH Gen

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of MACH Gen and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, MACH Gen, Reorganized Mach Gen, and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a MACH Gen Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that MACH Gen, Reorganized Mach Gen, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any MACH Gen Entity), based on or relating to, or in any manner arising from, in whole or in part, MACH Gen, the Chapter 11 Cases, the DIP Claims, the First Lien Claims, the Second Lien Claims, the purchase, sale, or rescission of the purchase or sale of any security of MACH Gen or Reorganized MACH Gen, the subject matter of, or the transactions or**

events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any MACH Gen Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.

(ii)    Third-Party Releases by Holders of Claims or Interests

On and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a MACH Gen Entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any MACH Gen Entity), based on or relating to, or in any manner arising from, in whole or in part, MACH Gen, the Chapter 11 Cases, the DIP Claims, the First Lien Claims, the Second Lien Claims, the purchase, sale, or rescission of the purchase or sale of any security of MACH Gen or Reorganized MACH Gen, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any MACH Gen Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.

e.    Exculpation

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim (including any Cause of Action) related to any act taken or omitted to be taken in connection with, relating to, or arising out of the out-of-court restructuring efforts of MACH Gen, negotiation of and entry into the Restructuring Support Agreement, the DIP Credit Agreement, the New First Lien Facilities Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other

44

agreement or document created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the preparation or filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the Restructuring Transactions, and the administration and implementation of the Plan, including the issuance of any securities or the distribution of property under the Plan or any other agreement or any obligation, cause of action, or liability for any such Claim; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; provided further, that in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

    f.   Injunction

    Except as otherwise expressly provided in the Plan and except for obligations issued pursuant to the Plan, including with respect to the New First Lien Facilities, all Entities who have held, hold, or may hold claims, Causes of Action, or interests that have been released pursuant to Article IX.D of the Plan (the "Released Claims") or discharged pursuant to Article IX.B of the Plan (the "Discharge"), or that are subject to exculpation pursuant to Article IX.E of the Plan (the "Exculpation"), are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (2) enforcing, attaching, collecting, or recovering, by any manner or means any judgment, award, decree or order against the Released Parties or the Exculpated Parties, as applicable, on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or the Exculpated Parties, as applicable, or their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; and (4) asserting any right of subrogation or recoupment of any kind against any obligation due from the Released Parties or the Exculpated Parties, as applicable, or against their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation.

11.     Conditions to Confirmation and Effective Date

      a.     Conditions to Confirmation

The following are conditions to Confirmation that shall have been satisfied or waived in accordance with Article X.C of the Plan:

    1.     no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred, and no Termination Event (as defined in the Restructuring Support Agreement) shall have occurred and not been waived that, in either instance, has the effect of (a) removing any MACH Gen Entity as a party to the Restructuring Support Agreement or (b) having Support Parties remaining as parties to the Restructuring Support Agreement that do not meet the thresholds specified in section 1 of the Restructuring Support Agreement;

    2.     the Confirmation Order shall approve all provisions, terms, and conditions of the Plan and be in form and substance reasonably acceptable to MACH Gen, the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders; and

    3.     the Plan Supplement shall have been filed at least fourteen (14) days prior to the Confirmation Hearing, in form and substance reasonably acceptable to MACH Gen, the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders, and any additional documents or amendments to previously-filed documents shall have been filed as amendments to the Plan Supplement prior to Confirmation.

      b.     Conditions to Effective Date

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article X.C of the Plan:

    1.     no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred, and no Termination Event (as defined in the Restructuring Support Agreement) shall have occurred and not been waived that, in either instance, has the effect of (a) removing any MACH Gen Entity as a party to the Restructuring Support Agreement or (b) having Support Parties remaining as parties to the Restructuring Support Agreement that do not meet the thresholds specified in section 1 of the Restructuring Support Agreement;

    2.     the Bankruptcy Court shall have entered the DIP Orders, which shall have become Final Orders, (a) in the forms attached to the Restructuring Support Agreement or (b) in such other forms as are consented to by each of MACH Gen, the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders;

3.  Confirmation shall have occurred, and the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, in form and substance reasonably acceptable to MACH Gen, the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders;

4.  all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of MACH Gen's permits and licenses, shall have been obtained from any appropriate regulatory agencies, including the Federal Energy Regulatory Commission, the Federal Communications Commission, and the New York State Public Services Commission, and not subject to any appeal;

5.  the members of the New Boards shall have been identified in the Plan Supplement and appointed;

6.  all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, which are in form and substance reasonably acceptable to MACH Gen, the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders and otherwise consistent with the Restructuring Support Agreement;

7.  all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law; and

8.  there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan.

c.  Waiver of Conditions

The conditions to Confirmation and the Effective Date set forth in Article X of the Plan may be waived only by MACH Gen, with the consent of the DIP Lenders, the Required First Lien Holders, and the Majority Second Lien Holders, in whole or in part, without notice, leave, or order of the Bankruptcy Court.

d.  Effect of Non-Occurrence of Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by MACH Gen, any holders of Claims or Interests (including the Support Parties), or any other Entity; (2) prejudice in any manner the rights of MACH Gen, any holders

47

of Claims or Interests (including the Support Parties), or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by MACH Gen, any holders of Claims or Interests (including the Support Parties), or any other Entity, in any respect. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Support Parties under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

      12.      Modification, Revocation or Withdrawal of Plan

      a.      Modification and Amendments

Except as otherwise specifically provided in the Plan, and subject to the terms of the Restructuring Support Agreement, MACH Gen reserves the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, each MACH Gen Entity expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such MACH Gen Entity, one or more times, after Confirmation, and to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

      b.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

      c.      Revocation or Withdrawal of Plan

MACH Gen reserves the right to revoke or withdraw the Plan with respect to any or all of the MACH Gen Entities prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement. If MACH Gen revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such MACH Gen Entity or any other Entity

(including the Support Parties); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such MACH Gen Entity or any other Entity (including the Support Parties).

13.      Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which MACH Gen is party or with respect to which MACH Gen may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving MACH Gen that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.J.1 of the Plan;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or final decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX of the Plan, regardless of whether such termination occurred before or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

B.     *Summary of Capitalization of Reorganized MACH Gen*

1.     Description of New Common Units

As set forth in the Plan, on the Effective Date, New Holdco will issue 10 million units of New Common Units representing, in aggregate, 100% of the equity interests in Reorganized MACH Gen, with 93.5% of the New Common Units allocated to the holders of Allowed Second Lien Claims and 6.5% of the New Common Units allocated to the holders of Allowed Interests in MACH Gen, LLC.  The New Common Units will be issued on terms consistent with the "Reorganized Equity Term Sheet" attached as Schedule 3 to the Restructuring Support Agreement, including, among others:

- **Classes of Equity:**  There will be no classes of equity senior to the New Common Units.

- **Transferability:**  Subject to the requirements of the Securities Act of 1933, as amended, the New Common Units will not be subject to rights of first refusal, rights of first offer, or any similar restrictions on transfer; provided, however that the New Common Units may contain reasonable and customary restrictions designed to maintain Reorganized MACH Gen as a private company and comply with the requirements of any applicable regulatory body, including without limitation the Federal Energy Regulatory Commission and New York State Public Service Commission.

- **Tag-Along Rights:**  In the event that any holder(s) of New Common Units proposes to transfer 35% or more of the outstanding New Common Units to a person or a group of affiliated persons, in a single transaction or series of related transactions, each other holder of New Common Units will have a tag-along right to participate, on a pro rata basis in such transaction(s), on the same terms and subject to the same conditions as the initiating holder(s).  Any proposed elimination of tag-along rights will require the consent of each affected holder of New Common Units.

- **Drag-Along Rights:**  In the event that any holder(s) of New Common Units propose to transfer at least 50% of the outstanding New Common Units to a person or group of affiliated persons that proposes to purchase for cash all (but not less than all) of the outstanding New Common Units, then the initiating holder(s) will have a drag-along right to cause all of the other holders to transfer

51

all of their New Common Units to such person(s), on the same terms and subject to the same conditions as the initiating holder(s), and subject to reasonable and customary minority protections.

- **Preemptive Rights:**  Each holder of at least 1% of the New Common Units will be entitled to reasonable and customary preemptive rights, subject to customary exceptions.

- **Governance:**  The boards of Reorganized MACH Gen will be determined in accordance with Article V.I of the Plan.

- **Registration Rights:**  Certain holders of New Common Units will have reasonable and customary piggy back registration rights.  In connection with a public offering, the board of New Holdco may approve the conversion of New Holdco from a limited liability company to a corporation and each holder of New Common Units shall cooperate in such conversion.

