**<u>Exhibit B</u>**

**Restructuring Support Agreement (with redactions)**

# MACH GEN, LLC

## RESTRUCTURING SUPPORT AGREEMENT

### January 15, 2014

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto (collectively, the "**Exhibits and Schedules**"), as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of January 15, 2014, is entered into by and among:  (i) MACH Gen, LLC (the "**Company**") and its subsidiaries MACH Gen GP, LLC, Millennium Power Partners, L.P., New Athens Generating Company, LLC, and New Harquahala Generating Company, LLC (such subsidiaries and the Company, each a "**MACH Gen Entity**" and, collectively, the "**MACH Gen Entities**"), (ii) the holders of Equity Interests (as defined herein) that are (and any holder that may become in accordance with Section 14 hereof) signatories hereto (collectively, the "**Consenting Equity Holders**"), (iii) the holders of the First Lien Claims[1] that are (and any holder that may become in accordance with Section 14 hereof) signatories hereto (collectively, the "**Consenting First Lien Holders**"), and (iv) the holders of Second Lien Claims that are (and any holder that may become in accordance with Section 14 hereof) signatories hereto (collectively, the "**Consenting Second Lien Holders**" and, together with the Consenting Equity Holders and Consenting First Lien Holders, the "**Restructuring Support Parties**").  This Agreement collectively refers to the MACH Gen Entities and the Restructuring Support Parties as the "**Parties**" and each individually as a "**Party**."

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding a restructuring transaction (the "**Restructuring**") pursuant to the terms and conditions set forth in this Agreement, including a joint prepackaged plan of reorganization for the MACH Gen Entities on terms consistent with **Schedule 3** hereto and substantially in the form attached hereto as **Exhibit A** and incorporated herein by reference pursuant to Section 2 hereof (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "**Plan**");

WHEREAS, it is anticipated that the Restructuring will be implemented through jointly-administered voluntary cases commenced by the MACH Gen Entities (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), pursuant to the Plan, which will be filed by the MACH Gen Entities in connection with the commencement of the Chapter 11 Cases;

WHEREAS, in anticipation of the Restructuring and in connection with this Agreement, the MACH Gen Entities have entered into that certain First Amendment to First Lien Credit and Guaranty Agreement, dated as of the date hereof and attached hereto as **Exhibit B** (the

---

[1]    Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to them in Exhibit A, subject to Section 2 hereof.

"**Prepetition Amendment**"), with the Consenting First Lien Holders and CLMG Corp., in its capacity as administrative agent and collateral agent, which amends, to the extent set forth therein, that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012 (the "**Existing First Lien Credit Agreement**"), among the MACH Gen Entities, the Consenting First Lien Holders, and CLMG Corp., in its capacity as administrative agent and collateral agent (as so amended, the "**Prepetition First Lien Credit Agreement**"), which Prepetition Amendment provides for, among other things and subject to the conditions set forth therein, an increase in the commitments of the Consenting First Lien Holders to make advances to the Company under the Existing First Lien Credit Agreement pending the commencement of the Chapter 11 Cases; and

WHEREAS, the Consenting First Lien Holders have agreed to provide financing and otherwise extend credit to the MACH Gen Entities during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Financing Orders and the DIP Credit Agreement (each as hereinafter defined);

NOW, THEREFORE, in consideration of the promises, mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.    <u>RSA Effective Date</u>.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date that all of the following have occurred (such date, the "**RSA Effective Date**"):  (a) the MACH Gen Entities and the Consenting First Lien Holders have executed the Prepetition Amendment and the Prepetition Amendment is effective according to its terms (subject only to the effectiveness of this Agreement), (b) that certain Amendment No. 2 to Collateral Agency and Intercreditor Agreement, attached hereto as **Exhibit C** (the "**Intercreditor Amendment**"), which amends that certain Collateral Agency and Intercreditor Agreement, dated as of December 5, 2006 (as amended, supplemented, restated, or modified from time to time (including, unless otherwise required by context, as amended by the Intercreditor Amendment), the "**Intercreditor Agreement**"), shall have been executed and become effective according to its terms (subject only to the effectiveness of this Agreement), (c) this Agreement has been executed by all of the following:  (i) each MACH Gen Entity; (ii) Consenting Equity Holders (A) holding, in aggregate, at least 75% of the voting rights of all issued and outstanding equity interests in the Company (the "**Equity Interests**") and (B) comprising, in aggregate, at least one-half in number of all holders of the Equity Interests; (iii) Consenting First Lien Holders (A) holding, in aggregate, at least 66-2/3% in principal amount outstanding of all First Lien Revolver Claims and at least 66-2/3% in principal amount outstanding of all First Lien Term Loan Claims and (B) comprising, in aggregate, more than one-half in number of all holders of First Lien Revolver Claims and more than one-half in number of all holders of First Lien Term Loan Claims; and (iv) Consenting Second Lien Holders holding, in aggregate, at least 66-2/3% in principal amount outstanding of all Second Lien Claims, and (d) MACH Gen shall have delivered to the Consenting First Lien Holders and Consenting Second Lien Holders copies of the (i) financial projections and related assumptions, (ii) liquidation analysis, and (iii) consolidated financial

statements, in each case in the final form that MACH Gen will include in or attach to the Disclosure Statement (as defined below) (together, the "**Financial Disclosures**").

2.        Exhibits and Schedules Incorporated by Reference.    Each of the Exhibits and Schedules is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern; provided, however, that notwithstanding anything to the contrary herein, the use of cash collateral and debtor-in-possession financing following the Petition Date (as defined in Section 4) through the Consummation Date (as defined in Section 4) shall be governed by the terms of, as applicable, (a) the interim order authorizing use of cash collateral and debtor-in-possession financing, in the form attached hereto as **Exhibit D** (the "**Interim Financing Order**"), (b) the final order authorizing use of cash collateral and debtor-in-possession financing, in the form attached hereto as **Exhibit E** (the "**Final Financing Order**" and together with the Interim Financing Order, the "**Financing Orders**"), and (c) the debtor-in-possession credit and guaranty agreement (the "**DIP Credit Agreement**") to be entered into in accordance with the Financing Orders.[2]

3.        Definitive Documentation.    The definitive documents and agreements (the "**Definitive Documentation**") governing the Restructuring shall include:  (a) the Plan (and all exhibits thereto) and the Confirmation Order (as defined in Section 4) with respect to the Plan; (b) the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "**Disclosure Statement**"); (c) the solicitation materials with respect to the Plan (collectively, the "**Solicitation Materials**"); (d) the documents identified on **Exhibit F** hereto (collectively, the "**New Owner Documents**"), which shall be on terms consistent with **Schedule 3** hereto; (e) the DIP Credit Agreement, (f) the Financing Orders; and (g) the new first lien credit and guaranty agreement in the form attached hereto as **Exhibit G** (the "**New First Lien Credit Agreement**"). The Definitive Documentation identified in the foregoing sentence other than the Plan, Interim Financing Order, Final Financing Order, and New First Lien Credit Agreement remains subject to negotiation and completion.    The Definitive Documentation that remains subject to negotiation and completion shall upon completion (x) contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and (y) be in form and substance reasonably acceptable to (i) the Company, (ii) Consenting First Lien Holders who hold, in the aggregate, at least 66-2/3% in principal amount outstanding of all First Lien Revolver Claims and at least 66-2/3% in principal amount outstanding of all First Lien Term Loan Claims (collectively, the "**Required First Lien Holders**"), and (iii) two or more Consenting Second Lien Holders who hold, in the aggregate, at least 66-2/3% in principal amount outstanding of all Second Lien Claims held in the aggregate by all Consenting Second Lien Holders (collectively, the "**Majority Second Lien Holders**").

4.        Milestones.    As provided in Section 6, the MACH Gen Entities shall implement the Restructuring on the following timeline (each deadline, a "**Milestone**"):

---

[2]    The Parties understand and agree that the DIP Credit Agreement shall contain the same economic terms and be consistent with, and no more restrictive than, the Prepetition First Lien Credit Agreement and the Financing Orders, and include such other terms and conditions as are customary for a debtor-in-possession facility of the kind described in this Agreement, negotiated in accordance with Section 3.

(a)     no later than seven (7) business days following the RSA Effective Date, the MACH Gen Entities shall commence solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan (such mailing date, the "**Solicitation Commencement Date**");

(b)     the deadline by which parties eligible to vote on the Plan must vote to accept or reject the Plan (the "**Voting Deadline**") shall be no later than twenty (20) business days after the Solicitation Commencement Date;

(c)     if at least (i) 66-2/3% in amount and a majority in number of holders of the Second Lien Claims that vote on the Plan (determined without including any vote by an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) vote to accept the Plan by the Voting Deadline and (ii) 75% in amount and 50% in number of holders of Equity Interests vote to accept the Plan by the Voting Deadline, the MACH Gen Entities shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court on a date  no later than fifteen (15) calendar days after the Voting Deadline (such filing date, the "**Petition Date**");

(d)     the Petition Date shall have occurred no later than seventy-five (75) calendar days after the RSA Effective Date;

(e)     on the Petition Date, the MACH Gen Entities shall file with the Bankruptcy Court:  (i) the Plan; (ii) the Disclosure Statement; (iii) a motion seeking entry of the Interim Financing Order and the Final Financing Order; and (iv) motions seeking (A) approval of the Disclosure Statement, (B) confirmation of the Plan, and (C) the scheduling of a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**");

(f)     no later than four (4) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Financing Order in the form attached hereto as **Exhibit D** or in a form that is otherwise consented to by the Required First Lien Holders;

(g)     no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Financing Order in the form attached hereto as **Exhibit E** or in a form that is otherwise consented to by the Required First Lien Holders;

(h)     no later than ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Disclosure Statement and confirming the Plan in form and substance reasonably acceptable to the Company, the Required First Lien Holders, and the Majority Second Lien Holders (the "**Confirmation Order**"); and

(i)     on the later to occur of (i) fifteen (15) calendar days from the date the Bankruptcy Court enters the Confirmation Order and (ii) the first business

day immediately following the date on which the MACH Gen Entities receive all necessary regulatory and other approvals to consummate the Restructuring (including, among other things, approval from the Federal Energy Regulatory Commission and the New York State Public Service Commission), the MACH Gen Entities shall consummate the transactions contemplated by the Plan (the date of such consummation, the "**Consummation Date**"), it being understood that the MACH Gen Entities' entry (as reorganized entities under the Plan) into the New First Lien Credit Agreement and the satisfaction of the conditions precedent to the Effective Date (as defined in the New First Lien Credit Agreement) shall be conditions precedent to the occurrence of the Consummation Date.

Notwithstanding anything to the contrary in this Agreement (including Section 30 hereof), a specific Milestone may not be extended or waived except with the express prior written consent of the Majority Second Lien Holders; provided, however, that (x) the Milestones described in Sub-clauses (d), (f) and (g) of this Section 4 may not be extended or waived except with the express written prior consent of the Required First Lien Holders and the Majority Second Lien Holders, and (y) the Milestone described in Sub-clause (h) of this Section 4 may not be extended or waived by more than thirty (30) calendar days without the express prior written consent of the Required First Lien Holders.

5.    Commitment of Restructuring Support Parties. Subject to compliance in all material respects by the other Parties with the terms of this Agreement, each Restructuring Support Party shall (severally and not jointly), from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 12) applicable to such Restructuring Support Party and without limiting any of the terms of Section 12 or the rights of such Restructuring Support Party under Sections 7, 8, 9, 11 and 12:

     (a)     support and cooperate with the MACH Gen Entities to take all commercially reasonable actions necessary to consummate the Restructuring in accordance with the Plan and the terms and conditions of this Agreement (but without limiting consent and approval rights provided in this Agreement), including: (i) voting all of its claims against, or interests in, as applicable, the MACH Gen Entities now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter serves as the nominee, investment manager, or advisor for holders thereof) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials; (ii) timely returning a duly-executed ballot in connection therewith; (iii) not "opting out" of any releases under the Plan; and (iv) solely with respect to the Consenting Equity Holders, timely providing all requisite consents and approvals, as they become available and are requested by the Company, under that certain Amended and Restated Limited Liability Company Agreement of MACH Gen, LLC, dated as of February 22, 2007 and as amended from time to time (the "LLC Agreement");

5

(b)      not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan;

(c)      not object to, delay, impede, or take any other action to interfere, directly or indirectly, with the Restructuring, or propose, file, support, or vote for, directly or indirectly, any restructuring, workout, or chapter 11 plan for any of the MACH Gen Entities other than the Restructuring and the Plan;

(d)      not take any action (or encourage or instruct any other party to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the First Lien Documents or the Second Lien Documents, as such terms are defined in the Intercreditor Agreement that exists as of the date hereof and is described on **Schedule 4** hereto or that would be triggered as a result of the commencement or pendency of the Chapter 11 Cases or the undertaking of any MACH Gen Entity hereunder to implement the Restructuring through the Chapter 11 Cases;

(e)      support and not object to, delay, impede, or take any other action to interfere, directly or indirectly, with the entry by the Bankruptcy Court of the Interim Financing Order or the Final Financing Order, or propose, file or support, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in the Interim Financing Order and the Final Financing Order; and

(f)      not take any other action, including, without limitation, initiating or joining in any legal proceeding, that is materially inconsistent with its obligations under this Agreement.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (x) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, (y) be construed to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring, or (z) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

6.      Commitment of the MACH Gen Entities.

(a)      Subject to Sub-clause (b) below, each of the MACH Gen Entities (i) agrees to (A) include the Disclosure Statement, including the Financial Disclosures in the form delivered pursuant to Section 1(d), in the Solicitation Materials mailed to parties eligible to vote on the Plan pursuant to Section 4(a), (B) support and complete the Restructuring and all transactions set forth in the Plan and this Agreement, (C) negotiate in good faith all

6

Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement, (D) complete the Restructuring and all transactions set forth in the Plan in accordance with each Milestone set forth in <u>Section 4</u> of this Agreement, and (E) make commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring, and (ii) shall not undertake any action materially inconsistent with the adoption and implementation of the Plan and the speedy confirmation thereof.

(b)          Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the directors, officers, or managers of any MACH Gen Entity (in such person's capacity as a director, officer, or manager of such MACH Gen Entity) to take any action, or to refrain from taking any action, that, after receiving advice from their counsel, is required to comply with such director's, officer's, or manager's fiduciary obligations under applicable law.

For the avoidance of doubt, nothing in this <u>Section 6</u> shall be construed to limit or affect in any way any Restructuring Support Party's rights under this Agreement, including upon occurrence of any Termination Event or the Outside Date.

7.    <u>Consenting First Lien Holder's Termination Events</u>. Each Consenting First Lien Holder shall have the right, but not the obligation, upon notice to the other Parties, to terminate its own obligations under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by such Consenting First Lien Holder on a prospective or retroactive basis (each, a "**First Lien Termination Event**"):

(a)          the failure to meet the Milestones in <u>Sub-clauses (d)</u>, <u>(f)</u>, <u>(g)</u>, or <u>(h)</u> of <u>Section 4</u> (subject to the last sentence of <u>Section 4</u>), unless (i) such failure is the result of any act, omission, or delay on the part of the Consenting First Lien Holder seeking termination in violation of its obligations under this Agreement or (ii) such Milestone is waived in accordance with <u>Section 4</u>;

(b)          the occurrence of a material breach of this Agreement by any MACH Gen Entity that has not been cured (if susceptible to cure) within five (5) business days after written notice to the Company of such material breach by the Consenting First Lien Holder asserting such termination;

(c)          the occurrence of a material breach by any of the MACH Gen Entities of its obligations under, or any Event of Default under (and as defined in), the (i) Prepetition First Lien Credit Agreement, other than any material breach or Event of Default triggered as a result of the commencement or pendency of the Chapter 11 Cases or the undertaking of any MACH Gen Entity of any other action in furtherance of implementing the Restructuring to the extent consistent with the terms of this Agreement, (ii) Financing Orders, or (iii) DIP Credit Agreement; in each case, which material breach or Event of Default has not been cured (if susceptible to cure) in accordance with the terms set forth therein;

(d) the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(e) the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f) any MACH Gen Entity amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) acceptable to the Required First Lien Holders;

(g) the Bankruptcy Court enters an order or grants any request of a person to amend or modify the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) acceptable to the Required First Lien Holders;

(h) any MACH Gen Entity files, propounds, or otherwise publicly supports or announces that any MACH Gen Entity will support any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets, without the prior written consent (in the sole discretion of each Consenting First Lien Holder) of the Required First Lien Holders;

(i) the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Company shall have five (5) business days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Required First Lien Holders;

(j) the failure to satisfy any requirement under Section 3 that the Plan, or any other agreement or document that is included in the Definitive Documentation, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and be reasonably acceptable to the Required First Lien Holders;

(k) the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the Interim Financing Order or Final Financing Order or otherwise consented to by the Required First Lien Holders;

(l) a breach by any other Restructuring Support Party of any representation, warranty, or covenant of such other Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the

8

Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by such other Restructuring Support Party of written notice of such breach;

(m)  a breach by any MACH Gen Entity of any representation, warranty, or covenant of such MACH Gen Entity set forth in Section 19 of this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Company of written notice of such breach;

(n)  either (i) any MACH Gen Entity or any other Restructuring Support Party files a motion, application, or adversary proceeding (or any MACH Gen Entity or other Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, the First Lien Obligations or the Second Lien Obligations (as defined in the Intercreditor Agreement) or the liens securing such obligations or (B) asserting any other cause of action against and/or with respect or relating to such obligations or the prepetition liens securing such obligations; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of such Consenting First Lien Holder with respect to any of the foregoing causes of action or proceedings;

(o)  any Party terminates its obligations under and in accordance with this Agreement, if any MACH Gen Entity is no longer a Party to this Agreement, or, in any instance, the Restructuring Support Parties remaining as Parties to this Agreement after such termination do not meet the thresholds in Section 1; or

(p)  if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the MACH Gen Entities' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code.

Notwithstanding the foregoing, denial by or other failure to obtain approval from a regulatory authority, including the Federal Energy Regulatory Commission and the New York State Public Service Commission, that is necessary to consummate the Restructuring shall not in itself constitute a First Lien Termination Event (except to the extent that such event ultimately results in a failure to meet a Milestone pursuant to Sub clause (a) of this Section 7) or a breach by a MACH Gen Entity of its obligations under this Agreement, provided that the MACH Gen Entities have diligently used all commercially reasonable efforts to obtain such approval.

8.  Consenting Second Lien Holder's Termination Events.  Each Consenting Second Lien Holder shall have the right, but not the obligation, upon notice to the other Parties, to terminate its own obligations under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by such Consenting Second Lien Holder on a prospective or

retroactive basis (each, a "**Second Lien Termination Event**"):

(a)    the failure to meet any Milestone, unless (i) such failure is the result of any act, omission, or delay on the part of the Consenting Second Lien Holder seeking termination or (ii) such Milestone is waived in accordance with Section 4;

(b)    the occurrence of a material breach of this Agreement by any MACH Gen Entity that has not been cured (if susceptible to cure) within five (5) business days after written notice to the Company of such material breach by the Consenting Second Lien Holder asserting such termination;

(c)    the occurrence of a First Lien Termination Event of the type described in Sub-clause (c) of Section 7, provided that the Consenting First Lien Holders have exercised their right to accelerate the obligations of the MACH Gen Entities arising under the Prepetition First Lien Credit Agreement, the Financing Orders, or the DIP Credit Agreement, as applicable;

(d)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(e)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)    any MACH Gen Entity amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) acceptable to the Majority Second Lien Holders;

(g)    the Bankruptcy Court enters an order or grants any request of a person to amend or modify the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) acceptable to the Majority Second Lien Holders;

(h)    any MACH Gen Entity files, propounds, or otherwise publicly supports or announces that any MACH Gen Entity will support any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets, without the prior written consent (in the sole discretion of each Consenting Second Lien Holder) of the Majority Second Lien Holders;

(i)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Company shall have five (5) business days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (i) does

not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Majority Second Lien Holders;

(j)      the failure to satisfy any requirement under <u>Section 3</u> that the Plan, or any other agreement or document that is included in the Definitive Documentation, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and be reasonably acceptable to the Majority Second Lien Holders;

(k)      the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the Interim Financing Order or Final Financing Order or otherwise consented to by the Majority Second Lien Holders;

(l)      a breach by any other Restructuring Support Party of any representation, warranty, or covenant of such other Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by such other Restructuring Support Party of written notice of such breach;

(m)     a breach by any MACH Gen Entity of any representation, warranty, or covenant of such MACH Gen Entity set forth in <u>Section 19</u> of this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Company of written notice of such breach;

(n)      either (i) any MACH Gen Entity or any other Restructuring Support Party files a motion, application or adversary proceeding (or any MACH Gen Entity or other Restructuring Support Party supports any such motion, application or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, the First Lien Obligations or the Second Lien Obligations (as defined in the Intercreditor Agreement) or the liens securing such obligations, or (B) asserting any other cause of action against and/or with respect or relating to such obligations or the prepetition liens securing such obligations; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Restructuring Support Parties with respect to any of the foregoing causes of action or proceedings;

(o)      any Party terminates its obligations under and in accordance with this Agreement, if any MACH Gen Entity is no longer a Party to this Agreement, or, in any instance, the Restructuring Support Parties remaining as Parties to this Agreement after such termination do not meet

the thresholds in <u>Section 1</u>;

(p)     the final forms of the New Owner Documents listed under a), f), and g) of **Exhibit F**, as such final forms are filed with the Bankruptcy Court in connection with confirmation of the Plan, are materially inconsistent with this Agreement and adverse to the interests of the Consenting Second Lien Holder seeking termination; or

(q)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the MACH Gen Entities' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code.

Notwithstanding the foregoing, denial by or other failure to obtain approval from a regulatory authority, including the Federal Energy Regulatory Commission and the New York State Public Service Commission, that is necessary to consummate the Restructuring shall not in itself constitute a Second Lien Termination Event (except to the extent that such event ultimately results in a failure to meet a Milestone pursuant to <u>Sub clause (a)</u> of this <u>Section 8</u>) or a breach by a MACH Gen Entity of its obligations under this Agreement, provided that the MACH Gen Entities have diligently used all commercially reasonable efforts to obtain such approval.

9.     <u>Consenting Equity Holder's Termination Events</u>.  Each Consenting Equity Holder shall have the right, but not the obligation, upon notice to the other Parties, to terminate its own obligations under this Agreement upon the occurrence of any of the following events, unless waived in writing, by such Consenting Equity Holder on a prospective or retroactive basis (each, an "**Equity Termination Event**"):

(a)     the occurrence of a material breach of this Agreement by any MACH Gen Entity, that has not been cured (if susceptible to cure) within five (5) business days after written notice to the Company of such material breach by the Consenting Equity Holder asserting such termination;

(b)     the occurrence of a First Lien Termination Event of the type described in <u>Sub-clause (c)</u> of <u>Section 7</u>, provided that the Consenting First Lien Holders have exercised their right to accelerate the obligations of the MACH Gen Entities arising under the Prepetition First Lien Credit Agreement, the Financing Orders or the DIP Credit Agreement, as applicable;

(c)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(e)     a breach by any other Restructuring Support Party of any representation, warranty, or covenant of such other Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material

adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by such other Restructuring Support Party of written notice of such breach;

(f)     a breach by any MACH Gen Entity of any representation, warranty, or covenant of such MACH Gen Entity set forth in Section 19 of this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Company of written notice of such breach;

(g)     any Party terminates its obligations under and in accordance with this Agreement, if any MACH Gen Entity is no longer a Party to this Agreement, or, in any instance, the Restructuring Support Parties remaining as Parties to this Agreement after such termination do not meet the thresholds in Section 1; or

(h)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the MACH Gen Entities' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code.

Notwithstanding the foregoing, denial by or other failure to obtain approval from a regulatory authority, including the Federal Energy Regulatory Commission and the New York State Public Service Commission, that is necessary to consummate the Restructuring shall not constitute an Equity Termination Event or a breach by a MACH Gen Entity of its obligations under this Agreement, provided that the MACH Gen Entities have diligently used all commercially reasonable efforts to obtain such approval.

10.     Company's Termination Events.  The Company (on behalf of itself and the other MACH Gen Entities) may terminate the MACH Gen Entities' obligations under this Agreement upon the occurrence of any of the following events (each a "**Company Termination Event**," and collectively and together with the First Lien Termination Events, Second Lien Termination Events, and Equity Termination Events, the "**Termination Events**"), subject to the rights of the Company to fully or conditionally waive, on a prospective or retroactive basis, the occurrence of a Company Termination Event:

(a)     a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by such Restructuring Support Party of notice and description of such breach;

(b)     the occurrence of a breach of this Agreement by any Restructuring Support Party that has the effect of materially impairing any of the MACH

13

Gen Entities' ability to effectuate the Restructuring and has not been cured (if susceptible to cure) within five (5) business days after written notice to all Parties of such breach;

(c)      upon notice to the Restructuring Support Parties, if the board of directors or board of managers, as applicable, of a MACH Gen Entity determines, after receiving advice from counsel, that proceeding with the Restructuring (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

(d)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the MACH Gen Entities have made reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(e)      any Party terminates its obligations under and in accordance with this Agreement, if any MACH Gen Entity is no longer a Party to this Agreement, or, in any instance, the Restructuring Support Parties remaining as Parties to this Agreement after such termination do not meet the thresholds in Section 1;

(f)      the occurrence of the Voting Deadline without sufficient votes accepting the Plan (taking into account any votes that are withdrawn or changed on or prior to the Voting Deadline) to satisfy section 1129(a)(8) of the Bankruptcy Code; or

(g)      the failure to satisfy any requirement under Section 3 that the Plan, or any other agreement or document that is included in the Definitive Documentation, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and be reasonably acceptable to the Company.

11.    Mutual Termination; Automatic Termination.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual agreement by and among all of the following Parties:  (a) the Company on behalf of itself and each other MACH Gen Entity; (b) Consenting Equity Holders holding, in aggregate, at least 50% of the voting rights of all Equity Interests (collectively, the "**Majority Equity Holders**"); (c) the Required First Lien Holders; and (d) the Majority Second Lien Holders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically upon the earlier to occur of:  (i) the occurrence of the Consummation Date; and (ii) June 30, 2014 (the "**Outside Date**"), it being understood that if all conditions to the Consummation Date other than receipt of any applicable regulatory approvals required to consummate the Plan, including from the Federal Energy Regulatory Commission and the New York State Public Service Commission, have been satisfied or are capable of immediate satisfaction on or before the Outside Date, the Outside Date shall be automatically extended by seventy-five (75) calendar days, provided that the MACH Gen Entities have diligently used all commercially reasonable efforts to obtain such approvals.

12.    _Effect of Termination_.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 7, 8, 9, 10, or 11 of this Agreement shall be referred to, with respect to such Party, as a "**Termination Date**." Upon the occurrence of a Termination Date, the terminating Party's obligations and, in the case of a Termination Date in accordance with Section 11 of this Agreement, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from its commitments, undertakings, and agreements; provided, however, that each of the following shall survive any such termination:  (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the MACH Gen Entities' obligations in Section 17 of this Agreement accrued up to and including such Termination Date; and (c) Sections 12, 18, 20, 21, 22, 24, 25, 27, 29, 33, 34, and 35.  Upon any Party's termination of this Agreement in accordance with its terms prior to the date on which the Confirmation Order is entered by the Bankruptcy Court, such Party shall have the immediate right, without further order of the Bankruptcy Court, and without the consent of the Company, to withdraw or change any vote previously tendered by such Party, irrespective of whether any voting deadline or similar deadline or bar date has passed, provided that such Party is not then in material breach of its obligations under this Agreement; provided further that, for the avoidance of doubt, the foregoing shall not be construed to prohibit any MACH Gen Entity or Restructuring Support Party from contesting whether such terminating Party's termination of this Agreement is in accordance with the terms of this Agreement.  Any Party withdrawing or changing its vote(s) pursuant to this Section 12 shall promptly provide written notice of such withdrawal or change to each other Party and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court

13.    _Cooperation and Support_.  The Company shall provide draft copies of all "first day" motions, applications, and other documents that any MACH Gen Entity intends to file with the Bankruptcy Court to counsel for each Restructuring Support Party at least four (4) calendar days (or as soon thereafter as is reasonably practicable under the circumstances) prior to the date when such MACH Gen Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use reasonable efforts to provide draft copies of all other material pleadings any MACH Gen Entity intends to file with the Bankruptcy Court to counsel to each Restructuring Support Party at least three (3) calendar days prior to filing such pleading to the extent practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion, consistent with the last sentence of Section 3 hereof.

14.    _Transfers of Claims and Interests_.

(a)    Each Restructuring Support Party shall not (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against, or interests in, any MACH Gen Entity, as applicable, in whole or in part, or (ii) grant any proxies, deposit any of such Restructuring Support Party's claims against or interests in any MACH Gen Entity, as applicable, into a voting trust, or enter into a voting agreement with

15

respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**Transfer**" and the Restructuring Support Party making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Restructuring Support Party or any other entity that (x) first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Company a Transferee Joinder substantially in the form attached hereto as **Exhibit H** (the "**Transferee Joinder**"), and (y) is reasonably capable, after due inquiry and investigation by the Transferor, of fulfilling its obligations under this Agreement; provided, however, the Company's prior written consent (which consent shall be provided only after reasonable consultation with the Majority Second Lien Holders and the Required First Lien Holders) shall be required (i) for any Transfer that would entitle the intended transferee or its affiliates to beneficially or legally own, in aggregate, at least ten percent (10%) of the reorganized equity in the Company (or its successor) (the "**Reorganized Equity**"), and (ii) in connection with a transfer of "beneficial ownership" (defined below) of Equity Interests (x) by an intended transferor that, on the date hereof, is treated as the beneficial owner of 4.9% or more of the Equity Interests, (y) if the intended transferee owns 4.9% or more of the Equity Interests prior to the proposed transfer, or such person would own 4.9% or more of the Equity Interests immediately following such proposed transfer.  For purposes of clause (ii) in the proviso above, "beneficial ownership" shall be determined in accordance with applicable rules under section 382 of the Internal Revenue Code, the U.S. Department of Treasury regulations promulgated thereunder and rulings issued by the Internal Revenue Service, and, thus, to the extent provided in those rules, from time to time shall include, without limitation, (i) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (ii) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock and (iii) in certain cases, the ownership of an option to acquire Equity Interests.  With respect to claims against or interests in a MACH Gen Entity held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Restructuring Support Party, as applicable, set forth in this Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Sub-clause (a) of this Section 14 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Company and/or any Restructuring Support Party, and shall not create any obligation or liability of any MACH Gen Entity or any other Restructuring Support Party to the purported transferee.  Notwithstanding the foregoing, (i) the Company's prior written consent shall not be required pursuant to this Agreement for any Transfer set forth on **Schedule 2**; (ii) for the avoidance of doubt, any total return swap transaction in respect of a Restructuring Support Party's Claims in existence as of the date hereof (an "**Existing TRS**") shall not constitute a Transfer; (iii) any amendment, restatement, or modification of an Existing TRS in connection with or following the Restructuring that does not change the "beneficial ownership" (as defined

above) of such Restructuring Support Party's Claims (if any) shall not constitute a Transfer.

(b)    Notwithstanding Sub-clause (a) of this Section 14, each Consenting Equity Holder shall not, and, as applicable, shall not permit its affiliates to, sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of its Equity Interests, in whole or in part, without the prior written consent of the Company (which consent shall be provided only after reasonable consultation with the Majority Second Lien Holders, and the Required First Lien Holders). Any such transfer made in violation of this Section 14 shall be deemed null and void *ab initio* and of no force or effect.

(c)    Notwithstanding Sub-clauses (a) and (b) of this Section 14, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Restructuring Support Party in order to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against, or interest in, any MACH Gen Entity, as applicable, by a Restructuring Support Party to a transferee; provided that such transfer by a Restructuring Support Party to a transferee shall be in all other respects in accordance with and subject to Sub-clauses (a) and (b) of this Section 14; and (ii) to the extent that a Restructuring Support Party, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any MACH Gen Entity from a holder of such claim or interest who is not a Restructuring Support Party, it may transfer (by purchase, sale, assignment, participation or otherwise) such claim or interest without the requirement that the transferee be or become a Restructuring Support Party in accordance with this Section 14.  For purposes of this Sub-clause (c), a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against, or interests in, the MACH Gen Entities (including debt securities or other debt) or enter with customers into long and short positions in claims against, or interests in, the MACH Gen Entities (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against, or interests in, the MACH Gen Entities, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

15.    Further Acquisition of Claims or Interests.  Except as set forth in Section 14, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional First Lien Claims, Second Lien Claims, Equity Interests, or interests in the instruments underlying the First Lien Claims, Second Lien Claims, or Equity Interests; provided, however, that any such additional First Lien Claims, Second Lien Claims, Equity Interests, or interests shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition by a Restructuring Support Party or any of its affiliates, such Restructuring Support Party shall promptly notify the Company, who shall update **Exhibit I** to reflect such further acquisition.

16.    Business Continuance.  Except as contemplated by this Agreement or with the

17

prior written consent of the Majority Second Lien Holders and the Required First Lien Holders, and subject to applicable bankruptcy or non-bankruptcy law, the Company covenants and agrees that, between the date hereof and the Consummation Date, the MACH Gen Entities shall continue to operate their businesses in accordance with their past practices and on the terms and conditions set forth in the 13-week cash flow attached hereto as **Exhibit J** (the "**Budget**"). The Company shall only be permitted to amend, modify, or revise the Budget with the express written consent of the Required First Lien Holders and Majority Second Lien Holders.

17.    Fees and Expenses.  Subject to Section 12, the Company shall pay or reimburse when due all reasonable and documented fees and expenses of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date):  (a) one (1) primary counsel and one (1) local counsel for all Consenting Equity Holders; (b) one (1) primary counsel, one (1) bankruptcy counsel, and one (1) local counsel for the Consenting First Lien Holders; and (c) one (1) primary counsel, one (1) local counsel, and one (1) financial advisor for all Consenting Second Lien Holders. In the event (x) the Company fails to meet any Milestone (after taking into account any extension to, or waiver of, the Milestones in accordance with the terms herein), which failure is not the result of any act, omission, or delay on the part of the Consenting First Lien Holders, (y) the Consenting First Lien Holders provide a waiver with respect to a First Lien Termination Event at the Company's request, or (z) the Consenting First Lien Holders require a financial advisor to testify or otherwise appear in the Chapter 11 Cases, the Company shall pay the reasonable fees and expenses of one (1) financial advisor for such purpose(s), and the Consenting First Lien Holders will negotiate the fee associated with engaging such financial advisor in good faith.  For the avoidance of doubt, nothing in this Section 17 shall be construed as limiting any of the Company's obligations under section 9.04 of the Existing First Lien Credit Agreement.

18.    Consents and Acknowledgments.

(a)    Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.  The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law (as provided under sections 1125(g) and 1126(b) of the Bankruptcy Code), and will be subject to sections 1125, 1126 and 1127 of the Bankruptcy Code.

(b)    By executing this Agreement (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date), each Consenting First Lien Holder, Consenting Second Lien Holder, and MACH Gen Entity acknowledges and agrees that, until the occurrence of the Consummation Date, and subject to the terms of the Financing Orders, (i) the Prepetition First Lien Credit Agreement, any use of cash collateral and debtor in possession financing authorized by the Financing Orders, including the DIP Credit Agreement, and the New First Lien Credit Agreement shall continue to constitute a "Refinancing First Lien Credit Agreement" "as Amended and Refinanced" pursuant to the Intercreditor Agreement; and (ii) the obligations under the Prepetition First Lien Credit Agreement, any use of cash collateral and debtor in possession financing authorized by the Financing Orders, including the DIP Credit Agreement, and the New First Lien Credit Agreement are and shall continue to be treated as First Lien Obligations (as defined in the Intercreditor Agreement) for all purposes of the Intercreditor Agreement and the Financing

Documents (as defined in the Intercreditor Agreement), including for purposes of the Lien (as defined in the Intercreditor Agreement) priorities and rights in respect of Collateral (as defined in the Intercreditor Agreement) set forth therein.

(c)    By executing this Agreement (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date), each Consenting Second Lien Holder hereby irrevocably consents, for all purposes of the Intercreditor Agreement and the Financing Documents (as defined in the Intercreditor Agreement), to the MACH Gen Entities' and Consenting First Lien Holders' entry into the Prepetition First Lien Credit Agreement, the MACH Gen Entities' use of cash collateral and debtor in possession financing authorized by the Financing Orders and the DIP Credit Agreement, and the MACH Gen Entities' and Consenting First Lien Holders' entry into the DIP Credit Agreement and the New First Lien Credit Agreement, and, in each case, the entry into the other documents related to the Prepetition First Lien Credit Agreement, the Financing Orders, the DIP Credit Agreement, and the New First Lien Credit Agreement and the transactions contemplated by the Prepetition First Lien Credit Agreement, the Financing Orders, the DIP Credit Agreement, and the New First Lien Credit Agreement.

(d)    By executing this Agreement (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date), each Consenting Equity Holder hereby irrevocably approves the MACH Gen Entities' and Consenting First Lien Holders' entry into the Prepetition First Lien Credit Agreement, the MACH Gen Entities' use of cash collateral and debtor in possession financing authorized by the Financing Orders and the DIP Credit Agreement, and the MACH Gen Entities' and Consenting First Lien Holders' entry into the DIP Credit Agreement and the New First Lien Credit Agreement, and, in each case, the entry into the other documents related to the Prepetition First Lien Credit Agreement, the Financing Orders, the DIP Credit Agreement, and the New First Lien Credit Agreement and the transactions contemplated by the Prepetition First Lien Credit Agreement, the Financing Orders, the DIP Credit Agreement, and the New First Lien Credit Agreement.

(e)    By executing this Agreement (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date), each Consenting First Lien Holder and Consenting Second Lien Holder hereby irrevocably waives any Default or Event of Default as defined under the Credit Agreements (as defined in the Intercreditor Agreement) that is caused by the MACH Gen Entities' entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement.

(f)    Each Consenting Equity Holder agrees that (i) its execution of this Agreement shall constitute its affirmative vote and written consent to the filing of the Chapter 11 Cases under Article 5.3 of the LLC Agreement, (ii) such affirmative vote and written consent shall be irrevocable and survive any Termination Date that may occur with respect to such Consenting Equity Holder, and (iii) such affirmative vote and written consent shall only expire upon the occurrence of the Outside Date, if the Petition Date has not occurred prior to the Outside Date.

(g)    If a Consenting Second Lien Holder provides notice to the Consenting First Lien Holders of the occurrence of a Termination Event on account of an Alternative Transaction, and the Parties to this Agreement remaining after such Termination Event do not include (x) all of

19

the MACH Gen Entities and (y) Restructuring Support Parties that meet all of the thresholds in Section 1, then the Consenting First Lien Holders shall have a period of twenty-one (21) calendar days from the date of such notice (such period, the "ROFR Period") in which to consider whether to consent to such Alternative Transaction. If the Required First Lien Holders do not consent to such Alternative Transaction within the ROFR Period and the MACH Gen Entities or other Restructuring Support Parties proceed with the Alternative Transaction and as a consequence the Consenting First Lien Holders accelerate the First Lien Obligations (as defined in the Intercreditor Agreement), the Parties agree that the Consenting First Lien Holders will be required to offer the Second Lien Secured Parties (as defined in the Intercreditor Agreement) the right to purchase First Lien Obligations in accordance with Section 5.5 of the Intercreditor Agreement.  In any other circumstance, if (i) the Second Lien Credit Agreement has been amended, or the loans under the Second Lien Credit Agreement have been restructured or Refinanced (as defined in the Intercreditor Agreement), in whole or in part, in any manner in violation of the Financing Documents (as defined in the Intercreditor Agreement), including the Intercreditor Agreement and the Security Deposit Agreement (other than as provided for in, or contemplated by, this Agreement), or (ii) any of the loans under the Second Lien Credit Agreement has been prepaid, redeemed, purchased, defeased or otherwise satisfied (including for the avoidance of doubt by conversion to equity) in violation of Section 5.02(j) of the Prepetition First Lien Credit Agreement or the DIP Credit Agreement, as applicable (other than as provided for in, or contemplated by, this Agreement), then, notwithstanding anything in Section 5.5 of the Intercreditor Agreement to the contrary, the purchase price for First Lien Obligations following an acceleration thereof as contemplated in such Section 5.5 of the Intercreditor Agreement shall include the applicable Yield Maintenance Fee (as defined in the Prepetition First Lien Credit Agreement or the DIP Credit Agreement, as applicable) as a result of such acceleration (and it being understood and agreed that, in the absence of any such violation of the Financing Documents, such offer to purchase shall not include any Yield Maintenance Fee).  For purposes of this Agreement, "Alternative Transaction" means a restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of any Mach Gen Entity (or any of its assets, equity interests or debt), other than the Plan and the Restructuring, which a Party did not, in violation of this Agreement, directly or indirectly seek, solicit, support, formulate, entertain, encourage or engage in discussions about, or enter into any agreements relating to, and which the Majority Second Lien Holders and the Majority Equity Holders have thereafter agreed to support, that (a) does not require changes in the terms of the First Lien Documents (as defined in the Intercreditor Agreement) or the New First Lien Credit Agreement, as applicable, that (x) in respect of economic terms, are adverse to the holders of First Lien Obligations, (y) adversely affect the Collateral or the relative priority and subordination of Liens on the Collateral as provided in the Intercreditor Agreement, or (z) are otherwise material to the rights and interests of the Consenting First Lien Holders, in each case relative to the terms agreed by the Parties as of the RSA Effective Date, (b) results (i) in the conversion of all of Second Lien Claims to Equity Interests (or reorganized equity interests in MACH Gen), (ii) in the conversion of at least a majority of the outstanding amount of Second Lien Claims to Equity Interests (or reorganized equity interests in MACH Gen), provided in such instance that the maturity date of any remaining loans under the Second Lien Credit Agreement has been extended to a date no earlier than August 31, 2016 (and any right of the holders of such loans to purchase First Lien Obligations in the circumstances described in Section 5.5 of the Intercreditor Agreement prior to such date shall be with the applicable Yield Maintenance Fee), or (iii) the acquisition by holders of the outstanding amount of the Second Lien Claims of substantially all of the assets of the

MACH Gen Entities (subject to the Liens securing the First Lien Obligations), and (c) is not otherwise permitted pursuant to the terms of the First Lien Loan Documents (including the Intercreditor Agreement and the Security Deposit Agreement).

(h)     By executing this Agreement (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date), (i) each of the Consenting Second Lien Holders, which together constitute (x) "Required Second Lien Secured Parties" under and as defined in the Intercreditor Agreement and (y) "Required Lenders" under and as defined in the Second Lien Credit Agreement, hereby authorizes and directs The Bank of New York Mellon, in its capacities as the Second Lien Agent and the Second Lien Collateral Agent (as each such term is defined in the Intercreditor Agreement), as applicable, to execute and deliver the Intercreditor Amendment, and (ii) each of the Consenting First Lien Holders, which together constitute (x) "Required First Lien Secured Parties" under and as defined in the Intercreditor Agreement and (y) "Required Lenders" under and as defined in the Existing First Lien Credit Agreement, hereby authorizes and directs CLMG Corp., in its capacities as the First Lien Agent and the First Lien Collateral Agent (as each such term is defined in the Intercreditor Agreement), as applicable, to execute and deliver the Intercreditor Amendment.

19.     <u>Representations and Warranties</u>.

(a)     Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

  (i)     it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

  (ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

  (iii)   the execution, delivery and performance by it of this Agreement does not (A) violate any provision of law, rule, or regulation applicable to it or any of its affiliates, or its certificate of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party;

  (iv)    the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state or other governmental authority or regulatory body, other than the Federal Energy Regulatory Commission and New York State Public Service Commission;

(v)    except as described on **Schedule 4** hereto, it has no knowledge of any "Default" or "Event of Default" under the "First Lien Documents" (in the case of the Consenting First Lien Holders) or the "Second Lien Documents" (in the case of the Consenting Second Lien Holders), as such terms are defined in the Intercreditor Agreement, which has occurred and is continuing;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vii)    it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, with sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to discuss the Plan and other information concerning the MACH Gen Entities with the MACH Gen Entities' representatives, and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(viii)    it has been advised that (A) the offer and sale of the Reorganized Equity has not been, and will not be, registered under the Securities Act and (B) the offering and issuance of the Reorganized Equity is intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code; and

(ix)    it (A) either (1) is the sole owner of the claims and interests set forth on **Exhibit I** and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests set forth on **Exhibit I**, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) does not directly or indirectly own any First Lien Claims, Second Lien Claims, or Equity Interests other than as set forth on **Exhibit I**.

(b)    Each MACH Gen Entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than the MACH Gen Entities) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate power and authority to enter into this

Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) or manager(s), as applicable, of each of the corporate entities that comprise the MACH Gen Entities;

(iii)   the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a default that would be triggered as a result of the Chapter 11 Cases or any MACH Gen Entity's undertaking to implement the Restructuring through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring, including with the Federal Energy Regulatory Commission and New York State Public Service Commission;

(v)     except as disclosed to the Restructuring Support Parties and described on **Schedule 4** annexed hereto, it has no knowledge of any "Default" or "Event of Default" under the "First Lien Documents" or the "Second Lien Documents," as such terms are defined in the Intercreditor Agreement, which has occurred and is continuing;

(vi)    (A) the offer and sale of the Reorganized Equity has not been, and will not be, registered under the Securities Act and (B) the offering and issuance of the Reorganized Equity is intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vii)   subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(viii)  it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the

23

opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction; and

(ix)    **Schedule 1** annexed hereto sets forth (A) each corporation, limited liability company, partnership, business association or other person in which the Company owns any direct or indirect equity interest including, without limitation, any entities that may or may not become debtors and debtors in possession in the Chapter 11 Cases, (B) the ownership interest therein of the MACH Gen Entities, and (C) the United States federal income tax status of the MACH Gen Entities as a corporation, limited liability company, partnership, or disregarded entity.  Except as set forth on **Schedule 1** (X) the Company owns, either directly or indirectly, all of the capital stock or other equity interests of the other MACH Gen Entities free and clear of all encumbrances, and (Y) there are no outstanding subscription rights, options, warrants, convertible or exchangeable securities, or other rights of any character whatsoever relating to issued or unissued capital stock or other equity interests of any MACH Gen Entity, or any commitments of any character whatsoever relating to issued or unissued capital stock or other equity interests of any MACH Gen Entity or pursuant to which any MACH Gen Entity is or may become bound to issue or grant additional shares of its capital stock or other equity interests or related subscription rights, options, warrants, convertible or exchangeable securities or other rights, or to grant preemptive rights. Except as set forth on **Schedule 1** the Company owns or has the license to all assets used in the business as it is currently conducted.

20.    Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the MACH Gen Entities and in contemplation of possible chapter 11 filings by the MACH Gen Entities and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

21.    Waiver.  If the transactions contemplated herein are or are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in Section 18, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement and all negotiations relating hereto are subject to Federal Rule of Evidence 408 and any other applicable rules of evidence.

22.    Relationship Among Parties.  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.

23.    Specific Performance.  It is understood and agreed by the Parties that money

damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement (excluding the Prepetition First Lien Credit Agreement, the DIP Credit Agreement and the New First Lien Credit Agreement to the extent any of the terms thereof are incorporated herein pursuant to <u>Section 2</u>, each of which such agreements once entered into (and approved by the Bankruptcy Court, if necessary) shall be governed exclusively by the terms set forth therein and, to the extent applicable, the Financing Orders), including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

24.    <u>Governing Law & Jurisdiction</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the District of Delaware, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to Delaware jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding or other contested matter.

25.    <u>Waiver of Right to Trial by Jury</u>.    Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to or incidental to the relationship established between any of them in connection with this Agreement.    Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

26.    <u>Successors and Assigns</u>.    Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

27.    <u>No Third-Party Beneficiaries</u>.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

28.    <u>Notices</u>.    All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may

25

be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

      (a)    If to any MACH Gen Entity:

      MACH Gen, LLC
      c/o Willow Bend Capital Management, LLC
      2701 Dallas Pkwy, Suite 560
      Plano, TX 75093
      Attn:   Garry Hubbard, Chief Executive Officer
      Tel:    (972) 943-3800
      Fax:    (972) 943-3808
      Email: garryh@wbcmllc.com
      With a copy to:  jimmyt@wbcmllc.com

      *With a copy to:*

      MACH Gen, LLC
      c/o Competitive Power Ventures, Inc.
      8403 Colesville Road, Suite 915
      Silver Spring, MD 20910
      Attn:   Eric Cada
      Tel:    (240) 723-2332
      Fax:    (240) 491-9593
      Email: ecada@cpv.com

      Milbank, Tweed, Hadley & M$^c$Cloy LLP
      1 Chase Manhattan Plaza
      New York, NY 10005
      Attn:   Matthew S. Barr
      Tel:    (212) 530-5194
      Fax:    (212) 822-5194
      Email: mbarr@milbank.com
      Attn:   Tyson M. Lomazow
      Tel:    (212) 530-5367
      Fax:    (212) 822-5367
      Email: tlomazow@milbank.com

      (b)    If to the Consenting Second Lien Holders:

      Angelo, Gordon & Co., L.P.
      245 Park Avenue, 26th Floor
      New York, NY 10167
      Attn:   Gavin Baiera
      Tel:    (212) 692-2000
      Fax:    (212) 867-9328
      Email:  gbaiera@angelogordon.com

Solus Alternative Asset Management LP
410 Park Avenue, 11th Floor
New York, NY 10022
Attn:    Stephen J. Blauner
            Michael Colodner
Tel:      (212) 284-4300
Fax:      (212) 284-4320
Email:   sblauner@soluslp.com
            mcolodner@soluslp.com

Energy Capital Partners, LLC
51 John F. Kennedy Parkway, Suite 200
Short Hills, New Jersey 07078
Attn:  Rahman D'Argenio
Tel:      (973) 671-6100
Fax:      (973) 671-6101
Email:  rdargenio@ecpartners.com

Deutsche Bank AG, London Branch
c/o Deutsche Bank AG New York Branch
60 Wall Street
New York, NY 10005
Attn: Alexander Gorokhovskiy (alexander.gorokhovskiy@db.com)
Telephone: (212) 250-2626
Facsimile: (646) 736-5751

*With a copy to:*

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:  Patrick J. Nash, Jr., P.C.
Tel:      (312) 862-2000
Fax:      (312) 862-2200
Email:  patrick.nash@kirkland.com

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:  Brian E. Schartz
Tel:      (212) 446-4800
Fax:      (212) 446-4900
Email:  brian.schartz@kirkland.com

(c)      If to the Consenting First Lien Holders:

27

c/o CLMG Corp., as administrative agent and collateral agent
7195 Dallas Parkway
Plano, TX  75024
Attn:  Mr. James Erwin
Tel:     (469) 467-5414
Fax:     (469) 467-5550
Email: jerwin@clmgcorp.com

*With a copy to (as applicable):*

Beal Bank USA
Beal Bank, SSB
     c/o CSG Investments Inc.
6000 Legacy Drive
Plano, TX  75024
Attn:  Mr. Jacob Cherner
Tel:     (469) 467-5563
Fax:     (469) 241-9567
Email: jcherner@csginvestments.com

*With a copy to:*

CSG Investments Inc.
6000 Legacy Drive
Plano, TX  75024
Attn:  Mr. Steve Harvey
Tel:     (469) 467-5651
Fax:     (469) 241-9567
Email: sharvey@csginvestments.com

*With a copy to:*

Hunton & Williams LLP
2200 Pennsylvania Ave. NW
Washington, DC   20037
Attn:  Ellis M. Butler, Esq.
Tel:     (202) 955-1500
Fax:     (202) 778-2201
Email: ebutler@hunton.com

*With a copy to:*

White & Case LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131
Attn:   Thomas E Lauria
Tel:     (305) 371-2700

Fax:    (305) 358-5744
Email: tlauria@whitecase.com

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attn:   Scott Greissman
Tel:    (212) 819-8200
Fax:    (212) 354-8113
Email: sgreissman@whitecase.com

29.    <u>Entire Agreement</u>.   This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

30.    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the MACH Gen Entities, the Required First Lien Holders, the Majority Second Lien Holders and the Majority Equity Holders.

31.    <u>Reservation of Rights</u>.

(a)    Except as expressly provided in this Agreement, including <u>Section 5(a)</u> of this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Restructuring Support Parties to protect and preserve its rights, remedies and interests, including, but not limited to, all of their rights and remedies under the First Lien Documents and the Second Lien Documents (as such terms are defined in the Intercreditor Agreement), including any such rights and remedies relating to Defaults or Events of Default or other events that may have occurred prior to the execution of this Agreement, any and all of its claims and causes of action against the MACH Gen Entities, any liens or security interests it may have in any assets of any of the MACH Gen Entities or any third parties, or its full participation in the Chapter 11 Cases, if commenced.

(b)    Without limiting <u>Sub-clause (a)</u> of this <u>Section 31</u> in any way, if the transactions contemplated by this Agreement are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Restructuring Support Parties and the MACH Gen Entities each fully reserve any and all of their respective rights, remedies, and interests under the First Lien Documents and the Second Lien Documents (and all documents executed and delivered in connection therewith), applicable law and in equity, subject to <u>Section 21</u> of this Agreement.

32.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be

delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

33.    _Public Disclosure_.  This Agreement, as well as its terms, its existence and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; _provided_, _however_, that after the commencement of solicitation on the Plan, the Parties may disclose the existence of, or the terms of, this Agreement, the Plan, the Disclosure Statement, or any other material term of the transaction contemplated herein without the express written consent of the other Parties; _provided_, _further_, that nothing in this Agreement shall prohibit any Restructuring Support Party from entering into discussions or negotiations with principals, employees, agents or professionals of the lenders and agent under the First Lien Documents and the Second Lien Documents, as applicable (provided that any such lender or agent is party to a confidentiality agreement with, or otherwise has an obligation of confidentiality to the Company), in furtherance and support of the Restructuring.

34.    _Headings_.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

35.    _Interpretation_.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

[_Signatures and exhibits follow_.]

**SIGNATURE PAGES REDACTED**

**<u>Schedule 1</u> to the Restructuring Support Agreement**

**Ownership of MACH Gen Subsidiaries**

The following entities are all of the subsidiaries of MACH Gen, LLC ("**<u>MACH Gen</u>**") as of the date of the Agreement:

    a.  MACH Gen GP, LLC ("**<u>MACH Gen GP</u>**")
        Jurisdiction of Organization:  Delaware
        Percentage of shares owned by MACH Gen: 100

    b.  Millennium Power Partners, L.P.
        Jurisdiction of Organization:  Delaware
        Percentage of shares owned by MACH Gen: .5
        Percentage of shares owned by MACH Gen GP:  99.5

    c.  New Harquahala Generating Company, LLC
        Jurisdiction of Organization:  Delaware
        Percentage of shares owned by MACH Gen:  100

    d.  New Athens Generating Company, LLC
        Jurisdiction of Organization:  Delaware
        Percentage of shares owned by MACH Gen: 100

**<u>Schedule 2</u> to the Restructuring Support Agreement**

**Permissible Transfers**

**REDACTED**

## <u>Schedule 3</u> to the Restructuring Support Agreement
## Reorganized Equity Term Sheet

| | |
|---|---|
| **Amount** | The Reorganized Equity will consist of limited liability company interests. On the Consummation Date, New Holdco shall issue 10,000,000 units of the Reorganized Equity in the form of common units. |
| **Private Company Status** | The Company will use commercially reasonable efforts to provide that at completion of the Restructuring, the Reorganized MACH Gen Entities shall not be required to file reports under the Securities Exchange Act of 1934, as amended (the "**<u>Exchange Act</u>**"). |
| **Classes of Equity** | There shall be no classes of equity senior to the Reorganized Equity. |
| **Deutsche Bank to Limit Equity Voting Pending Final FERC Approval** | Deutsche Bank AG, London Branch ("***DB***") is expected to be the legal owner of 11.5% of the total Reorganized Equity in New Holdco on the Consummation Date. DB is party to a Loan Total Return Swap Transaction evidenced by a Loan Total Return Swap Confirmation by and between ECP Polaris, Ltd, an affiliate of ECP, and DB (the "***TRS***"). If, pursuant to the TRS or an amended version of the TRS, DB is requested by ECP Polaris Ltd. to vote DB's share of the total Reorganized Equity in New Holdco, DB agrees that, from and on the Consummation Date, DB shall vote no more than 9.9% of such total Reorganized Equity in accordance with such request until FERC has favorably determined in writing an application pursuant to section 203 of the Federal Power Act that contains an Appendix A Analysis[1]. |
| **Transferability** | Subject to the requirements of the Securities Act of 1933 as amended, the Reorganized Equity shall not be subject to rights of first refusal, rights of first offer, or any similar restrictions on transfer; <u>provided</u> <u>however</u> that the Reorganized Equity may contain reasonable and customary restrictions designed to maintain Reorganized MACH Gen as a private company and comply with the requirements of any applicable regulatory body, including without limitation the Federal Energy Regulatory Commission and New York State Public Service Commission. |
| **Tag-Along Rights** | In the event that any unitholder(s) of New Holdco propose to transfer 35% or more of the outstanding units of the Reorganized Equity to a person or a group of affiliated persons, in a single transaction or series of related transactions (a "**<u>Tag-Along Sale</u>**"), each other holder of Reorganized Equity shall have a tag-along right to participate, on a pro rata basis (based on the number of units held by each New Holdco unitholder) in the Tag-Along Sale, on the same terms and subject to the same conditions as the initiating |

---

[1]    Pursuant to Appendix A of the *Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act*, 1996-2000 FERC Stats. & Regs. [Regs. Preambles] ¶ 31,044 (1996), *reconsideration denied*, Order No. 592-A, 79 FERC ¶ 61,321 (1997)

| | |
|---|---|
| | unitholders except that representations made by selling unitholders as to ownership of units shall only be made by each unitholder with respect to its own units.  Any proposed elimination of tag-along rights shall require the consent of each affected holder of the Reorganized Equity.  New Holdco shall be deemed to have satisfied any notice obligations related to a Tag-Along Sale by posting notice to a website to be established for purposes of communicating with unitholders. |
| **Drag-Along Rights** | In the event that any unitholder(s) of New Holdco propose to transfer at least 50% of the outstanding units of the Reorganized Equity to a person or group of affiliated persons (such persons being unaffiliated with any Dragging Unitholder (as defined below) and unaffiliated with Reorganized MACH Gen) that proposes to purchase for cash all (but not less than all) of the outstanding units of the Reorganized Equity (a "**Drag-Along Sale**"), then the transferring holders of the Reorganized Equity (the "**Dragging Unitholders**") shall have a drag-along right to cause all of the other holders of Reorganized Equity (the "**Drag-Along Unitholders**") to transfer all of their units of Reorganized Equity (or Reorganized Equity equivalents or convertibles, if any) to such person(s), on the same terms and subject to the same conditions as the Dragging Unitholders.  Any Drag-Along Sale would be subject to reasonable and customary minority protections.  New Holdco shall be deemed to have satisfied any notice obligations related to a Drag-Along Sale by posting notice to a website to be established for purposes of communicating with unitholders. |
| **Preemptive Rights** | Each holder of at least 1% of the Reorganized Equity (affiliates of such holder shall be considered for the purposes of calculating such holder's percentage ownership of the Reorganized Equity) shall be entitled to reasonable and customary preemptive rights, subject to customary exceptions.  New Holdco shall be deemed to have satisfied any notice obligations related to a transaction that triggers preemptive rights by posting notice to a website to be established for purposes of communicating with unitholders.<br><br>Any proposed elimination of preemptive rights shall require the consent of each affected holder of the Reorganized Equity. |
| **Information Rights** | Reorganized MACH Gen shall provide audited annual and quarterly financial statements to unitholders.  Additionally, unitholders will receive additional financial information prepared by Reorganized MACH Gen (other than Board-level information), subject to execution of a confidentiality agreement with Reorganized MACH Gen. |
| **Governance** | The boards of Reorganized MACH Gen will be determined in accordance with Article V.I. of the Plan. |
| **Termination of Equity Rights** | The unitholder rights set forth herein other than registration rights shall terminate upon an underwritten public offering of the Reorganized Equity so long as the Reorganized Equity, in connection with such offering, will be listed on a national securities exchange. |

| | |
|---|---|
| **Registration Rights** | Certain holders of the Reorganized Equity shall have reasonable and customary piggy back registration rights.  In connection with a public offering, the board of New Holdco may approve the conversion of New Holdco from a limited liability company to a corporation and each unitholder shall cooperate in such conversion. |
| **Issuance of Reorganized Equity** | On the Consummation Date, the Reorganized Equity to be distributed under the Plan shall be deemed fully paid. |

**<u>Schedule 4</u> to the Restructuring Support Agreement**

**Schedule of Defaults**

None.

**<u>Exhibit A</u> to the Restructuring Support Agreement**

**Joint Prepackaged Chapter 11 Plan of Reorganization**

**AVAILABLE UPON REQUEST; IF YOU WOULD LIKE A COPY, PLEASE CONTACT PRIME CLERK, LLC AT MACHGENINFO@PRIMECLERK.COM OR BY PHONE AT 212-257-5490.**

**Exhibit B** to the Restructuring Support Agreement

**Prepetition Amendment**

**Final Exhibit to RSA**

**EXECUTION VERSION**

# FIRST AMENDMENT TO
# AMENDED AND RESTATED FIRST LIEN CREDIT AND GUARANTY AGREEMENT

This FIRST AMENDMENT TO AMENDED AND RESTATED FIRST LIEN CREDIT AND GUARANTY AGREEMENT (this "***Amendment***") is entered into as of January 15, 2014, by and among MACH GEN, LLC (the "***Borrower***"), the Guarantors (as defined in the Existing Credit Agreement (as defined below)), the Lenders (as defined in the Existing Credit Agreement), the Revolving Issuing Bank (as defined in the Existing Credit Agreement), CLMG CORP., in its capacity as First Lien Collateral Agent (as defined in the Existing Credit Agreement) and in its capacity as Administrative Agent (as defined in the Existing Credit Agreement).  Except as otherwise provided herein, capitalized terms used in this Amendment have the meanings assigned to them pursuant to Section 6.1 below.

## RECITALS

A.    The Borrower is party to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012 (the "***Existing Credit Agreement***"), with the Guarantors, the Administrative Agent, the First Lien Collateral Agent and each of the banks, financial institutions, other institutional lenders and other parties party thereto from time to time.

B.    The Borrower is party to that certain Second Lien Credit and Guaranty Agreement, dated as of February 22, 2007, as amended by that certain Amendment No. 1 to the Second Lien Credit and Guaranty Agreement dated as of June 26, 2012 (as further amended, supplemented or otherwise modified from time to time, the "***Second Lien Credit Agreement***"), with the Guarantors, each of the banks, financial institutions and other institutional lenders party thereto from time to time (the "***Second Lien Lenders***"), The Bank of New York Mellon (f/k/a The Bank of New York, "***BONY***"), as Second Lien Collateral Agent (as defined in the Second Lien Credit Agreement) and as administrative agent for the Second Lien Lenders (the "***Second Lien Administrative Agent***").

C.    The Borrower desires to explore and implement a financial restructuring of the Borrower, including its obligations under the Credit Agreement and the Second Lien Credit Agreement, which would be effectuated through jointly-administered voluntary cases commenced by the Borrower and the Guarantors under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***") in accordance with the Restructuring Support Agreement.

D.    In order to obtain additional sources of funds and liquidity for the costs of such financial restructuring and for the provision of credit support to project counterparties during such period, the Borrower has requested that the Lender Parties agree to amend the Existing Credit Agreement to, among other things, (a) make available additional Term B Loans in the aggregate amount of $23,140,404.80, to be advanced to the Borrower by the Term B Lenders on the Amendment Effective Date, and (b) commencing on the Amendment Effective Date, temporarily increase the Commitments under the Revolving Credit Facility and the Revolving Letter of Credit Facility by $40,000,000.

E.      The Lender Parties have indicated their willingness to make available such additional Term B Loans and Commitments, subject to the terms and conditions of this Amendment.

F.      Accordingly, the parties hereto desire to enter into this Amendment to amend the Existing Credit Agreement as more particularly set forth below (the Existing Credit Agreement as so amended, and as it may be further amended, amended and restated or otherwise modified from time to time, the "***Credit Agreement***") and to enter into the other agreements set forth herein, which they agree shall continue to collectively constitute the "Refinancing First Lien Credit Agreement" "as Amended and Refinanced" for purposes of and as defined in the Intercreditor Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE 1.  NEW TERM B LOANS; INCREASED REVOLVING COMMITMENTS

1.1      New Term B Loans.

(a)      As of the date hereof and prior to giving effect to the advance contemplated to be made pursuant to clause (b) below, the parties hereto agree that the outstanding principal amount of Term B Loans is $460,068,880.34.

(b)      Each Term B Lender severally agrees, on the terms and conditions set forth in this Amendment, to make a single new Term B Loan to the Borrower on the Amendment Effective Date in an amount in Dollars equal to such Term B Lender's Pro Rata Share of $23,140,404.80 (each, a "***New Term B Loan***").  Each New Term B Loan shall be a "Term B Loan" for all purposes of the Credit Agreement and all Term B Loans, whether made pursuant to Section 2.01(a) of the Credit Agreement or this Section 1.1(b), shall be subject to the same terms (including as to repayment and prepayment thereof and interest thereon) set forth in the Credit Agreement.  New Term B Loans repaid or prepaid may not be reborrowed.

(c)      The New Term B Loans to be advanced on the Amendment Effective Date shall be available, and the Borrower agrees that it shall use the New Term B Loans, solely (A) to pay costs and expenses of the Restructuring (as defined in the Restructuring Support Agreement) consistent with the Budget (as defined in the Restructuring Support Agreement), and subject to any variance permitted with respect thereto, including, for the avoidance of doubt, professionals' fees associated with the Restructuring, (B) to provide working capital for the Loan Parties reasonably required to pay O&M Costs and satisfy Contractual Obligations then due and payable or in good faith reasonably anticipated to be due and payable during the next Funding Period (as defined in the Security Deposit Agreement) beginning on the relevant Funding Date (as defined in the Security Deposit Agreement), (C) to provide credit support required by counterparties to the Loan Parties' Contractual Obligations, and (D) for the Loan Parties' other general corporate purposes consistent with Prudent Industry Practices, including reasonable cash reserves in the Accounts, but excluding, in each case of clauses (A) through (D) above, any payment of principal, interest or fees in respect of Revolving Credit Loans.

(d)      The Term B Borrowing consisting of the New Term B Loans advanced on the Amendment Effective Date shall be made following the issuance of a Notice of Borrowing, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date

of the proposed Term B Borrowing, by the Borrower to the Administrative Agent, which shall give to the Term B Lenders prompt notice thereof by telecopier or electronic communication. Each such Notice of Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested (i) date of such Term B Borrowing (which shall be the Amendment Effective Date), and (ii) aggregate amount of such Term B Borrowing. Each Term B Lender shall, before 11:00 A.M. (New York City time) on the date of such Term B Borrowing, make available for the account of its Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, the amount of its Pro Rata Share of the Term B Borrowing. Following the Administrative Agent's receipt of such funds, the Administrative Agent will make such funds available to the Borrower on the Amendment Effective Date by wiring such funds to the Revenue Account (net of professionals' fees associated with the Restructuring incurred by or on behalf of the Agents). The Borrower shall transfer the full amount of such funds to the Operating Account on the next occurring Funding Date (as defined in the Security Deposit Agreement).

1.2    Revolving Credit Commitments and Revolving Letter of Credit Commitments. Beal Bank, SSB hereby severally agrees that, from and after the Amendment Effective Date, it will be a Revolving Credit Lender and will make Revolving Credit Loans to the Borrower on and subject to the terms and conditions set forth in the Credit Agreement; *provided*, *however*, that notwithstanding any provision of the Credit Agreement to the contrary, to the extent that the Credit Agreement provides for advances or payments to be made by or to the Revolving Credit Lenders ratably according to their Revolving Credit Commitments or according to their Pro Rata Shares, as between Beal Bank USA and Beal Bank, SSB, the Revolving Credit Lenders may allocate such advances and payments ratably according to their respective Unused Revolving Credit Commitments or in such other manner as Beal Bank USA and Beal Bank, SSB may agree without affecting in any manner the aggregate Revolving Credit Commitments available to the Borrower at any time. Each Revolving Credit Lender and each Revolving Issuing Bank severally agrees, subject to the terms and conditions set forth in this Amendment, that, commencing on the Amendment Effective Date, its Revolving Credit Commitment or Revolving Letter of Credit Commitment, as applicable, shall be as set forth next to such Lender Party's name on **_Exhibit A_**.

## ARTICLE 2.  AMENDMENTS TO EXISTING CREDIT AGREEMENT

2.1    Amendments to Section 1.01. On the Amendment Effective Date, Section 1.01 of the Existing Credit Agreement shall be amended as set forth in this Section 2.1.

(a)    The following definitions shall be added in the proper alphabetical order:

"**_Amendment Effective Date_**" has the meaning set forth in the First Amendment.

"**_Acceptable Plan_**" means (i) the Prepackaged Plan or (ii) a plan of reorganization of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code which has been consented to by the Administrative Agent.

"*Basic Revolver Period*" means the period prior to and following (but not including) the Temporary Revolver Period.

"*Chapter 11 Cases*" means jointly-administered voluntary cases that may be or have been commenced by the Borrower and the Guarantors under chapter 11 of the Bankruptcy Code in accordance with the terms of the Restructuring Support Agreement.

"*First Amendment*" means that certain First Amendment to First Lien Credit and Guaranty Agreement, dated as of January 15, 2014, by and among the Borrower, the Guarantors, the Lenders, the Revolving Issuing Bank, the First Lien Collateral Agent and the Administrative Agent.

"*Prepackaged Plan*" means that certain Joint Prepackaged Chapter 11 Plan of Mach Gen, LLC and its affiliated debtors and debtors-in-possession as contemplated in and in the form annexed to the Restructuring Support Agreement, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the Restructuring Support Agreement.

"*Refinancing*" has the meaning set forth in the Intercreditor Agreement.

"*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of January 15, 2014, among the Borrower, the Guarantors, the Lenders, certain Second Lien Lenders and certain holders of Equity Interests in the Borrower, as such agreement may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

"*Temporary Revolver Period*" means the period commencing on the Amendment Effective Date and continuing until the earliest of (a) the 60th day after the occurrence of a First Lien Termination Event (as defined in the Restructuring Support Agreement) on account of the Loan Parties failing to meet the milestone set forth in Section 4(d) of the Restructuring Support Agreement, (b) if the Chapter 11 Cases have not been commenced in accordance with the Restructuring Support Agreement, June 30, 2014 or (c) a breach by the Loan Parties of the covenant set forth in Section 6(a)(i)(A) of the Restructuring Support Agreement.

(b)   The following defined terms and their definitions shall be deleted in their entirety:

"*Capitalized Interest*"

"*Capitalized Interest Cap Amount*"

"*Cumulative Capitalized Interest Amount*"

"*Initial Term B Loan Amount*"

"***Interest Capitalization Period***"

(c)     The definition of "Applicable Margin" shall be deleted and replaced in its entirety as follows:

"***Applicable Margin***" means (a) with respect to the Term B Facility, 5.50% per annum and (b) with respect to the Revolving Credit Facility, (i) during the Temporary Revolver Period, 4.75% per annum and (ii) during the Basic Revolver Period, 4.25% per annum.

(d)     The definition of "Effective Date" shall be deleted and replaced in its entirety as follows:

"***Effective Date***" means July 10, 2012.

(e)     The definition of "Revolving Credit Commitment" shall be deleted and replaced in its entirety as follows:

"***Revolving Credit Commitment***" means, with respect to any Revolving Credit Lender at any time during the Temporary Revolver Period or the Basic Revolver Period, as the case may be, the amount set forth for such period opposite such Lender's name on Schedule I hereto under the caption "*Revolving Credit Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as such Lender's "*Revolving Credit Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to Sections 2.05 or 6.01.

(f)     The definition of "Revolving Credit Maturity Date" shall be deleted and replaced in its entirety as follows:

"***Revolving Credit Maturity Date***" means July 10, 2021.

(g)     The definition of "Revolving Letter of Credit Commitment" shall be deleted and replaced in its entirety as follows:

"***Revolving Letter of Credit Commitment***" means, with respect to the Revolving Issuing Bank at any time during the Temporary Revolver Period or the Basic Revolver Period, as the case may be, the amount set forth for such period opposite the Revolving Issuing Bank's name on Schedule I hereto under the caption "*Revolving Letter of Credit Commitment*" or, if the Revolving Issuing Bank has entered into an Assignment and Acceptance, set forth for the Revolving Issuing Bank in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as the Revolving Issuing Bank's "*Revolving Letter of Credit Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to Section 2.05.

(h)     The definition of "Term B Borrowing" shall be deleted and replaced in its

5

entirety as follows:

> "***Term B Borrowing***" means a borrowing consisting of simultaneous Term B Loans made or deemed to be made by the Term B Lenders on the Effective Date or the Amendment Effective Date, as the case may be.

(i)       The definition of "Term B Maturity Date" shall be deleted and replaced in its entirety as follows:

> "***Term B Maturity Date***" means the earliest of (a) July 10, 2022, (b) thirty (30) days prior to the scheduled maturity of any Second Lien Obligations and (c) the date the Term B Loans become due and payable pursuant to Section 6.01.

(j)       The definition of "Yield Maintenance Period" shall be deleted and replaced in its entirety as follows:

> "***Yield Maintenance Period***" means the period commencing on the Effective Date and continuing until the earlier of (a) subject to the proviso in Section 2.08(b)(iii)(B), if the scheduled maturity of the Second Lien Loans has not been extended beyond February 22, 2015, the date which is two weeks prior to January 22, 2015 (or if the scheduled maturity of the Second Lien Loans has been extended beyond February 22, 2015, the date which is two weeks prior to the date that is 30 days prior to such extended maturity date for the Second Lien Loans) and (b) July 10, 2016.

2.2       Amendments to Section 2.01.

(a)       On the Amendment Effective Date, Section 2.01(b) of the Existing Credit Agreement shall be amended by inserting the words "the earlier of (x) the commencement of the Chapter 11 Cases in accordance with the Restructuring Support Agreement or (y)" immediate after the words "during the period from the Effective Date until" in the first sentence of such Section 2.01(b).

(b)       On the Amendment Effective Date, Section 2.01(c)(i) of the Existing Credit Agreement shall be amended by inserting the words "the earlier of (x) the commencement of the Chapter 11 Cases in accordance with the Restructuring Support Agreement or (y)" immediate after the words "during the period from the Effective Date until" in the first sentence of such Section 2.01(c)(i).

2.3       Amendment to Section 2.04(a).       On the Amendment Effective Date, Section 2.04(a) of the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

> Term B Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term B Lenders the aggregate outstanding principal amount of the Term B Loans on the last Business Day of each of the following months in an amount equal to the product of (i) the aggregate principal amount of Term B Loans outstanding on the Amendment Effective Date (after giving effect

to the Term B Borrowings on the Amendment Effective Date pursuant to the First Amendment), multiplied by (ii) the percentage indicated opposite such month in the table below:

| **Month** | **Percentage** |
|---|---|
| March 2014 | 0.25% |
| June 2014 | 0.25% |
| September 2014 | 0.25% |
| December 2014 | 0.25% |
| March 2015 | 0.25% |
| June 2015 | 0.25% |
| September 2015 | 0.25% |
| December 2015 | 0.25% |
| March 2016 | 0.25% |
| June 2016 | 0.25% |
| September 2016 | 0.25% |
| December 2016 | 0.25% |
| March 2017 | 0.25% |
| June 2017 | 0.25% |
| September 2017 | 0.25% |
| December 2017 | 0.25% |
| March 2018 | 1.25% |
| June 2018 | 1.25% |
| September 2018 | 1.25% |
| December 2018 | 1.25% |
| March 2019 | 1.25% |
| June 2019 | 1.25% |
| September 2019 | 1.25% |
| December 2019 | 1.25% |
| March 2020 | 2.50% |
| June 2020 | 2.50% |
| September 2020 | 2.50% |
| December 2020 | 2.50% |
| March 2021 | 2.50% |
| June 2021 | 2.50% |
| September 2021 | 2.50% |
| December 2021 | 2.50% |
| March 2022 | 2.50% |

| June 2022 | 2.50% |
|---|---|
| July 10, 2022 | Remaining principal balance |

*provided*, *however*, that the final principal installment shall be repaid on the Term B Maturity Date and in any event shall be in an amount equal to the aggregate unpaid principal amount of the Term B Loans on such date.

2.4    Amendments to Section 2.05(b).

(a)    On the Amendment Effective Date, Section 2.05(b) of the Existing Credit Agreement shall be amended by inserting the following proviso at the end of clause (i):

*provided*, that, in the event of an Asset Sale during the Temporary Revolver Period, each of the amounts set forth in clauses (A), (B) and (C) shall be increased by twenty-five percent (25%).

(b)    On the Amendment Effective Date, Section 2.05(b) of the Existing Credit Agreement shall be amended by inserting the following new clause (iii) after clause (ii):

(iii)    Upon Expiration of the Temporary Revolver Period. On the last Business Day of the Temporary Revolver Period, automatically and without the requirement of any action by any Person (A) the Revolving Credit Commitments will be ratably and permanently reduced by $40,000,000, and (B) the Revolving Letter of Credit Commitments will be ratably and permanently reduced by $40,000,000.

2.5    Amendment to Section 2.06(b)(iv). On the Amendment Effective Date, Section 2.06(b)(iv) of the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

(iv)    If at any time (A) the sum of the aggregate outstanding balance of the Revolving Credit Loans and the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Credit Commitments or (B) the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Letter of Credit Commitments, whether because of a reduction of the Revolving Credit Commitments and/or Revolving Letter of Credit Commitments pursuant to Section 2.05(b) or otherwise, the Borrower shall within two (2) Business Days, first, repay the Revolving Credit Loans and, second, if necessary, transfer funds to the Revolving L/C Cash Collateral Account in an amount sufficient to eliminate such excess in accordance with this Agreement.

2.6    Amendment to Section 2.07(b). On the Amendment Effective Date, Section 2.07(b) of the Existing Credit Agreement shall be deleted and replaced in its entirety with "[Reserved]".

2.7    Amendments to Section 2.08.

(a)      On the Amendment Effective Date, Section 2.08(b)(i) of the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

Subject to clause (iii) below, upon any permanent reduction of the aggregate Revolving Credit Commitments pursuant to Section 2.05 or any termination of the aggregate Revolving Credit Commitments pursuant to Section 6.01, in either case during the Yield Maintenance Period (the amount of such reduction being the "*Commitment Reduction Amount*" and the date when such reduction occurs being the "*Commitment Reduction Date*"), the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Revolving Credit Lenders, a Yield Maintenance Fee in an amount equal to the Commitment Reduction Amount multiplied by the percentage set forth below opposite the period in which the Commitment Reduction Date occurs:

| Month | Yield Maintenance Fee Percentage |
|---|---|
| 11 January 2014 – 10 February 2014 | 6.51% |
| 11 February 2014 – 10 March 2014 | 6.30% |
| 11 March 2014 – 10 April 2014 | 6.08% |
| 11 April 2014 – 10 May 2014 | 5.86% |
| 11 May 2014 – 10 June 2014 | 5.64% |
| 11 June 2014 – 10 July 2014 | 5.43% |
| 11 July 2014 – 10 August 2014 | 5.21% |
| 11 August 2014 – 10 September 2014 | 4.99% |
| 11 September 2014 – 10 October 2014 | 4.78% |
| October 2014 – 10 November 2014 | 4.56% |
| 11 November 2014 – 10 December 2014 | 4.34% |
| 11 December 2014 – 10 January 2015 | 4.12% |
| 11 January 2015 – 10 February 2015 | 3.91% |

| | |
|---|---|
| 11 February 2015 – 10 March 2015 | 3.69% |
| 11 March 2015 – 10 April 2015 | 3.47% |
| 11 April 2015 – 10 May 2015 | 3.26% |
| 11 May 2015 – 10 June 2015 | 3.04% |
| 11 June 2015 – 10 July 2015 | 2.82% |
| 11 July 2015 – 10 August 2015 | 2.60% |
| 11 August 2015 – 10 September 2015 | 2.39% |
| 11 September 2015 – 10 October 2015 | 2.17% |
| 11 October 2015 – 10 November 2015 | 1.95% |
| 11 November 2015 – 10 December 2015 | 1.74% |
| 11 December 2015 – 10 January 2016 | 1.52% |
| 11 January 2016 – 10 February 2016 | 1.30% |
| 11 February 2016 – 10 March 2016 | 1.09% |
| 11 March 2016 – 10 April 2016 | 0.87% |
| 11 April 2016 – 10 May 2016 | 0.65% |
| 11 May 2016 – 10 June 2016 | 0.43% |
| 11 June 2016 – 10 July 2016 | 0.22% |
| After 10 July 2016 | 0.00% |

(b)      On the Amendment Effective Date, Section 2.08(b)(ii) of the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

Subject to clause (iii) below, in the event that (A) the Borrower makes any prepayment of Term B Loans pursuant to Section 2.06 other than any prepayment

upon the occurrence of a Casualty Event or an Event of Eminent Domain or (B) the unpaid principal balance of any Term B Loan is accelerated pursuant to Section 6.01 during the Yield Maintenance Period (the principal amount of such prepayment or amount so accelerated being the "***Prepayment Amount***") the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Term B Lenders, a Yield Maintenance Fee in an amount equal to the sum of the interest that would have been payable on the Prepayment Amount (in the absence of such prepayment or acceleration) at a rate per annum equal to the Applicable Margin (x) on all scheduled Interest Payment Dates falling after the date of prepayment or acceleration until the end of the Yield Maintenance Period and (y) if the last day of the Yield Maintenance Period is not an Interest Payment Date, on the last day of the Yield Maintenance Period, in each case discounted from the respective scheduled payment date to the date of prepayment or acceleration, in accordance with accepted financial practice at a discount factor equal to the equivalent weighted-average life U.S. Treasury yield as of 10:00 a.m. New York City time on the Business Day immediately preceding the date of prepayment or acceleration.

(c)     On the Amendment Effective Date, Section 2.08(b)(iii)(B) of the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

(B)     following the end of the Yield Maintenance Period; *provided*, *however*, that, notwithstanding clause (a) of the definition of "Yield Maintenance Period", in the event of (x) an acceleration of either (I) the Facilities or (II) any Second Lien Loans or (y) any failure to repay the Loans on the Term B Loan Maturity Date, in each case, other than on account of an acceleration of the Facilities as a result of the commencement of the Chapter 11 Cases as provided in the Restructuring Support Agreement, the Yield Maintenance Fee shall apply to the period commencing on the Effective Date and ending on July 10, 2016 (although for the avoidance of doubt, the amount of such Yield Maintenance Fee shall be determined pursuant to Section 2.08(b)(ii) above as if a prepayment occurred on the date of such acceleration or failure to repay);

(d)     On the Amendment Effective Date, Section 2.08(b)(iii)(C) of the Existing Credit Agreement shall be amended by replacing the word "do" with "does" prior to the words "not result" and striking the word "or" following the semi-colon at the end of such section.

(e)     On the Amendment Effective Date, Section 2.08(b)(iii)(D) of the Existing Credit Agreement shall be amended by replacing the period at the end of such clause with "; or".

(f)     On the Amendment Effective Date, Section 2.08(b)(iii) of the Existing Credit Agreement shall be amended by inserting the following new clause (E) after clause (D):

(E)     with respect to any prepayment of the Loans or termination of Revolving Credit Commitments in connection with (x) any Refinancing of the Term B Loans and the Revolving Credit Facility by the Lenders (A) pursuant to an Interim Financing Order or Final Financing Order (each as defined in the

Restructuring Support Agreement) or (B) pursuant to an Acceptable Plan, or (y) any reduction of Revolving Credit Commitments pursuant to Section 2.05(b)(iii).

(g)    On the Amendment Effective Date, Section 2.08(b) of the Existing Credit Agreement shall be amended by inserting the following new clause (iv) after clause (iii):

(iv)    Without limiting the proviso in Section 2.08(b)(iii)(B), clause (a) of the definition of "Yield Maintenance Period" shall apply and may be asserted as grounds that the Yield Maintenance Fee does not apply to a prepayment of the Term B Loans or termination of Revolving Credit Commitments only if the following conditions are satisfied (and the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower to that effect) at the time of such prepayment or termination:

(A)    other than as provided for in, or contemplated by, this Amendment and the Restructuring Support Agreement, the Second Lien Credit Agreement has not been amended, and the Second Lien Loans have not been restructured or Refinanced, in whole or in part, in any manner in violation of the Loan Documents, including the Intercreditor Agreement and the Security Deposit Agreement; and

(B)    other than as provided for in, or contemplated by, this Amendment and the Restructuring Support Agreement, none of the Second Lien Loans has been prepaid, redeemed, purchased, defeased or otherwise satisfied (including for the avoidance of doubt by conversion to Equity Interests) in violation of Section 5.02(j).

(It being understood and agreed that during the period provided in clause (a) of the definition of "Yield Maintenance Period", if the conditions set forth in the foregoing clauses (A) and (B) above are satisfied, such prepayment or reduction, as applicable, shall be without any Yield Maintenance Fee payable.)

2.8    Amendments to Section 2.14.  On the Amendment Effective Date, Section 2.14(b) of the Existing Credit Agreement shall be amended by deleting the text in clause (b) in its entirety and replacing it with the following:

The proceeds of the Revolving Credit Loans and issuances of Revolving Letters of Credit shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) on the Effective Date, (A) to refinance the Existing First Lien Credit Agreement, (B) to provide working capital for the Loan Parties, (C) to provide credit support in respect of such working capital needs and (D) for the Loan Parties' other general corporate purposes and (ii) from and after the Amendment Effective Date, (A) to pay costs and expenses of the Restructuring (as defined in the Restructuring Support Agreement) consistent with the Budget (as defined in the Restructuring Support Agreement), and subject to any variance permitted with respect thereto, including, for the avoidance of doubt,

professionals' fees associated with the Restructuring, (B) to provide working capital for the Loan Parties reasonably required by the Loan Parties to pay O&M Costs and satisfy Contractual Obligations then due and payable or in good faith reasonably anticipated to be due and payable during the next Funding Period (as defined in the Security Deposit Agreement) beginning on the relevant Funding Date (as defined in the Security Deposit Agreement), (C) to provide credit support required by counterparties to the Loan Parties' Contractual Obligations, and (D) for the Loan Parties' other general corporate purposes consistent with Prudent Industry Practices, including reasonable cash reserves in the Accounts in an amount (inclusive of amounts pursuant to sub-clauses (A), (B) and (C)) not to exceed $25 million.

2.9    <u>Amendment to Section 5.02(e)</u>.   On the Amendment Effective Date, Section 5.02(e) shall be amended by deleting the proviso in clause (v) of such Section in its entirety and replacing it with the following language:

> *provided*, *however*, for the sale of the last Project remaining as Collateral, the net Cash proceeds of such sale must be sufficient to permit the Borrower to immediately satisfy all the conditions of a Repayment Event, in which case the applicable threshold stated in the definition of "Floor Amount" will not apply in respect of such sale;

2.10    <u>Amendment to Section 5.03(d)</u>.   On the Amendment Effective Date, Section 5.03(d) shall be amended by replacing the period at the end of such sentence with a comma and adding the following:

> and, on the third to last Business Day of each month after the Amendment Effective Date, a "rolling" 13-week budget (commencing with the first Business Day of the immediately succeeding month) supplementing the Budget (as defined in the Restructuring Support Agreement), which supplemental budget shall be consistent in form and substance with the then-current Budget (as defined in the Restructuring Support Agreement) and in form and substance reasonably satisfactory to the Administrative Agent.

2.11    <u>Amendments to Section 6.01</u>.

(a)    On the Amendment Effective Date, Section 6.01 of the Existing Credit Agreement shall be amended by adding the word "or" at the end of clause (n) of such Section and inserting thereafter the following new clause (o):

> (o)    <u>Event of Default Under DIP Credit Agreement</u>.    Following the commencement, and during the pendency, of the Chapter 11 Cases, the occurrence of an "Event of Default" under, and as defined in, the DIP Credit Agreement (as defined in the Restructuring Support Agreement);

(b)    On the Amendment Effective Date, Section 6.01 of the Existing Credit Agreement shall be amended by inserting the following new sentence at the end of such Section:

Upon any acceleration of the unpaid principal balance of any Term B Loan or termination of any Revolving Credit Commitment pursuant to this Section 6.01 during the Yield Maintenance Period, in each case, other than on account of an acceleration or termination of the Facilities as a result of the commencement of the Chapter 11 Cases as provided in the Restructuring Support Agreement, the applicable Lender shall be entitled to, and the Borrower shall pay as liquidated damages (it being agreed that the amount of damages that such Lender will suffer in each case are difficult to calculate) an amount equal to the Yield Maintenance Fee applicable to the principal balance of such Term B Loan that has been accelerated or Revolving Credit Commitment that has been terminated, as the case may be, determined, in the case of a Term B Loan, as if such Term B Loan had been prepaid on the date of the acceleration thereof, less any interest accrued and paid thereon and attributable to the period from the date of acceleration to the date of payment, in each case in addition to all other amounts due and payable in respect of the Obligations hereunder.

2.12    Amendments to Schedule I. On the Amendment Effective Date, the Commitments of the Revolving Credit Lenders and the Revolving Issuing Banks set forth on Schedule I to the Existing Credit Agreement shall be deleted in their entirety and replaced with the Commitments set forth in Exhibit A.

2.13    Amendments to Schedule 5.01(d). On the Amendment Effective Date, Section 15 of Schedule 5.01(d) to the Existing Credit Agreement shall be deleted and replaced in its entirety as follows:

15.    Claims Made Forms. In the event that any policy is written on a "claims-made" basis and such policy is not renewed or the retroactive date of such policy is to be changed, the Borrower shall obtain for each such policy or policies the broadest basic and supplemental extended reporting period coverage ("tail" coverage) or prior acts coverage ("nose" coverage) as is reasonably available in the commercial insurance market for each such policy or policies and shall provide Administrative Agent and the First Lien Collateral Agent with proof that such extended reporting period coverage or prior acts coverage has been obtained.

## ARTICLE 3. EFFECTIVENESS

3.1    Conditions Precedent to Amendment Effective Date. The amendments to the Existing Credit Agreement set forth in this Amendment shall become effective on and as of the first date (the "**Amendment Effective Date**") on which the Administrative Agent determines in its sole and absolute discretion that the following conditions precedent have been satisfied, and the obligation of any Term B Lender to make a Term B Loan under Section 1.1(b) is subject to the satisfaction of such conditions precedent on or concurrently with the Amendment Effective Date:

(a)    Each of the parties hereto shall have executed and delivered counterparts of this Amendment.

14

(b)     The RSA Effective Date (as defined in the Restructuring Support Agreement) shall have occurred prior to or simultaneous with the Amendment Effective Date.

(c)     The Administrative Agent shall have received on or before the Amendment Effective Date the following, each dated such day (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)     Notes with respect to the Term B Facility and the Revolving Credit Facility, duly executed and delivered by the Borrower and payable to the order of the Lenders, evidencing the cumulative Term B Loan principal balance and the aggregate Revolving Credit Commitments after giving effect to the Loans and increases in Commitments occurring on the Amendment Effective Date.

(ii)     An amendment to the Intercreditor Agreement in the form attached as Exhibit C to the Restructuring Support Agreement, duly executed and delivered by the Loan Parties, the Administrative Agent, the Second Lien Administrative Agent, the First Lien Collateral Agent and the Second Lien Administrative Agent.

(iii)     Completed requests for information or similar search reports, dated on or before the Amendment Effective Date, listing all effective financing statements filed in the jurisdictions where the Loan Parties are incorporated or in which the Projects are located that name any Loan Party as debtor, together with copies thereof.

(iv)     Certified copies of any Material Contract not previously delivered to the Administrative Agent.

(v)     Evidence that all action that the Administrative Agent and the First Lien Collateral Agent deem reasonably necessary in order to perfect and protect the first priority liens and security interests securing the First Lien Obligations in accordance with the First Lien Security Agreement has been taken;

(vi)     With respect to the Liens granted pursuant to the First Lien Refinancing Mortgages:

(A)     evidence that all action that the Administrative Agent and the First Lien Collateral Agent deem reasonably necessary in order to perfect and protect the first priority liens and security interests securing the First Lien Obligations in accordance with the First Lien Refinancing Mortgages has been taken; and

(B)     current title reports prepared by the Title Company for each of the Projects.

(vii)     A certificate of each Loan Party signed on behalf of such Loan Party by a Responsible Officer, dated the Amendment Effective Date, certifying as to (A) the absence of any amendments to the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party since the Effective Date under the Existing Credit Agreement, (B) the absence of any amendments to the limited liability

company agreement or limited partnership agreement, as the case may be, of such Loan Party since the Effective Date under the Existing Credit Agreement, (C) the due formation and good standing or valid existence of such Loan Party as a limited liability company or limited partnership, as the case may be, organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of such Loan Party, (D) copies of the resolutions of the board of directors of the Borrower and the board of control of Millennium and authorizations of the sole member of each other Guarantor approving this Amendment and the Restructuring Support Agreement and the transactions contemplated thereby, (E) the truth in all material respects, before and after giving effect to the Borrowings (and the application of the proceeds therefrom) and the other transactions taking place on the Amendment Effective Date, of the representations and warranties contained in the Loan Documents as though made on and as of the Amendment Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) or are not true by virtue of the Loan Parties having entered into the Restructuring Support Agreement, and (F) the absence of receipt of notice from a party to the IDA Lease or a PILOT Document asserting that a breach or default has occurred and is continuing thereunder.

(viii)    A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Amendment Effective Date certifying (A) as to a true and correct copy of the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to such Loan Party's certificate of formation or certificate of limited partnership, as the case may be, on file in such Secretary's office, (2) to the extent applicable, such Loan Party has paid all franchise taxes to the date of such certificate and (3) such Loan Party is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(ix)    In the case of the Borrower, a certificate of the Borrower executed by a director of the Borrower, in the case of each Guarantor (other than Millennium), a certificate of the sole member of such Guarantor executed by a director of such sole member, and, in the case of Millennium, a certificate of the sole member of MACH Gen GP, LLC executed by a director of such sole member, in each case, certifying the name and true signature of the officer of such Loan Party authorized to sign this Amendment, the Restructuring Support Agreement and the other documents to be delivered hereunder and thereunder.

(x)    Evidence that all insurance required under Section 5.01(d) of the Credit Agreement has been obtained, is in full force in effect and meets the requirements of Section 5.01(d) of the Credit Agreement.

(xi)    A favorable opinion of Milbank, Tweed, Hadley & McCloy LLP, counsel for the Loan Parties with respect to this Amendment (including, without limitation, with respect to the enforceability thereof).

(d)    There shall exist no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries pending before any Governmental Authority or threatened in writing that (i) could reasonably be expected to have a Material Adverse Effect or materially impair or interfere with the operations of any Project Company, (ii) purports to affect the legality, validity or enforceability of any Loan Document, or (iii) could reasonably be expected to prevent, impair or interfere with the transactions contemplated by this Amendment or the Restructuring Support Agreement.

(e)    The Borrower shall have paid (or shall be contemporaneously paying from the proceeds of the Revolving Credit Loans on the Amendment Effective Date) all accrued fees of the Agents and the Lender Parties, and all accrued expenses of the Agents (including all accrued fees under the letter dated January 15, 2014 and the accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lender Parties).

(f)    The representations and warranties contained in each Loan Document shall be true and correct in all material respects on and as of the Amendment Effective Date, before and after giving effect to the Borrowings (and the application of the proceeds therefrom) and the other transactions taking place on the Amendment Effective Date, as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) or are not true by virtue of the Loan Parties having entered into the Restructuring Support Agreement.

(g)    Except for any Default by virtue of the Loan Parties having entered into the Restructuring Support Agreement, no Default has occurred and is continuing, or would result from the Borrowings (and the application of the proceeds therefrom) and the other transactions taking place on the Amendment Effective Date.

3.2    <u>Expiration</u>.  The parties hereto agree that, if the Amendment Effective Date does not occur within ten (10) Business Days after the date of this Agreement, this Amendment shall terminate and be of no further force and effect (including, for the avoidance of doubt, all amendments to the Existing First Lien Credit Agreement contained herein), and the Existing Credit Agreement shall continue in force, without amendment, as in effect prior to the date hereof.

## ARTICLE 4.  COSTS AND EXPENSES

Without limiting the obligations of the Borrower under the First Lien Credit Agreement, the Borrower agrees to pay or reimburse all of the reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the Lender Parties in connection with the preparation, negotiation and execution of this Amendment and the other instruments and documents to be delivered hereunder, including all reasonable and documented fees, expenses, disbursements and other charges of counsel.

## ARTICLE 5.  CONTINUING GUARANTY

Each Guarantor (a) acknowledges and agrees to all the amendments and other agreements contained in this Amendment, and (b) hereby ratifies and confirms its joint and several Guaranty

under Article VIII of the Credit Agreement and acknowledges and agrees that such Guaranty applies by its terms to all Guaranteed Obligations under the Credit Agreement (including as amended by and provided in this Amendment).

## **ARTICLE 6  MISCELLANEOUS**

6.1    Defined Terms; Rules of Construction.

(a)    As used in this Amendment, the following terms shall have the following meanings:

"*Amendment*" means this First Amendment to Amended and Restated First Lien Credit and Guaranty Agreement.

"*Amendment Effective Date*" has the meaning specified in Section 3.1.

"*BONY*" has the meaning specified in the recitals to this Amendment.

"*Borrower*" has the meaning specified in the recital of parties to this Amendment.

"*Chapter 11 Cases*" has the meaning specified in the recitals to this Amendment.

"*Credit Agreement*" has the meaning specified in the recitals to this Amendment.

"*Existing Credit Agreement*" has the meaning specified in the recitals to this Amendment.

"*New Term B Loan*" has the meaning specified in Section 1.1(b).

"*Second Lien Administrative Agent*" has the meaning specified in the recitals to this Amendment.

"*Second Lien Credit Agreement*" has the meaning specified in the recitals to this Amendment.

"*Second Lien Lenders*" has the meaning specified in the recitals to this Amendment.

(b)    Capitalized terms used and not otherwise defined in this Amendment shall have the meanings given to them in the Credit Agreement.

(c)    The rules of interpretation and construction set forth in the Credit Agreement shall apply equally, mutatis mutandis, to the interpretation and construction of this Amendment.

6.2    Governing Law; Counterparts; Miscellaneous.

(a)    THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    This Amendment may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart of this Amendment.

(c)    Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

6.3    <u>Representations and Warranties</u>.  Each Loan Party hereby represents and warrants as follows:

(a)    It has the legal power and authority to execute and deliver this Amendment and perform its obligations hereunder and under the Credit Agreement, and it has taken all necessary limited liability company or limited partnership (as applicable) action to authorize the execution, delivery and performance of this Amendment and the Credit Agreement.

(b)    This Amendment has been duly executed and delivered by it and constitutes its valid and binding obligations, enforceable against it in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

(c)    The execution and delivery of this Amendment and the performance of its obligations hereunder and under the Credit Agreement do not and will not violate or contravene any of its limited liability company agreement, limited partnership agreement or other constitutive documents or any law, rule or regulation applicable to it or require any consent or authorization of, filing with or notice to any Governmental Authority except for (A) the consents, authorizations, filings or other actions which have been duly obtained, taken, given or made and are in full force and effect and (B) those Governmental Authorizations the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(d)    As of the Amendment Effective Date, no information, exhibit or report furnished by or on behalf of any Loan Party to any Agent or any Lender Party in connection with the negotiation and syndication of the Loan Documents or pursuant to the terms of the Loan Documents contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein not misleading.

(e)    As of the Amendment Effective Date, and after giving effect to the Borrowings on such date, there are no First Lien Obligations other than Obligations arising under the Credit Agreement.

6.4    <u>Continuing Effect; No Other Amendments</u>.  Except as expressly amended hereby, all of the terms and provisions of the Existing Credit Agreement are, and shall remain, in full force and effect.  Notwithstanding anything contained herein, the terms of this Amendment are not intended to and do not serve to effect a novation of the Existing Credit Agreement.  The parties hereto expressly do not intend to extinguish the Existing Credit Agreement.  The

amendments and agreements contained herein shall not constitute an amendment or a waiver of any other provision of the Existing Credit Agreement or for any purpose except as expressly set forth herein.

6.5    <u>References</u>.  From and after the Amendment Effective Date, any reference to the Existing Credit Agreement or the Loan Documents contained in the Credit Agreement, in any Loan Document or in any notice, request, certificate or other document shall be deemed to include this Amendment unless the context shall otherwise require.

6.6    <u>Release and Waiver</u>.  AS A MATERIAL INDUCEMENT TO THE LENDER PARTIES, THE FIRST LIEN COLLATERAL AGENT AND THE ADMINISTRATIVE AGENT TO ENTER INTO THIS AMENDMENT, THE BORROWER AND THE GUARANTORS, EACH ON BEHALF OF ITSELF AND ITS OWNERS, SUCCESSORS, ASSIGNS AND LEGAL REPRESENTATIVES (WHETHER OR NOT A PARTY HERETO) (THE BORROWER, THE GUARANTORS, SUCH OWNERS, SUCCESSORS, ASSIGNS AND LEGAL REPRESENTATIVES BEING REFERRED TO HEREIN COLLECTIVELY AND INDIVIDUALLY, AS "OBLIGORS, ET AL."), AUTOMATICALLY, AND WITHOUT FURTHER ACTION BY ANY PERSON, UPON RECEIPT BY THE BORROWER OF THE TERM B LOANS CONTEMPLATED TO BE BORROWED BY THE BORROWER UPON THE EFFECTIVENESS OF THIS AMENDMENT, HEREBY FULLY, FINALLY AND COMPLETELY RELEASE AND FOREVER DISCHARGE EACH LENDER PARTY, THE FIRST LIEN COLLATERAL AGENT, THE ADMINISTRATIVE AGENT AND THE OTHER SECURED PARTIES, AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AFFILIATES, SUBSIDIARIES, PARENTS, OFFICERS, SHAREHOLDERS, DIRECTORS, EMPLOYEES, ATTORNEYS AND AGENTS, PAST, PRESENT AND FUTURE, AND THEIR RESPECTIVE HEIRS, PREDECESSORS, SUCCESSORS AND ASSIGNS (COLLECTIVELY AND INDIVIDUALLY, "LENDER, ET AL.") OF AND FROM ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES, LIABILITIES, OBLIGATIONS, DEMANDS, DAMAGES, EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES), DEBTS, LIENS, ACTIONS AND CAUSES OF ACTION OF ANY AND EVERY NATURE WHATSOEVER RELATING TO THE FACILITIES AND/OR THE LOAN DOCUMENTS, AND WAIVE AND RELEASE ANY DEFENSE, RIGHT OF COUNTERCLAIM, RIGHT OF SET-OFF OR DEDUCTION TO THE PAYMENT OF THE OBLIGATIONS WHICH OBLIGORS, ET AL. NOW HAVE OR MAY CLAIM TO HAVE AGAINST LENDER, ET AL., OR ANY THEREOF, ARISING OUT OF, CONNECTED WITH OR RELATING TO ANY AND ALL ACTS, OMISSIONS OR EVENTS OCCURRING PRIOR TO THE EXECUTION OF THIS AMENDMENT.

6.7    <u>Indemnification and Limitation of Liability</u>.  The Loan Parties acknowledge that Section 9.04 and Section 9.17 of the Credit Agreement apply in respect of this Amendment and any of the transactions contemplated hereby.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date first above written.

**MACH GEN, LLC**,
as Borrower

By _____
Name:
Title:

**MACH GEN GP, LLC**,
as Guarantor

By _____
Name:
Title:

**MILLENNIUM POWER PARTNERS, L.P.**,
as Guarantor

By _____
Name:
Title:

**NEW ATHENS GENERATING COMPANY, LLC**,
as Guarantor

By _____
Name:
Title:

**NEW HARQUAHALA GENERATING COMPANY, LLC**,
as Guarantor

By _____
Name:
Title:

**CLMG CORP.**,
as Administrative Agent


By _____
Name:
Title:


**CLMG CORP.**,
as First Lien Collateral Agent


By _____
Name:
Title:

**BEAL BANK USA**,
   as Term B Lender


By _____
   Name:
   Title:

**BEAL BANK USA**,
   as Revolving Issuing Bank


By _____
   Name:
   Title:


**BEAL BANK USA**,
   as Revolving Credit Lender


By _____
   Name:
   Title:

**BEAL BANK, SSB**,
    as Term B Lender


By _____
    Name:
    Title:


**BEAL BANK, SSB**,
    as Revolving Credit Lender


By _____
    Name:
    Title:

**EXHIBIT A**

AMENDMENTS TO SCHEDULE I
TO
AMENDED AND RESTATED FIRST LIEN CREDIT AND GUARANTY AGREEMENT

COMMITMENTS AND LENDING OFFICES

| Revolving Credit Lender | Revolving Credit Commitment | Lending Office |
|---|---|---|
| Beal Bank USA | During the Temporary Revolver Period:<br><br>$160,000,000 | Beal Bank USA<br>1970 Village Center Circle<br>Suite 1<br>Las Vegas, NV 89134<br><br>Send all notices and communications to: |
|  | During the Basic Revolver Period:<br><br>$160,000,000 | Beal Bank USA<br>c/o CLMG Corp.<br>7195 Dallas Parkway<br>Plano, Texas 75024<br>Attention: James Erwin<br>Fax: (469) 467-5550<br>E-mail: jerwin@clmgcorp.com |

| Revolving Credit Lender | Revolving Credit Commitment | Lending Office |
|---|---|---|
| Beal Bank, SSB | During the Temporary Revolver Period:<br><br>$40,000,000 | Beal Bank, SSB<br>6000 Legacy Drive<br>Plano, Texas 75024<br><br>Send all notices and communications to: |
|  | During the Basic Revolver Period:<br><br>$0 | Beal Bank, SSB<br>6000 Legacy Drive<br>Plano, Texas 75024<br>Attention: James Erwin<br>Fax: (469) 467-5550<br>E-mail: jerwin@clmgcorp.com |

| Revolving Issuing Bank | Revolving Letter of Credit Commitment | Lending Office |
|---|---|---|
| Beal Bank USA | During the Temporary Revolver Period:<br><br>$160,000,000 | Beal Bank USA<br>1970 Village Center Circle<br>Suite 1<br>Las Vegas, NV 89134<br><br>Send all notices and communications to: |
| | During the Basic Revolver Period:<br><br>$120,000,000 | Beal Bank USA<br>c/o CLMG Corp.<br>7195 Dallas Parkway<br>Plano, Texas 75024<br>Attention: James Erwin<br>Fax: (469) 467-5550<br>E-mail: jerwin@clmgcorp.com |

**Exhibit C** **to the Restructuring Support Agreement**

**Intercreditor Amendment**

AMENDMENT NO. 2 TO
COLLATERAL AGENCY AND INTERCREDITOR AGREEMENT

AMENDMENT NO. 2 TO COLLATERAL AGENCY AND INTERCREDITOR AGREEMENT (this "***Amendment***"), dated as of January [__], 2014, among MACH GEN, LLC (the "***Borrower***"), MACH GEN GP, LLC ("***GP***"), NEW ATHENS GENERATING COMPANY, LLC ("***Athens***"), NEW HARQUAHALA GENERATING COMPANY, LLC ("***Harquahala***"), AND MILLENNIUM POWER PARTNERS, L.P. ("***Millennium***", and together with GP, Athens and Harquahala, the "***Guarantors***", and together with the Borrower, the "***Loan Parties***"), CLMG CORP. as first lien administrative agent under the Amended and Restated First Lien Credit Agreement (defined below) (in such capacity, together with its successors and permitted assigns, the "***First Lien Agent***"), THE BANK OF NEW YORK MELLON, as second lien administrative agent under the Second Lien Credit Agreement (defined below) (in such capacity, together with its successors and permitted assigns, the "***Second Lien Agent***"), CLMG CORP., as the first lien collateral agent (in such capacity, together with its successors and permitted assigns, the "***First Lien Collateral Agent***") and  THE BANK OF NEW YORK MELLON, as the second lien collateral agent (in such capacity, together with its successors and permitted assigns, the "***Second Lien Collateral Agent***").

PRELIMINARY STATEMENTS

WHEREAS, reference is made to that certain Collateral Agency and Intercreditor Agreement, dated as of December 5, 2006, as amended by that certain Amendment No. 1 to Collateral Agency and Intercreditor Agreement dated as of June 26, 2012 (as it may be further amended, restated, supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"), by and among the Loan Parties, the First Lien Agent, the Second Lien Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent;

WHEREAS, the Borrower and the Guarantors are parties to (a) that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "***First Lien Credit Agreement***"), among the Borrower, the Guarantors, the First Lien Collateral Agent, the First Lien Agent and each of the banks, financial institutions and other parties party thereto, which constitutes the "Refinancing First Lien Credit Agreement" "as Amended and Refinanced" for purposes of the Intercreditor Agreement, and (b) that certain Second Lien Credit and Guaranty Agreement, dated as of February 22, 2007, as amended by that certain Amendment No. 1 to the Second Lien Credit and Guaranty Agreement dated as of June 26, 2012 (as it may be further amended, restated, supplemented or otherwise modified from time to time, the "***Second Lien Credit Agreement***"), among the Borrower, the Guarantors, the Second Lien Collateral Agent, the Second Lien Agent and each of the banks, financial institutions, other institutional lenders and other parties party thereto, which constitutes the "Refinancing Second Lien Credit Agreement" "as Amended and Refinanced" for purposes of the Intercreditor Agreement;

WHEREAS, as of the date hereof, the Borrower and the Guarantors are entering into (a) that certain First Amendment to Amended and Restated First Lien Credit and Guaranty Agreement, dated as of the date hereof (the "***First Lien Credit Agreement Amendment***"), by and

among the Borrower, the Guarantors, the Lender Parties (as defined in the First Lien Credit Agreement), the First Lien Collateral Agent and the First Lien Agent, and (b) that certain Restructuring Support Agreement, dated as of the date hereof (the "***Restructuring Support Agreement***"), among the Borrower, the Guarantors, certain First Lien Lenders, certain Second Lien Secured Parties and certain holders of Equity Interests in the Borrower; and

WHEREAS, it is a condition to effectiveness of the First Lien Credit Agreement Amendment and the Restructuring Support Agreement that the parties hereto enter into certain amendments to the Intercreditor Agreement on the terms set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

SECTION 1.01.    <u>Definitions; Principles of Interpretation</u>.  Unless the context shall otherwise require, or unless otherwise defined herein, capitalized terms used herein shall have the respective meanings specified in the Intercreditor Agreement, as amended by this Amendment and from time to time, and the principles of interpretation set forth therein shall apply herein.

## ARTICLE II
## EFFECTIVE DATE

SECTION 2.01.    <u>Effective Date</u>.  This Amendment shall become effective upon the later of (a) the execution of this Amendment by the Loan Parties, the First Lien Agent, the Second Lien Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent and (b) the occurrence of the "RSA Effective Date" under the Restructuring Support Agreement (the "***Effective Date***"); <u>provided</u>, <u>however</u>, that in the event that the RSA Effective Date does not occur within ten (10) Business Days after the date of this Amendment, this Amendment shall terminate and be of no further force and effect, and the Intercreditor Agreement shall continue in force, without amendment, as in effect prior to the date hereof.

## ARTICLE III
## AMENDMENTS

SECTION 3.01.    <u>Amendment to Section 5.5 of the Intercreditor Agreement</u>. Upon the Effective Date, Section 5.5 of the Intercreditor Agreement shall be and is hereby amended as and to the extent necessary to give effect to the provisions of Section 18(g) of the Restructuring Support Agreement, such that, in the circumstances provided in Section 18(g) of the Restructuring Support Agreement, the option of the Second Lien Secured Parties to purchase First Lien Obligations pursuant to Section 5.5 of the Intercreditor Agreement may be exercised only on the terms and conditions and at the applicable price set forth in Section 18(g) of the Restructuring Support Agreement.

SECTION 3.02.    <u>Amendment to Section 9.21 of the Intercreditor Agreement</u>. Notwithstanding anything to the contrary in Section 9.21 of the Intercreditor Agreement, from the Effective Date until the occurrence of the Consummation Date (as defined in the Restructuring Support Agreement), (i) the 2012 Refinancing First Lien Credit Agreement, any use of cash collateral and debtor in possession financing authorized by the Financing Orders (as defined in the Restructuring Support Agreement), including the DIP Credit Agreement (as defined in the Restructuring Support Agreement), and the New First Lien Credit Agreement (as defined in the Restructuring Support Agreement) shall continue to constitute a "Refinancing First Lien Credit Agreement" "as Amended and Refinanced" pursuant to the Intercreditor Agreement, and (ii) the obligations of the Loan Parties under any of the foregoing are and shall continue to be treated as First Lien Obligations for all purposes of the Intercreditor Agreement and the Financing Documents.

SECTION 3.03.    <u>Limitation of Amendments and Waivers</u>.

(a)    Except as expressly provided herein, the Intercreditor Agreement shall remain unchanged and in full force and effect and nothing contained in this Amendment shall abrogate, prejudice, diminish or otherwise affect any powers, rights, remedies or obligations of any Person arising before the date of this Amendment.

(b)    The amendments set forth herein shall be applicable solely with respect to those matters expressly provided herein and no other amendments may be construed or implied.

## ARTICLE IV
## MISCELLANEOUS

SECTION 4.01.    <u>Execution in Counterparts</u>.  This Amendment may be executed by the parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

SECTION 4.02.    <u>Governing Law</u>.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 4.03.    <u>Submission to Jurisdiction</u>.  Sections 9.8 and 9.20 of the Intercreditor Agreement shall be incorporated by reference herein *mutatis mutandis* as if fully set forth herein.

SECTION 4.04.    <u>Severability</u>.  In case any provision in or obligation hereunder or under any other Loan Document amended hereby shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

SECTION 4.05.    <u>Binding Effect; Successors and Assigns</u>.  All agreements, representations, warranties, indemnities and covenants contained herein and the respective rights and obligations of the parties hereunder and thereunder shall be binding upon the Person making the same and its successors and assigns, and inure to the benefit of, each Person for whom made and its respective successors and permitted assigns.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

MACH GEN, LLC
as the Borrower

By: _____
Name:
Title:

MACH GEN GP, LLC**,**
as a Guarantor


By: _____
Name:
Title:

NEW ATHENS GENERATING COMPANY, LLC**,**
as a Guarantor


By: _____
Name:
Title:

NEW HARQUAHALA GENERATING COMPANY, LLC**,**
as a Guarantor


By: _____
Name:
Title:

MILLENNIUM POWER PARTNERS, L.P.**,**
as a Guarantor


By: _____
Name:
Title:

CLMG CORP.,
as First Lien Agent


By: _____
Name:
Title:


CLMG CORP.,
as First Lien Collateral Agent


By: _____
Name:
Title:

THE BANK OF NEW YORK MELLON**,**
as Second Lien Agent


By: _____
Name:
Title:



THE BANK OF NEW YORK MELLON**,**
as Second Lien Collateral Agent


By: _____
Name:
Title:

**Exhibit D** **to the Restructuring Support Agreement**

**Interim Financing Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                                              :

In re:                                        :    Chapter 11
                                            :

MACH GEN, LLC, *et al.*,[1]                :    Case No. 14-_____
                                            :

                      Debtors.      :    (Joint Administration Requested)
                                            :

-------------------------------------------------------- X

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING MACH GEN TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of MACH Gen, LLC and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (each, a "MACH Gen Entity" and collectively, the "MACH Gen Entities" or "MACH Gen" ) for entry of an interim order (this "Interim Order") and a final order (the "Final Order") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia* (a) authorizing MACH Gen, LLC (the "Borrower") to

---

[1]  The debtors in these Chapter 11 cases, along with the last four digits of each debtor's tax identification number are:  MACH Gen, LLC (6738), MACH Gen GP, LLC (6738) ("GP"), Millennium Power Partners, L.P. (6688) ("Millennium"), New Athens Generating Company, LLC (0156) ("Athens"), and New Harquahala Generating Company, LLC (0092) ("Harquahala," collectively with GP, Millennium and Athens, the "Subsidiaries").  MACH Gen's main corporate address is 9300 US Highway 9W, Athens, New York 12015.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below).

obtain, and each of the Subsidiaries to guarantee, post-petition financing in the form of a

revolving credit facility from Beal Bank USA, Beal Bank and/or one or more affiliates, as

lenders (the "DIP Lenders"), with CLMG Corp. ("CLMG"), as administrative agent and

collateral agent (in such capacities, the "DIP Agent"), of up to $200 million (the "DIP Facility"),

of which $[80.6<sup>3</sup>] million, plus the amount of deemed DIP Extensions of Credit (as defined

below) as described in Paragraph 9 below and in Section 2.01(a) of the DIP Credit Agreement

(as defined below), shall be available on an interim basis, under the terms of this Interim Order

and the other DIP Loan Documents (as defined below), (b) authorizing the Borrower to use any

proceeds from Prepetition Collateral (as defined below) to repay and permanently reduce the

Prepetition Revolving Credit Balance (as defined below) and, upon entry of the Final Order, to

use the proceeds of DIP Extensions of Credit to repay in full the remaining Prepetition

Revolving Credit Balance, (c) authorizing the use of Cash Collateral (as defined below) by the

MACH Gen Entities effective as of the Petition Date, (d) allowing superpriority administrative

expense status of the DIP Obligations (as defined below) in the MACH Gen Entities' Chapter 11

cases (the "Chapter 11 Cases") and authorizing the MACH Gen Entities to grant to the DIP

Agent on behalf of the DIP Lenders automatically perfected security interests in and liens on all

of the Collateral (as defined below), (e) vacating and modifying the automatic stay imposed by

section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms and provisions of this Interim Order and the Final Order, (f) granting adequate protection

to the Prepetition Agents (as defined below) and the Prepetition Secured Lenders (as defined

below), (g) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order,

---

<sup>3</sup> [This amount equals the "Unused Revolving Credit Commitment" as defined in the First Lien Credit Agreement immediately prior to the commencement of the Chapter 11 Cases.  The interim availability will be recalculated as of the date of entry of this Interim Order.]

2

and (h) granting related relief; and the Court having found that the relief requested in the Motion

is in the best interests of MACH Gen, its estates, its creditors and other parties in interest; and the

Court having found that MACH Gen's notice of the Motion and the opportunity for a hearing on

the Motion was appropriate and no other notice need be provided; and the Court having reviewed

the Motion and having heard the statements in support of the relief requested therein at a hearing

before the Court on [_____ __], 2014 (the "Interim Hearing"); and the Court having

determined that the legal and factual bases set forth in the Motion, the First Day Declaration of

[_____], sworn to as of [_____ __], 2014 (the "First Day Declaration"), and the

Declaration of [_____], sworn to as of [_____ __], 2014 (the "Moelis Declaration"), and

at the Interim Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY FOUND AND CONCLUDED THAT:

      A.      Disposition.  The Motion is granted on an interim basis in accordance with the

terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim

Order that have not been withdrawn, waived or settled are hereby denied and overruled.

      B.      Commencement of Cases.  On [_____ __], 2014 (the "Petition Date"), each

MACH Gen Entity filed with this Court a voluntary petition for relief under chapter 11 of the

Bankruptcy Code.   The MACH Gen Entities are in possession of their properties and are

continuing to operate their businesses as debtors and debtors in possession under sections 1107

and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors (a

"Committee") has been appointed in the Chapter 11 Cases.

      C.      Jurisdiction and Venue.  This Court has jurisdiction over the Chapter 11 Cases

and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of*

*Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 Local Rule 4001-2.

D.    <u>Adequate Notice</u>.  On the Petition Date, MACH Gen filed the Motion with this Court pursuant to Bankruptcy Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the U.S. Trustee; (b) counsel to the First Lien Lenders (as defined below); (c) CLMG, in its capacity as administrative agent and collateral agent for the First Lien Lenders (the "<u>First Lien Agent</u>"); (d) counsel to certain Second Lien Lenders (as defined below) owning at least two-thirds in dollar amount of the outstanding Second Lien Prepetition Obligations (defined below); (e) The Bank of New York Mellon, in its capacity as administrative agent and collateral agent for the Second Lien Lenders (the "<u>Second Lien Agent</u>," and together with the First Lien Agent, the "<u>Prepetition Agents</u>"); (f) Citibank N.A., as Depositary under the Security Deposit Agreement (as defined below); (g) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the MACH Gen Entities' Chapter 11 petitions; and (h) all parties requesting service in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>").  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with the

4

Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable law, and no further notice relating to this proceeding and the hearing on this Motion is necessary or required.

      E.      <u>The Prepetition Obligations</u>.

      (i)      *Prepetition First Lien Credit Facility*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in (a) the Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012, as amended by the First Amendment to First Lien Credit and Guaranty Agreement, dated as of January 15, 2014 (the "<u>Prepetition First Lien Amendment</u>"), by and among the Borrower, the Subsidiaries, as guarantors, the lenders party thereto (the "<u>First Lien Lenders</u>"), and the First Lien Agent (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "<u>First Lien Credit Agreement</u>"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the First Lien Lenders, including, without limitation, the Intercreditor Agreement (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the First Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "<u>First Lien Financing Documents</u>"), the First Lien Lenders:

      (x)      agreed to make revolving loans to, and issue letters of credit for the account of, the Borrower, and to otherwise extend credit to the MACH Gen Entities, in an aggregate principal committed amount of up to $200 million (of

5

which not more than $160 million may be used to issue letters of credit) (the "Prepetition Revolving Credit Facility"); and

(y)    extended to the Borrower a term loan facility, in an aggregate outstanding principal amount of $[483,209,285.14] (the "Prepetition Term Loan Facility"; together with the Prepetition Revolving Credit Facility, the "Prepetition First Lien Facilities").

All obligations of the MACH Gen Entities arising under the First Lien Credit Agreement or any other First Lien Financing Document, including under the Prepetition Revolving Credit Facility and the Prepetition Term Loan Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the First Lien Financing Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of any other monetary amounts (including any Yield Maintenance Fees (as defined in the First Lien Credit Agreement)) owing to the First Lien Agent or First Lien Lenders by the MACH Gen Entities, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to collectively as the "First Lien Prepetition Obligations."

(ii)    *Prepetition Second Lien Credit Agreement.*  Prior to the Petition Date, the lenders party to the Second Lien Credit Agreement (the "Second Lien Lenders", and together with the First Lien Lenders, the "Prepetition Secured Lenders") made loans, advances and provided other financial accommodations to the Borrower pursuant to the terms and conditions set forth in (a) the Second Lien Credit and Guaranty Agreement, dated as of February 22, 2007, as amended

6

by that certain Amendment No. 1 to the Second Lien Credit and Guaranty Agreement dated as of June 26, 2012 (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "Second Lien Credit Agreement"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Second Lien Lenders, including, without limitation, the Intercreditor Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Second Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Second Lien Financing Documents"; together with the First Lien Financing Documents, the "Financing Documents").  All obligations of the MACH Gen Entities arising under the Second Lien Credit Agreement or any other Second Lien Financing Document, including all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Second Lien Financing Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Second Lien Agent or Second Lien Lenders by MACH Gen, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to collectively as the "Second Lien Prepetition Obligations" (and together with the First Lien Prepetition Obligations, the "Prepetition Obligations").

7

(iii)     *Subsidiary Guarantors*.  The First Lien Prepetition Obligations and the Second Lien Prepetition Obligations are guaranteed by the Subsidiaries under the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively.

(iv)     *Prepetition First Liens*.  Pursuant to those certain First Lien Collateral Documents (as such term is defined in the First Lien Credit Agreement), each MACH Gen Entity granted to the First Lien Agent for the benefit of the First Lien Lenders to secure the First Lien Prepetition Obligations, a first-priority security interest in and continuing lien (the "Prepetition First Liens") on all of its Property (as defined in the First Lien Credit Agreement), other than Excluded Property (as defined in the First Lien Credit Agreement), including without limitation the Equity Interests (as defined in the First Lien Credit Agreement) in the Subsidiaries (collectively, the "Prepetition Collateral").

(v)     *Prepetition Second Liens*.  Pursuant to those certain Second Lien Collateral Documents (as such term is defined in the First Lien Credit Agreement), each MACH Gen Entity granted to the Second Lien Agent for the benefit of the Second Lien Agent and the Lenders, to secure the Second Lien Prepetition Obligations, a second-priority security interest in and continuing lien on the Prepetition Collateral (the "Prepetition Second Liens"; and together with the Prepetition First Liens, the "Prepetition Liens").

(vi)     *No Other Liens*.  As of the Petition Date, other than as expressly permitted under the Financing Documents (including any "Permitted Liens" as such term is defined in the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively), there were no liens on or security interests in the Prepetition Collateral other than the Prepetition Liens.

(vii)     *Restructuring Support Agreement and Prepetition First Lien Amendment*. After good faith, arm's length negotiations, MACH Gen, certain holders of Equity Interests in

8

the Borrower, the First Lien Lenders, and certain Second Lien Lenders (owning at least two-thirds in dollar amount of the Second Lien Prepetition Obligations) entered into that certain Restructuring Support Agreement, dated as of January 15, 2014 (as may be amended, supplemented, restated, or modified from time to time in accordance with the terms thereof, the "RSA"), in which the parties thereto agreed, *inter alia*, to engage in various transactions to restructure MACH Gen's obligations under the Financing Documents and its capital structure pursuant to the Prepackaged Plan (as defined in the DIP Credit Agreement).  In connection with the RSA and as a necessary condition thereto, the First Lien Lenders and the First Lien Agent entered into the Prepetition First Lien Amendment and, pursuant to the terms thereof, *inter alia*, provided additional funding, which was necessary for the MACH Gen Entities to preserve their business operations and to consummate the transactions contemplated by the RSA.

F.    MACH Gen Entities' Stipulations.  Subject to the rights of any Committee or other parties-in-interest as and to the extent set forth in paragraph 37 below, the MACH Gen Entities acknowledge, admit, represent, stipulate and agree that:

(i)    *First Lien Prepetition Obligations*.  As of the Petition Date, the First Lien Prepetition Obligations for which the MACH Gen Entities are truly and justly indebted to the First Lien Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $[602,604,894.66], including (x) not less than approximately (1) $[119,395,609.52] on account of First Lien Prepetition Obligations incurred under and in connection with the Prepetition Revolving Credit Facility, including accrued but unpaid interest (but excluding fees and expenses) (the "Prepetition Revolving Credit Balance"), and (2) $[483,209,285.14] on account of First Lien Prepetition Obligations incurred under and in connection with the Prepetition Term Loan Facility, including accrued but unpaid interest (but

9

excluding fees and expenses) (the "Prepetition Term Loan Balance"), and (y) all other First Lien Prepetition Obligations.[4]

(ii)     *Prepetition First Liens Not Subject to Avoidance*.  The Prepetition First Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral that, prior to entry of this Interim Order, were senior in priority (except for Permitted Liens as defined in and to the extent expressly permitted under the First Lien Credit Agreement) over any and all other liens on the Prepetition Collateral; and (b) are not subject to avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the DIP Liens, the Adequate Protection Liens in respect of the First Lien Lenders and the Carve-Out (each term as defined below) in accordance with the provisions of this Interim Order and the other DIP Loan Documents).

(iii)     *Second Lien Prepetition Obligations*.  As of the Petition Date, the Second Lien Prepetition Obligations for which the MACH Gen Entities are truly and justly indebted to the Second Lien Agent and the Second Lien Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $[1,010,317,757.49], including (x) not less than approximately $[1,010,317,757.49] with respect to Second Lien Prepetition Obligations incurred under and in connection with the Second Lien Credit Agreement, including accrued but unpaid interest (but excluding fees and expenses) (the "Prepetition Second Lien Balance") and (y) all other Second Lien Prepetition Obligations. [5]

---

[4] [Prepetition amounts to be recalculated as of the Petition Date.]

[5] [Prepetition amounts to be recalculated as of the Petition Date.]

NEWYORK 9072399

(iv)    *Prepetition Second Liens Not Subject to Avoidance.*  The Prepetition Second Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral that, prior to entry of this Interim Order, were senior in priority over any and all liens on the Prepetition Collateral (except as expressly provided in the Financing Documents) other than the Prepetition First Liens; and (b) are not subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the Prepetition First Liens, the Adequate Protection Liens in respect of the First Lien Lenders, the DIP Liens, and the Carve-Out) in accordance with this Interim Order, the other DIP Loan Documents and the Intercreditor Agreement.

(v)    *No Claims.*  The MACH Gen Entities have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the First Lien Agent, the Second Lien Agent, or any Prepetition Secured Lender with respect to the Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code.

(vi)    *Value of Prepetition Collateral.*  The aggregate value of the Prepetition Collateral granted or pledged to the First Lien Agent, for the benefit of the First Lien Lenders, pursuant to the Financing Documents, is equal to or greater than the aggregate amount of the First Lien Prepetition Obligations.

11

(vii)    *Indemnity*.  The First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the RSA, the Prepetition First Lien Amendment, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders shall be and hereby are indemnified and held harmless by the MACH Gen Entities in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph F(vii), in the First Lien Financing Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the First Lien Agent, the First Lien Lenders, the DIP Agent or the DIP Lenders, as the case may be.

(viii)    *Release.*  The MACH Gen Entities hereby stipulate and agree that they forever and irrevocably release, discharge and acquit the DIP Agent, the First Lien Agent, all former, current and future First Lien Lenders and DIP Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies,

12

disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition First Lien Facilities, the First Lien Financing Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders.  The MACH Gen Entities further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the First Lien Prepetition Obligations and the DIP Obligations which the MACH Gen Entities now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order.

G.    Cash Collateral.  For purposes of this Interim Order the term "Cash Collateral" shall mean and include all "cash collateral" as defined in section 363 of the Bankruptcy Code, in which the First Lien Agent on behalf of the First Lien Lenders or the Second Lien Agent on behalf of the Second Lien Lenders has a lien or security interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or any Final Order, or otherwise.  The MACH Gen Entities represent and stipulate that all of MACH Gen's cash, cash equivalents, negotiable instruments, investment property, and securities constitute Cash Collateral of the First Lien Agent on behalf of the First Lien Lenders and the Second Lien Agent on behalf of itself and the Second Lien Lenders.

13

H.    Use of DIP Facility and Cash Collateral.  The MACH Gen Entities have an immediate and critical need to use the DIP Facility and Cash Collateral to preserve and operate their businesses and effectuate a reorganization of their businesses, which will be used in accordance with the terms of this Interim Order and subject to the Approved Budget (as defined below).  Without the use of the DIP Facility and Cash Collateral, the MACH Gen Entities will not have sufficient liquidity to be able to continue to operate their businesses.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or nonobjection of certain parties, and to adequately protect the parties' interests in the Prepetition Collateral.  Absent authorization to immediately use the DIP Facility and Cash Collateral, the MACH Gen Entities' estates and their creditors would suffer immediate and irreparable harm.

I.    Other Financing Unavailable.  As discussed in the First Day Declaration and the Moelis Declaration, MACH Gen is unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(l) of the Bankruptcy Code or (b) under section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered  assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the First Lien Lenders on terms more favorable than the terms of the DIP Facility.  The only available source of secured credit available to MACH Gen, other than the use of Cash Collateral, is the DIP Facility.  MACH Gen requires both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order in order to satisfy its post-petition liquidity needs.

14

J.      <u>Best Financing Presently Available</u>.  The DIP Agent and the DIP Lenders have indicated a willingness to provide MACH Gen with financing solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Court, the Final Order) and the other DIP Loan Documents.  After considering all of their alternatives, the MACH Gen Entities have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order (and, subject to entry by the Court, the Final Order) and the other DIP Loan Documents, represents the best financing presently available to MACH Gen.  The DIP Lenders are good faith financiers.  The DIP Lenders' and DIP Agent's claims, superpriority claims, security interests, liens and other protections granted pursuant to this Interim Order (and, subject to entry by the Court, the Final Order) and the DIP Credit Agreement will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

K.      <u>Good Cause for Immediate Entry</u>.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the MACH Gen Entities to enter into the DIP Facility, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the MACH Gen Entities and their estates.  Entry of this Interim Order is in the best interest of the MACH Gen Entities, their estates and creditors. The terms of the DIP Facility (including MACH Gen's continued use of Cash Collateral) are fair and reasonable under the circumstances, reflect MACH Gen's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

NEWYORK 9072399

L.    Arm's Length Negotiation.  MACH Gen, the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders and certain of the Second Lien Lenders (owning at least two-thirds in dollar amount of the Second Lien Prepetition Obligations) have negotiated the terms and conditions of the DIP Facility (including the MACH Gen Entities' continued use of Cash Collateral) and this Interim Order in good faith and at arm's length, and any credit extended and loans made to MACH Gen pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

M.    Application of Proceeds of the Collateral.  All proceeds of the sale or other disposition of the Collateral shall be applied in accordance with the terms of the DIP Loan Documents and this Interim Order.

N.    Adequate Protection for the Prepetition Secured Lenders.  The Prepetition Secured Lenders, the First Lien Agent and certain of the Second Lien Lenders have negotiated and acted in good faith regarding the RSA, the Prepetition First Lien Amendment, the DIP Facility and MACH Gen's use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of MACH Gen's estates and continued operation of their businesses, in accordance with the terms hereof.  The Prepetition Secured Lenders, the First Lien Agent and certain of the Second Lien Lenders have agreed to permit MACH Gen to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof and the Approved Budget (subject to Permitted Variances (as defined below)).  The Yield Maintenance Fee is an essential element of the adequate protection provided hereunder.  Without the Yield Maintenance Fee being payable in accordance with the terms of the First Lien Credit Agreement and the DIP Credit Agreement (and irrespective of the filing or continuation of these Chapter 11 Cases or any

16

Successor Cases (as defined below)), the First Lien Agent and the First Lien Lenders would not have entered into the Prepetition First Lien Amendment or extended credit in connection therewith, entered into the RSA or consented to the use of Cash Collateral or the DIP Facility. The rights of the Prepetition Secured Lenders under the RSA are also an essential element of their adequate protection. Without their rights under the RSA, the First Lien Agent and the First Lien Lenders would not have entered into the Prepetition First Lien Amendment, and the Prepetition Agents and the Prepetition Secured Lenders would not have consented to the use of Cash Collateral or the DIP Facility. Accordingly, the Prepetition Secured Lenders may exercise all of their termination and other rights under the RSA, in accordance with the terms thereof, irrespective of the commencement or the continuation of the Chapter 11 Cases or any Successor Case, or the automatic stay to the extent it might apply to such termination or other rights. The Prepetition Secured Lenders and the Prepetition Agents are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to §§ 361, 362 and 363 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect MACH Gen's prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the consent thereto of the Prepetition Secured Lenders and the Prepetition Agents; provided, that nothing in this Interim Order or the other DIP Loan Documents shall (x) be construed as a consent by the First Lien Agent or any First Lien Lender that it would be adequately protected in the event debtor in possession financing is provided by a third party (i.e., other than the DIP Lenders) or a consent to the terms of any other such financing or any lien encumbering the Collateral (whether senior or junior) or to the

17

use of Cash Collateral except as provided in this Interim Order, or (y) prejudice, limit or

otherwise impair the rights of the First Lien Agent (for the benefit of the First Lien Lenders) to

seek new, different or additional adequate protection in the event circumstances change after the

date hereof.

O.    <u>Prepetition Intercreditor Agreement</u>.    The MACH Gen Entities and the

Prepetition Agents are parties to that certain Collateral Agency and Intercreditor Agreement

dated as of December 5, 2006 (as amended, supplemented or otherwise modified from time to

time, the "<u>Intercreditor Agreement</u>"), which governs the relative rights against the MACH Gen

Entities of the Prepetition Secured Lenders in respect of the respective Prepetition Obligations

and the Collateral.  The Intercreditor Agreement remains in full force and effect in accordance

with the terms thereof.  By executing the RSA (and subject to the terms and conditions contained

therein), each Second Lien Lender party thereto agreed, and all other Second Lien Lenders are

deemed to have agreed and consented, that the First Lien Credit Agreement (as amended by the

Prepetition First Lien Amendment), any use of Cash Collateral hereunder and under the Final

Order, and the DIP Loan Documents shall constitute a "Refinancing First Lien Credit

Agreement" "as Amended and Refinanced" pursuant to the Intercreditor Agreement, and that the

First Lien Prepetition Obligations, any use of Cash Collateral and the DIP Obligations authorized

by this Interim Order (and the Final Order), and under the DIP Loan Documents, are and shall

continue to be treated as First Lien Obligations (as defined in the Intercreditor Agreement) for all

purposes of the Intercreditor Agreement and the Financing Documents, including for purposes of

the lien priorities and rights in respect of Collateral set forth therein, subject to the terms of this

Interim Order.  By executing the RSA, each Second Lien Lender party thereto has agreed, and all

Second Lien Lenders are deemed to have agreed, for all purposes of the Intercreditor Agreement

NEWYORK 9072399

and the Financing Documents, to the MACH Gen Entities' use of Cash Collateral and the

incurrence of DIP Obligations authorized by this Interim Order (and the Final Order), and under

the DIP Credit Agreement, and the MACH Gen Entities' and First Lien Lenders' entry into the

Prepetition First Lien Amendment and the DIP Credit Agreement, and, in each case, the entry

into the other documents related thereto and the transactions contemplated thereby.

P.      Sections 506(c) and 552(b).  In light of the Prepetition Secured Lenders'

agreement to subordinate their liens and claims to the Carve-Out, the DIP Liens and the

Adequate Protection Liens in respect of the First Lien Lenders, to permit the use of the DIP

Facility and Cash Collateral for payments made in accordance with the Approved Budget and the

terms of this Interim Order, subject to entry of a Final Order, (a) the Prepetition Secured Lenders

and the Prepetition Agents are entitled to a waiver of the provisions of Bankruptcy Code section

506(c), and (b) the First Lien Lenders and the First Lien Agent are entitled to a waiver of any

"equities of the case" claims under Bankruptcy Code section 552(b).

Q.      Order of the Court.  Based upon the foregoing findings, acknowledgements, and

conclusions, and upon the record made before this Court at the Interim Hearing, and good and

sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED**

**THAT:**

1.      Motion Granted.  The Motion is granted on an interim basis, subject to the terms

set forth herein.  Any objections to the Motion that have not previously been withdrawn or

resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all

parties in interest, and fully effective immediately upon entry notwithstanding the possible

application of Bankruptcy Rule 6004(h), 7062 and 9014.

19

2.    Authority to Enter Into DIP Facility.  The MACH Gen Entities are hereby authorized to incur and perform the obligations arising from and after the date of this Interim Order under the DIP Facility, on the terms set forth in this Interim Order, the debtor-in-possession credit and guaranty agreement attached hereto as Exhibit A (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), and such additional documents, instruments and agreements as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of and transactions contemplated by this Interim Order, the Final Order (when entered by the Court) and the DIP Credit Agreement (collectively, this Interim Order, the Final Order, the DIP Credit Agreement and such additional documents, instruments and agreements, including any fee letters, the "DIP Loan Documents"). The MACH Gen Entities are hereby authorized to execute and deliver the DIP Loan Documents and borrow money and obtain letters of credit under the DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $[80.6[6]] million, plus the amount of deemed DIP Extensions of Credit as described in Paragraph 9 below and in Section 2.01(a) of the DIP Credit Agreement, and the Subsidiaries are hereby authorized to guaranty such borrowings and the Borrower's obligations under the DIP Facilities and the DIP Loan Documents, all in accordance with the terms of this Interim Order and the other DIP Loan Documents.

3.    Use of Cash Collateral and DIP Extensions of Credit.  The MACH Gen Entities are hereby authorized to use Cash Collateral and the proceeds of any DIP Extensions of Credit (as defined below) solely in accordance with the Approved Budget and the financial covenants, availability formulae and other terms and conditions set forth in this Interim Order and the other DIP Loan Documents.

---

[6] [See note 3 above.]

20

4.      Validity of DIP Loan Documents.  The DIP Loan Documents shall constitute

valid and binding obligations of the MACH Gen Entities, enforceable against each MACH Gen

Entity party thereto in accordance with the terms thereof.  No obligation, payment, transfer or

grant of security under the DIP Loan Documents as approved under this Interim Order shall be

stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any

applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or

counterclaim.

5.      DIP Extensions of Credit.  All loans and letters of credit made to or for the benefit

of any of the MACH Gen Entities on or after the Petition Date in accordance with the DIP Loan

Documents (collectively, the "DIP Extensions of Credit"), all interest thereon and all fees, costs,

expenses, indemnification obligations and other liabilities, including any Yield Maintenance Fee

(which shall be payable in accordance with the DIP Loan Documents irrespective of the

commencement or the continuation of the Chapter 11 Cases or any Successor Case), owing by

the MACH Gen Entities to the DIP Lenders or the DIP Agent in accordance with and relating to

this Interim Order and the other DIP Loan Documents shall hereinafter be referred to as the "DIP

Obligations."  The DIP Extensions of Credit:  (a) shall be evidenced by the books and records of

the DIP Agent or the DIP Lenders and, upon the request of any DIP Lender, a note executed and

delivered to such DIP Lender by the Borrower in accordance with the terms of the DIP Loan

Documents, which note shall evidence such DIP Lender's DIP Extensions of Credit in addition

to such accounts and records; (b) shall bear interest payable and incur fees at the rates set forth in

Section 2.07 of the DIP Credit Agreement; (c) shall be secured in the manner specified below;

(d) shall be payable in accordance with the DIP Loan Documents; and (e) shall otherwise be

governed by the terms set forth in this Interim Order and the other DIP Loan Documents.

21

6.     <u>Structure of DIP Facility</u>.  The DIP Facility shall be comprised of a $200 million revolving credit facility.  An amount up to $[80.6[7]] million, <u>plus</u> the amount of deemed DIP Extensions of Credit as described in Paragraph 9 below and in Section 2.01(a) of the DIP Credit Agreement, of the DIP Facility shall be available upon entry of this Interim Order.  All letters of credit issued and outstanding as of the date hereof under the Prepetition Revolving Credit Facility shall, immediately upon entry of this Interim Order, be deemed to be issued under the DIP Facility.

7.     <u>Conditions Precedent</u>.  The DIP Lenders and the DIP Agent shall have no obligation to make any DIP Extensions of Credit or any other financial accommodation under the DIP Loan Documents unless the conditions precedent to make such extensions of credit under the DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

8.     <u>Repayment of Prepetition Revolving Credit Balance</u>.  The MACH Gen Entities are authorized and directed to pay to the First Lien Agent on behalf of the First Lien Lenders all principal, interest and fees in respect of the Prepetition Revolving Credit Balance, in accordance with the First Lien Financing Documents and paragraphs 9 and 10 of this Interim Order.

9.     <u>Repayment of Prepetition Revolving Credit Loans</u>.  The MACH Gen Entities are authorized and directed to make all payments and transfers of estate property constituting proceeds of Prepetition Collateral to the First Lien Agent on behalf of the First Lien Lenders in respect of the Prepetition Revolving Credit Balance as provided in this paragraph 9, which payments and transfers shall not be avoidable or recoverable from the First Lien Lenders under sections 547, 548, 550, 553 or any other section of the Bankruptcy Code or subject to any other

---

[7] [See note 3 above.]

claim, charge, assessment or other liability, whether by applicable provisions of the Bankruptcy

Code, other law or otherwise.  All proceeds of the Prepetition Collateral, including all amounts

received in the Revenue Account, the Proceeds Account and other Accounts (each as defined in

the Security Deposit Agreement (as defined below)), and any other amounts received by the First

Lien Agent or the First Lien Lenders in respect of the Prepetition Obligations, shall be applied or

deemed to be applied in accordance with this Interim Order, <u>first</u> to permanently reduce the

Prepetition Revolving Credit Balance until the Prepetition Revolving Credit Balance is

indefeasibly paid in full in cash and completely satisfied (and upon each such reduction, the DIP

Lenders shall be deemed to have made a DIP Extension of Credit in an equivalent amount, up to

but not exceeding, together with all outstanding DIP Extensions of Credit, the maximum amount

of the DIP Facility), and <u>then</u> as otherwise provided, permitted and/or required under the DIP

Loan Documents and the First Lien Financing Documents (including the Security Deposit

Agreement).  Amounts so applied in repayment of the Prepetition Revolving Credit Balance may

not be reborrowed.  The Borrower shall not request and the DIP Lenders are not required to

make any DIP Extensions of Credit (other than any deemed DIP Extensions of Credit pursuant to

this paragraph 9) if cash on hand in the Accounts (as defined in the Security Deposit Agreement)

exceeds $25 million. Without limiting the generality of the foregoing, the MACH Gen Entities

are authorized and directed, without further order of this Court, to pay or reimburse the First Lien

Lenders and the DIP Lenders for all past, present and future costs and expenses, including,

without limitation, all reasonable professional fees, consultant fees and legal fees and expenses

(without the necessity of filing a fee application) paid or incurred by the First Lien Lenders, the

First Lien Agent, the DIP Lenders or the DIP Agent in connection with the financing transactions

provided in this Interim Order, the other DIP Loan Documents and the First Lien Financing

23

Documents, all of which shall be and are included as part of the principal amount of the DIP Obligations and secured by the Collateral.

10.    <u>Continuation of Prepetition Cash Management Procedures</u>.  Except to the extent inconsistent with the express terms of this Interim Order, all prepetition practices and procedures (including bank account cash management practices) provided in the Financing Documents (including in that certain Security Deposit Agreement, dated as of December 5, 2006 (the "<u>Security Deposit Agreement</u>"), by and among the MACH Gen Entities, the Prepetition Agents and Citibank, N.A., as Depositary) for the payment, collection and application of proceeds of the Prepetition Collateral, the turnover and transfer of cash and other financial assets, the delivery of property to the First Lien Lenders or the First Lien Agent, and the funding of extensions of credit pursuant thereto are hereby approved and shall continue without interruption in respect of the Prepetition Collateral and the First Lien Prepetition Obligations and in respect of the Collateral, the DIP Obligations and the DIP Extensions of Credit (including the issuance of letters of credit under the DIP Facility) pursuant to the DIP Loan Documents, which shall constitute a Revolving Credit Facility under and as defined in the Security Deposit Agreement.

11.    <u>Rights and Benefits Under Intercreditor Agreement</u>.  Except to the extent (if any) that such terms and conditions are inconsistent with the express terms of this Interim Order or the RSA, the terms and conditions of the Intercreditor Agreement (including with respect to the relative rights of the Prepetition Secured Lenders) shall not be mitigated or modified as a result of entry of this Interim Order, entry into the DIP Loan Documents or the incurrence of the DIP Obligations.  The Second Lien Lenders have consented or are deemed to have consented to the terms of the DIP Facility under the RSA and the Intercreditor Agreement.

24

12.     <u>Other Use of DIP Extensions of Credit and Cash Collateral</u>.  Subject to the terms

and conditions set forth in this Interim Order and the other DIP Loan Documents, MACH Gen

may use the DIP Extensions of Credit and the Cash Collateral, in accordance with the Approved

Budget, to pay the amounts associated with the items set forth in Section 2.14 of the DIP Credit

Agreement.

13.     <u>Approved Budget</u>.

(a)     The budget annexed hereto as <u>Exhibit B</u> (as updated periodically in

accordance with the DIP Credit Agreement, the "<u>Approved Budget</u>")[8] hereby is approved.

Proceeds of the DIP Extensions of Credit and Cash Collateral under this Interim Order shall be

used by MACH Gen only in accordance with the Approved Budget and this Interim Order,

subject to any Permitted Variance.  Subject to the Carve-Out, the DIP Lenders' consent to the

Approved Budget shall not be construed as consent to the use of DIP Extensions of Credit or

Cash Collateral beyond the Termination Date (as defined below), regardless of whether the

aggregate funds shown on the Approved Budget have been expended.

(b)     Subject to paragraph 36 of this Interim Order, upon the written consent of

the First Lien Lenders, MACH Gen, and the Majority Second Lien Holders (as defined in the

RSA), and without further order of the Court, the Approved Budget may be amended from time

to time.  MACH Gen shall provide a copy of any so amended revised budget to the U.S. Trustee

and counsel to the Committee, if any.

14.     <u>Permitted Variance</u>.  Notwithstanding the Approved Budget, so long as the

Termination Date has not occurred, the MACH Gen Entities shall be authorized to use proceeds

---

[8] [The Approved Budget will be updated as of the date of entry of this Interim Order, <u>provided</u> that such updated
Approved Budget shall be consistent with Exhibit B to this Interim Order and otherwise in form and substance
reasonably satisfactory to the DIP Agent and DIP Lenders.]

of the DIP Extensions of Credit and Cash Collateral in accordance with the Approved Budget, in

an amount that would not cause MACH Gen to use Cash Collateral or DIP Extensions of Credit

in an aggregate amount greater than one-hundred and twenty percent (120%) of the Approved

Budget for any two-week period (a "Permitted Variance"); provided, however, that the purchase

of gas required for the operation of the MACH Gen Entities' facilities and the payment of

variable operations and maintenance expenses of such facilities as required in the ordinary

course of business to operate and maintain such facilities, shall be excluded from the calculation

of Permitted Variance.  If the aggregate amount of proceeds from DIP Extensions of Credit or

Cash Collateral actually used by MACH Gen, measured once every two weeks, is less than the

aggregate amount of DIP Extensions of Credit and Cash Collateral available for use by MACH

Gen in the Approved Budget during such period, then MACH Gen may carry over any such

unused amount to the future periods in the Approved Budget.

      15.   Continuation of Prepetition Liens.  Until (a) the Borrower and the Subsidiaries

have indefeasibly paid in full all DIP Obligations (including the satisfactory cash

collateralization of all issued and outstanding letters of credit under the DIP Credit Agreement in

accordance with the DIP Loan Documents), all First Lien Prepetition Obligations and all Second

Lien Prepetition Obligations, (b) the DIP Lenders' obligations under the DIP Facility have

terminated, (c) all objections and challenges to (i) the liens and security interests of the

Prepetition Secured Lenders (including, without limitation, liens granted for adequate protection

purposes) and (ii) the First Lien Prepetition Obligations and the Second Lien Prepetition

Obligations, have been waived, denied or barred, and (d) all of MACH Gen's stipulations in

paragraph F above have become binding upon their estates and parties in interest in accordance

with paragraph 37 below, all liens and security interests of the DIP Lenders and the Prepetition

26

Secured Lenders (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein. Without limiting the foregoing, notwithstanding any payment of all or any portion of the First Lien Prepetition Obligations, the Prepetition Liens shall continue in full force and effect and shall be deemed to secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Liens granted to the DIP Agent on behalf of the DIP Lenders in paragraph 16 below) until the payment in full of all of the DIP Obligations and the termination of the DIP Lenders' obligations under the DIP Facility.

16.    <u>DIP Liens and Collateral</u>.  As security for the full and timely payment of the DIP Obligations, the DIP Agent on behalf of the DIP Lenders is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, nonavoidable and fully perfected security interests in and liens and mortgages (collectively, the "<u>DIP Liens</u>") upon all existing and after-acquired tangible and intangible personal and real property and assets of each of the MACH Gen Entities, including, without limitation, Prepetition Collateral, accounts receivable, inventory, equipment, fee and leasehold interests in real property, general intangibles, contract rights, intercompany notes, cash, deposit accounts, securities accounts, investment property, rights, claims and causes of action, commercial tort claims, and one hundred percent (100%) of the outstanding equity interests in the Subsidiaries (collectively, the "<u>Collateral</u>"); provided that this Interim Order does not grant, and shall not be deemed to grant, any security interests in or liens on claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, the "<u>Avoidance Actions</u>").  The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or

27

security interest, other than to the extent expressly provided herein and subject to the Carve-Out, by any court order heretofore or hereafter entered in the Chapter 11 Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Chapter 11 Cases.  The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code or, upon entry of the Final Order, section 506(c) of the Bankruptcy Code.  The MACH Gen Entities shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, except as permitted by the DIP Loan Documents or as approved by the Court.

17.    <u>Priority of DIP Liens</u>.  The DIP Liens (a) shall constitute first-priority security interests in and liens upon all Collateral that is not otherwise subject to any valid, perfected, enforceable and nonavoidable lien in existence as of the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code; (b) shall be senior to and prime the Prepetition Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, and (c) shall be senior to and prime all Adequate Protection Liens.

18.    <u>Automatic Effectiveness of Liens</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the MACH Gen Entities to grant the liens and security interests to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and the DIP Lenders contemplated by this Interim Order and the other DIP Loan Documents.

NEWYORK 9072399

19.    <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable and duly perfected first priority security interests and liens, and the DIP Agent and DIP Lenders shall <u>not</u> be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the MACH Gen Entities  to execute any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, perfection or priority of such liens.  The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent or the DIP Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim Order.  Upon the request of the DIP Lenders, the MACH Gen Entities, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Agent or the DIP Lenders to further validate, perfect, preserve and enforce the DIP Liens.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds

29

of trust, notices of lien or similar instruments, and all filing offices are hereby authorized and

directed to accept such certified copy of this Interim Order for filing and recording.

20.     <u>Other Automatic Perfection Matters</u>.  To the extent that any Prepetition Agent is

the secured party under any account control agreements, listed as loss payee under any of MACH

Gen's insurance policies or is the secured party under any Financing Document, the DIP Agent,

on behalf of the DIP Lenders, is also deemed to be the secured party under such account control

agreements, loss payee under MACH Gen's insurance policies and the secured party under each

such Financing Document, and shall have all rights and powers in each case attendant to that

position (including, without limitation, rights of enforcement), and shall act in that capacity and

distribute any proceeds recovered or received in accordance with the terms of this Interim Order

and/or the Final Order, as applicable, and the other DIP Loan Documents.  The First Lien Agent

or the Second Lien Agent, as applicable, shall serve as agent for the DIP Agent for purposes of

perfecting the DIP Agent's security interests in and liens on all Collateral that is of a type such

that perfection of a security interest therein may be accomplished only by possession or control

by a secured party.

21.     <u>Automatic Perfection of Adequate Protection Liens</u>.  The Adequate Protection

Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable and

duly perfected security interests and liens, and the First Lien Agent, First Lien Lenders, Second

Lien Agent and Second Lien Lenders (collectively, the "<u>Adequate Protection Parties</u>") shall <u>not</u>

be required to file or serve financing statements, mortgage deeds, deeds of trust, notices of lien

or similar instruments which otherwise may be required under federal, state or local law in any

jurisdiction, or take any action, including taking possession, to validate and perfect such security

interests and liens; and the failure by the MACH Gen Entities to execute any documentation

30

relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or priority of such liens.  The Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim Order.  Upon the request of the First Lien Lenders and/or Second Lien Lenders, subject in each case to the Intercreditor Agreement, the MACH Gen Entities, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the applicable Adequate Protection Party to further validate, perfect, preserve and enforce the Adequate Protection Liens. A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording.

22.    <u>DIP Superpriority Claims</u>.  In addition to the liens and security interests granted to the DIP Agent on behalf of the DIP Lenders pursuant to this Interim Order, subject to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the

DIP Obligations (including, without limitation, all DIP Extensions of Credit) shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of MACH Gen, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of MACH Gen, including, but not limited to, the Avoidance Actions (subject to entry of the Final Order), and all proceeds thereof.  For the avoidance of doubt, the DIP Superpriority Claims may be treated as set forth in an Acceptable Plan (as defined in the Prepetition First Lien Amendment)[9] (but only if such Acceptable Plan is confirmed).

      23.    <u>Adequate Protection Liens and Adequate Protection Superpriority Claims</u>.

Subject only to the Carve-Out, the Adequate Protection Parties are hereby granted the following Adequate Protection Obligations, in each case to secure an amount equal to the aggregate post-petition diminution in value (which shall be calculated in accordance with Bankruptcy Code section 506(a)) of the interests of the Adequate Protection Parties in the Prepetition Collateral (including the Cash Collateral), including without limitation any such diminution in value resulting from depreciation, physical deterioration, use, sale, loss or decline in market value of the Prepetition Collateral, the priming of the First Lien Agent's and Second Lien Agent's security interests and liens in the Prepetition Collateral, and/or the imposition of the automatic stay under section 362 of the Bankruptcy Code, or otherwise:

---

[9] [The definition of "Acceptable Plan" in the DIP Credit Agreement will conform to the definition in the Prepetition First Lien Amendment.]

(a)    The First Lien Agent, on behalf of the First Lien Lenders, shall receive:

(i)    valid, enforceable, nonavoidable and fully perfected, postpetition security interests in and liens (effective and perfected upon the date of entry of this Interim Order and without the necessity of execution by the MACH Gen Entities (except to the extent so requested by the First Lien Agent) of mortgages, deeds of trust, security agreements, pledge agreements, financing statements, and other agreements or instruments) on the Collateral, including for the avoidance of doubt Cash Collateral (the "Adequate Protection Liens"), which liens shall be junior and subject only to the DIP Liens and, solely upon the occurrence of a Termination Date, payment of the Carve-Out in accordance with the terms and conditions set forth in this Interim Order;

(ii)    superpriority administrative expense claims under Bankruptcy Code section 507(b) (the "Adequate Protection Superpriority Claims"; and together with the DIP Superpriority Claims, the "Superpriority Claims") which claims shall be junior and subject only to the DIP Superpriority Claims and, solely upon the occurrence of a Termination Date, payment of the Carve-Out in accordance with the terms and conditions set forth in this Interim Order, and which shall have priority in payment, subject to entry of a Final Order, over any and all other administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to the entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552, 1113 and 1114, whether or not such expenses or claims arise in the Chapter 11 Cases or in any subsequent cases or proceedings under the Bankruptcy Code that may result therefrom; and

(iii)    reimbursement from MACH Gen, without further order of this Court, of all reasonable past, present and future costs and expenses of the First Lien Lenders and the DIP

33

Lenders when due  (including, without limitation, the reasonable fees and expenses of the First Lien Lenders' and the DIP Lenders' professionals (without the necessity of filing a fee application)).

(b)    The Second Lien Agent, on behalf of the Second Lien Lenders, shall receive Adequate Protection Liens on the Collateral, including for the avoidance of doubt Cash Collateral, which liens shall be subordinate and junior to (x) the Prepetition Liens, (y) the DIP Liens, and (z) the Adequate Protection Liens granted to the First Lien Agent on behalf of the First Lien Lenders and otherwise subject as Second Liens (as defined in the Intercreditor Agreement) to the terms of the Intercreditor Agreement in all respects.

(c)    Additionally, the Second Lien Lenders shall receive reimbursement from MACH Gen, without further order of this Court, of all reasonable past, present and future costs and expenses of the Second Lien Agent and the Second Lien Lenders when due  (including, without limitation, the reasonable fees and expenses of the Second Lien Agent's professionals and the Second Lien Lenders' professionals (without the necessity of filing a fee application)).

(d)    For the avoidance of doubt, the use of Cash Collateral, for any purpose, shall constitute post-petition diminution in value of the Prepetition Secured Lenders' interest in the Collateral and shall entitle the First Lien Lenders (or the First Lien Agent on behalf of the First Lien Lenders) to dollar-for-dollar Adequate Protection Liens and Adequate Protection Superpriority Claims and the Second Lien Lenders (or the Second Lien Agent on behalf of the Second Lien Lenders) to dollar-for-dollar Adequate Protection Liens, in accordance with the terms of this Interim Order.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Adequate Protection Parties hereunder is insufficient to compensate for any post-petition diminution in

34

value of the interests of the Adequate Protection Parties in the Prepetition Collateral during the

Chapter 11 Cases or any successor cases; provided that any claim granted to the Second Lien

Lenders (or the Second Lien Agent on behalf of the Second Lien Lenders) under Bankruptcy

Code section 507(b) shall be subordinate and junior to (i) any claims granted to the First Lien

Lenders (or the First Lien Agent on behalf of the First Lien Lenders) and (ii) all Superpriority

Claims.

   24. <u>Additional First Lien Adequate Protection</u>.  In addition to the Adequate Protection

Liens and the Adequate Protection Superpriority Claims, the First Lien Agent on behalf of the

First Lien Lenders shall receive from MACH Gen, as additional adequate protection, (a) upon

the entry of this Interim Order, immediate cash payment of all accrued and unpaid interest then

due under the First Lien Credit Agreement at the non-default rate provided for in the First

Lien Financing Documents, and all other accrued and unpaid fees (including any letter of

credit fees and fronting fees) and disbursements (including reasonable legal and advisory

fees and expenses (without the necessity of filing a fee application)) owing to the First Lien

Agent and the First Lien Lenders under the First Lien Financing Documents and incurred

prior to the Petition Date, and (b) periodic adequate protection payments in accordance with, and

in the amounts set forth in, the Approved Budget, which shall include the cash payment of (i) all

interest (at the non-default rate), fees, disbursements (including reasonable legal and advisory

fees and expenses (without the necessity of filing a fee application)) and principal, in each

case, when due under the First Lien Credit Agreement with respect to the Prepetition Term Loan

Facility and in accordance with the First Lien Credit Agreement; and (ii) all interest (at the non-

default rate) and fees (including letter of credit fees, fronting fees and unused line fees) and

disbursements (including reasonable legal and advisory fees and expenses (without the

35

necessity of filing a fee application)), when due under the First Lien Credit Agreement with

respect to the Prepetition Revolving Credit Facility, in each case in accordance with the First

Lien Credit Agreement; <u>provided</u> that adequate protection payments of interest under the First

Lien Credit Agreement under clauses (b)(i) and (b)(ii) shall be at the default rate after the

occurrence and during the continuance of an Event of Default (other than the Events of Default

specified in Section 18(e) of the RSA) (the "<u>Additional First Lien Adequate Protection</u>

<u>Payments</u>"; and together with the Adequate Protection Liens, the Adequate Protection

Superpriority Claims, and other amounts required to be made under paragraphs 22, 23, and 24 of

this Interim Order, the "<u>Adequate Protection Obligations</u>").  In addition, the payment of the

Yield Maintenance Fee in accordance with the terms of the DIP Loan Documents, the Financing

Documents and this Interim Order constitutes an integral element of the adequate protection

provided to the DIP Lenders and the First Lien Lenders.  Each Prepetition Secured Lender is also

authorized to terminate the RSA, as to itself, and to exercise all of its rights thereunder, in

accordance with the terms of the RSA irrespective of the automatic stay which, to the extent it

might apply, is hereby modified to permit such termination and the exercise by each Prepetition

Secured Lender of its rights under the RSA.

     25.    <u>Carve-Out</u>.  Upon the DIP Agent's issuance of a Default Notice (as defined

below), all liens, claims and other security interests held by any party, including the

Superpriority Claims, the Adequate Protection Liens, the DIP Liens, and the Prepetition Liens,

shall be subject to the payment of the Carve-Out.  For purposes of this Order, the "<u>Carve-Out</u>"

shall mean, collectively:  (a) fees pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); and

(b) unpaid fees and expenses of professionals retained by the MACH Gen Entities pursuant to

section 327 or 328 of the Bankruptcy Code (the "<u>Professionals</u>") incurred and accruing after the

date the DIP Agent issues a Default Notice, to the extent such fees and expenses are allowed by the Court, in an aggregate amount (excluding any incurred and unpaid professional fees and expenses of any of the agents or lenders payable pursuant to this Interim Order) not in excess of (i) $2,300,000, with respect to MACH Gen's Professionals (the "MACH Gen Professional Carve-Out Cap") and (ii) $50,000, with respect to the Professionals of any Committee (the "Committee Professionals' Carve-Out Cap" and together with the MACH Gen Professionals' Carve-Out Cap, the "Professionals' Carve-Out Cap") and (iii) unpaid Professionals' fees and expenses incurred and accruing prior to or on the date upon which the DIP Agent issues a Default Notice, but only to the extent such unpaid fees and expenses are, with respect to each Professional, set forth in the Approved Budget and are allowed by the Court (clauses (i), (ii) and (iii), collectively, the "Professionals' Carve-Out"); provided, however, that the Professionals' Carve-Out Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by MACH Gen and paid to the applicable Professionals following delivery of a Default Notice to MACH Gen. Notwithstanding the foregoing, so long as a Default Notice has not been issued, MACH Gen shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Approved Budget and that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the MACH Gen Entities and the Prepetition Secured Lenders, as the same may be due and payable, and the same shall not reduce the Professionals' Carve-Out Cap. In any event, the DIP Lenders and the Prepetition Secured Lenders reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals. Notwithstanding any provision (including, without limitation, any

37

"variance" or similar provision) of this Interim Order, any Final Order or the DIP Loan Documents to the contrary, aggregate cumulative expenditures for restructuring professional fees of MACH Gen or any Committee shall not exceed one hundred percent (100%) of the amount with respect thereto set forth in the Approved Budget.

26.    <u>Investigation Budget</u>.  The MACH Gen Entities shall not assert or prosecute, and no portion of the DIP Facility, the Collateral (including the Prepetition Collateral and the Cash Collateral), or the Carve-Out, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any party in interest in connection with (a) asserting or prosecuting any claims, causes of action, or Challenge (as defined in paragraph 37) against the Prepetition Secured Lenders, or (b) asserting any Challenge or raising any defenses to the Prepetition Obligations, the DIP Obligations, the Second Lien Prepetition Obligations or the liens of the Prepetition Secured Lenders; <u>provided</u>, however, that not more than $25,000 in the aggregate of proceeds of the Carve-Out, any Cash Collateral or any proceeds of the DIP Facility or the Collateral may be used to pay any allowed fees of the Committee or professionals retained by the Committee and incurred in connection with investigating the matters covered by the stipulations contained in paragraph F of this Interim Order (the "<u>Investigation Budget</u>").

27.    <u>506(c) Waiver</u>.  Upon the entry of the Final Order, the MACH Gen Entities (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting, any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Prepetition Secured Lenders upon, the Collateral.  In no event shall the DIP

Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders be subject to the equitable

doctrine of marshaling or any similar doctrine with respect to the Collateral.

28.    <u>Restrictions on Granting Post-Petition Liens; Collateral Rights; Limitations in</u>

<u>Respect of Subsequent Court Orders and Subordination of Liens</u>.    Except for the Carve-Out or

as otherwise expressly set forth in this Interim Order, it shall constitute an Event of Default if

any of the MACH Gen Entities incurs or requests authority to incur a claim or grants a lien (or a

claim or lien is allowed) having a priority superior to or *pari passu* with those granted pursuant

to this Interim Order to the First Lien Agent on behalf of the First Lien Lenders at any time

during which any portion of the DIP Facility, the DIP Obligations, the Prepetition Revolving

Credit Facility, the Prepetition Term Loan Facility, the First Lien Prepetition Obligations, or the

Adequate Protection Obligations owing to the First Lien Lenders remains outstanding.  Without

limiting any other provisions and protections of this Interim Order, unless the DIP Agent and the

First Lien Agent have provided their prior written consent, there shall not be entered in these

proceedings, or in any Successor Case, any order which authorizes (i) the obtaining of credit or

the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or

other lien on all or any portion of the Collateral and/or entitled to priority administrative status

which is superior to or *pari passu* with those granted pursuant to this Interim Order for any

purpose other than as set forth in the Approved Budget.  Without limiting the provisions and

protections of this paragraph 28, if at any time prior to the indefeasible repayment and

satisfaction in full in cash of all DIP Obligations and all First Lien Prepetition Obligations,

including the satisfactory cash collateralization of all issued and outstanding letters of credit in

accordance with the DIP Loan Documents, and the termination of the DIP Lenders' obligations

to make DIP Extensions of Credit, including subsequent to the confirmation of any plan of

reorganization (including an Acceptable Plan), with respect to the MACH Gen Entities or their

estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently

appointed, shall obtain credit or incur debt in violation of this Interim Order or the other DIP

Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash

Collateral shall be immediately be turned over to the DIP Agent or the First Lien Agent, as the

case may be, for application in accordance with this Interim Order, the DIP Loan Documents and

the First Lien Financing Documents, as applicable, and under applicable law.

29.     <u>Binding Nature of Order</u>.  The provisions of this Interim Order shall be binding

upon the MACH Gen Entities and their respective successors and assigns (including, without

limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any

MACH Gen Entity's estate or with respect to its property).

30.     <u>Survival of Order</u>.  With respect to the DIP Lenders and the First Lien Lenders

only, the provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive

the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases;

(ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or

(iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in full force and effect

notwithstanding the entry of any such order, and the claims, liens, and security interests granted

pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until

all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP

Loan Documents (including the satisfactory cash collateralization of all issued and outstanding

letters of credit in accordance with the DIP Loan Documents).  The DIP Obligations shall not be

discharged by the entry of any order confirming any plan of reorganization in any of the Chapter

11 Cases that does not provide for payment in full of the DIP Obligations (including the

40

satisfactory cash collateralization of all issued and outstanding letters of credit in accordance with the DIP Loan Documents, and payment of any Yield Maintenance Fee, if applicable), and, only upon the entry of any such order, the MACH Gen Entities shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code; provided, that notwithstanding the foregoing sentence, upon the consummation of an Acceptable Plan, (i) the DIP Obligations shall be (A) deemed paid in full and finally satisfied (whether by payment from the proceeds of the New First Lien Revolver (as defined in the Prepackaged Plan) or through replacement of the DIP Obligations with obligations under the New First Lien Revolver, in each case, as provided in Article II.C.2 of the Prepackaged Plan) or (B) otherwise satisfied in accordance with the terms of an Acceptable Plan and (ii) in either case, the discharges provided under such Acceptable Plan shall be effective.

31. <u>Protection under Section 364(e) of the Bankruptcy Code</u>. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders incurred prior to the actual receipt by the DIP Lenders and the First Lien Lenders of written notice of the effective date of such reversal, modification, vacation or stay, (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders, (iii) the validity of any Adequate Protection Obligations owing to the Second Lien Agent or the Second Lien Lenders incurred prior to the actual receipt by the Second Lien Lenders of written notice of the effective date of such reversal, modification, vacation or

41

stay, subject in any event to the terms of the Intercreditor Agreement and the RSA, or (iv) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any Adequate Protection Obligations owing to the Second Lien Agent or the Second Lien Lenders, subject in any event to the terms of the Intercreditor Agreement and the RSA. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations owing to the Adequate Protection Parties by MACH Gen prior to the actual receipt by the Prepetition Secured Lenders of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the other DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Adequate Protection Parties.

32.     <u>Termination of DIP Facility</u>.  MACH Gen's  right to use the DIP Facility and Cash Collateral shall terminate immediately upon the earliest of (i) thirty (30) days after the Petition Date (unless a Final Order approved by the DIP Lenders and the First Lien Lenders has been entered as of such date extending MACH Gen's right to use Cash Collateral and the DIP Facility), (ii) seven (7) days following delivery of written notice (the "<u>Default Notice</u>," and such period of time, the "<u>Default Notice Period</u>") via electronic mail and facsimile by the DIP Lenders or the DIP Agent to counsel to MACH Gen, counsel to the First Lien Agent, counsel to the Second Lien Lenders, the U.S. Trustee, counsel to the Committee (if any) and any other official committee appointed in the Chapter 11 Cases, of the occurrence of an Event of Default (as

42

defined below) and (iii) the Revolving Credit Maturity Date (as defined in the DIP Credit Agreement) (the date of such termination pursuant to clause (i), (ii) or (iii) above, the "Termination Date"), and the Yield Maintenance Fee (as such term is defined in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable) shall apply to such termination and be included in the First Lien Prepetition Obligations and the DIP Obligations as provided in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable, and irrespective of the commencement or continuation of the Chapter 11 Cases or any Successor Case.

33.    Events of Default.  Except as otherwise provided in this Interim Order or to the extent the First Lien Lenders may otherwise agree in writing, any violation of any of the terms of this Interim Order or any occurrence of an "Event of Default" under and as defined in Section 6.01 of the DIP Credit Agreement shall constitute an event of default (each, an "Event of Default"); it being understood that termination of the RSA (an "RSA Non-Default Termination") shall not be an Event of Default unless resulting from (i) the failure of MACH Gen to meet the milestones set forth in subparagraph (f), (g) or (h) of Section 4 (including the last sentence of Section 4, as applicable) of the RSA, or (ii) the occurrence of the Outside Date (as defined in the RSA) prior to the occurrence of the Consummation Date (as defined in the RSA.  Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.[10]  Nothing in this paragraph 33 shall be construed to preclude or affect in any

---

[10]  The DIP Credit Agreement will include the following provision in respect of default interest:

43

way the DIP Lenders' rights or remedies in respect of any Event of Default occurring after an RSA Non-Default Termination.

34.     <u>Modification of Stay; Rights and Remedies Upon Termination</u>.  Subject to paragraph 32 of this Interim Order, upon the occurrence of a Termination Date, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders, as applicable, to exercise all rights and remedies provided in this Interim Order, the DIP Loan Documents or the First Lien Financing Documents, as applicable, and to take any or all of the following actions without further order of or application to this Court:  (a) immediately terminate MACH Gen's use of Cash Collateral and cease making any DIP Extensions of Credit to MACH Gen; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the DIP Facility and the availability of any DIP Extensions of Credit thereunder; (d) immediately set off any and all amounts in accounts maintained by the MACH Gen Entities with (or subject to a security interest in favor of) the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders, as applicable, against the DIP Obligations or the Prepetition Obligations, or otherwise enforce rights against the Collateral in the possession of, or subject to a lien in favor of the DIP Agent,

---

Upon the occurrence and during the continuance of an Event of Default the Borrower shall pay interest ("*Default Interest*") on (i) the unpaid principal amount of each [DIP] Loan owing to each [DIP] Lender, payable in arrears on the dates referred to in <u>Section [2.07(a)]</u>, as applicable, and on demand, at a rate *per annum* equal  to 2% *per annum* above the rate *per annum* required to be paid on such [DIP] Loan pursuant to <u>Section [2.07(a)]</u> and (ii) to the fullest extent permitted by applicable law, and without prejudice to clause (i) above, the amount of any interest, fee or other amount payable under [the DIP Credit] Agreement or any other [DIP] Loan Document to any [DIP] Agent or any [DIP] Lender that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid pursuant to <u>Section [2.07(a)]</u>. In addition, in the event that at any time more than one Event of Default has occurred and is continuing, to the maximum extent permitted by law, the rate at which Default Interest is payable shall be increased by 1% *per annum* above the rate *per annum* required to be paid on such [DIP] Loan for each Event of Default (other than the first Event of Default) that is then continuing.

44

the DIP Lenders, the First Lien Agent, or the First Lien Lenders, as applicable, in each case for application towards the DIP Obligations or the Prepetition Obligations, as applicable; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, the First Lien Financing Documents or applicable law to effect the repayment of the DIP Obligations and the First Lien Prepetition Obligations.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided above, unless and until, during the Default Notice Period, the Court has determined that an Event of Default has not occurred and/or is not continuing.  Any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default.  During the Default Notice Period, the MACH Gen Entities shall (x) have no right to use any proceeds of the DIP Facility or the Cash Collateral, or any right to request advances or issuances of letters of credit under the DIP Facility, other than (i) with the consent of the DIP Lenders and the First Lien Lenders, (ii) to fund the Carve-Out to the extent claims giving rise to the Carve-Out are incurred during the Default Notice Period, or (iii) to contest the occurrence and/or continuance of the an Event of Default and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lenders and the First Lien Lenders, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.  The rights and remedies of the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders may respectively have under the DIP Loan Documents or the First Lien Financing Documents, or otherwise.  The MACH Gen Entities shall cooperate fully with the DIP Agent, the DIP Lenders, the First Lien

45

Agent and the First Lien Lenders, respectively, in their exercise of rights and remedies, whether against the Collateral or otherwise.

35.    <u>Limitations on Borrowings</u>.  It shall constitute an Event of Default if any of the MACH Gen Entities, the Committee, or any of the members of the Committee seeks authorization for the MACH Gen Entities or their estates to borrow money from any person other than the DIP Lenders to the extent that the repayment of such borrowings is to be secured pursuant to section 364(d)(1) of the Bankruptcy Code by a security interest, lien or mortgage that is senior to or *pari passu* with any of the security interests, liens or mortgages held by the DIP Agent on behalf of the DIP Lenders or the First Lien Agent on behalf of the First Lien Lenders, including the Adequate Protection Liens, the Prepetition Liens, and the DIP Liens, unless in connection with such borrowings the DIP Obligations and any remaining First Lien Prepetition Obligations (including, for the avoidance of doubt, any Yield Maintenance Fees (as such term is defined in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable)) are indefeasibly paid in full in cash (including the satisfactory cash collateralization of all issued and outstanding letters of credit in accordance with the DIP Loan Documents) as a condition to the closing of such borrowings.

36.    <u>Modifications of DIP Loan Documents and Budgets</u>.  The MACH Gen Entities are hereby authorized, without further order of this Court, to enter into agreements with the DIP Agent, the DIP Lenders, the First Lien Agent and First Lien Lenders providing for any non-material modifications to the Approved Budget or the DIP Loan Documents, or of any other modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan Documents to this Interim Order; provided, however, that the MACH Gen Entities shall provide notice of any material modification or amendment to the Approved Budget or the DIP Loan

46

Documents that is adverse to the MACH Gen Entities' estates to counsel to any Committee, counsel to the First Lien Lenders, counsel to the Second Lien Lenders and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment. If any Committee, the U.S. Trustee, the First Lien Lenders or Second Lien Lenders timely objects to any such material modification or amendment to the Approved Budget or the DIP Loan Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

37. _Stipulations Regarding First Lien Prepetition Obligations and Prepetition Liens Binding on Parties in Interest_. The stipulations and admissions contained in this Interim Order, including, without limitation, in recital paragraph F of this Interim Order, shall be binding on the MACH Gen Entities' estates and all parties in interest, including, without limitation, all Committees, unless (a) any Committee, or another party in interest (other than any of the MACH Gen Entities) with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 26 hereof, including, for the avoidance of doubt, the Investigation Budget) (a "Challenge") challenging the amount, validity or enforceability of the First Lien Prepetition Obligations, the Second Lien Prepetition Obligations, or the perfection or priority of the Prepetition Liens, or otherwise asserting any objections, claims or causes of action on behalf of the MACH Gen Entities' estates against the Prepetition Secured Lenders relating to the First Lien Prepetition Obligations, Second Lien Prepetition Obligations or the Prepetition Liens no later than on or before either (i) if no Committee has been appointed, the earlier of (A) 75 days from the Petition Date and (B) the date on which objections to confirmation of MACH Gen's Chapter 11 plan or plans of reorganization for one or more of the MACH Gen Entities are due, or (ii) if a Committee has been appointed,

47

the earlier of (A) 60 days after such Committee is appointed and (B) the date on which objections to confirmation of MACH Gen's Chapter 11 plan or plans of reorganization for one or more of the MACH Gen Entities are due, and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  If no such Challenge is timely commenced as of such date then, without further order of the Court, (x) the claims, liens and security interests of the Prepetition Secured Lenders shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise, and (y) without further order of the Court, the MACH Gen Entities and their estates shall be deemed to have released any and all claims or causes of action against the Prepetition Secured Lenders with respect to the Financing Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph F of this Interim Order shall be binding on the MACH Gen Entities' estates, any Committee and all parties in interest.  If a Challenge is timely commenced, the stipulations contained in paragraph F of this Interim Order shall be binding on the MACH Gen Entities' estates and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge, as and when originally filed (ignoring any relation back principles); provided, that if and to the extent a Challenge is withdrawn, denied or overruled, the stipulations specifically challenged in such Challenge also shall be binding on the MACH Gen Entities' estates and all parties in interest.

      38.   Waiver of Requirement to File Proofs of Claim.

      (a)   The DIP Agent and the DIP Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims

NEWYORK 9072399

for payment of principal or interest under the DIP Loan Documents.  The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b)    The First Lien Agent, the Second Lien Agent and the Prepetition Secured Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of principal or interest under the respective Financing Documents.  The statements of claim in respect of the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations, respectively, set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

39.    Final Hearing.  The Final Hearing is scheduled for _____ __, 2014, at __:00_.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or other parties in interest to any provisions of this Interim Order shall be deemed waived unless timely filed and served in accordance with this paragraph 39.  MACH Gen shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties in interest in accordance with the Bankruptcy Rules and the Local Rules.  Without limiting the foregoing, MACH Gen shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed

49

with the United States Bankruptcy Court for the District of Delaware by no later than 5:00 p.m. (prevailing Eastern Time) on _____ __, 2014 (the "Objection Deadline").

40.    DIP Agent and First Lien Agent Authorization.  For the avoidance of doubt and notwithstanding any provision of the Financing Documents or the DIP Loan Documents, each of the DIP Agent and First Lien Agent is hereby authorized to make any and all account transfers requested by MACH Gen in accordance with the Approved Budget, and is further authorized to take any other action reasonably necessary to implement the terms of this Interim Order.

41.    No Modification of Interim Order.  The MACH Gen Entities irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the DIP Lenders and the First Lien Lenders and no such consent shall be implied by any action, inaction or acquiescence of the DIP Lenders or the First Lien Lenders

42.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the DIP Agent's, the DIP Lenders', the First Lien Agent's, the First Lien Lenders' or the Second Lien Lenders' right to seek any other or supplemental relief in respect of MACH Gen, including the right to seek additional adequate protection, as applicable, subject to the terms of the Intercreditor Agreement and the RSA, (b) any of the rights of the DIP Agent, DIP Lender, the First Lien Agent, the First Lien Lenders, or the Second Lien Lenders under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreement).  Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the First Lien Agent or the First Lien Lenders that the adequate protection granted herein does in fact adequately protect the First Lien Agent or the First Lien Lenders against any diminution in value of the Prepetition Collateral.

50

43.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the Motion, any other order of this Court (other than the Final Order), or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern.

44.    <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11 Cases.

45.    <u>Limitation of Liability</u>.  In determining to make any DIP Extensions of Credit, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Loan Documents, or the Financing Documents, none of the DIP Agent or the DIP Lenders, the First Lien Agent or the First Lien Lenders, or the Second Lien Agent or the Second Lien Lenders shall be deemed to be in control of the operations of the MACH Gen Entities or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the MACH Gen Entities, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the MACH Gen Entities or any affiliate of the MACH Gen Entities (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order, the DIP Loan Documents, or the Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent or the Second Lien

51

Lenders of any liability for any claims arising from the prepetition or postpetition activities of the MACH Gen Entities or any affiliate of the MACH Gen Entities.

46.    <u>Cash Management</u>.  Subject to paragraph 10 of this Interim Order, the MACH Gen Entities shall not seek approval of any cash management system without the prior approval of the DIP Lenders and the Prepetition Secured Lenders, which consent shall not be unreasonably withheld, and any order approving such cash management system shall be reasonably acceptable to the DIP Lenders and the Prepetition Secured Lenders.

47.    <u>Credit Bidding</u>.

(a)    The DIP Agent, acting at the direction of the requisite DIP Lenders, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; and

(b)    The First Lien Agent, at the direction of the requisite First Lien Lenders, shall have the unqualified right to credit bid up to the full amount of any remaining First Lien Prepetition Obligations in the sale of any Prepetition Collateral (or any part thereof) subject to the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Lenders, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

48.    <u>Equities of the Case</u>.  Subject to and effective upon entry of the Final Order and, in light of, as applicable, the subordination of the Prepetition Liens to the Adequate Protection Liens in respect of the First Lien Lenders, the DIP Liens, and the Carve-Out, and the granting of

NEWYORK 9072399

the DIP Liens, the First Lien Agent and the First Lien Lenders shall be entitled to all benefits of

Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy

Code section 552(b) shall not apply to the First Lien Agent or the First Lien Lenders with respect

to the proceeds, product, offspring, or profits of any of the Collateral, including the Prepetition

Collateral.

      49.    <u>Reporting Requirements</u>.  Notwithstanding any procedures or requirements under

the Financing Documents or the DIP Loan Documents, MACH Gen shall prepare and furnish to

counsel for the DIP Lenders, counsel for the First Lien Lenders and counsel for the Second Lien

Lenders, in form and substance reasonably acceptable to the DIP Agent and the Prepetition

Secured Lenders, a weekly report of receipts, disbursements, and a reconciliation of actual

receipts and disbursements with those set forth in the Approved Budget, on a line-by-line basis,

showing any percentage variance to the proposed corresponding line item of the Approved

Budget (a) for the immediately preceding two-week period and (b) on a cumulative basis for the

period of the Approved Budget or such other budget period, as applicable, and showing a

calculation of the covenants and MACH Gen's compliance or noncompliance, which shall be

certified by the chief financial officer or chief executive officer as having been prepared under

such officer's supervision and in good faith (the "<u>Budget Reconciliation</u>").  MACH Gen shall

also provide counsel to the DIP Agent, counsel to the First Lien Lenders, and counsel to the

Second Lien Lenders with (i) a list of any and all prepetition claims paid during such period,

each with a notation regarding which order authorized such payments, and (ii) the cumulative

total of all prepetition claims paid, each with a notation regarding which order authorized such

payments (the "<u>Other Reporting Obligations</u>").  Such Budget Reconciliation and Other Reporting

Obligations shall be provided to counsel to the DIP Lenders, counsel to the First Lien Lenders

53

and counsel to the Second Lien Lenders, so as actually to be received within three (3) business days following the end of each applicable period.  MACH Gen and its professionals shall make themselves available to discuss the Budget Reconciliation and any other reports provided pursuant to this Interim Order with the professionals retained by the DIP Lenders, the First Lien Lenders and Second Lien Lenders on such basis as may be reasonably requested by the DIP Lenders, the First Lien Lenders and Second Lien Lenders.

50.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any party, creditor, equity holder or other entity other than the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, and the MACH Gen Entities, and their respective successors and assigns.

51.    <u>Intercreditor Issues</u>.  Nothing in this Interim Order shall be construed to convey on any individual DIP Lender or Prepetition Secured Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents, Financing Documents and RSA, as applicable.  Nothing in this Interim Order shall be construed to impair or otherwise affect any intercreditor, subordination or similar agreement or arrangement in respect of the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations, including, without limitation, the Intercreditor Agreement, which, was negotiated at arm's length among commercially sophisticated parties, comprises an integral part of the Prepetition First Lien Facilities (and the use of Cash Collateral), as the case may be, and is enforceable to the fullest extent provided by Section 510(a) of the Bankruptcy Code and applicable law.

52.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully

54

enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Any findings

of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any

conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

       53.    <u>Retention of Jurisdiction</u>.  Notwithstanding any provision in the DIP Loan

Documents or the Financing Documents, this Court shall retain jurisdiction over all matters

pertaining to the implementation, interpretation and enforcement of this Interim Order, the DIP

Facility, or the DIP Loan Documents.

Dated: _____, 2014          _____
       Wilmington, Delaware             United States Bankruptcy Judge

55

**EXHIBIT A**

**DIP Credit Agreement**

**EXHIBIT B**

**Approved Budget**

[*See* **_Exhibit J_** *to Restructuring Support Agreement*]

**Exhibit E** **to the Restructuring Support Agreement**

**Final Financing Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- X
                                                           :

In re:                                      :   Chapter 11
                                                            :

MACH GEN, LLC, *et al.*,[1]                  :   Case No. 14-_____
                                                            :

                              Debtors.        :   (Joint Administration Requested)
                                                            :

--------------------------------------------------------- X

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING MACH GEN TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, <u>AND (V) GRANTING RELATED RELIEF</u>

Upon the motion (the "<u>Motion</u>")[2] of MACH Gen, LLC and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (each, a "<u>MACH Gen Entity</u>" and collectively, the "<u>MACH Gen Entities</u>" or "<u>MACH Gen</u>" ) for entry of an interim order and a final order (this "<u>Final Order</u>") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

---

[1]      The debtors in these Chapter 11 cases, along with the last four digits of each debtor's tax identification number are: MACH Gen, LLC (6738), MACH Gen GP, LLC (6738) ("<u>GP</u>"), Millennium Power Partners, L.P. (6688) ("<u>Millennium</u>"), New Athens Generating Company, LLC (0156) ("<u>Athens</u>"), and New Harquahala Generating Company, LLC (0092) ("<u>Harquahala</u>," collectively with GP, Millennium and Athens, the "<u>Subsidiaries</u>"). MACH Gen's main corporate address is 9300 US Highway 9W, Athens, New York 12015.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below).

*inter alia* (a) authorizing MACH Gen, LLC (the "Borrower") to obtain, and each of the

Subsidiaries to guarantee, post-petition financing in the form of a revolving credit facility from

Beal Bank USA, Beal Bank and/or one or more affiliates, as lenders (the "DIP Lenders"), with

CLMG Corp. ("CLMG"), as administrative agent and collateral agent (in such capacities, the

"DIP Agent"), of up to $ 200 million (the "DIP Facility"), of which $[80.6$^3$] million, plus the

amount of the deemed DIP Extensions of Credit (as defined below) described in Paragraph 9

below and in Section 2.01(a) of the DIP Credit Agreement (as defined below), was available on

an interim basis, under the terms of the Interim Order and the other DIP Loan Documents (each

as defined below), (b) authorizing the Borrower to use any proceeds from Prepetition Collateral

(as defined below) to repay and permanently reduce the Prepetition Revolving Credit Balance (as

defined below) and, upon entry of this Final Order, to use the proceeds of DIP Extensions of

Credit to repay in full the remaining Prepetition Revolving Credit Balance, (c) authorizing the

use of Cash Collateral (as defined below) by the MACH Gen Entities effective as of the Petition

Date, (d) allowing superpriority administrative expense status of the DIP Obligations (as defined

below) in the MACH Gen Entities' Chapter 11 cases (the "Chapter 11 Cases") and authorizing

the MACH Gen Entities to grant to the DIP Agent on behalf of the DIP Lenders automatically

perfected security interests in and liens on all of the Collateral (as defined below), (e) vacating

and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent

necessary to implement and effectuate the terms and provisions of the Interim Order and this

Final Order, (f) granting adequate protection to the Prepetition Agents (as defined below) and the

Prepetition Secured Lenders (as defined below), (g) scheduling a final hearing to consider entry

---

[3] [This amount equals the "Unused Revolving Credit Commitment" as defined in the First Lien Credit Agreement immediately prior to the commencement of the Chapter 11 Cases. The interim availability will be recalculated as of the date of entry of the Interim Order.]

of this Final Order, and (h) granting related relief; and the Court having found that the relief

requested in the Motion is in the best interests of MACH Gen, its estates, its creditors and other

parties in interest; and the Court having reviewed the Motion and having heard the statements in

support of the relief requested therein at a hearing before the Court on [_____ __], 2014 (the

"Interim Hearing") to consider entry of the Interim Order and at a final hearing on the Motion

held [_____ __], 2014 (the "Final Hearing"); and the Court having determined that the legal

and factual bases set forth in the Motion, the First Day Declaration of [_____], sworn to as

of [_____ __], 2014 (the "First Day Declaration"), and the Declaration of [_____], sworn

to as of [_____ __], 2014 (the "Moelis Declaration"), and at the Interim Hearing and the Final

Hearing establish just cause for the relief granted herein; and the Court having entered on

[_____], 2014, after the Interim Hearing, that certain Interim Order Pursuant to 11 U.S.C.

§§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing

MACH Gen to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral,  (III)

Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition

Secured Lenders, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "Interim

Order") approving the DIP Facility and the MACH Gen Entities' use of Cash Collateral on an

interim basis, and the Court having found that MACH Gen's notice of the Motion, the Interim

Hearing and the Final Hearing was appropriate and no other notice need be provided; and the

Final Hearing having been held before the Court and concluded on [_____], 2014; and upon

the record of the Interim Hearing and Final Hearing and all of the proceedings had before the

Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND

AND CONCLUDED THAT:

A.      Disposition.  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled are hereby denied and overruled.

B.      Commencement of Cases.  On [_____ __], 2014 (the "Petition Date"), each MACH Gen Entity filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The MACH Gen Entities are in possession of their properties and are continuing to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors (a "Committee") has been appointed in the Chapter 11 Cases.

C.      Jurisdiction and Venue.  This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The entry of this Final Order is consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 Local Rule 4001-2.

D.      Interim Order.  At the Interim Hearing, the Court approved the DIP Facility on an interim basis pending the Final Hearing and entry of this Final Order.  Pursuant to the Interim Order, the Final Hearing to consider final approval of the DIP Facility was scheduled for [_____], 2014.

4

E.    <u>Adequate Notice</u>.  Notice of the Final Hearing and the relief requested in the Motion has been provided by MACH Gen by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the  U.S. Trustee; (b) counsel to the First Lien Lenders (as defined below); (c) CLMG, in its capacity as administrative agent and collateral agent for the First Lien Lenders (the "<u>First Lien Agent</u>"); (d) counsel to certain Second Lien Lenders (as defined below) owning at least two-thirds in dollar amount of the outstanding Second Lien Prepetition Obligations (defined below); (e) The Bank of New York Mellon, in its capacity as administrative agent and collateral agent for the Second Lien Lenders (the "<u>Second Lien Agent</u>," and together with the First Lien Agent, the "<u>Prepetition Agents</u>"); (f) Citibank N.A., as Depositary under the Security Deposit Agreement (as defined below); (g) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the MACH Gen Entities' Chapter 11 petitions; and (h) all parties requesting service in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>").  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable law, and no further notice relating to this proceeding and the hearing on this Motion is necessary or required.

F.    <u>The Prepetition Obligations</u>.

(i)    *Prepetition First Lien Credit Facility*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in (a) the Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012, as amended by the First Amendment to First Lien Credit and Guaranty Agreement, dated as of  January 15, 2014 (the "<u>Prepetition First Lien</u>

Amendment"), by and among the Borrower, the Subsidiaries, as guarantors, the lenders party thereto (the "First Lien Lenders"), and the First Lien Agent (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "First Lien Credit Agreement"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the First Lien Lenders, including, without limitation, the Intercreditor Agreement (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the First Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "First Lien Financing Documents"), the First Lien Lenders:

>(x)    agreed to make revolving loans to, and issue letters of credit for the account of, the Borrower, and to otherwise extend credit to the MACH Gen Entities, in an aggregate principal committed amount of up to $200 million (of which not more than $160 million may be used to issue letters of credit) (the "Prepetition Revolving Credit Facility"); and

>(y)    extended to the Borrower a term loan facility, in an aggregate outstanding principal amount of $[483,209,285.14] (the "Prepetition Term Loan Facility"; together with the Prepetition Revolving Credit Facility, the "Prepetition First Lien Facilities").

All obligations of the MACH Gen Entities arising under the First Lien Credit Agreement or any other First Lien Financing Document, including under the Prepetition Revolving Credit Facility

and the Prepetition Term Loan Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the First Lien Financing Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of any other monetary amounts (including any Yield Maintenance Fees (as defined in the First Lien Credit Agreement)) owing to the First Lien Agent or First Lien Lenders by the MACH Gen Entities, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to collectively as the "First Lien Prepetition Obligations."

(ii)    *Prepetition Second Lien Credit Agreement.*  Prior to the Petition Date, the lenders party to the Second Lien Credit Agreement (the "Second Lien Lenders", and together with the First Lien Lenders, the "Prepetition Secured Lenders") made loans, advances and provided other financial accommodations to the Borrower pursuant to the terms and conditions set forth in (a) the Second Lien Credit and Guaranty Agreement, dated as of February 22, 2007, as amended by that certain Amendment No. 1 to the Second Lien Credit and Guaranty Agreement dated as of June 26, 2012 (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "Second Lien Credit Agreement"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Second Lien Lenders, including, without limitation, the Intercreditor Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or

7

related thereto (all the foregoing, together with the Second Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Second Lien Financing Documents"; together with the First Lien Financing Documents, the "Financing Documents").  All obligations of the MACH Gen Entities arising under the Second Lien Credit Agreement or any other Second Lien Financing Document, including all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Second Lien Financing Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Second Lien Agent or Second Lien Lenders by MACH Gen, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to collectively as the "Second Lien Prepetition Obligations" (and together with the First Lien Prepetition Obligations, the "Prepetition Obligations").

(iii)    *Subsidiary Guarantors*.  The First Lien Prepetition Obligations and the Second Lien Prepetition Obligations are guaranteed by the Subsidiaries under the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively.

(iv)    *Prepetition First Liens*.  Pursuant to those certain First Lien Collateral Documents (as such term is defined in the First Lien Credit Agreement), each MACH Gen Entity granted to the First Lien Agent for the benefit of the First Lien Lenders to secure the First Lien Prepetition Obligations, a first-priority security interest in and continuing lien (the "Prepetition First Liens") on all of its Property (as defined in the First Lien Credit Agreement), other than Excluded Property (as defined in the First Lien Credit Agreement), including without limitation

8

the Equity Interests (as defined in the First Lien Credit Agreement) in the Subsidiaries (collectively, the "Prepetition Collateral").

(v)    *Prepetition Second Liens*.  Pursuant to those certain Second Lien Collateral Documents (as such term is defined in the First Lien Credit Agreement), each MACH Gen Entity granted to the Second Lien Agent for the benefit of the Second Lien Agent and the Second Lien Lenders, to secure the Second Lien Prepetition Obligations, a second-priority security interest in and continuing lien on the Prepetition Collateral (the "Prepetition Second Liens"; and together with the Prepetition First Liens, the "Prepetition Liens").

(vi)    *No Other Liens*.  As of the Petition Date, other than as expressly permitted under the Financing Documents (including any "Permitted Liens" as such term is defined in the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively), there were no liens on or security interests in the Prepetition Collateral other than the Prepetition Liens.

(vii)    *Restructuring Support Agreement and Prepetition First Lien Amendment*. After good faith, arm's length negotiations, MACH Gen, certain holders of Equity Interests in the Borrower, the First Lien Lenders, and certain Second Lien Lenders (owning at least two-thirds in dollar amount of the Second Lien Prepetition Obligations) entered into that certain Restructuring Support Agreement, dated as of January 15, 2014 (as may be amended, supplemented, restated, or modified from time to time in accordance with the terms thereof, the "RSA"), in which the parties thereto agreed, *inter alia*, to engage in various transactions to restructure MACH Gen's obligations under the Financing Documents and its capital structure pursuant to the Prepackaged Plan (as defined in the DIP Credit Agreement).  In connection with the RSA and as a necessary condition thereto, the First Lien Lenders and the First Lien Agent entered into the Prepetition First Lien Amendment and, pursuant to the terms thereof, *inter alia*,

provided additional funding, which was necessary for the MACH Gen Entities to preserve their business operations and to consummate the transactions contemplated by the RSA.

G.     MACH Gen Entities' Stipulations.  Subject to the rights of any Committee or other parties-in-interest as and to the extent set forth in paragraph 37 below, the MACH Gen Entities acknowledge, admit, represent, stipulate and agree that:

(i)     *First Lien Prepetition Obligations*.  As of the Petition Date, the First Lien Prepetition Obligations for which the MACH Gen Entities are truly and justly indebted to the First Lien Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $[602,604,894.66], including (x) not less than approximately (1) $[119,395,609.52] on account of First Lien Prepetition Obligations incurred under and in connection with the Prepetition Revolving Credit Facility, including accrued but unpaid interest (but excluding fees and expenses) (the "Prepetition Revolving Credit Balance"), and (2) $[483,209,285.14] on account of First Lien Prepetition Obligations incurred under and in connection with the Prepetition Term Loan Facility, including accrued but unpaid interest (but excluding fees and expenses) (the "Prepetition Term Loan Balance"), and (y) all other First Lien Prepetition Obligations. [4]

(ii)     *Prepetition First Liens Not Subject to Avoidance*.  The Prepetition First Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral that, prior to entry of the Interim Order, were senior in priority (except for Permitted Liens as defined in and to the extent expressly permitted under the First Lien Credit Agreement) over any and all other liens on the Prepetition Collateral; and (b) are not subject to avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual

---

[4] [Prepetition amounts to be recalculated as of the Petition Date.]

or otherwise), counterclaims, cross-claims, defenses or any other challenges under the

Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are

subordinated to the DIP Liens, the Adequate Protection Liens in respect of the First Lien Lenders

and the Carve-Out (each term as defined below) in accordance with the provisions of this Final

Order, the Interim Order and the other DIP Loan Documents).

      (iii)    *Second Lien Prepetition Obligations*.  As of the Petition Date, the Second

Lien Prepetition Obligations for which the MACH Gen Entities are truly and justly indebted to

the Second Lien Agent and the Second Lien Lenders, without defense, counterclaim, recoupment

or offset of any kind, aggregated not less than approximately $[1,010,317,757.49], including (x)

not less than approximately $[1,010,317,757.49] with respect to Second Lien Prepetition

Obligations incurred under and in connection with the Second Lien Credit Agreement, including

accrued but unpaid interest (but excluding fees and expenses) (the "Prepetition Second Lien

Balance") and (y) all other Second Lien Prepetition Obligations. [5]

      (iv)    *Prepetition Second Liens Not Subject to Avoidance*.  The Prepetition

Second Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected

liens on the Prepetition Collateral that, prior to entry of the Interim Order, were senior in priority

over any and all liens on the Prepetition Collateral (except as expressly provided in the Financing

Documents) other than the Prepetition First Liens; and (b) are not subject to avoidance,

reductions, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any

other applicable law or regulation (except insofar as such liens are subordinated to the

Prepetition First Liens, the Adequate Protection Liens in respect of the First Lien Lenders, the

---

[5] [Prepetition amounts to be recalculated as of the Petition Date.]

DIP Liens, and the Carve-Out) in accordance with this Final Order, the other DIP Loan Documents and the Intercreditor Agreement.

(v)     *No Claims*.  The MACH Gen Entities have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the First Lien Agent, the Second Lien Agent, or any Prepetition Secured Lender with respect to the Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code.

(vi)     *Value of Prepetition Collateral*.  The aggregate value of the Prepetition Collateral granted or pledged to the First Lien Agent, for the benefit of the First Lien Lenders, pursuant to the Financing Documents, is equal to or greater than the aggregate amount of the First Lien Prepetition Obligations.

(vii)     *Indemnity*.  The First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the RSA, the Prepetition First Lien Amendment, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders shall be and hereby are indemnified and held harmless by the MACH Gen Entities in respect of any claim or liability incurred in respect

thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph G (vii), in the First Lien Financing Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the First Lien Agent, the First Lien Lenders, the DIP Agent or the DIP Lenders, as the case may be.

(viii)  *Release.*  The MACH Gen Entities hereby stipulate and agree that they forever and irrevocably release, discharge and acquit the DIP Agent, the First Lien Agent, all former, current and future First Lien Lenders and DIP Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition First Lien Facilities, the First Lien Financing Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders. The MACH Gen Entities further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the

First Lien Prepetition Obligations and the DIP Obligations which the MACH Gen Entities now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Final Order.

H.      H. Cash Collateral.  For purposes of this Final Order the term "Cash Collateral" shall mean and include all "cash collateral" as defined in section 363 of the Bankruptcy Code, in which the First Lien Agent on behalf of the First Lien Lenders or the Second Lien Agent on behalf of the Second Lien Lenders has a lien or security interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or this Final Order, or otherwise.  The MACH Gen Entities represent and stipulate that all of MACH Gen's cash, cash equivalents, negotiable instruments, investment property, and securities constitute Cash Collateral of the First Lien Agent on behalf of the First Lien Lenders and the Second Lien Agent on behalf of itself and the Second Lien Lenders.

I.      Use of DIP Facility and Cash Collateral.  The MACH Gen Entities have an immediate and critical need to use the DIP Facility and Cash Collateral to preserve and operate their businesses and effectuate a reorganization of their businesses, which will be used in accordance with the terms of this Final Order and subject to the Approved Budget (as defined below).  Without the use of the DIP Facility and Cash Collateral, the MACH Gen Entities will not have sufficient liquidity to be able to continue to operate their businesses.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or nonobjection of certain parties, and to adequately protect the parties' interests in the Prepetition

Collateral.  Absent authorization to immediately use the DIP Facility and Cash Collateral, the

MACH Gen Entities' estates and their creditors would suffer immediate and irreparable harm.

J.      Other Financing Unavailable.  As discussed in the First Day Declaration, the

Moelis Declaration and at the Interim Hearing, MACH Gen is unable to obtain (i) adequate

unsecured credit allowable either (a) under sections 364(b) and 503(b)(l) of the Bankruptcy Code

or (b) under section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior

lien on unencumbered  assets of their estates under section 364(c)(2) of the Bankruptcy Code and

(y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy

Code, or (iii) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other

than the First Lien Lenders on terms more favorable than the terms of the DIP Facility.  The only

available source of secured credit available to MACH Gen, other than the use of Cash Collateral,

is the DIP Facility.  MACH Gen requires both additional financing under the DIP Facility and

the continued use of Cash Collateral under the terms of this Final Order in order to satisfy its

post-petition liquidity needs.

K.      Best Financing Presently Available.  The DIP Agent and the DIP Lenders have

indicated a willingness to provide MACH Gen with financing solely on the terms and conditions

set forth in the Interim Order, this Final Order and the other DIP Loan Documents.  After

considering all of their alternatives, the MACH Gen Entities have concluded, in an exercise of

their sound business judgment, that the financing provided (and to be provided) by the DIP

Lenders pursuant to the terms of the Interim Order, this Final Order and the other DIP Loan

Documents, represents the best financing presently available to MACH Gen.  The DIP Lenders

are good faith financiers.  The DIP Lenders' and DIP Agent's claims, superpriority claims,

security interests, liens and other protections granted pursuant to this Final Order, the Interim

Order and the DIP Credit Agreement will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order, the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

       L.       <u>Good Cause for Immediate Entry</u>.  Good cause has been shown for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the MACH Gen Entities to enter into the DIP Facility, to continue using Cash Collateral and to obtain financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the MACH Gen Entities and their estates.  Entry of this Final Order is in the best interest of the MACH Gen Entities, their estates and creditors. The terms of the DIP Facility (including MACH Gen's continued use of Cash Collateral) are fair and reasonable under the circumstances, reflect MACH Gen's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

       M.       <u>Arm's Length Negotiation</u>.  MACH Gen, the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders and certain of the Second Lien Lenders (owning at least two-thirds in dollar amount of the Second Lien Prepetition Obligations) have negotiated the terms and conditions of the DIP Facility (including the MACH Gen Entities' continued use of Cash Collateral), this Final Order and the Interim Order in good faith and at arm's length, and any credit extended and loans made to MACH Gen pursuant to this Final Order and the Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

N.    <u>Application of Proceeds of the Collateral</u>.  All proceeds of the sale or other disposition of the Collateral shall be applied in accordance with the terms of the DIP Loan Documents and this Final Order.

O.    <u>Adequate Protection for the Prepetition Secured Lenders</u>.  The Prepetition Secured Lenders, the First Lien Agent and certain of the Second Lien Lenders have negotiated and acted in good faith regarding the RSA, the Prepetition First Lien Amendment, the DIP Facility and MACH Gen's use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of MACH Gen's estates and continued operation of their businesses, in accordance with the terms hereof.  The Prepetition Secured Lenders, the First Lien Agent and certain of the Second Lien Lenders have agreed to permit MACH Gen to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof and the Approved Budget (subject to Permitted Variances (as defined below)).  The Yield Maintenance Fee is an essential element of the adequate protection provided hereunder.  Without the Yield Maintenance Fee being payable in accordance with the terms of the First Lien Credit Agreement and the DIP Credit Agreement (and irrespective of the filing or continuation of these Chapter 11 Cases or any Successor Cases (as defined below)), the First Lien Agent and the First Lien Lenders would not have entered into the Prepetition First Lien Amendment or extended credit in connection therewith, entered into the RSA or consented to the use of Cash Collateral or the DIP Facility. The rights of the Prepetition Secured Lenders under the RSA are also an essential element of their adequate protection.  Without their rights under the RSA, the First Lien Agent and the First Lien Lenders would not have entered into the Prepetition First Lien Amendment, and the Prepetition Agents and the Prepetition Secured Lenders would not have consented to the use of Cash Collateral or the DIP Facility.  Accordingly, the Prepetition Secured Lenders may exercise

17

all of their termination and other rights under the RSA, in accordance with the terms thereof, irrespective of the commencement or the continuation of the Chapter 11 Cases or any Successor Case, or the automatic stay to the extent it might apply to such termination or other rights.  The Prepetition Secured Lenders and the Prepetition Agents are entitled to the adequate protection provided in the Interim Order and this Final Order as and to the extent set forth herein pursuant to §§ 361, 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect MACH Gen's prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the consent thereto of the Prepetition Secured Lenders and the Prepetition Agents; provided, that nothing in this Final Order or the other DIP Loan Documents shall (x) be construed as a consent by the First Lien Agent or any First Lien Lender that it would be adequately protected in the event debtor in possession financing is provided by a third party (i.e., other than the DIP Lenders) or a consent to the terms of any other such financing or any lien encumbering the Collateral (whether senior or junior) or to the use of Cash Collateral except as provided in this Final Order, or (y) prejudice, limit or otherwise impair the rights of the First Lien Agent (for the benefit of the First Lien Lenders) to seek new, different or additional adequate protection in the event circumstances change after the date hereof.

P.    Prepetition Intercreditor Agreement.    The MACH Gen Entities and the Prepetition Agents are parties to that certain Collateral Agency and Intercreditor Agreement dated as of December 5, 2006 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs the relative rights against the MACH Gen

Entities of the Prepetition Secured Lenders in respect of the respective Prepetition Obligations and the Collateral.  The Intercreditor Agreement remains in full force and effect in accordance with the terms thereof.  By executing the RSA (and subject to the terms and conditions contained therein), each Second Lien Lender party thereto agreed, and all other Second Lien Lenders are deemed to have agreed and consented, that the First Lien Credit Agreement (as amended by the Prepetition First Lien Amendment), any use of Cash Collateral under this Final Order, the Interim Order, and the other DIP Loan Documents shall constitute a "Refinancing First Lien Credit Agreement" "as Amended and Refinanced" pursuant to the Intercreditor Agreement, and that the First Lien Prepetition Obligations, any use of Cash Collateral and the DIP Obligations authorized by the Interim Order, this Final Order, and under the DIP Loan Documents, are and shall continue to be treated as First Lien Obligations (as defined in the Intercreditor Agreement) for all purposes of the Intercreditor Agreement and the Financing Documents, including for purposes of the lien priorities and rights in respect of Collateral set forth therein, subject to the terms of this Final Order.  By executing the RSA, each Second Lien Lender party thereto has agreed, and all Second Lien Lenders are deemed to have agreed, for all purposes of the Intercreditor Agreement and the Financing Documents, to the MACH Gen Entities' use of Cash Collateral and the incurrence of DIP Obligations authorized by this Final Order and the Interim Order, and under the DIP Credit Agreement, and the MACH Gen Entities' and First Lien Lenders' entry into the Prepetition First Lien Amendment and the DIP Credit Agreement, and, in each case, the entry into the other documents related thereto and the transactions contemplated thereby.

      Q.    <u>Sections 506(c) and 552(b)</u>.  In light of the Prepetition Secured Lenders' agreement to subordinate their liens and claims to the Carve-Out, the DIP Liens and the

Adequate Protection Liens in respect of the First Lien Lenders, to permit the use of the DIP Facility and Cash Collateral for payments made in accordance with the Approved Budget and the terms of the Interim Order and this Final Order, (a) the Prepetition Secured Lenders and the Prepetition Agents are entitled to a waiver of the provisions of Bankruptcy Code section 506(c), and (b) the First Lien Lenders and the First Lien Agent are entitled to a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b).

R. <u>Order of the Court</u>. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing and the Final Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Motion Granted</u>. The Motion is granted on a final basis, subject to the terms set forth herein. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits. This Final Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rule 6004(h), 7062 and 9014.

2. <u>Authority to Enter Into DIP Facility</u>. The MACH Gen Entities are hereby authorized to incur and perform the obligations arising from and after the date of this Final Order under the DIP Facility, on the terms set forth in this Final Order, the debtor-in-possession credit and guaranty agreement attached to the Interim Order as Exhibit A (as amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), and such additional documents, instruments and agreements as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of and transactions contemplated by this Final

20

Order, the Interim Order and the DIP Credit Agreement (collectively, this Final Order, the Interim Order, the DIP Credit Agreement and such additional documents, instruments and agreements, including any fee letters, the "DIP Loan Documents"). The MACH Gen Entities are hereby authorized to execute and deliver (to the extent not previously executed or delivered) the DIP Loan Documents and borrow money and obtain letters of credit under the DIP Facility, on a final basis, up to an aggregate principal amount not to exceed $200 million, and the Subsidiaries are hereby authorized to guaranty such borrowings and the Borrower's obligations under the DIP Facilities and the DIP Loan Documents, all in accordance with the terms of this Final Order and the other DIP Loan Documents.

3.    Use of Cash Collateral and DIP Extensions of Credit.  The MACH Gen Entities are hereby authorized to use Cash Collateral and the proceeds of any DIP Extensions of Credit (as defined below) solely in accordance with the Approved Budget and the financial covenants, availability formulae and other terms and conditions set forth in this Final Order and the other DIP Loan Documents.

4.    Validity of DIP Loan Documents.  The DIP Loan Documents shall constitute valid and binding obligations of the MACH Gen Entities, enforceable against each MACH Gen Entity party thereto in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Final Order and/or the Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.    DIP Extensions of Credit.  All loans and letters of credit made to or for the benefit of any of the MACH Gen Entities on or after the Petition Date in accordance with the DIP Loan

Documents (collectively, the "DIP Extensions of Credit"), all interest thereon and all fees, costs, expenses, indemnification obligations and other liabilities, including any Yield Maintenance Fee (which shall be payable in accordance with the DIP Loan Documents irrespective of the commencement or the continuation of the Chapter 11 Cases or any Successor Case), owing by the MACH Gen Entities to the DIP Lenders or the DIP Agent in accordance with and relating to this Final Order, the Interim Order and the other DIP Loan Documents shall hereinafter be referred to as the "DIP Obligations."  The DIP Extensions of Credit:  (a) shall be evidenced by the books and records of the DIP Agent or the DIP Lenders and, upon the request of any DIP Lender, a note executed and delivered to such DIP Lender by the Borrower in accordance with the terms of the DIP Loan Documents, which note shall evidence such DIP Lender's DIP Extensions of Credit in addition to such accounts and records; (b) shall bear interest payable and incur fees at the rates set forth in Section 2.07 of the DIP Credit Agreement; (c) shall be secured in the manner specified below; (d) shall be payable in accordance with the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth in this Final Order and the other DIP Loan Documents.

6.      Structure of DIP Facility.  The DIP Facility shall be comprised of a $ 200 million revolving credit facility.  All letters of credit issued and outstanding as of the date hereof under the Prepetition Revolving Credit Facility are deemed to be issued under the DIP Facility.

7.      Conditions Precedent.  The DIP Lenders and the DIP Agent shall have no obligation to make any DIP Extensions of Credit or any other financial accommodation under the DIP Loan Documents unless the conditions precedent to make such extensions of credit under the DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

8.      <u>Repayment of Prepetition Revolving Credit Balance</u>.  The MACH Gen Entities are authorized and directed to pay to the First Lien Agent on behalf of the First Lien Lenders all principal, interest and fees in respect of the Prepetition Revolving Credit Balance, in accordance with the First Lien Financing Documents and paragraphs 9 and 10 of this Final Order.

9.      <u>Repayment of Prepetition Revolving Credit Loans</u>.  Pursuant to the Interim Order, all proceeds of the Prepetition Collateral, including all amounts received in the Revenue Account, the Proceeds Account and other Accounts (each as defined in the Security Deposit Agreement), and any other amounts received by the First Lien Agent or the First Lien Lenders in respect of the Prepetition Obligations, were (or were deemed to be) applied in accordance with the Interim Order to permanently reduce and repay the Prepetition Revolving Credit Balance. Upon the entry of this Final Order, the DIP Lenders shall be deemed to have made a DIP Extension of Credit in an amount equal to, and which shall be deemed applied to permanently reduce and repay in full, any outstanding unpaid Prepetition Revolving Credit Balance on the date of entry of this Final Order, which payment and transfer shall not be avoidable or recoverable from the First Lien Lenders under sections 547, 548, 550, 553 or any other section of the Bankruptcy Code or subject to any other claim, charge, assessment or other liability, whether by applicable provisions of the Bankruptcy Code, other law or otherwise.  Amounts applied in repayment of the Prepetition Revolving Credit Balance in accordance with this Paragraph 9 may not be reborrowed.  From and after the entry of this Final Order, all amounts received in the Revenue Account, the Proceeds Account and other Accounts, and any other amounts received by the First Lien Agent or the First Lien Lenders in respect of the Prepetition Obligations, are to be applied as provided, permitted and/or required under the DIP Loan Documents and the First Lien Financing Documents (including the Security Deposit Agreement).  The Borrower shall not

request and the DIP Lenders are not required to make any DIP Extensions of Credit (other than

the deemed DIP Extensions of Credit pursuant to this Paragraph 9) if cash on hand in the

Accounts (as defined in the Security Deposit Agreement) exceeds $25 million.  Without limiting

the generality of the foregoing, the MACH Gen Entities are authorized and directed, without

further order of this Court, to pay or reimburse the First Lien Lenders and the DIP Lenders for all

past, present and future costs and expenses, including, without limitation, all reasonable

professional fees, consultant fees and legal fees and expenses (without the necessity of filing a

fee application) paid or incurred by the First Lien Lenders, the First Lien Agent, the DIP Lenders

or the DIP Agent in connection with the financing transactions provided in this Final Order, the

Interim Order, the other DIP Loan Documents and the First Lien Financing Documents, all of

which shall be and are included as part of the principal amount of the DIP Obligations and

secured by the Collateral.

      10.    <u>Continuation of Prepetition Cash Management Procedures</u>.  Except to the extent

expressly provided in the Interim Order, this Final Order or the other DIP Loan Documents, all

prepetition practices and procedures (including bank account cash management practices)

provided in the Financing Documents (including in that certain Security Deposit Agreement,

dated as of December 5, 2006 (the "<u>Security Deposit Agreement</u>"), by and among the MACH

Gen Entities, the Prepetition Agents and Citibank, N.A., as Depositary) for the payment,

collection and application of proceeds of the Prepetition Collateral, the turnover and transfer of

cash and other financial assets, the delivery of property to the First Lien Lenders or the First Lien

Agent, and the funding of  extensions of credit pursuant thereto are hereby approved and shall

continue without interruption in respect of the Prepetition Collateral and the First Lien

Prepetition Obligations and in respect of the Collateral, the DIP Obligations and the DIP

Extensions of Credit (including the issuance of letters of credit under the DIP Facility) pursuant

to the DIP Loan Documents, which shall constitute a Revolving Credit Facility under and as

defined in the Security Deposit Agreement.

11.     Rights and Benefits Under Intercreditor Agreement.  Except to the extent (if any)

that such terms and conditions are inconsistent with the express terms of this Final Order or the

RSA, the terms and conditions of the Intercreditor Agreement (including with respect to the

relative rights of the Prepetition Secured Lenders) shall not be mitigated or modified as a result

of entry of this Final Order, entry into the DIP Loan Documents or the incurrence of the DIP

Obligations.  The Second Lien Lenders have consented or are deemed to have consented to the

terms of the DIP Facility under the RSA and the Intercreditor Agreement.

12.     Other Use of DIP Extensions of Credit and Cash Collateral.  Subject to the terms

and conditions set forth in this Final Order and the other DIP Loan Documents, MACH Gen may

use the DIP Extensions of Credit and the Cash Collateral, in accordance with the Approved

Budget, to pay the amounts associated with the items set forth in Section 2.14 of the DIP Credit

Agreement.

13.     Approved Budget.

(a)     The budget annexed to the Interim Order as Exhibit B (as updated

periodically in accordance with the DIP Credit Agreement, the "Approved Budget") hereby is

approved on a final basis.  Proceeds of the DIP Extensions of Credit and Cash Collateral under

this Final Order shall be used by MACH Gen only in accordance with the Approved Budget and

this Final Order, subject to any Permitted Variance.  Subject to the Carve-Out, the DIP Lenders'

consent to the Approved Budget shall not be construed as consent to the use of DIP Extensions

of Credit or Cash Collateral beyond the Termination Date (as defined below), regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(a)     Subject to paragraph 36 of this Final Order, upon the written consent of the First Lien Lenders, MACH Gen, and the Majority Second Lien Holders (as defined in the RSA), and without further order of the Court, the Approved Budget may be amended from time to time.  MACH Gen shall provide a copy of any so amended revised budget to the U.S. Trustee and counsel to the Committee, if any.

14.     Permitted Variance.  Notwithstanding the Approved Budget, so long as the Termination Date has not occurred, the MACH Gen Entities shall be authorized to use proceeds of the DIP Extensions of Credit and Cash Collateral in accordance with the Approved Budget, in an amount that would not cause MACH Gen to use Cash Collateral or DIP Extensions of Credit in an aggregate amount greater than one-hundred and twenty percent ( 120 %) of the Approved Budget for any  two-week period (a "Permitted Variance") ; provided, however, that the purchase of gas required for the operation of the MACH Gen Entities' facilities and the payment of variable operations and maintenance expenses of such facilities as required in the ordinary course of business to operate and maintain such facilities, shall be excluded from the calculation of Permitted Variance.  If the aggregate amount of proceeds from DIP Extensions of Credit or Cash Collateral actually used by MACH Gen, measured once every two weeks, is less than the aggregate amount of DIP Extensions of Credit and Cash Collateral available for use by MACH Gen in the Approved Budget during such period, then MACH Gen may carry over any such unused amount to the future periods in the Approved Budget.

15.     Continuation of Prepetition Liens.  Until (a) the Borrower and the Subsidiaries have indefeasibly paid in full all DIP Obligations (including the satisfactory cash

26

collateralization of all issued and outstanding letters of credit under the DIP Credit Agreement in accordance with the DIP Loan Documents), all First Lien Prepetition Obligations and all Second Lien Prepetition Obligations, (b) the DIP Lenders' obligations under the DIP Facility have terminated, (c) all objections and challenges to (i) the liens and security interests of the Prepetition Secured Lenders (including, without limitation, liens granted for adequate protection purposes) and (ii) the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations, have been waived, denied or barred, and (d) all of MACH Gen's stipulations in paragraph G above have become binding upon their estates and parties in interest in accordance with paragraph 37 below, all liens and security interests of the DIP Lenders and the Prepetition Secured Lenders (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein. Without limiting the foregoing, notwithstanding any payment of all or any portion of the First Lien Prepetition Obligations, the Prepetition Liens shall continue in full force and effect and shall be deemed to secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Liens granted to the DIP Agent on behalf of the DIP Lenders in paragraph 16 below) until the payment in full of all of the DIP Obligations and the termination of the DIP Lenders' obligations under the DIP Facility.

16.     <u>DIP Liens and Collateral</u>.  As security for the full and timely payment of the DIP Obligations, the DIP Agent on behalf of the DIP Lenders was granted pursuant to the Interim Order on an interim basis and is hereby granted on a final basis, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, nonavoidable and fully perfected security interests in and liens and mortgages (collectively, the "<u>DIP Liens</u>") upon all existing and after-acquired tangible and intangible personal and real property and assets of each

of the MACH Gen Entities, including, without limitation, Prepetition Collateral, accounts receivable, inventory, equipment, fee and leasehold interests in real property, general intangibles, contract rights, intercompany notes, cash, deposit accounts, securities accounts, investment property, rights, claims and causes of action, commercial tort claims, and one hundred percent (100%) of the outstanding equity interests in the Subsidiaries (collectively, the "Collateral"); provided that this Final Order does not grant, and shall not be deemed to grant, any security interests in or liens on claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, the "Avoidance Actions"). The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and subject to the Carve-Out, by any court order heretofore or hereafter entered in the Chapter 11 Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code. The MACH Gen Entities shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, except as permitted by the DIP Loan Documents or as approved by the Court.

17.    Priority of DIP Liens. The DIP Liens (a) shall continue to constitute first-priority security interests in and liens upon all Collateral that is not otherwise subject to any valid,

perfected, enforceable and nonavoidable lien in existence as of the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code; (b) shall continue to be senior to and prime the Prepetition Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, and (c) shall continue to be senior to and prime all Adequate Protection Liens.

18.    <u>Automatic Effectiveness of Liens</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the MACH Gen Entities to continue to grant the liens and security interests to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and the DIP Lenders previously granted by the Interim Order and the other DIP Loan Documents (and which continue to remain effective and perfected upon and after the date of entry of this Final Order).

19.    <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens granted pursuant to the Interim Order shall upon and after the date of entry of this Final Order continue to constitute valid, enforceable, nonavoidable and duly perfected first priority security interests and liens, and the DIP Agent and DIP Lenders shall <u>not</u> be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the MACH Gen Entities  to execute any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, perfection or priority of such liens.  The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent or the DIP Lenders shall, in

their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of the Interim Order and this Final Order.  Upon the request of the DIP Lenders, the MACH Gen Entities, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Agent or the DIP Lenders to further validate, perfect, preserve and enforce the DIP Liens.  A certified copy of the Interim Order and/or this Final Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of the Interim Order and/or this Final Order for filing and recording.

20.    Other Automatic Perfection Matters.  To the extent that any Prepetition Agent is the secured party under any account control agreements, listed as loss payee under any of MACH Gen's insurance policies or is the secured party under any Financing Document, the DIP Agent, on behalf of the DIP Lenders, is also deemed to be the secured party under such account control agreements, loss payee under MACH Gen's insurance policies and the secured party under each such Financing Document, and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of the Interim Order and/or this Final Order, as applicable, and the other DIP Loan Documents.  The First Lien Agent

or the Second Lien Agent, as applicable, shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's security interests in and liens on all Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

21.    <u>Automatic Perfection of Adequate Protection Liens</u>.  The Adequate Protection Liens granted pursuant to the Interim Order shall upon the date of entry of this Final Order continue to constitute valid, enforceable, nonavoidable and duly perfected security interests and liens, and the First Lien Agent, First Lien Lenders, Second Lien Agent and Second Lien Lenders (collectively, the "<u>Adequate Protection Parties</u>") shall <u>not</u> be required to file or serve financing statements, mortgage deeds, deeds of trust, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the MACH Gen Entities to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or priority of such liens.  The Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of the

Interim Order and this Final Order.  Upon the request of the First Lien Lenders and/or Second

Lien Lenders, subject in each case to the Intercreditor Agreement, the MACH Gen Entities,

without any further consent of any party, are authorized to take, execute and deliver such

instruments (in each case without representation or warranty of any kind except as set forth in the

DIP Loan Documents) to enable the applicable Adequate Protection Party to further validate,

perfect, preserve and enforce the Adequate Protection Liens.  A certified copy of the Interim

Order and/or this Final Order may be filed with or recorded in filing or recording offices in

addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or

similar instruments, and all filing offices are hereby authorized and directed to accept such

certified copy of the Interim Order and/or this Final Order for filing and recording.

      22.    <u>DIP Superpriority Claims</u>.  In addition to the liens and security interests granted to

the DIP Agent on behalf of the DIP Lenders pursuant to the Interim Order (which continue to

remain effective and perfected upon and after the date of entry of this Final Order), subject to the

Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all

of the DIP Obligations (including, without limitation, all DIP Extensions of Credit) shall as of

the date of this Final Order continue to constitute allowed superpriority administrative expense

claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses

of MACH Gen, whether heretofore or hereafter incurred, of the kind specified in, or ordered

pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 726,

1113, 1114 or any other provisions of the Bankruptcy Code, and which DIP Superpriority Claims

shall be payable from and have recourse to all prepetition and postpetition property of MACH

Gen, including, but not limited to, the Avoidance Actions, and all proceeds thereof.  For the

avoidance of doubt, the DIP Superpriority Claims may be treated as set forth in an Acceptable

Plan (as defined in the Prepetition First Lien Amendment) (but only if the Acceptable Plan is confirmed).

        23.     <u>Adequate Protection Liens and Adequate Protection Superpriority Claims</u>. Subject only to the Carve-Out, the Adequate Protection Parties were granted pursuant to the Interim Order on an interim basis and are hereby granted, reaffirmed and ratified on a final basis, the following Adequate Protection Obligations, in each case to secure an amount equal to the aggregate post-petition diminution in value (which shall be calculated in accordance with Bankruptcy Code section 506(a)) of the interests of the Adequate Protection Parties in the Prepetition Collateral (including the Cash Collateral), including without limitation any such diminution in value resulting from depreciation, physical deterioration, use, sale, loss or decline in market value of the Prepetition Collateral, the priming of the First Lien Agent's and Second Lien Agent's security interests and liens in the Prepetition Collateral, and/or the imposition of the automatic stay under section 362 of the Bankruptcy Code, or otherwise:

        (a)     The First Lien Agent, on behalf of the First Lien Lenders, shall receive:

        (i)     valid, enforceable, nonavoidable and fully perfected, postpetition security interests in and liens (effective and perfected upon and after the date of entry of the Interim Order (and which continue to remain effective and perfected upon the date of entry of this Final Order) and without the necessity of execution by the MACH Gen Entities (except to the extent so requested by the First Lien Agent) of mortgages, deeds of trust, security agreements, pledge agreements, financing statements, and other agreements or instruments) on the Collateral, including for the avoidance of doubt Cash Collateral (the "<u>Adequate Protection Liens</u>"), which liens shall be junior and subject only to the DIP Liens and, solely upon the occurrence of a

Termination Date, payment of the Carve-Out in accordance with the terms and conditions set forth in this Final Order;

(ii)    superpriority administrative expense claims under Bankruptcy Code section 507(b) (the "Adequate Protection Superpriority Claims"; and together with the DIP Superpriority Claims, the "Superpriority Claims") which claims shall be junior and subject only to the DIP Superpriority Claims and, solely upon the occurrence of a Termination Date, payment of the Carve-Out in accordance with the terms and conditions set forth in this Final Order, and which shall have priority in payment over any and all other administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552, 1113 and 1114, whether or not such expenses or claims arise in the Chapter 11 Cases or in any subsequent cases or proceedings under the Bankruptcy Code that may result therefrom; and

(iii)    reimbursement from MACH Gen, without further order of this Court, of all reasonable past, present and future costs and expenses of the First Lien Lenders and the DIP Lenders when due  (including, without limitation, the reasonable fees and expenses of the First Lien Lenders' and the DIP Lenders' professionals (without the necessity of filing a fee application)).

(b)    The Second Lien Agent, on behalf of the Second Lien Lenders, shall receive Adequate Protection Liens on the Collateral, including for the avoidance of doubt Cash Collateral, which liens shall be subordinate and junior to (x) the Prepetition Liens, (y) the DIP Liens, and (z) the Adequate Protection Liens granted to the First Lien Agent on behalf of the First Lien Lenders and otherwise subject as Second Liens (as defined in the Intercreditor Agreement) to the terms of the Intercreditor Agreement in all respects.

34

(c)    Additionally, the Second Lien Lenders shall receive reimbursement from MACH Gen, without further order of this Court, of all reasonable past, present and future costs and expenses of the Second Lien Agent and the Second Lien Lenders when due  (including, without limitation, the reasonable fees and expenses of the Second Lien Agent's professionals and the Second Lien Lenders' professionals (without the necessity of filing a fee application).

(d)    For the avoidance of doubt, the use of Cash Collateral, for any purpose, shall constitute post-petition diminution in value of the Prepetition Secured Lenders' interest in the Collateral and shall entitle the First Lien Lenders (or the First Lien Agent on behalf of the First Lien Lenders) to dollar-for-dollar Adequate Protection Liens and Adequate Protection Superpriority Claims and the Second Lien Lenders (or the Second Lien Agent on behalf of the Second Lien Lenders) to dollar-for-dollar Adequate Protection Liens, in accordance with the terms of this Final Order.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Adequate Protection Parties hereunder is insufficient to compensate for any post-petition diminution in value of the interests of the Adequate Protection Parties in the Prepetition Collateral during the Chapter 11 Cases or any successor cases; provided that any claim granted to the Second Lien Lenders (or the Second Lien Agent on behalf of the Second Lien Lenders) under Bankruptcy Code section 507(b) shall be subordinate and junior to (i) any claims granted to the First Lien Lenders (or the First Lien Agent on behalf of the First Lien Lenders) and (ii) all Superpriority Claims.

24.    Additional First Lien Adequate Protection.  In addition to the Adequate Protection Liens and the Adequate Protection Superpriority Claims, the First Lien Agent on behalf of the First Lien Lenders was granted pursuant to the Interim Order on an interim basis and is hereby

granted, reaffirmed and ratified on a final basis from MACH Gen, as additional adequate

protection (a) cash payment of all accrued and unpaid interest then due under the First Lien

Credit Agreement at the non-default rate provided for in the First Lien Financing Documents,

and all other accrued and unpaid fees (including any letter of credit fees and fronting fees) and

disbursements (including reasonable legal and advisory fees and expenses (without the

necessity of filing a fee application)) owing to the First Lien Agent and the First Lien Lenders

under the First Lien Financing Documents and incurred prior to the Petition Date, and (b)

periodic adequate protection payments in accordance with, and in the amounts set forth in, the

Approved Budget, which shall include the cash payment of (i) all interest (at the non-default

rate), fees, disbursements (including reasonable legal and advisory fees and expenses (without

the necessity of filing a fee application)) and principal, in each case, when due under the First

Lien Credit Agreement with respect to the Prepetition Term Loan Facility and in accordance

with the First Lien Credit Agreement; and (ii) all interest (at the non-default rate), fees (including

letter of credit fees, fronting fees and unused line fees) and disbursements (including reasonable

legal and advisory fees and expenses (without the necessity of filing a fee application)), when

due under the First Lien Credit Agreement with respect to the Prepetition Revolving Credit

Facility, in each case in accordance with the First Lien Credit Agreement; provided that adequate

protection payments of interest under the First Lien Credit Agreement under clauses (b)(i) and

(b)(ii) shall be at the default rate after the occurrence and during the continuance of an Event of

Default (other than the Events of Default specified in Section 18(e) of the RSA) (the "Additional

First Lien Adequate Protection Payments"; and together with the Adequate Protection Liens, the

Adequate Protection Superpriority Claims, and other amounts required to be made under

paragraphs 22, 23, and 24 of this Final Order, the "Adequate Protection Obligations").  In

addition, the payment of the Yield Maintenance Fee in accordance with the terms of the DIP

Loan Documents, the Financing Documents, the Interim Order, and this Final Order constitute an

integral element of the adequate protection provided to the DIP Lenders and the First Lien

Lenders.  Each Prepetition Secured Lender is also authorized to terminate the RSA, as to itself,

and to exercise all of its rights thereunder, in accordance with the terms of the RSA irrespective

of the automatic stay which, to the extent it might apply, is hereby modified to permit such

termination and the exercise by each Prepetition Secured Lender of its rights under the RSA.

      25.   <u>Carve-Out</u>.  Upon the DIP Agent's issuance of a Default Notice (as defined

below), all liens, claims and other security interests held by any party, including the

Superpriority Claims, the Adequate Protection Liens, the DIP Liens, and the Prepetition Liens,

shall be subject to the payment of the Carve-Out.  For purposes of this Order, the "<u>Carve-Out</u>"

shall mean, collectively:  (a) fees pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); and

(b) unpaid fees and expenses of professionals retained by the MACH Gen Entities pursuant to

section 327 or 328 of the Bankruptcy Code (the "<u>Professionals</u>") incurred and accruing after the

date the DIP Agent issues a Default Notice, to the extent such fees and expenses are allowed by

the Court, in an aggregate amount (excluding any incurred and unpaid professional fees and

expenses of any of the agents or lenders payable pursuant to this Final Order) not in excess of (i)

$2,300,000, with respect to MACH Gen's Professionals (the "<u>MACH Gen Professional Carve-</u>

<u>Out Cap</u>") and (ii) $50,000,  with respect to the Professionals of any Committee (the "<u>Committee</u>

<u>Professionals' Carve-Out Cap</u>" and together with the MACH Gen Professionals' Carve-Out Cap,

the "<u>Professionals' Carve-Out Cap</u>") and (iii) unpaid Professionals' fees and expenses incurred

and accruing prior to or on the date upon which the DIP Agent issues a Default Notice, but only

to the extent such unpaid fees and expenses are, with respect to each Professional, set forth in the

Approved Budget and are allowed by the Court (clauses (i), (ii) and (iii), collectively, the "Professionals' Carve-Out"); provided, however, that the Professionals' Carve-Out Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by MACH Gen and paid to the applicable Professionals following delivery of a Default Notice to MACH Gen.  Notwithstanding the foregoing, so long as a Default Notice has not been issued, MACH Gen shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Approved Budget and that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the MACH Gen Entities and the Prepetition Secured Lenders, as the same may be due and payable, and the same shall not reduce the Professionals' Carve-Out Cap.  In any event, the DIP Lenders and the Prepetition Secured Lenders reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals.  Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of this Final Order, the Interim Order or the DIP Loan Documents to the contrary, aggregate cumulative expenditures for restructuring professional fees of MACH Gen or any Committee shall not exceed one hundred percent (100%) of the amount with respect thereto set forth in the Approved Budget.

26.    Investigation Budget.  The MACH Gen Entities shall not assert or prosecute, and no portion of the DIP Facility, the Collateral (including the Prepetition Collateral and the Cash Collateral), or the Carve-Out, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any party in interest in connection with (a) asserting or prosecuting any claims, causes of action, or

Challenge (as defined in paragraph 37) against the Prepetition Secured Lenders, or (b) asserting

any Challenge or raising any defenses to the Prepetition Obligations, the DIP Obligations, the

Second Lien Prepetition Obligations or the liens of the Prepetition Secured Lenders; provided,

however, that not more than $25,000 in the aggregate of proceeds of the Carve-Out, any Cash

Collateral or any proceeds of the DIP Facility or the Collateral may be used to pay any allowed

fees of the Committee or professionals retained by the Committee and incurred in connection

with investigating the matters covered by the stipulations contained in paragraph G of this Final

Order (the "Investigation Budget").

   27.     506(c) Waiver.  The MACH Gen Entities (on behalf of themselves and their

estates) irrevocably waive, and shall be prohibited from asserting, any surcharge claim under

section 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in

connection with the preservation, protection or enhancement of, or realization by the Prepetition

Secured Lenders upon, the Collateral.  In no event shall the DIP Agent, the DIP Lenders, the

First Lien Agent or the First Lien Lenders be subject to the equitable doctrine of marshaling or

any similar doctrine with respect to the Collateral.

   28.     Restrictions on Granting Post-Petition Liens; Collateral Rights; Limitations in

Respect of Subsequent Court Orders and Subordination of Liens.   Except for the Carve-Out or

as otherwise expressly set forth in this Final Order, it shall constitute an Event of Default if any

of the MACH Gen Entities incurs or requests authority to incur a claim or grants a lien (or a

claim or lien is allowed) having a priority superior to or *pari passu* with those granted pursuant

to this Final Order to the First Lien Agent on behalf of the First Lien Lenders at any time during

which any portion of the DIP Facility, the DIP Obligations, the Prepetition Revolving Credit

Facility, the Prepetition Term Loan Facility, the First Lien Prepetition Obligations, or the

Adequate Protection Obligations owing to the First Lien Lenders remains outstanding.  Without limiting any other provisions and protections of this Final Order, unless the DIP Agent and the First Lien Agent have provided their prior written consent, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Final Order and/or the Interim Order for any purpose other than as set forth in the Approved Budget.  Without limiting the provisions and protections of this paragraph  28, if at any time prior to the indefeasible repayment and satisfaction in full in cash of all DIP Obligations and all First Lien Prepetition Obligations, including the satisfactory cash collateralization of all issued and outstanding letters of credit in accordance with the DIP Loan Documents, and the termination of the DIP Lenders' obligations to make DIP Extensions of Credit, including subsequent to the confirmation of any plan of reorganization (including an Acceptable Plan), with respect to the MACH Gen Entities or their estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt in violation of this Final Order, the Interim Order or the other DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall be immediately be turned over to the DIP Agent or the First Lien Agent, as the case may be, for application in accordance with this Final Order, the other DIP Loan Documents and the First Lien Financing Documents, as applicable, and under applicable law.

29.    Binding Nature of Order.  The provisions of this Final Order shall be binding upon the MACH Gen Entities and their respective successors and assigns (including, without

limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any

MACH Gen Entity's estate or with respect to its property).

      30.    <u>Survival of Order</u>.  With respect to the DIP Lenders and the First Lien Lenders

only, the provisions of this Final Order and any actions taken pursuant thereto (a) shall survive

the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases;

(ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or

(iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in full force and effect

notwithstanding the entry of any such order, and the claims, liens, and security interests granted

pursuant to the Interim Order and/or this Final Order shall maintain their priority as provided by

this Final Order until all of the DIP Obligations are indefeasibly paid in full and discharged in

accordance with the DIP Loan Documents (including the satisfactory cash collateralization of all

issued and outstanding letters of credit in accordance with the DIP Loan Documents).  The DIP

Obligations shall not be discharged by the entry of any order confirming any plan of

reorganization in any of the Chapter 11 Cases that does not provide for payment in full of the

DIP Obligations (including the satisfactory cash collateralization of all issued and outstanding

letters of credit in accordance with the DIP Loan Documents, and payment of any Yield

Maintenance Fee, if applicable), and, only upon the entry of any such order, the MACH Gen

Entities shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4)

of the Bankruptcy Code; <u>provided</u>, that notwithstanding the foregoing sentence, upon the

consummation of an Acceptable  Plan, (i) the DIP Obligations shall be (A) deemed paid in full

and finally satisfied (whether by payment from the proceeds of the New First Lien Revolver (as

defined in the Prepackaged Plan) through replacement of the DIP Obligations with obligations

under the New First Lien Revolver, in each case, as provided in Article II.C.2 of the Prepackaged

Plan) or (B) otherwise satisfied in accordance with the terms of an Acceptable Plan, and (ii) in either case, the discharges provided under such Acceptable Plan shall be effective.

31.    <u>Protection under Section 364(e) of the Bankruptcy Code</u>.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders incurred prior to the actual receipt by the DIP Lenders and the First Lien Lenders of written notice of the effective date of such reversal, modification, vacation or stay, (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders, (iii) the validity of any Adequate Protection Obligations owing to the Second Lien Agent or the Second Lien Lenders incurred prior to the actual receipt by the Second Lien Lenders of written notice of the effective date of such reversal, modification, vacation or stay, subject in any event to the terms of the Intercreditor Agreement and the RSA, or  (iv) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any Adequate Protection Obligations owing to the Second Lien Agent or the Second Lien Lenders, subject in any event to the terms of the Intercreditor Agreement and the RSA.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations owing to the Adequate Protection Parties by MACH Gen prior to the actual receipt by the Prepetition Secured Lenders of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions

of this Final Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Final Order and the other DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Adequate Protection Parties.

32.    <u>Termination of DIP Facility</u>.   MACH Gen's  right to use the DIP Facility and Cash Collateral shall terminate immediately upon the earliest of (i) seven (7) days following delivery of written notice (the "<u>Default Notice</u>," and such period of time, the "<u>Default Notice Period</u>") via electronic mail and facsimile by the DIP Lenders or the DIP Agent to counsel to MACH Gen, counsel to the First Lien Agent, counsel to the Second Lien Lenders, the  U.S. Trustee, counsel to the Committee (if any) and any other official committee appointed in the Chapter 11 Cases, of the occurrence of an Event of Default (as defined below) and (ii) the Revolving Credit Maturity Date (as defined in the DIP Credit Agreement) (the date of such termination pursuant to clause (i) or (ii) above, the "<u>Termination Date</u>"), and the  Yield Maintenance Fee (as such term is defined in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable) shall apply to such termination and be included in the First Lien Prepetition Obligations and the DIP Obligations as provided in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable, and irrespective of the commencement or continuation of the Chapter 11 Cases or any Successor Case.

33.    <u>Events of Default</u>.  Except as otherwise provided in this Final Order or to the extent the First Lien Lenders may otherwise agree in writing, any violation of any of the terms of this Final Order or any occurrence of an "Event of Default" under and as defined in Section 6.01 of the DIP Credit Agreement shall constitute an event of default (each, an "<u>Event of Default</u>"); it

43

being understood that termination of the RSA (an "RSA Non-Default Termination") shall not be an Event of Default unless resulting from (i) the failure of MACH Gen to meet the milestones set forth in subparagraph (f), (g) or (h) of Section 4 (including the last sentence of Section 4, as applicable) of the RSA, or (ii) the occurrence of the Outside Date (as defined in the RSA) prior to the occurrence of the Consummation Date (as defined in the RSA). Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Nothing in this paragraph 33 shall be construed to preclude or affect in any way the DIP Lenders' rights or remedies in respect of any Event of Default occurring after an RSA Non-Default Termination.

34.    Modification of Stay; Rights and Remedies Upon Termination.  Subject to paragraph 32 of this Final Order, upon the occurrence of a Termination Date, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders, as applicable, to exercise all rights and remedies provided in this Final Order, the other DIP Loan Documents or the First Lien Financing Documents, as applicable, and to take any or all of the following actions without further order of or application to this Court:  (a) immediately terminate MACH Gen's use of Cash Collateral and cease making any DIP Extensions of Credit to MACH Gen; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the DIP Facility and the availability of any DIP Extensions of Credit thereunder; (d) immediately set off any and all amounts in accounts maintained by the MACH Gen Entities with (or subject to a security interest in favor of) the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders, as applicable, against the DIP Obligations or the Prepetition Obligations, or otherwise enforce

rights against the Collateral in the possession of, or subject to a lien in favor of the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders, as applicable, in each case for application towards the DIP Obligations or the Prepetition Obligations, as applicable; and (e) take any other actions or exercise any other rights or remedies permitted under this Final Order, the other DIP Loan Documents, the First Lien Financing Documents or applicable law to effect the repayment of the DIP Obligations and the First Lien Prepetition Obligations.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided above, unless and until, during the Default Notice Period, the Court has determined that an Event of Default has not occurred and/or is not continuing.  Any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default.  During the Default Notice Period, the MACH Gen Entities shall (x) have no right to use any proceeds of the DIP Facility or the Cash Collateral, or any right to request advances or issuances of letters of credit under the DIP Facility, other than (i) with the consent of the DIP Lenders and the First Lien Lenders, (ii) to fund the Carve-Out to the extent claims giving rise to the Carve-Out are incurred during the Default Notice Period, or (iii) to contest the occurrence and/or continuance of the an Event of Default and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lenders and the First Lien Lenders, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.  The rights and remedies of the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders may respectively have under the DIP Loan Documents or the First Lien Financing Documents, or otherwise.  The

MACH Gen Entities shall cooperate fully with the DIP Agent, the DIP Lenders, the First Lien

Agent and the First Lien Lenders, respectively, in their exercise of rights and remedies, whether

against the Collateral or otherwise.

35.    Limitations on Borrowings.  It shall constitute an Event of Default if any of the

MACH Gen Entities, the Committee, or any of the members of the Committee seeks

authorization for the MACH Gen Entities or their estates to borrow money from any person other

than the DIP Lenders to the extent that the repayment of such borrowings is to be secured

pursuant to section 364(d)(1) of the Bankruptcy Code by a security interest, lien or mortgage that

is senior to or *pari passu* with any of the security interests, liens or mortgages held by the DIP

Agent on behalf of the DIP Lenders or the First Lien Agent on behalf of the First Lien Lenders,

including the Adequate Protection Liens, the Prepetition Liens, and the DIP Liens, unless in

connection with such borrowings the DIP Obligations and any remaining First Lien Prepetition

Obligations (including, for the avoidance of doubt, any Yield Maintenance Fees (as such term is

defined in the First Lien Credit Agreement or the DIP Credit Agreement, as applicable)) are

indefeasibly paid in full in cash (including the satisfactory cash collateralization of all issued and

outstanding letters of credit in accordance with the DIP Loan Documents) as a condition to the

closing of such borrowings.

36.    Modifications of DIP Loan Documents and Budgets.  The MACH Gen Entities

are hereby authorized, without further order of this Court, to enter into agreements with the DIP

Agent, the DIP Lenders, the First Lien Agent and First Lien Lenders providing for any non-

material modifications to the Approved Budget or the DIP Loan Documents, or of any other

modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan

Documents to this Final Order; provided, however, that the MACH Gen Entities shall provide

notice of any material modification or amendment to the Approved Budget or the DIP Loan

Documents that is adverse to the MACH Gen Entities' estates to counsel to any Committee,

counsel to the First Lien Lenders, counsel to the Second Lien Lenders and the U.S. Trustee, each

of whom shall have five (5) days from the date of such notice within which to object in writing

to such modification or amendment.  If any Committee, the U.S. Trustee, the First Lien Lenders

or Second Lien Lenders timely objects to any such material modification or amendment to the

Approved Budget or the DIP Loan Documents, such modification or amendment shall only be

permitted pursuant to an order of this Court.

       37.      <u>Stipulations Regarding First Lien Prepetition Obligations and Prepetition Liens</u>

<u>Binding on Parties in Interest</u>.  The stipulations and admissions contained in this Final Order,

including, without limitation, in recital paragraph G of this Final Order, shall be binding on the

MACH Gen Entities' estates and all parties in interest, including, without limitation, all

Committees, unless (a) any Committee, or another party in interest (other than any of the MACH

Gen Entities) with standing and requisite authority, has timely commenced a contested matter or

adversary proceeding (subject to the limitations set forth in paragraph 26 hereof, including, for

the avoidance of doubt, the Investigation Budget) (a "<u>Challenge</u>") challenging the amount,

validity or enforceability of the First Lien Prepetition Obligations, the Second Lien Prepetition

Obligations, or the perfection or priority of the Prepetition Liens, or otherwise asserting any

objections, claims or causes of action on behalf of the MACH Gen Entities' estates against the

Prepetition Secured Lenders relating to the First Lien Prepetition Obligations, Second Lien

Prepetition Obligations or the Prepetition Liens no later than on or before either (i) if no

Committee has been appointed, the earlier of (A) 75 days from the Petition Date and (B) the date

on which objections to confirmation of MACH Gen's Chapter 11 plan or plans of reorganization

for one or more of the MACH Gen Entities are due, or (ii) if a Committee has been appointed,

the earlier of (A) 60 days after such Committee is appointed and (B) the date on which

objections to confirmation of MACH Gen's Chapter 11 plan or plans of reorganization for one or

more of the MACH Gen Entities are due, and (b) to the extent the Court rules in favor of the

plaintiff in any such timely and properly filed Challenge.  If no such Challenge is timely

commenced as of such date then, without further order of the Court, (x) the claims, liens and

security interests of the Prepetition Secured Lenders shall, without further order of the Court, be

deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent

Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to

validity, priority, amount or otherwise, and (y) without further order of the Court, the MACH

Gen Entities and their estates shall be deemed to have released any and all claims or causes of

action against the Prepetition Secured Lenders with respect to the Financing Documents or any

related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely

commenced, the stipulations contained in paragraph G of this Final Order shall be binding on

the MACH Gen Entities' estates, any Committee and all parties in interest.  If a Challenge is

timely commenced, the stipulations contained in paragraph G of this Final Order shall be

binding on the MACH Gen Entities' estates and all parties in interest except to the extent such

stipulations are specifically challenged in such Challenge, as and when originally filed (ignoring

any relation back principles); provided, that if and to the extent a Challenge is withdrawn,

denied or overruled, the stipulations specifically challenged in such Challenge also shall be

binding on the MACH Gen Entities' estates and all parties in interest.

      38.      Waiver of Requirement to File Proofs of Claim.

(a)    The DIP Agent and the DIP Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of principal or interest under the DIP Loan Documents.  The statements of claim in respect of the DIP Obligations set forth in the Interim Order and this Final Order, together with the evidence accompanying the Motion and presented at the Interim Hearing and the Final Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b)    The First Lien Agent, the Second Lien Agent and the Prepetition Secured Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of principal or interest under the respective Financing Documents.  The statements of claim in respect of the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations, respectively, set forth in the Interim Order and this Final Order, together with the evidence accompanying the Motion and presented at the Interim Hearing and the Final Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

39.    <u>DIP Agent and First Lien Agent Authorization</u>.  For the avoidance of doubt and notwithstanding any provision of the Financing Documents or the DIP Loan Documents, each of the DIP Agent and First Lien Agent is hereby authorized to make any and all account transfers requested by MACH Gen in accordance with the Approved Budget, and is further authorized to take any other action reasonably necessary to implement the terms of this Final Order.

40.    <u>No Modification of Final Order</u>.  The MACH Gen Entities irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the prior

written consent of the DIP Lenders and the First Lien Lenders and no such consent shall be implied by any action, inaction or acquiescence of the DIP Lenders or the First Lien Lenders

41.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the DIP Agent's, the DIP Lenders', the First Lien Agent's, the First Lien Lenders' or the Second Lien Lenders' right to seek any other or supplemental relief in respect of MACH Gen, including the right to seek additional adequate protection, as applicable, subject to the terms of the Intercreditor Agreement and the RSA, (b) any of the rights of the DIP Agent, DIP Lender, the First Lien Agent, the First Lien Lenders, or the Second Lien Lenders under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreement).  Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the First Lien Agent or the First Lien Lenders that the adequate protection granted herein does in fact adequately protect the First Lien Agent or the First Lien Lenders against any diminution in value of the Prepetition Collateral.

42.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, the terms and provisions of this Final Order shall govern.

43.     <u>Entry of Final Order; Effect</u>.  This Final Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Final Order on this Court's docket in the Chapter 11 Cases.

44.    <u>Limitation of Liability</u>.  In determining to make any DIP Extensions of Credit, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Final Order, the Interim Order, the other DIP Loan Documents, or the Financing Documents, none of the DIP Agent or the DIP Lenders, the First Lien Agent or the First Lien Lenders, or the Second Lien Agent or the Second Lien Lenders shall be deemed to be in control of the operations of the MACH Gen Entities or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the MACH Gen Entities, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the MACH Gen Entities or any affiliate of the MACH Gen Entities (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Furthermore, nothing in this Final Order, the Interim Order, the other DIP Loan Documents, or the Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent or the Second Lien Lenders of any liability for any claims arising from the prepetition or postpetition activities of the MACH Gen Entities or any affiliate of the MACH Gen Entities.

45.    <u>Cash Management</u>.  Subject to paragraph 10 of this Final Order, the MACH Gen Entities shall not seek approval of any cash management system without the prior approval of the DIP Lenders and the Prepetition Secured Lenders, which consent shall not be unreasonably withheld, and any order approving such cash management system shall be reasonably acceptable to the DIP Lenders and the Prepetition Secured Lenders.

46.    <u>Credit Bidding.</u>

(a)      The DIP Agent, acting at the direction of the requisite DIP Lenders, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; and

(b)      The First Lien Agent, at the direction of the requisite First Lien Lenders, shall have the unqualified right to credit bid up to the full amount of any remaining First Lien Prepetition Obligations in the sale of any Prepetition Collateral (or any part thereof) subject to the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Lenders, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

47.      Equities of the Case.  In light of, as applicable, the subordination of the Prepetition Liens to the Adequate Protection Liens in respect of the First Lien Lenders, the DIP Liens, and the Carve-Out, and the granting of the DIP Liens, the First Lien Agent and the First Lien Lenders shall be entitled to all benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the First Lien Agent or the First Lien Lenders with respect to the proceeds, product, offspring, or profits of any of the Collateral, including the Prepetition Collateral.

48.      Reporting Requirements.  Notwithstanding any procedures or requirements under the Financing Documents or the DIP Loan Documents, MACH Gen shall prepare and furnish to counsel for the DIP Lenders, counsel for the First Lien Lenders and counsel for the Second Lien Lenders, in form and substance reasonably acceptable to the DIP Agent and the Prepetition

Secured Lenders, a weekly report of receipts, disbursements, and a reconciliation of actual receipts and disbursements with those set forth in the Approved Budget, on a line-by-line basis, showing any percentage variance to the proposed corresponding line item of the Approved Budget (a) for the immediately preceding two-week period and (b) on a cumulative basis for the period of the Approved Budget or such other budget period, as applicable, and showing a calculation of the covenants and MACH Gen's compliance or noncompliance, which shall be certified by the chief financial officer or chief executive officer as having been prepared under such officer's supervision and in good faith (the "Budget Reconciliation").  MACH Gen shall also provide counsel to the DIP Agent, counsel to the First Lien Lenders, and counsel to the Second Lien Lenders with (i) a list of any and all prepetition claims paid during such period, each with a notation regarding which order authorized such payments, and (ii) the cumulative total of all prepetition claims paid, each with a notation regarding which order authorized such payments (the "Other Reporting Obligations").  Such Budget Reconciliation and Other Reporting Obligations shall be provided to counsel to the DIP Lenders, counsel to the First Lien Lenders and counsel to the Second Lien Lenders, so as actually to be received within three (3) business days following the end of each applicable period.  MACH Gen and its professionals shall make themselves available to discuss the Budget Reconciliation and any other reports provided pursuant to this Final Order with the professionals retained by the DIP Lenders, the First Lien Lenders and Second Lien Lenders on such basis as may be reasonably requested by the DIP Lenders, the First Lien Lenders and Second Lien Lenders.

49.    No Third Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any party, creditor, equity holder or other entity other than the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second

Lien Agent, the Second Lien Lenders, and the MACH Gen Entities, and their respective successors and assigns.

50.    <u>Intercreditor Issues</u>.  Nothing in this Final Order shall be construed to convey on any individual DIP Lender or Prepetition Secured Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents, Financing Documents and RSA, as applicable.  Nothing in this Final Order shall be construed to impair or otherwise affect any intercreditor, subordination or similar agreement or arrangement in respect of the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations, including, without limitation, the Intercreditor Agreement, which, was negotiated at arm's length among commercially sophisticated parties, comprises an integral part of the Prepetition First Lien Facilities (and the use of Cash Collateral), as the case may be, and is enforceable to the fullest extent provided by Section 510(a) of the Bankruptcy Code and applicable law.

51.    <u>Enforceability</u>.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

52.    <u>Retention of Jurisdiction</u>.  Notwithstanding any provision in the DIP Loan Documents or the Financing Documents, this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Final Order, the DIP Facility, or the other DIP Loan Documents.

Dated: _____, 2014          _____
           Wilmington, Delaware                          United States Bankruptcy Judge

**Exhibit F** **to the Restructuring Support Agreement**

**New Owner Documents**

a)  New Organizational Documents for each MACH Gen Entity;

b)  List of Retained Causes of Action;

c)  List of Assumed Executory Contracts or Unexpired Leases;

d)  List of Rejected Executory Contracts or Unexpired Leases, if any;

e)  List of the Members of the New MACH Gen Board;

f)  Registration Rights Agreement; and

g)  Security Holders Agreement and such other documents as are necessary or advisable to implement the terms of **Schedule 3** to this Agreement.

**<u>Exhibit G</u> to the Restructuring Support Agreement**

**New First Lien Credit Agreement**

**$[_____] FIRST LIEN CREDIT AND GUARANTY AGREEMENT**

Dated as of [_____], 2014

Among

[NEW][1] MACH GEN, LLC

<u>as</u> <u>Borrower</u>

and

THE GUARANTORS

<u>as</u> <u>Guarantors</u>

and

THE INITIAL LENDERS AND INITIAL REVOLVING ISSUING BANK NAMED HEREIN

<u>as</u> <u>Initial Lenders and Initial Revolving Issuing Bank</u>

and

CLMG CORP.

<u>as</u> <u>First Lien Collateral Agent</u>

and

CLMG CORP.

<u>as</u> <u>Administrative Agent</u>

---

[1]    [NTD: The parties have discussed a potential new entity as the Borrower, perhaps as a drop down subsidiary of MACH Gen, LLC.] [To be discussed.]

# T A B L E   O F   C O N T E N T S

**Section**                                                                                                      **Page**

ARTICLE I.  DEFINITIONS AND ACCOUNTING TERMS                                          2

    SECTION 1.01.  Certain Defined Terms.................................................................2
    SECTION 1.02.  Computation of Time Periods.................................................31
    SECTION 1.03.  Accounting Terms.......................................................................31
    SECTION 1.04.  Other Definitional Provisions and Rules of Construction. ...........31

ARTICLE II.  AMOUNTS AND TERMS OF THE LOANS AND THE LETTERS OF CREDIT31

    SECTION 2.01.  The Loans and the Letters of Credit. ..........................................31
    SECTION 2.02.  Making the Loans ......................................................................33
    SECTION 2.03.  Issuance of and Drawings and Reimbursements Under Revolving Letters of
                Credit.........................................................................35
    SECTION 2.04.  Repayment of Loans. ................................................................41
    SECTION 2.05.  Termination or Reduction of the Commitments ...........................43
    SECTION 2.06.  Prepayments................................................................................44
    SECTION 2.07.  Interest........................................................................................46
    SECTION 2.08.  Fees. ..........................................................................................47
    SECTION 2.09.  [Reserved].................................................................................50
    SECTION 2.10.  Increased Costs, Etc .................................................................50
    SECTION 2.11.  Payments and Computations.......................................................51
    SECTION 2.12.  Taxes .........................................................................................52
    SECTION 2.13.  Sharing of Payments, Etc..........................................................55
    SECTION 2.14.  Use of Proceeds.........................................................................56
    SECTION 2.15.  Evidence of Debt.......................................................................56
    SECTION 2.16.  Duty to Mitigate .......................................................................57

ARTICLE III.  CONDITIONS TO EFFECTIVENESS OF LENDING                     57

    SECTION 3.01.  Conditions Precedent. ................................................................57
    SECTION 3.02.  Conditions Precedent to Each Borrowing and Issuance. ...............63

ARTICLE IV.  REPRESENTATIONS AND WARRANTIES                                    64

    SECTION 4.01.  Representations and Warranties...................................................64

ARTICLE V.  COVENANTS                                                                          70

    SECTION 5.01.  Affirmative Covenants................................................................70
    SECTION 5.02.  Negative Covenants. .................................................................74
    SECTION 5.03.  Reporting Requirements. ...........................................................81

## ARTICLE VI.  EVENTS OF DEFAULT                                    84

SECTION 6.01.  Events of Default. ...............................................................................84
SECTION 6.02.  Actions in Respect of the Revolving Letters of Credit Upon Default ..........88

## ARTICLE VII.  THE AGENTS                                          89

SECTION 7.01.  Authorization and Action................................................................89
SECTION 7.02.  Administrative Agent's Reliance, Etc.................................................89
SECTION 7.03.  Agents and Affiliates. ..................................................................90
SECTION 7.04.  Lender Party Credit Decision..........................................................90
SECTION 7.05.  Indemnification ..........................................................................90
SECTION 7.06.  Successor Administrative Agent.......................................................92
SECTION 7.07.  First Lien Collateral Agent.. ..........................................................93

## ARTICLE VIII.  GUARANTY                                           93

SECTION 8.01.  Guaranty; Limitation of Liability....................................................93
SECTION 8.02.  Guaranty Absolute. .....................................................................94
SECTION 8.03.  Waivers and Acknowledgments.. .....................................................95
SECTION 8.04.  Subrogation ..............................................................................96
SECTION 8.05.  Subordination ............................................................................97
SECTION 8.06.  Continuing Guaranty; Assignments..................................................98

## ARTICLE IX.  MISCELLANEOUS                                        98

SECTION 9.01.  Amendments, Etc.........................................................................98
SECTION 9.02.  Notices, Etc ...............................................................................100
SECTION 9.03.  No Waiver; Remedies...................................................................102
SECTION 9.04.  Costs and Expenses.....................................................................102
SECTION 9.05.  Right of Set-off...........................................................................104
SECTION 9.06.  Binding Effect.............................................................................104
SECTION 9.07.  Assignments and Participations......................................................104
SECTION 9.08.  Execution in Counterparts.............................................................108
SECTION 9.09.  No Liability of the Revolving Issuing Banks. ....................................108
SECTION 9.10.  Confidentiality. ..........................................................................108
SECTION 9.11.  Marshalling; Payments Set Aside ...................................................109
SECTION 9.12.  Patriot Act Notice.......................................................................109
SECTION 9.13.  Jurisdiction, Etc..........................................................................109
SECTION 9.14.  Governing Law. ..........................................................................110
SECTION 9.15.  Waiver of Jury Trial.....................................................................110
SECTION 9.16.  Limitation on Liability..................................................................110

SCHEDULES

Schedule I              -        Commitments and Lending Offices
Schedule II             -        Guarantors
[Schedule 2.03(e)       -        Existing Letters of Credit Refinanced]
Schedule 3.01(a)(ii)(F)-         First Lien Consents and Agreements
Schedule 4.01(b)        -        Loan Parties
Schedule 4.01(c)        -        Subsidiaries
Schedule 4.01(e)        -        Governmental Approvals and Authorizations
Schedule 4.01(o)        -        Environmental Disclosure
Schedule 4.01(r)        -        Owned Real Property
Schedule 4.01(s)        -        Leased Real Property
Schedule 4.01(t)        -        Material Contracts
Schedule 5.01(d)        -        Insurance
Schedule 5.02(a)        -        Liens

EXHIBITS

Exhibit A-1  -  Form of Revolving Credit Note
Exhibit A-2  -  Form of Term B Note
Exhibit B-1  -  Form of Notice of Borrowing
Exhibit B-2  -  Form of Notice of Issuance
Exhibit C    -  Form of Assignment and Acceptance
Exhibit D    -  Forms of Initial First Lien Mortgages
Exhibit E    -  Form of Solvency Certificate
Exhibit F-1  -  Form of Consent and Agreement for Permitted Commodity Hedge and
                Power Sale Agreements
Exhibit F-2  -  Form of Consent and Agreement for Other Material Contracts
Exhibit G    -  Form of Local Counsel Opinions as to Real Estate Matters
[Exhibit H   -  Form of Intercreditor Agreement][2]
[Exhibit I   -  Form of Security Deposit Agreement][3]
Exhibit J    -  Form of Survey Certification

[2]      [NTD: The parties will negotiate in good faith following the RSA Effective Date to agree upon the form of Intercreditor Agreement, which shall be in form and substance satisfactory to the Administrative Agent.]

[3]      [NTD: The parties will negotiate in good faith following the RSA Effective Date to agree upon the form of Security Deposit Agreement, which shall be in form and substance satisfactory to the Administrative Agent.]

## FIRST LIEN CREDIT AND GUARANTY AGREEMENT

FIRST LIEN CREDIT AND GUARANTY AGREEMENT dated as of [_____], 2014 among [NEW] MACH GEN, LLC, a Delaware limited liability company (the "***Borrower***"), the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), the Revolving Issuing Bank (as hereinafter defined), CLMG CORP. ("***CLMG***"), a Texas corporation, as first lien collateral agent (together with any successor collateral agent appointed [pursuant to Section 7 of the Intercreditor Agreement],[4] the "***First Lien Collateral Agent***") for the First Lien Secured Parties (as hereinafter defined), and CLMG, as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***" and, together with the First Lien Collateral Agent, the "***Agents***") for the Lender Parties (as hereinafter defined).

PRELIMINARY STATEMENTS:

(1)     Each of MACH Gen, LLC and the Guarantors (a) is a debtor in a pending case under chapter 11 of the Bankruptcy Code, jointly administered with the corresponding case of each other Loan Party (such cases together, the "***Chapter 11 Cases***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and (b) is the proponent of a prepackaged plan of reorganization of the Loan Parties (the "***Plan of Reorganization***"), which Plan of Reorganization has been confirmed by the Bankruptcy Court by order dated [_____, 2014].

(2)     In order to satisfy certain conditions to effectiveness and consummation of the Plan of Reorganization, the Borrower has requested that the Lender Parties make available, effective upon consummation of the Plan of Reorganization, first lien secured credit facilities for the Borrower comprised of (a) a $[483,209,285.14][5] term B loan facility and (b) a $200,000,000 working capital revolving credit facility (of which up to $160,000,000 shall be available for the issuance of letters of credit) to pay transaction fees and expenses, provide security in the form of letters of credit to support the working capital needs and obligations of the Borrower and Guarantors and provide funds for ongoing working capital requirements and other general corporate purposes of the Borrower and the Guarantors after the date hereof.

(3)     The Lender Parties have indicated their willingness to agree to make available the Facilities (as hereinafter defined), subject to the terms and conditions of this Agreement.

(4)     The parties hereto are entering into this Agreement on the effective date of the Plan and in order to consummate the Plan of Reorganization.

---

[4]     [NTD: To be conformed following agreement on the form of the Intercreditor Agreement.]

[5]     [NTD: This amount is stated as of the date of this draft. To be confirmed at Consummation Date. Term B Loan will equal the remaining outstanding principal balance of the prepetition Term B Loans upon exit from bankruptcy.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.      Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"*Accepting Lenders*" has the meaning specified in Section 2.06(c).

"*Accession Agreement*" has the meaning specified in the Intercreditor Agreement.

"*Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lender Parties from time to time.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "*controlling*," "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to vote 15% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" has the meaning specified in the recital of parties to this Agreement.

"*Agreement*" means this First Lien Credit and Guaranty Agreement, as amended.

"*Agreement Value*" means, for each Hedge Agreement or Commodity Hedge and Power Sale Agreement, on any date of determination, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement or Commodity Hedge and Power Sale Agreement, as the case may be, in accordance with its terms as if an Early Termination Event has occurred on such date of determination.

"*Anti-Terrorism Laws*" means any of the following (a) the Anti-Terrorism Order, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the US Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the US Code of Federal Regulations), (d) the Foreign Terrorist Organizations

Sanctions Regulations (Title 31 Part 597 of the US Code of Federal Regulations), (e) the Patriot Act, (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts and acts of war.

"*Anti-Terrorism Order*" means Section 1 of Executive Order 13224 of September 24, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (Title 12, Part 595 of the US Code of Federal Regulations).

"*Applicable Margin*" means (a) with respect to the Term B Facility, 5.50% *per annum* and (b) with respect to the Revolving Credit Facility, (i) until the Revolving Credit Reduction Date, 4.75% *per annum* and (ii) from and after the Revolving Credit Reduction Date, 4.25% *per annum.*

"*Appropriate Lender*" means, at any time, with respect to (a) any of the Term B Facility or the Revolving Credit Facility, a Lender that has a Commitment with respect to such Facility at such time and (b) with respect to the Revolving Letter of Credit Facility, the Revolving Issuing Bank and each Revolving Credit Lender.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender Party, (b) an Affiliate of a Lender Party or (c) an entity or an Affiliate of an entity that administers or manages a Lender Party.

"*Asset Management Agreement*" means that certain Amended and Restated Asset Management Agreement, dated September 30, 2010, by and among MACH Gen, LLC, Athens, Millennium, Harquahala and Competitive Power Ventures in respect of the Athens Project, the Millennium Project and the Harquahala Project.

"*Asset Sale*" has the meaning specified in the Security Deposit Agreement.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender Party and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "*Eligible Assignee*"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"*Athens*" means New Athens Generating Company, LLC, a Delaware limited liability company and owner of the Athens Project.

"*Athens Cap Amount*" means, as of any date of determination, an amount equal to the product of (a) $[_____][6] *multiplied by* (b) a fraction, the numerator of which is

---

[6]    [NTD: Athens Cap Amount may depend on the New York Public Service Commission approval to be obtained prior to consummation of the Loan Parties' Plan of Reorganization.]

3

the Outstanding Amount under this Agreement at such time and the denominator of which is the sum of (i) the total Outstanding Amount under this Agreement at such time and (ii) any outstanding First Lien Obligations under any First Lien Commodity Hedge and Power Sale Agreements, in each case, at such time.

"*Athens Project*" means the 1,080 MW natural gas/fuel oil-fired capable electric generating station located in Greene County, New York and all appurtenances thereto owned or operated by Athens, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"*Available Amount*" of any Revolving Letter of Credit means, at any time, the maximum amount (whether or not such maximum amount is then in effect under such Revolving Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Revolving Letter of Credit) available to be drawn under such Revolving Letter of Credit at such time (assuming compliance at such time with all conditions to drawing).

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "*Bankruptcy*," as now and hereafter in effect, or any successor statute.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Bankruptcy Law*" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Base Capex Amount*" has the meaning specified in Section 5.02(m).

"*Base Case Projections*" has the meaning specified in Section 3.01(a)(xii).

"*Borrower*" has the meaning specified in the recital of parties to this Agreement.

"*Borrowing*" means a Term B Borrowing, a Revolving Credit Borrowing or a Revolving Letter of Credit Borrowing, as the context may require.

"*Budget*" has the meaning specified in Section 5.03(d).

"*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York City or Las Vegas, Nevada, and, if the applicable Business Day relates to any Loans, on which dealings are carried on in the London interbank market.

"*Capacity*" means 1,080 MW in the case of Athens, 360 MW in the case of Millennium, and 1,092 MW in the case of Harquahala.

"*Capex Carryover Amount*" has the meaning specified in Section 5.02(m).

"***Capital Expenditures***" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person *plus* (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures.  For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"***Capital Expenditures for Investment***" means, in respect of any of the Loan Parties, the portions of such Loan Party's Capital Expenditures that are not Capital Expenditures for Maintenance.

"***Capital Expenditures for Maintenance***" means, in respect of any of the Loan Parties, Capital Expenditures that are customary for the operation and maintenance of any of the Projects at its Capacity in accordance with applicable law and Prudent Industry Practice and in the ordinary course of business consistent with past practice, which shall include, for the avoidance of doubt, the Vane Upgrades and Control System Replacement.

"***Capitalized Leases***" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"***Cash***" means money, currency or a credit balance in any demand account or deposit account.

"***Cash Equivalents***" has the meaning specified in the Security Deposit Agreement.

"***Cash Flow Available for Debt Service***" means funds applied to the repayment of the principal amount of Term B Loans that were transferred from the Revenue Account to (a) the [First Lien Principal Payment Account (as defined in the Security Deposit Agreement)] pursuant to [*priority third* of Section 3.2] of the Security Deposit Agreement, (b) the voluntary prepayment of Term B Loans pursuant to [*priority sixth* of Section 3.2] of the Security Deposit Agreement or (c) the [Prepayment Account (as defined in the Security Deposit Agreement)] on Cash Flow Payment Dates after the Effective Date pursuant to [*priority eighth* of Section 3.2] of the Security Deposit Agreement.[7]

---

[7]     [NTD: Section and waterfall "priority" references to the new Security Deposit Agreement to be confirmed once the form of such agreement is agreed.]

"*Cash Flow Payment Date*" has the meaning specified in the Security Deposit Agreement.

"*Cash Sweep Percentage*" has the meaning specified in Section 2.06(b)(i).

"*Casualty Event*" has the meaning specified in the Security Deposit Agreement.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

["*Change of Control*" means, at any time, any "*person*" or "*group*" (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) [other than any member or members of the Sponsor Group] (a) shall have acquired ownership, directly or indirectly, beneficially or of record, of more than 50% on a fully diluted basis of the aggregate voting power represented by the issued and outstanding Equity Interests in the Borrower or (b) have acquired direct or indirect control of the Borrower.  For the purposes of this definition, "*Control*" shall be defined to mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Borrower, whether through the ability to exercise voting power, contract or otherwise.][8]

"*Chapter 11 Cases*" has the meaning specified in the recitals to this Agreement.

"*CLMG*" has the meaning specified in the recital of parties to this Agreement.

"*Collateral*" means all Property (including Equity Interests in any Guarantor) of the Loan Parties, now owned or hereafter acquired, other than Excluded Property.

"*Collateral Agent's Office*" means, with respect to the First Lien Collateral Agent or any successor First Lien Collateral Agent, the office of such Agent as such Agent may from time to time specify to the Borrower and the Administrative Agent.

"*Commitment*" means a Term B Commitment, a Revolving Credit Commitment or a Revolving Letter of Credit Commitment, as the context may require.

"*Commitment Reduction Amount*" has the meaning specified in Section 2.08(b)(i).

"*Commitment Reduction Date*" has the meaning specified in Section 2.08(b)(i).

---

[8]        [NTD: To be finalized in connection with confirmation.]

"**Commodity Hedge and Power Sale Agreement**" means any Non-Speculative swap, cap, collar, floor, future, option, spot, forward, power purchase and sale agreement, electric power generation capacity swap or purchase and sale agreement, fuel purchase and sale agreement, power transmission agreement, fuel transportation agreement, fuel storage agreement, or netting agreement or similar agreement entered into in respect of any commodity by any Loan Party in connection with any Permitted Trading Activity hedged with the same Commodity Hedge Counterparty under one master or implementation agreement, but excluding any Energy Management Agreement and any master or implementation agreements or transactions entered into pursuant to such Energy Management Agreement between any Loan Party and its counterparty to such Energy Management Agreement.

"**Commodity Hedge Counterparty**" means any Person that (a)(i) is a commercial bank, insurance company, investment fund or other similar financial institution or any Affiliate thereof which is engaged in the business of entering into commodity hedge and power sale agreements, (ii) is any industrial or utility company or other company that enters into commodity hedges in the ordinary course of its business, or (iii) is either a load-serving entity that has received an order from a local commission or a municipal or cooperative entity that has been granted a monopoly franchise territory for retail electric sales and, in either case, the right to recover costs of purchased power in rates, and (b) in the case of (i) and (ii) only, at the time the applicable Commodity Hedge and Power Sale Agreement is entered into, has a Required Rating.

"**Communications**" has the meaning specified in Section 9.02(b).

"**Confidential Information**" means information that any Loan Party furnishes to any Agent or any Lender Party designated as confidential, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender Party of its obligations hereunder or that is or becomes available to such Agent or such Lender Party from a source other than the Loan Parties that is not, to the best of such Agent's or such Lender Party's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"**Consolidated**" refers to the consolidation of accounts in accordance with GAAP.

"**Contractual Obligations**" means, as applied to any Person, any provision of any Equity Interests issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"**Control System Replacement**"  means the replacement of the existing control system at the Athens Project with a Siemens Power Plant Automation T3000 control system, or equivalent.

"**Debt**" of any Person means, without duplication, (a) Debt for Borrowed Money of such Person, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue (unless being contested in

good faith by appropriate proceedings for which reserves and other appropriate provisions, if any, required by GAAP shall have been made) by more than 90 days incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (g) all obligations of such Person in respect of Hedge Agreements and Commodity Hedge and Power Sale Agreements, valued at the Agreement Value thereof, (h) all Guaranteed Debt of such Person and (i) all indebtedness and other payment obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations, not to exceed the value of the property on which such Lien exists.

"***Debt for Borrowed Money***" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, (b) all obligations of such Person under acceptance, letter of credit or similar facilities at such date and (c) all Synthetic Debt of such Person at such date.

"***Debt Service Reserve Account***" has the meaning specified in the Security Deposit Agreement.

"***Debt Service Reserve Requirement***" means $20,000,000, provided that from and after the first date on which the sale of (x) Millennium or the Millennium Project and (y) Harquahala or the Harquahala Project shall both have been consummated such amount shall be reduced to $10,000,000.

"***Declining Lender***" has the meaning specified in Section 2.06(c).

"***Default***" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"***Default Interest***" has the meaning set forth in Section 2.07(c).

"***Defaulting Lender***" means, at any time, any Lender Party that, at such time, (a) fails to pay (other than as a result of a good faith dispute) any amount required to be

paid by such Lender Party to any Revolving Issuing Bank under this Agreement (beyond any applicable cure period) or (b) shall take any action or be the subject of any action or proceeding of a type described in Section 6.01(f).

"*Depositary*" has the meaning specified in the Security Deposit Agreement.

"*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of [_____], 2014, among the Borrower, the Guarantors, CLMG Corp. in its capacities as administrative agent and collateral agent, and each of the banks, financial institutions, other institutional lenders and other parties party thereto from time to time, as amended.

"*Dollars*" and the sign "*$*" mean the lawful currency of the United States of America.

"*Early Termination Event*" has the meaning specified in the Intercreditor Agreement.

"*Effective Date*" has the meaning specified in Section 3.01.

"*Electric Interconnection and Transmission Agreements*" means each of: (a) that certain Interconnection Agreement dated April 27, 2001 by and between Athens and Niagara Mohawk Power Corporation in respect of the Athens Project; (b) that certain Construction and Operating Agreement, dated July 9, 2007, by and between Athens and Consolidated Edison Company of New York, Inc. in respect of the Athens Project; (c) that certain Special Protection System Engineering, Construction and Implementation Agreement, dated December 6, 2006, by and between Athens and Niagara Mohawk Power Corporation d/b/a National Grid in respect of the Athens Project; (d) that certain Interconnection Service Agreement, dated November 26, 1997, by and between Millennium and New England Power Company in respect of the Millennium Project; (e) that certain Service Agreement for Network Integration Transmission Service, effective February 1, 2002, by and between Millennium and New England Power Company in respect of the Millennium Project; (f) that certain Southwest Reserve Sharing Group Participation Agreement, dated November 3, 1997, by and among various participants in respect of the Harquahala Project; and (g) that certain ANPP Hassayampa Switchyard Interconnection Agreement, dated November 1, 2001, by and among various parties, including Salt River Project Agricultural Improvement and Power District and Harquahala in respect of the Harquahala Project.

"*Eligible Assignee*" means (a) a Lender Party; (b) an Affiliate of a Lender Party; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed); *provided*, *however*, that in the case of an assignment to any Person of (A) a Revolving Credit Commitment, the Revolving Issuing Bank shall have consented to such assignment (such approval of the Revolving Issuing Bank, not to be unreasonably withheld or delayed); *provided*, *further*, that (i) with respect to an assignment of a

Revolving Letter of Credit Commitment, such Eligible Assignee must also be an Eligible Bank and (ii) no Loan Party shall qualify as an Eligible Assignee under this definition.

"*Eligible Bank*" means (i) the Initial Revolving Issuing Bank or an Affiliate of the Initial Revolving Issuing Bank, or (ii) any bank or financial institution established under the laws of the United States, any State thereof or any other country that is a member of the OECD which has a long term unsecured non-credit enhanced rating of A3 or higher from Moody's and A- or higher from S&P.

"*Energy Management Agreements*" means each energy management agreement or similar agreement entered into by a Loan Party with a counterparty, which counterparty shall have a Required Rating, for the management of Permitted Trading Activities of such Loan Party, including: (a) that certain Energy Management and Marketing Agreement, dated November 1, 2013, by and between Millennium and Consolidated Edison Energy, Inc. in respect of the Millennium Project; (b) that certain Energy Management and Marketing Agreement, November 1, 2013, by and between Athens and Consolidated Edison Energy, Inc. in respect of the Athens Project; and (c) that certain Energy Management Agreement, dated October 25, 2010, by and between Harquahala and Twin Eagle Resource Management, LLC (as assignee of BNP Paribas Energy Trading GP) in respect of the Harquahala Project, in each case including all master or implementation agreements and transactions thereunder (including relating to the purchase and sale of fuel or power or the transmission or transportation thereof) entered into pursuant to such Energy Management Agreement between any Loan Party and its counterparty to such Energy Management Agreement.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"*Environmental Law*" means any Federal, state or local statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Materials, health or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or

other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"*Equity Issuance*" has the meaning specified in the Security Deposit Agreement.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 414 (b) or (c) of the Internal Revenue Code.

"*ERISA Event*" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g)(5) of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"*Eurocurrency Liabilities*" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Eurodollar Rate*" means, for any Interest Period in respect of a Loan, an interest rate *per annum* equal to the rate per annum obtained by dividing (a) the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the British Bankers Association LIBOR Rate ("*BBA LIBOR*") by Bloomberg, Reuters or other commercially

available source providing quotations of BBA LIBOR, as designated by the Administrative Agent from time to time, at approximately 11:00 A.M. (London time) on the Interest Rate Determination Date for such Interest Period, as the London interbank offered rate for deposits in Dollars with a maturity corresponding to the applicable Eurodollar Rate Period, by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period, as applicable.

"***Eurodollar Rate Period***" means, for any Interest Period in respect of a Loan, a period of twelve months.

"***Eurodollar Rate Reserve Percentage***" means, for any Interest Period in respect of a Loan, the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Loans is determined) having a term equal to such Interest Period.

"***Event of Eminent Domain***" has the meaning specified in the Security Deposit Agreement.

"***Events of Default***" has the meaning specified in Section 6.01.

"***EWG***" has the meaning specified in Section 4.01(v).

"***Excluded Property***" has the meaning specified in the Intercreditor Agreement.

"***Existing Debt***" means Debt of each Loan Party outstanding immediately before the occurrence of the Effective Date.

"***Existing Letters of Credit***" has the meaning specified in Section 2.03(e).

"***Facility***" means the Term B Facility, the Revolving Credit Facility or the Revolving Letter of Credit Facility, as the context may require, and "***Facilities***" means collectively, the Term B Facility, the Revolving Credit Facility and the Revolving Letter of Credit Facility.

"***FERC***" means the Federal Energy Regulatory Commission and its successors.

"***Financing Documents***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Collateral Agent***" has the meaning specified in the recital of parties to this Agreement.

"***First Lien Collateral Documents***" means the First Lien Security Agreement, the Security Deposit Agreement, the First Lien Mortgages, each First Lien Consent and Agreement, each of the collateral documents, instruments and agreements delivered pursuant to Section 5.01(j), and each other agreement that creates or purports to create a Lien in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, in each case, as amended.

"***First Lien Commodity Hedge and Power Sale Agreement***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Consent and Agreement***" means with respect to any Material Contract, (i) if such Material Contract is a Commodity Hedge and Power Sale Agreement, a consent and agreement in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties) in substantially the form attached hereto as Exhibit F-1 and (ii) in the case of any other such Material Contract, a consent and agreement in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties) in substantially the form attached hereto as Exhibit F-2 or, in either case, otherwise in form and substance reasonably satisfactory to the First Lien Collateral Agent and the Administrative Agent.

"***First Lien Mortgage Policies***" has the meaning set forth in Section 3.01(a)(iii)(B).

"***First Lien Mortgages***" means the Initial First Lien Mortgages and any other deed of trust, trust deed, mortgage, leasehold mortgage or leasehold deed of trust delivered from time to time after the date hereof pursuant to Section 5.01(j), in each case as amended.

"***First Lien Obligations***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Secured Parties***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Security Agreement***" means that certain First Lien Security Agreement, dated as of the date hereof, by the Borrower and the Guarantors in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, as amended.

"***First Offer***" has the meaning specified in Section 2.06(c).

"***Fiscal Quarter***" means a fiscal quarter of any Fiscal Year.

"***Fiscal Year***" means a fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"***Floor Amount***" means with respect to any sale in respect of any Project or any Project Company pursuant to Section 5.02(e)(v), with respect to (i) the Athens Project or

Athens, $600,000,000, (ii) the Millennium Project or Millennium, $150,000,000 and (iii) the Harquahala Project or Harquahala, $300,000,000.

"***FPA***" means the Federal Power Act, as amended.

"***Fronting Bank***" has the meaning specified in <u>Section 2.03(j)(iii)</u>.

"***Fund***" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"***GAAP***" has the meaning specified in <u>Section 1.03</u>.

"***Gas Interconnection Agreements***" means each of: (a) that certain Interconnection Agreement, dated May 16, 1997, by and between Millennium and Tennessee Gas Pipeline Company in respect of the Millennium Project; (b) that certain Letter Agreement, dated November 6, 1997, by and between Millennium and Tennessee Gas Pipeline Company regarding reimbursement and installation of facilities in respect of the Millennium Project; (c) that certain Balancing Agreement, dated March 15, 2000, by and between Millennium and Tennessee Gas Pipeline Company in respect of the Millennium Project; (d) that certain Interconnection Facilities Agreement, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (e) that certain Operations and Maintenance Agreement for the Athens Interconnection Facility, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (f) that certain Operational Balancing Agreement, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (g) that certain Letter Agreement, dated November 27, 2000, by and between Harquahala and El Paso Natural Gas Company in respect of the Harquahala Project; and (h) that certain Operational Balancing Agreement, dated February 28, 2003, between Harquahala and El Paso Natural Gas Company in respect of the Harquahala Project.

"***Governmental Authority***" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Granting Lender***" has the meaning specified in <u>Section 9.07(l)</u>.

"***Guaranteed Debt***" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or otherwise assure payment of any Debt ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner,

whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor or (iii) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in <u>Section 8.01(a)</u>.

"*Guarantors*" means MACH Gen GP, LLC and each of the Project Companies.

"*Guaranty*" means the guaranty of the Guarantors set forth in <u>Article VIII</u>.

"*Harquahala*" means New Harquahala Generating Company, LLC, a Delaware limited liability company and owner of the Harquahala Project.

"*Harquahala Project*" means the 1,092 MW natural gas/fuel oil-fired electric generating station located in Maricopa County, Arizona and all appurtenances thereto owned or operated by Harquahala, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"*Harquahala Sale*" means the sale of all, but not less than all, of the Equity Interests in, or all or substantially all, but not less than substantially all, of the Property of, Harquahala or the Harquahala Project.

"*Harquahala TO Agreement*" means that certain Transmission Owner/Operator Services Agreement, dated May 5, 2008, as extended pursuant to the Agreement dated April 11, 2011, by and between Harquahala and Constellation Energy Control and Dispatch, LLC in respect of the Harquahala Project.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements but excluding any Commodity Hedge and Power Sale Agreement.

"*Hedge Bank*" means any Person that is a commercial bank, insurance company or other similar financial institution, or any Affiliate thereof, that (a) is engaged in the business of entering into interest rate Hedge Agreements and (b) at the time the applicable Hedge Agreement is entered into, has a Required Rating.

"*Honor Date*" has the meaning specified in Section 2.03(d)(i).

"*IDA Lease*" means that certain Lease Agreement, dated December 1, 2001, amended and restated on May 1, 2003, by and between the Greene County Industrial Development Agency, as landlord, and Athens Generating Company, LLC, as tenant, in respect of the Athens Project, as amended.

"*Indemnified Costs*" has the meaning specified in Section 7.05(a).

"*Indemnified Party*" has the meaning specified in Section 9.04(b).

"*Independent Engineer*" means any independent engineer reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Leidos Engineering, LLC (formerly R.W. Beck, Inc).

"*Independent Environmental Consultant*" means any independent environmental consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Terracon Consultants, Inc.

"*Independent Insurance Consultant*" means any independent insurance consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Moore-McNeil, LLC.

"*Independent Power Market Consultant*" means any independent power market consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Charles River Associates.

"*Initial Extension of Credit*" means the earlier to occur of the initial Borrowing and the initial issuance of a Letter of Credit hereunder.

"*Initial First Lien Mortgages*" means, with respect to: (a) the Athens Project, (i) the Fee and Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (New York) by Athens and by Greene County Industrial Development Agency to CLMG, as collateral agent, dated as of the date hereof, and (ii) the First Lien

16

Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (New York) by Athens to CLMG, as collateral agent, dated as of the date hereof; (b) the Harquahala Project, the First Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (Arizona) by Harquahala to Fidelity National Title Insurance Company, for the benefit of CLMG, as collateral agent, dated as of the date hereof; and (c) the Millennium Project, the First Lien Fee and Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (Massachusetts) by Millennium to CLMG, as collateral agent, dated as of the date hereof.

"*Initial Lender Parties*" means the Initial Revolving Issuing Bank and the Initial Lenders.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Operating Budget*" has the meaning specified in <u>Section 3.01(a)(xii)</u>.

"*Initial Pledged Debt*" has the meaning specified in the First Lien Security Agreement.

"*Initial Pledged Equity*" has the meaning specified in the First Lien Security Agreement.

"*Initial Revolving Issuing Bank*" means the bank listed on the signature pages hereof as the Initial Revolving Issuing Bank.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, dated as of the date hereof, by and among the Borrower, the Guarantors, the First Lien Collateral Agent, CLMG, as First Lien Administrative Agent and the other Persons party thereto from time to time, as amended.

"*Interest Payment Date*" means, with respect to any Loan, the last day of each March, June, September and December; *provided*, that, in addition to the foregoing, in each case, each of (x) the date upon which the Loan has been paid in full, or has been prepaid in full or in part pursuant to <u>Section 2.06</u>, (y) the Term B Maturity Date, and (z) the Revolving Credit Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under the Agreement.

"*Interest Period*" means, for each Loan, the period commencing on the date of such Loan, and, thereafter, each subsequent period commencing on the day following the last day of the immediately preceding Interest Period, and ending on the last day of the period determined pursuant to the provisions below.

(a)    Interest Periods commencing on the same date shall be of the same duration;

(b)      the initial Interest Period for any Term B Loan shall end on the Interest Payment Date occurring in December in the calendar year in which such Loan is made and the initial Interest Period for any Revolving Credit Loan shall end on the one-year anniversary of such Revolving Credit Loan;

(c)      whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day; provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(d)      (i) no Interest Period for a Term B Loan may end later than the Term B Maturity Date and (ii) no Interest Period for a Revolving Credit Loan or Revolving Letter of Credit Loan may end later than the Revolving Credit Termination Date; and

(e)      whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"*Interest Rate Determination Date*" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*Investment*" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "*Debt*" in respect of such Person.

"*L/C Disbursement*" means a payment or disbursement made by the Revolving Issuing Bank pursuant to a Revolving Letter of Credit.

"*L/C Related Documents*" has the meaning specified in Section 2.03(g)(i).

"*Lender Party*" means any Lender or any Revolving Issuing Bank.

"*Lenders*" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 9.07 for so long as such Person shall be a party to this Agreement.

"*Lending Office*" means, with respect to any Lender, the office of such Lender specified as its "*Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"*Liability Amount*" means the amount that a Loan Party would owe under an Energy Management Agreement to the counterparty thereunder upon the termination of such Energy Management Agreement.

"*Lien*" means, with respect to any Property, (a) any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such Property, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), relating to such Property, and (c) in the case of Equity Interests or debt securities, any purchase option, call or similar right of a third party with respect to such Equity Interests or debt securities.  For the avoidance of doubt, "*Lien*" shall not include any netting or set-off arrangements under any Contractual Obligation (other than Contractual Obligations constituting Debt for Borrowed Money) otherwise permitted under the terms of the Loan Documents.

"*Loan*" means a Term B Loan, a Revolving Credit Loan or a Revolving Letter of Credit Loan, as the context may require, and "*Loans*" means collectively the Term B Loans, the Revolving Credit Loans and the Revolving Letter of Credit Loans.

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Intercreditor Agreement, and (e) the First Lien Collateral Documents, in each case as amended.

"*Loan Parties*" means the Borrower and the Guarantors.

"*LTSAs*" means each of: (a) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Athens in respect of the Athens Project; (b) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Harquahala in respect of the Harquahala Project; and (c) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Millennium in respect of the Millennium Project.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Change*" means any change, occurrence or development (including, without limitation, as a result of regulatory changes applicable to the Borrower or any of its Subsidiaries) that has had or could reasonably be expected to have a Material Adverse Effect.

19

"*Material Adverse Effect*" means a material adverse effect on (a) the financial condition, business, results or operations of the Borrower and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or the Lender Parties, taken as a whole, under any Loan Document or (c) the ability of the Loan Parties to perform their respective Obligations under the Loan Documents.

"*Material Contract*"[9] means each of (a) the Electric Interconnection and Transmission Agreements, (b) the Gas Interconnection Agreements, (c) the Water Supply Contracts, (d) the LTSAs, (e) any Commodity Hedge and Power Sale Agreement with a term in excess of one year after the first delivery or settlement thereunder, (f) the IDA Lease and the PILOT Documents, (g) the Millennium Lease, the Millennium Agreement and the Millennium Decommissioning Agreement, (h) the O&M Agreements, (i) the Asset Management Agreement, (j) the Energy Management Agreements, (k) the Harquahala TO Agreement, and (l) any other Contractual Obligation (other than the Loan Documents) entered into after the date hereof by any Loan Party for which breach, nonperformance or cancellation could reasonably be expected to have a Material Adverse Effect or materially impair or interfere with the operations of the Project Company to which such Contractual Obligation relates.

"*Material Contract Threshold Amount*" has the meaning specified in Section 6.01(n).

"*Maximum Potential Exposure*" means, with respect to any Commodity Hedge and Power Sale Agreement, an amount equal to the maximum potential exposure of the Loan Parties to the Commodity Hedge Counterparty as determined pursuant to such Commodity Hedge and Power Sale Agreement.

"*Millennium*" means Millennium Power Partners, L.P, a Delaware limited partnership and owner of the Millennium Project.

"*Millennium Agreement*" means that certain Agreement, dated March 6, 1997, by and between Millennium and Town of Charlton, Massachusetts in respect of the Millennium Project.

"*Millennium Decommissioning Agreement*" means that certain Decommissioning Agreement, dated November 25, 1997, by and between Millennium and Town of Charlton, Massachusetts in respect of the Millennium Project.

"*Millennium Lease*" means that certain Lease agreement, dated as of August 31, 1998 by and between the Town of Southbridge, Massachusetts and Millennium, in respect of the Millennium Project, as amended.

"*Millennium Project*" means the 360 MW natural gas/fuel oil-fired capable electric generating station located in Worcester County, Massachusetts and all

---

[9]     [NTD: Definitions of the various Material Contracts described in this definition to be updated by the Borrower in connection with confirmation.]

appurtenances thereto owned or operated by Millennium, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"***Moody's***" means Moody's Investors Service, Inc.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"***Net Cash Proceeds***" has the meaning specified in the Security Deposit Agreement.

"***Non-Speculative***" means, in the case of any applicable Commodity Hedge and Power Sale Agreement, that (i) such Commodity Hedge and Power Sale Agreement is limited such that the volume of the hedges entered into thereunder with respect to a Project, taken together with the aggregate volume of hedges under all other Commodity Hedge and Power Sale Agreements in effect with respect to such Project, does not exceed the power output or fuel input limits of the Plant it is intended to hedge and (ii) transactions under such Commodity Hedge and Power Sale Agreement are executed in a manner such that the amount of fixed-price gas purchased and the amount of fixed price power sold under such Commodity Hedge and Power Sale Agreement, in aggregate, are appropriately related (i.e., the amount of gas purchased under such Commodity Hedge and Power Sale Agreement approximates as reasonably as possible the amount of gas needed to generate the amount of fixed-price power sold thereunder); *provided*, *however*, that any Commodity Hedge and Power Sale Agreement entered into for a period that does not exceed five days and that otherwise meets the requirements of clause (i) above, shall be deemed to be Non-Speculative so long as the Borrower uses commercially reasonable efforts to minimize the duration of such uncovered arrangements.

"***Note***" means a Term B Note or a Revolving Credit Note, as the context may require, and "***Notes***" means all of the Term B Notes and the Revolving Credit Notes.

"***Notice of Borrowing***" means a Notice of Borrowing, in substantially the form of Exhibit B-1 hereto, given by the Borrower in accordance with Section 2.02.

"***Notice of Issuance***" has the meaning specified in Section 2.03(a).

"***Notice of Non-Renewal***" has the meaning specified in Section 2.01(d)(iii).

"***NPL***" means the National Priorities List under CERCLA.

"*O&M Agreements*" means each of: (a) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Millennium and NAES Corporation in respect of the Millennium Project; (b) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Athens and NAES Corporation in respect of the Athens Project; and (c) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Harquahala and NAES Corporation in respect of the Harquahala Project.

"*Obligation*" means all payment obligations of every nature of each Loan Party from time to time owed to any Agent or any Lender Party from time to time under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Revolving Letters of Credit, fees, expenses, indemnification or otherwise.

"*Operating Account*" has the meaning specified in the Security Deposit Agreement.

"*Other Taxes*" has the meaning specified in Section 2.12(b).

"*Outstanding Amount*" has the meaning specified in the Intercreditor Agreement.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Permitted Encumbrances*" has the meaning specified in the First Lien Mortgages.

"*Permitted Liens*" means (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); (b) Liens imposed by or arising by operation of law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens (i) for amounts that are not overdue or (ii) for amounts that are overdue that (A) do not materially adversely affect the use of the Property to which they relate or (B) are bonded or are being contested in good faith by appropriate proceedings for which reserve and other appropriate provisions, if any, required by GAAP shall have been made; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation, unemployment insurance, social security legislation or other similar legislation or to secure public or statutory obligations or to secure a bond or letter of credit or similar instrument that is utilized to secure such obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business or to secure a bond or letter of

credit or similar instrument that is utilized to secure such obligations; (e) Liens securing judgments (or the payment of money not constituting a Default under Section 6.01(g)) or securing appeal or other surety bonds related to such judgments or to secure a bond or letter of credit or similar instrument that is utilized to secure such judgments; (f) Permitted Encumbrances; and (g) easements, rights-of-way, restrictions, encroachments and other minor defects or irregularities in title and any zoning or other similar restrictions to or vested in any governmental office or agency to control or regulate the use of any Real Property, that individually or in the aggregate do not materially adversely affect the value of said Real Property or materially impair the ability of the Loan Parties to operate the Real Property to which they relate in the ordinary course of business.

"*Permitted Trading Activity*" means (a) the daily or forward purchase and/or sale or other acquisition or disposition of wholesale or retail electric energy, capacity, ancillary services, transmission rights, emissions allowances, weather derivatives, demand derivatives and/or related commodities, in each case, whether physical or financial, (b) the daily or forward purchase and/or sale or other acquisition of fuel, fuel transportation and/or storage rights and/or capacity, whether physical or financial, (c) electric energy-related tolling transactions, as seller or tolling servicer, (d) price risk management activities or services, (e) other similar electric industry activities or services or (f) additional services as may be consistent with Prudent Industry Practice from time to time in support of the marketing and trading related to the Projects, in each case in the foregoing clauses (a) through (f), to the extent (i) the purpose of such activity (when taken together with any other related Permitted Trading Activities undertaken by the Loan Parties from time to time) is to protect the Borrower and the other Loan Parties against fluctuations in the price, availability or supply of any commodity, (ii) such activity is conducted in the ordinary course of business of the Borrower and the other Loan Parties and (iii) not for speculative purposes or on a speculative basis.

"*Person*" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"*PILOT Documents*" means the PILOT Agreement, the PILOT Mortgage and each other Instrument of Collateral Security (as each such term is defined in the IDA Lease).

"*Plan*" means a Single Employer Plan or a Multiple Employer Plan.

"*Plan of Reorganization*" has the meaning specified in the recitals to this Agreement.

"*Platform*" has the meaning specified in Section 9.02(b).

"*Pledged Accounts*" has the meaning specified in the First Lien Security Agreement.

"*Pledged Debt*" has the meaning specified in the First Lien Security Agreement.

"*Post-Petition Interest*" has the meaning specified in Section 8.05(b).

"*Preferred Interests*" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

"*Prepayment Amount*" has the meaning specified in Section 2.08(b)(ii).

"*Pre-Petition First Lien Credit Agreement*" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012, among the Borrower, the Guarantors, CLMG Corp. in its capacities as administrative agent and first lien collateral agent, and each of the banks, financial institutions, other institutional lenders and other parties party thereto from time to time, as amended.

"*Pro Rata Share*" of any amount means, (a) with respect to any Revolving Credit Lender at any time and with respect to the Revolving Credit Facility, the product of such amount *times* a fraction the numerator of which is the amount of such Lender's Revolving Credit Commitment at such time and the denominator of which is the aggregate amount of the Revolving Credit Facility at such time and (b) with respect to any Term B Lender at any time and with respect to the Term B Facility, the product of such amount *times* a fraction the numerator of which is the amount of Loans owed to such Term B Lender under the Term B Facility at such time and the denominator of which is the aggregate amount of the Loans then outstanding and owed to all Term B Lenders under the Term B Facility at such time.

"*Project Companies*" means Athens, Harquahala and Millennium.

"*Projects*" means the Athens Project, the Harquahala Project and the Millennium Project.

"*Property*" means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether intangible or tangible.

"*Prudent Industry Practice*" means those practices, methods, equipment, specifications and standards of safety and performance, as are commonly used by electric generating stations utilizing comparable fuels as good, safe and prudent engineering practices would dictate in connection with the design, construction, operation, maintenance, repair and use of electrical and other equipment, facilities and improvements of such electrical generating stations, with commensurate standards of safety, performance, dependability (including the implementation of procedures that shall not adversely affect the long term reliability of the Projects, in favor of short term performance), efficiency and economy, in each such case as the same may evolve from time to time, consistent with applicable law and considering the state in which a Project is located and the type and size of such Project. "*Prudent Industry Practice*" as defined

herein does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

"*PUHCA*" has the meaning specified in <u>Section 4.01(v)</u>.

"*Real Properties*" means each item of Property listed on <u>Schedules 4.01(r)</u> and <u>4.01(s)</u> hereto and any other real property subsequently acquired by any Loan Party covered by <u>Section 5.01(j)</u> hereof.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Register*" has the meaning specified in <u>Section 9.07(e)</u>.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Repayment Event*" means the satisfaction of the following conditions: (a) the repayment in full in Cash of all of the outstanding principal amount of the Loans and all other Obligations (other than contingent Obligations) due and payable under the Loan Documents, (b) the termination of all Commitments and (c) the termination and cancellation of all Revolving Letters of Credit (unless such Revolving Letters of Credit are cash collateralized on terms, conditions and amounts (but no more than 103.0% of the Available Amount of such Revolving Letters of Credit) reasonably satisfactory to the Administrative Agent and the Revolving Issuing Bank).

"*Required Lenders*" means, at any time, Lenders owed or holding more than 50% of the sum of (without duplication) (a) the aggregate principal amount of the Loans outstanding at such time, *plus* (b) the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time, *plus* (c) the aggregate Unused Revolving Credit Commitments at such time.

"*Required Rating*" means with respect to (a) any Commodity Hedge Counterparty that is described in <u>clause (a)(i)</u> of the definition of "*Commodity Hedge Counterparty*" or any Hedge Bank either (i) the unsecured senior debt obligations of such Person are rated at least Baa1 by Moody's and at least BBB+ by S&P or (ii) such Person's obligations under any applicable Commodity Hedge and Power Sale Agreement or Hedge Agreement, as the case may be, are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa1 by Moody's and at least BBB+ by S&P and (b) any Commodity Hedge Counterparty described in clause (a)(ii) of the definition of "*Commodity Hedge Counterparty*" either (i) the unsecured senior debt obligations of such Person are rated at least Baa3 by Moody's and at least BBB- by S&P or (ii) such Commodity Hedge Counterparty's obligations under any applicable Commodity Hedge and Power Sale Agreement are guaranteed by a Person whose unsecured senior debt

obligations are rated at least Baa3 by Moody's and at least BBB- by S&P, and (c) any counterparty to an Energy Management Agreement either (i) the unsecured senior debt obligations of such Person are rated at least Baa1 by Moody's and at least BBB+ by S&P or (ii) such Person's obligations under any applicable Energy Management Agreement are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa1 by Moody's and at least BBB+ by S&P.

"*Responsible Officer*" means, as to any Person, any duly authorized and appointed officer of such Person, as demonstrated by a certificate of incumbency or other appropriate appointment or resolution, having actual knowledge of the matter in question.

"*Revenue Account*" has the meaning specified in the Security Deposit Agreement.

"*Revolving Credit Borrowing*" means a borrowing consisting of simultaneous Revolving Credit Loans made by the Revolving Credit Lenders.

"*Revolving Credit Commitment*"[10] means, with respect to any Revolving Credit Lender at any time for any period the amount set forth for such period opposite such Lender's name on Schedule I hereto under the caption "*Revolving Credit Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as such Lender's "*Revolving Credit Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to Sections 2.05 or 6.01.

"*Revolving Credit Facility*" means, at any time, the aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments at such time.

"*Revolving Credit Lender*" means any Lender that has a Revolving Credit Commitment.

"*Revolving Credit Loan*" has the meaning specified in Section 2.01(b).

"*Revolving Credit Maturity Date*" means July 10, 2021.

"*Revolving Credit Note*" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender, in substantially the form of Exhibit A-1 hereto, evidencing the aggregate indebtedness of the Borrower to such Lender resulting from the Revolving Credit Loans made by such Lender, as amended.

"*Revolving Credit Reduction Date*" means the date which is sixty (60) days after the Effective Date.

---

[10]    [NTD: Aggregate Revolving Credit Commitments on Schedule I upon consummation of the Loan Parties' Plan of Reorganization is to be $200 million until the Revolving Credit Reduction Date and $160 million from and after the Revolving Credit Reduction Date.]

"***Revolving Credit Termination Date***" means the earlier of (a) the Revolving Credit Maturity Date and (b) the date of termination in whole of the Revolving Credit Commitments and the Revolving Letter of Credit Commitment pursuant to Section 2.05 or 6.01.

"***Revolving Issuing Bank***" means the Initial Revolving Issuing Bank and any Eligible Assignee to which the Revolving Letter of Credit Commitment hereunder has been assigned pursuant to Section 9.07 so long as such Eligible Assignee expressly agrees to perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Revolving Issuing Bank and notifies the Administrative Agent of its Lending Office and the amount of its Revolving Letter of Credit Commitment (which information shall be recorded by the Administrative Agent in the Register), for so long as such Initial Revolving Issuing Bank or Eligible Assignee, as the case may be, shall have a Revolving Letter of Credit Commitment.

"***Revolving L/C Cash Collateral Account***" has the meaning specified in the Security Deposit Agreement.

"***Revolving Letter of Credit***" has the meaning specified in Section 2.01(d)(i).

"***Revolving Letter of Credit Borrowing***" means an extension of credit resulting from a drawing under any Revolving Letter of Credit which has not been reimbursed on the applicable Honor Date or refinanced as Revolving Credit Borrowing.

"***Revolving Letter of Credit Commitment***"[11] means, with respect to the Revolving Issuing Bank at any time for any period the amount set forth for such period opposite the Revolving Issuing Bank's name on Schedule I hereto under the caption "*Revolving Letter of Credit Commitment*" or, if the Revolving Issuing Bank has entered into an Assignment and Acceptance, set forth for the Revolving Issuing Bank in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as the Revolving Issuing Bank's "*Revolving Letter of Credit Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to Section 2.05.

"***Revolving Letter of Credit Facility***" means, at any time, an amount equal to the Revolving Issuing Bank's Revolving Letter of Credit Commitment at such time, as such amount may be reduced at or prior to such time pursuant to Section 2.05.

"***Revolving Letter of Credit Loan***" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any Revolving Letter of Credit Borrowing in accordance with its Pro Rata Share pursuant to Section 2.03.

---

[11]    [NTD: Aggregate Revolving Letter of Credit Commitments on Schedule I upon consummation of the Loan Parties' Plan of Reorganization is to be $160 million until the Revolving Credit Reduction Date and $120 million from and after the Revolving Credit Reduction Date.]

"**S&P**" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"**Second Offer**" has the meaning specified in Section 2.06(c).

"**Secured Parties**" has the meaning specified in the Intercreditor Agreement.

"**Security Deposit Agreement**" means that certain Security Deposit Agreement, dated as of the date hereof, by the Borrower, the Guarantors, the First Lien Collateral Agent and the Depositary, as amended.

"**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature (taking into account reasonably anticipated prepayments and refinancings) and (c) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Sponsor Group**" means [      ].

"**SPC**" has the meaning specified in Section 9.07(l).

"**Subordinated Obligations**" has the meaning specified in Section 8.05.

"**Subsidiary**" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," the principal amount of all (a) obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" has the meaning specified in Section 2.12(a).

"*Term B Borrowing*" means a borrowing consisting of simultaneous Term B Loans made by the Term B Lenders on the Effective Date.

"*Term B Commitment*" means, (a) with respect to any Term B Lender at any time, the amount set forth opposite its name on Schedule I hereto under the caption "*Term B Commitment*" or, (b) with respect to any Term B Lender that has entered into one or more Assignment and Acceptances, the amount set forth for such Term B Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as such Term B Lender's "*Term B Commitment*," in each case, as such amount may be reduced at or prior to such time pursuant to Sections 2.05 or 6.01.

"*Term B Facility*" means, at any time, the aggregate amount of the Term B Lenders' Term B Commitments at such time.

"*Term B Lender*" means, any Lender that has a Term B Commitment or holds a Term B Loan.

"*Term B Loan*" has the meaning specified in Section 2.01(a).

"*Term B Maturity Date*" means the earlier of (a) July 10, 2022 and (b) the date the Term B Loans become due and payable pursuant to Section 6.01.

"*Term B Note*" means a promissory note of the Borrower payable to the order of any Term B Lender, in substantially the form of Exhibit A-2 hereto, evidencing the indebtedness of the Borrower to such Term B Lender, as amended.

"*Termination Payment*" has the meaning specified in the Intercreditor Agreement.

"*Title Company*" means Fidelity National Title Insurance Company.

"*Unreimbursed Amount*" has the meaning set forth in Section 2.03(d)(i).

"***Unused Revolving Credit Commitment***" means, with respect to any Revolving Credit Lender at any time, (a) such Lender's Revolving Credit Commitment at such time minus (b) the sum of (i) the aggregate principal amount of all Revolving Credit Loans and Revolving Letter of Credit Loans made by such Lender (in its capacity as a Revolving Credit Lender) and outstanding at such time *plus* (ii) such Lender's Pro Rata Share of (A) the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time and (B) the aggregate principal amount of all Revolving Letter of Credit Loans made by the Revolving Issuing Bank pursuant to Section 2.03(d) (to the extent that such Revolving Credit Lender has not made such Lender's Pro Rata Share of any L/C Disbursement available to the Administrative Agent) outstanding at such time.

"***Vane Upgrades***" means the installation of CT Row 2 vane upgrades in respect of the Athens Project, the Millennium Project and the Harquahala Project pursuant to one or more agreements with Siemens Power Generation, Inc. (or an affiliate thereof).

"***Voting Interests***" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"***Water Supply Contracts***" means each of: (a) that certain Water Protection Agreement, dated July 11, 2000, by and between Harquahala Generating Company, LLC, the Harquahala Valley Irrigation District and Harquahala Valley Power District in respect of the Harquahala Project; (b) that certain Water Delivery Agreement, dated July 11, 2000, between Harquahala Generating Company, LLC and the Harquahala Valley Irrigation District in respect of the Harquahala Project; (c) that certain Delivery of Excess Central Arizona Project Water Agreement, dated May 21, 2004, by and between Harquahala and the Central Arizona Water Conservation District in respect of the Harquahala Project; (d) that certain Water Supply Agreement, dated January 5, 1998, by and between Millennium and the Town of Southbridge, MA in respect of the Millennium Project; (e) that certain Water Rights Agreement, dated June 5, 1997, and as amended January 29, 1999, by and between Millennium, American Optical Company and Southbridge Associates Limited Partnership in respect of the Millennium Project; and (f) that certain Water Withdrawal Registration Partial Transfer Agreement, dated June 5, 1997, by and between Millennium and American Optical Corporation in respect of the Millennium Project.

"***Withdrawal Liability***" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

"***Yield Maintenance Fee***" means any yield maintenance fee payable pursuant to Section 2.08(b).

"***Yield Maintenance Period***" means the period commencing on July 10, 2012 and continuing until July 10, 2016.

SECTION 1.02.    Computation of Time Periods.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding."

SECTION 1.03.    Accounting Terms.    All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in effect in the United States from time to time ("*GAAP*").

SECTION 1.04.    Other Definitional Provisions and Rules of Construction.

(a)    Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

(b)    References to "Sections" and "subsections" shall be to Sections and subsections, respectively, of this Agreement unless otherwise specifically provided.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

(c)    The use in any of the Loan Documents of the word "include" or "including," shall not be construed to be limiting whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto.

(d)    Unless otherwise expressly provided herein or in the other Loan Documents, references in the Loan Documents to any agreement or contract shall be deemed to be a reference to such agreement or contract as amended, amended and restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms and in compliance with the Loan Documents.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS AND THE LETTERS OF CREDIT

SECTION 2.01.    The Loans and the Letters of Credit.

(a)    The Term B Loans.    Each Term B Lender severally agrees, on the terms and conditions hereinafter set forth, to make a single advance (a "*Term B Loan*") to the Borrower on the Effective Date in an amount in Dollars not to exceed such Lender's Term B Commitment at such time.  The Term B Borrowing shall consist of Term B Loans made simultaneously by the Term B Lenders ratably according to their Term B Commitments.  Term B Loan amounts repaid or prepaid may not be reborrowed.

(b)    The Revolving Credit Loans.  Each Revolving Credit Lender severally agrees, on and subject to the terms and conditions hereinafter set forth, to make advances (each, a "*Revolving Credit Loan*") to the Borrower from time to time on any Business Day during the period from the Effective Date until the date that is thirty (30) days prior to the Revolving Credit Termination Date in an amount for each such Loan not to exceed such Lender's Unused

Revolving Credit Commitment at such time.  Each Revolving Credit Borrowing shall be in an aggregate amount equal to the lesser of (i) $5,000,000 or an integral multiple of $1,000,000 in excess thereof (other than a Borrowing the proceeds of which shall be used solely to repay or prepay in full outstanding Revolving Letter of Credit Loans or the initial Borrowing of Revolving Credit Loans) or (ii) the aggregate Unused Revolving Credit Commitment at such time and, in each case, shall consist of Revolving Credit Loans made simultaneously by the Revolving Credit Lenders ratably according to their Revolving Credit Commitments.  Within the limits of each Revolving Credit Lender's Unused Revolving Credit Commitment in effect from time to time, the Borrower may borrow under this <u>Section 2.01(b)</u>, prepay pursuant to <u>Section 2.06(a)</u> and reborrow under this <u>Section 2.01(b)</u>.

      (c)    <u>Letters of Credit</u>.

      (i)    <u>Revolving Letters of Credit</u>.  The Revolving Issuing Bank agrees, on the terms and conditions hereinafter set forth and in reliance on the agreements of the Revolving Credit Lenders set forth in <u>Section 2.03</u> below, to issue (or cause its Affiliate that is a commercial bank that meets the criteria set forth in the definition of "*Eligible Assignee*" to issue on its behalf) letters of credit (the "***Revolving Letters of Credit***") in U.S. Dollars for the account of the Borrower from time to time on any Business Day during the period from the Effective Date until thirty (30) days before the Revolving Credit Termination Date in an aggregate Available Amount (i) for all Revolving Letters of Credit not to exceed at any time the lesser of (A) the Revolving Letter of Credit Facility at such time and (B) the Revolving Issuing Bank's Revolving Letter of Credit Commitment at such time and (ii) for each such Revolving Letter of Credit not to exceed the Unused Revolving Credit Commitments of the Revolving Credit Lenders at such time.

      (ii)    [Reserved].[12]

      (iii)    <u>Renewal and Termination of Revolving Letters of Credit</u>.  No Revolving Letter of Credit shall have an expiration date (including all rights of the Borrower or the beneficiary to require renewal) later than the tenth Business Day prior to the Revolving Credit Termination Date and may by its terms be renewable annually as may be stated in the Revolving Letter of Credit and upon the fulfillment of the applicable conditions set forth in Article III unless the Revolving Issuing Bank, upon notice (a "***Notice of Non-Renewal***") to the beneficiary and the Borrower (with a copy to the Administrative Agent) at least 60 calendar days (or such other period that may be specified in such Revolving Letter of Credit) prior to the then applicable expiration date that such  Revolving Letter of Credit will not be renewed; *provided* that the terms of each Revolving Letter of Credit that is automatically renewable annually shall, (x) permit such beneficiary, upon receipt of such Notice of Non-Renewal, to draw under such Revolving Letter of Credit prior to the date such Revolving Letter of Credit otherwise would have expired and (y) not permit the expiration date (after any renewal) of such Revolving Letter

---

[12]    [NTD: Upon agreement on the substance of this form, the parties may, if they wish, delete the section references that have been "reserved" in prior amendments and refinancings of the MACH Gen credit facilities.]

of Credit in any event to be extended to a date later than 10 Business Days before the Revolving Credit Termination Date. If a "Notice of Non-Renewal" is given by any Revolving Issuing Bank pursuant to the immediately preceding sentence, such Revolving Letter of Credit shall expire on the expiry date. Within the limits of the Revolving Letter of Credit Facility and subject to the limits referred to above, the Borrower may request the issuance of Revolving Letters of Credit under this Section 2.01, repay any Unreimbursed Amounts resulting from drawings thereunder pursuant to Section 2.03(d)(i) or repay any Revolving Letter of Credit Loan resulting from drawings thereunder pursuant to Section 2.03(d)(ii), and request the issuance of additional Letters of Credit under this Section 2.01.

SECTION 2.02.   Making the Loans.   (a)   Each Revolving Credit Borrowing shall be made following the issuance of a Notice of Borrowing, given not later than 11:00 A.M. (New York City time) (x) subject to the following clause (y), on the third Business Day prior to the date of the proposed Revolving Credit Borrowing, in the case of a Borrowing in a principal amount of up to $25,000,000, or (y) the tenth Business Day prior to the date of the proposed Revolving Credit Borrowing, in the case of any Borrowing that, together with all other Borrowings requested within the preceding 10 consecutive Business Days, would result in the aggregate principal amount of such Borrowings being greater than $25,000,000 (except in the case of the initial Borrowing on the Effective Date), by the Borrower to the Administrative Agent, which shall give to each Appropriate Lender prompt notice thereof by telecopier or electronic communication. Each such Notice of Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested (i) date of such Revolving Credit Borrowing, and (ii) aggregate amount of such Borrowing. Each Appropriate Lender shall, before 11:00 A.M. (New York City time) on the date of such Revolving Credit Borrowing, make available for the account of its Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Revolving Credit Borrowing in accordance with the respective Commitments under the Revolving Credit Facility of such Lender and the other Appropriate Lenders. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting the Operating Account. [Notwithstanding any provision of the Security Deposit Agreement or otherwise, each Revolving Credit Lender hereby acknowledges and agrees that its Unused Revolving Credit Commitment existing on the date of any Harquahala Sale will not require cash collateralization pursuant to [Section 3.8] of the Security Deposit Agreement in connection with (i) the application of Net Cash Proceeds from a Harquahala Sale or (ii) mandatory prepayments pursuant to Section 2.06(b)(i) below.][13]

(b)   The Term B Borrowing consisting of Term B Loans advanced by the Term B Lenders on the Effective Date shall be made following the issuance of a Notice of Borrowing, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Term B Borrowing, by the Borrower to the Administrative

---

[13]        [NTD: To be conformed upon agreement on the form of Security Deposit Agreement in connection with confirmation.]

Agent, which shall give to the Term B Lenders prompt notice thereof by telecopier or electronic communication. Each such Notice of Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested (i) date of such Term B Borrowing (which shall be the Effective Date), and (ii) aggregate amount of such Term B Borrowing. Each Term B Lender shall, before 11:00 A.M. (New York City time) on the date of such Term B Borrowing, make available for the account of its Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, its Pro Rata Share of the amount of such Term B Borrowing in accordance with its Commitment under the Term B Facility. [After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Borrower hereby directs the Administrative Agent to apply such funds to the repayment of the Existing Debt of the Loan Parties.]

(c)    [Reserved].

(d)    [Reserved].

(e)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify each Appropriate Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Loan to be made by such Lender as part of such Borrowing when such Loan, as a result of such failure, is not made on such date.

(f)    Unless the Administrative Agent shall have received notice from an Appropriate Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Loans comprising such Borrowing and (ii) in the case of such Lender, the Eurodollar Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Borrowing for all purposes.

(g)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03.    Issuance of and Drawings and Reimbursements Under Revolving Letters of Credit.

(a)    Request for Issuance.  Each Revolving Letter of Credit shall be issued upon notice, given not later than 11:00 A.M. (New York City time) (x) subject to the following clause (y), on the third Business Day prior to the date of the proposed issuance of such Revolving Letter of Credit, in the case of a Revolving Letter of Credit with an Available Amount of up to $25,000,000, or (y) the tenth Business Day prior to the date of the proposed issuance of such Revolving Letter of Credit, in the case of a Revolving Letter of Credit with an Available Amount that, together with the Available Amount of all other Revolving Letters of Credit requested within the preceding 10 consecutive Business Days, would result in the aggregate Available Amount of all such Revolving Letters of Credit being greater than $25,000,000 (except in the case of the initial Revolving Letters of Credit to be issued or deemed issued on the Effective Date), by the Borrower to the Administrative Agent, which shall give to the Revolving Issuing Bank prompt notice thereof by telecopier or electronic communication by no later than 5:00 P.M. (New York time) at least three Business Days or ten Business Days, as the case may be, prior to the date of the proposed issuance.  The notice of issuance of any Revolving Letter of Credit shall be substantially in the form attached hereto as Exhibit B-2 (a "**Notice of Issuance**") and shall be in writing or by telecopier or electronic communication (and confirmed by telephone), specifying therein the requested (i) date of such issuance (which shall be a Business Day), (ii) Available Amount of such Revolving Letter of Credit, (iii) expiration date of such Revolving Letter of Credit, (iv) name and address of the beneficiary of such Revolving Letter of Credit, (v) supportable obligation and (vi) form of such Revolving Letter of Credit.  If the requested form of such Revolving Letter of Credit is acceptable to the Revolving Issuing Bank in its sole discretion, the Revolving Issuing Bank will, upon fulfillment of the applicable conditions set forth in Article III, make such Revolving Letter of Credit available to the Borrower at its office referred to in Section 9.02 or as otherwise agreed with the Borrower in connection with such issuance.  Notwithstanding anything herein to the contrary, no Revolving Issuing Bank shall be under any obligation to issue any Revolving Letter of Credit if (x) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Revolving Issuing Bank from issuing such Revolving Letter of Credit, or any law applicable to such Revolving Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Revolving Issuing Bank shall prohibit, or direct that such Revolving Issuing Bank refrain from, the issuance of letters of credit generally or such Revolving Letter of Credit in particular or shall impose upon such Revolving Issuing Bank with respect to such Revolving Letter of Credit any restriction, reserve or capital requirement (for which such Revolving Issuing Bank is not otherwise compensated hereunder), or shall impose upon such Revolving Issuing Bank any unreimbursed loss, cost or expense (for which such Revolving Issuing Bank is not otherwise compensated hereunder) or (y) any Lender under the Revolving Letter of Credit Facility is a Defaulting Lender, unless such Revolving Issuing Bank has entered into arrangements with the Borrower or such Defaulting Lender satisfactory to such Revolving Issuing Bank to eliminate such Revolving Issuing Bank's risk with respect to such Defaulting Lender.

(b)    Revolving Letter of Credit Reports.  Each Revolving Issuing Bank shall promptly (i) notify the Administrative Agent in writing of the amount and expiry date of each

Revolving Letter of Credit issued by it and (ii) provide a copy of such Revolving Letter of Credit (and any amendments, renewals or extension thereof) to the Administrative Agent.

(c)     Participations in Revolving Letters of Credit. Upon the issuance of each Revolving Letter of Credit [and, in the case of the Existing Letters of Credit, upon the Effective Date], without further action, each Revolving Credit Lender shall be deemed to have irrevocably purchased, to the extent of its Pro Rata Share, a participation interest in such Revolving Letter of Credit and such Revolving Credit Lender shall, to the extent of its contingent obligation or Pro Rata Share, be responsible for reimbursing the Revolving Issuing Bank in respect of any Unreimbursed Amount in accordance with Section 2.03(d) (with the terms of this Section surviving the termination of this Agreement).

(d)     Drawing and Reimbursement; Funding of Participations.

(i)     Upon receipt from the beneficiary of any Revolving Letter of Credit of any notice of drawing under such Revolving Letter of Credit, the Revolving Issuing Bank that issued such Revolving Letter of Credit shall notify promptly the Borrower and the Administrative Agent thereof.  On the same Business Day on which any payment is made by any Revolving Issuing Bank under a Revolving Letter of Credit (each such date, an "**Honor Date**"), the Borrower shall reimburse such Revolving Issuing Bank through the Administrative Agent in an amount equal to the amount of such drawing.  If the Borrower fails to so reimburse any Revolving Issuing Bank by such time (it being acknowledged and agreed that any such failure shall not be a Default hereunder), the Administrative Agent shall promptly notify each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing (the "**Unreimbursed Amount**"), and the amount of such Appropriate Lender's Pro Rata Share thereof.  In such event, in the case of an Unreimbursed Amount under a Revolving Letter of Credit, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Loans under the Revolving Credit Facility, to be disbursed on the Business Day immediately following the Honor Date in an amount not to exceed the Unreimbursed Amount thereof subject to the amount of the Unused Revolving Credit Commitments (without regard, in each case, to the conditions set forth in Section 3.02).  Any notice given by a Revolving Issuing Bank or the Administrative Agent pursuant to this Section 2.03(d) may be given by telephone if immediately confirmed in writing;  provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice. Unreimbursed Amounts shall bear interest at the Eurodollar Rate *plus* the Applicable Margin, from the Honor Date until such Unreimbursed Amount shall be repaid or converted into a Revolving Letter of Credit Loan, payable on demand.

(ii)     Each Revolving Credit Lender shall upon any notice pursuant to Section 2.03(d)(i) make funds available for the account of its Lending Office to the Administrative Agent for the account of the Revolving Issuing Bank by deposit to the Administrative Agent's Account, in same day funds, an amount equal to such Lender's Pro Rata Share of any Unreimbursed Amount in respect of any Revolving Letter of Credit issued by such Revolving Issuing Bank not later than 11:00 A.M. (New York City time) on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of subsection (iii), each Revolving Credit Lender that so makes

funds available to the Revolving Issuing Bank shall be deemed to have made a Eurodollar Rate Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the Revolving Issuing Bank.

(iii)    Until each Revolving Credit Lender funds its Revolving Credit Loan or Revolving Letter of Credit Loan pursuant to this Section 2.03(d) to reimburse the Revolving Issuing Bank for any amount drawn under any Revolving Letter of Credit issued by the Revolving Issuing Bank, interest in respect of such Lender's Pro Rata Share of such amount shall be solely for the account of the applicable Revolving Issuing Bank.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or Revolving Letter of Credit Loans to reimburse the Revolving Issuing Bank for amounts drawn under any Revolving Letter of Credit issued by the Revolving Issuing Bank, as contemplated by this Section 2.03(d), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Credit Lender may have against the Revolving Issuing Bank, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing.

(v)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Revolving Issuing Bank any amount required to be paid by such Revolving Credit Lender pursuant to the foregoing provisions of this Section 2.03(d) by the time specified in Section 2.03(d)(ii), the Revolving Issuing Bank shall be entitled to recover from such Revolving Credit Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Revolving Issuing Bank at a rate per annum equal to the Eurodollar Rate plus the Applicable Margin from time to time in effect.  A certificate of the Revolving Issuing Bank submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(d)(v) shall be conclusive absent manifest error.

(vi)    If, at any time after the Revolving Issuing Bank has made a payment under any Revolving Letter of Credit and has received from any Revolving Credit Lender such Lender's Revolving Letter of Credit Loan in respect of such payment in accordance with this Section 2.03(d), the Administrative Agent receives for the account of such Revolving Issuing Bank any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower, or otherwise, including proceeds of Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving Credit Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's Revolving Letter of Credit Loan was outstanding) in the same funds as those received by the Administrative Agent.

(vii)    If any payment received by the Administrative Agent for the account of any Revolving Issuing Bank pursuant to Section 2.03(d)(i) is required to be

returned under any of the circumstances described in Section 9.11 (including pursuant to any settlement entered into by the Revolving Issuing Bank in its discretion), in the case of a Revolving Letter of Credit, each Revolving Credit Lender shall pay for the account of its Lending Office to the Administrative Agent for the account of such Revolving Issuing Bank its Pro Rata Share thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Revolving Credit Lender, at a rate *per annum* equal to the Eurodollar Rate from time to time in effect.

(e)    Existing Letters of Credit Refinanced.[14]    [As of the date hereof, the Borrower acknowledges that certain letters of credit as set forth in Schedule 2.03(e) have been issued by or on behalf of the Initial Revolving Issuing Bank for the account of the Loan Parties (the "***Existing Letters of Credit***").    The parties agree that all reimbursement and other obligations of the Loan Parties in respect of the Existing Letters of Credit, if then outstanding, shall be refinanced by the Revolving Letter of Credit Facility under this Agreement with effect from the Effective Date and thereafter such letters of credit will be deemed for all purposes of the Loan Documents to have been provided under the Revolving Letter of Credit Facility under this Agreement.]

(f)    [Reserved].

(g)    Obligations Absolute.    The Obligations of the Borrower under this Agreement and any other agreement or instrument relating to any Revolving Letter of Credit shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and such other agreement or instrument under all circumstances, including, without limitation, the following circumstances:

(i)    any lack of validity or enforceability of any Loan Document, any Revolving Letter of Credit or any other agreement or instrument relating thereto (all of the foregoing being, collectively, the "***L/C Related Documents***");

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations of the Borrower in respect of any L/C Related Document or any other amendment or waiver of or any consent to departure from all or any of the L/C Related Documents;

(iii)    the existence of any claim, set-off, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a Revolving Letter of Credit (or any Persons for which any such beneficiary or any such transferee may be acting), any Revolving Issuing Bank or any other Person, whether in connection with the transactions contemplated by the L/C Related Documents or any unrelated transaction;

---

[14]    [NTD: To be finalized in connection with confirmation.]

(iv)     any statement or any other document presented under a Revolving Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)     payment by any Revolving Issuing Bank under a Revolving Letter of Credit against presentation of a draft, certificate or other document that does not strictly comply with the terms of such Revolving Letter of Credit;

(vi)     any exchange, release or non-perfection of any Collateral or other collateral, or any release or amendment or waiver of or consent to departure from the Guarantees or any other guarantee, for all or any of the Obligations of the Borrower in respect of the L/C Related Documents; or

(vii)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including, without limitation, any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

(h)     <u>Replacement of a Revolving Issuing Bank</u>.

(i)     Any Revolving Issuing Bank may be replaced at any time by written agreement among the Borrower, the new Revolving Issuing Bank and the Administrative Agent (with notice to the Revolving Issuing Bank being replaced); *provided*, *however*, that, if the Revolving Issuing Bank being replaced so requests, any Revolving Letter of Credit issued by such Revolving Issuing Bank shall be replaced and cancelled prior to the removal of such Revolving Issuing Bank and all fees and other amounts owed to such removed Revolving Issuing Bank shall be paid to it by the Borrower; and *provided*, *further*, that the Initial Revolving Issuing Bank may not be replaced without the consent of the Required Lenders.

(ii)     If at any time the unsecured senior debt of any Revolving Issuing Bank (other than the Initial Revolving Issuing Bank or an Affiliate of the Initial Revolving Issuing Bank) is not rated at least A3 by Moody's and A- by S&P, then the Borrower may, upon 10 days' prior written notice to such Revolving Issuing Bank and the Administrative Agent, elect to (i) replace such Revolving Issuing Bank with a Person selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent or (ii) cause such Revolving Issuing Bank to assign its Letter of Credit Commitment to an additional Revolving Issuing Bank selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent.  Each replacement or assignment pursuant to this <u>Section 2.03(h)</u> shall be done in accordance with <u>Section 9.07</u>.

(iii)     From and after the effective date of any such replacement or addition, (A) the successor or additional Revolving Issuing Bank shall have all the rights and obligations of a Revolving  Issuing Bank under this Agreement (and the Revolving Letters of Credit to be issued by it on such effective date or thereafter) and (B) references herein to the term "*Revolving Issuing Bank*" shall be deemed to refer to such successor,

additional Revolving Issuing Bank or to any previous Revolving Issuing Bank, or to such successor, additional Revolving Issuing Bank and all previous Issuing Banks, as the context may require.

(i)    _Resignation of a Revolving Issuing Bank_.  Each Revolving Issuing Bank may at any time give notice of its resignation to the Administrative Agent and the Borrower, in each case by giving 30 days written notice thereof to such parties.  Upon receipt of any such notice of resignation, the Borrower shall have the right, in consultation with the Administrative Agent, to appoint a successor, which shall be an Eligible Assignee and shall be reasonably satisfactory to the Administrative Agent, it being understood that [each of Wells Fargo, N.A., Deutsche Bank AG, Bank of America, N.A., Natixis New York and Barclays Bank PLC and their respective Affiliates or branches operating in New York] (each a "**_Pre-Approved Issuing Bank_**") is approved by and reasonably acceptable to both Borrower and the Administrative Agent.  If no such successor shall have been so appointed by the Borrower and shall have accepted such appointment within 30 days after the retiring Revolving Issuing Bank gives notice of its resignation, then the retiring Revolving Issuing Bank may on behalf of the Revolving Credit Lenders, appoint a successor Revolving Issuing Bank, as applicable, meeting the qualifications set forth above; _provided_, that, if such Revolving Issuing Bank shall notify the Borrower and the Revolving Credit Lenders, that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and the retiring Revolving Issuing Bank shall be discharged from its duties and obligations hereunder and under the other Loan Documents.  Upon the acceptance of a successor's appointment as Revolving Issuing Bank hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Revolving Issuing Bank, and the retiring Revolving Issuing Bank shall be discharged from all of its duties and obligations to issue additional Revolving Letters of Credit hereunder without affecting its rights and obligations in respect to Revolving Letters of Credit previously issued by it (if not already discharged therefrom as provided above in this Section).  After the resignation of the Revolving Issuing Bank hereunder, the retiring Revolving Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of a Revolving Issuing Bank set forth in this Agreement and the other Loan Documents with respect to Revolving Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Revolving Letters of Credit.

(j)    _Revolving Letter of Credit Issuance Protocol_.  Notwithstanding any other provision of this Agreement, so long as Beal Bank USA or an Affiliate thereof is a Revolving Issuing Bank, the following protocol and agreements shall govern the issuance of all Revolving Letters of Credit by such Revolving Issuing Bank:

(i)    the Borrower shall use its commercially reasonable efforts to have the beneficiary of any requested Revolving Letter of Credit accept a Revolving Letter of Credit issued by Beal Bank USA or an Affiliate thereof;

(ii)    if the applicable beneficiary declines to accept a Revolving Letter of Credit issued by Beal Bank USA or an Affiliate thereof, then such Revolving Issuing Bank agrees (A) to use its commercially reasonable efforts to cause [Wells Fargo Bank, N.A., Natixis New York] or another bank reasonably acceptable to the Borrower and such

Revolving Issuing Bank to issue such Revolving Letter of Credit (*i.e.*, front for such Revolving Issuing Bank) and (B) to the extent, in the manner and in the amount required by such bank, cash collateralize such Revolving Letter of Credit;

(iii)    in respect of any Revolving Letter of Credit issued by [Wells Fargo Bank, N.A., Natixis New York] or another bank pursuant to clause (ii) or (iii) above (a "***Fronting Bank***"), (A) the letter of credit and fronting fees payable to the Fronting Bank for issuing such Revolving Letter of Credit shall be for the account of the Borrower, (B) the funds (if any) used to cash collateralize a Revolving Letter of Credit issued by a Fronting Bank shall be provided by such Revolving Issuing Bank, provided that any draw on any such Revolving Letter of Credit (and application or utilization of such funds by the Fronting Bank to reimburse itself for any such draw), and any loss of such funds by such Revolving Issuing Bank due to any cause whatsoever (except to the extent such loss and the amount of such loss are solely caused by breach of the Loan Documents or by acts of gross negligence or willful misconduct on the part of such Revolving Issuing Bank), shall give rise to a reimbursement obligation on the part of the Borrower to such Revolving Issuing Bank and a deemed advance by such Revolving Issuing Bank to be repaid by the Borrower to such Revolving Issuing Bank as if such amount had been drawn on the applicable Revolving Letter of Credit in accordance with Section 2.03(d), (C) unless otherwise agreed by the Borrower and such Revolving Issuing Bank, the Fronting Bank in its capacity as such shall have no rights or recourse against any Loan Party and shall not be a Secured Party or a Lender Party, (D) such Revolving Letter of Credit shall constitute a utilization of the applicable Revolving Letter of Credit Facility, and (E) the Borrower shall pay to such Revolving Issuing Bank the fees in respect of such Letter of Credit as if such Revolving Issuing Bank had issued such Revolving Letter of Credit pursuant to this Section 2.03; and

(iv)    a failure or delay by (A) any Fronting Bank to issue any Revolving Letter of Credit in accordance with the protocol set forth in this Section 2.03(j) or (B) any Revolving Issuing Bank or Fronting Bank to issue any Revolving Letter of Credit in the form requested by the Loan Parties shall not constitute a breach or default by such Revolving Issuing Bank of any of its obligations under this Agreement

SECTION 2.04.    Repayment of Loans.

(a)    Term B Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term B Lenders the aggregate outstanding principal amount of the Term B Loans on the last Business Day of each of the following months in an amount equal to the product of (i) the aggregate principal amount of Term B Loans outstanding on the Effective Date (after giving effect to the Term B Borrowings on the Effective Date), multiplied by (ii) the percentage indicated opposite such month in the table below:

| Month | Percentage |
|---|---|
| [March 2014][15] | 0.25% |

---

[15]    [NTD:  Scheduled amortization dates prior to Consummation will be deleted upon signing this Agreement.]

| | |
|---|---|
| June 2014 | 0.25% |
| September 2014 | 0.25% |
| December 2014 | 0.25% |
| March 2015 | 0.25% |
| June 2015 | 0.25% |
| September 2015 | 0.25% |
| December 2015 | 0.25% |
| March 2016 | 0.25% |
| June 2016 | 0.25% |
| September 2016 | 0.25% |
| December 2016 | 0.25% |
| March 2017 | 0.25% |
| June 2017 | 0.25% |
| September 2017 | 0.25% |
| December 2017 | 0.25% |
| March 2018 | 1.25% |
| June 2018 | 1.25% |
| September 2018 | 1.25% |
| December 2018 | 1.25% |
| March 2019 | 1.25% |
| June 2019 | 1.25% |
| September 2019 | 1.25% |
| December 2019 | 1.25% |
| March 2020 | 2.50% |
| June 2020 | 2.50% |
| September 2020 | 2.50% |
| December 2020 | 2.50% |
| March 2021 | 2.50% |
| June 2021 | 2.50% |
| September 2021 | 2.50% |
| December 2021 | 2.50% |
| March 2022 | 2.50% |
| June 2022 | 2.50% |
| July 10, 2022 | Remaining principal balance |

*provided*, *however*, that the final principal installment shall be repaid on the Term B Maturity Date and in any event shall be in an amount equal to the aggregate unpaid principal amount of the Term B Loans on such date.

(b)    Revolving Credit Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Credit Lenders on the Revolving Credit Termination Date the aggregate principal amount of the Revolving Credit Loans then outstanding.

(c)    Revolving Letter of Credit Loans.  The Borrower shall repay to the Administrative Agent for the account of the Revolving Issuing Bank and each Revolving Credit Lender that has made a Revolving Letter of Credit Loan on the Revolving Credit Termination Date the outstanding principal amount of each Revolving Letter of Credit Loan made by each of them.

SECTION 2.05.    Termination or Reduction of the Commitments.

(a)    Optional.  The Borrower may, upon at least five Business Days' written notice to the Administrative Agent, terminate in whole or reduce in part the Unused Revolving Credit Commitments; *provided, however*, that each partial reduction of the Revolving Credit Facility shall be in an aggregate amount of $5,000,000 or an integral multiple of $500,000 in excess thereof and shall be made ratably among the Revolving Credit Lenders in accordance with their Commitments with respect to the Revolving Credit Facility. The Borrower's written notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the relevant Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the relevant Commitments of the Appropriate Lenders proportionately in accordance with each such Appropriate Lender's Pro Rata Share thereof.

(b)    Mandatory.

(i)    Revolving Letter of Credit Commitments.  The Revolving Letter of Credit Facility shall be permanently and ratably reduced from time to time on the date of each reduction of the Unused Revolving Credit Commitments pursuant to Section 2.05(a) by the amount, if any, by which the amount of the Revolving Letter of Credit Facility exceeds the Revolving Credit Facility after giving effect to such reduction of the Unused Revolving Credit Commitments.

(ii)    Asset Sales.  In addition, in the event of an Asset Sale, the Revolving Credit Commitments (and, if applicable, the corresponding Revolving Letter of Credit Commitments to the extent necessary so that such Revolving Letter of Credit Commitments will not exceed the reduced Revolving Credit Commitments) will be ratably and permanently reduced by the applicable amounts set forth below:

(A)    $25,000,000, in the event of a sale of the Millennium Project or Millennium;

(B)    $40,000,000, in the event of a Harquahala Sale; and

(C)    $100,000,000, in the event of a sale of the Athens Project or Athens.

*provided*, that, in the event of an Asset Sale on or prior to the Revolving Credit Reduction Date, each of the amounts set forth in clauses (A), (B) and (C) shall be increased by twenty-five percent (25%).

(iii)    <u>Upon Revolving Credit Reduction Date</u>.  On the Revolving Credit Reduction Date, automatically and without the requirement of any action by any Person, (A) the Revolving Credit Commitments will be ratably and permanently reduced by $40,000,000, and (B) the Revolving Letter of Credit Commitments will be ratably and permanently reduced by $40,000,000.

(c)    <u>Yield Maintenance Fee</u>. The Borrower will pay any Yield Maintenance Fee due in connection with any reduction of the Revolving Credit Commitments on the terms set forth in <u>Section 2.08(b)</u>.

SECTION 2.06.    <u>Prepayments</u>. (a) <u>Optional</u>.  The Borrower may, upon at least three Business Days' notice to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall, prepay the outstanding aggregate principal amount of the Loans in whole or ratably in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid and the applicable Yield Maintenance Fee (if any; it being understood that no Yield Maintenance Fee will be applicable with respect to prepayments of Revolving Credit Loans or Revolving Letter of Credit Loans that do not result in a permanent reduction of the Revolving Credit Commitments); *provided, however*, that (i) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $500,000 in excess thereof and (ii) if any prepayment of a Loan is made on a date other than the last day of an Interest Period for such Loan, the Borrower shall also pay any amounts owing pursuant to <u>Section 9.04(c)</u>.  Each such prepayment of the Term B Loans shall be applied to scheduled principal payments of the Term B Loans in inverse order of maturity, including the principal amount due on the Term B Maturity Date.

(b)    <u>Mandatory</u>.  (i)  On each Cash Flow Payment Date, the Borrower shall prepay an aggregate principal amount of the Term B Loans in accordance with [priority *eighth* of Section 3.2] of the Security Deposit Agreement and [priority *first* of Section 3.8] of the Security Deposit Agreement, in an amount equal to seventy-five percent (75%) of the aggregate amount available for prepayment at [*priority eighth* of Section 3.2] of the Security Deposit Agreement (the "***Cash Sweep Percentage***"); *provided*, that if at least $150,000,000 of the outstanding aggregate principal amount of Term B Loans have been prepaid on or prior to July 10, 2016 solely from Cash Flow Available for Debt Service, the Cash Sweep Percentage shall be reduced to fifty percent (50%); *provided, further*, that if at least $225,000,000 of the outstanding aggregate principal amount of Term B Loans have been prepaid on or prior to July 10, 2018 solely from Cash Flow Available for Debt Service, the Cash Sweep Percentage shall be reduced to thirty-three percent (33%). Each such prepayment of the Term B Loans shall be applied to scheduled principal payments of the Term B Loans in inverse order of maturity (including the principal amount due on the Term B Maturity Date).

(ii)    [Subject to the Security Deposit Agreement, upon the occurrence of a Casualty Event, Event of Eminent Domain, Asset Sale or the incurrence or issuance of any Debt (other than Debt permitted to be incurred pursuant to Section 5.02(b)), the Borrower shall (A) prepay an aggregate principal amount of the Loans and (B) deposit an amount in the Revolving L/C Cash Collateral Account in an aggregate amount equal to the Net Cash Proceeds thereof in accordance with [priorities *first* through *third* of Section 3.8] of the Security Deposit Agreement. Each such prepayment of the Term B Loans shall be applied to scheduled principal payments of the Term B Loans in inverse order of maturity, including the principal amount due on the Term B Maturity Date.][16]

(iii)    [Reserved.]

(iv)    If at any time (A) the sum of the aggregate outstanding balance of the Revolving Credit Loans and the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Credit Commitments or (B) the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Letter of Credit Commitments, whether because of a reduction of the Revolving Credit Commitments and/or Revolving Letter of Credit Commitments pursuant to Section 2.05(b) or otherwise, the Borrower shall within two (2) Business Days, first, repay the Revolving Credit Loans and, second, if necessary, transfer funds to the Revolving L/C Cash Collateral Account in an amount sufficient to eliminate such excess in accordance with this Agreement.

(v)    All prepayments under this clause (b) shall be made together with (A) accrued and unpaid interest to the date of such prepayment on the principal amount prepaid, (B) any amounts owing pursuant to Section 9.04(c) and (C) any applicable Yield Maintenance Fee.

(c)    Term B Lender's Option to Decline Prepayment. Except as provided in the last sentence of this clause (c), any Term B Lender, at its option, may elect not to accept all or any portion of any prepayment of the Term B Loans pursuant to Section 2.06(b). Subject to the immediately preceding sentence, upon each prepayment date set forth in Section 2.06(b) for any prepayment of Term B Loans, in accordance with the Security Deposit Agreement, the Borrower shall notify the Administrative Agent in writing of the amount that is available to prepay the Term B Loans. Promptly after the date of receipt of such notice, the Administrative Agent shall provide written notice (the "***First Offer***") to the Term B Lenders of the amount available to prepay the Term B Loans. Any Term B Lender declining such prepayment (a "***Declining Lender***") shall give written notice thereof to the Administrative Agent by 11:00 a.m. New York City time no later than two (2) Business Days after the date of such notice from the Administrative Agent; any Term B Lender that does not give such notice during such period shall be deemed to have accepted such prepayment offer. On such date the Administrative Agent shall then provide written notice (the "***Second Offer***") to the Term B Lenders other than the Declining Lenders (such Term B Lenders being the "***Accepting Lenders***") of the additional

---

[16]    [NTD: Agreement to delete "Equity Issuance" from the clause (ii) mandatory prepayment provisions is subject to agreement on procedures in the Security Deposit Agreement for receipt of equity proceeds and application to permitted purposes.]

amount available (due to such Declining Lenders' declining such prepayment) to prepay the Term B Loans owing to such Accepting Lenders.  Any Term B Lender declining prepayment pursuant to such Second Offer shall give written notice thereof to the Administrative Agent by 11:00 a.m. New York City time no later than two (2) Business Days after the date of such notice of a Second Offer; any Term B Lender that does not give such notice during such period shall be deemed to have accepted such prepayment offer.  Amounts remaining after the allocation of accepted amounts shall be applied as provided in [Section 3.8 of the Security Deposit Agreement], except to the extent otherwise set forth in Section 2.06(b). Notwithstanding the above, (A) if Term B Lenders owed or holding more than 50% of the aggregate principal amount of the Term B Loans outstanding at such time accept or are deemed to have accepted all or any portion of any prepayment offer pursuant to this clause (c), then all Term B Lenders shall be deemed to have accepted such prepayment offer to the same extent and (B) in the case of the mandatory prepayment of Term B Loans pursuant to Section 2.06(b) as a result of a Harquahala Sale, the right of the Term B Lenders to reject prepayments hereunder shall only be permitted once the Term B Loans have been prepaid with such proceeds such that the aggregate principal amount of the Term B Loans is $310,000,000 or less.

SECTION 2.07.    Interest.  (a)    Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Loan owing to each Lender from the date of such Loan until such principal amount shall be paid in full, at a rate per annum equal at all times during each Interest Period for such Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Loan *plus* (B) the Applicable Margin in effect from time to time, payable in arrears on each Interest Payment Date.

(b)    [Reserved].

(c)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the request of the Required Lenders shall, require that the Borrower pay interest ("***Default Interest***") on (i) the unpaid principal amount of each Loan owing to each Lender Party, payable in arrears on the dates referred to in Section 2.07(a), as applicable, and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid on such Loan pursuant to Section 2.07(a), as applicable, and (ii) to the fullest extent permitted by applicable law, the amount of any interest, fee or other amount payable under this Agreement or any other Loan Document to any Agent or any Lender Party that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid pursuant to Section 2.07(a); *provided*, *however*, that following the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, Default Interest shall accrue and be payable hereunder whether or not previously required by the Administrative Agent.  Payment or acceptance of the increased rates of interest provided for in this Section 2.07(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender Party.

SECTION 2.08.    Fees.

(a)    Commitment Fee.  The Borrower shall pay to the Administrative Agent for the account of each of the Revolving Credit Lenders, a commitment fee, from the date hereof in the case of each Initial Lender and from the effective date specified in the Assignment and Acceptance pursuant to which it became a Revolving Credit Lender in the case of each other Revolving Credit Lender until the Revolving Credit Termination Date, payable in arrears quarterly on the last Business Day of each December, March, June and September occurring after the Effective Date, and on the Revolving Credit Termination Date, at the Eurodollar Rate *per annum* on the average daily Unused Revolving Credit Commitment of such Revolving Credit Lender during such quarter.   [Notwithstanding anything to the contrary in any Financing Document, the unpaid amount of such undrawn commitment fee shall be deemed to be an "Interest Expense under or in respect of the First Lien Loan Documents" for purposes of the Security Deposit Agreement.][17]

(b)    Yield Maintenance Fee.

(i)    Subject to clause (iii) below, upon any permanent reduction of the aggregate Revolving Credit Commitments pursuant to Section 2.05 or any termination of the aggregate Revolving Credit Commitments pursuant to Section 6.01 during the Yield Maintenance Period (the amount of such reduction being the "***Commitment Reduction Amount***" and the date when such reduction occurs being the "***Commitment Reduction Date***"), the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Revolving Credit Lenders, a Yield Maintenance Fee in an amount equal to the Commitment Reduction Amount multiplied by the percentage set forth below opposite the period in which the Commitment Reduction Date occurs:

| Month[18] | Yield Maintenance Fee Percentage |
|---|---|
| 11 December 2013 – 10 January 2014 | 6.73% |
| 11 January 2014 – 10 February 2014 | 6.51% |
| 11 February 2014 – 10 March 2014 | 6.30% |
| 11 March 2014 – 10 April 2014 | 6.08% |
| 11 April 2014 – 10 May 2014 | 5.86% |
| 11 May 2014 – 10 June 2014 | 5.64% |

---

[17]    [NTD: To be clarified in the form of the Security Deposit Agreement to be agreed.]

[18]    [NTD:  Periods prior to the consummation date of the Plan will be deleted upon signing this Agreement.]

| | |
|---|---|
| 11 June 2014 – 10 July 2014 | 5.43% |
| 11 July 2014 – 10 August 2014 | 5.21% |
| 11 August 2014 – 10 September 2014 | 4.99% |
| 11 September 2014 – 10 October 2014 | 4.78% |
| October 2014 – 10 November 2014 | 4.56% |
| 11 November 2014 – 10 December 2014 | 4.34% |
| 11 December 2014 – 10 January 2015 | 4.12% |
| 11 January 2015 – 10 February 2015 | 3.91% |
| 11 February 2015 – 10 March 2015 | 3.69% |
| 11 March 2015 – 10 April 2015 | 3.47% |
| 11 April 2015 – 10 May 2015 | 3.26% |
| 11 May 2015 – 10 June 2015 | 3.04% |
| 11 June 2015 – 10 July 2015 | 2.82% |
| 11 July 2015 – 10 August 2015 | 2.60% |
| 11 August 2015 – 10 September 2015 | 2.39% |
| 11 September 2015 – 10 October 2015 | 2.17% |
| 11 October 2015 – 10 November 2015 | 1.95% |
| 11 November 2015 – 10 December 2015 | 1.74% |
| 11 December 2015 – 10 January 2016 | 1.52% |
| 11 January 2016 – 10 February 2016 | 1.30% |
| 11 February 2016 – 10 March 2016 | 1.09% |
| 11 March 2016 – 10 April 2016 | 0.87% |

| 11 April 2016 – 10 May 2016 | 0.65% |
|---|---|
| 11 May 2016 – 10 June 2016 | 0.43% |
| 11 June 2016 – 10 July 2016 | 0.22% |
| After 10 July 2016 | 0.00% |

(ii)       Subject to clause (iii) below, in the event that (A) the Borrower makes any prepayment of Term B Loans pursuant to Section 2.06 other than any prepayment upon the occurrence of a Casualty Event or an Event of Eminent Domain or (B) the unpaid principal balance of any Term B Loan is accelerated pursuant to Section 6.01 during the Yield Maintenance Period (the principal amount of such prepayment or amount so accelerated being the "*Prepayment Amount*"), the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Term B Lenders, a Yield Maintenance Fee in an amount equal to the sum of the interest that would have been payable on the Prepayment Amount (in the absence of such prepayment or acceleration) at a rate per annum equal to the Applicable Margin (x) on all scheduled Interest Payment Dates falling after the date of prepayment or acceleration until the end of the Yield Maintenance Period and (y) if the last day of the Yield Maintenance Period is not an Interest Payment Date, on the last day of the Yield Maintenance Period, in each case discounted from the respective scheduled payment date to the date of prepayment or acceleration, in accordance with accepted financial practice at a discount factor equal to the equivalent weighted-average life U.S. Treasury yield as of 10:00 a.m. New York City time on the Business Day immediately preceding the date of prepayment or acceleration.

(iii)       Notwithstanding anything set forth in this Agreement, no Yield Maintenance Fee will be due:

(A)       with respect to any prepayment of the Loans or reduction of Revolving Credit Commitments, in each case, resulting from a Harquahala Sale;

(B)       following the end of the Yield Maintenance Period; provided, however, that, in the event of an acceleration of the Facilities pursuant to Section 6.01 or Section 6.02, the Yield Maintenance Fee shall apply and shall be determined pursuant to clause (b)(ii) above as if a prepayment occurred on the date of such acceleration;

(C)       with respect to any payment of Revolving Credit Loans or Revolving Letter of Credit Loans that does not result in a permanent reduction of the Revolving Credit Commitments;

(D)       [Reserved]; or

(E)       with respect to any reduction of Revolving Credit Commitments pursuant to Section 2.05(b)(iii).

(c)    Revolving Letter of Credit Fees.

(i)    The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender a letter of credit fee, payable in arrears quarterly on the last Business Day of each December, March, June and September occurring after the Effective Date, and on the Revolving Credit Termination Date, on such Revolving Credit Lender's Pro Rata Share of the average daily aggregate Available Amount during such quarter of all Revolving Letters of Credit outstanding from time to time during such quarter at a rate per annum equal to the Eurodollar Rate plus 2.00%.

(ii)    The Borrower shall pay the Revolving Issuing Bank, for its own account, such commissions, issuance fees, fronting fees, transfer fees and other fees and charges in connection with the issuance, administration and amendment of each Revolving Letter of Credit as the Borrower and such Revolving Issuing Bank shall agree.

(d)    Agents' Fees.  The Borrower shall pay to each Agent for its own account such fees as may from time to time be agreed between the Borrower and such Agent.

SECTION 2.09.    [Reserved].

SECTION 2.10.    Increased Costs, Etc.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), there shall be any increase in the cost to any Lender Party of agreeing to make or of making, funding or maintaining Loans or of agreeing to issue or of issuing or maintaining or participating in Revolving Letters of Credit or of agreeing to make or of making or maintaining Revolving Letter of Credit Loans (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis or rate of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender Party is organized or has its Lending Office or any political subdivision thereof), then the Borrower shall from time to time, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party additional amounts sufficient to compensate such Lender Party for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender Party, shall be conclusive and binding for all purposes, absent manifest error.

(b)    If any Lender Party determines that compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender Party or any corporation controlling such Lender Party and that the amount of such capital is increased by or based upon the existence of such Lender Party's commitment to make Loans or to issue or participate in Revolving Letters of Credit hereunder and other commitments of such type or the issuance or maintenance of or participations in the Revolving Letters of Credit (or similar Guaranteed Debts), then, upon demand by such Lender Party or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender Party, from time

to time as specified by such Lender Party, additional amounts sufficient to compensate such Lender Party in the light of such circumstances, to the extent that such Lender Party reasonably determines such increase in capital to be allocable to the existence of such Lender Party's commitment to make Loans or to issue or participate in Revolving Letters of Credit hereunder or to the issuance or maintenance of or participation in any Revolving Letters of Credit.  A certificate as to such amounts submitted to the Borrower by such Lender Party shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11.  <u>Payments and Computations</u>.  (a)  The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in <u>Section 2.13</u>), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day.  The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender Party, to such Lender Parties for the account of their respective Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lender Parties and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender Party, to such Lender Party for the account of its Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to <u>Section 9.07(e)</u>, from and after the effective date of such Assignment and Acceptance, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)    The Borrower hereby authorizes each Lender Party and each of its Affiliates, if and to the extent payment owed to such Lender Party is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender Party or such Affiliate any amount so due.

(c)    All computations of interest based on the Eurodollar Rate and of commitment fees, letter of credit fees and other fees and commissions shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable.  Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the

computation of payment of interest or commitment or letter of credit fee or commission, as the case may be; *provided*, *however*, that, if such extension would cause payment of interest on or principal of Loans to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender Party hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender Party on such due date an amount equal to the amount then due such Lender Party. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender Party shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender Party together with interest thereon, for each day from the date such amount is distributed to such Lender Party until the date such Lender Party repays such amount to the Administrative Agent, at the Eurodollar Rate.

(f)    If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Loans or the Facility to which, or the manner in which, such funds are to be applied, the Administrative Agent may, if no instructions with respect thereto are received from the Lender Parties upon request, but shall not be obligated to, elect to distribute such funds to each of the Lender Parties in accordance with such Lender Parties pro rata share of the sum of (i) the aggregate principal amount of all Loans outstanding at such time and (ii) the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender Party, and, in the case of the Term B Facility, for application to such principal repayment installments thereof, as the Administrative Agent shall direct.

SECTION 2.12.    Taxes.  (a)  Any and all payments by any Loan Party to or for the account of any Lender Party or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.11 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender Party and each Agent, taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which such Lender Party or such Agent, as the case may be, is organized (or any political subdivision thereof), has its Lending Office, has a permanent establishment or is engaged in business (other than the business that the Lender Party is engaged in solely by reason of the transactions contemplated by this Agreement), (y) any branch profits taxes imposed by the United States of America and (z) withholding taxes imposed under law in effect on the date hereof or at the time the Lender Party designates a new Lending Office, other than any new Lending Office designated at the written request of a Loan Party (in the case of a Lender Party that is not an Initial Lender, this clause (z) shall include taxes imposed under law in effect on the date such Lender Party becomes a Lender Party, except to the extent that the Lender's predecessor would have been entitled to receive additional amounts under this Section 2.12(a))

and, in the case of each Lender Party, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of such Lender Party's Lending Office or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "**_Taxes_**").  If any Loan Party shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender Party or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender Party or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)	In addition, each Loan Party shall pay any present or future stamp, documentary, excise, property (including intangible property, but with regard to all property taxes, only to the extent relating to property of a Loan Party) mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "**_Other Taxes_**").

(c)	The Loan Parties shall indemnify each Lender Party and each Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender Party or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such Lender Party or such Agent (as the case may be) makes written demand therefor.

(d)	Within 30 days after the date of any payment of Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.  In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Loan Party through an account or branch outside the United States or by or on behalf of a Loan Party by a payor that is not a United States person, if such Loan Party determines that no Taxes are payable in respect thereof, such Loan Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes.  For purposes of subsections (d) and (e) of this Section 2.12, the terms "**_United States_**" and "**_United States person_**" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)	Each Lender Party organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender Party and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender Party in the case of each other Lender Party, and from time to time

53

thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender Party remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two original Internal Revenue Service Forms W-8BEN or W-8EC1 or (in the case of a Lender Party that has certified in writing to the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender Party is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender Party that has certified that it is not a "bank" as described above, certifying that such Lender Party is a foreign corporation, partnership, estate or trust.  As provided in Section 2.12(a), if the forms provided by a Lender Party at the time such Lender Party first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender Party provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided*, *however*, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender Party becomes a party to this Agreement, the Lender Party assignor was entitled to payments under subsection (a) of this Section 2.12 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender Party assignee on such date.  If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8EC1 or the related certificate described above, that the applicable Lender Party reasonably considers to be confidential, such Lender Party shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)    For any period with respect to which a Lender Party has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender Party shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.12 with respect to Taxes imposed by the United States by reason of such failure; *provided*, *however*, that should a Lender Party become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Lender Party shall reasonably request, at the Lender Party's sole expense and as long as the Loan Parties determine that such steps will not, in the reasonable judgment of the Loan Parties, be disadvantageous to the Loan Parties, to assist such Lender Party to recover such Taxes.

(g)     Any Lender Party claiming any additional amounts payable pursuant to this Section 2.12 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender Party, be otherwise disadvantageous to such Lender Party.  In addition, if a Lender Party determines, in such Lender Party's sole discretion, that it has received a refund or credit in respect of any Taxes or Other Taxes as to which it has been indemnified pursuant to Section 2.12(c), or with respect to which additional amounts have been paid pursuant to Section 2.12(a), such Lender Party shall pay to the Borrower an amount equal to such refund (but such amount in no event to exceed the amount of any indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses of such Lender Party, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of such Lender Party, shall agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender Party in the event such Lender Party subsequently determines that such refund or credit is unavailable under applicable law or is otherwise required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require a Lender Party to rearrange its tax affairs or to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

SECTION 2.13.   Sharing of Payments, Etc.  If any Lender Party shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 9.07), (a) on account of Obligations due and payable to such Lender Party hereunder and under the other Loan Documents in excess of its ratable share (according to the proportion of the amount of such Obligations due and payable to such Lender Party, (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such interests or participating interests in the Obligations as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; *provided*, *however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such

other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered.  The Loan Parties agree that any Lender Party so purchasing an interest or participating interest from another Lender Party pursuant to this Section 2.13 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender Party were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be. For the avoidance of doubt, notwithstanding anything to the contrary in this Section 2.13 or otherwise, the Lender Parties shall not be entitled to receive or share in any fees paid by the Borrower pursuant to Section 2.08(c), which fees shall be solely for the account of the Revolving Credit Lenders (with respect to Section 2.08(c)(i)) and Revolving Issuing Bank (with respect to Section 2.08(c)(ii)).

SECTION 2.14.    Use of Proceeds.

(a)    [The Term B Loans to be advanced on the Effective Date shall be available (and the Borrower agrees that it shall use the Term B Loans) solely to (i) pay transaction fees and expenses due in connection with the transactions occurring on the Effective Date and (ii) repay the Existing Debt of the Loan Parties outstanding on the Effective Date.]

(b)    The proceeds of the Revolving Credit Loans and utilization of Revolving Letter of Credit Facility Commitments shall be available (and the Borrower agrees that it shall use such proceeds and Commitments) solely (i) on the Effective Date, to repay and/or refinance in full all obligations of the Loan Parties outstanding on the Effective Date under the Pre-Petition First Lien Credit Agreement and the DIP Credit Agreement, [including to refinance the obligations of the Loan Parties with respect to Existing Letters of Credit then outstanding], in accordance with the Plan of Reorganization, and (ii) on and after the Effective Date, (A) to provide working capital for the Loan Parties, (B) to provide credit support in respect of such working capital needs, and (C) for the Loan Parties' other general corporate purposes.

SECTION 2.15.    Evidence of Debt.  (a)  Each Lender Party shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender Party resulting from each Loan owing to such Lender Party from time to time, including the amounts of principal and interest payable and paid to such Lender Party from time to time hereunder.  The Borrower agrees that upon notice by any Lender Party to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender Party to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender Party, the Borrower shall promptly execute and deliver to such Lender Party, with a copy to the Administrative Agent, a Revolving Credit Note and a Term B Note, as applicable, in substantially the form of Exhibits A-1 and A-2 hereto, respectively, payable to the order of such Lender Party in a principal amount equal to the Revolving Credit Commitment and Term B Loans, respectively, of such Lender Party.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Register maintained by the Administrative Agent pursuant to Section 9.07(e) shall include a control account, and a subsidiary account for each Lender Party, in which

accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder and, if appropriate, the Eurodollar Rate Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender Party hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender Party's share thereof.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender Party in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender Party  and, in the case of such account or accounts, such Lender Party, under this Agreement, absent manifest error; *provided*, *however*, that the failure of the Administrative Agent or such Lender Party to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.16.   Duty to Mitigate.  In the event that any Lender Party demands payment of costs or additional amounts pursuant to Section 2.10 or 2.12, the Borrower may, upon 20 days' prior written notice to such Lender Party and the Administrative Agent, elect to cause such Lender Party to assign its Loans and Commitments in full to one or more Persons selected by the Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent and any Revolving Issuing Bank, (ii) such Lender Party receives payment in full in Cash of the outstanding principal amount of all Loans  made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender Party as of the date of such assignment (including, without limitation, amounts owing pursuant to Sections 2.10, 2.12 and 9.04) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender Party hereunder in accordance with Section 9.07.

# ARTICLE III

## CONDITIONS TO EFFECTIVENESS OF LENDING

SECTION 3.01.   Conditions Precedent.   Section 2.01 of this Agreement shall become effective on and as of the first date (the "***Effective Date***") on which the Administrative Agent determines in its sole and absolute discretion that the following conditions precedent have been satisfied (and the obligation of any Revolving Issuing Bank to issue a Revolving Letter of Credit [or refinance an Existing Letter of Credit], any Revolving Credit Lender to make a Revolving Credit Loan and the Term B Lenders to make a Term B Loan hereunder is subject to the satisfaction of such conditions precedent before or concurrently with the Effective Date):

(a)     The Administrative Agent shall have received on or before the Effective Date the following, each dated such day (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)    The Notes, duly executed and delivered by the Borrower and payable to the order of the Lenders, to the extent requested by the Lenders pursuant to the terms of Section 2.15.

(ii)    The First Lien Security Agreement, duly executed by the Borrower and each Guarantor, together with:

(A)    confirmation reasonably satisfactory to the Administrative Agent that (1) certificates representing the Initial Pledged Equity referred to therein accompanied by undated membership interest powers or partnership interest powers, as applicable, executed in blank, and (2) instruments evidencing the Initial Pledged Debt referred to therein, indorsed in blank, in each case, have been delivered to the First Lien Collateral Agent,

(B)    appropriately completed financing statements in form appropriate for filing under the Uniform Commercial Code in the State of Delaware, covering the Collateral described in the First Lien Security Agreement,

(C)    completed requests for information or similar search reports, dated on or before the Effective Date, listing all effective financing statements filed in the jurisdictions where the Loan Parties are incorporated or in which the Projects are located that name any Loan Party as debtor, together with copies of such other financing statements,

(D)    true and complete copies of each Material Contract,

(E)    [Reserved],

(F)    a First Lien Consent and Agreement in respect of each Commodity Hedge and Power Sale Agreement and each other Material Contract set forth on Schedule 3.01(a)(ii)(F) hereto;[19] and

(G)    evidence that all other action that the Administrative Agent and the First Lien Collateral Agent may deem reasonably necessary in order to perfect and protect the first priority liens and security interests created under the First Lien Security Agreement has been taken.

(iii)    Original counterparts of the mortgages, deeds of trust or security deeds encumbering each of the Real Properties and substantially in the form of Exhibit D

---

[19]    [NTD: The expectation is that the Consents and Agreements to be listed on Schedule 3.01(a)(ii)(F) would be only those who have entered into Consents and Agreements with CLMG for the previous financings, and in the same form, and consents in connection with any future Commodity Hedge and Power Sale Agreement or other Material Contract entered into by a Loan Party before consummation of the Plan of Reorganization.]

(with such changes or modifications as may be required by local law and, with respect to the mortgage with respect to the New York property, with such modifications as Greene County Industrial Development Agency or its counsel may reasonably request), duly executed by the appropriate Loan Party (collectively the "***Initial First Lien Mortgages***"), together with:

(A)    evidence that counterparts of the Initial First Lien Mortgages have been either (x) duly recorded on or before the Effective Date or (y) duly executed, acknowledged and delivered to the Title Company in form suitable for filing or recording, in all filing or recording offices necessary in order to create a valid first and subsisting Lien on the property described therein in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties and that all filing and recording taxes and fees have been paid to the Title Company,

(B)    certified copies of the fully paid American Land Title Association Lender's Extended Coverage title insurance policies (the "***First Lien Mortgage Policies***") in the amount of [$_____] for New York property (Athens), [$_____] for Arizona property (Harquahala) and [$_____] for Massachusetts property (Millennium), in form and substance and with endorsements (including zoning endorsements) to the extent available, reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent, issued by the Title Company, and reinsured by title insurers reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent, insuring the Initial First Lien Mortgages to be valid first and subsisting Liens on the property described therein, free of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Liens, [and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents and for mechanics' and materialmen's Liens) and such direct access reinsurance as the Administrative Agent may reasonably require, and with respect to any such property located in a State in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report from the Planning and Zoning Resource Corporation, in each case, in form reasonably acceptable to the First Lien Collateral Agent][20],

(C)    certified copies of American Land Title Association/American Congress on Surveying and Mapping form surveys, for which all necessary fees (where applicable) have been paid, and dated no more than 60 days before the Effective Date, certified to the Administrative Agent and the First Lien Collateral Agent and the Title Company using a form of certification in substantially the form attached

---

[20]    [NTD:  To be finalized in connection with confirmation.]

hereto as <u>Exhibit J</u> by a land surveyor duly registered and licensed in the States in which the property described in such surveys is located, showing the matters required by such certification and the absence of material encroachments and any other material defects other than encroachments or other defects acceptable to the Administrative Agent and the First Lien Collateral Agent and Permitted Liens,

(D)     estoppel and consent agreements, in form and substance satisfactory to the Administrative Agent and the First Lien Collateral Agent, executed by each of the lessors of the leased real properties listed on <u>Schedule 4.01(s)</u> hereto, [other than the IDA Lease and the Millennium Lease] and, in the case of any leasehold interest that was acquired or subleased from the holder of a recorded leasehold interest, to the extent required by the Title Company to issue the relevant First Lien Mortgage Policy, the applicable assignment or sublease document, executed and acknowledged by such holder,[21]

(E)     evidence of the insurance required by the terms of the First Lien Mortgages, and

(F)     such other consents, agreements and confirmations of lessors and third parties as the Administrative Agent or the First Lien Collateral Agent may deem reasonably necessary or desirable and evidence that all other actions that the Administrative Agent or the First Lien Collateral Agent may deem necessary or desirable in order to create the valid first and subsisting Liens on the property described in the First Lien Mortgages has been taken.

(iv)     The Intercreditor Agreement, in form and substance satisfactory to the Administrative Agent, and duly executed by the Borrower and each Guarantor and each other party thereto as of the Effective Date.

(v)     The Security Deposit Agreement, in form and substance satisfactory to the Administrative Agent, and duly executed by the Borrower and each Guarantor and each other party thereto as of the Effective Date.

(vi)     Certified copies of the resolutions of the board of directors of the Borrower and the board of control of Millennium and authorizations of the sole member of each other Guarantor approving the Loan Documents to which it is or is to be a party and the transactions contemplated thereby, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and

---

[21]     [NTD: The expectation is that no consents or estoppels with respect to real property interests beyond those for which consents and estoppels were obtained in for the earlier Beal Bank financings would be necessary, absent a change in circumstances or a requirement of the title company.]

consents, if any, with respect to the Loan Documents to which it is or is to be a party and the transactions contemplated thereby.

(vii)    A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Effective Date certifying (A) as to a true and correct copy of the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to such Loan Party's certificate of formation or certificate of limited partnership, as the case may be, on file in such Secretary's office, (2) to the extent applicable, such Loan Party has paid all franchise taxes to the date of such certificate and (3) to the extent applicable, such Loan Party is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(viii)    A certificate of each Loan Party signed on behalf of such Loan Party by its chief executive officer, dated the Effective Date (the statements made in which certificate shall be true on and as of the Effective Date), certifying as to (A) the absence of any amendments to the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party since the date of the Secretary of State's certificate referred to in Section 3.01(a)(vii), (B) a true and correct copy of the limited liability company agreement or limited partnership agreement, as the case may be, of such Loan Party as in effect on the date on which the resolutions referred to in Section 3.01(a)(vi) were adopted and on the Effective Date, (C) the due formation and good standing or valid existence of such Loan Party as a limited liability company or limited partnership, as the case may be, organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of such Loan Party, (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Effective Date and (E) the absence of receipt of notice from a party to the IDA Lease or a PILOT Document asserting that a breach or default has occurred and is continuing thereunder.

(ix)    In the case of the Borrower, a certificate of the Borrower executed by a director of the Borrower, in the case of each Guarantor (other than Millennium), a certificate of the sole member of such Guarantor executed by a director of such sole member, and, in the case of Millennium, a certificate of the sole member of MACH Gen GP, LLC executed by a director of such sole member, in each case, certifying the name and true signature of the officer of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(x)    [Reserved.]

(xi)    A certificate in substantially the form of Exhibit E, attesting to the Solvency of the Borrower and its Subsidiaries on a Consolidated basis after giving effect to the Loan Documents and the transactions contemplated thereby, from its chief executive officer.

(xii)     (A) A certified hard copy of, and a computer disk containing, *pro forma* cash flow statements with respect to the Borrower and its Subsidiaries for the period from the Effective Date through and including Fiscal Year 2030 (the "***Base Case Projections***"); and (B) a certified copy of the operating budget for the Borrower and its Subsidiaries for Fiscal Year 2014 (the "***Initial Operating Budget***").

(xiii)    [Financial statements to be discussed. Consider internal or *pro forma* financial statements to represent financial condition before fresh start accounting review is completed.][22]

(xiv)     Copies of final due diligence reports from the following consultants in form and substance satisfactory to the Administrative Agent: (A) the Independent Engineer; (B) the Independent Environmental Consultant; (C) the Independent Power Market Consultant; and (D) the Independent Insurance Consultant.

(xv)      Copies of all certificates representing the policies, endorsements and other documents required under Section 5.01(d) to be in effect as of the Effective Date, accompanied by (A) a certificate of the Borrower signed by its chief executive officer certifying that the copies of each of the policies, endorsements and other documents delivered pursuant to this Section 3.01(a)(xv) are true, correct and complete copies thereof, (B) letters from the Borrower's insurance brokers or insurers, dated not earlier than fifteen (15) days prior to the Effective Date, stating with respect to each such insurance policy that (1) such policy is in full force and effect, (2) all premiums theretofore due and payable thereon have been paid and (3) the underwriters of such insurance have agreed that the policies, when issued, will contain the provisions required under Section 5.01(d) and (C) a certificate from the Independent Insurance Consultant in form and substance reasonably satisfactory to the Lenders confirming that such required insurance is in full force and effect in accordance with the terms of this Agreement.

(xvi)     An opinion of Milbank, Tweed, Hadley & McCloy LLP, counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent (including, without limitation, with respect to the enforceability of this Agreement).

(xvii)    Opinions of local counsel for the Loan Parties in substantially the form of Exhibit G with respect to the enforceability and perfection of each Initial First Lien Mortgage and any related fixture filings, in form and substance reasonably satisfactory to the Administrative Agent.

(b)     The Plan of Reorganization shall have been confirmed by the Bankruptcy Court, and the order of the Bankruptcy Court confirming the Plan of Reorganization shall (i) approve and authorize the Facilities, the transactions contemplated hereby and the granting of the Liens securing the Facilities, and (ii) be in full force and effect and shall not have been stayed, reversed, amended or modified.

---

[22]        [NTD: To be finalized in connection with confirmation.]

(c)     The conditions to effectiveness of the Plan of Reorganization shall have been satisfied, and the Plan of Reorganization will be substantially consummated with the effectiveness of this Agreement on the Effective Date.

(d)     The Administrative Agent shall be satisfied that all Existing Debt has been (or is contemporaneously being) prepaid, redeemed or defeased in full or otherwise satisfied and extinguished, including all interest, fees and other amounts accrued and unpaid in accordance with the Final Financing Order (as defined in the Restructuring Support Agreement), and all commitments relating thereto are (or are contemporaneously being) terminated.

(e)     Before giving effect to the Loan Documents and the transactions contemplated thereby, there shall have occurred no Material Adverse Change since the date of confirmation of the Plan of Reorganization by the Bankruptcy Court.

(f)     There shall exist no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries pending or threatened in writing before any Governmental Authority (other than the Chapter 11 Cases) that (i) could reasonably be expected to have a Material Adverse Effect or materially impair or interfere with the operations of any Project Company or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated hereby.

(g)     Except for any Governmental Authorizations required in connection with the Lender Parties' exercise of remedies under the Loan Documents, all Governmental Authorizations and third party consents and approvals necessary in connection with the Loan Documents and the transactions contemplated thereby or for the ownership and operation of the Projects at full design capacity shall have been obtained (without the imposition of any condition that is not acceptable to the Administrative Agent or the Lenders) and shall remain in effect.

(h)     The Borrower shall have paid (or shall be contemporaneously paying from the proceeds of the Loans) all accrued fees of the Agents and the Lender Parties, and all accrued expenses of the Agents (including all accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lender Parties) and other compensation contemplated in connection with this Agreement, the Final DIP Order and the Plan of Reorganization payable to the Administrative Agent and the Lender Parties in respect of the transactions contemplated by this Agreement.

(i)     The Administrative Agent shall be reasonably satisfied that the amount of committed financing available to the Borrower shall be sufficient to meet the ongoing financial needs of the Borrower and its Subsidiaries after giving effect to the Loan Documents and the transactions contemplated thereby.

SECTION 3.02.   Conditions Precedent to Each Borrowing and Issuance.  The obligation of each Appropriate Lender to make a Loan (other than a Revolving Letter of Credit Loan made by a Revolving Issuing Bank or a Revolving Credit Lender pursuant to Section 2.03(c)), or deem to make any Term B Loan on the occasion of each Borrowing (including the initial Borrowing), and the obligation of each Revolving Issuing Bank to issue a Revolving Letter of Credit [or refinance an Existing Letter of Credit] (including on the Effective

Date) shall be subject to the conditions precedent that on the date of such Borrowing or other extension of credit the following statements shall be true and the Administrative Agent shall have received for the account of such Lender or such Revolving Issuing Bank a certificate signed by a duly authorized officer of the Borrower, dated the date of such Borrowing or extension of credit, stating that (and each of the giving of the applicable Notice of Borrowing or Notice of Issuance and the acceptance by the Borrower of the proceeds of such Borrowing or such Revolving Letter of Credit shall constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Borrowing or extension of credit such statements are true):

(a)    the representations and warranties contained in each Loan Document are true and correct in all material respects on and as of such date, before and after giving effect to such Borrowing or other extension of credit and to the application of the proceeds therefrom, as though made on and as of such date; and

(b)    no Default has occurred and is continuing, or would result from such Borrowing or other extension of credit or from the application of the proceeds therefrom.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties. Each Loan Party represents and warrants as follows:

(a)    Organization.  It (i) is a limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a limited liability company or limited partnership in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not reasonably be expected to have a Material Adverse Effect and (iii) has all requisite limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)    Location.  Set forth on Schedule 4.01(b) hereto is a complete and accurate list of all Loan Parties, showing as of the date hereof (as to each Loan Party) the jurisdiction of its formation, the address of its principal place of business and its U.S. taxpayer identification number.  The copy of the charter, certificate of formation or certificate of limited partnership, as applicable, of each Loan Party and each amendment thereto provided pursuant to Section 3.01(a)(vi) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(c)    Ownership Information.  Set forth on Schedule 4.01(c) hereto is a complete and accurate list of all Subsidiaries of each Loan Party, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares, membership interests or limited partnership interests (as applicable) of each class of its Equity Interests

authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares, membership interests or limited partnership interests (as applicable) covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof.  All of the outstanding Equity Interests in each Loan Party's Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Subsidiaries free and clear of all Liens, except those created under the First Lien Collateral Documents or Permitted Liens.

(d)      Authorization Non-Contravention.    The execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within such Loan Party's limited liability company or limited partnership (as applicable) powers, have been duly authorized by all necessary limited liability company or limited partnership (as applicable) action, and do not (i) contravene such Loan Party's limited liability company agreement, limited partnership agreement or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to or binding on it, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, a Contractual Obligation of any Loan Party (except to the extent such conflict, breach, default or payment could not reasonably be expected to have a Material Adverse Effect) or (iv) except for the Liens created under the First Lien Collateral Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of any Loan Party or any of its Subsidiaries.  As of the Effective Date, no Loan Party is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which could reasonably be expected to have a Material Adverse Effect.

(e)      Consents and Approvals.

(i)      No Governmental Authorization, and no notice to, filing with, or consent or approval of any other third party is required for (A) the due execution, delivery, recordation, filing or performance by any Loan Party of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated thereby, (B) the grant by any Loan Party of the Liens granted by it pursuant to the First Lien Collateral Documents, (C) the perfection or maintenance of the Liens created under the First Lien Collateral Documents (including the first priority nature thereof) or (D) the exercise by any Agent or any Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the First Lien Collateral Documents, except for (1) those Governmental Authorizations, notices and filings set forth on Schedule 4.01(e), (A) all of which have been duly obtained, taken, given or made, (B) are in full force and effect, and (C) are free from conditions or requirements that have not been met or complied with or (2) those Governmental Authorizations, notices, filings with, or consents of, any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(ii)     No Governmental Authorization, and no notice to, filing with, or consent or approval of any Governmental Authority or any other third party is required in connection with the operation of the Projects in accordance with applicable law and as otherwise contemplated by this Agreement, except for (A) the Governmental Authorizations, notices and filings set forth on Schedule 4.01(e), (1) all of which have been duly obtained, taken, given or made, (2) are in full force and effect and (3) are free from conditions or requirements that have not been met or complied with or (B) those Governmental Authorizations, notices, filings with or consents of any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(f)     Binding Agreement.   This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party party thereto.   This Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms.

(g)     Litigation.   There is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened in writing before any Governmental Authority or arbitrator that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby.

(h)     Financial Statements.

(i)     The Consolidated balance sheet of the Borrower and its Subsidiaries, the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the fiscal year then ended, and the Consolidated balance sheet of the Borrower and its Subsidiaries and the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the three months then ended, duly certified by a Responsible Officer of the Borrower, in each case which have most recently been furnished to the Administrative Agent pursuant to Section 5.03, fairly present in all material respects, subject, in the case of any interim balance sheet and related statements of income and cash flows for the relevant three months then ended, to year-end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at the dates of such financial statements and the Consolidated results of operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis.

(ii)     Since the Effective Date, there has been no Material Adverse Change.

(iii)     The Base Case Projections of the Borrower and its Subsidiaries delivered to the Administrative Agent pursuant to Section 3.01(a)(xii) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in

66

light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial performance.

(i)    Information.  As of the Effective Date, no information, exhibit or report furnished by or on behalf of any Loan Party to any Agent or any Lender Party in connection with the negotiation and syndication of the Loan Documents or pursuant to the terms of the Loan Documents contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein not misleading.

(j)    Margin Stock.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan or drawings under any Revolving Letter of Credit will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(k)    Investment Company Act.  No Loan Party is an "*investment company*," as defined in or subject to regulations under the Investment Company Act of 1940, as amended.

(l)    Security Interest.  All filings and other actions necessary to perfect and protect the security interest in the Collateral created under the First Lien Collateral Documents have been duly made or taken and are in full force and effect, and the First Lien Collateral Documents create in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral, securing the payment of the First Lien Obligations.  The Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(m)    Solvency.  After giving effect to the Loan Documents and the transactions contemplated thereby, the Borrower and its Subsidiaries are, on a Consolidated basis, Solvent.

(n)    ERISA Etc. (i)  No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has resulted in or is reasonably expected to result in a material liability of any Loan Party or any ERISA Affiliate.

(ii)    Neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any material Withdrawal Liability to any Multiemployer Plan.

(iii)    Neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a material Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(o)    Environmental Matters.

(i)    Except as otherwise set forth on Part I of Schedule 4.01(o) hereto, the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits, all past non-compliance

with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, except for any such noncompliance, obligation or cost that could not reasonably be expected to have a Material Adverse Effect and, to the best knowledge of each Loan Party, no circumstances exist that could (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that could reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(ii)    Except as otherwise set forth on Part II of <u>Schedule 4.01(o)</u> hereto, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is currently listed or proposed for listing on the NPL or on the CERCLIS or any analogous state or local list; there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries that requires abatement under any applicable Environmental Law; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries in a manner that would reasonably be expected to require any material investigation, cleanup, remediation or remedial action by any Loan Party under any applicable Environmental Law.

(iii)    Except as otherwise set forth on Part III of <u>Schedule 4.01(o)</u> hereto, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries except, in each case above, where any such investigation or assessment or remedial or response action or liability could not reasonably be expected to have a Material Adverse Effect.

(p)    <u>Tax Matters</u>.    (i)    Neither any Loan Party nor any of its Subsidiaries is party to any tax sharing agreement.

(ii)    Each Loan Party and each of its Subsidiaries has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed, other than those tax returns where the failure to file such returns could not be reasonably expected to have a Material Adverse Effect or to result in a liability of such Loan Party and its Subsidiaries in an amount in excess of $2,000,000 at any time, and has paid all taxes shown thereon to be due, together with applicable interest and

68

penalties (other than taxes contested in good faith by proper proceedings to the extent that adequate reserves are being maintained therefor).

(iii)    No issues have been raised by the Internal Revenue Service in respect of federal income tax returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(iv)    No issues have been raised by any state, local or foreign taxing authorities, in respect of the returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise, that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(q)    [Reserved].

(r)    Owned Real Property.  Set forth on Schedule 4.01(r) hereto is a complete and accurate list of all real property owned by any Loan Party, showing as of the date hereof the street address, county or other relevant jurisdiction, state and record owner thereof.  Each Loan Party has good and marketable fee simple title to such real property, free and clear of all Liens, other than Liens created or permitted by the Loan Documents.

(s)    Leased Real Property.  Set forth on Schedule 4.01(s) hereto is a complete and accurate list of all leases of real property under which any Loan Party is the lessee, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor and lessee thereof.  Each such lease is the legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms.

(t)    Material Contracts.  Each Material Contract (i) has been duly authorized, executed and delivered by all parties thereto, has not been amended or otherwise modified from the form previously delivered to the Administrative Agent except to the extent permitted under the terms of the Loan Documents and (ii) is in full force and effect and is binding upon and enforceable against all parties thereto in accordance with its terms, and to the best knowledge of the Loan Parties, there exists no material default under any Material Contract by any party thereto. All Material Contracts and Hedge Agreements, including all amendments thereto, to which any Loan Party is a party and in effect as of the Effective Date are set forth on Schedule 4.01(t).

(u)    Accounts.  Neither the Borrower nor any of its Subsidiaries has any deposit or securities accounts other than the Accounts or Pledged Accounts otherwise permitted under the terms of this Agreement.

(v)    Regulatory Status.  Each Project Company:  (i) meets the requirements for, and has made the necessary filing with, or has been determined by, FERC to be an exempt wholesale generator ("*EWG*") within the meaning of Section 1262(6) of the Public Utility Holding Company Act of 2005 ("*PUHCA*"); (ii) is authorized by FERC pursuant to Section 205 of the FPA to sell electric power, including energy and capacity, at market-based rates; and (iii) is authorized by FERC to issue securities and assume obligations and liabilities pursuant to Section 204 of the FPA.

(w)    FERC Proceedings.  There are no pending FERC proceedings in which the EWG status, market-based rate authority or the FPA Section 204 authority of a Project Company is subject to withdrawal, revocation or material modification, other than with respect to FERC's Notice of Proposed Rulemaking of general applicability in Docket No. RM04-7-00 with respect to market-based rate authority and blanket authorizations under FPA Section 204.

(x)    Regulatory Approvals.  Except for any FERC approvals required in connection with the Lender Parties' exercise of remedies under the Loan Documents, no approvals or authorizations from FERC are required to be obtained by any Project Company, the Loan Parties, the First Lien Collateral Agent or the Lender Parties with respect to the Loan Documents and the transactions contemplated thereby.

(y)    Existing Regulatory Orders.  The Borrower and each Project Company is in full compliance with the terms and conditions of all orders issued by FERC under Section 203 of the FPA and obtained by the Borrower or any Project Company.

(z)    PUHCA.  The Borrower is a "*holding company*" within the meaning of Section 1262(8) of PUHCA solely with respect to its ownership of one or more EWGs, and is not subject to or is otherwise exempt from regulation under PUHCA.

(aa)    Patriot Act. No Loan Party is in material violation of any Anti-Terrorism Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(bb)    Secured Obligations.  As of the Effective Date, and after giving effect to the Initial Extension of Credit, there are no First Lien Obligations other than Obligations arising under this Agreement.

## ARTICLE V

## COVENANTS

SECTION 5.01.    Affirmative Covenants. Until a Repayment Event has occurred, the Borrower and each Guarantor will:

(a)    Compliance with Laws, Etc.  Comply, and cause each of its Subsidiaries to comply with all applicable laws, rules, regulations and orders binding on the Borrower or such Subsidiary, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, other than any such non-compliance which could not reasonably be expected to have a Material Adverse Effect.

(b)    Payment of Taxes, Etc.  Pay and discharge, and cause each of its Subsidiaries to pay and discharge, before the same shall become delinquent, (i) all taxes,

assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property (unless, in the case of (i) and (ii), the failure to do so could not reasonably be expected to have a Material Adverse Effect, or to result in a liability of such Loan Party and its Subsidiaries in an amount in excess of $2,000,000 at any time); *provided*, *however*, that neither the Borrower nor any of its Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and, and only to the extent that, adequate reserves are being maintained.

(c)   Compliance with Environmental Laws.   Comply, and cause each of its Subsidiaries and, if applicable, take commercially reasonable efforts to cause, all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all material Environmental Permits necessary for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, cleanup, removal, remedial or other action in response to any release, discharge or disposal of any Hazardous Materials from or at any of its properties, to the extent required by, and in material compliance with, all Environmental Laws; *provided*, *however*, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings provided appropriate reserves are being maintained with respect to such circumstances.

(d)   Maintenance of Insurance.   Maintain, and cause each of its Subsidiaries to maintain, insurance in accordance with Schedule 5.01(d).

(e)   Preservation of Existence, Etc.   Preserve and maintain, and cause each of its Subsidiaries to preserve and maintain, its existence as a limited liability company or limited partnership, as applicable, its good standing in the State of Delaware and, to the extent required under applicable law, its qualification to do business and good standing in each other state or jurisdiction in which it operates a material part of its business; *provided*, *however*, that the Borrower and its Subsidiaries may consummate any merger or consolidation permitted under Section 5.02(d).

(f)   Visitation Rights.   Upon reasonable notice, at any reasonable time and from time to time, permit any of the Agents or any of the Lender Parties, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, the Borrower and any of its Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Subsidiaries with any of their officers or directors and with their independent certified public accountants; *provided* that so long as no Event of Default shall have occurred and be continuing, unless the Borrower shall have consented thereto, neither the Agents nor the Lender Parties shall be entitled to more than one visit at the cost of Borrower to any single Project in any Fiscal Year.

(g)   Keeping of Books.   Keep, and cause each of its Subsidiaries to keep, proper books of record and account in accordance with GAAP.

(h)   <u>Maintenance of Properties, Etc</u>.  Maintain, preserve and protect, and cause each of its Subsidiaries to maintain, preserve and protect, all of its properties and equipment necessary in the conduct of the business of the Projects in good working order and condition, ordinary wear and tear excepted, and in accordance with Prudent Industry Practices.

(i)   <u>Transactions with Affiliates</u>.  Conduct, and cause each of its Subsidiaries to conduct, all transactions otherwise permitted under the Loan Documents with any of their Affiliates on terms that are, when taken as a whole, fair and reasonable and no less favorable to the Borrower or such Subsidiary than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

(j)   <u>Covenant to Give Security</u>.  Upon the acquisition of (i) fee title to any property which is leased pursuant to the IDA Lease or (ii) any other property by any Loan Party with a fair market value in excess of $5,000,000 or which is otherwise necessary or desirable for the continued operation of any Project, and such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority security interest in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, then in each case at the Borrower's expense:

(i)   within 10 days after such acquisition, furnish to the Administrative Agent and the First Lien Collateral Agent a description of the real and personal properties so acquired, in each case in detail satisfactory to the Administrative Agent; and

(ii)   promptly, but in any event within 90 days after such acquisition, take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, estoppel and consent agreements of lessors, documents, instruments, agreements, opinions and certificates with respect to such Property as the Administrative Agent shall reasonably request to create (and provide evidence thereof) a valid and perfected first priority Lien on such Property in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties).

(k)   <u>Further Assurances</u>.  Promptly upon request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, estoppel and consent agreements of lessors, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender Party through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the First Lien Collateral Documents and (iii) perfect and maintain the validity, effectiveness and priority of any of the First Lien Collateral Documents and any of the Liens intended to be created thereunder.

(l)   [<u>Accounts</u>.  (i) Establish and maintain, and cause each other Loan Party to maintain at all times in accordance with the Security Deposit Agreement, the Accounts, (ii) cause

all Revenues (as defined in the Security Deposit Agreement) and other amounts payable to it to be deposited into, or credited to, the Accounts, in accordance with the terms of the Security Deposit Agreement and (iii) cause all funds deposited in the Accounts to be applied and disbursed in accordance with the terms of the Security Deposit Agreement, including directing the Depositary to transfer funds from the Revenue Account to the Debt Service Reserve Account pursuant to [*priority fifth* of Section 3.2] of the Security Deposit Agreement as when necessary (to the extent of available funds) so that the balance in the Debt Service Reserve Account is equal to the Debt Service Reserve Requirement.]

(m)     <u>Commodity Hedge Counterparty Security</u>. Any Loan Party that enters into a Commodity Hedge and Power Sale Agreement that benefits from a Lien permitted pursuant to <u>Section 5.02(a)(1)</u> shall:

(i)     require that the terms and conditions of such Commodity Hedge and Power Sale Agreement provide that if the Commodity Hedge Counterparty thereto ceases at any time to have a Required Rating (including with respect to any Person guaranteeing the obligations of such Commodity Hedge Counterparty), such Commodity Hedge Counterparty will provide collateral in amount and form, and pursuant to documents, customarily provided in comparable transactions to secure its obligations under the applicable Commodity Hedge and Power Sale Agreement; and

(ii)     exercise its rights to enforce such obligations of the Commodity Hedge Counterparty at all times, except to the extent that the Commodity Hedge and Power Sale Agreement in question has a Maximum Potential Exposure of $5,000,000 or less; *provided* that no breach shall arise hereunder if any such exercise is unsuccessful so long as the applicable Loan Party has exercised its rights to enforce.

(n)     [Reserved].

(o)     <u>Performance of Material Contracts</u>.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms unless the failure to do so would not reasonably be expected to have a Material Adverse Effect or, in the case of the IDA Lease, the Borrower obtains fee title to the Athens Project as set forth in <u>Section 6.01(n)</u>.

(p)     <u>Separateness</u>.  Comply with the following:

(i)     Each of the Borrower and its Subsidiaries will act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(ii)     Each of the Borrower and its Subsidiaries will conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (including, without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iii)    Each of the Borrower and its Subsidiaries will obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(iv)    Each of the Borrower and its Subsidiaries will comply with the terms of its certificate of incorporation or formation and by-laws or limited liability company agreement (or similar constituent documents).

(q)    <u>Maintenance of Regulatory Status</u>.  The Project Companies shall maintain EWG status, market-based rate authority under FPA Section 205, FPA Section 204 blanket pre-approval and compliance with previously issued FPA Section 203 orders applicable to the Borrower or Project Company.

SECTION 5.02.    <u>Negative Covenants</u>.  Until a Repayment Event has occurred, neither the Borrower nor any Guarantor will, at any time:

(a)    <u>Liens, Etc</u>.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist, or permit any of its Subsidiaries to sign or file or suffer to exist, under the Uniform Commercial Code of any jurisdiction, a financing statement that names the Borrower or any of its Subsidiaries as debtor, or sign or suffer to exist, or permit any of its Subsidiaries to sign or suffer to exist, any security agreement authorizing any secured party thereunder to file such financing statement, or assign, or permit any of its Subsidiaries to assign, any accounts or other right to receive income, except:

(i)    Liens created under the First Lien Collateral Documents; *provided* that (A) such Liens only secure (1) Debt permitted under <u>Section 5.02(b)(i)</u> and/or (2) Debt arising under Commodity Hedge and Power Sales Agreements (I) that are entered into with Commodity Hedge Counterparties, (II) that (x) commit no more than the output of one unit from either Harquahala or Athens (approximately 360MW) for no more than one month, (y) are not secured by pari passu liens with the Facilities in excess of (A) $80,000,000, prior to the Harquahala Sale, (B) $50,000,000, upon and following the Harquahala Sale, and (C) $40,000,000, upon and following an Asset Sale with respect to Millennium or the Millennium Project, in the aggregate when taken together with the amount of any other Commodity Hedge and Power Sales Agreements then secured by the Collateral, minus, to the extent such amounts are greater than $20,000,000, the aggregate amount of all swap termination payments paid by the Borrower with respect to termination of Commodity Hedge and Power Sales Agreement during the term of the Facilities that exceed [$20,000,000,][23] or (z) provide that the obligation to sell power or purchase fuel is contingent upon the subject unit being available for operation, (III) that are not in respect of the Millennium Project and (IV) at the time that any such

---

[23]    [NTD: Figure will be reduced by the amount of any such termination payments by the Borrower from July 10, 2012 through the date of consummation of the Plan.]

Commodity Hedge and Power Sale Agreement is entered into, or any Lien in respect of the Collateral is granted in respect thereof, the aggregate amount of claims due and unpaid beyond any applicable cure period under any other Commodity Hedge and Power Sales Agreements secured by the Collateral does not exceed $25,000,000, (B) such Liens are subject to the terms of the Intercreditor Agreement and (C) any lender or issuing bank (or any agent or trustee thereof) with respect to such Debt and any Commodity Hedge Counterparty party to any such Commodity Hedge and Power Sale Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of, a First Lien Secured Party thereunder;

(ii)    Liens created under the Second Lien Collateral Documents; *provided* that (A) such Liens only secure obligations under Commodity Hedge and Power Sale Agreements which provide by their terms that they are to be secured by a second priority Lien on the Collateral, (B) such Liens are subject to the terms of the Intercreditor Agreement and (C) any Commodity Hedge Counterparty party to any such Commodity Hedge and Power Sale Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of a Second Lien Secured Party thereunder;

(iii)    Permitted Liens;

(iv)    [Reserved];

(v)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower or any of its Subsidiaries in the ordinary course of business (excluding any equipment that is necessary or desirable for the continued operation of any Project) to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided*, *however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (v) shall not exceed the amount permitted under Section 5.02(b)(iv) at any time outstanding;

(vi)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(vii)    Liens arising from precautionary Uniform Commercial Code financing statements regarding, and any interest or title of a licensor, lessor or sublessor under, any operating lease;

(viii)    pledges or deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to

providers of property, casualty or liability insurance in the ordinary course of business; and

(ix)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(vii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the property subject to such Capitalized Leases.

(b)    <u>Debt</u>.    Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    [reserved];

(iii)    [reserved];

(iv)    Debt secured by Liens permitted by Section 5.02(a)(v) not to exceed in the aggregate, when taken together with any outstanding Debt permitted to be incurred pursuant to Section 5.02(b)(vii), $25,000,000 at any time outstanding;

(v)    to the extent constituting Debt, payment or guaranty obligations under any Commodity Hedge and Power Sale Agreements to the extent permitted under Section 5.02(l);

(vi)    Debt owed to any Loan Party, which Debt shall (x) constitute Pledged Debt, (y) be on terms reasonably acceptable to the Administrative Agent and (z) be otherwise permitted under Section 5.02(f);

(vii)    (x) Capitalized Leases not to exceed in the aggregate, when taken together with any outstanding Debt permitted to be incurred pursuant to Section 5.02(b)(iv), $25,000,000 at any time outstanding, and (y) in the case of Capitalized Leases to which any Subsidiary of the Borrower is a party, Debt of the Borrower of the type described in <u>clause (i)</u> of the definition of "***Debt***" guaranteeing the Obligations of such Subsidiary under such Capitalized Leases;

(viii)    to the extent constituting Debt, Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and similar obligations incurred in the ordinary course of business and not in connection with Debt for Borrowed Money;

(ix)    other unsecured Debt of (A) Athens in an aggregate amount not to exceed $5,000,000 at any one time outstanding and (B) the other Loan Parties in an aggregate amount not to exceed $25,000,000 at any one time outstanding; *provided* that the aggregate amount of Debt incurred pursuant to this <u>clause (ix)</u> shall not exceed $25,000,000;

(x)    other unsecured Debt of the Loan Parties issued in settlement of delinquent obligations of the Loan Parties or disputes between the Loan Parties and other Persons under Contractual Obligations of the Loan Parties (other than in respect of Debt);

(xi)    [reserved]; and

(xii)    Guaranteed Debt of any Loan Party in respect of any Debt otherwise permitted to be incurred under this Section 5.02(b).

(c)    Change in Nature of Business.  Make, or permit any of its Subsidiaries to make, any material change in the nature of its business as carried on at the date hereof.

(d)    Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it, or permit any of its Subsidiaries to do so; *provided that* any Subsidiary of the Borrower may merge into or consolidate with any other Subsidiary of the Borrower; *provided* that, in the case of any such merger or consolidation, the Person formed by such merger or consolidation shall be a wholly owned Subsidiary of the Borrower; *provided* that the Person formed by such merger or consolidation obtain prior approval under Section 204 of the Federal Power Act to the extent required; and *provided further* that, in the case of any such merger or consolidation to which a Guarantor is a party, the Person formed by such merger or consolidation shall be a Guarantor.

(e)    Sales, Etc. of Assets.  Without the prior written consent of the Required Lenders, which consent may be granted or withheld in each Required Lender's sole and absolute discretion, sell, lease, transfer or otherwise dispose of, or permit any of its Subsidiaries to sell, lease, transfer or otherwise dispose of, any assets, or grant any option or other right to purchase, lease or otherwise acquire, or permit any of its Subsidiaries to grant any option or other right to purchase, lease or otherwise acquire, any assets, except:

(i)    sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) power, natural gas, fuel, capacity or ancillary services or other inventory in the ordinary course of such Person's business;

(ii)    sales, transfers or other dispositions in the ordinary course of its business of Property that is surplus (excluding surplus land owned by Harquahala or related to the Harquahala Project, unless the Administrative Agent shall have given its prior written consent to such sale or disposition, which consent may be granted or withheld in the Administrative Agent's sole and absolute discretion), obsolete, defective, worn-out, damaged, or that individually or in the aggregate is not reasonably necessary for the continued operation of any Project, which, in the case of any such sale, transfer or disposition exceeding $1,000,000.00 in value, shall be so certified by a Responsible Officer of the Borrower and agreed by the Administrative Agent;

(iii)    the liquidation, sale or use of Cash and Cash Equivalents;

(iv)    sales, transfers or other dispositions of assets among Loan Parties; and

(v)     sales of (A) all, but not less than all, of the Equity Interest in or (B) all or substantially all, but not less than substantially all, of the Property of, in each case, any Project Company, including to a special purpose vehicle owned by one or more Persons other than the Loan Parties, so long as (1) the Net Cash Proceeds received by the Borrower and the Guarantors in respect of such sale are not less than the Floor Amount in respect of such Project Company, (2) the purchase price for such sale shall be paid solely in Cash, and (3) the Loan Parties shall have terminated or transferred to the buyer or another unaffiliated third party any Commodity Hedge and Power Sale Agreement relating to the Project that is the subject of the sale, only to the extent that such Commodity Hedge and Power Sale Agreement relates solely to the Project that is the subject of the sale; *provided, however*, for the sale of the last Project remaining as Collateral, the net Cash proceeds of such sale must be sufficient to permit the Borrower to immediately satisfy all the conditions of a Repayment Event, in which case the applicable threshold stated in the definition of "*Floor Amount*" will not apply in respect of such sale;

*provided,* that the Borrower may not engage in any Asset Sales unless the proceeds thereof are applied to prepay the First Lien Obligations pursuant to and in the manner set forth in the Security Deposit Agreement [(provided that the proceeds of any Asset Sale with respect to Harquahala or the Harquahala Project shall be applied as provided in Section 2.06(b) of this Agreement notwithstanding any provision of the Security Deposit Agreement or otherwise)];[24] and *provided, further,* notwithstanding the foregoing, that the Borrower may not sell an undivided interest in any Project or Project Company without the prior written consent of the Required Lenders, which consent may be given or withheld by the Required Lenders in their sole and absolute discretion. For the avoidance of doubt, except as the result of any Asset Sale permitted pursuant to this Section 5.02(e), the Borrower shall not fail to hold, directly or indirectly, 100% of the Equity Interests in each of the Project Companies.

(f)     Investments in Other Persons. Make or hold, or permit any of its Subsidiaries to make or hold, any Investment in any Person, except:

(i)     Investments by and among Loan Parties in other Loan Parties;

(ii)     Investments by the Borrower and its Subsidiaries in (A) Cash, (B) direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury of the United States of America) or obligations the timely payment of the principal and interest on which are fully guaranteed by the United States of America and (C) certificates of deposit fully insured by the Federal Deposit Insurance Corporation in national, state or foreign commercial banks whose outstanding long term debt is rated at least A or the equivalent by S&P or Moody's;

---

[24]     [NTD: Upon agreement on the form of Security Deposit Agreement, an exception in this clause for a Harquahala Sale will no longer be necessary.]

(iii)    to the extent constituting Investments, Investments in contracts and agreements (including, without limitation, Commodity Hedge and Power Sale Agreements and interest rate Hedge Agreements), including prepaid deposits and expenses thereunder, to the extent permitted under the Loan Documents;

(iv)    Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business;

(v)    Investments in the Accounts, and Investments permitted pursuant to Section 5.02(f)(ii) on deposit in or credited to the Accounts, or other accounts permitted under the Loan Documents; and

(vi)    loans and advances to officers, directors and employees of any Loan Party for reasonable and customary business related travel expenses, moving expenses and similar expenses incurred in the ordinary course of business of such Loan Party in an aggregate principal amount at any time outstanding not exceeding $1,000,000.

(g)    Restricted Payments.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Subsidiaries to do any of the foregoing, or permit any of its Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower, except that (A) any Subsidiary of the Borrower may (1) declare and pay Cash dividends to the Borrower or to any Loan Party of which it is a Subsidiary and (2) accept capital contributions from its parent to the extent permitted under Section 5.02(f)(i) [and (B) on [Quarterly Distribution Dates], the Borrower may declare and pay dividends to the holders of common Equity Interests in the Borrower with distributable cash available and permitted to be used for such purpose under the Security Deposit Agreement.][25]

(h)    Amendments of Constitutive Documents.  Amend, or permit any of its Subsidiaries to amend, its limited liability company agreement, limited partnership agreement or other constitutive documents, other than amendments in respect of the constitutive documents of the Borrower that could not be reasonably expected to have a Material Adverse Effect.

(i)    Accounting Changes.  Make or permit, or permit any of its Subsidiaries to make or permit, any change in (i) accounting policies or reporting practices, except, with prior written notice to the Administrative Agent, as permitted by GAAP, or (ii) Fiscal Year.

(j)    Prepayments, Etc., of Debt.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Debt that is expressly subordinated to the

---

[25]    [NTD: To be discussed in connection with agreement on the form of the Security Deposit Agreement.]

Obligations hereunder, or that is secured and the Liens securing such Debt rank behind the Liens created by the First Lien Collateral Documents, or permit any of its Subsidiaries to do any of the foregoing, in each case, except to the extent permitted by the Security Deposit Agreement and the Intercreditor Agreement.

      (k)    <u>Partnerships; Formation of Subsidiaries, Etc.</u>  (i) Except with respect to Millennium, become a general partner in any general or limited partnership or joint venture, or permit any of its Subsidiaries to do so or (ii) organize, or permit any Subsidiary to organize, any new Subsidiary.

      (l)    <u>Speculative Transactions</u>.  Engage, or permit any of its Subsidiaries to engage, in any transaction involving commodity options or futures contracts or any similar transactions, other than Permitted Trading Activity (it being understood and agreed that all activities of the Loan Parties under the Energy Management Agreements are subject to this covenant).

      (m)    <u>Capital Expenditures</u>.  Make, or permit any of its Subsidiaries to make:

      (i)    any Capital Expenditures for Maintenance that would cause the aggregate of all such Capital Expenditures for Maintenance made by the Borrower and its Subsidiaries to exceed $25,000,000 (the "***Base Capex Amount***") per Fiscal Year; *provided*, *however* that if, for any Fiscal Year, the Base Capex Amount exceeds the aggregate amount of Capital Expenditures for Maintenance made by the Borrower and its Subsidiaries for such Fiscal Year, the Borrower and its Subsidiaries shall be entitled to make Capital Expenditures for Maintenance in any succeeding Fiscal Year in an amount (such amount being referred to herein as the "***Capex Carryover Amount***") equal to such excess.  Capital Expenditures for Maintenance shall be deemed to be made, first, from Capex Carryover Amounts and second, the Base Capex Amount in any Fiscal Year; or

      (ii)    any Capital Expenditures for Investment using funds from the Operating Account in excess of $1,000,000 per Fiscal Year without the prior written consent of the Administrative Agent, which consent may be granted or withheld in the Administrative Agent's sole and absolute discretion. [For the avoidance of doubt, (x) for purposes of the Security Deposit Agreement, Capital Expenditures for Investment in excess of the threshold set forth above shall not be "Approved Capital Expenditures" or "O&M Costs" unless the Administrative Agent's prior written consent (which may be granted or withheld in the Administrative Agent's sole and absolute discretion) shall have been obtained therefor and (y) the Borrower may make Capital Expenditures for Investment without restriction under this <u>Section 5.02(m)</u> so long as such Capital Expenditures for Investment are not made using funds from the Operating Account or any funds generated from the operation of the Projects.][26]

---

[26]    [NTD: To conformed following agreement on the form of the Security Deposit Agreement.]

(n)    <u>Amendment, Etc., of Material Contracts</u>.    Cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract, waive any default under or breach of any Material Contract, agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract, or permit any of its Subsidiaries to do any of the foregoing, unless (x) such cancellation, termination, amendment, modification or change could not reasonably be expected to have a Material Adverse Effect, (y) such Material Contract has been replaced as set forth in <u>Section 6.01(n)</u> or (z) in the case of the IDA Lease, the Borrower obtains fee title to the Athens Project as set forth in <u>Section 6.01(n)</u>.

(o)    <u>Regulatory Matters</u>.    Make or permit to be made any change in the upstream ownership of a Guarantor without first obtaining any necessary authorization under Section 203 of the FPA.

(p)    <u>Investments by Depositary</u>.    Direct or permit the Depositary to invest any funds on deposit in or credited to the Accounts under the Security Deposit Agreement to be invested in any Investments other than Investments permitted pursuant to <u>Section 5.02(f)(ii)</u>.[27]

SECTION 5.03.    <u>Reporting Requirements</u>.    Until a Repayment Event has occurred, the Borrower will furnish to the Agents:

(a)    <u>Default Notice</u>.    As soon as possible and in any event within five days after the Borrower obtains knowledge thereof:

(i)    the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect or to materially impair or interfere with the operations of any Project Company, a written statement of a Responsible Officer of the Borrower setting forth details of such Default, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto; and

(ii)    any breach or default, any allegation of breach or default, or any event, development or occurrence under the IDA Lease, the PILOT Documents, the Millennium Lease or, only to the extent such breach or default, or allegation thereof is reasonably likely to have a Material Adverse Effect (or to materially impair or interfere with the operations of any Project Company), any other Material Contract, a written statement of an officer of the Borrower setting forth details of such breach, default, allegation, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

(b)    <u>Annual Financials</u>.    As soon as available and in any event within 120 days after the end of each Fiscal Year, a copy of the annual audit report for such year for the Borrower and its Subsidiaries, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and a Consolidated statement of income and a

---

[27]    [NTD: Applicable limitations on cash investments may be included in the form of the Security Deposit Agreement to be agreed.]

Consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of KPMG or other independent public accountants of recognized standing acceptable to the Administrative Agent and (ii) a certificate of a Responsible Officer of the Borrower (A) certifying such financial statements as having been prepared in accordance with GAAP and (B) stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

(c)     Quarterly Financials.  As soon as available and in any event within (i) 45 days after the end of each of the first three quarters of each Fiscal Year and (ii) 60 days after the end of the fourth quarter of each Fiscal Year, a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous fiscal quarter and ending with the end of such fiscal quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

(d)     Annual Budget.  As soon as available and in any event no later than 15 days before the start of each Fiscal Year, an annual budget, prepared on a quarterly basis for such Fiscal Year in substantially the same form as the Initial Operating Budget or in form otherwise acceptable to the Administrative Agent (with respect to each such Fiscal Year, the "**_Budget_**"), which Budget shall be certified by a Responsible Officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made.

(e)     Litigation.  Promptly after the commencement thereof, notice of all actions, suits, litigation and proceedings before any Governmental Authority of the type described in Section 4.01(g).

(f)     Agreement Notices; Etc.

(i)     Promptly upon execution thereof, copies of any Material Contract entered into by any Loan Party after the date hereof;

(ii)     promptly (but in any event within 10 days) following any Loan Party's entering into of any Material Contract after the date hereof, a First Lien Consent and Agreement substantially in the form of Exhibit F-1 or Exhibit F-2, as applicable, in respect of such Material Contract; and

(iii)    promptly upon execution thereof, copies of any amendment, modification or waiver of any provision of any Material Contracts.

(g)    ERISA.

(i)    ERISA Events and ERISA Reports.  (A) Promptly and in any event within 10 Business Days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liability in excess of $5,000,000, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party or such ERISA Affiliate has taken and proposes to take with respect thereto and (B) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information within 10 Business Days.

(ii)    Plan Terminations.  Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(iii)    Multiemployer Plan Notices.  Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability that could reasonably be expected to result in liability in excess of $5,000,000 by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan that could reasonably be expected to result in liability in excess of $5,000,000 or (C) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in clause (A) or (B).

(h)    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance known to the Borrower by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect (or to materially impair or interfere with the operations of any Project Company) or (ii) cause any property described in the First Lien Mortgages to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(i)    Real Property.  As soon as available and in any event within 30 days after the end of each Fiscal Year, a report supplementing Schedules 4.01(r) and 4.01(s) hereto, including an identification of all owned and leased real property disposed of by the Borrower or any of its Subsidiaries during such Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, and, in the case of leases of property, lessor and lessee thereof) of all real property acquired or leased during such Fiscal Year and a description of such other changes in the information included in such Schedules as may be necessary for such Schedules to be accurate and complete.

(j)    Insurance.

(i)    (i)  Promptly after the Borrower gains knowledge of the occurrence thereof, a report summarizing any changes in the insurance coverage of the Borrower and its Subsidiaries resulting from a change in the insurance markets of the type described in Section 2 of Schedule 5.01(d).

(ii)    Promptly after the occurrence thereof, notice of any Casualty Event or Event of Eminent Domain affecting any Loan Party, whether or not insured, through fire, theft, other hazard or casualty involving a probable loss of $4,000,000 or more.

(iii)    Promptly after receipt thereof, copies of any cancellation or receipt of written notice of threatened cancellation of any property damage insurance required to be maintained under Section 5.01(d).

(k)    Other Information.    Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender Party through the Administrative Agent, may from time to time reasonably request.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    Events of Default.  If any of the following events ("***Events of Default***") shall occur and be continuing:

(a)    Payment Defaults.  (i) the Borrower shall fail to pay any principal of any Loan when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on any Loan within three Business Days after the same shall become due and payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (iii) within ten Business Days after the same shall become due and payable and notice thereof from the Agent shall have been delivered;

(b)    Misrepresentation.    any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; *provided*, *however*, that if (i) such Loan Party was not aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied, within 60 days from the date on which the Borrower or any officer thereof first obtains knowledge thereof such that such incorrect or false representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such incorrect or false representation or warranty shall not constitute a Default or Event of Default;

(c)    Certain Covenants.  the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 2.14, 5.01(d), (e), (i), (l) and (p), 5.02 or 5.03(a);

(d)    Other Covenant.  any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 30 days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party;

(e)    Cross Default.  any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of (i) any Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount (or, in the case of any Hedge Agreement or Commodity Hedge and Power Sale Agreement, an Agreement Value) of at least $25,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding hereunder) or (ii) any Energy Management Agreement that has a Liability Amount of at least $25,000,000, in each case, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt or Energy Management Agreement; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof;

(f)    Insolvency Event.  any Loan Party or any of its Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Loan Party or any of its Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or any Loan Party or any of its Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (f);

(g)    Judgments.  any final judgments or orders, either individually or in the aggregate, for the payment of money in excess of (i) $5,000,000, in the case of judgments or orders that are superior in right of payment to any Obligation under this Agreement, or (ii) $25,000,000, in the case of any other judgment or order, in each case, shall be rendered against any Loan Party or any of its Subsidiaries by one or more Governmental Authorities, arbitral tribunals or other bodies having jurisdiction against such Loan Party and either (x) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (y) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; and *provided, however,* that any such judgment or order shall not give rise to an Event of Default under this Section 6.01(g) if and for so long as (A) the amount of such judgment or order in excess of the thresholds listed above is covered by a valid and binding policy of insurance in favor of such Loan Party or Subsidiary from an insurer that is rated at least "A" "X" by A.M. Best Company, which policy covers full payment thereof and (B) such insurer has been notified, and has not denied the claim made for payment, of the amount of such judgment or order;

(h)    Non-Monetary Judgments.  any non-monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    Invalidity.  any provision of any Loan Document after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (except as a result of acts or omissions of the First Lien Secured Parties) cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

(j)    Collateral.  any First Lien Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby;

(k)    Change of Control.  a Change of Control shall occur;

(l)    ERISA Event.

(i)    any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds $10,000,000;

(ii)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as

Withdrawal Liability (determined as of the date of such notification), exceeds $5,000,000 or requires payments exceeding $5,000,000 *per annum*; or

(iii)     any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $10,000,000;

(m)     Dissolution. any order, judgment or decree shall be entered against any Loan Party or any of its Subsidiaries decreeing the dissolution or split up of such Loan Party or Subsidiary and such order shall remain undischarged or unstayed for a period in excess of 30 days;

(n)     Material Contracts.  (i) any Material Contract shall at any time cease to be valid and binding or in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)  or (ii) any Loan Party shall default in any material respect in the performance or observance of any covenant or agreement contained in any Material Contract to which it is a party and such default has continued beyond any applicable grace period specified therein, and in the case of (i) or (ii), such event could reasonably be expected to have a Material Adverse Effect or to have an adverse impact on the value of the Collateral in excess of an amount (the "***Material Contract Threshold Amount***") equal to (A) $50,000,000 *multiplied by* (B) an amount equal to (I) one *minus* (II) an amount equal to (1) the sum of the Floor Amounts for each Project or Project Company that has been transferred pursuant to an Asset Sale, if any (and for the avoidance of doubt, if no Asset Sales have occurred, this sum shall be equal to zero), *divided by* (2) $1,050,000,000, unless within 120 days of such termination or default, the applicable Loan Party replaces such Material Contract with a replacement agreement (x) similar in scope to and on terms not materially less favorable to the relevant Loan Party, the relevant Project and the Lender Parties than the Material Contract being replaced or (y) in form and substance reasonably satisfactory to the Administrative Agent, and in each case with a counterparty of comparable or better standing in the applicable industry; *provided* that if at any time during such 120 day grace period the Administrative Agent reasonably determines that the applicable Loan Party is not diligently seeking to replace the applicable Material Contract, an Event of Default shall immediately occur; and *provided*, *further*, that to the extent the IDA Lease is terminated, no Default or Event of Default shall occur to the extent that concurrently therewith the Borrower obtains fee title to the Athens Project and grants to the First Lien Collateral Agent a mortgage in respect thereof as set forth in Section 5.01(j) and no Material Adverse Effect results from the termination of the IDA Lease;

then, and in any such event, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender Party and the obligation of each Lender Party to make Loans (other than Revolving

Letter of Credit Loans by the Revolving Issuing Bank or Revolving Credit Lenders pursuant to Section 2.03(c)) and each Revolving Issuing Bank to issue Revolving Letters of Credit to be terminated, whereupon the same shall forthwith terminate and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; *provided*, *however*, that, in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, (x) the Commitments of each Lender Party and the obligation of each Lender Party to make Loans (other than Revolving Letter of Credit Loans by the Revolving Issuing Bank or Revolving Credit Lenders pursuant to Section 2.03(c)) and of each Revolving Issuing Bank to issue Revolving Letters of Credit shall automatically be terminated and (y) the Loans, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower. For the avoidance of doubt, payment defaults may be cured within the applicable cure period, if any, by equity contributions from one or more members of the Borrower without limitation as to the number of such cures. Upon any acceleration of the unpaid principal balance of any Term B Loan or termination of any Revolving Credit Commitment pursuant to this Section 6.01 during the Yield Mainteance Period, the applicable Lender shall be entitled to, and the Borrower shall pay as liquidated damages (it being agreed that the amount of damages that such Lender will suffer in each case are difficult to calculate) an amount equal to the Yield Maintenance Fee applicable to the principal balance of such Term B Loan that has been accelerated or Revolving Credit Commitment that has been terminated, as the case may be, determined, in the case of a Term B Loan, as if such Term B Loan had been prepaid on the date of the acceleration thereof, less any interest accrued and paid thereon and attributable to the period from the date of acceleration to the date of payment, in each case in addition to all other amounts due and payable in respect of the Obligations hereunder.

SECTION 6.02.    Actions in Respect of the Revolving Letters of Credit Upon Default.  If any Event of Default shall have occurred and be continuing, the Administrative Agent may, or shall at the request of the Required Lenders, irrespective of whether it is taking any of the actions described in Section 6.01 or otherwise, make demand upon the Borrower to, and forthwith upon such demand the Borrower will, pay to the First Lien Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Revolving L/C Cash Collateral Account, an amount equal to 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding; *provided*, *however*, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, the Borrower shall be obligated to pay to the First Lien Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Revolving L/C Cash Collateral Account, an amount equal to 103.0% of the aggregate Available Amount of all Letters of Credit then outstanding, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.  If at any time the Administrative Agent or the First Lien Collateral Agent determines that any funds held in the Revolving L/C Cash Collateral Account are subject to any right or claim of any Person other than the Agents and the Lender Parties or that the total amount of such funds is less than 103.0%

of the aggregate Available Amount of all Revolving Letters of Credit, the Borrower will, forthwith upon demand by the Administrative Agent or the First Lien Collateral Agent, pay to the First Lien Collateral Agent, as additional funds to be deposited and held in the Revolving L/C Cash Collateral Account, an amount equal to the excess of (a) 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding *over* (b) the total amount of funds, if any, then held in the Revolving L/C Cash Collateral Account that the Administrative Agent or the First Lien Collateral Agent, as the case may be, determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit in the Revolving L/C Cash Collateral Account, such funds shall be applied to reimburse the Revolving Issuing Bank or the Appropriate Lenders, as applicable, to the extent permitted by applicable law.

## ARTICLE VII

## THE AGENTS

SECTION 7.01.  Authorization and Action.  (a)  Each Lender Party (in its capacities as a Lender and a Revolving Issuing Bank (if applicable)) hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lender Parties and all holders of Notes; *provided*, *however*, that the Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or applicable law. Without limiting the generality of the foregoing, each Lender Party hereby authorizes and instructs the Administrative Agent to enter into the documents to be entered into by the Administrative Agent expressly mentioned in Section 3.01.

(b)    The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the First Lien Collateral Documents or of exercising any rights and remedies thereunder at the direction of the First Lien Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney-in-fact that it selects in accordance with the foregoing provisions of this Section 7.01(b) in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 7.02.  Administrative Agent's Reliance, Etc.    Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan

Documents, except for its or their own gross negligence or willful misconduct.   Without limitation of the generality of the foregoing, the Administrative Agent:  (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender Party and shall not be responsible to any Lender Party for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03.   <u>Agents and Affiliates</u>.   With respect to its Commitments, the Loans made by it and any Notes issued to it, each Agent and its Affiliates shall have the same rights and powers under the Loan Documents as any other Lender Party and may exercise the same as though each were not an Agent or an Affiliate of an Agent; and the term "*Lender Party*" or "*Lender Parties*" shall, unless otherwise expressly indicated, include each Agent and its Affiliates in their respective individual capacities.   Each Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Agent was not an Agent and without any duty to account therefor to the Lender Parties.   No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

SECTION 7.04.   <u>Lender Party Credit Decision</u>.   Each Lender Party acknowledges that it has, independently and without reliance upon any Agent or any other Lender Party and based on the financial statements referred to in <u>Section 3.01</u> and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender Party also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05.   <u>Indemnification</u>.   (a)  Each Lender Party severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower and without limiting its obligation to do so) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions,

judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "***Indemnified Costs***"); *provided*, *however*, that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender Party agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, reasonable fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender Party or any other Person. Each Agent is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all amounts it receives pursuant to the Loan Documents to or for the credit or the account of any Lender Party against any and all obligations of such Lender Party to such Agent now or hereafter existing under this Section 7.05; *provided* that the foregoing sentence shall only apply if such Lender Party fails to promptly pay such obligation following such Agent's written request for payment; *provided further* that any obligation a Lender Party fails to promptly pay following the Agent's written request for payment shall bear interest at the same rate as Default Interest and the Agent is authorized to set off against any such accrued interest in the manner described above.

(b)     Each Revolving Credit Lender severally agrees to indemnify the Revolving Issuing Bank (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Revolving Issuing Bank in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Revolving Issuing Bank under the Loan Documents; *provided*, *however*, that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Revolving Issuing Bank's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Revolving Credit Lender agrees to reimburse the Revolving Issuing Bank promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Revolving Issuing Bank is not promptly reimbursed for such costs and expenses by the Borrower.

(c)     For purposes of Section 7.05(a), (i) each Lender Party's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Loans outstanding at such time and owing to such Lender Party, (B) in the case of any Revolving Credit Lender, such Revolving Credit Lender's Unused Revolving Credit Commitments at such time and (C) in the case of any Revolving Credit Lender, such Revolving Credit Lender's Pro Rata Shares of the aggregate Available Amount of all Revolving Letters of

Credit outstanding at such time; and (ii) each Revolving Credit Lender's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Revolving Credit Loans outstanding at such time and owing to such Lender, (B) such Lender's Pro Rata Shares of the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time and (C) such Lender's Unused Revolving Credit Commitments at such time; *provided* that the aggregate principal amount of Revolving Letter of Credit Loans owing to the Revolving Issuing Bank shall be considered to be owed to the Revolving Credit Lenders ratably in accordance with their respective Revolving Credit Commitments and Section 7.05(b). The failure of any Lender Party to reimburse any Agent or any Revolving Issuing Bank, as the case may be, promptly upon demand for its ratable share of any amount required to be paid by the Lender Parties to the such Agent or such Revolving Issuing Bank, as the case may be, as provided herein shall not relieve any other Lender Party of its obligation hereunder to reimburse such Agent or Revolving Issuing Bank, as the case may be, for its ratable share of such amount, but no Lender Party shall be responsible for the failure of any other Lender Party to reimburse such Agent or Revolving Issuing Bank, as the case may be, for such other Lender Party's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender Party hereunder, the agreement and obligations of each Lender Party contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. Successor Administrative Agent. The Administrative Agent may resign as to any or all of the Facilities at any time by giving 15 days' written notice thereof to the Lender Parties and the Borrower and may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent as to such of the Facilities as to which the Administrative Agent has resigned or been removed. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lender Parties, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent as to less than all of the Facilities, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent as to such Facilities, other than with respect to funds transfers and other similar aspects of the administration of Borrowings under such Facilities, issuance of Revolving Letters of Credit (notwithstanding any resignation as Administrative Agent with respect to the Revolving Letter of Credit Facility) and payments by the Borrower in respect of such Facilities, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement as to such Facilities, other than as aforesaid. If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this Section 7.06 no successor Administrative Agent shall have been appointed

and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above.   After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent as to any of the Facilities shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent as to such Facilities under this Agreement.

SECTION 7.07.   First Lien Collateral Agent.  Each of the Administrative Agent and the Lender Parties hereby designates and appoints CLMG as First Lien Collateral Agent under this Agreement and the other Loan Documents and authorizes CLMG, in the capacity of First Lien Collateral Agent, to (A) execute, deliver and perform the obligations, if any, of the First Lien Collateral Agent, as applicable under this Agreement and each other Loan Document and (B) take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the First Lien Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto; *provided*, *however*, that the First Lien Collateral Agent shall not be required to take any action that exposes the First Lien Collateral Agent to personal liability or that is contrary to this Agreement or applicable law. Without limiting the generality of the foregoing, each of the Administrative Agent and the Lender Parties hereby authorizes and instructs CLMG, in the capacity of First Lien Collateral Agent, to execute and deliver the documents to be entered into by the First Lien Collateral Agent expressly mentioned in Section 3.01, and, without limiting any of the provisions of this Agreement, CLMG, in the capacity of First Lien Collateral Agent, shall continue to be bound by and entitled to all the benefits and protections afforded to the First Lien Collateral Agent under the Intercreditor Agreement, including [Section 7 of the Intercreditor Agreement], as if fully set forth herein.

## ARTICLE VIII

## GUARANTY

SECTION 8.01.   Guaranty; Limitation of Liability.  (a) Subject in the case of Athens to the Athens Cap Amount, each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "***Guaranteed Obligations***"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Lender Party in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, subject in the case of Athens to the Athens Cap

Amount, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)    Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Lender Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Administrative Agent, the other Lender Parties and the Guarantors hereby irrevocably agree that the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c)    Subject in the case of Athens to the Athens Cap Amount, each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender Parties under or in respect of the Loan Documents.

SECTION 8.02.    Guaranty Absolute. Subject in the case of Athens to the Athens Cap Amount, each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Lender Party with respect thereto.  The obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Lender Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender Party (each Guarantor waiving any duty on the part of the Lender Parties to disclose such information);

(g)     the failure of any other Person to execute or deliver this Agreement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender Party or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 8.03.   Waivers and Acknowledgments.   (a)  Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such

Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the obligations of such Guarantor hereunder.

(d)    Each Guarantor acknowledges that the First Lien Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the First Lien Collateral Agent and the other First Lien Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender Party.

(f)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 8.02 and this Section 8.03 are knowingly made in contemplation of such benefits.

SECTION 8.04.    Subrogation.    Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender Party against the Borrower, any other Loan Party or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower or any other Loan Party directly or indirectly, in Cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in Cash, all Revolving Letters of Credit shall be expired or been terminated and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in Cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, (b) the Term B Maturity Date and (c) the latest date of expiration or termination of all Revolving Letters of Credit, such amount shall be received and held in trust for the benefit of the Lender Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to any Lender Party of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid

in full in Cash, (iii) the Term B Maturity Date shall have occurred, and (c) all Revolving Letters of Credit shall have expired or been terminated, the Lender Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 8.05.   Subordination.   Each Guarantor hereby subordinates any and all debts, liabilities and other obligations owed to such Guarantor by each other Loan Party (the "*Subordinated Obligations*") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this Section 8.05:

(a)   Prohibited Payments, Etc.   Except during the continuance of any Event of Default, each Guarantor may receive regularly scheduled payments from any other Loan Party on account of the Subordinated Obligations in compliance with the Security Deposit Agreement. After the occurrence and during the continuance of any Event of Default, however, unless the Required Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations other than to the extent payment of such Subordinated Obligations is permitted under the terms of the Security Deposit Agreement and the other Loan Documents.

(b)   Prior Payment of Guaranteed Obligations.   In any proceeding under any Bankruptcy Law relating to any other Loan Party, each Guarantor agrees that the Lender Parties shall be entitled to receive payment in full in Cash of all Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Bankruptcy Law, whether or not constituting an allowed claim in such proceeding ("*Post-Petition Interest*")) before such Guarantor receives payment of any Subordinated Obligations.

(c)   Turn-Over.   After the occurrence and during the continuance of any Default, each Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Lender Parties and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d)   Administrative Agent Authorization.   After the occurrence and during the continuance of any Default, the Administrative Agent is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

97

SECTION 8.06.  Continuing Guaranty; Assignments.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until a Repayment Event has occurred, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lender Parties and their successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, any Lender Party may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and any Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender Party herein or otherwise, in each case as and to the extent provided in Section 9.07.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Required Lenders, which consent may be granted or withheld in the Required Lenders' sole and absolute discretion.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01.  Amendments, Etc.  (a)  [Subject to Sections 5.3(d) and 5.3(e) of the Intercreditor Agreement][28] and clause (b) below, no amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document (including the Intercreditor Agreement and the Security Deposit Agreement), nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders (or the Administrative Agent on their behalf), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each Lender, do any of the following at any time:

(A)     waive any of the conditions specified in Section 3.01 or, in the case of the Initial Extension of Credit, Section 3.02;

(B)     change (1) the definition of "*Required Lenders*" or (2) the number of Lenders or the percentage of (x) the Commitments, (y) the aggregate unpaid principal amount of the Loans or (z) the aggregate Available Amount of outstanding Revolving Letters of Credit that, in each case, shall be required for the Lender Parties or any of them to take any action hereunder or under any other Loan Document;

(C)     change any other definition in the Intercreditor Agreement or the Security Deposit Agreement in any manner adverse to the Lender Parties;

(D)     other than as expressly contemplated by [Section 5.1] of the Intercreditor Agreement, release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lender Parties under the

---

[28]     [NTD: To be conformed following agreement on the form of the Intercreditor Agreement.]

Guarantees) if such release or limitation is in respect of a material portion of the value of the Guarantees to the Lender Parties;

(E)      other than as expressly contemplated by [Section 5.1] of the Intercreditor Agreement, release any material portion of the Collateral in any transaction or series of related transactions;

(F)      subordinate the Liens of the Lender Parties; or

(G)      amend this Section 9.01,

and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each Lender Party specified below for such amendment, waiver or consent:

(A)      increase the Commitments of a Lender Party without the consent of such Lender Party;

(B)      reduce or forgive the principal of, or stated rate of interest on, the Loans owed to a Lender Party or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender Party without the consent of such Lender;

(C)      postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or 2.07, any or any date fixed for any payment of fees hereunder, in each case, payable to a Lender Party without the consent of such Lender Party;

(D)      impose any restrictions on the rights of such Lender under Section 9.07 without the consent of such Lender;

(E)      change the order of application of any reduction in the Commitments or any prepayment of Loans among the Facilities from the application thereof set forth in the applicable provisions of Section 2.05(b) or 2.06(b), respectively, in any manner that materially adversely affects the Lenders under a Facility without the consent of holders of a majority of the Commitments or Loans outstanding under such Facility;

(F)      increase the maximum duration of any Eurodollar Rate Period;

(G)      change the order of application of proceeds of Collateral and other payments set forth in [Section 4.1] of the Intercreditor Agreement or [Article III] of the Security Deposit Agreement in a manner that materially adversely affects any Lender Party without the consent of such Lender Party;

(H)      otherwise amend or modify any of the Intercreditor Agreement or any First Lien Collateral Document in a manner which disproportionately affects any Lender Party vis-à-vis any other Secured Party without the written consent of such Lender Party; or

(I)    amend or modify the provisions of <u>Sections 2.11(a)(i)</u>, <u>2.11(f)</u> and <u>2.13</u> (including the definition of "Pro Rata Share") in a manner that adversely affects any Lender Party without the consent of such Lender Party;

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by each Revolving Issuing Bank, as the case may be, in addition to the Lenders required above to take such action, affect the rights or obligations of the Revolving Issuing Banks, as the case may be, under this Agreement; and *provided further* that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

(b)    Notwithstanding the other provisions of this <u>Section 9.01</u>, the Borrower, the Guarantors, the First Lien Collateral Agent and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender Party:  (i) to cure any ambiguity, defect or inconsistency; (ii) to make any change that would provide any additional rights or benefits to the Lender Parties or (iii) to make, complete or confirm any grant of Collateral permitted or required by this Agreement or any of the First Lien Collateral Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the First Lien Collateral Documents.

SECTION 9.02.    <u>Notices, Etc</u>.    (a)    All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in <u>Section 9.02(b)</u> and in the proviso to this <u>Section 9.02(a)</u>, in an electronic medium and delivered as set forth in <u>Section 9.02(b)</u>, (i) if to any Loan Party, to the Borrower at its address at [New] MACH Gen, LLC, 9300 US Highway 9W, Athens, NY 12015, Attention: Garry Hubbard, Fax: (972) 943-3808, E-mail Address: garryh@wbcmllc.com (with a copy sent to Willow Bend Capital Management, 2701 Dallas Parkway, Suite 560 Plano, TX 75093, Attention: Jimmy Teringo, Fax: (972) 943-3808, E-mail Address: jimmyt@wbcmllc.com; and to Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910, Attention: Eric Cada, Fax: (240) 723-2339, E-mail Address: ecada@cpv.com); (ii) if to any Term B Lender or Revolving Credit Lender identified on <u>Schedule I</u> hereto, at its Lending Office specified opposite its name on <u>Schedule I</u> hereto; (iii) if to any Initial Lender or Initial Revolving Issuing Bank, at its Lending Office specified in Schedule I attached hereto; (iv) if to any other Lender Party, at its Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender Party; (v) if to the First Lien Collateral Agent or Administrative Agent, at its address at 7195 Dallas Parkway, Plano, TX 75024, Attention: James Erwin, Fax: (469) 467-5550, E-mail Address: jerwin@clmgcorp.com; or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided*, *however*, that materials and information described in <u>Section 9.02(b)</u> shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent.    All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective when deposited in the mails, delivered to the telegraph company, transmitted by telecopier or sent by electronic communication, respectively,

except that notices and communications to any Agent pursuant to <u>Article II</u>, <u>III</u> or <u>VII</u> shall not be effective until received by such Agent.  Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Borrowing (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lender Parties by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "***Platform***").

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.   IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED

PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender Party agrees (i) that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents. Each Lender Party agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03.    No Waiver; Remedies.  No failure on the part of any Lender or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.    Costs and Expenses.  (a)    The Borrower agrees to pay on demand (i) all costs and expenses of each Agent and Revolving Issuing Bank in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for each Agent with respect thereto, with respect to advising such Agent or Revolving Issuing Bank, as the case may be, as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of each Agent and each Lender Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each Lender Party with respect thereto).

(b)    The Borrower agrees to indemnify, defend and save and hold harmless each Agent, each Lender Party and each of their Affiliates and their respective officers, directors, employees, trustees, agents and advisors (each, an "**_Indemnified Party_**") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted

or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facilities, the actual or proposed use of the proceeds of the Loans or the Revolving Letters of Credit, the Loan Documents or any of the transactions contemplated thereby or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated thereby are consummated. The Borrower also agrees not to assert any claim against any Agent, any Lender Party or any of their Affiliates, or any of their respective officers, directors, employees, trustees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facilities, the actual or proposed use of the proceeds of the Loans or the Revolving Letters of Credit, the Loan Documents or any of the transactions contemplated by the Loan Documents.

(c)    If any payment of principal of any Loan is made by the Borrower to or for the account of a Lender Party other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to Section 2.06, acceleration of the maturity of the Loans pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of a Loan for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.06 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or such failure to pay or prepay, as the case may be, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Loan.

(d)    If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender Party, in its sole discretion.

(e)    Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Sections 2.10 and 2.12 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

103

SECTION 9.05.   <u>Right of Set-off</u>.   Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by <u>Section 6.01</u> to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of <u>Section 6.01</u>, each Agent and each Lender Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender Party or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender Party shall have made any demand under this Agreement and although such Obligations may be unmatured. Each Agent and each Lender Party agrees promptly to notify the Borrower after any such set-off and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such set-off and application.   The rights of each Agent and each Lender Party and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender Party and their respective Affiliates may have.

SECTION 9.06.   <u>Binding Effect</u>.   This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each initial Lender Party that such initial Lender Party has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender Party and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.   This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

SECTION 9.07.   <u>Assignments and Participations</u>.   (a)  Each Lender Party may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Loans owing to it, and the Note or Notes held by it); *provided*, *however*, that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of any or all Facilities, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender Party, an Affiliate of any Lender Party or an Approved Fund of any Lender Party or an assignment of all of a Lender Party's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $2,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Default shall have occurred and be continuing at the time of effectiveness of such assignment, the Borrower), (iii) each such assignment shall be to an Eligible Assignee, (iv) no such assignments shall be permitted without the written consent of the Administrative Agent, which consent shall not be unreasonably withheld and (v) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note or Notes (if any) subject to such assignment.

(b)      [Reserved].

(c)      [Reserved].

(d)      Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender or Revolving Issuing Bank, as the case may be, hereunder and (ii) the Lender or Revolving Issuing Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's or Revolving Issuing Bank's rights and obligations under this Agreement, such Lender or Revolving Issuing Bank shall cease to be a party hereto).

(e)      By executing and delivering an Assignment and Acceptance, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender or Revolving Issuing Bank, as the case may be.

(f)      The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the

recordation of the names and addresses of the Lender Parties and the Commitment under each Facility of, and principal amount of the Loans owing under each Facility to, each Lender Party from time to time (the "*Register*").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties shall treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(g)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender Party and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent.  In the case of any assignment by a Lender, within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) an amended and restated Note (which shall be marked "*Amended and Restated*") to the order of such Eligible Assignee in an amount equal to the Commitment assumed by it under each Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such Facility, an amended and restated Note to the order of such assigning Lender in an amount equal to the Commitment retained by it hereunder.  Such amended and restated Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A-1 or A-2 hereto, as the case may be.

(h)    Each Lender Party may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Loans owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender Party's shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender Party shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom.

(i)    Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender Party.

(j)      Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank or Federal Home Loan Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or similar laws and regulations relating to the Federal Home Loan Banks.

(k)      Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may, without the consent of the Borrower or any other Person, create a security interest in all or any portion of the Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(l)      Notwithstanding anything to the contrary contained herein, any Lender Party (a "***Granting Lender***") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "***SPC***") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender Party would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.10 and 2.12 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender Party of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $500, assign all or any portion of its interest in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.  This subsection (l) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Loans are being funded by the SPC at the time of such amendment.

SECTION 9.08.   <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 9.09.   <u>No Liability of the Revolving Issuing Banks</u>.  The Borrower assumes all risks of the acts or omissions of any beneficiary or transferee of any Revolving Letter of Credit with respect to its use of such Revolving Letter of Credit.  Neither any Revolving Issuing Bank nor any of its officers or directors shall be liable or responsible for: (a) the use that may be made of any Revolving Letter of Credit or any acts or omissions of any beneficiary or transferee in connection therewith; (b) the validity, sufficiency or genuineness of documents, or of any endorsement thereon, even if such documents should prove to be in any or all respects invalid, insufficient, fraudulent or forged; (c) payment by such Revolving Issuing Bank against presentation of documents that do not comply with the terms of a Revolving Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Revolving Letter of Credit; or (d) any other circumstances whatsoever in making or failing to make payment under any Revolving Letter of Credit, except that the Borrower shall have a claim against such Revolving Issuing Bank, and such Revolving Issuing Bank shall be liable to the Borrower, to the extent of any direct, but not consequential, damages suffered by the Borrower that the Borrower proves were caused by (i) such Revolving Issuing Bank's willful misconduct or gross negligence as determined in a final, non-appealable judgment by a court of competent jurisdiction in determining whether documents presented under any Revolving Letter of Credit comply with the terms of the Revolving Letter of Credit or (ii) such Revolving Issuing Bank's willful failure to make lawful payment under a Revolving Letter of Credit after the presentation to it of a draft and certificates strictly complying with the terms and conditions of the Revolving Letter of Credit.  In furtherance and not in limitation of the foregoing, such Revolving Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in connection therewith, shall adhere to Uniform Customs and Practice for Documentary Credits as in effect as at the time of the Revolving Letter of Credit Issuance Date.

SECTION 9.10.   <u>Confidentiality</u>.  Neither any Agent nor any Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender Party's Affiliates and their officers, directors, employees, trustees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender Party, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender Party, (e) in connection with any litigation or proceeding to which such Agent or such Lender Party or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 9.11.  <u>Marshalling; Payments Set Aside</u>.  Neither any Agent nor any Lender Party shall be under any obligation to marshal its assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lender Parties (or to Administrative Agent, on behalf of the Lender Parties), or any Agent or Lender Party enforces any security interests or exercise its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

SECTION 9.12.  <u>Patriot Act Notice</u>.  Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.  The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with the Patriot Act.

SECTION 9.13.  <u>Jurisdiction, Etc</u>.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Except as provided in Section 9.17, nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.14.   <u>Governing Law</u>.   This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.15.   <u>Waiver of Jury Trial</u>.   Each of the Borrower, the Agents and the Lender Parties irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans, the Revolving Letters of Credit or the actions of any Agent or any Lender Party in the negotiation, administration, performance or enforcement thereof.

SECTION 9.16.   <u>Limitation on Liability</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS: (A) NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL BE LIABLE TO ANY PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THEIR RESPECTIVE ACTIVITIES RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, THE TERM B LOAN, THE REVOLVING CREDIT LOANS, THE REVOLVING LETTER OF CREDIT LOANS OR OTHERWISE IN CONNECTION WITH THE FOREGOING; (B) WITHOUT LIMITING THE FOREGOING, NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL BE SUBJECT TO ANY EQUITABLE REMEDY OR RELIEF, INCLUDING SPECIFIC PERFORMANCE OR INJUNCTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY; (C) NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL HAVE ANY LIABILITY TO THE LOAN PARTIES, FOR DAMAGES OR OTHERWISE, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY UNTIL THE EFFECTIVE DATE HAS OCCURRED; AND (D) IN NO EVENT SHALL LENDERS' LIABILITY TO THE LOAN PARTIES FOR FAILURE TO FUND ANY REVOLVING CREDIT LOAN EXCEED ACTUAL DIRECT DAMAGES INCURRED BY THE LOAN PARTIES OF UP TO $20,000,000 IN THE AGGREGATE.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[NEW] MACH GEN, LLC,
   as Borrower


By _____
   Name:
   Title:

MACH GEN GP, LLC,
   as Guarantor


By _____
   Name:
   Title:

MILLENNIUM POWER PARTNERS, L.P.,
   as Guarantor


By _____
   Name:
   Title:

NEW ATHENS GENERATING
   COMPANY, LLC,
   as Guarantor


By _____
   Name:
   Title:

NEW HARQUAHALA GENERATING
   COMPANY, LLC,
   as Guarantor


By _____
   Name:
   Title:

CLMG CORP.,
    as Administrative Agent


By _____
    Name:
    Title:


CLMG CORP.,
    as First Lien Collateral Agent


By _____
    Name:
    Title:

BEAL BANK USA,
    as Term B Lender


By _____
    Name:
    Title:


BEAL BANK USA,
    as an Initial Revolving Issuing Bank


By _____
    Name:
    Title:


BEAL BANK USA,
    as an Initial Lender


By _____
    Name:
    Title:

BEAL BANK, SSB,
   as an Initial Lender


By _____
   Name:
   Title:

**Exhibit H** to the Restructuring Support Agreement

**Form of Transferee Joinder**

This joinder (this "**Joinder**") to the Restructuring Support Agreement (the "**Agreement**"), dated as of January 15, 2014, by and among:  (i) MACH Gen, LLC ("**the Company**") and its subsidiaries MACH Gen GP, LLC, Millennium Power Partners, L.P., New Athens Generating Company, LLC, and New Harquahala Generating Company, LLC (such subsidiaries and the Company, each a "**MACH Gen Entity**," and collectively, the "**MACH Gen Entities**"), (ii) the Consenting Equity Holders, (iii) the Consenting First Lien Holders, and (iv) the Consenting Second Lien Holders, is executed and delivered by [_____] (the "**Joining Party**") as of [_____].  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties.

2.    Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the First Lien Claims, Second Lien Claims, and/or Equity Interests identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 19 of the Agreement to each other Party.

3.    Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.    Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By:
Name:

Title:

Holdings: $_____ of Debt
           Under the First Lien Documents


Holdings: $_____ of Debt
           Under the Second Lien Documents


Holdings: $_____ of Equity Interests
           in the Company


Acknowledgements:

By:
Name:
Title:

**<u>Annex I</u> to the Form of Transferee Joinder**

**<u>Exhibit I</u> to the Restructuring Support Agreement**

**Claims and Interests of Restructuring Support Parties**

**REDACTED**

**Exhibit J** to the Restructuring Support Agreement

**Budget**

Printed: 1/14/2014, 5:19 PM

# MACH Gen, LLC et al.

## Cash Flow Forecast
## For the 13-Week Period Ending April 11, 2014



protiviti®
Risk & Business Consulting.
Internal Audit.

**MACH Gen, LLC et al.**

Cash Flow Forecast through April 11, 2014

<u>Statement of Limitations of Information Provided</u>

I.      The information and projections contained herein have been prepared based upon financial, accounting and other data provided by Competitive Power Ventures, Inc. ("CPV"), North American Energy Services ("NAES") and Willow Bend Capital Management ("Willow Bend") who serve as the management and staff of MACH Gen, LLC and its subsidiaries (together, the "Company" or "MACH Gen"). The management and staff of the Company confirm that they are unaware of any facts that would make the information provided herein incomplete or misleading given the scenario contemplated in these projections.

II.     The projections contained herein are subject to change based on the ongoing analysis being performed by the Company and Protiviti, and those changes may be material. These projections may also change due to the changing business environment in which the Company operates.

III.    The information contained herein has not been subjected to an examination in accordance with generally accepted auditing or attestation standards or the Statement on Standards for Prospective Financial Information issued by the AICPA. While the Company has used the best available information in preparing these forward looking statements, neither Protiviti, nor the Company can warrant the accuracy or achievability of the projections presented herein.

IV.     This document has been prepared for the specific use of the intended recipients and may not be distributed to third parties without the express written consent of the Company.

MACH Gen, LLC et al.
Cash Flow Forecast through April 11, 2014

Statement of Significant Assumptions

I.  General

A)  These projections assume that MACH Gen, LLC ("MACH Gen"), MACH Gen GP, LLC ("MACH GP"), New Athens Generating Company, LLC ("Athens"), Millennium Power Partners, L.P. ("Millennium") and New Harquahala Generating Company, LLC ("Harquahala") (together, the "Company") file for Chapter 11 bankruptcy protection on February 10, 2014. This date was chosen for illustrative purposes and any delay or acceleration of the actual filing may cause numbers to move by a material amount.

B)  The projections assume that the Company remains in Chapter 11 and operates business as usual throughout the projection period.

C)  The weekly operating projections are premised on management's annual 2013 forecast and 2014 budget, dated November 11, 2013 and December 17, 2013, respectively. Restructuring expenses are forecast pursuant to the terms of the professionals' engagement letters, the proposed amended credit agreement, and applicable bankruptcy law. The detailed assumptions are described below and are illustrated on Exhibits A through F of this report.

D)  The projections assume that on January 14, 2014 the First Amendment to Amended and Restated First Lien Credit and Guaranty Agreement (the "Prepetition First Lien Amendment") becomes effective. In addition, the court approves the Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement on a final basis approximately 30 days after filing. At that time, the Company will resume use of the amended facilities to assist with the funding of operations and to provide liquidity for contingencies and chapter 11 expenses.

E)  The Company will continue to draw on the revolving credit facility pre-petition but will not make any principal repayments on the facility prior to filing.

F)  The Company will maintain a cash balance of at least $2.0 million prior to the execution of the Prepetition First Lien Amendment. Once the Company has entered into the amendment with Beal Bank ("Beal"), it will maintain a cash balance of approximately $25.0 million. The minimum cash balance represents management's estimate of the amount of cash the Company may need in any given month if unpredictable weather, non-routine maintenance/outages, or other unforeseeable events occur. In addition, management considered the uncertainty related to the availability of the credit facilities post-petition. See Section IV. E) below for additional information.

G)  As of the filing date, the Company's bank accounts are projected to have the following beginning cash balances:

| Account Type | | Bank | Beginning Balance February 10, 2014 | |
|---|---|---|---|---|
| Revenue Account | MACH Gen | Citibank | $ | - |
| O&M Account | MACH Gen | Citibank | 28,358,347 | [See Section IV. E] |
| Checking Account | Athens | Capital One | 50,000 | |
| Checking Account | Harquahala | Capital One | 50,000 | |
| Checking Account | Millennium | Capital One | 50,000 | |
| 1st Lien Interest Payment | MACH Gen | Citibank | - | |
| 1st Lien Principal Payment | MACH Gen | Citibank | - | |
| Debt Service Reserve | MACH Gen | Citibank | - | |
| | | | $ 28,508,347 | |

MACH Gen, LLC et al.
Cash Flow Forecast through April 11, 2014

Statement of Significant Assumptions

H)   In the normal course of business, the Company receives revenues earned by its subsidiaries into a single Revenue Account and transfers funds from the Revenue Account into the O&M Account for distribution to vendors of both MACH Gen and its three operating subsidiaries. Subsidiary vendors are either paid directly from the O&M Account in the form of a wire transfer, or funds are wired from the O&M Account to a local Checking Account held by each subsidiary where a check is cut. For projection purposes only, all disbursements normally made from the local Checking Accounts are assumed to be paid through the O&M Account. As a result, the Checking Accounts are projected to have no debit or credit activity and the O&M Account's cash balance includes amounts that may be on deposit at Capital One. Throughout the forecasted period, each Checking Account maintains a $50,000 balance to illustrate the continued use of the bank account.

I)   Although all cash receipts and nearly all cash disbursements are processed through the Revenue and O&M Accounts held by MACH Gen, detail provided herein shows revenues and expenses separately by subsidiary.

II.  CASH RECEIPTS

A)   **Net Power Generation:** Net power receipts are based on management's 2013 forecast and 2014 budgeted energy, capacity and ancillary revenue for each plant. Cash receipts have been derived using the following key assumptions:

1)   Merrill Lynch Commodities, Inc. ("Merrill Lynch") will continue to perform under its Energy Management Agreements ("EMA's") with Athens and Millennium until November 30, 2013 and will make its final payment to the Company on December 25, 2013. Consolidated Edison, Inc. ("ConEd") will replace Merrill Lynch as Athen's and Millennium's energy manager under substantially similar terms and will make its first payment to the Company on January 25, 2013. Twin Eagle Resource Management ("Twin Eagle" and together with Merrill Lynch and ConEd "Energy Managers") will continue to perform under its Energy Management Agreement with Harquahala. The Energy Managers will not exercise their rights to terminate the EMA's as a result of the bankruptcy filing.

2)   Merrill Lynch, ConEd and Twin Eagle will send monthly energy statements to the Company on the 15th of each month for the prior months net revenue. The Energy Managers will deposit the prior months net revenue in the Revenue Account on the 25th of each month.

3)   Harquahala is projected to run at a loss in January and February 2014 while it undergoes testing. As a result, it is not projected to receive any net power generation cash receipts during the forecast period.

4)   The Energy Managers will continue to pay for and net the following expenses ("EM Net Expenses") from monthly revenue payments based on the terms of the applicable Energy Management Agreement and historical practices:

| | Athens | Millennium | Harquahala |
|---|---|---|---|
| Gas purchases | ❖ | ❖ | |
| Gas Transportation | ❖ | ❖ | |
| Electricity - Backfeed at Site | ❖ | ❖ | ❖ |
| ISO / RTO Fee | ❖ | ❖ | |
| Forward Trading Activity | | ❖ | ❖ |
| EMA Fee | ❖ | ❖ | ❖ |

[Note: Harquahala gas transportation and backfeed services are provided by other vendors; ISO fees are not applicable in Desert Southwest]

MACH Gen, LLC et al.
Cash Flow Forecast through April 11, 2014

Statement of Significant Assumptions

5) These projections assume that the Company prepays the Energy Managers for estimated monthly gas purchases during the first week of each month, beginning January 10, 2014. The remaining monthly EM Net Expenses will be net in the following month's cash receipts. See Section IV below for additional information.

B) **Other:** Other cash receipts include miscellaneous refunds, insurance proceeds, and funds from the PIK drawdown. Pursuant to the terms of the Prepetition First Lien Amendment and recent discussions with Beal, the Company will receive the funds from the PIK drawdown, net of any third-party professional fees incurred by Beal, upon execution of the amendment. No additional cash receipts of this nature are projected during the forecast period.

### III. CASH DISBURSEMENTS

A) **Fuel and Emissions Costs:** Fuel and emissions costs relate to the purchase and sale of energy and gas and represent those costs not paid and netted by the Energy Managers. These expenses include CO2 allowance purchases for Athens and Millenium and gas transportation and AZ gas sales and use tax for Harquahala. On or before the 15th of each calendar quarter's last month, Athens and Millennium participate in the Regional Greenhouse Gas Initiative ("RGGI") emission allowances auction. At each auction, CO2 emission allowances are purchased for the upcoming calendar quarter. Harquahala pays a fixed transportation fee to El Paso Natural Gas each month on 30 day terms. These projections assume the January 2014 fixed charge is not paid prior to filing.

B) Operating and maintenance cash disbursements relate to the day-to-day maintenance and continued operations of Athens, Harquahala and Millennium (together, the "Plants") and are comprised of the following expenses:

1) **Labor and Related Costs:** The Company does not have any direct employees. Athens, Harquahala and Millennium are staffed by an O&M contractor, NAES. Pursuant to the terms of the O&M Agreements between each Plant and NAES, the Company must pre-pay labor expenses on the first of each month for that month including a true-up of labor expenses for the prior month. In addition, the Company also pays NAES and its employees an annual incentive bonus in February for the prior calendar year performance. These projections assume the Company does not pay the estimated 2013 incentive bonus prior to filing but receives court approval to pay this amount in the normal course.

2) **Long Term Service Agreements & Outages:** Each Plant is party to a Long Term Service Agreement ("LTSA") with Siemens Energy, Inc. ("Siemens") covering the seven 501G gas turbines at the Plants. Pursuant to the terms of each LTSA, which were amended and extended in October 2013, Siemens is due quarterly fixed and variable fees for maintenance, scheduled outage service fees, and payment for purchased parts, other than "Program Parts", in connection with the maintenance of the Plants. In the ordinary course of business, the Company pays Q4 fixed and variable fees in January of the following year. These projections assume the Company pays the aforementioned costs prior to filing for bankruptcy. In addition, any costs incurred pre-petition with all vendors related to Harquahala's January 2014 scheduled outage are assumed to be paid prior to filing. See Section IV below for additional information.

3) **Other O&M Costs:** Other costs include payments related to inventory replenishment, chemicals and consumables purchases, utility expenses, subcontractor services, and other employee and facility expenses.

C) **General & Administrative:** General and administrative expenses include property taxes, insurance, professional services, management fees, and other administrative expenses.

D) **Capital Expenditures:** Forecast capital expenditures mainly relate to safety, reliability, and environmental improvements necessary to maintain and operate the Plants.

MACH Gen, LLC et al.
Cash Flow Forecast through April 11, 2014

Statement of Significant Assumptions

## IV.  RESTRUCTURING

**A)  Professional Fees:**  The projections include provisions for professional fees of the Company, Creditors' Committee and lenders.  The projections assume the lenders' professionals are paid pursuant to the terms of their respective engagement letters in the ordinary course of business.  The Company's and Committee's professionals are subject to the following court-approved interim compensation procedures:

- Monthly fee applications are filed on or after the 15th day of each month following the month for which compensation is sought; and
- As a result of the pre-packaged bankruptcy filing, 100% of requested fees and 100% of requested expenses are paid if no objections have been received 20 days after filing a monthly fee application.

**B)  US Trustee Fees:**  Pursuant to applicable bankruptcy law and procedures, US Trustee fees are budgeted to be paid quarterly on the last day of the month following the calendar quarter.  Fees are based on total disbursements for the quarter in accordance with the US Trustee's quarterly fee schedule:

| Disbursement Range | Quarterly Fee | |
|---|---|---|
| Quarterly disbursements of $1,000,000 to $1,999,999.99 | $ | 6,500 |
| Quarterly disbursements of $2,000,000 to $2,999,999.99 | $ | 9,750 |
| Quarterly disbursements of $3,000,000 to $4,999,999.99 | $ | 10,400 |
| Quarterly disbursements of $5,000,000 to $14,999,999.99 | $ | 13,000 |
| Quarterly disbursements of $15,000,000 to $29,999,999.99 | $ | 20,000 |
| Quarterly disbursements of $30,000,000 or more | $ | 30,000 | [Company's projected fee] |

**C)  Noticing Agent:**  The Company will retain a noticing agent to provide noticing and claims administration services during the pre-petition solicitation period and throughout the bankruptcy process.  A retainer will be paid and replenished to cover pre-petition expenses and post-petition payments will be made monthly in arrears.

**D)  Key Vendor Prepayments:**  These projections assume that the Company will be required to prepay key vendors the following amounts for pre-petition expenses due and/or accrued prior to the filing date:

| Vendor | Expense | Athens | Millennium | Harquahala | MACH Gen | Total |
|---|---|---|---|---|---|---|
| ConEd | January Gas Purchases | 10,900,000 | 13,200,000 | - | $ - | 24,100,000 |
| Siemens | Q4 2013 LTSA | 1,800,000 | 800,000 | 210,000 | - | 2,810,000 |
| Siemens | All other amounts due | - | - | 1,500,000 | - | 1,500,000 |
| Various | Harquahala HGP Vendors | - | - | 1,000,000 | - | 1,000,000 |
| Deloitte & Touche LLP | Tax Deposit | - | - | - | 30,000 | 30,000 |
| | | $ 12,700,000 | $ 14,000,000 | $ 2,710,000 | $ 30,000 | $ 29,440,000 |

MACH Gen, LLC et al.
Cash Flow Forecast through April 11, 2014

Statement of Significant Assumptions

For projection purposes only, the estimated expenses relating to each of the aforementioned prepayments are included in the following cash disbursement line items during the weeks listed below. The application of the prepaid amounts is reflected as a negative disbursement in the "Key Vendor Prepayment" line item in the week the expense is budgeted:

| Vendor | Expense | Athens | Millennium | Harquahala | MACH Gen | Week Ending Friday, |
|---|---|---|---|---|---|---|
| ConEd | January Gas Purchases | Net Power Generation | Net Power Generation | | | 2/28/2014 |
| Siemens | Q4 2013 LTSA | O&M - LTSA | O&M - LTSA | O&M - LTSA | | 1/31/2014 |
| Siemens | All other amounts due | | | O&M - LTSA | | 2/28/2014 |
| Various | Harquahala HGP Vendors | | | Capital Expenditures | | 2/28/2014 |
| Deloitte & Touche LLP | Tax Deposit | | | | G&A - Prof. Services | 3/28/2014 |

Furthermore, these projections assume that ConEd requires prepayment of gas purchases throughout the bankruptcy process. This prepayment is projected in the first week of each month and the application of the prepaid funds is illustrated as a negative disbursement in the "Key Vendor Prepayment" line item on the 25th of the following month.

| Vendor | Expense | Athens | Millennium | Total | Week Prepaid | Week Budgeted |
|---|---|---|---|---|---|---|
| ConEd | February Gas Purchases | $ 8,300,000 | $ 15,900,000 | $ 24,200,000 | 2/7/2014 | 3/28/2014 |
| ConEd | March Gas Purchases | 18,700,000 | 10,400,000 | 29,100,000 | 3/7/2014 | 4/25/2014 |
| ConEd | April Gas Purchases | 16,600,000 | 7,900,000 | 24,500,000 | 4/4/2014 | 5/30/2014 |
| | | $ 43,600,000 | $ 34,200,000 | $ 77,800,000 | | |

E)   In the week prior to the filing date, the Company will draw on its credit facilities to have enough cash to prepay the following month's estimated gas purchases and to provide a $25.0 million cash balance for working capital.

F)   **Contractual Vendor Deposits:**  The following vendors have specific contractual rights to demand additional collateral if the Company appears to be financially unstable. These projections assume that the Company will pay the following deposits to each vendor prior to filing and that these deposits will be returned once the Company has emerged from bankruptcy:

| Vendor | Athens | Millennium | Harquahala | MACH Gen | Total |
|---|---|---|---|---|---|
| Operator of Hassayampa Switchyard | $ - | $ - | $ 100,000 | $ - | $ 100,000 |
| AZ Department of Environmental Quality | - | - | 300,000 | - | 300,000 |
| Tennessee Gas | - | 300,000 | - | - | 300,000 |
| Iroquois Gas | 2,000,000 | - | - | - | 2,000,000 |
| El Paso Gas | - | - | 1,000,000 | - | 1,000,000 |
| | $ 2,000,000 | $ 300,000 | $ 1,400,000 | $ - | $ 3,700,000 |

Exhibit A

**MACH Gen, LLC et al.**
**13-Week Cash Flow Forecast**

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Receipts** | | | | | | | | | | | | | | | |
| a) Net Power Generation | Exhibit C | | | | | | | | | | | | | | |
|    Athens | | - | - | 6,850 | - | - | - | 4,039 | - | - | - | 2,956 | - | - | 13,845 |
|    Millennium | | - | - | 2,409 | - | - | - | 2,472 | - | - | - | 3,096 | - | - | 7,977 |
|    Harquahala | | - | - | (206) | - | - | - | (108) | - | - | - | (266) | - | - | (581) |
| | | - | - | 9,054 | - | - | - | 6,402 | - | - | - | 5,786 | - | - | 21,242 |
| b) Other | II. B) | 22,318 | - | - | - | - | - | - | - | - | - | - | - | - | 22,318 |
| Total Receipts | | 22,318 | - | 9,054 | - | - | - | 6,402 | - | - | - | 5,786 | - | - | 43,560 |
| **II. Disbursements** | | | | | | | | | | | | | | | |
| a) Operating Expenses | | | | | | | | | | | | | | | |
|    Athens | Exhibit D | 188 | 8 | 2,422 | 81 | 373 | 81 | 1,236 | 147 | 1,871 | 147 | 764 | - | 500 | 7,818 |
|    Millennium | Exhibit D | 356 | 31 | 1,708 | 24 | 67 | 24 | 1,036 | 15 | 637 | 15 | 569 | - | 40 | 4,522 |
|    Harquahala | Exhibit D | 430 | 19 | 4,412 | 353 | 189 | 353 | 5,008 | 291 | 856 | 291 | 1,183 | - | 51 | 13,436 |
|    MACH Gen | Exhibit D | - | 4 | 155 | 4 | 15 | 4 | 101 | 4 | 37 | 4 | 434 | - | - | 725 |
|    Capital Expenditures | Exhibit E | 12 | - | 25 | - | 6 | - | 1,664 | - | - | - | 72 | - | 4 | 1,816 |
| | | 986 | 61 | 8,722 | 461 | 649 | 461 | 9,045 | 457 | 3,401 | 457 | 3,022 | - | 595 | 28,318 |
| Cash Flow from Operations | | 21,332 | (61) | 332 | (461) | (649) | (461) | (2,643) | (457) | (3,401) | (457) | 2,764 | - | (595) | 15,242 |
| b) Non-Operating/Restructuring | | | | | | | | | | | | | | | |
|    Debtors' Professionals | Exhibit F | 30 | - | 825 | - | - | - | - | - | - | - | - | - | 830 | 1,760 |
|    Committee Professionals | Exhibit F | - | - | - | - | - | - | 50 | - | - | - | - | - | - | 50 |
|    Lenders' Professionals | Exhibit F | - | - | 700 | 150 | - | - | 125 | - | - | - | 799 | - | - | 1,700 |
|    Term Loan P&I | Exhibit B | - | - | - | - | - | - | - | - | - | - | 8,837 | - | - | 8,837 |
|    Revolver Interest & Fees | Exhibit B | 800 | - | - | - | - | - | - | - | - | - | - | - | - | 800 |
|    DIP Interest & Fees | Exhibit B | - | - | - | - | - | - | - | - | - | - | 2,099 | - | - | 2,099 |
|    UST Fees & Utility Deposits | IV. B) | - | - | - | - | - | 1,000 | - | - | - | - | - | - | - | 1,000 |
|    Noticing Agent | IV. C) | - | - | - | - | - | - | 10 | - | - | - | - | - | - | 10 |
|    Key Vendor Prepayment | IV. D) | 29,440 | - | (2,810) | 24,200 | - | - | (26,600) | 29,100 | - | - | (24,230) | 24,500 | - | 53,600 |
|    Contractual Vendor Deposits | IV. F) | 3,700 | - | - | - | - | - | - | - | - | - | - | - | - | 3,700 |
| | | 33,970 | - | (1,285) | 24,350 | - | 1,000 | (26,415) | 29,100 | - | - | (12,495) | 24,500 | 830 | 73,555 |
| **III. Net Change in Cash Before Financing** | | (12,638) | (61) | 1,617 | (24,811) | (649) | (1,461) | 23,772 | (29,557) | (3,401) | (457) | 15,259 | (24,500) | (1,425) | (58,314) |
| **IV. Beginning Cash** | | 4,401 | 26,763 | 26,703 | 28,320 | 28,508 | 27,859 | 26,398 | 25,170 | 25,613 | 27,211 | 26,754 | 25,013 | 25,513 | 4,401 |
|    Net Change in Cash | | (12,638) | (61) | 1,617 | (24,811) | (649) | (1,461) | 23,772 | (29,557) | (3,401) | (457) | 15,259 | (24,500) | (1,425) | (58,314) |
|    Revolver Draw (Paydown) | | 35,000 | - | - | 25,000 | - | - | (25,000) | - | - | - | - | - | - | 35,000 |
|    DIP Draw (Paydown) | | - | - | - | - | - | - | - | 30,000 | 5,000 | - | (17,000) | 25,000 | - | 43,000 |
| Ending Cash Balance | | 26,763 | 26,703 | 28,320 | 28,508 | 27,859 | 26,398 | 25,170 | 25,613 | 27,211 | 26,754 | 25,013 | 25,513 | 24,088 | 24,088 |

Printed: 1/14/2014, 5:19 PM

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Debt

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Term Loan** | | | | | | | | | | | | | | | |
| **a) Term B Loan** | | | | | | | | | | | | | | | |
| Beginning Balance | | $ 460,076 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 482,001 | $ 482,001 | $ 460,076 |
| Accrued Interest | | | | | | | | | | | | 7,629 | | | 7,629 |
| Interest Payment | | | | | | | | | | | | (7,629) | | | (7,629) |
| Principal Payment | | | | | | | | | | | | (1,208) | | | (1,208) |
| Unused PIK Drawdown | | 23,133 | | | | | | | | | | | | | 23,133 |
| Ending Balance | | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 483,209 | 482,001 | 482,001 | 482,001 | 482,001 |
| **b) PIK** | | | | | | | | | | | | | | | |
| Capitalized Interest Cap | [a] | | | | | | | | | | | | | | n/a |
| Amount Capitalized | | | | | | | | | | | | | | | n/a |
| Available Amount | | | | | | | | | | | | | | | n/a |
| **c) Summary - Term P&L** | | | | | | | | | | | | | | | |
| Term - Interest Payments | | | | | | | | | | | | (7,629) | | | (7,629) |
| Term - Principal Payments | | | | | | | | | | | | (1,208) | | | (1,208) |
| **Total Term Loan P&L Payments** | | | | | | | | | | | | (8,837) | | | (8,837) |
| **II. Revolver** | | | | | | | | | | | | | | | |
| **a) Working Capital** | | | | | | | | | | | | | | | |
| Beginning Balance | | 88,953 | 123,953 | 123,953 | 123,953 | 148,953 | 148,953 | 148,953 | 93,343 | 93,343 | | | | | 88,953 |
| Accrued Interest | | | | | | | | | | | | | | | |
| Interest Payment | | | | | | | | | | | | | | | |
| Operating Repayments | | | | | | | | (25,000) | | | | | | | (25,000) |
| Prepetition Cash Collateral Repayments | | | | | | | | (30,611) | | | | | | | (30,611) |
| Transfer to DIP | | | | | | | | | | (93,343) | | | | | (93,343) |
| Draws | | 35,000 | | | 25,000 | | | | | | | | | | 60,000 |
| Ending Balance | | 123,953 | 123,953 | 123,953 | 148,953 | 148,953 | 148,953 | 93,343 | 93,343 | | | | | | |
| **b) LCs** | | | | | | | | | | | | | | | |
| Beginning Balance | | 30,442 | 30,442 | 30,442 | 28,942 | 28,942 | | | | | | | | | 30,442 |
| Accrued Interest | | | | | | | | | | | | | | | |
| Interest Payment | | | | | | | | | | | | | | | |
| Expirations | | | | (1,500) | | | | | | | | | | | (1,500) |
| Transfer to DIP | | | | | | (28,942) | | | | | | | | | (28,942) |
| Posts | | | | | | | | | | | | | | | |
| Ending Balance | | 30,442 | 30,442 | 28,942 | 28,942 | | | | | | | | | | 30,442 |

9 of 19

Printed: 1/14/2014, 5:19 PM

Exhibit B

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Debt

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Week Ending Friday | | | | | | | |
| **c) Fees** | | | | | | | | | | | | | | | |
| Maximum Borrowing | | 200,000 | 200,000 | 200,000 | 200,000 | | | | | | | | | | n/a |
| Ending Borrowed Balance | | 154,396 | 154,396 | 152,896 | 177,896 | | | | | | | | | | n/a |
| Unused Balance | | 45,604 | 45,604 | 47,104 | 22,104 | | | | | | | | | | n/a |
| | | | | | | | | | | | | | | | |
| Unused Fee Payment | | | | | | | | | | | | | | | |
| Upfront Fee Payment | | (800) | | | | | | | | | | | | | (800) |
| | | (800) | | | | | | | | | | | | | (800) |
| **d) Summary - Interest & Fees** | | | | | | | | | | | | | | | |
| WC - Interest Payment | | | | | | | | | | | | | | | |
| LCs - Interest Payment | | | | | | | | | | | | | | | |
| Fees | | (800) | | | | | | | | | | | | | (800) |
| | | | | | | | | | | | | | | | |
| **Total Revolver Interest & Fees** | | (800) | | | | | | | | | | | | | (800) |
| | | | | | | | | | | | | | | | |
| **III. DIP Facility** | | | | | | | | | | | | | | | |
| **a) Working Capital** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | 30,611 | 60,611 | 158,953 | 158,953 | 141,953 | 166,953 | |
| Accrued Interest | | | | | | | | | | | | 1,813 | | | 1,813 |
| Interest Payment | | | | | | | | | | | | (1,813) | | | (1,813) |
| Operating Repayments | | | | | | | | | | | | (17,000) | | | (17,000) |
| Prepetition Cash Collateral Repayments | | | | | | | | 30,611 | | | | | | | 30,611 |
| Transfer from Revolver | | | | | | | | | | 93,343 | | | | | 93,343 |
| Draws | | | | | | | | | 30,000 | 5,000 | | | 25,000 | | 60,000 |
| Ending Balance | | | | | | | | 30,611 | 60,611 | 158,953 | 158,953 | 141,953 | 166,953 | 166,953 | 166,953 |
| **b) LCs** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | 28,942 | 28,942 | 30,942 | 31,007 | 31,007 | 31,007 | 29,007 | 29,007 | |
| Accrued Interest | | | | | | | | | | | | 215 | | | 215 |
| Interest Payment | | | | | | | | | | | | (215) | | | (215) |
| Expirations | | | | | | | | | | | | (2,000) | | | (2,000) |
| Transfer from Revolver | | | | | | 28,942 | | | | | | | | | 28,942 |
| Posts | | | | | | | 2,000 | 65 | | | | | | | 2,065 |
| Ending Balance | | | | | | 28,942 | 28,942 | 30,942 | 31,007 | 31,007 | 31,007 | 29,007 | 29,007 | 29,007 | 29,007 |
| **c) Fees** | | | | | | | | | | | | | | | |
| Maximum Borrowing | | | | | | 51,047 | 51,047 | 106,657 | 106,657 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| Ending Borrowed Balance | | | | | | 28,942 | 28,942 | 61,553 | 91,618 | 189,961 | 189,961 | 170,961 | 195,961 | 195,961 | n/a |
| Unused Balance | | | | | | 22,104 | 22,104 | 45,104 | 15,039 | 10,039 | 10,039 | 29,039 | 4,039 | 4,039 | n/a |

Exhibit B

## MACH Gen, LLC et al.
### Derivation of Cash Disbursements Forecast
### Debt

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unused Fee Payment | | | | | | | | | | | | (71) | | | (71) |
| Upfront Fee Payment | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | (71) | | | (71) |
| **d) Summary - Interest & Fees** | | | | | | | | | | | | | | | |
| WC - Interest Payment | | | | | | | | | | | | (1,813) | | | (1,813) |
| LCs - Interest Payment | | | | | | | | | | | | (215) | | | (215) |
| Fees | | | | | | | | | | | | (71) | | | (71) |
| **Total DIP Interest & Fees** | | | | | | | | | | | | (2,099) | | | (2,099) |
| **IV. Total Debt Payments & Fees** | | | | | | | | | | | | | | | |
| Term Loan | | | | | | | | | | | | (8,837) | | | (8,837) |
| Revolver | | (800) | | | | | | | | | | | | | (800) |
| DIP Facility | | | | | | | | | | | | (2,099) | | | (2,099) |
| **Total Debt Payments & Fees** | | $ (800) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (10,935) | $ - | $ - | $ (11,735) |
| **V. Liquidity** | | | | | | | | | | | | | | | |
| Revolver Capacity | | 200,000 | 200,000 | 200,000 | 200,000 | 148,953 | 148,953 | 93,343 | 93,343 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| | | | | | | 51,047 | 51,047 | 106,657 | 106,657 | | | | | | n/a |
| DIP Capacity | | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| Less: | | | | | | | | | | | | | | | |
| Working Capital Usage | [b] | 123,953 | 123,953 | 123,953 | 148,953 | 148,953 | 148,953 | 123,953 | 153,953 | 158,953 | 158,953 | 141,953 | 166,953 | 166,953 | n/a |
| LC Usage | | 30,442 | 30,442 | 28,942 | 28,942 | 28,942 | 28,942 | 30,942 | 31,007 | 31,007 | 31,007 | 29,007 | 29,007 | 29,007 | n/a |
| | | 154,396 | 154,396 | 152,896 | 177,896 | 177,896 | 177,896 | 154,896 | 184,961 | 189,961 | 189,961 | 170,961 | 195,961 | 195,961 | n/a |
| Remaining Borrowing Liquidity | | 45,604 | 45,604 | 47,104 | 22,104 | 22,104 | 22,104 | 45,104 | 15,039 | 10,039 | 10,039 | 29,039 | 4,039 | 4,039 | n/a |
| Cash Balance | | 26,763 | 26,703 | 28,320 | 28,508 | 27,859 | 26,398 | 25,170 | 25,613 | 27,211 | 26,754 | 25,013 | 25,513 | 24,088 | n/a |
| **Total Remaining Liquidity** | | $ 72,368 | $ 72,307 | $ 75,424 | $ 50,613 | $ 49,963 | $ 48,502 | $ 70,274 | $ 40,652 | $ 37,251 | $ 36,794 | $ 54,052 | $ 29,552 | $ 28,127 | n/a |

Note:
[a] Included in Term B Loan balance.
[b] Includes both prepetition and super-priority postpetition amounts.

Exhibit C

($ in 000's)

**MACH Gen, LLC et al.**
Derivation of Cash Receipts Forecast
Net EMA Receipts

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I.** | | | | | | | | Week Ending Friday | | | | | | | |
| **Athens EMA** | | | | | | | | | | | | | | | |
| a) Receipts | | | | | | | | | | | | | | | |
| Energy Revenue | | $ - | $ - | $ 19,264 | $ - | $ - | $ - | $ 12,623 | $ - | $ - | $ - | $ 9,462 | $ - | $ - | $ 41,349 |
| Capacity Revenue | | - | - | 2,037 | - | - | - | 2,705 | - | - | - | 2,164 | - | - | 6,906 |
| Ancillary Revenue | | - | - | 195 | - | - | - | 195 | - | - | - | 195 | - | - | 585 |
| | | | | 21,496 | | | | 15,523 | | | | 11,822 | | | 48,840 |
| b) Net from Revenue | | | | | | | | | | | | | | | |
| Commodity | | - | - | 14,108 | - | - | - | 10,890 | - | - | - | 8,279 | - | - | 33,277 |
| Transportation | | - | - | 402 | - | - | - | 419 | - | - | - | 417 | - | - | 1,238 |
| Electricity - Backfeed at Site | | - | - | 40 | - | - | - | 50 | - | - | - | 50 | - | - | 140 |
| ISO / RTO Fee | | - | - | 96 | - | - | - | 95 | - | - | - | 95 | - | - | 286 |
| Power Marketer Fee | | - | - | - | - | - | - | 30 | - | - | - | 25 | - | - | 55 |
| | | | | 14,646 | | | | 11,484 | | | | 8,866 | | | 34,996 |
| **Total Athens EMA Receipts (Net)** | | | | 6,850 | | | | 4,039 | | | | 2,956 | | | 13,845 |
| **II.** | | | | | | | | | | | | | | | |
| **Millennium EMA** | | | | | | | | | | | | | | | |
| a) Receipts | | | | | | | | | | | | | | | |
| Energy Revenue | | - | - | 10,112 | - | - | - | 14,924 | - | - | - | 18,162 | - | - | 43,198 |
| Capacity Revenue | | - | - | 735 | - | - | - | 898 | - | - | - | 898 | - | - | 2,531 |
| Ancillary Revenue | | - | - | 42 | - | - | - | 42 | - | - | - | 42 | - | - | 126 |
| | | | | 10,889 | | | | 15,863 | | | | 19,102 | | | 45,854 |
| b) Net from Revenue | | | | | | | | | | | | | | | |
| Commodity | | - | - | 8,290 | - | - | - | 13,196 | - | - | - | 15,848 | - | - | 37,334 |
| Transportation | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Electricity - Backfeed at Site | | - | - | 18 | - | - | - | 120 | - | - | - | 67 | - | - | 205 |
| ISO / RTO Fee | | - | - | 47 | - | - | - | 32 | - | - | - | 32 | - | - | 111 |
| Power Marketer Fee | | - | - | 124 | - | - | - | 44 | - | - | - | 59 | - | - | 227 |
| | | | | 8,479 | | | | 13,392 | | | | 16,006 | | | 37,877 |
| **Total Millennium EMA Receipts (Net)** | | | | 2,409 | | | | 2,472 | | | | 3,096 | | | 7,994 |

Printed: 1/14/2014, 5:19 PM

Exhibit C

**MACH Gen, LLC et al.**
**Derivation of Cash Receipts Forecast**
**Net EMA Receipts**

($ in 000's)

| | Reference | Week Ending Friday | | | | | | | | | | | | | 13-Week |
| | | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **III. Harquahala EMA** | | | | | | | | | | | | | | | |
| a) Receipts | | | | | | | | | | | | | | | |
| Energy Revenue | | - | - | 2,800 | - | - | - | 109 | - | - | - | 147 | - | - | 3,056 |
| Capacity Revenue | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ancillary Revenue | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | 2,800 | - | | | 109 | | | | 147 | | | 3,056 |
| b) Net from Revenue | | | | | | | | | | | | | | | |
| Commodity | | - | - | 2,980 | - | - | - | 197 | - | - | - | 393 | - | - | 3,570 |
| Transportation | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Electricity - Backfeed at Site | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ISO / RTO Fee | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Power Marketer Fee | | - | - | 26 | - | - | - | 20 | - | - | - | 20 | - | - | 3,6?7 |
| | | | | 3,006 | - | | | 217 | | | | 413 | | | |
| **Total Harquahala EMA Receipts (Net)** | | - | - | (206) | - | - | - | (108) | - | - | - | (266) | - | - | (5?) |
| **IV. Total EMA Receipts (Net)** | | | | | | | | | | | | | | | |
| Athens | | - | - | 6,850 | - | - | - | 4,039 | - | - | - | 2,956 | - | - | 13,8?5 |
| Millennium | | - | - | 2,409 | - | - | - | 2,472 | - | - | - | 3,096 | - | - | 7,9?7 |
| Harquahala | | - | - | (206) | - | - | - | (108) | - | - | - | (266) | - | - | (5?) |
| **Grand Total** | | $ - | $ - | $ 9,054 | $ - | $ - | $ - | $ 6,402 | $ - | $ - | $ - | $ 5,786 | $ - | $ - | $ 21,2? |

Exhibit D

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Operating Disbursements

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Athens** | | | | | | | | | | | | | | | |
| **a) Fuel & Emissions** | | | | | | | | | | | | | | | |
| Fuel Gas | | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| Fuel Oil | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Emissions Inventory | | - | - | - | - | - | - | - | - | 1,276 | - | - | - | - | 1,276 |
| **b) Operating & Maintenance** | | | | | | | | | | | | | | | |
| Maintenance Parts and Services | | 76 | 5 | 4 | 79 | 76 | 79 | 28 | 143 | 301 | 143 | 156 | - | 493 | 1,583 |
| Long Term Service Agreement | | - | - | 1,730 | - | - | - | - | - | - | - | - | - | - | 1,730 |
| Chemicals | | 2 | - | 144 | - | 2 | - | 11 | - | 2 | - | 56 | - | - | 217 |
| Consumables | | 27 | - | - | - | 22 | - | - | - | - | - | - | - | - | 49 |
| Utilities | | 1 | - | 27 | - | 1 | - | 27 | - | 37 | - | 27 | - | - | 120 |
| Permit/Emission Fees | | 6 | - | - | - | 5 | - | - | - | 2 | - | - | - | - | 13 |
| Site Labor | | - | - | 361 | - | - | - | 921 | - | 5 | - | 371 | - | - | 1,658 |
| Employee & Community Relations | | 6 | - | - | - | 10 | - | - | - | 75 | - | - | - | - | 91 |
| Training & Travel | | 4 | 1 | 1 | 1 | 4 | 2 | 2 | 3 | 6 | 3 | 2 | - | 6 | 35 |
| Office Expenses | | 5 | - | - | - | 5 | - | - | - | 34 | - | - | - | - | 44 |
| Communications | | 6 | - | - | - | 6 | - | - | - | 7 | - | - | - | - | 19 |
| Vehicles | | 2 | - | - | - | - | - | - | - | 2 | - | - | - | - | 4 |
| Building & Grounds | | 17 | - | - | - | 15 | - | - | - | 38 | - | - | - | - | 70 |
| Subcontractor Services | | 14 | - | - | - | 10 | - | - | - | 39 | - | - | - | - | 63 |
| | | 165 | 6 | 2,267 | 80 | 157 | 80 | 988 | 147 | 547 | 147 | 612 | - | 500 | 5,696 |
| **c) General & Administrative** | | | | | | | | | | | | | | | |
| Property Taxes and Fees | | - | - | 20 | - | 193 | - | 17 | - | - | - | 17 | - | - | 247 |
| Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Services | | 23 | 2 | - | - | 23 | - | - | - | 49 | - | - | - | - | 97 |
| Administrative | | - | - | 135 | - | - | - | 231 | - | - | - | 135 | - | - | 501 |
| Bank Fees | | - | - | - | 1 | - | 1 | - | 1 | - | 1 | - | - | 1 | 5 |
| | | 23 | 2 | 155 | 1 | 216 | 1 | 248 | 1 | 49 | 1 | 152 | - | 1 | 850 |
| **Total Athens Operating Expenses** | | 188 | 8 | 2,422 | 81 | 373 | 81 | 1,236 | 147 | 1,871 | 147 | 764 | - | 500 | 7,818 |

Exhibit D

**MACH Gen, LLC. et al.**
Derivation of Cash Disbursements Forecast
Operating Disbursements

($ in 000's)

| | | Week Ending Friday | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
| **II. Millennium** | | | | | | | | | | | | | | |
| **a) Fuel & Emissions** | | | | | | | | | | | | | | |
| Fuel Gas | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fuel Oil | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Emissions Inventory | - | - | - | - | - | - | - | - | 554 | - | - | - | - | 554 |
| | - | - | - | - | - | - | - | - | 554 | - | - | - | - | 554 |
| **b) Operating & Maintenance** | | | | | | | | | | | | | | |
| Maintenance Parts and Services | 205 | 15 | 132 | 12 | 6 | 12 | 7 | 3 | 3 | 3 | 7 | - | 22 | 427 |
| Long Term Service Agreement | - | - | 790 | - | - | - | - | - | - | - | - | - | - | 790 |
| Chemicals | - | - | 42 | - | - | - | 24 | - | - | - | 29 | - | - | 95 |
| Consumables | 31 | - | - | - | 19 | - | - | - | - | - | - | - | - | 50 |
| Utilities | - | - | 291 | 3 | - | 3 | 43 | 3 | 20 | 3 | 125 | - | 3 | 494 |
| Permit/Emission Fees | - | - | - | - | - | - | - | - | 8 | - | - | - | - | 8 |
| Site Labor | - | - | 251 | - | - | - | 609 | - | - | - | 255 | - | - | 1,115 |
| Employee & Community Relations | 27 | - | - | - | 15 | - | 1 | - | 14 | - | - | - | - | 57 |
| Training & Travel | 7 | 2 | - | 1 | 2 | 1 | - | 1 | 3 | 1 | 1 | - | 8 | 32 |
| Office Expenses | 4 | - | - | - | 3 | - | - | - | 16 | - | - | - | - | 23 |
| Communications | 5 | - | - | - | 4 | - | - | - | 6 | - | - | - | - | 15 |
| Vehicles | 2 | - | - | - | - | - | - | - | - | - | - | - | - | 2 |
| Building & Grounds | 15 | - | - | - | 7 | - | - | - | 8 | - | - | - | - | 30 |
| Subcontractor Services | 60 | - | - | - | 11 | - | - | - | 5 | - | - | - | - | 76 |
| | 356 | 17 | 1,506 | 16 | 67 | 16 | 686 | 7 | 83 | 7 | 417 | - | 32 | 3,214 |
| **c) General & Administrative** | | | | | | | | | | | | | | |
| Property Taxes and Fees | - | - | 19 | - | - | - | - | - | - | - | - | - | 19 | 19 |
| Insurance | - | - | - | - | 1 | - | - | - | - | - | - | - | - | 1 |
| Professional Services | - | 14 | 49 | 8 | - | 8 | 127 | 8 | - | 8 | 25 | - | 8 | 255 |
| Administrative | - | - | 135 | - | - | - | 223 | - | - | - | 127 | - | - | 485 |
| Bank Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | - | 14 | 202 | 8 | 1 | 8 | 350 | 8 | - | 8 | 152 | - | 8 | 790 |
| **Total Millennium Operating Expenses** | 356 | 31 | 1,708 | 24 | 67 | 24 | 1,036 | 15 | 637 | 15 | 569 | - | 40 | 4,558 |

Printed: 1/14/2014, 5:19 PM

Exhibit D

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Operating Disbursements

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **III. Harquahala** | | | | | | | | | | | | | | | |
| a) **Fuel & Emissions** | | | | | | | | | | | | | | | |
| Fuel Gas | | - | - | 242 | - | - | - | - | - | - | - | 206 | - | - | 448 |
| Fuel Oil | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Emissions Inventory | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | - | - | 242 | - | - | - | - | - | - | - | 206 | - | - | 448 |
| b) **Operating & Maintenance** | | | | | | | | | | | | | | | |
| Maintenance Parts and Services | | 328 | - | 16 | 350 | 65 | 350 | 1,405 | 288 | 588 | 288 | 33 | - | 40 | 3,784 |
| Long Term Service Agreement | | - | 11 | 204 | - | - | - | 2,253 | - | - | - | - | - | - | 2,468 |
| Chemicals | | - | - | 6 | - | - | - | 18 | - | - | - | 41 | - | - | 65 |
| Consumables | | 13 | - | 4 | - | 16 | - | 5 | - | 17 | - | 4 | - | - | 59 |
| Utilities | | 35 | - | 177 | - | 35 | - | 154 | - | 20 | - | 148 | - | - | 569 |
| Permit/Emission Fees | | 3 | - | - | 3 | 2 | - | - | - | - | - | - | - | - | 8 |
| Site Labor | | - | - | 358 | - | - | - | 756 | - | 61 | - | 348 | - | - | 1,523 |
| Employee & Community Relations | | 5 | - | 1 | - | 16 | - | 1 | - | 4 | - | - | - | - | 27 |
| Training & Travel | | 2 | - | - | - | - | 3 | 4 | 3 | 4 | 3 | - | - | 11 | 30 |
| Office Expenses | | 4 | - | - | - | 4 | - | - | - | 6 | - | - | - | - | 14 |
| Communications | | 11 | - | - | - | 11 | - | - | - | 11 | - | - | - | - | 33 |
| Vehicles | | 2 | - | - | - | 1 | - | - | - | 2 | - | - | - | - | 5 |
| Building & Grounds | | 2 | - | - | - | 2 | - | - | - | 6 | - | - | - | - | 10 |
| Subcontractor Services | | 12 | - | - | - | 13 | - | 75 | - | 127 | - | - | - | - | 227 |
| | | 417 | 11 | 766 | 353 | 166 | 353 | 4,669 | 291 | 846 | 291 | 575 | - | 51 | 8,789 |
| c) **General & Administrative** | | | | | | | | | | | | | | | |
| Property Taxes and Fees | | - | - | 3,192 | - | - | - | - | - | - | - | 190 | - | - | 3,384 |
| Insurance | | - | - | - | - | - | - | 2 | - | - | - | - | - | - | 2 |
| Professional Services | | 13 | - | - | - | 23 | - | 337 | - | 10 | - | 213 | - | - | 596 |
| Administrative | | - | 8 | 212 | - | - | - | - | - | - | - | - | - | - | 220 |
| Bank Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | 13 | 8 | 3,404 | - | 23 | - | 339 | - | 10 | - | 402 | - | - | 4,176 |
| **Total Harquahala Operating Expenses** | | 430 | 19 | 4,412 | 353 | 189 | 353 | 5,008 | 291 | 856 | 291 | 1,183 | - | 51 | 13,436 |

**MACH Gen, LLC et al.**
**Derivation of Cash Disbursements Forecast**
**Operating Disbursements**

($ in 000's)

Week Ending Friday:

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV. MACH Gen** | | | | | | | | | | | | | | | |
| **a) Fuel & Emissions** | | | | | | | | | | | | | | | |
| Fuel Gas | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fuel Oil | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Emissions Inventory | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **b) Operating & Maintenance** | | | | | | | | | | | | | | | |
| Maintenance Parts and Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Long Term Service Agreement | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chemicals | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Consumables | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Permit/Emission Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Site Labor | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee & Community Relations | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Training & Travel | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office Expenses | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Communications | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicles | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Building & Grounds | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subcontractor Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **c) General & Administrative** | | | | | | | | | | | | | | | |
| Property Taxes and Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Services | | - | 4 | 60 | 4 | 6 | 4 | 36 | 4 | - | 4 | 38 | - | 4 | 164 |
| Administrative | | - | - | 80 | - | 9 | - | 65 | - | - | - | 368 | - | - | 522 |
| Bank Fees | | - | - | 15 | - | - | - | - | - | - | - | 28 | - | - | 43 |
| **Total MACH Gen Operating Expenses** | | - | 4 | 155 | 4 | 15 | 4 | 101 | 4 | - | 4 | 434 | - | 4 | 725 |
| **V. Total Operating Expenses** | | | | | | | | | | | | | | | |
| Athens | | 188 | 8 | 2,422 | 81 | 373 | 81 | 1,236 | 147 | 1,871 | 147 | 764 | - | 500 | 7,818 |
| Millennium | | 356 | 31 | 1,708 | 24 | 67 | 24 | 1,036 | 15 | 637 | 15 | 569 | - | 40 | 4,522 |
| Harquahala | | 430 | 19 | 4,412 | 353 | 189 | 353 | 5,008 | 291 | 856 | 291 | 1,183 | - | 51 | 13,436 |
| MACH Gen | | - | 4 | 155 | 4 | 15 | 4 | 101 | 4 | - | 4 | 434 | - | 4 | 725 |
| **Grand Total** | | $ 974 | $ 61 | $ 8,697 | $ 461 | $ 643 | $ 461 | $ 7,381 | $ 457 | $ 3,365 | $ 457 | $ 2,950 | $ - | $ 595 | $ 26,502 |

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Capital Expenditures

($ in 000's)

Week Ending Friday

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Athens** | | | | | | | | | | | | | | | |
| Spare Parts | | - | - | - | - | - | - | - | - | - | - | 60 | - | - | 60 |
| Tools & Equipment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office Purchases | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicles | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Projects | | - | - | 25 | - | - | - | 500 | - | - | - | - | - | - | 525 |
| **Total Athens Capital Expenditures** | | - | - | 25 | - | - | - | 500 | - | - | - | 60 | - | - | 585 |
| **II. Millennium** | | | | | | | | | | | | | | | |
| Spare Parts | | 12 | - | - | - | 6 | - | - | - | 30 | - | - | - | - | 48 |
| Tools & Equipment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office Purchases | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicles | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Projects | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Millennium Capital Expenditures** | | 12 | - | - | - | 6 | - | - | - | 30 | - | - | - | - | 48 |
| **III. Harquahala** | | | | | | | | | | | | | | | |
| Spare Parts | | - | - | - | - | - | - | 24 | - | 7 | - | 12 | - | - | 43 |
| Tools & Equipment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office Purchases | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicles | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Projects | | - | - | - | - | - | - | 1,140 | - | - | - | - | - | - | 1,140 |
| **Total Harquahala Capital Expenditures** | | - | - | - | - | - | - | 1,164 | - | 7 | - | 12 | - | - | 1,183 |
| **IV. Total Capital Expenditures** | | | | | | | | | | | | | | | |
| Athens | | - | - | 25 | - | - | - | 500 | - | - | - | 60 | - | - | 585 |
| Millennium | | 12 | - | - | - | 6 | - | - | - | 30 | - | - | - | - | 48 |
| Harquahala | | - | - | - | - | - | - | 1,164 | - | 7 | - | 12 | - | - | 1,183 |
| **Grand Total** | | 12 | - | 25 | - | 6 | - | 1,664 | - | 37 | - | 72 | - | - | 1,816 |

Exhibit F

**MACH Gen, LLC et al.**
**Derivation of Cash Disbursements Forecast**
**Professional Fees**

($ in 000's)

| | Reference | 1/17/2014 Week -3 | 1/24/2014 Week -2 | 1/31/2014 Week -1 | 2/7/2014 Week 0 | 2/14/2014 Week 1 | 2/21/2014 Week 2 | 2/28/2014 Week 3 | 3/7/2014 Week 4 | 3/14/2014 Week 5 | 3/21/2014 Week 6 | 3/28/2014 Week 7 | 4/4/2014 Week 8 | 4/11/2014 Week 9 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Pre-Petition Payments** | | | | | | | | | | | | | | | |
| a) Debtors' Professionals | | | | | | | | | | | | | | | |
| Milbank | | - | - | 500 | - | - | - | - | - | - | - | - | - | - | 500 |
| RLF | | - | - | 100 | - | - | - | - | - | - | - | - | - | - | 100 |
| Moelis | | - | - | - | 150 | - | - | - | - | - | - | - | - | - | 150 |
| Protiviti | | 30 | - | 50 | - | - | - | - | - | - | - | - | - | - | 80 |
| Miscellaneous | | - | - | 50 | - | - | - | - | - | - | - | - | - | - | 50 |
| | | 30 | - | 700 | 150 | - | - | - | - | - | - | - | - | - | 880 |
| b) Lenders' Professionals | | | | | | | | | | | | | | | |
| Kirkland & Ellis | | - | - | 550 | - | - | - | - | - | - | - | - | - | - | 550 |
| 1st Lien Counsel | | - | - | 150 | - | - | - | - | - | - | - | - | - | - | 150 |
| Centerview Partners | | - | - | 125 | - | - | - | - | - | - | - | - | - | - | 125 |
| | | - | - | 825 | - | - | - | - | - | - | - | - | - | - | 825 |
| **Total Pre-Petition Payments** | | 30 | - | 1,525 | 150 | - | - | - | - | - | - | - | - | - | 1,705 |
| **II. Post-Petition Payments** | | | | | | | | | | | | | | | |
| a) Debtors' Professionals | | | | | | | | | | | | | | | |
| Milbank | | - | - | - | - | - | - | - | - | - | - | - | - | 500 | 500 |
| RLF | | - | - | - | - | - | - | - | - | - | - | - | - | 100 | 100 |
| Moelis | | - | - | - | - | - | - | - | - | - | - | - | - | 150 | 150 |
| Protiviti | | - | - | - | - | - | - | - | - | - | - | - | - | 30 | 30 |
| Miscellaneous | | - | - | - | - | - | - | 50 | - | - | - | 50 | - | - | 100 |
| | | - | - | - | - | - | - | 50 | - | - | - | 50 | - | 780 | 880 |
| b) Lenders' Professionals | | | | | | | | | | | | | | | |
| Kirkland & Ellis | | - | - | - | - | - | - | - | - | - | - | 500 | - | - | 500 |
| 1st Lien Counsel | | - | - | - | - | - | - | - | - | - | - | 125 | - | - | 125 |
| Centerview Partners | | - | - | - | - | - | - | 125 | - | - | - | 125 | - | - | 250 |
| | | - | - | - | - | - | - | 125 | - | - | - | 750 | - | - | 875 |
| c) Committee Professionals | | | | | | | | | | | | | | | |
| Counsel | | - | - | - | - | - | - | - | - | - | - | - | - | 50 | 50 |
| Financial Advisor | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | - | - | - | - | - | - | - | - | - | - | - | - | 50 | 50 |
| **Total Post-Petition Payments** | | - | - | - | - | - | - | 175 | - | - | - | 800 | - | 830 | 1,805 |
| **III. Total Professional Fees** | | | | | | | | | | | | | | | |
| Debtors' Professionals | | 30 | - | 700 | 150 | - | - | 50 | - | - | - | 50 | - | 780 | 1,760 |
| Lenders' Professionals | | - | - | 825 | - | - | - | 125 | - | - | - | 750 | - | - | 1,700 |
| Creditors' Committee | | - | - | - | - | - | - | - | - | - | - | - | - | 50 | 50 |
| **Total Professional Fees** | | 30 | - | 1,525 | 150 | - | - | 175 | - | - | - | 800 | - | 830 | 3,510 |

(Week Ending Friday)