# EXHIBIT A

## DIP Credit Agreement

.

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND
GUARANTY AGREEMENT**

Dated as of March [_____], 2014

Among

MACH GEN, LLC

as Borrower

and

THE GUARANTORS

as Guarantors

and

THE INITIAL LENDERS AND INITIAL REVOLVING ISSUING BANK NAMED HEREIN

as Initial Lenders and Initial Revolving Issuing Bank

and

CLMG CORP.

as Collateral Agent

and

CLMG CORP.

as Administrative Agent

# TABLE OF CONTENTS

**Section**                                                                                                    **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS                                                                          2

   SECTION 1.01. Certain Defined Terms..................................................................................2
   SECTION 1.02. Computation of Time Periods.......................................................................32
   SECTION 1.03. Accounting Terms.........................................................................................32
   SECTION 1.04. Other Definitional Provisions and Rules of Construction ...........................32

ARTICLE II AMOUNTS AND TERMS OF THE LOANS AND THE LETTERS OF CREDIT;
REORGANIZATION MATTERS                                                                                             33

   SECTION 2.01. The Loans and the Letters of Credit ............................................................33
   SECTION 2.02. Making the Loans .........................................................................................35
   SECTION 2.03. Issuance of and Drawings and Reimbursements Under Revolving Letters of
   Credit         36
   SECTION 2.04. Repayment of Loans .....................................................................................42
   SECTION 2.05. Termination or Reduction of the Commitments............................................43
   SECTION 2.06. Prepayments.................................................................................................44
   SECTION 2.07. Interest..........................................................................................................45
   SECTION 2.08. Fees. .............................................................................................................46
   SECTION 2.09. [Reserved.]...................................................................................................47
   SECTION 2.10. Increased Costs, Etc .....................................................................................48
   SECTION 2.11. Payments and Computations.........................................................................48
   SECTION 2.12. Taxes ............................................................................................................50
   SECTION 2.13. Sharing of Payments, Etc.............................................................................54
   SECTION 2.14. Use of Proceeds............................................................................................54
   SECTION 2.15. Evidence of Debt..........................................................................................55
   SECTION 2.16. Duty to Mitigate ...........................................................................................56
   SECTION 2.17. Reorganizational Matters..............................................................................56

ARTICLE III CONDITIONS TO EFFECTIVENESS OF LENDING                                                                 59

   SECTION 3.01. Conditions Precedent ....................................................................................59
   SECTION 3.02. Conditions Precedent to Each Borrowing and Issuance ...............................61

ARTICLE IV REPRESENTATIONS AND WARRANTIES                                                                          63

   SECTION 4.01. Representations and Warranties.....................................................................63

ARTICLE V COVENANTS                                                                                                 70

   SECTION 5.01. Affirmative Covenants...................................................................................71
   SECTION 5.02. Negative Covenants ......................................................................................75
   SECTION 5.03. Reporting Requirements ...............................................................................84

i

## ARTICLE VI EVENTS OF DEFAULT                                                          87

SECTION 6.01.  Events of Default ....................................................................87
SECTION 6.02.  Actions in Respect of the Revolving Letters of Credit Upon Default ..........95

## ARTICLE VII THE AGENTS                                                                 95

SECTION 7.01.  Authorization and Action............................................................95
SECTION 7.02.  Administrative Agent's Reliance, Etc................................................96
SECTION 7.03.  Agents and Affiliates ...............................................................96
SECTION 7.04.  Lender Party Credit Decision.........................................................97
SECTION 7.05.  Indemnification .......................................................................97
SECTION 7.06.  Successor Administrative Agent.......................................................98
SECTION 7.07.  Collateral Agent .....................................................................99

## ARTICLE VIII GUARANTY                                                                 100

SECTION 8.01.  Guaranty; Limitation of Liability...................................................100
SECTION 8.02.  Guaranty Absolute ....................................................................100
SECTION 8.03.  Waivers and Acknowledgments .........................................................102
SECTION 8.04.  Waiver................................................................................103
SECTION 8.05.  Subordination ........................................................................103
SECTION 8.06.  Continuing Guaranty; Assignments....................................................104

## ARTICLE IX MISCELLANEOUS                                                              104

SECTION 9.01.  Amendments, Etc.......................................................................105
SECTION 9.02.  Notices, Etc..........................................................................107
SECTION 9.03.  No Waiver; Remedies ..................................................................109
SECTION 9.04.  Costs and Expenses ...................................................................109
SECTION 9.05.  Right of Set-off .....................................................................111
SECTION 9.06.  Binding Effect........................................................................111
SECTION 9.07.  Assignments and Participations .......................................................111
SECTION 9.08.  Execution in Counterparts.............................................................115
SECTION 9.09.  No Liability of the Revolving Issuing Banks ..........................................116
SECTION 9.10.  Confidentiality ......................................................................116
SECTION 9.11.  Marshalling; Payments Set Aside .....................................................116
SECTION 9.12.  Patriot Act Notice ...................................................................117
SECTION 9.13.  Other Loan Documents; Order...........................................................117
SECTION 9.14.  Jurisdiction, Etc.....................................................................117
SECTION 9.15.  Governing Law ........................................................................118
SECTION 9.16.  Waiver of Jury Trial..................................................................118
SECTION 9.17.  Limitation on Liability...............................................................118
SECTION 9.18.  Parties Including Trustees; Bankruptcy Court Proceedings.  ...........................118

NEWYORK 9071746 v16 (2K)

SCHEDULES

| | | |
|---|---|---|
| Schedule I | - | Commitments and Lending Offices |
| Schedule II | - | Guarantors |
| Schedule 2.03(a) | - | Existing Letters of Credit |
| Schedule 4.01(b) | - | Loan Parties |
| Schedule 4.01(c) | - | Subsidiaries |
| Schedule 4.01(e) | - | Governmental Approvals and Authorizations |
| Schedule 4.01(o) | - | Environmental Disclosure |
| Schedule 4.01(q) | - | Pre-Petition Debt |
| Schedule 4.01(r) | - | Owned Real Property |
| Schedule 4.01(s) | - | Leased Real Property |
| Schedule 4.01(t) | - | Material Contracts |
| Schedule 5.01(d) | - | Insurance |
| Schedule 5.02(a) | - | Liens |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Note |
| Exhibit B-1 | - | Form of Notice of Borrowing |
| Exhibit B-2 | - | Form of Notice of Issuance |
| Exhibit C | - | Form of Assignment and Acceptance |
| Exhibit D | - | [Reserved] |
| Exhibit E | - | [Reserved] |
| Exhibit F-1 | - | Form of Consent and Agreement for Permitted Commodity Hedge and Power Sale Agreements |
| Exhibit F-2 | - | Form of Consent and Agreement for Other Material Contracts |

iii

# SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT dated as of March [____], 2014, among MACH GEN, LLC, a Delaware limited liability company (the *"Borrower"*), the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), the Revolving Issuing Bank (as hereinafter defined), CLMG CORP. (*"CLMG"*), a Texas corporation, as collateral agent (together with any successor collateral agent, the *"Collateral Agent"*) for the Secured Parties (as hereinafter defined), and CLMG, as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the *"Administrative Agent"* and, together with the Collateral Agent, the *"Agents"*) for the Lender Parties (as hereinafter defined).

## PRELIMINARY STATEMENTS:

WHEREAS, on [_____], 2014 (the *"Petition Date"*), each of the Loan Parties commenced a voluntary case (collectively, the *"Chapter 11 Cases"*) under Chapter 11 of Title 11 of the United States Code entitled "Bankruptcy" (as now or hereafter in effect, or any successor thereto, the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*), which Chapter 11 Cases are jointly administered for procedural purposes and such Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a senior secured superpriority debtor-in-possession revolving loan credit facility in an aggregate principal amount not to exceed $200,000,000, of which not more than $160,000,000 may be used for the issuance of Revolving Letters of Credit hereunder, and the proceeds of which shall be used solely for the purposes permitted under Section 2.14;

WHEREAS, the Lenders are willing to make certain Post-Petition loans and procure the issuance of certain Post-Petition letters of credit at the request of the Borrower of up to the amount of the aggregate Commitments under the DIP Facility upon the terms and conditions set forth herein;

WHEREAS, the Guarantors are willing to guarantee all of the Obligations of the Borrower to the Lender Parties under the Loan Documents;

WHEREAS, the Borrower and each Guarantor acknowledges that they each will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Loan Parties hereunder and under the other Loan Documents, including (i) direct borrowings and (ii) reimbursement obligations under Letters of Credit, each of the Loan Parties

will provide to the Collateral Agent (for the benefit of the Secured Parties) the Liens, status and protection set forth in the Interim Order and the Final Order.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. <u>Certain Defined Terms</u>.   As used in this Agreement, the following terms shall have the following meanings:

"*Acceptable Plan*" means (i) the     Prepackaged     Plan, or (ii) a plan of reorganization of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code which has been consented to by the Administrative Agent.

"*Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lender Parties from time to time.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "*controlling*," "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to vote 15% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" means the Collateral Agent and the Administrative Agent.

"*Agreement*" means this Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, as modified, supplemented, amended or restated from time to time.

"*Agreement Value*" means, for each Hedge Agreement or Commodity Hedge and Power Sale Agreement, on any date of determination, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement or Commodity Hedge and Power Sale Agreement, as the case may be, in accordance with its terms as if an Early Termination Event has occurred on such date of determination.

2

"*Anti-Terrorism Laws*" means any of the following (a) the Anti-Terrorism Order, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the US Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the US Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the US Code of Federal Regulations), (e) the Patriot Act, (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts and acts of war.

"*Anti-Terrorism Order*" means Section 1 of Executive Order 13224 of September 24, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (Title 12, Part 595 of the US Code of Federal Regulations).

"*Applicable Margin*" means 4.75% *per annum.*

"*Approved Budget*" means the "Approved Budget" as defined in the Interim Order and, after the Final Order Entry Date, the Final Order, in each case, including, for the avoidance of doubt, as updated periodically in accordance with Section 5.03(d)(ii).

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender Party, (b) an Affiliate of a Lender Party, or (c) an entity or an Affiliate of an entity that administers or manages a Lender Party.

"*Asset Management Agreement*" means that certain Amended and Restated Asset Management Agreement, dated September 30, 2010, by and among MACH Gen, LLC, Athens, Millennium, Harquahala and Competitive Power Ventures in respect of the Athens Project, the Millennium Project and the Harquahala Project.

"*Asset Sale*" has the meaning specified in the Security Deposit Agreement.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender Party and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "*Eligible Assignee*"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"*Athens*" means New Athens Generating Company, LLC, a Delaware limited liability company and owner of the Athens Project.

"*Athens Cap Amount*" means, as of any date of determination, an amount equal to the product of (a) $447,900,000 multiplied by (b) a fraction, the numerator of which is the sum of (x) the total Outstanding Amount of all Revolving Credit Loans and Revolving Letters of Credit under this Agreement and (y) the total Intercreditor Outstanding Amount under the Pre-Petition First Lien Credit Agreement, in each case at such time, and the denominator of which is the sum of (i) the total Outstanding Amount

3

of all Revolving Credit Loans and Revolving Letters of Credit under this Agreement, (ii) the total Intercreditor Outstanding Amount under the Pre-Petition First Lien Credit Agreement, and (iii) any outstanding First Lien Obligations (as defined in the Intercreditor Agreement) under any First Lien Commodity Hedge and Power Sale Agreements, in each case, at such time.

"*Athens Project*" means the 1,080 MW natural gas/fuel oil-fired capable electric generating station located in Greene County, New York and all appurtenances thereto owned or operated by Athens, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"*Available Amount*" of any Revolving Letter of Credit means, at any time, the maximum amount (whether or not such maximum amount is then in effect under such Revolving Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Revolving Letter of Credit) available to be drawn by the beneficiary under such Revolving Letter of Credit at such time (assuming compliance at such time with all conditions to drawing).

"*Avoidance Actions*" mean claims and causes of actions under Chapter 5 of the Bankruptcy Code and other similar laws for preferences, fraudulent conveyances, and other avoidance power claims.

"*Bankruptcy Code*" has the meaning specified in the Recitals hereto.

"*Bankruptcy Court*" has the meaning specified in the Recitals hereto.

"*Bankruptcy Law*" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Base Capex Amount*" has the meaning specified in Section 5.02(m)(i).

"*Borrower*" has the meaning specified in the recital of parties to this Agreement.

"*Borrowing*" means a Revolving Credit Borrowing or a Revolving Letter of Credit Borrowing, as the context may require.

"*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York City or Las Vegas, Nevada, and, if the applicable Business Day relates to any Loans, on which dealings are carried on in the London interbank market.

"*Capacity*" means 1,080 MW in the case of Athens, 360 MW in the case of Millennium, and 1,092 MW in the case of Harquahala.