Additionally, Deutsche Bank AG, London Branch ("DB"), who is a Consenting Second Lien Holder, is expected to be the legal owner of 11.5% of the total New Common Units to be issued and outstanding as of the Effective Date.  DB is party to a Loan Total Return Swap Transaction evidenced by a Loan Total Return Swap Confirmation by and between ECP Polaris, Ltd ("ECP") and DB (the "Total Return Swap").  If, pursuant to the Total Return Swap or an amended version of the Total Return Swap, DB is requested by ECP to vote DB's share of the New Common Units, DB agrees that, from and on the Effective Date, DB will vote no more than 9.9% of such New Common Units in accordance with such request until FERC has favorably determined in writing an application pursuant to section 203 of the Federal Power Act that contains an Appendix A Analysis.

**Additional information regarding the terms of the New Common Units may be found in the reorganized equity term sheet attached as Schedule 3 to the Restructuring Support Agreement.**

2.      Description of New First Lien Facilities

As set forth in the Plan, on the Effective Date, New Holdco (or another newly-formed subsidiary of New Holdco) will enter into the New First Lien Facilities, and distributions to holders of Allowed First Lien Revolver Claims and Allowed First Lien Term Loan Claims will be made in the form of new debt issued pursuant to the New First Lien Facilities.  The New First Lien Facilities will comprise (a) a new $200 million revolving credit facility (of which up to $160 million will be available for the issuance of letters of credit) and (b) a new term loan facility in the aggregate principal amount of approximately $483 million.  The new term loan facility will be on terms substantially similar to those of MACH Gen's current term loan facility under the First Lien Credit Agreement, as modified by the Prepetition Amendment.

As of the Effective Date, the new revolving credit facility will be on terms substantially similar to those of the DIP Facility.  Sixty (60) days after the Effective Date, the total revolving commitment will be reduced by $40 million, and the borrower's obligations will thereafter be on

terms substantially similar to those of MACH Gen's current revolving loan facility under the First Lien Credit Agreement, as such terms existed prior to effectiveness of the Prepetition Amendment.

New Holdco (or a newly-formed subsidiary of New Holdco) will act as borrower under the New First Facilities, with MACH Gen GP, Millennium Power, New Athens, and New Harquahala as guarantors.  As security for the obligations arising under the New First Lien Facilities, MACH Gen expects that New Holdco and the guarantors will grant first priority liens and security interests in substantially all of their assets and property, including the property of and equity interests in MACH Gen GP, Millennium Power, New Athens, and New Harquahala.

The form of First Lien Credit and Guaranty Agreement that will govern the New First Lien Facilities is attached as Exhibit G to the Restructuring Support Agreement.

## SECTION V.
## VOTING PROCEDURES AND REQUIREMENTS

This Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan.  If you are entitled to vote to accept or reject the Plan, you should receive a ballot for the purpose of voting on the Plan.  If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class of Claims or Interests.  If you are entitled to vote and did not receive a ballot, received a damaged ballot, or lost your ballot please contact the Voting Agent by e-mail at machgeninfo@primeclerk.com or by phone at (212) 257-5490.

**Before voting to accept or reject the Plan, each eligible holder of a Claim or Interest should carefully review the Plan attached hereto as <u>Exhibit A</u> and described in Section IV herein entitled, "Joint Prepackaged Chapter 11 Plan."**

A.      *Voting Deadline*

To be considered for purposes of accepting or rejecting the Plan, all ballots must be **actually received** by the Voting Agent no later than the Voting Deadline of **5:00 p.m., prevailing Eastern Time, on February 19, 2014**, unless MACH Gen extends the Voting Deadline.  **MACH Gen expressly reserves the absolute right to extend, by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which ballots will be accepted for any reason, until the necessary ballots have been received. MACH Gen will not have any obligation to publish, advertise, or otherwise communicate any such extension, other than by issuing a news release through PR Newswire.  There can be no assurance that MACH Gen will exercise any right to extend the solicitation period and deadline for the receipt of ballots.**

Except to the extent requested by MACH Gen, in its sole discretion, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, ballots received by the Voting Agent after the Voting Deadline will not be counted or otherwise used in connection with MACH Gen's request for confirmation of the Plan (or any permitted modification thereof).

ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

Ballot Processing
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, NY 10022

You must complete and return your original ballot(s).  Votes may not be transmitted orally, by facsimile, or by electronic mail.  Accordingly, you are urged to return your signed and completed ballot(s) promptly.

B.    *Voting Record Date*

Consistent with the provisions of Bankruptcy Rule 3018(b), MACH Gen has fixed January 15, 2014 as the "Voting Record Date" for the determination of holders of record of Claims or Interests entitled to vote to accept or reject the Plan.  Only holders of record are entitled to vote to accept or reject the Plan.

C.    *Parties Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not Impaired by a plan are deemed to accept the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "Impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Creditors and equity interest holders whose claims or interests are Impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

As mentioned above, this Disclosure Statement and other Solicitation Package materials are being furnished prior to the commencement of the Chapter 11 Cases, and MACH Gen is soliciting votes on the Plan from the holders of Allowed Claims and Interests in Classes 3A, 3B, 4, and 7(a), which Classes are deemed to be Impaired, as follows:

- Holders of Class 3A First Lien Revolver Claims whose names appear as of the Voting Record Date in the list of holders maintained by the First Lien Agent;

- Holders of Class 3B First Lien Term Loan Claims whose names appear as of the Voting Record Date in the list of holders maintained by the First Lien Agent;

- Holders of Class 4 Second Lien Claims whose names appear as of the Voting Record Date in the list of holders maintained by the Second Lien Agent; and

- Holders of Class 7(a) Interests in MACH Gen, LLC whose names appear in MACH Gen, LLC's records as of the Voting Record Date.

Holders of Claims and Interests that are entitled to vote should receive ballots with their Solicitation Package, which ballots should be used to submit their vote.

D.    *Ballots*

Each ballot enclosed with this Disclosure Statement is marked with the Class into which the Claim or Interest has been placed under the Plan.  All votes to accept or reject the Plan with respect to any Class of Claims or Interests must be cast by properly submitting the duly completed and executed form of ballot designated for such Class.  Holders of Claims or Interests voting on the Plan should complete and sign their ballot(s) in accordance with the instructions thereon, being sure to check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN."  Any executed ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

To the extent a holder of Claims or Interests holds multiple Claims or Interests within a particular Class, MACH Gen may, in its discretion, instruct the Voting Agent to aggregate, to the extent possible, such holder's Claims or Interests (as applicable) for purposes of counting votes.

Ballots must be delivered to the Voting Agent, at its address set forth above, and **actually received** by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a ballot, received a damaged ballot, or lost your ballot, please contact the Voting Agent by e-mail at machgeninfo@primeclerk.com or by phone at (212) 257-5490.

E.    *Agreements upon Furnishing Ballots*

The delivery of a ballot to the Voting Agent by a holder of a Claim or an Interest voting to accept the Plan will constitute the agreement of such holder to accept (1) all of the terms of, and conditions to, the solicitation and (2) the terms of the Plan; provided, however, that all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code in accordance with any applicable order of the Bankruptcy Court.

In addition, a vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

1.       Special Consents by Holders of Interests in MACH Gen, LLC upon Furnishing Ballots

**FOR A HOLDER OF AN INTEREST VOTING TO ACCEPT THE PLAN**, THE DELIVERY OF A BALLOT TO THE VOTING AGENT WILL ALSO CONSTITUTE, FOR PURPOSES OF THE AMENDED AND RESTATED LIMITED LIABILITY AGREEMENT OF MACH GEN, LLC, A WRITTEN CONSENT TO THE RESTRUCTURING AND ALL NECESSARY OR APPROPRIATE STEPS TAKEN IN FURTHERANCE THEREOF, INCLUDING, WITHOUT LIMITATION, AUTHORIZING THE FILING BY MACH GEN, LLC, OF A VOLUNTARY PETITION COMMENCING ITS CHAPTER 11 CASE.

F.       *Withdrawal or Change of Votes on Plan*

Except as may be provided in the Restructuring Support Agreement with respect to the votes of the Support Parties, after the Voting Deadline, no vote may be withdrawn without the prior consent of MACH Gen, which consent shall be provided in MACH Gen's sole discretion.

Any holder who has submitted a properly completed ballot to the Voting Agent prior to the Voting Deadline may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly-completed ballot for acceptance or rejection of the Plan. If more than one timely, properly-completed ballot is received with respect to the same Claim or Interest, the ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the ballot that the Voting Agent determines in its sole discretion was the last to be received.