4

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person *plus* (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"*Capital Expenditures for Investment*" means, in respect of any of the Loan Parties, the portions of such Loan Party's Capital Expenditures that are not Capital Expenditures for Maintenance.

"*Capital Expenditures for Maintenance*" means, in respect of any of the Loan Parties, Capital Expenditures that are customary for the operation and maintenance of any of the Projects at its Capacity in accordance with applicable law and Prudent Industry Practice and in the ordinary course of business consistent with past practice, which shall include, for the avoidance of doubt, the Vane Upgrades and Control System Replacement.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Carve-Out*" has the meaning specified in Section 2.17(a).

"*Cash*" means money, currency or a credit balance in any demand account or deposit account.

"*Cash Equivalents*" has the meaning specified in the Security Deposit Agreement.

"*Casualty Event*" has the meaning specified in the Security Deposit Agreement.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"*Change of Control*" means, at any time, any "*person*" or "*group*" (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) (a) shall have acquired

5

ownership, directly or indirectly, beneficially or of record, of more than 50% on a fully diluted basis of the aggregate voting power represented by the issued and outstanding Equity Interests in the Borrower or (b) have acquired direct or indirect control of the Borrower. For the purposes of this definition, *"Control"* shall be defined to mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Borrower, whether through the ability to exercise voting power, contract or otherwise; <u>provided</u>, that if any of the foregoing occurs as part of the consummation of an Acceptable Plan, it shall not constitute a Change of Control.

*"Chapter 11 Cases"* has the meaning specified in the Recitals hereto.

*"CLMG"* has the meaning specified in the recital of parties to this Agreement.

*"Collateral"* means all Property (including Equity Interests in any Guarantor) of the Loan Parties, now owned or hereafter acquired, other than Excluded Property and Avoidance Actions; <u>provided</u>, that, upon the Final Order Entry Date, the proceeds of Avoidance Actions shall constitute Collateral.

*"Collateral Agent"* has the meaning specified in the Recitals hereto.

*"Collateral Agent's Office"* means, with respect to the Collateral Agent or any successor Collateral Agent, the office of such Agent as such Agent may from time to time specify to the Borrower and the Administrative Agent.

*"Commitment"* means, with respect to a Lender Party, its Revolving Credit Commitment or Revolving Letter of Credit Commitment, as the context may require.

*"Commitment Reduction Amount"* has the meaning specified in <u>Section 2.08(b)(i)</u>.

*"Commitment Reduction Date"* has the meaning specified in <u>Section 2.08(b)(i)</u>.

*"Commodity Hedge and Power Sale Agreement"* means any Non-Speculative swap, cap, collar, floor, future, option, spot, forward, power purchase and sale agreement, electric power generation capacity swap or purchase and sale agreement, fuel purchase and sale agreement, power transmission agreement, fuel transportation agreement, fuel storage agreement, or netting agreement or similar agreement entered into in respect of any commodity by any Loan Party in connection with any Permitted Trading Activity hedged with the same Commodity Hedge Counterparty under one master or implementation agreement, but excluding any Energy Management Agreement and any master or implementation agreements or transactions entered into pursuant to such Energy Management Agreement between any Loan Party and its counterparty to such Energy Management Agreement.

*"Commodity Hedge Counterparty"* means any Person that (a)(i) is a commercial bank, insurance company, investment fund or other similar financial institution or any Affiliate thereof which is engaged in the business of entering into commodity hedge and power sale agreements, (ii) is any industrial or utility company or other company that

6

enters into commodity hedges in the ordinary course of its business, or (iii) is either a load-serving entity that has received an order from a local commission or a municipal or cooperative entity that has been granted a monopoly franchise territory for retail electric sales and, in either case, the right to recover costs of purchased power in rates, and (b) in the case of (i) and (ii) only, at the time the applicable Commodity Hedge and Power Sale Agreement is entered into, has a Required Rating.

"*Communications*" has the meaning specified in Section 9.02(b).

"*Confidential Information*" means information that any Loan Party furnishes to any Agent or any Lender Party designated as confidential, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender Party of its obligations hereunder or that is or becomes available to such Agent or such Lender Party from a source other than the Loan Parties that is not, to the best of such Agent's or such Lender Party's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"*Consent and Agreement*" means with respect to any Material Contract, (i) if such Material Contract is a Commodity Hedge and Power Sale Agreement, a consent and agreement in favor of Collateral Agent (for the benefit of the Secured Parties) in substantially the form attached hereto as Exhibit F-1 and (ii) in the case of any other such Material Contract, a consent and agreement in favor of the Collateral Agent (for the benefit of the Secured Parties) in substantially the form attached hereto as Exhibit F-2 or, in either case, otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Administrative Agent.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Contractual Obligations*" means, as applied to any Person, any provision of any Equity Interests issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"*Control System Replacement*" means the replacement of the existing control system at the Athens Project with a Siemens Power Plant Automation T3000 control system, or equivalent.

"*Debt*" of any Person means, without duplication, (a) Debt for Borrowed Money of such Person, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue (unless being contested in good faith by appropriate proceedings for which reserves and other appropriate provisions, if any, required by GAAP shall have been made) by more than 90 days incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default

7

are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (g) all obligations of such Person in respect of Hedge Agreements and Commodity Hedge and Power Sale Agreements, valued at the Agreement Value thereof, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment obligations referred to in <u>clauses (a)</u> through <u>(h)</u> above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations.

"***Debt for Borrowed Money***" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, (b) all obligations of such Person under acceptance, letter of credit or similar facilities at such date and (c) all Synthetic Debt of such Person at such date.

"***Default***" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"***Default Interest***" has the meaning set forth in <u>Section 2.07(c)</u>.

"***Default Notice***" has the meaning specified in <u>Section 6.01</u>.

"***Defaulting Lender***" means, at any time, any Lender Party that, at such time, (a) fails to pay (other than as a result of a good faith dispute) any amount required to be paid by such Lender Party to any Revolving Issuing Bank under this Agreement (beyond any applicable cure period) or (b) shall take any action or be the subject of any action or proceeding of a type described in <u>Section 6.01(g)</u>.

"***Depositary***" has the meaning specified in the Security Deposit Agreement.

"***DIP Facility***" means the Revolving Credit Facility or the Revolving Letter of Credit Facility, as the context may require, and "***DIP Facilities***" means collectively the Revolving Credit Facility and the Revolving Letter of Credit Facility.

"***Dollars***" and the sign "***$***" mean the lawful currency of the United States of America.

"***Early Termination Event***" has the meaning specified in the Intercreditor Agreement.

"***Effective Date***" has the meaning specified in <u>Section 3.01</u>.

8

"*Electric Interconnection and Transmission Agreements*" means each of: (a) that certain Interconnection Agreement dated April 27, 2001 by and between Athens and Niagara Mohawk Power Corporation in respect of the Athens Project; (b) that certain Construction and Operating Agreement, dated July 9, 2007, by and between Athens and Consolidated Edison Company of New York, Inc. in respect of the Athens Project; (c) that certain Special Protection System Engineering, Construction and Implementation Agreement, dated December 6, 2006, by and between Athens and Niagara Mohawk Power Corporation d/b/a National Grid in respect of the Athens Project; (d) that certain Interconnection Service Agreement, dated November 26, 1997, by and between Millennium and New England Power Company in respect of the Millennium Project; (e) that certain Service Agreement for Network Integration Transmission Service, effective February 1, 2002, by and between Millennium and New England Power Company in respect of the Millennium Project; (f) that certain Southwest Reserve Sharing Group Participation Agreement, dated November 3, 1997, by and among various participants in respect of the Harquahala Project; and (g) that certain ANPP Hassayampa Switchyard Interconnection Agreement, dated November 1, 2001, by and among various parties, including Salt River Project Agricultural Improvement and Power District and Harquahala in respect of the Harquahala Project.

"*Eligible Assignee*" means (a) a Lender Party; (b) an Affiliate of a Lender Party; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed); *provided, however*, that in the case of an assignment to any Person of (A) a Revolving Credit Commitment, the Revolving Issuing Bank shall have consented to such assignment (such approval of the Revolving Issuing Bank, not to be unreasonably withheld or delayed); *provided, further*, that (i) with respect to an assignment of a Revolving Letter of Credit Commitment, such Eligible Assignee must also be an Eligible Bank and (ii) no Loan Party shall qualify as an Eligible Assignee under this definition.

"*Eligible Bank*" means (i) the Initial Revolving Issuing Bank or an Affiliate of the Initial Revolving Issuing Bank, or (ii) any bank or financial institution established under the laws of the United States, any State thereof or any other country that is a member of the OECD which has a long term unsecured non-credit enhanced rating of A3 or higher from Moody's and A- or higher from S&P.

"*Energy Management Agreements*" means each energy management agreement or similar agreement entered into by a Loan Party with a counterparty, which counterparty shall have a Required Rating, for the management of Permitted Trading Activities of such Loan Party, including: (a) that certain Energy Management and Marketing Agreement, dated November 1, 2013, by and between Millennium and Consolidated Edison Energy, Inc. in respect of the Millennium Project; (b) that certain Energy Management and Marketing Agreement, dated November 1, 2013, by and between Athens and Consolidated Edison Energy, Inc. in respect of the Athens Project; and (c) that certain Energy Management Agreement, dated October 25, 2010, by and between Harquahala and Twin Eagle Resource Management, LLC (as assignee of BNP Paribas Energy Trading GP) in respect of the Harquahala Project, in each case including all master or implementation agreements and transactions thereunder (including relating

9

to the purchase and sale of fuel or power or the transmission or transportation thereof) entered into pursuant to such Energy Management Agreement between any Loan Party and its counterparty to such Energy Management Agreement.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"*Environmental Law*" means any Federal, state or local statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Materials, health or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"*Equity Issuance*" has the meaning specified in the Security Deposit Agreement.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 414 (b) or (c) of the Internal Revenue Code.

"*ERISA Event*" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor,

10

as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g)(5) of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"*Eurocurrency Liabilities*" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Eurodollar Rate*" means, for any Interest Period in respect of a Loan, an interest rate *per annum* equal to the rate per annum obtained by dividing (a) the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the British Bankers Association LIBOR Rate ("*BBA LIBOR*") by Bloomberg, Reuters or other commercially available source providing quotations of BBA LIBOR, as designated by the Administrative Agent from time to time, at approximately 11:00 A.M. (London time) on the Interest Rate Determination Date for such Interest Period, as the London interbank offered rate for deposits in Dollars with a maturity corresponding to the applicable Eurodollar Rate Period, by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period, as applicable.

"*Eurodollar Rate Period*" means, for any Interest Period in respect of a Loan, a period of twelve months.

"*Eurodollar Rate Reserve Percentage*" means, for any Interest Period in respect of a Loan, the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Loans is determined) having a term equal to such Interest Period.

11

"***Event of Eminent Domain***" has the meaning specified in the Security Deposit Agreement.

"***Events of Default***" has the meaning specified in <u>Section 6.01</u>.

"***EWG***" has the meaning specified in <u>Section 4.01(v)</u>.

"***Excluded Property***" has the meaning specified in the Intercreditor Agreement.

"***Existing Liens***" has the meaning specified in <u>Section 2.17(a)(iv)</u>.

"***Federal Home Loan Bank***" means any of the Federal Home Loan Banks established in accordance with the Federal Home Loan Bank Act of 1932, as amended.

"***FERC***" means the Federal Energy Regulatory Commission and its successors.

"***Final Order***" means the final order authorizing, *inter alia*, entry into the DIP Facility and the use of cash collateral, on a final basis, entered by the Bankruptcy Court in the form annexed to the Restructuring Support Agreement as Exhibit E or otherwise in a form that has been consented to by the Required First Lien Holders (as defined in the Restructuring Support Agreement).

"***Final Order Entry Date***" means the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

"***First Lien Commodity Hedge and Power Sale Agreement***" has the meaning specified in the Intercreditor Agreement.

"***Fiscal Quarter***" means a fiscal quarter of any Fiscal Year.

"***Fiscal Year***" means a fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"***Floor Amount***" means with respect to any sale in respect of any Project or any Project Company pursuant to <u>Section 5.02(e)(v)</u>, with respect to (i) the Athens Project or Athens, $600,000,000, (ii) the Millennium Project or Millennium, $150,000,000 and (iii) the Harquahala Project or Harquahala, $300,000,000.

"***FPA***" means the Federal Power Act, as amended.

"***Fronting Bank***" has the meaning specified in <u>Section 2.03(j)(iv)</u>.

"***Fund***" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"***GAAP***" has the meaning specified in <u>Section 1.03</u>.