G.       *Fiduciaries and Other Representatives*

If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, such Entity should indicate such capacity when signing and, if requested by MACH Gen, will be required to submit proper evidence satisfactory to MACH Gen of authority to so act. Authorized signatories should submit the separate ballot of each holder for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS **ACTUALLY RECEIVED** BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT MACH GEN RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO ACCEPT AND COUNT ANY SUCH LATE BALLOT. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.

H.       *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by MACH Gen in its sole discretion, which determination will be final and binding. As indicated above, effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. MACH Gen reserves the absolute right to contest the validity of any

such withdrawal.  MACH Gen also reserves the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of MACH Gen or its counsel, be unlawful. MACH Gen further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular ballot.  The interpretation (including the ballot and the applicable instructions thereto) by MACH Gen, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as MACH Gen (or the Bankruptcy Court) determines.  Neither MACH Gen nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots, nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

I.      *Further Information, Additional Copies*

If you have any questions or require further information about the voting procedure for voting your Claim or Interest or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by of Bankruptcy Rule 3017(d)), please contact the Voting Agent by e-mail at machgeninfo@primeclerk.com or by phone at (212) 257-5490.

J.      *Requirements for Acceptance by Impaired Class*

1.      Class of Claims

An Impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

2.      Class of Interests

An Impaired Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds in amount of the Allowed Interests in such Class that have voted on the Plan.

**SECTION VI.**
**CONFIRMATION OF PLAN**

A.      *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing.  On, or as promptly as practicable after commencement of the Chapter 11 Cases, MACH Gen will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity interest holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for

an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules, (3) set forth the name of the objecting party, the nature of Claims or Interests held or asserted by the objecting party, and (4) state with particularity the legal and factual basis for the objection, and (5) be filed with the Bankruptcy Court, together with proof of service thereof, and served so as to be received no later than the date and time designated in the notice of the Confirmation Hearing.

The procedures for filing objections to confirmation of the Plan shall be determined by the Bankruptcy Court after the Chapter 11 Cases are commenced.

B.      *Requirements for Confirmation of Plan – Consensual Confirmation*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  If the Plan is accepted by all Impaired Classes of Claims and Interests (i.e., a consensual confirmation), among the requirements for confirmation are that the Plan is (1) feasible and (2) in the "best interests" of holders of Claims and Interests Impaired under the Plan.

1.      Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of MACH Gen or any successors to MACH Gen under the Plan.  This condition is often referred to as the "feasibility" of the Plan. MACH Gen believes that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, MACH Gen, in consultation with its financial and market advisors, has analyzed MACH Gen's ability to meet its obligations under the Plan.  As part of that analysis, MACH Gen has prepared consolidated projected financial results (the "Projections") for each of the fiscal years 2014 through and including 2018.  These Projections, and the assumptions on which they are based, are attached hereto as Exhibit C.

MACH Gen has prepared the Projections based upon certain assumptions and upon the assessments of certain market experts that it believes to be reasonable at the time of preparation. Those assumptions MACH Gen considered to be significant are described in the Projections. The Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material.  All holders of Claims and Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the feasibility of the Plan.

2.      Best Interests Test

Unless each Impaired Class of Claims or Interests under the Plan unanimously accepts the Plan, section 1129 of the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims and Interests in such Classes. This "best interests" test must show that each holder of Impaired Claims or Interests receive property with a value not less than the amount such holder would receive if MACH Gen were liquidated under chapter 7 of the Bankruptcy Code. MACH Gen believes that under the Plan, holders of Impaired Claims or Interests will receive property with a value equal to or in excess of the value such holders would receive in a chapter 7 liquidation.

To estimate the potential recoveries to holders of Claims and Interests in a Chapter 7 liquidation, MACH Gen determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.

The amount of liquidation value available to holders of unsecured Claims against MACH Gen would be reduced by, first, the Claims of secured creditors to the extent of the value of their collateral and, second, the administrative expenses and priority claims allowed in chapter 7, including the costs and expenses of liquidation. Costs and other administrative expenses of a chapter 7 liquidation would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, applicable taxes, litigation costs, all unpaid administrative expenses incurred by MACH Gen in the Chapter 11 Cases that are allowed in the chapter 7 cases, such as compensation of counsel and other professionals retained by MACH Gen and Claims arising from MACH Gen's operations during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the original course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to another Class would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full.

Once the Bankruptcy Court ascertains the liquidation recoveries to MACH Gen's secured and priority creditors in chapter 7, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. MACH Gen believes that the Liquidation Analysis attached hereto

as <u>Exhibit D</u> will demonstrate that each holder in a Class of Impaired Claims or Interests will receive at least as much, if not more, under the Plan as such holder would receive if MACH Gen were liquidated pursuant to chapter 7. Therefore, MACH Gen believes that the Plan satisfies the requirements of the "best interests" test.

C.    *Requirements for Confirmation of Plan – Non-Consensual Confirmation*

All Classes of Claims and Interests under the Plan are either Unimpaired or will have accepted the Plan as a condition to MACH Gen commencing the Chapter 11 Cases. Nevertheless, MACH Gen reserves the right to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding rejection or deemed rejection by any Impaired Class of Claims or Interests (<u>i.e.</u>, a non-consensual confirmation).

The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over the dissent of any Impaired Class of Claims or Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the chapter 11 process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection by any Impaired Class of Claims or Interests if, among other requirements, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class. While these requirements will not apply if the Plan is accepted by all Impaired Classes of Claims and Interests, MACH Gen believes that the Plan nonetheless satisfies the requirements for a non-consensual confirmation and may be confirmed over the dissent of any Impaired Class of Claims or Interests.

1.    Unfair Discrimination

A plan does not discriminate unfairly against a dissenting class if its legal rights are treated in a manner consistent with the treatment of the legal rights of other classes of the same liquidation priority under non-bankruptcy law as the dissenting class. MACH Gen believes that the Plan treats each Impaired Class in a manner consistent with each other Class of equal priority and therefore satisfies the "unfair discrimination" test.

2.    Fair and Equitable Test

A chapter 11 plan is only fair and equitable with respect to a dissenting class if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests. The "fair and equitable" test also imposes certain requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of Impaired secured creditors, a chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of

consummation of the chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of Impaired unsecured creditors, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the chapter 11 plan.

To be fair and equitable with respect to a dissenting class of Impaired equity interest holders, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the chapter 11 plan.

MACH Gen believes that the Plan does not permit holders any Class to receive more than they entitled to on account their Claims or Interests and that the Plan satisfies each other requirement of the "fair and equitable" test with respect to each Impaired Class.

## SECTION VII.
## PROJECTED FINANCIAL INFORMATION AND
## VALUATION ANALYSIS

A.    *Consolidated Financial Projections*

As noted above, MACH Gen has prepared certain Projections, which are attached to this Disclosure Statement as Exhibit C.  MACH Gen engaged Leidos Engineering, LLC ("Leidos"), an industry-leading, independent energy markets consultancy firm, to develop sales volumes and gross margin projections for each Facility. MACH Gen and Leidos undertook a thorough analysis of MACH Gen's operations and applied that analysis to the Projections for the years 2014–2018.  The Projection period commences January 1, 2014.  The development of the Projections considered historical and recent operational performance, costs required to maintain strong availability, and Leidos's proprietary view regarding forecasted growth rates and electricity prices for the primary markets in which MACH Gen participates.  The principal assumptions that are part of the Projections are set forth as part of Exhibit C.

MACH Gen prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of Reorganized MACH Gen.  MACH Gen does not generally publish its business plans and strategies or make external projections of their anticipated financial position or results of operations.  MACH Gen does not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.  Furthermore, Reorganized MACH Gen does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

THE PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE

FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS.  MACH GEN'S INDEPENDENT ACCOUNTANTS
HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS
AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF
ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY
FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE
PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, MACH
GEN DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL
POSITION OR RESULTS OF OPERATIONS.  MACH GEN DOES NOT INTEND TO
UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR
CIRCUMSTANCES EXISTING OR ARISING AFTER JANUARY 21, 2014 OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

MACH GEN BELIEVES THAT THE PROJECTIONS ARE BASED ON ESTIMATES
AND ASSUMPTIONS THAT ARE REASONABLE.  THE ESTIMATES AND
ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY
SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE
UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND MACH
GEN'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER
THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE
PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND
EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON
WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE
ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT
FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE
PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR
OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  SEE
SECTION X HEREIN ENTITLED, "RISK FACTORS."