12

"*Gas Interconnection Agreements*" means each of: (a) that certain Interconnection Agreement, dated May 16, 1997, by and between Millennium and Tennessee Gas Pipeline Company in respect of the Millennium Project; (b) that certain Letter Agreement, dated November 6, 1997, by and between Millennium and Tennessee Gas Pipeline Company regarding reimbursement and installation of facilities in respect of the Millennium Project; (c) that certain Balancing Agreement, dated March 15, 2000, by and between Millennium and Tennessee Gas Pipeline Company in respect of the Millennium Project; (d) that certain Interconnection Facilities Agreement, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (e) that certain Operations and Maintenance Agreement for the Athens Interconnection Facility, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (f) that certain Operational Balancing Agreement, dated October 24, 2001, by and between Athens and Iroquois Gas Transmission System, LP in respect of the Athens Project; (g) that certain Letter Agreement, dated November 27, 2000, by and between Harquahala and El Paso Natural Gas Company in respect of the Harquahala Project; and (h) that certain Operational Balancing Agreement, dated February 28, 2003, between Harquahala and El Paso Natural Gas Company in respect of the Harquahala Project.

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"*Granting Lender*" has the meaning specified in Section 9.07(l).

"*Guaranteed Debt*" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary

13

obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in Section 8.01(a).

"*Guarantors*" means MACH Gen GP, LLC and each of the Project Companies.

"*Guaranty*" means the guaranty of the Guarantors set forth in Article VIII.

"*Harquahala*" means New Harquahala Generating Company, LLC, a Delaware limited liability company and owner of the Harquahala Project.

"*Harquahala Project*" means the 1,092 MW natural gas/fuel oil-fired electric generating station located in Maricopa County, Arizona and all appurtenances thereto owned or operated by Harquahala, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"*Harquahala Sale*" means the sale of all, but not less than all, of the Equity Interests in, or all or substantially all, but not less than substantially all, of the Property of, Harquahala or the Harquahala Project.

"*Harquahala TO Agreement*" means that certain Transmission Owner/Operator Services Agreement, dated May 5, 2008, as extended pursuant to the Agreement dated April 11, 2011, by and between Harquahala and Constellation Energy Control and Dispatch, LLC in respect of the Harquahala Project.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements but excluding any Commodity Hedge and Power Sale Agreement.

"*Hedge Bank*" means any Person that is a commercial bank, insurance company or other similar financial institution, or any Affiliate thereof, that (a) is engaged in the business of entering into interest rate Hedge Agreements and (b) at the time the applicable Hedge Agreement is entered into, has a Required Rating.

14

"*Honor Date*" has the meaning specified in <u>Section 2.03(d)(i)</u>.

"*IDA Lease*" means that certain Lease Agreement, dated December 1, 2001, amended and restated on May 1, 2003, by and between the Greene County Industrial Development Agency, as landlord, and Athens Generating Company, LLC, as tenant, in respect of the Athens Project, as amended.

"*Indemnified Costs*" has the meaning specified in <u>Section 7.05(a)</u>.

"*Indemnified Party*" has the meaning specified in <u>Section 9.04(b)</u>.

"*Initial Extension of Credit*" means the earlier to occur of the initial Borrowing and the initial issuance of a Revolving Letter of Credit hereunder.

"*Initial Pre-Petition First Lien Mortgages*" means, with respect to: (a) the Athens Project, (i) the Fee and Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (New York) by Athens and by Greene County Industrial Development Agency to CLMG, as collateral agent, dated as of February 2, 2012, and (ii) the Pre-Petition First Lien Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (New York) by Athens to CLMG, as collateral agent, dated as of February 2, 2012; (b) the Harquahala Project, the Pre-Petition First Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (Arizona) by Harquahala to Fidelity National Title Insurance Company, for the benefit of CLMG, as collateral agent, dated as of February 2, 2012; and (c) the Millennium Project, the Pre-Petition First Lien Fee and Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (Massachusetts) by Millennium to CLMG, as collateral agent, dated as of February 2, 2012.

"*Initial Lender Parties*" means the Initial Revolving Issuing Bank and the Initial Lenders.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Revolving Issuing Bank*" means the bank listed on the signature pages hereof as the Initial Revolving Issuing Bank.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, dated as of December 5, 2006, by and among the Borrower, the Guarantors, the Pre-Petition First Lien Collateral Agent, the Pre-Petition Second Lien Collateral Agent, the Pre-Petition First Lien Administrative Agent, the Pre-Petition Second Lien Administrative Agent and the other Persons party thereto from time to time, as amended, including pursuant to Amendment No. 2 to the Collateral Agency and Intercreditor Agreement dated as of January 15, 2014.

"**Intercreditor Outstanding Amount**" has the meaning given to the term "Outstanding Amount" in the Intercreditor Agreement.

"**Interest Payment Date**" means, with respect to any Loan, the last day of each of March, June, September and December; *provided*, that, in addition to the foregoing, in each case, each of (x) the date upon which the Loan has been paid in full, or has been prepaid in full or in part pursuant to Section 2.06, and (y) the Revolving Credit Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under this Agreement.

"**Interest Period**" means, for each Loan, the period commencing on the date of such Loan, and, thereafter, each subsequent period commencing on the day following the last day of the immediately preceding Interest Period, and ending on the last day of the period determined pursuant to the provisions below.

(a)    Interest Periods commencing on the same date shall be of the same duration;

(b)    the initial Interest Period for any Revolving Credit Loan shall end on the one-year anniversary of such Revolving Credit Loan;

(c)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day; provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(d)    no Interest Period for a Revolving Credit Loan or Revolving Letter of Credit Loan may end later than the Revolving Credit Termination Date; and

(e)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order**" means the interim order authorizing, *inter alia*, entry into the DIP Facility and the use of cash collateral on an interim basis, entered by the Bankruptcy Court in the form annexed to the Restructuring Support Agreement as Exhibit D or otherwise in a form that has been consented to by the Required First Lien Holders (as defined in the Restructuring Support Agreement).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

16

"**Investment**" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "**Debt**" in respect of such Person.

"**L/C Disbursement**" means a payment or disbursement made by the Revolving Issuing Bank pursuant to a Revolving Letter of Credit.

"**L/C Related Documents**" has the meaning specified in Section 2.03(g)(i).

"**Lender Party**" means any Lender or any Revolving Issuing Bank.

"**Lenders**" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 9.07 for so long as such Person shall be a party to this Agreement.

"**Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "*Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"**Liability Amount**" means the amount that a Loan Party would owe under an Energy Management Agreement to the counterparty thereunder upon the termination of such Energy Management Agreement.

"**Lien**" means, with respect to any Property, (a) any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such Property, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), relating to such Property, and (c) in the case of Equity Interests or debt securities, any purchase option, call or similar right of a third party with respect to such Equity Interests or debt securities. For the avoidance of doubt, "**Lien**" shall not include any netting or set-off arrangements under any Contractual Obligation (other than Contractual Obligations constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms of the Loan Documents.

"**Loan**" means a Revolving Credit Loan or a Revolving Letter of Credit Loan, as the context may require, and "**Loans**" means collectively the Revolving Credit Loans and the Revolving Letter of Credit Loans.

17

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) each Security Document, and (e) to the extent applicable to the DIP Facilities or the Lenders and Agents pursuant to the Interim Order or Final Order (as applicable), the Intercreditor Agreement and the Security Deposit Agreement, in each case as amended.

"*Loan Parties*" means the Borrower and the Guarantors.

"*LTSAs*" means each of: (a) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Athens in respect of the Athens Project; (b) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Harquahala in respect of the Harquahala Project; and (c) that certain Amended and Restated Combustion Turbine Parts Supply and Repair Agreement, dated January 26, 2007, by and between Siemens Power Generation, Inc. and Millennium in respect of the Millennium Project.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Change*" means any change, occurrence or development (including, without limitation, as a result of regulatory changes applicable to the Borrower or any of its Subsidiaries) that has had or could reasonably be expected to have a Material Adverse Effect.

"*Material Adverse Effect*" means a material adverse effect on (a) the condition (financial or otherwise), business, results or operations of the Borrower and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or the Lender Parties, taken as a whole, under any Loan Document or (c) the ability of the Loan Parties to perform their respective Obligations under the Loan Documents; provided, that the commencement of the Chapter 11 Cases and the solicitation of votes with respect to an Acceptable Plan, shall not constitute a Material Adverse Effect under clause (a) above.

"*Material Contract*" means each of (a) the Electric Interconnection and Transmission Agreements, (b) the Gas Interconnection Agreements, (c) the Water Supply Contracts, (d) the LTSAs, (e) any Commodity Hedge and Power Sale Agreement with a term in excess of one year after the first delivery or settlement thereunder, (f) the IDA Lease and the PILOT Documents, (g) the Millennium Lease, the Millennium Agreement and the Millennium Decommissioning Agreement, (h) the O&M Agreements, (i) the Asset Management Agreement, (j) the Energy Management Agreements, (k) the Harquahala TO Agreement, and (l) any other Contractual Obligation (other than any Loan Document, the Restructuring Support Agreement, any Pre-Petition First Lien Loan Document or any Pre-Petition Second Lien Loan Document) entered into after the date hereof by any Loan Party for which breach, nonperformance or cancellation could reasonably be expected to have a Material Adverse Effect or materially impair or interfere with the operations of the Project Company to which such Contractual Obligation relates.

18

"*Material Contract Threshold Amount*" has the meaning specified in Section 6.01(m).

"*Maximum Potential Exposure*" means, with respect to any Commodity Hedge and Power Sale Agreement, an amount equal to the maximum potential exposure of the Loan Parties to the Commodity Hedge Counterparty as determined pursuant to such Commodity Hedge and Power Sale Agreement.

"*Milestones*" has the meaning specified in the Restructuring Support Agreement.

"*Millennium*" means Millennium Power Partners, L.P, a Delaware limited partnership and owner of the Millennium Project.

"*Millennium Agreement*" means that certain Agreement, dated March 6, 1997, by and between Millennium and Town of Charlton, Massachusetts in respect of the Millennium Project.

"*Millennium Decommissioning Agreement*" means that certain Decommissioning Agreement, dated November 25, 1997, by and between Millennium and Town of Charlton, Massachusetts in respect of the Millennium Project.

"*Millennium Lease*" means that certain Lease agreement, dated as of August 31, 1998 by and between the Town of Southbridge, Massachusetts and Millennium, in respect of the Millennium Project, as amended.

"*Millennium Project*" means the 360 MW natural gas/fuel oil-fired capable electric generating station located in Worcester County, Massachusetts and all appurtenances thereto owned or operated by Millennium, including electrical switchyards, electrical interconnections and fuel delivery and storage facilities.

"*Moody's*" means Moody's Investors Service, Inc.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"*Net Cash Proceeds*" has the meaning specified in the Security Deposit Agreement.

19

"*Non-Specified RSA Termination Event*" means the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) with respect to the Consenting First Lien Holders (as defined in the Restructuring Support Agreement) for a reason other than a Specified RSA Termination Event.

"*Non-Speculative*" means, in the case of any applicable Commodity Hedge and Power Sale Agreement, that (i) such Commodity Hedge and Power Sale Agreement is limited such that the volume of the hedges entered into thereunder with respect to a Project, taken together with the aggregate volume of hedges under all other Commodity Hedge and Power Sale Agreements in effect with respect to such Project, does not exceed the power output or fuel input limits of the Plant it is intended to hedge and (ii) transactions under such Commodity Hedge and Power Sale Agreement are executed in a manner such that the amount of fixed-price gas purchased and the amount of fixed price power sold under such Commodity Hedge and Power Sale Agreement, in aggregate, are appropriately related (i.e., the amount of gas purchased under such Commodity Hedge and Power Sale Agreement approximates as reasonably as possible the amount of gas needed to generate the amount of fixed-price power sold thereunder); *provided, however,* that any Commodity Hedge and Power Sale Agreement entered into for a period that does not exceed five days and that otherwise meets the requirements of clause (i) above, shall be deemed to be Non-Speculative so long as the Borrower uses commercially reasonable efforts to minimize the duration of such uncovered arrangements.

"*Note*" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to such Lender resulting from the Revolving Credit Loans made by such Lender, as amended.

"*Notice of Borrowing*" means a Notice of Borrowing, in substantially the form of Exhibit B-1 hereto, given by the Borrower in accordance with Section 2.02.

"*Notice of Issuance*" has the meaning specified in Section 2.03(a).

"*Notice of Non-Renewal*" has the meaning specified in Section 2.01(d)(iii).

"*NPL*" means the National Priorities List under CERCLA.

"*O&M Agreements*" means each of: (a) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Millennium and NAES Corporation in respect of the Millennium Project; (b) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Athens and NAES Corporation in respect of the Athens Project; and (c) that certain Amended and Restated Operation and Maintenance Agreement, dated January 1, 2010, by and between Harquahala and NAES Corporation in respect of the Harquahala Project.