B.    *Reorganized MACH Gen Valuation Analysis*

At MACH Gen's request, Moelis & Company ("Moelis") performed a valuation analysis
of Reorganized MACH Gen.  Based upon and subject to the review and analysis described
herein, and subject to the assumptions, limitations and qualifications described herein, Moelis'
view, as of December 31, 2013, was that the estimated going concern enterprise value of
Reorganized MACH Gen would be in a range between $1,090 million and $1,260 million.
Moelis' views are necessarily based on economic, market, and other conditions as in effect on,
and the information made available to Moelis as of, the date of its analysis (December 31, 2013).
It should be understood that, although subsequent developments may affect Moelis' views,
Moelis does not have any obligation to update, revise or reaffirm its estimate.

Moelis' analysis is based, at MACH Gen's direction, on a number of assumptions,
including, among other assumptions, that (1) MACH Gen will be reorganized in accordance with
the Plan; (2) Reorganized MACH Gen will achieve the results set forth in Projections provided
to Moelis by MACH Gen; (3) Reorganized MACH Gen's capitalization and available cash will
be as set forth in the Plan and this Disclosure Statement (in particular, the pro forma
indebtedness of Reorganized MACH Gen as of the Effective Date will be a maximum of $683

million) and (4) Reorganized MACH Gen will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the Projections.  Moelis makes no representation as to the achievability or reasonableness of such assumptions.  In addition, Moelis assumed that there will be no material change in economic, market, and other conditions as of the Effective Date.

Moelis assumed, at MACH Gen's direction, that the Projections prepared by MACH Gen's management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of MACH Gen's management as to the future financial and operating performance of Reorganized MACH Gen.  The future results of Reorganized MACH Gen are dependent upon various factors, many of which are beyond the control or knowledge of MACH Gen, and consequently are inherently difficult to project.  Please refer to Section VII.A herein, entitled "Consolidated Financial Projections."  Reorganized MACH Gen's actual future results may differ materially (positively or negatively) from the Projections and as a result, the actual enterprise value of Reorganized MACH Gen may be significantly higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of Reorganized MACH Gen.

The estimated enterprise value in this section represents a hypothetical enterprise value of Reorganized MACH Gen as the continuing operators of the business and assets of MACH Gen, after giving effect to the Plan, based on certain valuation methodologies as described below.  The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of Reorganized MACH Gen, its securities or its assets, which may be significantly higher or lower than the estimated enterprise value range herein.  The actual value of an operating business such as Reorganized MACH Gen's business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things:  (1) reviewed certain publicly available business and financial information relating to Reorganized MACH Gen that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities and prospects of Reorganized MACH Gen, including projections, furnished to Moelis by MACH Gen; (3) conducted discussions with members of senior management and representatives of MACH Gen concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning MACH Gen's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate.  In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of MACH Gen, relied on such information being complete and accurate in all material respects.  In addition, at the direction of MACH Gen, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of Reorganized MACH Gen, nor was Moelis furnished with any such

evaluation or appraisal.  Moelis also assumed, with MACH Gen's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any holder of a Claim or Interest as to how such holder should vote or otherwise act with respect to the Plan.  Moelis has not been asked to and does not express any view as to what the trading value of Reorganized MACH Gen's securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

1.    Valuation Methodologies

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a discounted cash flow analysis, (b) a selected publicly traded companies analysis, and (c) a selected transactions analysis.  This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis.  The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.

a.    Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  Moelis' DCF analysis used Reorganized MACH Gen's Projections of its debt-free, after-tax cash flows for the remaining useful life of Reorganized MACH Gen's assets without estimating any value of the assets and liabilities at the end of the remaining useful life.  These cash flows were then discounted at a range of estimated weighted average costs of capital, which are determined by reference to, among other things the cost of debt and estimated cost of equity of selected publicly traded companies that are similar to Reorganized MACH Gen in certain respects.  Moelis's DCF analysis also valued Reorganized MACH Gen's current and estimated future federal and state net operating loss balance.

b.    Selected Publicly Traded Companies Analysis

The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to Reorganized MACH Gen, for example, comparable lines of business, business risks, growth prospects, market presence, geography, maturity of business, local market dynamics, diversification, and size and scale of operations.  Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for

each selected company and then applied to Reorganized MACH Gen's financials to imply an enterprise value for Reorganized MACH Gen. Moelis used, among other measures, enterprise value (defined as market value of equity plus book value of debt, book value of preferred stock and minority interests less cash, subject to adjustment where appropriate) for each selected company as a multiple of such company's publicly available forward consensus projected EBITDA (Calendar Year 2014E and 2015E EBITDA were used). Selected companies include public independent power producers with large and diversified fleets in the U.S. with significant merchant exposure. Although the selected companies were used for comparison purposes, no selected company is either identical or directly comparable to the business of Reorganized MACH Gen. Accordingly, Moelis' comparison of the selected companies to the business of Reorganized MACH Gen and analysis of the results of such comparisons were not purely mathematical but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and Reorganized MACH Gen. The selection of appropriate companies for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information. The lack of U.S. publicly traded mid-cap natural gas-fired electric generation power companies with similar geographic exposure to Reorganized MACH Gen made the selection of companies for comparison to Reorganized MACH Gen challenging.

Moelis did not primarily rely on this analysis in its valuation analysis of Reorganized MACH Gen due to the significant differences in risk profile, scale, and diversification of the selected public companies, as well as differences in the amount of power production capacity that such public companies have previously contracted to sell to counterparties.

c.    Selected Transactions Analysis

The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions that have operating and financial characteristics comparable in certain respects to Reorganized MACH Gen, taking into account, among other factors, markets in which they operate, age, technology, contract status, heat rate. and capacity factors. Additionally, Moelis focused on transactions for merchant natural gas-fired power plant assets with limited or no cogeneration capability. Under this methodology, the enterprise value of each such company is determined by a review of the consideration paid and the debt assumed in the merger or acquisition transaction. The enterprise value is calculated as a multiple of the target's nominal electric generation capacity.

Unlike the selected publicly traded companies analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in a company's assets). Thus, this methodology generally may produce higher valuations than the selected publicly traded companies analysis. In addition, other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors: (i) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (i.e., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (ii) the market environment is not identical for transactions occurring at different periods of time; (iii) the sale of a discrete asset or segment may warrant a discount or premium to the sale of an entire

company depending on the specific operational circumstances of the seller and acquirer; and (iv) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (i.e., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

Although the selected transactions were used for comparison purposes, no selected transaction is either identical or directly comparable to the business or assets of Reorganized MACH Gen.  Accordingly, Moelis' comparison of the selected transaction to the business and assets of Reorganized MACH Gen and analysis of the results of such comparisons were not purely mathematical but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected transactions and Reorganized MACH Gen.  The selection of appropriate transactions for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.  The lack of U.S. natural gas-fired electric generation power plant transactions in similar geographies to Reorganized MACH Gen's assets made the selection of transactions for comparison to Reorganized MACH Gen challenging.

Moelis did not primarily rely on this analysis in its valuation analysis of Reorganized MACH Gen due to the significant differences in risk profile, scale, and geography, as well as differences in the amount of power production capacity that such companies and assets had previously contracted to sell to counterparties.

2.    Valuation Considerations

As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.  Accordingly, none of MACH Gen, Moelis or any other person assumes responsibility for the accuracy of such estimated enterprise value.  Depending on the actual financial results of MACH Gen or changes in the financial markets, the enterprise value of Reorganized MACH Gen as of the Effective Date may differ from the estimated enterprise value set forth herein.  In addition, the market prices, to the extent there is a market, of Reorganized MACH Gen's securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## SECTION VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
## THE PLAN

The following is a discussion of certain U.S. federal income tax consequences of the Plan to MACH Gen and certain holders of Claims and Interests.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired, holders who are not entitled to vote because they are deemed to reject the Plan, or holders of Class 3A or 3B Claims.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and MACH Gen does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to holders of Claims or Interests that are not U.S. persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that holders of Claims and Interests hold such Claims and Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of U.S. federal income taxation that may apply to MACH Gen and holders of Claims or Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law and does not address the U.S. "Medicare" tax on certain net investment income. MACH Gen previously made an election to be treated as a corporation for U.S. federal income tax purposes, and such treatment is expected to continue following the Effective Date.