"*Obligation*" means all payment obligations of every nature of each Loan Party from time to time owed to any Agent (including former Agents) or any Lender Party from time to time under any Loan Document, whether for principal, interest (including

20

interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Revolving Letters of Credit, fees, expenses, indemnification or otherwise.

"*Operating Account*" has the meaning specified in the Security Deposit Agreement.

"*Other Taxes*" has the meaning specified in Section 2.12(b).

"*Outstanding Amount*" means (a) with respect to the Revolving Credit Loans on any date, the outstanding principal amount thereof after giving effect to any Revolving Credit Borrowings and prepayments or repayments of Revolving Credit Loans occurring on such date; and (b) with respect to the Revolving Letters of Credit on any date, the outstanding amount thereof on such date after giving effect to any Revolving Letter of Credit Borrowing occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Revolving Letters of Credit (including any refinancing of outstanding unpaid drawings under Revolving Letters of Credit as a Revolving Letter of Credit Borrowing) or any reductions in the maximum amount available for drawing under Revolving Letters of Credit taking effect on such date.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Permitted Variance*" has the meaning given to it in the Interim Order or the Final Order (as applicable).

"*Permitted Liens*" means (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business (i) for amounts that are not overdue or (ii) for amounts that are overdue that (A) do not materially adversely affect the use of the Property to which they relate or (B) are bonded or are being contested in good faith by appropriate proceedings for which reserve and other appropriate provisions, if any, required by GAAP shall have been made; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation, unemployment insurance, social security legislation or other similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens securing judgments (or the payment of money not constituting a Default under Section

21

6.01(g)) or securing appeal or other surety bonds related to such judgments; (f) Liens existing on the date hereof and described on Schedule 5.02(a) hereto, (g) any Liens created pursuant to the Interim Order and/or the Final Order and (h) easements, rights-of-way, restrictions, encroachments and other minor defects or irregularities in title and any zoning or other similar restrictions to or vested in any governmental office or agency to control or regulate the use of any Real Property, that individually or in the aggregate do not materially adversely affect the value of said Real Property or materially impair the ability of the Loan Parties to operate the Real Property to which they relate in the ordinary course of business.

"*Permitted Trading Activity*" means (a) the daily or forward purchase and/or sale or other acquisition or disposition of wholesale or retail electric energy, capacity, ancillary services, transmission rights, emissions allowances, weather derivatives, demand derivatives and/or related commodities, in each case, whether physical or financial, (b) the daily or forward purchase and/or sale or other acquisition of fuel, fuel transportation and/or storage rights and/or capacity, whether physical or financial, (c) electric energy-related tolling transactions, as seller or tolling servicer, (d) price risk management activities or services, (e) other similar electric industry activities or services or (f) additional services as may be consistent with Prudent Industry Practice from time to time in support of the marketing and trading related to the Projects, in each case in the foregoing clauses (a) through (f), to the extent (i) the purpose of such activity (when taken together with any other related Permitted Trading Activities undertaken by the Loan Parties from time to time) is to protect the Borrower and the other Loan Parties against fluctuations in the price, availability or supply of any commodity, (ii) such activity is conducted in the ordinary course of business of the Borrower and the other Loan Parties and (iii) not for speculative purposes or on a speculative basis.

"*Person*" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"*Petition Date*" has the meaning specified in the Recitals hereto.

"*PILOT Documents*" means the PILOT Agreement, the PILOT Mortgage and each other Instrument of Collateral Security (as each such term is defined in the IDA Lease).

"*Plan*" means a Single Employer Plan or a Multiple Employer Plan.

"*Platform*" has the meaning specified in Section 9.02(b).

"*Pledged Accounts*" has the meaning specified in the Pre-Petition First Lien Security Agreement.

"*Pledged Debt*" has the meaning specified in the Pre-Petition First Lien Security Agreement.

22

"*Post-Petition*" means the time period beginning immediately upon the filing of the petitions commencing the Chapter 11 Cases.

"*Post-Petition Debt*" means the obligations of the Loan Parties arising on or after the Petition Date, including any obligations related to the Post-Petition operation of the Loan Parties' business and including the Obligations.

"*Post-Petition Interest*" has the meaning specified in Section 8.05(b).

"*Prepackaged Plan*" means that certain Joint Prepackaged Chapter 11 Plan of Mach Gen, LLC and its affiliated debtors and debtors-in-possession as contemplated in and in the form annexed to the Restructuring Support Agreement, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the Restructuring Support Agreement.

"*Pre-Petition*" means the time period prior to the filing of the Chapter 11 Cases.

"*Pre-Petition Debt*" means the obligations of the Loan Parties arising before the Petition Date relating to the Loan Parties' bankruptcy estates, including related to the Pre-Petition operation of the Loan Parties' business.

"*Pre-Petition Facilities*" means, collectively, the loan facilities provided under each of the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement, respectively.

"*Pre-Petition First Lien Administrative Agent*" means the "Administrative Agent" under and as defined in the Pre-Petition First Lien Credit Agreement.

"*Pre-Petition First Lien Collateral*" has the meaning given to the term "Collateral" in the Pre-Petition First Lien Credit Agreement.

"*Pre-Petition First Lien Collateral Agent*" has the meaning given to the term "Collateral Agent" in the Pre-Petition First Lien Credit Agreement.

"*Pre-Petition First Lien Collateral Documents*" has the meaning given to the term "First Lien Collateral Documents" in the Pre-Petition First Lien Credit Agreement.

"*Pre-Petition First Lien Consent and Agreement*" means a "First Lien Consent and Agreement" under and as defined in the Pre-Petition First Lien Credit Agreement.

"*Pre-Petition First Lien Credit Agreement*" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of June 26, 2012, among the Borrower, the Guarantors, the Pre-Petition First Lien Administrative Agent, the Pre-Petition First Lien Collateral Agent and each of the banks, financial institutions, other institutional lenders and other parties party thereto from time to time, as amended.

"*Pre-Petition First Lien Lenders*" has the meaning given to the term "Lenders" in the Pre-Petition First Lien Credit Agreement.

NEWYORK 9071746 v16 (2K)

"***Pre-Petition First Lien Letters of Credit***" has the meaning specified in <u>Section 2.01(a)(i)</u>.

"***Pre-Petition First Lien Loan Documents***" means the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Mortgages***" means the Initial Pre-Petition First Lien Mortgages, the Pre-Petition First Lien Refinancing Mortgages and any other deed of trust, trust deed, mortgage, leasehold mortgage or leasehold deed of trust delivered from time to time, in each case as amended.

"***Pre-Petition First Lien Obligations***" has the meaning given to the term "First Lien Obligations" in the Intercreditor Agreement.

"***Pre-Petition First Lien Refinancing Mortgages***" has the meaning given to the term "First Lien Refinancing Mortgages" in Section 3.01(a)(iii) of the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Repayment Event***" means the "Repayment Event" as defined in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Revolving Credit Loan***" has the meaning specified in <u>Section 2.01(a)(i)</u>.

"***Pre-Petition First Lien Secured Parties***" has the meaning given to the term "First Lien Secured Parties" in the Intercreditor Agreement.

"***Pre-Petition First Lien Security Agreement***" means that certain Amended and Restated First Lien Security Agreement, dated as of June 26, 2012, by the Borrower and the Guarantors in favor of the Pre-Petition First Lien Collateral Agent for the benefit of the Pre-Petition First Lien Secured Parties, as amended.

"***Pre-Petition Loan Documents***" means the Pre-Petition First Lien Loan Documents, Pre-Petition Second Lien Loan Documents and all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Pre-Petition First Lien Lenders or the Pre-Petition Second Lien Lenders (as the case maybe), including, without limitation, the Intercreditor Agreement, all security agreements, notes, guarantees, mortgages, UCC financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto.

"***Pre-Petition Payment***" means a direct or indirect payment, redemption, purchase, defeasance or acquisition for value of principal or interest or otherwise on account of any Pre-Petition Debt or other Pre-Petition claims against any Loan Party.

"***Pre-Petition Second Lien Administrative Agent***" has the meaning given to the term "Administrative Agent" in the Pre-Petition Second Lien Credit Agreement.

24

"**Pre-Petition Second Lien Collateral**" has the meaning given to the term "Collateral" in the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Collateral Agent**" has the meaning given to the term "Collateral Agent" in the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Collateral Documents**" has the meaning given to the term "Second Lien Collateral Documents" in the Intercreditor Agreement.

"**Pre-Petition Second Lien Credit Agreement**" has the meaning given to the term "Second Lien Credit Agreement" in the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition Second Lien Lenders**" has the meaning given to the term "Lenders" in the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Loan Documents**" means the "Refinancing Second Lien Loan Documents" as defined in the Intercreditor Agreement.

"**Pre-Petition Second Lien Loans**" means "Term C Loans" as defined under the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition Second Lien Obligations**" has the meaning given to the term "Second Lien Obligations" in the Intercreditor Agreement.

"**Preferred Interests**" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

"**Primed Liens**" has the meaning specified in Section 2.17(a)(iii).

"**Priming Lien**" has the meaning specified in Section 2.17(a)(iii).

"**Pro Rata Share**" of any amount means, with respect to any Revolving Credit Lender at any time and with respect to the Revolving Credit Facility, the product of such amount *times* a fraction the numerator of which is the amount of such Lender's Revolving Credit Commitment at such time and the denominator of which is the aggregate amount of the Revolving Credit Facility at such time.

"**Professionals**" has the meaning specified in Section 2.17(a).

"**Professionals' Carve-Out Cap**" has the meaning specified in Section 2.17(a).

"**Project Companies**" means Athens, Harquahala and Millennium.

"**Projects**" means the Athens Project, the Harquahala Project and the Millennium Project.

25

"*Property*" means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether intangible or tangible.

"*Prudent Industry Practice*" means those practices, methods, equipment, specifications and standards of safety and performance, as are commonly used by electric generating stations utilizing comparable fuels as good, safe and prudent engineering practices would dictate in connection with the design, construction, operation, maintenance, repair and use of electrical and other equipment, facilities and improvements of such electrical generating stations, with commensurate standards of safety, performance, dependability (including the implementation of procedures that shall not adversely affect the long term reliability of the Projects, in favor of short term performance), efficiency and economy, in each such case as the same may evolve from time to time, consistent with applicable law and considering the state in which a Project is located and the type and size of such Project. "*Prudent Industry Practice*" as defined herein does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

"*PUHCA*" has the meaning specified in <u>Section 4.01(v)</u>.

"*Real Properties*" means each item of Property listed on <u>Schedules 4.01(r)</u> and <u>4.01(s)</u> hereto and any other real property subsequently acquired by any Loan Party covered by <u>Section 5.01(j)</u> hereof.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Register*" has the meaning specified in <u>Section 9.07(e)</u>.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Repayment Event*" means the satisfaction of the following conditions: (a) the repayment in full in Cash of all of the outstanding principal amount of the Loans and all other Obligations (other than contingent Obligations) due and payable under the Loan Documents, (b) the termination of all Commitments, (c) the termination and cancellation of all Revolving Letters of Credit (unless such Revolving Letters of Credit are cash collateralized on terms, conditions and amounts (but no more than 103.0% of the Available Amount of such Revolving Letters of Credit) reasonably satisfactory to the Administrative Agent and the Revolving Issuing Bank).

"*Required Lenders*" means, at any time, Lenders owed or holding more than 50% of the sum of (without duplication) (a) the aggregate principal amount of the Loans outstanding at such time, *plus* (b) the aggregate Available Amount of all Revolving

26

Letters of Credit outstanding at such time, *plus* (c) the aggregate Unused Revolving Credit Commitments at such time.

"***Required Rating***" means with respect to (a) any Commodity Hedge Counterparty that is described in <u>clause (a)(i)</u> of the definition of "*Commodity Hedge Counterparty*" or any Hedge Bank either (i) the unsecured senior debt obligations of such Person are rated at least Baa1 by Moody's and at least BBB+ by S&P or (ii) such Person's obligations under any applicable Commodity Hedge and Power Sale Agreement or Hedge Agreement, as the case may be, are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa1 by Moody's and at least BBB+ by S&P and (b) any Commodity Hedge Counterparty described in clause (a)(ii) of the definition of "*Commodity Hedge Counterparty*" either (i) the unsecured senior debt obligations of such Person are rated at least Baa3 by Moody's and at least BBB- by S&P or (ii) such Commodity Hedge Counterparty's obligations under any applicable Commodity Hedge and Power Sale Agreement are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa3 by Moody's and at least BBB- by S&P, and (c) any counterparty to an Energy Management Agreement either (i) the unsecured senior debt obligations of such Person are rated at least Baa1 by Moody's and at least BBB+ by S&P or (ii) such Person's obligations under any applicable Energy Management Agreement are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa1 by Moody's and at least BBB+ by S&P.