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.    *Certain U.S. Federal Income Tax Consequences to MACH Gen*

1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any indebtedness received, and (iii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange. COD

Income, however, does not arise in certain circumstances, including in connection with the cancellation of an obligation, the payment of which would have been deductible by the payor. A debtor will not be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Whether COD Income will arise in connection with the implementation of the Plan will depend, in part, on the value of the property transferred in satisfaction of a Claim and the allocation of that value between the principal amount and accrued interest on the Claim. A significant portion of the amounts owing with respect to the Class 4 Claims is attributable to accrued interest on such Claims. Accrued interest on the Class 4 Claims has not yet been deducted. As a result, a deduction is generally expected to arise in connection with the payment of interest on the Class 4 Claims (other than certain interest that cannot be deducted based on certain Tax Code limitations). Based on the above, as a general matter, cancellation of MACH Gen's obligation to pay accrued interest on the Class 4 Claims is not expected to result in COD Income. However it is unclear whether MACH Gen could be required to recognize COD Income with respect to the cancellation of any portion of the accrued interest on the Class 4 Claims that would not be deductible when paid. MACH Gen intends to take the position that cancellation of its obligation to repay any such amounts should not give rise to COD Income. However, due to uncertainties in the application of the COD income rules it is possible that such cancellation will give rise to COD Income. If any COD Income arises in connection with the implementation of the Plan, MACH Gen will not be required to pay tax on such income, but it will be required to reduce certain tax attributes by the amount of such COD Income.

2.     Limitation of NOL Carry Forwards and Other Tax Attributes

MACH Gen estimates it had approximately $265 million of U.S. federal NOLs as of December 31, 2013, and expects to generate additional NOLs prior to emergence. If MACH Gen undergoes an "ownership change" for purposes of section 382 of the Tax Code as a result of transactions occurring pursuant to the Plan, NOLs and certain other tax attributes of Reorganized MACH Gen allocable to periods prior to the Effective Date (collectively, the "Pre-Change Losses") may be subject to an annual limitation on use under section 382 of the Tax Code.

a.     General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (3.50% for ownership changes occurring in December 2013). This annual limitation often may be increased in the event the corporation (or consolidated group) has

an overall "built-in" gain in its assets at the time of the ownership change.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

        b.        Special Bankruptcy Exception

An exception  (the "382(l)(5) Exception") to the foregoing annual limitation rules generally applies when at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in a case under chapter 11 of the Bankruptcy Code) is held by shareholders and certain "qualified creditors" of the debtor company (to the extent such stock is received in exchange for their stock or in satisfaction of such qualified creditors' claims against the debtor).  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, with respect to all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and New Holdco undergoes another "ownership change" within two years after consummating the Plan, then New Holdco would be unable to use any of its NOLs or similar tax attributes generated any time prior to the date such second ownership change occurs.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply to an ownership change that occurs pursuant to a confirmed chapter 11 plan (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account any increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo another change of ownership within two years thereafter without triggering the elimination of its NOLs.

MACH Gen expects that an ownership change under section 382 of the Tax Code will occur as a result of the implementation of the Plan.  However, it has not yet determined whether New Holdco will be eligible for, or will elect to utilize, the 382(l)(5) Exception.  In the event that MACH Gen undergoes an ownership change and the 382(l)(5) Exception does not apply, MACH Gen expects that use of its NOLs after the Effective Date will be subject to limitation based on the rules discussed above, taking into account any benefit provided by the 382(l)(6) Exception. If New Holdco determines that it is eligible for and chooses to utilize the 382(l)(5) Exception, it is possible that New Holdco will seek to impose restrictions on the transfer of the New Common Units, in order to ensure that another ownership change does not occur within the two-year period after the Effective Date.

Whether an ownership change under section 382 of the Tax Code will have a material impact on New Holdco will depend on several factors, including whether New Holdco qualifies for the 382(l)(5) Exception, the value of New Holdco on the Effective Date of a Plan and how quickly New Holdco generates taxable income.

3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause New Holdco to owe taxes in connection with income or gain, even if such amounts do not exceed its available NOLs.

B.    *Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims and Interests*

1.    Consequences to Holders of Claims

a.    Tax Treatment of Holders of Claims in Class 4

MACH Gen is treated as a corporation for U.S. federal income tax purposes.  Pursuant to the Plan, and in full satisfaction of its Claim, a holder of an Allowed Class 4 Claim will receive its Pro Rata share of New Common Units available to pay its Class of creditors.  The U.S. federal income tax consequences of the Plan to holders of Allowed Class 4 Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.  The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

If the Class 4 Claims constitute securities, the exchange of Class 4 Claims for New Common Units should qualify as a recapitalization for U.S. federal income tax purposes.  In such

case, a holder would not recognize a gain or loss on the exchange, nor would such holder be permitted to recognize a "bad debt" or "worthless security" deduction with respect to such Claim, in whole or in part.  However, a holder may recognize ordinary income to the extent that a portion of the consideration received in exchange for a Claim is treated as received in satisfaction of accrued but untaxed interest on the Claim, as described below.  The holder's tax basis in the New Common Units that it receives in exchange for its Claim, apart from any amounts attributable to accrued but untaxed interest, generally should equal the holder's tax basis in its surrendered Claim.  The holding period of any such New Common Units received under the Plan, apart from amounts allocable to accrued but untaxed interest, generally should include the holding period of such surrendered Claim.

If the Class 4 Claims do not constitute securities, the exchange of Class 4 Claims for New Common Units will be a fully taxable transaction.  In that case, the exchanging holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate fair market value of any New Common Units received in exchange for its Class 4 Claims (other than amounts allocable to accrued but unpaid interest) and (ii) the holder's adjusted tax basis in the Class 4 Claims (other than with respect to accrued but unpaid interest).  In the case of a taxable exchange, a holder's tax basis in any New Common Units received in respect of its Class 4 Claims should equal the fair market value of such units on the Effective Date.  A holder's holding period for such units should begin on the day following the Effective Date.  Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder and how long the Claim has been held.

b.    Accrued but Untaxed Interest

A portion of the consideration received by holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Any amounts treated as received for accrued interest should generally be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Where the fair value of the consideration received by a holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration received will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a holder of Claims will be allocated first to the principal amount of the holder's Claims, with any excess allocated to accrued but unpaid interest.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes.  The IRS could take the position, however, that the consideration received by a holder should be allocated in some way other than as provided in the Plan.  With respect to a corporate holder of Claims, under applicable U.S. federal income tax rules, certain payments of amounts attributable to interest may be treated as a dividend eligible for the dividends received deduction.  A holder of an Allowed Claim should generally recognize a deductible loss to the extent the holder previously included accrued interest in its gross income and such interest is not paid in full.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

71

       c.      Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

       2.      Consequences to Holders of Interests in Class 7(a)

Pursuant to the Plan, and in full satisfaction of its Claim, a holder of an Allowed Class 7(a) Interest will receive its Pro Rata share of New Common Units available to pay its Class of Interest holders.  If the receipt of New Common Units is treated as an exchange, rather than as a continuation of a holder's investment in the Class 7(a) Interests, such exchange should not be considered a taxable event for U.S. federal income tax purposes, which should generally serve to defer the recognition of any gain or loss by the holder.  A holder's aggregate tax basis in the New Common Units received will equal the holder's aggregate adjusted tax basis in the Class 7(a) Interests exchanged therefor and the holder's holding period in the New Common Units received will include its holding period in the Class 7(a) Interests exchanged therefor.

       3.      Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a holder of a Claim or Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it

results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## SECTION IX.
## CERTAIN FEDERAL AND STATE SECURITIES LAW
## CONSIDERATIONS

A.      *Exemption from Registration Requirements for New Common Units*

Upon consummation of the Plan, MACH Gen will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Units from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of a debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan.  MACH Gen believes that New Holdco is a successor to MACH Gen, LLC under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New Common Units under the Plan satisfy the requirements of section 1145 and are therefore exempt from the registration requirements of the Securities Act and state securities laws.

B.      *Subsequent Transfers of New Common Units*

In general, recipients of New Common Units will be able to resell such securities without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such securities is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of New Common Units issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (1) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (2) offers to sell securities issued under a plan for the holders of such securities, (3) offers to buy

securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (4) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act.  Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by, or under common control with the issuer.

To the extent recipients of New Common Units are deemed to be "underwriters," the resale of such securities by such persons would not be exempted from registration by section 4(1) of the Securities Act.  Accordingly, the resale of such securities by such persons could only be made upon the registration of such securities in the future or an available exemption from such registration.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, public information, notice, and manner of sale requirements and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by rule 144 under the Securities Act.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "UNDERWRITER" WITH RESPECT TO NEW COMMON UNITS, MACH GEN MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE SUCH SECURITIES UNDER THE PLAN.  MACH GEN RECOMMENDS THAT HOLDERS OF CLAIMS AND INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

## SECTION X.
## RISK FACTORS

The implementation of the Plan and the issuance of the New Common Units are subject to a number of material risks, including those summarized below.  However, this summary of risks and considerations is not exhaustive.  Prior to deciding whether and how to vote on the Plan, holders of Claims or Interests entitled to vote should read and consider carefully all of the information in the Plan and this Disclosure Statement, as well as all other information referenced or incorporated by reference into this Disclosure Statement.