"***Responsible Officer***" means, as to any Person, any duly authorized and appointed officer of such Person, as demonstrated by a certificate of incumbency or other appropriate appointment or resolution, having actual knowledge of the matter in question.

"***Restructuring***" has the meaning specified in the Restructuring Support Agreement.

"***Restructuring Support Agreement***" means the Restructuring Support Agreement, dated as of January 15, 2014, among the Borrower, the Guarantors, the Pre-Petition First Lien Lenders, certain Pre-Petition Second Lien Lenders, and certain holders of Equity Interests in the Borrower, as such agreement may be amended, restated, supplement, or otherwise modified from time to time in accordance with its terms.

"***Revolving Credit Borrowing***" means a borrowing consisting of simultaneous Revolving Credit Loans made by the Revolving Credit Lenders.

"***Revolving Credit Commitment***" means, with respect to any Revolving Credit Lender at any time (x) during the period from the Effective Date until the Final Order Entry Date and (y) from and after the Final Order Entry Date, as the case may be, the amount set forth for such period opposite such Lender's name on <u>Schedule I</u> hereto under the caption "*Revolving Credit Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to <u>Section 9.07(f)</u> as such Lender's "*Revolving Credit Commitment*" for such period, as such amount may be reduced at or prior to such

27

time pursuant to Section 2.05 or 6.01. The aggregate of the Revolving Credit Commitments of all Lenders hereunder shall be $200 million.

"*Revolving Credit Facility*" means, at any time, the aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments at such time.

"*Revolving Credit Lender*" means any Lender that has a Revolving Credit Commitment.

"*Revolving Credit Loan*" has the meaning specified in Section 2.01(b).

"*Revolving Credit Maturity Date*" means the earlier of (a) the Outside Date (as defined in the Restructuring Support Agreement and as may be extended by seventy-five (75) calendar days pursuant to clause (ii) of the second sentence of Section 11 of the Restructuring Support Agreement) and (b) the date on which any plan of reorganization of the Loan Parties with respect to the Chapter 11 Cases (including, without limitation, any Acceptable Plan) becomes effective.

"*Revolving Credit Termination Date*" means the earlier of (a) the Revolving Credit Maturity Date and (b) the date of termination in whole of the Revolving Credit Commitments and the Revolving Letter of Credit Commitment pursuant to Section 2.05 or 6.01.

"*Revolving Issuing Bank*" means the Initial Revolving Issuing Bank and any Eligible Assignee to which the Revolving Letter of Credit Commitment hereunder has been assigned pursuant to Section 9.07 so long as such Eligible Assignee expressly agrees to perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Revolving Issuing Bank and notifies the Administrative Agent of its Lending Office and the amount of its Revolving Letter of Credit Commitment (which information shall be recorded by the Administrative Agent in the Register), for so long as such Initial Revolving Issuing Bank or Eligible Assignee, as the case may be, shall have a Revolving Letter of Credit Commitment.

"*Revolving L/C Cash Collateral Account*" has the meaning specified in the Security Deposit Agreement.

"*Revolving Letter of Credit*" has the meaning specified in Section 2.01(c)(i).

"*Revolving Letter of Credit Borrowing*" means an extension of credit resulting from a drawing under any Revolving Letter of Credit which has not been reimbursed on the applicable Honor Date or refinanced as Revolving Credit Borrowing.

"*Revolving Letter of Credit Commitment*" means, with respect to the Revolving Issuing Bank at any time (x) from the Effective Date until the Final Order Entry Date and (y) from and after the Final Order Entry Date, as the case may be, the amount set forth for such period opposite the Revolving Issuing Bank's name on Schedule I hereto under the caption "*Revolving Letter of Credit Commitment*" or, if the Revolving Issuing Bank has entered into an Assignment and Acceptance, set forth for the Revolving Issuing Bank in

the Register maintained by the Administrative Agent pursuant to <u>Section 9.07(f)</u> as the Revolving Issuing Bank's "*Revolving Letter of Credit Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to <u>Section 2.05</u>. The aggregate of the Revolving Letter of Credit Commitments of all Revolving Issuing Banks hereunder shall be $160 million.

"*Revolving Letter of Credit Facility*" means, at any time, an amount equal to the Revolving Issuing Bank's Revolving Letter of Credit Commitment at such time, as such amount may be reduced at or prior to such time pursuant to <u>Section 2.05</u>.

"*Revolving Letter of Credit Loan*" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any Revolving Letter of Credit Borrowing in accordance with its Pro Rata Share pursuant to <u>Section 2.03</u>.

"*S&P*" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"*Secured Parties*" means and includes the Administrative Agent, the Collateral Agent and each Lender.

"*Security Deposit Agreement*" means that certain Security Deposit Agreement, dated as of December 5, 2006, by the Borrower, the Guarantors, the Pre-Petition First Lien Collateral Agent, the Pre-Petition Second Lien Collateral Agent and the Depositary, as amended.

"*Security Documents*" mean the Interim Order and the Final Order (as applicable) and, after the execution and delivery thereof, each additional security document executed pursuant to <u>Section 2.17(b)</u>.

"*Single Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"*SPC*" has the meaning specified in <u>Section 9.07(l)</u>.

"*Specified RSA Termination Event*" means the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) with respect to the Consenting First Lien Holders (as defined in the Restructuring Support Agreement) as a result of a failure by the Borrower and the Guarantors to meet the Milestones specified in subclauses 4(f), 4(g) or 4(h) of Section 4 of the Restructuring Support Agreement (including the last sentence of Section 4, as applicable).

"*Subordinated Obligations*" has the meaning specified in <u>Section 8.05</u>.

29

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Superpriority Claims*" means, subject to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, claims against the Loan Parties constituting allowed superpriority administrative expense claims with priority over any and all administrative expenses of the Loan Parties, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, and which shall be payable from and have recourse to all prepetition and postpetition property of the Loan Parties, including, but not limited to, the Avoidance Actions (subject to entry of the Final Order), and all proceeds thereof.

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," the principal amount of all (a) obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" has the meaning specified in Section 2.12(a).

"*Termination Payment*" has the meaning specified in the Intercreditor Agreement.

"*UCC*" means the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"*Unreimbursed Amount*" has the meaning set forth in Section 2.03(d)(i).

"*Unused Revolving Credit Commitment*" means, with respect to any Revolving Credit Lender at any time, (a) such Lender's Revolving Credit Commitment at such time

30

minus (b) the sum of (i) the aggregate principal amount of all Revolving Credit Loans and Revolving Letter of Credit Loans made by such Lender (in its capacity as a Revolving Credit Lender) and outstanding at such time *plus* (ii) such Lender's Pro Rata Share of (A) the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time and (B) the aggregate principal amount of all Revolving Letter of Credit Loans made by the Revolving Issuing Bank pursuant to <u>Section 2.03(d)</u> (to the extent that such Revolving Credit Lender has not made such Lender's Pro Rata Share of any L/C Disbursement available to the Administrative Agent) outstanding at such time *plus* (iii) prior to the Final Order Entry Date, any Pre-Petition First Lien Revolving Credit Loans made by such Lender under the Pre-Petition First Lien Credit Agreement on the date of entry of the Interim Order and which has not been deemed to have been converted into a Revolving Credit Loan under the Revolving Credit Facility pursuant to <u>Section 2.01(a)</u> of this Agreement.

"*Vane Upgrades*" means the installation of CT Row 2 vane upgrades in respect of the Athens Project, the Millennium Project and the Harquahala Project pursuant to one or more agreements with Siemens Power Generation, Inc. (or an affiliate thereof).

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"*Water Supply Contracts*" means each of: (a) that certain Water Protection Agreement, dated July 11, 2000, by and between Harquahala Generating Company, LLC, the Harquahala Valley Irrigation District and Harquahala Valley Power District in respect of the Harquahala Project; (b) that certain Water Delivery Agreement, dated July 11, 2000, between Harquahala Generating Company, LLC and the Harquahala Valley Irrigation District in respect of the Harquahala Project; (c) that certain Delivery of Excess Central Arizona Project Water Agreement, dated May 21, 2004, by and between Harquahala and the Central Arizona Water Conservation District in respect of the Harquahala Project; (d) that certain Water Supply Agreement, dated January 5, 1998, by and between Millennium and the Town of Southbridge, MA in respect of the Millennium Project; (e) that certain Water Rights Agreement, dated June 5, 1997, and as amended January 29, 1999, by and between Millennium, American Optical Company and Southbridge Associates Limited Partnership in respect of the Millennium Project; and (f) that certain Water Withdrawal Registration Partial Transfer Agreement, dated June 5, 1997, by and between Millennium and American Optical Corporation in respect of the Millennium Project.

"*Withdrawal Liability*" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

"*Yield Maintenance Fee*" means any yield maintenance fee payable pursuant to <u>Section 2.08(b)</u>.

31

"*Yield Maintenance Period*" means the period commencing on the Effective Date and continuing until July 10, 2016.

SECTION 1.02.    Computation of Time Periods.    In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding."

SECTION 1.03.    Accounting Terms.    All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in effect in the United States from time to time ("*GAAP*").

SECTION 1.04.    Other Definitional Provisions and Rules of Construction.

(a) Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

(b) References to "Sections" and "subsections" shall be to Sections and subsections, respectively, of this Agreement unless otherwise specifically provided. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect. Any references in this Agreement to "Articles" and/or "Sections" which make reference to any particular piece of legislation or statute, including without limitation, the Bankruptcy Code, ERISA and Internal Revenue Code shall, to the extent that the context implies a reference to any other similar or equivalent legislation as is in effect from time to time in any other applicable jurisdiction, mean the equivalent section in the applicable piece of legislation. Furthermore, where any such reference is meant to apply to such other similar or equivalent legislation where such other similar or equivalent legislation has parallel or like concepts, then such references shall import such parallel or like concepts from such other similar or equivalent legislation, as applicable.

(c) The use in any of the Loan Documents of the word "include" or "including," shall not be construed to be limiting whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto.

(d) Unless otherwise expressly provided herein or in the other Loan Documents, references in the Loan Documents to any agreement or contract shall be deemed to be a reference to such agreement or contract as amended, amended and restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms and in compliance with the Loan Documents.

## ARTICLE II

32

**AMOUNTS AND TERMS OF THE LOANS AND THE LETTERS OF CREDIT; REORGANIZATION MATTERS**

SECTION 2.01.    The Loans and the Letters of Credit.

(a) Roll up of Pre-Petition First Lien Revolving Loans and Pre-Petition First Lien Letters of Credit.

(i)    As of the date hereof, the Borrower acknowledges that: (A) the outstanding principal amount of the Revolving Credit Loans under and as defined in the Pre-Petition First Lien Credit Agreement is $[_____] (the *"Pre-Petition First Lien Revolving Credit Loans"*); and (B) the Borrower acknowledges that certain letters of credit as set forth in Schedule 2.03(a) were issued under the Pre-Petition First Lien Credit Agreement and remain outstanding (the *"Pre-Petition First Lien Letters of Credit"*).

(ii)    In accordance with the terms of the Interim Order: (A) on and after the occurrence of the Effective Date but prior to the Final Order Entry Date, the proceeds of Pre-Petition First Lien Collateral received by the Borrower and the Guarantors (including, without limitation and without duplication, amounts deposited from time to time into the Revenue Account, the Proceeds Account and other Accounts (each as defined in the Security Deposit Agreement)) shall be deemed to convert Pre-Petition First Lien Revolving Credit Loans (having in aggregate an outstanding principal amount equivalent to such proceeds) to Revolving Credit Loans (also having in aggregate an outstanding principal amount equivalent to such proceeds) advanced for the account of the Borrower by the applicable Revolving Credit Lenders pursuant to the Revolving Credit Facility under this Agreement; and (B) on the Effective Date, all Pre-Petition First Lien Letters of Credit then outstanding shall be deemed to have been provided for the account of the Borrower pursuant to the Revolving Letter of Credit Facility under this Agreement.

(iii)    In accordance with the terms of the Final Order, on the Final Order Entry Date, all then outstanding Pre-Petition First Lien Revolving Credit Loans will be deemed to convert to Revolving Credit Loans (having in aggregate an outstanding principal amount equal to the outstanding principal amount of such converted Pre-Petition First Lien Revolving Credit Loans) advanced for the account of the Borrower pursuant to the Revolving Credit Facility under this Agreement by the applicable Revolving Credit Lenders.