These risk factors contain certain statements that are "forward-looking statements." These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of MACH Gen, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, the effect of the reorganization on customers, suppliers, and vendors, fluctuations in raw material (including but not limited to, gas, coal, electricity, and other energy commodities) prices and other costs, downturns in industrial production, housing, and construction, the consumption of durable and

nondurable goods, the degree and nature of competition, increases in insurance costs, changes in government regulations, changes in the application or interpretation of those regulations, changes in the systems, personnel, technologies, or other resources MACH Gen devotes to compliance with regulations, MACH Gen's ability to complete acquisitions and successfully integrate the operations of acquired businesses, terrorist actions or acts of war, operating efficiencies, labor relations, property tax assessments, and other market and competitive conditions. Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements. No party, including, without limitation, MACH Gen or Reorganized MACH Gen, undertakes an obligation to update any such statements.

A.      *Certain Bankruptcy Law Considerations*

**We cannot predict the amount of time needed in chapter 11 to implement the Plan, and lengthy chapter 11 cases could disrupt our businesses, as well as impair prospects for reorganization on terms contained in the Plan and possibly provide an opportunity for other plans to be proposed.**

MACH Gen cannot be certain that the Chapter 11 Cases, commenced solely for the purpose of implementing the Plan, would be of relatively short duration (e.g., 45 to 90 days) and would not unduly disrupt its businesses. It is impossible to predict with certainty the amount of time needed in bankruptcy, and MACH Gen cannot be certain that the Plan would be confirmed. Moreover, the Bankruptcy Code limits the time during which a debtor has an exclusive right to file a plan before other proponents can propose and file their own plan.

Lengthy chapter 11 cases would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for personnel, vendors, and customers. The disruption that lengthy chapter 11 cases would inflict upon MACH Gen's businesses would increase with the length of time needed to complete the Restructuring, and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including critical vendors, personnel, and customers. Significant delay may result in the termination of the Restructuring Support Agreement due to missed milestones or other termination events, to the extent MACH Gen is unable to obtain waivers or amendments from the relevant Support Parties.

If MACH Gen is unable to obtain confirmation of the Plan on a timely basis for any reason, MACH Gen may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. Protracted chapter 11 cases would increase both the probability and the magnitude of the adverse effects described above.

**We may be unable to obtain confirmation of the Plan.**

Although MACH Gen believes that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be

required for confirmation or that such modifications would not be sufficiently material as to necessitate the re-solicitation of votes on the Plan.

The Plan provides that MACH Gen reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent necessary.  In the event that Classes 3A, 3B, 4, or 7(a) fail to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, MACH Gen reserves the right to:  (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) modify the Plan in accordance with Article XI of the Plan.  While MACH Gen believes that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay MACH Gen's emergence from chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan.  If a liquidation or protracted reorganization of MACH Gen's bankruptcy estates were to occur, there is a substantial risk that MACH Gen's going-concern value would be substantially eroded to the detriment of all stakeholders.

### The Effective Date may not occur.

Although MACH Gen believes the Effective Date may occur shortly after the Confirmation Date and receipt of regulatory approvals, there can be no assurance as to such timing.  The occurrence of the Effective Date is also subject to certain conditions precedent as set forth in Article X of the Plan.  Failure to meet any of these conditions could result in the Plan not being consummated.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any claims by MACH Gen, any holders of Claims or Interests (including the Support Parties), or any other Entity; (b) prejudice in any manner the rights of MACH Gen, any holders of Claims or Interests (including the Support Parties), or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by MACH Gen, any holders of Claims or Interests (including the Support Parties), or any other Entity, in any respect.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan.  If a liquidation or protracted reorganization of MACH Gen's Estates were to occur, there is a substantial risk that MACH Gen's going-concern value would be eroded to the detriment of all stakeholders.

***We may be unsuccessful in obtaining first-day orders to authorize payment to key creditors in the ordinary course of business.***

There can be no guaranty that MACH Gen will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize payment of accounts payable to key creditors in the ordinary course of business.  As a result, MACH Gen may be unable to make certain prepetition payments to customers, vendors, and other key creditors, in which case the businesses may suffer.

B.    *Business-Related Risks*

***The announcement of the Restructuring could adversely affect the value of our businesses.***

It is possible that announcement of the Restructuring or the filing of the Chapter 11 Cases could adversely affect MACH Gen's operations and relationships with third parties.  Due to uncertainties, many risks exist, including the following:

- customers could switch to competitors;

- personnel may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with their competitors;

- customers may delay making payments;

- although the Plans provides for payment in full of General Unsecured Claims, general unsecured creditors may suspend or terminate their relationship with MACH Gen, exercise rights of set-off or similar remedies, further restrict ordinary credit terms, or require guarantee of payment;

- business partners could terminate their relationship or require financial assurances or enhanced performance;

- trade creditors could require payment in advance or cash on delivery;

- the ability to renew existing contracts and compete for new business may be adversely affected;

- competitors may take business away from MACH Gen; and

- insurance policies may be more difficult or expensive to obtain.

A delay in completing the Restructuring may result in the same adverse consequences. The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations, and prospects of MACH Gen and the value of its existing interests and debt.

***Because wholesale power prices are subject to extreme volatility, the revenues that we generate are subject to significant fluctuations.***

MACH Gen must sell all or a portion of the electrical energy, capacity, and other products from the Facilities into wholesale power markets. The prices of such energy products in those markets are influenced by many factors outside of its control, including fuel prices, energy prices, capacity prices, transmission constraints and prices, supply and demand, weather, economic conditions, and the rules, regulations, and actions of the system operators and regulatory regimes in those markets. In addition, unlike most other commodities, electric energy, for the most part, cannot be stored and therefore must be produced concurrently with its use. As a result, the wholesale power markets are subject to significant price fluctuations over relatively short periods of time and can be unpredictable.

***Competition in wholesale power markets may have a material adverse effect on our financial condition, results of operations, and cash flows.***

MACH Gen has numerous competitors, and additional competitors may enter the industry. MACH Gen's power generation businesses compete with other non-utility generators, regulated utilities, unregulated subsidiaries of regulated utilities, other energy service companies, and financial institutions in the sale of electric energy, capacity, and ancillary services, as well as in the procurement of fuel, transmission, and transportation services. Moreover, aggregate demand for power may be met by generation capacity based on several competing technologies, as well as power generating facilities fueled by alternative or renewable energy sources, including hydroelectric power, synthetic fuels, solar, wind, wood, geothermal, waste heat, and solid waste sources. Regulatory initiatives designed to enhance renewable generation could increase competition from these types of facilities.

MACH Gen also competes against other energy merchants on the basis of their relative operating skills, financial position, and access to credit sources. Electric energy customers, wholesale energy suppliers, and transporters often seek financial guarantees, credit support such as letters of credit, and other assurances that energy contracts will be satisfied. Companies with which MACH Gen competes may have greater resources in these areas or lower costs of service than MACH Gen.

Other factors may contribute to increased competition in wholesale power markets. New forms of capital and competitors have entered the industry in the last several years, including financial investors who perceive that asset values are at levels below their true replacement value. As a result, a number of generation facilities in the United States are now owned by lenders and investment companies with a lower cost basis than the original construction costs. Furthermore, mergers and asset reallocations in the industry could create powerful new competitors. Under any scenario, MACH Gen anticipates that it will face competition from numerous companies in the industry, some of which have superior capital structures.

Moreover, many companies in the regulated utility industry, with which the wholesale power industry is closely linked, are also restructuring or reviewing their strategies. Several of those companies have discontinued or are discontinuing their unregulated activities and are seeking to divest or spin-off their unregulated subsidiaries. Some of those companies have had,

or are attempting to have, their regulated subsidiaries acquire assets out of their or other companies' unregulated subsidiaries.  This may lead to increased competition between the regulated utilities and the unregulated power producers within certain markets.  To the extent competition increases, MACH Gen's financial condition, results of operations, and cash flows may be materially adversely affected.

***We may not successfully manage risks associated with the wholesale power markets if a sufficient amount of working capital and collateral are not retained in the businesses to manage and mitigate operational and market risk.***

MACH Gen is exposed to market risks through its power marketing business and energy management arrangements, which involve the sale of energy and capacity and the procurement of fuel and emission allowances.  MACH Gen buys and sells forward contracts and options in transactions identified by the energy managers and buys and sells its energy, capacity, and other energy products into spot markets.  In addition, MACH Gen procures fuel and emission allowances for the Facilities in spot and forward markets and on exchanges.  Without a sufficient amount of working capital and collateral to post as performance guarantees or margin, MACH Gen may not be able to effectively manage this price volatility and may not be able to successfully manage the other risks associated with trading in energy markets, including the risk that counterparties may not perform or refuse to continue to do business with MACH Gen.