(b) The Revolving Credit Loans.    Each Revolving Credit Lender severally agrees, on and subject to the terms and conditions set forth herein and in the Interim Order or the Final Order (as applicable), to make advances (each, a *"Revolving Credit Loan"*) to the Borrower from time to time on any Business Day during the period from the Effective Date until the Revolving Credit Termination Date in an amount for each such Revolving Credit Loan not to exceed such Lender's Unused Revolving Credit Commitment at such time.    Each Revolving Credit Borrowing shall be in an aggregate amount equal to the lesser of (i) $5,000,000 or an integral multiple of $1,000,000 in excess thereof (other than a Borrowing the proceeds of which

33

shall be used solely to repay or prepay in full outstanding Revolving Letter of Credit Loans, the initial Borrowing of Revolving Credit Loans or a Borrowing deemed to have been made under <u>Section 2.01(a)</u>) or (ii) the aggregate Unused Revolving Credit Commitment at such time and, in each case, shall consist of Revolving Credit Loans made simultaneously by the Revolving Credit Lenders ratably according to their Revolving Credit Commitments. Within the limits of each Revolving Credit Lender's Unused Revolving Credit Commitment in effect from time to time, the Borrower may borrow under this <u>Section 2.01(b)</u>, prepay pursuant to <u>Section 2.06(a)</u> and reborrow under this <u>Section 2.01(b)</u>.

(c)    <u>Letters of Credit</u>.

(i)    <u>Revolving Letters of Credit</u>.  The Revolving Issuing Bank agrees, on the terms and conditions set forth herein and in the Interim Order or the Final Order (as applicable) and in reliance on the agreements of the Revolving Credit Lenders set forth in <u>Section 2.03</u> below, to issue (or cause its Affiliate or (subject to Section 2.03(j)) a Fronting Bank that, in each case, is a commercial bank that meets the criteria set forth in the definition of "*Eligible Assignee*" to issue on its behalf) letters of credit (the "***Revolving Letters of Credit***") in U.S. Dollars for the account of the Borrower from time to time on any Business Day during the period from the Effective Date until ten (10) Business Days before the Revolving Credit Termination Date in an aggregate Available Amount (i) for all Revolving Letters of Credit not to exceed at any time the lesser of (A) the Revolving Letter of Credit Facility at such time and (B) the Revolving Issuing Bank's Revolving Letter of Credit Commitment at such time and (ii) for each such Revolving Letter of Credit not to exceed the Unused Revolving Credit Commitments of the Revolving Credit Lenders at such time.

(ii)    [Reserved].

(iii)    <u>Renewal and Termination of Revolving Letters of Credit</u>.  No Revolving Letter of Credit shall have an expiration date (including all rights of the Borrower or the beneficiary to require renewal) later than 365 days after the date of issuance thereof and may by its terms be renewable annually as may be stated in the Revolving Letter of Credit and upon the fulfillment of the applicable conditions set forth in <u>Article III</u> unless the Revolving Issuing Bank, upon notice (a "***Notice of Non-Renewal***") to the beneficiary and the Borrower (with a copy to the Administrative Agent) at least 60 calendar days (or such other period that may be specified in such Revolving Letter of Credit) prior to the then applicable expiration date that such Revolving Letter of Credit will not be renewed; *provided* that the terms of each Revolving Letter of Credit that is automatically renewable annually shall, permit such beneficiary, upon receipt of such Notice of Non-Renewal, to draw under such Revolving Letter of Credit prior to the date such Revolving Letter of Credit otherwise would have expired.  If a "Notice of Non-Renewal" is given by any Revolving Issuing Bank pursuant to the immediately preceding sentence, such Revolving Letter of Credit shall expire on the expiry date.  Within the limits of the Revolving Letter of Credit Facility and subject to the limits referred to above, the Borrower may request the issuance of Revolving Letters of Credit under this

34

Section 2.01, repay any Unreimbursed Amounts resulting from drawings thereunder pursuant to Section 2.03(d)(i) or repay any Revolving Letter of Credit Loan resulting from drawings thereunder pursuant to Section 2.03(d)(ii), and request the issuance of additional Revolving Letters of Credit under this Section 2.01.

SECTION 2.02.  Making the Loans.  (a)  Each Revolving Credit Borrowing shall be made following the issuance of a Notice of Borrowing, given not later than 11:00 A.M. (New York City time) (x) subject to the following clause (y), on the third Business Day prior to the date of the proposed Revolving Credit Borrowing, in the case of a Borrowing in a principal amount of up to $25,000,000, or (y) the tenth Business Day prior to the date of the proposed Revolving Credit Borrowing, in the case of any Borrowing that, together with all other Borrowings requested within the preceding ten consecutive Business Days, would result in the aggregate principal amount of such Borrowings being greater than $25,000,000 (except in the case of the initial Borrowing on the Effective Date), by the Borrower to the Administrative Agent, which shall give to each Lender prompt notice thereof by telecopier or electronic communication. Each such Notice of Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested (i) date of such Revolving Credit Borrowing, and (ii) aggregate amount of such Borrowing. Each Lender shall, before 11:00 A.M. (New York City time) on the date of such Revolving Credit Borrowing, make available for the account of its Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Revolving Credit Borrowing in accordance with the respective Commitments under the Revolving Credit Facility of such Lender and the other Lenders.  After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting the Operating Account.

(b) [Reserved].

(c) [Reserved].

(d) [Reserved].

(e) Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify each Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Loan to be made by such Lender as part of such Borrowing when such Loan, as a result of such failure, is not made on such date.

(f) Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of

35

such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Loans comprising such Borrowing and (ii) in the case of such Lender, the Eurodollar Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Borrowing for all purposes.

(g) The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03. Issuance of and Drawings and Reimbursements Under Revolving Letters of Credit.

(a) Request for Issuance. After the Effective Date, each Revolving Letter of Credit shall be issued upon notice, given not later than 11:00 A.M. (New York City time) (x) subject to the following clause (y), on the third Business Day prior to the date of the proposed issuance of such Revolving Letter of Credit, in the case of a Revolving Letter of Credit with an Available Amount of up to $25,000,000, or (y) the tenth Business Day prior to the date of the proposed issuance of such Revolving Letter of Credit, in the case of a Revolving Letter of Credit with an Available Amount that, together with the Available Amount of all other Revolving Letters of Credit requested within the preceding 10 consecutive Business Days, would result in the aggregate Available Amount of all such Revolving Letters of Credit being greater than $25,000,000 (except in the case of the initial Revolving Letters of Credit to be issued or deemed issued on the Effective Date), by the Borrower to the Administrative Agent, which shall give to the Revolving Issuing Bank prompt notice thereof by telecopier or electronic communication by no later than 5:00 P.M. (New York time) at least three Business Days or ten Business Days, as the case may be, prior to the date of the proposed issuance. The notice of issuance of any Revolving Letter of Credit shall be substantially in the form attached hereto as Exhibit B-2 (a "*Notice of Issuance*") shall be in writing or by telecopier or electronic communication (and confirmed by telephone), specifying therein the requested (i) date of such issuance (which shall be a Business Day), (ii) Available Amount of such Revolving Letter of Credit, (iii) expiration date of such Revolving Letter of Credit, (iv) name and address of the beneficiary of such Revolving Letter of Credit, (v) supportable obligation and (vi) form of such Revolving Letter of Credit. If the requested form of such Revolving Letter of Credit is

36

acceptable to the Revolving Issuing Bank in its sole discretion, the Revolving Issuing Bank will, upon fulfillment of the applicable conditions set forth in Article III, make such Revolving Letter of Credit available to the Borrower at its office referred to in Section 9.02 or as otherwise agreed with the Borrower in connection with such issuance. Notwithstanding anything herein to the contrary, no Revolving Issuing Bank shall be under any obligation to issue any Revolving Letter of Credit if (x) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Revolving Issuing Bank from issuing such Revolving Letter of Credit, or any law applicable to such Revolving Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Revolving Issuing Bank shall prohibit, or direct that such Revolving Issuing Bank refrain from, the issuance of letters of credit generally or such Revolving Letter of Credit in particular or shall impose upon such Revolving Issuing Bank with respect to such Revolving Letter of Credit any restriction, reserve or capital requirement (for which such Revolving Issuing Bank is not otherwise compensated hereunder), or shall impose upon such Revolving Issuing Bank any unreimbursed loss, cost or expense (for which such Revolving Issuing Bank is not otherwise compensated hereunder) or (y) any Lender under the Revolving Letter of Credit Facility is a Defaulting Lender, unless such Revolving Issuing Bank has entered into arrangements with the Borrower or such Defaulting Lender satisfactory to such Revolving Issuing Bank to eliminate such Revolving Issuing Bank's risk with respect to such Defaulting Lender.

(b)    Revolving Letter of Credit Reports.  Each Revolving Issuing Bank shall promptly (i) notify the Administrative Agent in writing of the amount and expiry date of each Revolving Letter of Credit issued by it and (ii) provide a copy of such Revolving Letter of Credit (and any amendments, renewals or extension thereof) to the Administrative Agent.

(c)    Participations in Revolving Letters of Credit. Upon the issuance of each Revolving Letter of Credit and, in the case of the Pre-Petition Letters of Credit, upon the Effective Date, without further action, each Revolving Credit Lender shall be deemed to have irrevocably purchased, to the extent of its Pro Rata Share, a participation interest in such Revolving Letter of Credit and such Revolving Credit Lender shall, to the extent of its contingent obligation or Pro Rata Share, be responsible for reimbursing the Revolving Issuing Bank in respect of any Unreimbursed Amount in accordance with Section 2.03(d) (with the terms of this Section 2.03(c) surviving the termination of this Agreement).

(d)    Drawing and Reimbursement; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Revolving Letter of Credit of any notice of drawing under such Revolving Letter of Credit, the Revolving Issuing Bank that issued such Revolving Letter of Credit shall notify promptly the Borrower and the Administrative Agent thereof. On the same Business Day on which any payment is made by any Revolving Issuing Bank under a Revolving Letter of Credit (each such date, an "**Honor Date**"), the Borrower shall reimburse such Revolving Issuing Bank through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse any Revolving Issuing Bank by such time (it being acknowledged and agreed that any such failure shall not be a Default hereunder), the Administrative Agent shall promptly notify each Lender of the Honor Date, the amount of

37

the unreimbursed drawing (the "*Unreimbursed Amount*"), and the amount of such Lender's Pro Rata Share thereof.  In such event, (A) in the case of an Unreimbursed Amount under a Revolving Letter of Credit, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Loans under the Revolving Credit Facility, to be disbursed on the Business Day immediately following the Honor Date in an amount not to exceed the Unreimbursed Amount thereof subject to the amount of the Unused Revolving Credit Commitments (without regard, in each case, to the conditions set forth in Section 3.02).  Any notice given by a Revolving Issuing Bank or the Administrative Agent pursuant to this Section 2.03(d) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.  Unreimbursed Amounts shall bear interest at the Eurodollar Rate *plus* the Applicable Margin, from the Honor Date until such Unreimbursed Amount shall be repaid or converted into a Revolving Letter of Credit Loan, payable on demand.

(ii)     Each Revolving Credit Lender shall upon any notice pursuant to Section 2.03(d)(i) make funds available for the account of its Lending Office to the Administrative Agent for the account of the Revolving Issuing Bank by deposit to the Administrative Agent's Account, in same day funds, an amount equal to such Lender's Pro Rata Share of any Unreimbursed Amount in respect of any Revolving Letter of Credit issued by such Revolving Issuing Bank not later than 11:00 A.M. (New York City time) on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of subsection (iii), each Revolving Credit Lender that so makes funds available to the Revolving Issuing Bank shall be deemed to have made a Eurodollar Rate Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the Revolving Issuing Bank.

(iii)    Until each Revolving Credit Lender funds its Revolving Credit Loan or Revolving Letter of Credit Loan pursuant to this Section 2.03(d) to reimburse the Revolving Issuing Bank for any amount drawn under any Revolving Letter of Credit issued by the Revolving Issuing Bank, interest in respect of such Lender's Pro Rata Share of such amount shall be solely for the account of the applicable Revolving Issuing Bank.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or Revolving Letter of Credit Loans to reimburse the Revolving Issuing Bank for amounts drawn under any Revolving Letter of Credit issued by the Revolving Issuing Bank, as contemplated by this Section 2.03(d), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Credit Lender may have against the Revolving Issuing Bank, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing.

(v)     If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Revolving Issuing Bank any amount required to be paid by such Revolving Credit Lender pursuant to the foregoing provisions of this Section 2.03(d) by the time specified in Section 2.03(d)(ii), the Revolving Issuing Bank

38

shall be entitled to recover from such Revolving Credit Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Revolving Issuing Bank at a rate per annum equal to the Eurodollar Rate from time to time in effect. A certificate of the Revolving Issuing Bank submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(d)(v) shall be conclusive absent manifest error.

(vi)     If, at any time after the Revolving Issuing Bank has made a payment under any Revolving Letter of Credit and has received from any Revolving Credit Lender such Lender's Revolving Letter of Credit Loan in respect of such payment in accordance with this Section 2.03(d), the Administrative Agent receives for the account of such Revolving Issuing Bank any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower, or otherwise, including proceeds of Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving Credit Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's Revolving Letter of Credit Loan was outstanding) in the same funds as those received by the Administrative Agent.