***Our competitors may be less sensitive to the risks associated with the wholesale power markets.***

Many of MACH Gen's competitors, particularly in the Desert Southwest, derive revenue from sources other than wholesale power, such as sales of power to retail customers at cost-of-service regulated rates and power purchase contracts.  As a result, fluctuations in wholesale energy prices and related costs may disproportionately impact the profitability of MACH Gen as compared to its competitors.

***Operation of power generation facilities involves significant risks, which cannot always be covered by insurance or contractual protections.***

The operation of power generation, thermal energy production, transmission, and resource recovery facilities involve many risks, including supply interruptions, work stoppages, labor disputes, safety-related concerns social unrest, weather interferences, unforeseen engineering, environmental and geological problems, and unanticipated cost overruns on maintenance and refurbishment projects.

The ongoing operation of the Facilities involves all of the risks described above, in addition to risks relating to the breakdown or failure of equipment or processes and performance below expected levels of generation output or efficiency.  New plants may employ recently developed and technologically complex equipment, especially in the case of newer environmental emission control technology.  The Facilities cannot operate without certain critical components that, if they failed, could take over a year to replace.  While MACH Gen maintains insurance, obtains warranties from vendors, and obligates contractors to meet certain performance levels, the proceeds of such insurance, warranties, or performance guarantees may not be timely received or adequate to cover lost revenues, increased expenses, or liquidated

damages payments.  Any of these risks could cause MACH Gen to operate below expected capacity levels, which in turn could result in lost revenues, increased expenses, higher maintenance costs, and penalties.  As a result, the Facilities may operate at a loss or MACH Gen may be unable to fund principal and interest payments under the New First Lien Facilities or certain other project financing agreements, which may result in a default under such indebtedness.

***We are exposed to the risk of natural gas and transportation cost increases and interruption in fuel supply because our facilities generally do not have long-term natural gas supply agreements.***

MACH Gen's power generation facilities that sell energy into the wholesale power markets primarily purchase natural gas on the spot market.  Even though MACH Gen attempts to hedge its known fuel requirements, it still may face the risk of supply interruptions and some fuel price volatility.  The price MACH Gen can obtain for the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs.  This may have a material adverse effect on its financial performance.

***We often rely on single suppliers, exposing us to significant financial risks if they should fail to perform their obligations.***

MACH Gen often relies on a single supplier for the provision of water and other services required for operation of a facility and its energy managers are the sole counterparties for the provision of natural gas and sole overseers of the sale of electricity and ancillary services generated at the Facilities.  MACH Gen also relies on single providers for (i) parts and service for its combustion turbine generators and (ii) operations and maintenance services.  The failure of any one supplier to fulfill its contractual obligations in connection with any Facility could have a material adverse effect on such Facility's (and MACH Gen's) financial results.  Consequently, the financial performance of any such facility is dependent on the continued performance by suppliers of their obligations and, in particular, on the credit quality of the project's suppliers.

***We do not own or control significant transmission facilities required to sell wholesale power from our generation facilities.***

MACH Gen depends on dedicated, non-redundant transmission facilities owned and operated by ISOs and other third parties to sell wholesale power from the Facilities.  ISOs provide transmission services, administer transparent and competitive power markets, and maintain system reliability.  Many of these ISOs operate in the realtime and day-ahead markets in which MACH Gen sells energy.  These transmission facilities may fail and would require extended periods for repair.  If service from these third-party owned transmission facilities is unavailable or disrupted, or if the transmission capacity infrastructure is inadequate, MACH Gen's ability to sell and deliver wholesale power may be materially adversely affected.

***Wholesale electric markets are highly structured and regulated and subject to frequent change that can materially affect our revenues.***

Because the transmission facilities used by MACH Gen are operated by ISOs and other third parties, they are subject to changes in structure and operation and impose various pricing limitations. These changes and pricing limitations may affect the products that MACH Gen is permitted to sell, the price and terms on which the Facilities' output can be sold, and MACH Gen's ability to deliver power to the market that would, in turn, adversely affect the profitability of its generation facilities. The ISOs that oversee most of the wholesale power markets impose, and in the future may continue to impose, offer caps and other mechanisms to guard against the potential exercise of market power in these markets as well as price limitations. These types of price limitations and other regulatory mechanisms may adversely affect the profitability of MACH Gen's generation facilities that sell energy and capacity into the wholesale power markets.

Rules governing the various regional power markets may also change from time to time, which could affect MACH Gen's costs or revenues. Furthermore, the rates for transmission capacity from these facilities are set by others and thus are subject to change, some of which could be significant. As a result, MACH Gen's financial condition, results of operations, and cash flows may be materially adversely affected.

***We are subject to competitive pressures in the Desert Southwest power market.***

In the Desert Southwest power market where the Harquahala Facility operates, the Facility must provide its own operating reserves to support firm power sales. While this does not generally present a problem during peak summer months, MACH Gen is placed at a competitive disadvantage during non-peak months, operating as a lone asset. During non-peak months, MACH Gen operates only one of the Harquahala Facility's generation units and provides unit contingent power, while the remaining units are kept idle. Because demand for unit contingent power is relatively low, such unit contingent power sells at a significant discount to firm power and is potentially subject to further demand and price deterioration.

In addition, the region served by the Harquahala Facility is exclusively a bilateral market, and, as such, the Facility does not enjoy the benefits provided by certain centralized markets, such as the ISOs. The bilateral market can result in less market transparency, greater uneconomic dispatch by fully integrated load serving entities with their own generation resources, and other preferential treatment of utility owned assets.

C.      *Regulatory Risks*

MACH Gen's businesses are subject to extensive energy, environmental, and other laws and regulations of federal, state, and local authorities. MACH Gen is generally required to obtain and comply with a wide variety of licenses, permits, and other approvals in order to operate the Facilities. MACH Gen may incur significant additional costs because of its compliance with these requirements. If it fails to comply with these requirements, it could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become

applicable to MACH Gen or its Facilities, and future changes in laws and regulation may have a detrimental effect on its businesses.  Furthermore, with the continuing trend toward stricter standards, greater regulation, more extensive permitting requirements, MACH Gen expects its environmental expenditures may be substantial in the future.

**_The acquisition of New Common Units, including through the Plan, may be subject to regulatory restrictions._**

The acquisition of New Common Units, including through the Plan, and the ability to vote New Common Units may be subject to compliance with regulatory requirements and/or prior regulatory approvals by the holder or acquirer of New Common Units.  Such regulatory approvals may include, without limitation, Federal Energy Regulatory Commission authorization under section 203 of the Federal Power Act, approvals from any other regulatory body or bodies, or the satisfaction of any notification and waiting period requirements, such as those of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (the "HSR Act").  The applicability of regulatory approvals may depend on the amount of New Common Units to be acquired or to be voted, or, in the case of the HSR Act, if certain size of parties and size of transaction thresholds are satisfied and no exemption is applicable.  The ability to obtain regulatory approvals may depend upon the business activities of the proposed acquirers of New Common Units, and the affiliates of such proposed acquirers, and in particular upon holdings of or interests in electric power generation or transmission facilities or other energy infrastructure.  Regulatory approvals may be denied, conditioned, or delayed and may not be available.  Denial, condition or delay could prevent a proposed holder from acquiring New Common Units and could prevent a holder of New Common Units from voting its New Common Units.

A holder or acquirer of New Common Units should consult with its own legal counsel with regard to compliance with and/or obtaining appropriate regulatory approvals.  The acquisition of New Common Units or voting of New Common Units prior to obtaining and/or complying with any necessary regulatory approvals may result in liability including potentially substantial civil penalties.

D.      *Risks Related to New Common Units*

The ultimate recoveries under the Plan to holders of Claims in Class 4 and Interests in Class 7(a) that receive New Common Units pursuant to the Plan will depend on the realizable value of the New Common Units.  The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below.  Prior to voting on the Plan, each holder of Claims in Class 4 or Interests in Class 7(a) should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan and this Disclosure Statement.

**_Lack of established market for the New Common Units may adversely affect liquidity._**

The New Common Units will be illiquid securities without an active trading market. There can be no assurance that an active trading market for the New Common Units will develop, nor can any assurance be given as to the prices at which such units might be traded,

should an active trading market develop. MACH Gen and Reorganized MACH Gen do not anticipate that the New Common Units to be issued under the Plan will be listed on or traded on any nationally recognized market or exchange. Further, the New Common Units to be issued under the Plan will not be registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Common Units may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Section IX herein entitled, "Certain Federal and State Securities Law Considerations," MACH Gen and Reorganized MACH Gen anticipate that most recipients of New Common Units will be able to resell such securities without registration pursuant to the exemption provided by section 4(1) of the Securities Act.