(vii)     If any payment received by the Administrative Agent for the account of any Revolving Issuing Bank pursuant to Section 2.03(d)(i) is required to be returned under any of the circumstances described in Section 9.11 (including pursuant to any settlement entered into by the Revolving Issuing Bank in its discretion), in the case of a Revolving Letter of Credit, each Revolving Credit Lender shall pay for the account of its Lending Office to the Administrative Agent for the account of such Revolving Issuing Bank its Pro Rata Share thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Revolving Credit Lender, at a rate *per annum* equal to the Eurodollar Rate from time to time in effect.

(e)     [Reserved].

(f)     [Reserved].

(g)     Obligations Absolute.     The Obligations of the Borrower under this Agreement and any other agreement or instrument relating to any Revolving Letter of Credit shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and such other agreement or instrument under all circumstances, including, without limitation, the following circumstances:

(i)     any lack of validity or enforceability of any Loan Document, any Revolving Letter of Credit or any other agreement or instrument relating thereto (all of the foregoing being, collectively, the "*L/C Related Documents*");

(ii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations of the Borrower in respect of any L/C Related

39

Document or any other amendment or waiver of or any consent to departure from all or any of the L/C Related Documents;

(iii)    the existence of any claim, set-off, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a Revolving Letter of Credit (or any Persons for which any such beneficiary or any such transferee may be acting), any Revolving Issuing Bank or any other Person, whether in connection with the transactions contemplated by the L/C Related Documents or any unrelated transaction;

(iv)    any statement or any other document presented under a Revolving Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)    payment by any Revolving Issuing Bank under a Revolving Letter of Credit against presentation of a draft, certificate or other document that does not strictly comply with the terms of such Revolving Letter of Credit;

(vi)    any exchange, release or non perfection of any Collateral or other collateral, or any release or amendment or waiver of or consent to departure from the Guarantees or any other guarantee, for all or any of the Obligations of the Borrower in respect of the L/C Related Documents; or

(vii)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including, without limitation, any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

(h)    <u>Replacement of a Revolving Issuing Bank.</u>

(i)    Any Revolving Issuing Bank may be replaced at any time by written agreement among the Borrower, the new Revolving Issuing Bank and the Administrative Agent (with notice to the Revolving Issuing Bank being replaced); *provided, however*, that, if the Revolving Issuing Bank being replaced so requests, any Revolving Letter of Credit issued by such Revolving Issuing Bank shall be replaced and cancelled prior to the removal of such Revolving Issuing Bank and all fees and other amounts owed to such removed Revolving Issuing Bank shall be paid to it; and *provided, further*, that the Initial Revolving Issuing Bank may not be replaced without the consent of the Required Lenders.

(ii)    If at any time the unsecured senior debt of any Revolving Issuing Bank (other than the Initial Revolving Issuing Bank or an Affiliate of the Initial Revolving Issuing Bank) is not rated at least A3 by Moody's and A- by S&P, then the Borrower may, upon 10 days' prior written notice to such Revolving Issuing Bank and the Administrative Agent, elect to (i) replace such Revolving Issuing Bank with a Person selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent or (ii) cause such Revolving Issuing Bank to assign its Revolving Letter of Credit Commitment to an additional Revolving Issuing

Bank selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent. Each replacement or assignment pursuant to this Section 2.03(h) shall be done in accordance with Section 9.07.

(iii)    From and after the effective date of any such replacement or addition, (A) the successor or additional Revolving Issuing Bank shall have all the rights and obligations of a Revolving Issuing Bank under this Agreement (and the Revolving Letters of Credit to be issued by it on such effective date or thereafter) and (B) references herein to the term *"Revolving Issuing Bank"* shall be deemed to refer to such successor, additional Revolving Issuing Bank or to any previous Revolving Issuing Bank, or to such successor, additional Revolving Issuing Bank and all previous Issuing Banks, as the context may require.

(i)Resignation of a Revolving Issuing Bank. Each Revolving Issuing Bank may at any time give notice of its resignation to the Administrative Agent and the Borrower, in each case by giving 30 days written notice thereof to such parties. Upon receipt of any such notice of resignation, the Borrower shall have the right, in consultation with the Administrative Agent, to appoint a successor, which shall be an Eligible Assignee and shall be reasonably satisfactory to the Administrative Agent, it being understood that each of Wells Fargo, N.A., Deutsche Bank AG, Bank of America, N.A., Natixis New York and Barclays Bank PLC and their respective Affiliates or branches operating in New York (each a *"Pre-Approved Issuing Bank"*) is approved by and reasonably acceptable to both Borrower and the Administrative Agent. If no such successor shall have been so appointed by the Borrower and shall have accepted such appointment within 30 days after the retiring Revolving Issuing Bank gives notice of its resignation, then the retiring Revolving Issuing Bank may on behalf of the Revolving Credit Lenders, appoint a successor Revolving Issuing Bank, as applicable, meeting the qualifications set forth above; *provided*, that, if such Revolving Issuing Bank shall notify the Borrower and the Revolving Credit Lenders, that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and the retiring Revolving Issuing Bank shall be discharged from its duties and obligations hereunder and under the other Loan Documents. Upon the acceptance of a successor's appointment as Revolving Issuing Bank hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Revolving Issuing Bank, and the retiring Revolving Issuing Bank shall be discharged from all of its duties and obligations to issue additional Revolving Letters of Credit hereunder without affecting its rights and obligations in respect to Revolving Letters of Credit previously issued by it (if not already discharged therefrom as provided above in this Section 2.03). After the resignation of the Revolving Issuing Bank hereunder, the retiring Revolving Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of a Revolving Issuing Bank set forth in this Agreement and the other Loan Documents with respect to Revolving Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Revolving Letters of Credit.

(j)Revolving Letter of Credit Issuance Protocol. Notwithstanding any other provision of this Agreement, so long as Beal Bank USA or an Affiliate thereof is a Revolving Issuing Bank, the following protocol and agreements shall govern the issuance of all Revolving Letters of Credit by such Revolving Issuing Bank:

41

(i)    the Borrower shall use its commercially reasonable efforts to have the beneficiary of any requested Revolving Letter of Credit accept a Revolving Letter of Credit issued by Beal Bank USA or an Affiliate thereof;

(ii)    [Reserved]

(iii)    if the applicable beneficiary declines to accept a Revolving Letter of Credit issued by Beal Bank USA or an Affiliate thereof, then such Revolving Issuing Bank agrees (A) to use its commercially reasonable efforts to cause Wells Fargo Bank, N.A., Natixis New York or another bank reasonably acceptable to the Borrower and such Revolving Issuing Bank to issue such Revolving Letter of Credit (*i.e.*, front for such Revolving Issuing Bank) and (B) to the extent, in the manner and in the amount required by such bank, cash collateralize such Revolving Letter of Credit;

(iv)    in respect of any Revolving Letter of Credit issued by Wells Fargo, N.A., Natixis New York or another bank pursuant to clause (iii) above (a "*Fronting Bank*"), (A) the letter of credit and fronting fees payable to the Fronting Bank for issuing such Revolving Letter of Credit shall be for the account of the Borrower, (B) the funds (if any) used to cash collateralize a Revolving Letter of Credit issued by a Fronting Bank shall be provided by such Revolving Issuing Bank, provided that any draw on any such Revolving Letter of Credit (and application or utilization of such funds by the Fronting Bank to reimburse itself for any such draw), and any loss of such funds by such Revolving Issuing Bank due to any cause whatsoever (except to the extent such loss and the amount of such loss are solely caused by breach of the Loan Documents or by acts of gross negligence or willful misconduct on the part of such Revolving Issuing Bank), shall give rise to a reimbursement obligation on the part of the Borrower to such Revolving Issuing Bank and a deemed advance by such Revolving Issuing Bank to be repaid by the Borrower to such Revolving Issuing Bank as if such amount had been drawn on the applicable Revolving Letter of Credit in accordance with Section 2.03(d), (C) unless otherwise agreed by the Borrower and such Revolving Issuing Bank, the Fronting Bank in its capacity as such shall have no rights or recourse against any Loan Party and shall not be a Secured Party or a Lender Party, (D) such Revolving Letter of Credit shall constitute a utilization of the applicable Revolving Letter of Credit Facility, and (E) the Borrower shall pay to such Revolving Issuing Bank the fees in respect of such Revolving Letter of Credit as if such Revolving Issuing Bank had issued such Revolving Letter of Credit pursuant to this Section 2.03; and

(v)    a failure or delay by (A) any Fronting Bank to issue any Revolving Letter of Credit in accordance with the protocol set forth in this Section 2.03(j) or (B) any Revolving Issuing Bank or Fronting Bank to issue any Revolving Letter of Credit in the form requested by the Loan Parties shall not constitute a breach or default by such Revolving Issuing Bank of any of its obligations under this Agreement

SECTION 2.04.  Repayment of Loans.

(a) Revolving Credit Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Credit Lenders

42

on the Revolving Credit Termination Date the aggregate principal amount of the Revolving Credit Loans then outstanding.

(b) <u>Revolving Letter of Credit Loans</u>. The Borrower shall repay to the Administrative Agent for the account of the Revolving Issuing Bank and each Revolving Credit Lender that has made a Revolving Letter of Credit Loan on the Revolving Credit Termination Date the outstanding principal amount of each Revolving Letter of Credit Loan made by each of them.

(c) <u>Revolving Letters of Credit.</u> If, on the Revolving Credit Termination Date, any Revolving Letter of Credit for any reason remains outstanding and partially or wholly undrawn, the Borrower shall on the Revolving Credit Termination Date deposit in the Revolving L/C Cash Collateral Account an amount that, together with any existing amounts in the Revolving L/C Cash Collateral Account, is equal to 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding.

SECTION 2.05.    <u>Termination or Reduction of the Commitments</u>.

(a) <u>Optional</u>. The Borrower may, upon at least five Business Days' written notice to the Administrative Agent, terminate in whole or reduce in part the Unused Revolving Credit Commitments; *provided, however*, that each partial reduction of the Revolving Credit Facility shall be in an aggregate amount of $5,000,000 or an integral multiple of $500,000 in excess thereof and shall be made ratably among the Revolving Credit Lenders in accordance with their Commitments with respect to the Revolving Credit Facility. The Borrower's written notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the relevant Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the relevant Commitments of the Lenders proportionately in accordance with each such Lender's Pro Rata Share thereof.

(b) <u>Mandatory</u>.

(i)    <u>Revolving Credit Commitments</u>. The Revolving Letter of Credit Facility shall be permanently and ratably reduced from time to time on the date of each reduction of the Unused Revolving Credit Commitments pursuant to <u>Section 2.05(a)</u> by the amount, if any, by which the amount of the Revolving Letter of Credit Facility exceeds the Revolving Credit Facility after giving effect to such reduction of the Unused Revolving Credit Commitments. In addition, in the event of an Asset Sale, the Revolving Credit Commitments (and, if applicable, the corresponding Revolving Letter of Credit Commitments to the extent necessary so that such Revolving Letter of Credit

43

Commitments will not exceed the reduced Revolving Credit Commitments) will be ratably and permanently reduced by the applicable amounts set forth below:

>>> (A)    $31,250,000, in the event of a sale of the Millennium Project or Millennium;

>>> (B)    $50,000,000, in the event of a Harquahala Sale; and

>>> (C)    $125,000,000, in the event of a sale of the Athens Project or Athens.

>> (ii)    [Reserved].

>> (iii)    [Reserved].

>>> (c) <u>Yield Maintenance Fee</u>. The Borrower will pay any Yield Maintenance Fee due in connection with any reduction of the Revolving Credit Commitments on the terms set forth in <u>Section 2.08(b)</u>.

> SECTION 2.06. <u>Prepayments</u>. (a) <u>Optional</u>. The Borrower may, upon at least three Business Days' notice to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall, prepay the outstanding aggregate principal amount of the Loans in whole or ratably in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid and the applicable Yield Maintenance Fee (if any); *provided, however*, that (i) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $500,000 in excess thereof and (ii) if any prepayment of a Loan is made on a date other than the last day of an Interest Period for such Loan, the Borrower shall also pay any amounts owing pursuant to <u>Section 9.04(c)</u>.