***The New Common Units will be subject to significant contractual transfer restrictions.***

The New Common Units are not freely transferable and are subject to significant contractual transfer restrictions that may affect the development of an active trading market for the New Common Units and/or the future trading prices of the New Common Units. For additional information regarding the contractual transfer restrictions applicable to the New Common Units, please refer to Section IV.B.1 herein, entitled "Description of New Common Units," as well as the "Reorganized Equity Term Sheet" attached as Schedule 3 to the Restructuring Support Agreement.

***Lack of dividends on New Common Units may adversely affect value and  liquidity.***

MACH Gen does not anticipate that cash dividends or other distributions will be made by Reorganized MACH Gen with respect to the New Common Units in the foreseeable future. In addition, covenants in the New First Lien Facilities or certain other debt instruments to which Reorganized MACH Gen may be a party may restrict the ability of Reorganized MACH Gen to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for New Common Units as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

***Certain holders of New Common Units may hold substantial interests in Reorganized MACH Gen.***

During the pendency of the Chapter 11 Cases, there will be no limitation on the trading of Claims or Interests, beyond any contractual, regulatory, or other limitation that may already be in place prior to commencement of the Chapter 11 Cases, including under the Restructuring Support Agreement. Accordingly, upon consummation of the Plan, certain holders of Claims and Interests may receive distributions of New Common Units representing a substantial amount of the New Common Units outstanding on the Effective Date. If holders of significant numbers of New Common units were to act as a group, such holders could be in a position to control the outcome of actions requiring member approval, including, among other things, election of managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of MACH Gen and, consequently, impact the value of the New Common Units.

Further, the possibility that one or more holders of significant numbers of shares of New Common Units may determine to sell all or a large portion of their New Common Units in a short period of time may adversely affect the market price of the New Common Units.

E.    *Other Risks*

**The DIP Facility and/or New First Lien Facilities may not become available to us.**

On or shortly after the Petition Date, MACH Gen intends to ask the Bankruptcy Court to authorize the DIP Facility to provide for funding during the Chapter 11 Cases.  The DIP Facility is intended to provide liquidity to MACH Gen during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility on the terms requested by MACH Gen.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, MACH Gen may exhaust its financing.  There is no assurance that it will be able to obtain additional financing from its existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of MACH Gen's businesses may be materially impaired.

In addition, the DIP Facility Agreement and the New First Lien Facilities Agreement include various conditions to closing.  Accordingly, MACH Gen cannot give assurances that the DIP Facility or the New First Lien Facilities will be consummated.  In the event either of these facilities are not consummated, and MACH Gen is unable to promptly obtain replacement facilities, the ability of MACH Gen to confirm the Plan will be materially and adversely affected.

Even if the DIP Facility Agreement and the New First Lien Facilities Agreement are entered into, any inability of Reorganized MACH Gen to remain in compliance with its covenants thereunder could restrict the ability of Reorganized MACH Gen to fully access the maximum amount that may be borrowed under the DIP Facility Agreement and the New First Lien Facilities Agreement.  While MACH Gen believes this risks are mitigated in part by the fact that the DIP Facility and New First Lien Facilities are expected to be provided by the Consenting First Lien Holder, these uncertainties with respect to the DIP Facility Agreement and the New First Lien Facilities Agreement may nonetheless adversely affect the success of Reorganized MACH Gen.

**The extent of leverage may limit Reorganized MACH Gen's ability to obtain additional financing.**

Although the Plan will result in the elimination of debt, Reorganized MACH Gen will continue to have a significant amount of indebtedness after the Effective Date.

Such levels of indebtedness may limit the ability of Reorganized MACH Gen to obtain additional financing for working capital, capital expenditures, debt service requirements, and general corporate or other purposes.  Such levels of indebtedness may also limit the ability of Reorganized MACH Gen to adjust to changing market conditions and to withstand competitive pressures, possibly leaving Reorganized MACH Gen vulnerable in a downturn in general economic conditions or in its business, or unable to carry out necessary maintenance or capital spending.

***Our Projections and other financial information are based on assumptions that may prove incorrect.***

The Projections and other financial information contained herein reflect numerous assumptions concerning the anticipated future performance of Reorganized MACH Gen, some of which may not materialize, including the projected prices of electricity and natural gas.

The financial information contained in this Disclosure Statement, other than that in **Exhibit E**, has not been audited.  In preparing this Disclosure Statement, MACH Gen has relied on financial data derived from its books and records that was available at the time of such preparation.  Although MACH Gen has exercised its reasonable business judgment to ensure the accuracy of the financial information provided herein, and while MACH Gen believes that such financial information fairly reflects its financial results, MACH Gen is unable to warrant or represent that the financial information contained herein is without inaccuracies.

The Projections are, by their nature, forward-looking, and necessarily based on certain assumptions or estimates that are beyond MACH Gen's control and may ultimately prove to be incorrect.  The actual future financial results of Reorganized MACH Gen may turn out to be materially different from the Projections.  As discussed above, the wholesale power markets are volatile and MACH Gen's operations are subject to inherent uncertainties and risks, all of which make accurate forecasting very difficult.  In preparing the Projections, MACH Gen has relied upon the expertise of Leidos to assess and evaluate many of those uncertainties and risks on a prospective basis, and there can be no assurances that such prospective assessments will ultimately prove to be accurate.

It was assumed in the preparation of the Projections and other financial information contained herein that the historical book value of MACH Gen's assets as of September 30, 2013 approximates those assets' fair value, except for specific adjustments.

***Historical financial information may not be comparable.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of Reorganized MACH Gen from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in MACH Gen's historical financial statements.

## SECTION XI.
## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF PLAN

If the Plan is not confirmed, the alternatives include (a) liquidation of MACH Gen under chapter 7 or chapter 11 of the Bankruptcy Code and (b) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization.  Each of these possibilities is discussed in turn below.

A.    *Liquidation Under Chapter 7 or Chapter 11*

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of MACH Gen.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims or Interests, MACH Gen believes that in a chapter 7 liquidation, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and equity interest holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of MACH Gen's operations and the failure to realize the greater going concern value of MACH Gen's assets.

MACH Gen could also be liquidated pursuant to the provisions of a chapter 11 plan.  In a liquidation under chapter 11, MACH Gen's assets could be sold in a more orderly fashion over a longer period of time than in a chapter 7 liquidation.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.  Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed.  However, the drafting and pursuit of a liquidation plan and its balloting and tabulation would result in additional administrative costs.  Any distributions to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, MACH Gen believes that any liquidation is a much less attractive alternative for creditors and equity interest holders than the Plan because of the greater recoveries MACH Gen anticipates will be provided by the Plan.  MACH GEN BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by MACH Gen with its financial advisors, is premised upon a chapter 7 liquidation and is attached hereto as Exhibit D.  In the Liquidation Analysis, MACH Gen has taken into account the nature, status, and underlying value of the assets of MACH Gen, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.  Based on this analysis, it is likely that a liquidation of MACH Gen's assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan.

B.    *Alternative Plans of Reorganization*

If MACH Gen remained in chapter 11, MACH Gen could continue to operate its businesses and manage its properties as debtors-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether MACH Gen could continue as a viable going-concern in protracted Chapter 11 Cases.  MACH Gen could have difficulty operating with the high operating and financing costs and the eroding confidence of its customers and trade vendors, if MACH Gen remained in chapter 11.  It is unlikely that MACH Gen would be able to find alternative bank financing if the DIP Facility were terminated.  If MACH Gen were able to obtain financing and continue as a viable going-concern, MACH Gen (or other parties in interest) could ultimately propose another plan or attempt to liquidate MACH Gen under chapter 7 or chapter 11.  Such alternative plans might involve either a reorganization and continuation of MACH Gen's businesses or an orderly liquidation of its assets, or a combination of both.

## SECTION XII.
## CONCLUSION AND RECOMMENDATION

MACH Gen, with the support of the Support Parties, believes that confirmation and implementation of the Plan is in the best interests of the holders of Claims and Interests because it provides the greatest distributions and opportunity for distributions to such holders.  In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased administrative expenses.

Accordingly, MACH Gen, with the support of the Support Parties, urges all holders of Claims and Interests who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be **actually received** by the Voting Agent no later than 5:00 p.m., prevailing Eastern Time, on February 19, 2014.

[*Remainder of page intentionally left blank*]

Dated: January 2\ , 2014

Respectfully submitted.

MACH GEN, LLC, on its own behalf and
on behalf of its affiliated debtors and debtors
in possession

By: _____

Name: Garry N. Hubbard
Title: CEO