> (b) <u>Mandatory</u>.  (i) Subject to the Interim Order and the Final Order (as applicable) and the Security Deposit Agreement (to the extent that its terms are not inconsistent with the Interim Order or the Final Order (as the case may be)), upon the occurrence of a Casualty Event, Event of Eminent Domain, Asset Sale, Equity Issuance or the incurrence or issuance of any Debt (other than Debt permitted to be incurred pursuant to <u>Section 5.02(b)</u>), and excluding, in each case, where any of the foregoing occurs as part of the consummation of an Acceptable Plan, the Borrower shall apply an amount equal to the Net Cash Proceeds thereof (1) *first*, to (A) prepay the Loans and (B) deposit an amount in the Revolving L/C Cash Collateral Account in an amount equal to 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding, (2) *second*, to the extent any amount of the Net Cash Proceeds remains after the application pursuant to preceding clause (1) but only until the Final Order Entry Date, to prepay the Pre-Petition First Lien Revolving Credit Loans, and (3) *thereafter*, to the extent any amount of the Net Cash Proceeds remains after the application pursuant to preceding clauses (1) and, if applicable, (2), to prepay the Pre-Petition First Lien Obligations in accordance with and as provided for in the Security Deposit Agreement.

>> (ii)    [Reserved.]

44

(iii)    If at any time (A) the sum of the aggregate outstanding balance of the Revolving Credit Loans and the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Credit Commitments or (B) the Available Amount of all Revolving Letters of Credit exceeds the aggregate Revolving Letter of Credit Commitments, whether because of a reduction of the Revolving Credit Commitments and/or Revolving Letter of Credit Commitments pursuant to Section 2.05(b) or otherwise, the Borrower shall within two (2) Business Days, first, repay the Revolving Credit Loans and, second, if necessary, transfer funds to the Revolving L/C Cash Collateral Account in an amount sufficient to eliminate such excess in accordance with this Agreement.

(iv)    All prepayments under this clause (b) shall be made together with (A) accrued and unpaid interest to the date of such prepayment on the principal amount prepaid, (B) any amounts owing pursuant to Section 9.04(c) and (C) any applicable Yield Maintenance Fee.

SECTION 2.07.  Interest.  (a)  Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Loan owing to each Lender from the date of such Loan until such principal amount shall be paid in full, at a rate per annum equal at all times during each Interest Period for such Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Loan *plus* (B) the Applicable Margin, payable in arrears on each Interest Payment Date.

(b)  [Reserved].

(c)  Default Interest.  Upon the occurrence and during the continuance of an Event of Default the Borrower shall pay interest ("*Default Interest*") on (i) the unpaid principal amount of each Loan owing to each Lender Party, payable in arrears on the dates referred to in Section 2.07(a), as applicable, and on demand, at a rate *per annum* equal to 2% *per annum* above the rate *per annum* required to be paid on such Loan pursuant to Section 2.07(a) and (ii) to the fullest extent permitted by applicable law, and without prejudice to clause (i) above, the amount of any interest, fee or other amount payable under this Agreement or any other Loan Document to any Agent or any Lender Party that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid pursuant to Section 2.07(a). In addition, in the event that at any time more than one Event of Default has occurred and is continuing, to the maximum extent permitted by law, the rate at which Default Interest is payable shall be increased by 1% *per annum* above the rate *per annum* required to be paid on such Loan for each Event of Default (other than the first Event of Default) that is then continuing. Payment or acceptance of the increased rates of interest provided for in this Section 2.07(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender Party.

45

SECTION 2.08.   Fees.

(a) Commitment Fee.   The Borrower shall pay to the Administrative Agent for the account of each of the Revolving Credit Lenders, a commitment fee, from the date hereof in the case of each Initial Lender and from the effective date specified in the Assignment and Acceptance pursuant to which it became a Lender in the case of each other Lender until the Revolving Credit Termination Date, payable in arrears quarterly on the last Business Day of each December, March, June and September occurring after the Effective Date, and on the Revolving Credit Termination Date, at the Eurodollar Rate *per annum* on the average daily Unused Revolving Credit Commitment of such Lender during such quarter. Notwithstanding anything to the contrary in any Loan Documents, but subject to the Interim Order or the Final Order (as applicable), the unpaid amount of such undrawn commitment fee shall be deemed to be an "Interest Expense under or in respect of the First Lien Loan Documents" for purposes of the Security Deposit Agreement.

(b) Yield Maintenance Fee.

(i) Subject to clause (iii) below, upon any permanent reduction of the aggregate Revolving Credit Commitments pursuant to Section 2.05 or any termination of the aggregate Revolving Credit Commitments pursuant to Section 6.01, in either case during the Yield Maintenance Period (the amount of such reduction being the "*Commitment Reduction Amount*" and the date when such reduction occurs being the "*Commitment Reduction Date*"), the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Revolving Credit Lenders, a Yield Maintenance Fee in an amount equal to the Commitment Reduction Amount multiplied by the percentage set forth below opposite the period in which the Commitment Reduction Date occurs:

| Month | Yield Maintenance Fee Percentage |
|---|---|
| 11 January 2014 – 10 February 2014 | 6.51% |
| 11 February 2014 – 10 March 2014 | 6.30% |
| 11 March 2014 – 10 April 2014 | 6.08% |
| 11 April 2014 – 10 May 2014 | 5.86% |
| 11 May 2014 – 10 June 2014 | 5.64% |
| 11 June 2014 – 10 July 2014 | 5.43% |
| 11 July 2014 – 10 August 2014 | 5.21% |

46

| 11 August 2014 – 10 September 2014 | 4.99% |
|---|---|
| 11 September 2014– 10 October 2014 | 4.78% |

(ii)    If, for any reason whatsoever, the Commitment Reduction Date occurs after the last month shown in the table in clause (i) above, the applicable Yield Maintenance Fee percentage will be the same as the Yield Maintenance Fee percentage applicable to such month pursuant to section 2.08(b) of the Prepetition First Lien Credit Agreement.

(iii)    Notwithstanding anything set forth in this Agreement, no Yield Maintenance Fee will be due:

(A)    with respect to any prepayment of the Loans or reduction of Revolving Credit Commitments, in each case, resulting from a Harquahala Sale;

(B)    following the end of the Yield Maintenance Period;

(C)    with respect to any payment of Revolving Credit Loans or Revolving Letter of Credit Loans that does not result in a permanent reduction of the Revolving Credit Commitments; or

(D)    if the aggregate Revolving Credit Commitments are permanently reduced as a result of a refinancing in full of the Revolving Credit Facility pursuant to an Acceptable Plan.

(c)    Revolving Letter of Credit Fees.

(i)    The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender a letter of credit fee, payable in arrears quarterly on the last Business Day of each December, March, June and September occurring after the Effective Date, and on the Revolving Credit Termination Date, on such Revolving Credit Lender's Pro Rata Share of the average daily aggregate Available Amount during such quarter of all Revolving Letters of Credit outstanding from time to time during such quarter at a rate per annum equal to the Eurodollar Rate plus 2.00%.

(ii)    The Borrower shall pay the Revolving Issuing Bank, for its own account, such commissions, issuance fees, fronting fees, transfer fees and other fees and charges in connection with the issuance, administration and amendment of each Revolving Letter of Credit as the Borrower and such Revolving Issuing Bank shall agree.

(d) Agents' Fees. The Borrower shall pay to each Agent for its own account such fees as may from time to time be agreed between the Borrower and such Agent.

SECTION 2.09.    [Reserved.]

47

SECTION 2.10.  Increased Costs, Etc.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), there shall be any increase in the cost to any Lender Party of agreeing to make or of making, funding or maintaining Loans or of agreeing to issue or of issuing or maintaining or participating in Revolving Letters of Credit or of agreeing to make or of making or maintaining Revolving Letter of Credit Loans (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis or rate of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender Party is organized or has its Lending Office or any political subdivision thereof), then the Borrower shall from time to time, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party additional amounts sufficient to compensate such Lender Party for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender Party, shall be conclusive and binding for all purposes, absent manifest error.

(b)  If any Lender Party determines that compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender Party or any corporation controlling such Lender Party and that the amount of such capital is increased by or based upon the existence of such Lender Party's commitment to make Loans or to issue or participate in Revolving Letters of Credit hereunder and other commitments of such type or the issuance or maintenance of or participations in the Revolving Letters of Credit (or similar Guaranteed Debts), then, upon demand by such Lender Party or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender Party, from time to time as specified by such Lender Party, additional amounts sufficient to compensate such Lender Party in the light of such circumstances, to the extent that such Lender Party reasonably determines such increase in capital to be allocable to the existence of such Lender Party's commitment to make Loans or to issue or participate in Revolving Letters of Credit hereunder or to the issuance or maintenance of or participation in any Revolving Letters of Credit.  A certificate as to such amounts submitted to the Borrower by such Lender Party shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11.  Payments and Computations.  (a)  The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in Section 2.13), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest,

commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender Party, to such Lender Parties for the account of their respective Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lender Parties and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender Party, to such Lender Party for the account of its Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(f), from and after the effective date of such Assignment and Acceptance, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b) The Borrower hereby authorizes each Lender Party and each of its Affiliates, if and to the extent payment owed to such Lender Party is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender Party or such Affiliate any amount so due.

(c) All computations of interest based on the Eurodollar Rate and of commitment fees, letter of credit and other fees and commissions shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable.  Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d) Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment or letter of credit fee or commission, as the case may be; *provided, however,* that, if such extension would cause payment of interest on or principal of Loans to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender Party hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender Party on such due date an amount equal to the amount then due such Lender Party.  If and to the extent the Borrower shall

49

not have so made such payment in full to the Administrative Agent, each such Lender Party shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender Party together with interest thereon, for each day from the date such amount is distributed to such Lender Party until the date such Lender Party repays such amount to the Administrative Agent, at the Eurodollar Rate.

(f) If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Loans to which, or the manner in which, such funds are to be applied, the Administrative Agent may, if no instructions with respect thereto are received from the Lender Parties upon request, but shall not be obligated to, elect to distribute such funds to each of the Lender Parties in accordance with such Lender Parties pro rata share of the sum of (i) the aggregate principal amount of all Loans outstanding at such time and (ii) the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender Party.

(g) Notwithstanding any provision of this Agreement to the contrary, to the extent that this Agreement provides for advances or payments (or deemed advances or payments) to be made by or to the Revolving Credit Lenders ratably according to their Revolving Credit Commitments or according to their Pro Rata Shares, as between Beal Bank USA and Beal Bank, SSB, the Revolving Credit Lenders may allocate such advances and payments ratably according to their respective Unused Revolving Credit Commitments or in such other manner as Beal Bank USA and Beal Bank, SSB may agree without affecting in any manner the aggregate Revolving Credit Commitments available to the Borrower at any time.

SECTION 2.12. <u>Taxes</u>. (a) Any and all payments by any Loan Party to or for the account of any Lender Party or any Agent hereunder or under any other Loan Document shall be made, in accordance with <u>Section 2.11</u> or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender Party and each Agent, taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which such Lender Party or such Agent, as the case may be, is organized (or any political subdivision thereof), has its Lending Office, has a permanent establishment or is engaged in business (other than the business that the Lender Party is engaged in solely by reason of the transactions contemplated by this Agreement), (y) any branch profits taxes imposed by the United States of America and (z) withholding taxes imposed under law in effect on the date hereof or at the time the Lender Party designates a new Lending Office, other than any new Lending Office designated at the written request of a Loan Party (in the case of a Lender Party

that is not an Initial Lender, this clause (z) shall include taxes imposed under law in effect on the date such Lender Party becomes a Lender Party, except to the extent that the Lender's predecessor would have been entitled to receive additional amounts under this Section 2.12(a)) and, in the case of each Lender Party, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of such Lender Party's Lending Office or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "*Taxes*").  If any Loan Party shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender Party or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender Party or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b) In addition, each Loan Party shall pay any present or future stamp, documentary, excise, property (including intangible property, but with regard to all property taxes, only to the extent relating to property of a Loan Party) mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "*Other Taxes*").

(c) The Loan Parties shall indemnify each Lender Party and each Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender Party or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such Lender Party or such Agent (as the case may be) makes written demand therefor.

(d) Within 30 days after the date of any payment of Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.  In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Loan Party through an account or branch outside the United States or by or on behalf of a Loan Party by a payor that is not a United States person, if such Loan Party determines that no Taxes are payable in respect thereof, such Loan Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion

51

of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this Section 2.12, the terms *"United States"* and *"United States person"* shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e) Each Lender Party organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender Party and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender Party in the case of each other Lender Party, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender Party remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two original Internal Revenue Service Forms W-8BEN or W-8EC1 or (in the case of a Lender Party that has certified in writing to the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender Party is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender Party that has certified that it is not a "bank" as described above, certifying that such Lender Party is a foreign corporation, partnership, estate or trust. As provided in Section 2.12(a), if the forms provided by a Lender Party at the time such Lender Party first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender Party provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided, however*, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender Party becomes a party to this Agreement, the Lender Party assignor was entitled to payments under subsection (a) of this Section 2.12 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender Party assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8EC1 or the related certificate described above, that the applicable Lender Party reasonably considers to be confidential, such Lender Party shall give notice thereof to the Borrower and

52