shall not be obligated to include in such form or document such confidential information.

(f) For any period with respect to which a Lender Party has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender Party shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.12 with respect to Taxes imposed by the United States by reason of such failure; *provided, however,* that should a Lender Party become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Lender Party shall reasonably request, at the Lender Party's sole expense and as long as the Loan Parties determine that such steps will not, in the reasonable judgment of the Loan Parties, be disadvantageous to the Loan Parties, to assist such Lender Party to recover such Taxes.

(g) Any Lender Party claiming any additional amounts payable pursuant to this Section 2.12 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender Party, be otherwise disadvantageous to such Lender Party. In addition, if a Lender Party determines, in such Lender Party's sole discretion, that it has received a refund or credit in respect of any Taxes or Other Taxes as to which it has been indemnified pursuant to Section 2.12(c), or with respect to which additional amounts have been paid pursuant to Section 2.12(a), such Lender Party shall pay to the Borrower an amount equal to such refund (but such amount in no event to exceed the amount of any indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses of such Lender Party, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of such Lender Party, shall agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender Party in the event such Lender Party subsequently determines that such refund or credit is unavailable under applicable law or is otherwise required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require a Lender Party to rearrange its tax affairs or to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

NEWYORK 9071746 v16 (2K)

SECTION 2.13. <u>Sharing of Payments, Etc.</u> If any Lender Party shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to <u>Section 9.07</u>), (a) on account of Obligations due and payable to such Lender Party hereunder and under the other Loan Documents in excess of its ratable share (according to the proportion of the amount of such Obligations due and payable to such Lender Party, (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such interests or participating interests in the Obligations as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; *provided, however,* that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered. The Loan Parties agree that any Lender Party so purchasing an interest or participating interest from another Lender Party pursuant to this <u>Section 2.13</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender Party were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be. For the avoidance of doubt, notwithstanding anything to the contrary in this <u>Section 2.13</u> or otherwise, the Lenders shall not be entitled to receive or share in any fees paid by the Borrower pursuant to <u>Section 2.08(c)(ii)</u>, which fees shall be solely for the account of the Revolving Issuing Bank.

SECTION 2.14. <u>Use of Proceeds.</u>

(a) [Reserved.]

(b) The proceeds of the Revolving Credit Loans and issuances of Revolving Letters of Credit shall be available (and the Borrower agrees that it shall use such proceeds) solely for the purposes permitted by the Interim Order and the Final Order (as applicable) and the Approved Budget (subject to any Permitted Variance), including but not limited to: (a) paying interest, fees and expenses associated with the DIP Facility in accordance with the Loan

Documents; (b) pay (i) the quarterly fees of the U.S. Trustee and (ii) the fees and expenses of Professionals retained by the Borrower, to the extent set forth in the Approved Budget (subject to any Permitted Variance) and approved in accordance with compensation procedures approved by the Bankruptcy Court and in form and substance acceptable to the Borrower and the Lenders and the First Lien Lenders, subject to the Carve-Out; (c) make any payments required under the Interim Order or the Final Order, as applicable, in respect of the Adequate Protection Obligations (as defined in the Interim Order or the Final Order, as applicable); (d) fund any adequate assurance deposits for the Borrower's and/or the Subsidiaries' utility providers pursuant to section 366 of the Bankruptcy Code; (e) providing working capital reasonably required by the Loan Parties to pay O&M Costs and satisfy Contractual Obligations then due and payable or in good faith reasonably anticipated to be due and payable during the next Funding Period (as defined in the Security Deposit Agreement) beginning on the relevant Funding Date (as defined in the Security Deposit Agreement); (f) to provide credit support required by counterparties to the Loan Parties' Contractual Obligations; and (g) the other general corporate purposes of the Loan Parties consistent with Prudent Industry Practices, (other than fees and expenses of professional persons, which fees and expenses are addressed in subclause (b) above and, to the extent such fees and expenses of professional persons constitute Adequate Protection Obligations, subclause (c) above) including reasonable cash reserves in the Accounts in an amount (inclusive of amounts pursuant to subclauses (e), (f) and (g)) not to exceed $25 million.

SECTION 2.15. <u>Evidence of Debt</u>. (a) Each Lender Party shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender Party resulting from each Loan owing to such Lender Party from time to time, including the amounts of principal and interest payable and paid to such Lender Party from time to time hereunder. The Borrower agrees that upon notice by any Lender Party to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender Party to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender Party, the Borrower shall promptly execute and deliver to such Lender Party, with a copy to the Administrative Agent, a Note, as applicable, in substantially the form of <u>Exhibit A</u> hereto payable to the order of such Lender Party in a principal amount equal to the Revolving Credit Commitment of such Lender Party. All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b) The Register maintained by the Administrative Agent pursuant to <u>Section 9.07(f)</u> shall include a control account, and a subsidiary account for each Lender Party, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder and, if appropriate, the Eurodollar Rate Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender Party hereunder and (iv) the

amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender Party's share thereof.

(c) Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender Party in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender Party and, in the case of such account or accounts, such Lender Party, under this Agreement, absent manifest error; *provided, however,* that the failure of the Administrative Agent or such Lender Party to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.16. Duty to Mitigate. In the event that any Lender Party demands payment of costs or additional amounts pursuant to Section 2.10 or 2.12, the Borrower may, upon 20 days' prior written notice to such Lender Party and the Administrative Agent, elect to cause such Lender Party to assign its Loans and Commitments in full to one or more Persons selected by the Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent and any Revolving Issuing Bank, (ii) such Lender Party receives payment in full in Cash of the outstanding principal amount of all Loans made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender Party as of the date of such assignment (including, without limitation, amounts owing pursuant to Sections 2.10, 2.12 and 9.04) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender Party hereunder in accordance with Section 9.07.

SECTION 2.17. Reorganizational Matters.

(a) Superpriority Claims and Liens. Each of the Loan Parties hereby covenants, represents and warrants that, upon entry of the Interim Order or the Final Order (as applicable), the Obligations authorized by the Interim Order or the Final Order (as applicable) of the Borrower and the Guarantors under the Loan Documents:

(i) pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several Superpriority Claims in the Chapter 11 Cases;

(ii) pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Loan Party shall have granted to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority Lien on all Collateral;

(iii) pursuant to Section 364(d)(1) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Loan Party shall have granted to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority, senior

56

priming Lien (the *"Priming Lien"*) on the Collateral under and as defined in each of the Pre-Petition First Lien Collateral Documents and Pre-Petition Second Lien Collateral Documents, which Priming Lien shall prime all Liens securing the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement and any Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the *"Primed Liens"*); and

(iv)    pursuant to Section 364(c)(3) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Loan Party shall have granted to the Collateral Agent, for the benefit of the Secured Parties, a perfected junior Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Borrowers, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of *"Collateral"*), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence on the Petition Date that were permitted by the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement or (y) valid Liens in existence on the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any (in each case, other than Liens securing the Pre-Petition Facilities) (the *"Existing Liens"*).

Each of Sections 2.17(a)(i), 2.17(a)(ii) and 2.17(a)(iii) shall be subject only to (x) on and after delivery of a Default Notice, the payment of fees pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); and (y) on and after the delivery of a Default Notice, the payment of (i) unpaid fees and expenses of professionals retained by the Borrower and the Guarantors pursuant to Section 327 or 328 of the Bankruptcy Code or by any Committee pursuant to Section 1103 of the Bankruptcy Code (collectively, the *"Professionals"*) incurred and accruing after the date upon which the Default Notice is issued (to the extent such fees and expenses are allowed by the Bankruptcy Court), in an aggregate amount (excluding any incurred and unpaid professional fees and expenses of any of the agents or lenders payable pursuant to the Interim Order or Final Order, as applicable) not in excess of (A) $2,300,000, with respect to the Borrower's and Guarantors' Professionals and (B) $50,000, with respect to the Professionals of any Committee (the amounts in clauses (A) and (B), collectively, the *"Professionals' Carve-Out Cap"*) and (ii) unpaid Professionals' fees and expenses incurred and accruing prior to or on the date upon which a Default Notice is issued, but only to the extent such unpaid fees and expenses are, with respect to each Professional, set forth in the Approved Budget and are allowed by the Court; provided, however, that the Professionals' Carve-Out Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by the Borrower and the Guarantors or by any Committee, as applicable, and paid to the applicable Professionals following delivery of a Default Notice (clauses (x) and (y) together, the *"Carve-Out"*). Except as otherwise provided in the Interim Order or the Final Order (as applicable), no portion of the Carve-Out shall be utilized for the payment of professional fees and expenses incurred in connection with any challenge to

57

the amount, extent, priority, validity, perfection or enforcement of the Debt of the Borrower and the Guarantors owing to the Lenders, the Agents or indemnified parties under the this Agreement or the Pre-Petition First Lien Credit Agreement or to the collateral securing this Agreement or the Pre-Petition First Lien Credit Agreement or the Pre-Petition Second Lien Credit Agreement. The Lenders agree that so long as no Default Notice has been delivered, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 328, 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Professionals' Carve-Out Cap. The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Agents and the Lenders to object to the allowance and payment of such amount.

(b) Collateral Security Perfection. Each of the Loan Parties agrees to take all actions that the Collateral Agent may request in its sole and absolute discretion to further secure the Obligations or perfect and protect the Collateral Agent's Liens for the benefit of the Secured Parties upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents (including, without limitation, security documents, mortgages, deeds of trust, subordination and intercreditor agreements), instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents (in all cases without representation or warranty of any kind) in recordable form as the Collateral Agent or any Lender may reasonably request and, in all cases, in form and substance satisfactory to the Collateral Agent. Each Loan Party hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Loan Party agrees to furnish any such information to the Collateral Agent promptly upon request. Notwithstanding the provisions of this Section 2.17(b), the Collateral Agent and the Lenders shall have the benefits of the Interim Order and the Final Order.

(c) Real Property. Subject in all respects to the priorities set forth in Section 2.17(a) above and to the Carve-Out, the Borrower and the Guarantors shall grant to the Collateral Agent on behalf of the Secured Parties a security interest in, and mortgage on, all of the right, title and interest of the

58

Borrower and the Guarantors in all real property, if any, owned or leased by the Borrower or any of the Guarantors, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, in each case to the extent secured pursuant to the Pre-Petition First Lien Mortgages. The Borrower and the Guarantors acknowledge that, pursuant to the Interim Order or the Final Order (as applicable), the Liens in favor of the Collateral Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Collateral Agent and the Lenders shall have the benefits of the Interim Order. The Loan Parties agree that upon the reasonable request of the Collateral Agent, the Borrower and such Guarantor shall promptly enter into separate fee or leasehold mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Collateral Agent.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS OF LENDING

SECTION 3.01. <u>Conditions Precedent</u>. <u>Section 2.01</u> of this Agreement shall become effective on and as of the first date (the "*Effective Date*") on which the Administrative Agent determines in its sole and absolute discretion that the following conditions precedent have been satisfied (and the obligation of each Lender to make a Revolving Credit Loan or any Revolving Issuing Bank to issue a Revolving Letter of Credit hereunder is subject to the satisfaction of such conditions precedent before or concurrently with the Effective Date):

(a) The Administrative Agent shall have received on or before the Effective Date the following, each dated such day (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)    This Agreement duly executed and delivered by the Parties hereto.

(ii)    The Notes, duly executed and delivered by the Borrower and payable to the order of the Lenders.

(iii)    Security Documents (other than the Interim Order and the Final Order), to the extent requested by the Collateral Agent pursuant to <u>Section 2.17(b)</u> prior to the date of this Agreement in all cases, duly executed and delivered by the Parties thereto and, together with evidence that all other action that the Administrative Agent and the Collateral Agent may deem reasonably necessary in order to perfect and protect the first priority liens and security interests created under the Security Documents have been taken.

59

(iv)    A certificate of the Borrower signed on behalf of the Borrower by a Responsible Officer, dated the Effective Date, certifying that, as of the Effective Date, the Borrower and its Subsidiaries have filed with the Bankruptcy Court all the pleadings required to be filed on the Petition Date pursuant to paragraph (e) of Section 4 of the Restructuring Support Agreement.

(v)    A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Effective Date certifying (A) as to a true and correct copy of the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to such Loan Party's certificate of formation or certificate of limited partnership, as the case may be, on file in such Secretary's office, (2) to the extent applicable, such Loan Party has paid all franchise taxes to the date of such certificate and (3) to the extent applicable, such Loan Party is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(vi)    A certificate of each Loan Party signed on behalf of such Loan Party by its chief executive officer, dated the Effective Date (the statements made in which certificate shall be true on and as of the Effective Date), certifying as to (A) the absence of any amendments to the certificate of formation or certificate of limited partnership, as the case may be, of such Loan Party since the date of the Secretary of State's certificate referred to in <u>Section 3.01(a)(vi)</u>, (B) a true and correct copy of the limited liability company agreement or limited partnership agreement, as the case may be, of such Loan Party as in effect on the Effective Date, (C) the due formation and good standing or valid existence of such Loan Party as a limited liability company or limited partnership, as the case may be, organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of such Loan Party, (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Effective Date (E) in the case of the Borrower only, the Restructuring Support Agreement remains in force and effect according to its terms, (F) the absence of receipt of notice from a party to the IDA Lease or a PILOT Document asserting that a breach or default has occurred and is continuing thereunder (other than a breach or default due to the commencement of the Chapter 11 Cases or the Loan Parties entering into the Restructuring Support Agreement and implementing the Restructuring) and (G) in the case of the Borrower only, the absence of any material amendment, modification, variation or waiver with respect to each Material Contract that has been delivered to the Pre-Petition First Lien Administrative Agent pursuant to the Petition First Lien Credit Agreement.

(vii)    In the case of the Borrower, a certificate of the Borrower executed by a director of the Borrower, in the case of each Guarantor (other than Millennium), a certificate of the sole member of such Guarantor executed by a director of such sole member, and, in the case of Millennium, a certificate of the sole member of MACH Gen GP, LLC executed by a director of such sole member, in each case, certifying the name and true signature of the officer of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

60

(viii)   Except as previously delivered in connection with the Prepetition First Lien Credit Agreement, certified copies of audited financial statements (including balance sheets, income statements and cash flow statements) of the Borrower and its Subsidiaries dated December 31, 2012 and interim financial statements of the Borrower and its Subsidiaries as of and for the Fiscal Quarter ended September 30, 2013.

(ix)   An opinion of Milbank, Tweed, Hadley & McCloy LLP, counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent (including, without limitation, with respect to the enforceability of this Agreement).

(b) The Bankruptcy Court shall have entered the Interim Order on its docket and it shall be in full force and effect and shall not have been amended, modified, stayed or reversed, in each case, without the prior written consent of the Administrative Agent.

(c) Before giving effect to the Loan Documents and the transactions contemplated thereby, there shall have occurred no Material Adverse Change since January 15, 2014.

(d) There shall exist no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries pending or threatened in writing before any Governmental Authority that (i) could reasonably be expected to have a Material Adverse Effect or, except for the Chapter 11 Cases,  materially impair or interfere with the operations of any Project Company or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated hereby.

(e) Except for any Governmental Authorizations required in connection with the Lender Parties' exercise of remedies under the Loan Documents or the consummation of an Acceptable Plan, all Governmental Authorizations and third party consents and approvals necessary in connection with the Loan Documents and the transactions contemplated thereby or for the ownership and operation of the Projects at full design capacity shall have been obtained (without the imposition of any condition that is not acceptable to the Administrative Agent or the Lenders) and shall remain in effect.

(f) The   Borrower   shall   have   paid   (or   shall   be contemporaneously paying from the proceeds of the Loans) all accrued fees of the Agents and the Lender Parties, and all accrued expenses of the Agents (including the accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lender Parties).

SECTION 3.02.  Conditions Precedent to Each Borrowing and Issuance.  The obligation of each Lender to make a Loan (other than Loans made or deemed to be made by a Revolving Issuing Bank or a Revolving Credit Lender pursuant to Section 2.01(a) or

61

Section 2.03(d)) on the occasion of each Borrowing (including an initial Borrowing) and the obligation of each Revolving Issuing Bank to issue a Revolving Letter of Credit (including the initial issuance) shall be subject to the further conditions precedent that on the date of such Borrowing or issuance:

    (a) the Administrative Agent shall have received for the account of such Lender or such Revolving Issuing Bank a certificate signed by a duly authorized officer of the Borrower, dated the date of such Borrowing or issuance, stating that (and each of the giving of the applicable Notice of Borrowing or Notice of Issuance and the acceptance by the Borrower of the proceeds of such Borrowing or such Revolving Letter of Credit shall constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Borrowing or issuance such statements are true):

    (i)    the representations and warranties contained in each Loan Document are true and correct in all material respects on and as of such date, before and after giving effect to such Borrowing or issuance and to the application of the proceeds therefrom, as though made on and as of such date;

    (ii)    no Default has occurred and is continuing, or would result from such Borrowing or from the application of the proceeds therefrom under this Agreement; and

    (iii)    no Default (as defined in the Pre-Petition First Lien Credit Agreement) other than a Default or Event of Default waived by the Consenting First Lien Holders (as defined in the Restructuring Support Agreement) pursuant to Section 18(e) of the Restructuring Support Agreement has occurred and is continuing, or would result from such Borrowing or from the application of the proceeds therefrom under the Pre-Petition First Lien Credit Agreement;

    (b) at the time of such extension of credit and after giving effect thereto, (i) if such extension of credit has been requested before the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect, in each case, without the prior written consent of the Administrative Agent and (ii) if such extension of credit is requested after the Final Order Entry Date, the Administrative Agent and the Lenders shall have received a copy of the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect, in each case, without the prior written consent of the Administrative Agent;

    (c) at the time of such extension of credit and after giving effect thereto, the Loan Parties shall be in compliance with the Approved Budget (subject to any Permitted Variance) and the proposed Loan is permitted by the Approved Budget (subject to any Permitted Variance); and

(d) At the time of each such extension of credit and after giving effect thereto and to the use of the proceeds thereof, the Cash and Cash Equivalents held by the Borrower and the Guarantors (taken as a whole) shall not exceed $25,000,000.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.  Representations and Warranties. Each Loan Party represents and warrants as follows:

(a) Organization. It (i) is a limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a limited liability company or limited partnership in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not reasonably be expected to have a Material Adverse Effect and (iii) has all requisite limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b) Location.  Set forth on Schedule 4.01(b) hereto is a complete and accurate list of all Loan Parties, showing as of the date hereof (as to each Loan Party) the jurisdiction of its formation, the address of its principal place of business and its U.S. taxpayer identification number. The copy of the charter, certificate of formation or certificate of limited partnership, as applicable, of each Loan Party and each amendment thereto provided pursuant to Section 3.01(a)(vi) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(c) Ownership Information.  Set forth on Schedule 4.01(c) hereto is a complete and accurate list of all Subsidiaries of each Loan Party, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares, membership interests or limited partnership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares, membership interests or limited partnership interests (as applicable) covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof. All of the outstanding Equity Interests in each Loan Party's Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Subsidiaries free and clear of all Liens, other

63

than Liens created or permitted by the Loan Documents, the Interim Order and the Final Order.

(d) <u>Authorization Non-Contravention</u>. The execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within such Loan Party's limited liability company or limited partnership (as applicable) powers, have been duly authorized by all necessary limited liability company or limited partnership (as applicable) action, and do not (i) contravene such Loan Party's limited liability company agreement, limited partnership agreement or other constituent documents, (ii) on entry of the Interim Order or Final Order (as applicable), violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to or binding on it, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, a Contractual Obligation of any Loan Party (except to the extent such conflict, breach, default or payment could not reasonably be expected to have a Material Adverse Effect) or (iv) except for the Liens created under the Security Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of any Loan Party or any of its Subsidiaries. As of the Effective Date, no Loan Party is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which could reasonably be expected to have a Material Adverse Effect.

(e) <u>Consents and Approvals</u>.

(i) Except as otherwise provided in the Interim Order or the Final Order (as applicable), no Governmental Authorization, and no notice to, filing with, or consent or approval of any other third party is required for (A) the due execution, delivery, recordation, filing or performance by any Loan Party of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated thereby, (B) the grant by any Loan Party of the Liens granted by it pursuant to the Security Documents, (C) the perfection or maintenance of the Liens created under the Security Documents (including the priority of such Liens) or (D) the exercise by any Agent or any Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Security Documents, except for (1) those Governmental Authorizations, notices and filings set forth on <u>Schedule 4.01(e)</u>, (A) all of which have been duly obtained, taken, given or made, (B) are in full force and effect, and (C) are free from conditions or requirements that have not been met or complied with (other than requirements not complied with as a result of the Loan Parties entering into the Restructuring Support Agreement and the implementation of the Restructuring) or (2) those Governmental Authorizations, notices, filings with, or consents of, any other third

64

party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(ii)    No Governmental Authorization, and no notice to, filing with, or consent or approval of any Governmental Authority or any other third party is required in connection with the operation of the Projects in accordance with applicable law and as otherwise contemplated by this Agreement, except for (A) the Governmental Authorizations, notices and filings set forth on Schedule 4.01(e), (1) all of which have been duly obtained, taken, given or made, (2) are in full force and effect and (3) are free from conditions or requirements that have not been met or complied with or (B) those Governmental Authorizations, notices, filings with or consents of any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(f)  Binding Agreement.  Upon entry of the Interim Order (or the Final Order, as applicable), this Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party thereto.  Upon entry of the Interim Order (or the Final Order, as applicable), this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms.

(g)  Litigation.  Except for the Chapter 11 Cases, there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened in writing before any Governmental Authority or arbitrator that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby.

(h)  Approved Budget.  The Loan Parties have disclosed to the Administrative Agent all material assumptions with respect to the Approved Budget, which assumptions were fair in light of the conditions existing at the time of delivery and represented, at the time of delivery, the Borrower's best estimate of its future financial performance.

(i)  Financial Statements.

(i)    The Consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2012, the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the fiscal year then ended, the Consolidated balance sheet of the Borrower and its Subsidiaries as of September 30, 2013, and the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the three months then ended, duly certified by a Responsible Officer of the Borrower, copies of which have been furnished to the Administrative Agent, fairly present in all material

65

respects, subject, in the case of said balance sheet as at September 30, 2013, and said statements of income and cash flows for the three months then ended, to year end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated results of operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis, and since December 31, 2012, there has been no Material Adverse Change.

(ii)     The Consolidated forecasted balance sheet, statement of income and statement of cash flows of the Borrower and its Subsidiaries delivered to the Administrative Agent pursuant to Section 3.01(a)(ix) or 5.03 were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial performance.

(j)     Information.     As of the Effective Date, no information, exhibit or report furnished by or on behalf of any Loan Party to any Agent or any Lender Party in connection with the negotiation and syndication of the Loan Documents or pursuant to the terms of the Loan Documents contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein not misleading.

(k)     Margin Stock.     The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan or drawings under any Revolving Letter of Credit will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(l)     Investment Company Act.     No Loan Party is an "investment company," as defined in or subject to regulations under the Investment Company Act of 1940, as amended.

(m)     Security Interest.     (i) The entry of the Interim Order or the Final Order (as applicable) and the entering into of any other Security Documents create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid, enforceable and perfected Liens in the Collateral, with the priority expressed to be applicable to such Liens in the Interim Order or the Final Order (as applicable) and under Section 2.17 of this Agreement, securing the payment of the Obligations.     (ii) The Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents and the Interim Order or the Final Order (as applicable). (iii) On and after the Effective Date and the entry of the Interim Order, such Interim Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.17 of this Agreement.

(n) <u>ERISA Etc.</u> (i)   No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has resulted in or is reasonably expected to result in a material liability of any Loan Party or any ERISA Affiliate.

(ii)   Neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any material Withdrawal Liability to any Multiemployer Plan.

(iii)   Neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a material Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(o) <u>Environmental Matters.</u>

(i)   Except as otherwise set forth on Part I of <u>Schedule 4.01(o)</u> hereto, the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, except for any such noncompliance, obligation or cost that could not reasonably be expected to have a Material Adverse Effect and, to the best knowledge of each Loan Party, no circumstances exist that could (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that could reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(ii)   Except as otherwise set forth on Part II of <u>Schedule 4.01(o)</u> hereto, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is currently listed or proposed for listing on the NPL or on the CERCLIS or any analogous state or local list; there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries that requires abatement under any applicable Environmental Law; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries in a manner that would reasonably be expected to require any material investigation, cleanup, remediation or remedial action by any Loan Party under any applicable Environmental Law.

(iii)   Except as otherwise set forth on Part III of <u>Schedule 4.01(o)</u> hereto, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any

67

investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries except, in each case above, where any such investigation or assessment or remedial or response action or liability could not reasonably be expected to have a Material Adverse Effect.

(p) Tax Matters.  (i)  Neither any Loan Party nor any of its Subsidiaries is party to any tax sharing agreement.

(ii)     Each Loan Party and each of its Subsidiaries has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed, other than those tax returns where the failure to file such returns could not be reasonably expected to have a Material Adverse Effect or to result in a liability of such Loan Party and its Subsidiaries in an amount in excess of $2,000,000 at any time, and has paid all taxes shown thereon to be due, together with applicable interest and penalties (other than taxes contested in good faith by proper proceedings to the extent that adequate reserves are being maintained therefor).

(iii)    No issues have been raised by the Internal Revenue Service in respect of federal income tax returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(iv)    No issues have been raised by any state, local or foreign taxing authorities, in respect of the returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise, that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(q)  Pre-Petition Debt.  Set forth on Schedule 4.01(q) hereto is a complete and accurate list of all Debt for Borrowed Money constituting Pre-Petition Debt, showing as of the date hereof the obligor and the principal amount outstanding thereunder and the maturity date thereof.

(r)  Owned Real Property.  Set forth on Schedule 4.01(r) hereto is a complete and accurate list of all real property owned by any Loan Party, showing as of the date hereof the street address, county or other relevant jurisdiction, state and record owner thereof.  Each Loan Party has good and marketable fee simple title to such real property, free and clear of all Liens, other than Liens created or permitted by the Loan Documents, the Interim Order and the Final Order.

68

(s) <u>Leased Real Property</u>.  Set forth on <u>Schedule 4.01(s)</u> hereto is a complete and accurate list of all leases of real property under which any Loan Party is the lessee, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor and lessee thereof.  Each such lease is the legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms.

(t) <u>Material Contracts</u>.  Each Material Contract (i) has been duly authorized, executed and delivered by all parties thereto, has not been amended or otherwise modified from the form previously delivered to the Administrative Agent except to the extent permitted under the terms of the Loan Documents and (ii) is in full force and effect and is binding upon and enforceable against all parties thereto in accordance with its terms, and to the best knowledge of the Loan Parties, there exists no material default under any Material Contract by any party thereto other than any default caused as a result of the commencement of the Chapter 11 Cases or the Loan Parties entering into the Restructuring Support Agreement and the implementation of the Restructuring and as to which defaults (if any) the relevant counterparty(ies) to such Material Contract cannot exercise remedies (except any remedies permitted under the safe-harbor provisions of the Bankruptcy Code).  All Material Contracts and Hedge Agreements, including all amendments thereto, to which any Loan Party is a party and in effect as of the Effective Date are set forth on <u>Schedule 4.01(t)</u>.

(u) <u>Accounts</u>.  Neither the Borrower nor any of its Subsidiaries has any deposit or securities accounts other than the Accounts or Pledged Accounts otherwise permitted under the terms of this Agreement, the Pre-Petition First Lien Loan Documents and the Pre-Petition Second Lien Loan Documents.

(v) <u>Regulatory Status</u>.  Each Project Company:  (i) meets the requirements for, and has made the necessary filing with, or has been determined by, FERC to be an exempt wholesale generator ("*EWG*") within the meaning of Section 1262(6) of the Public Utility Holding Company Act of 2005 ("*PUHCA*"); (ii) is authorized by FERC pursuant to Section 205 of the FPA to sell electric power, including energy and capacity, at market-based rates; and (iii) is granted blanket authorization by FERC to issue securities and assume obligations and liabilities pursuant to Section 204 of the FPA.

(w) <u>FERC Proceedings</u>.    There  are  no  pending  FERC proceedings in which the EWG status, market-based rate authority or blanket FPA Section 204 authority of a Project Company is subject to withdrawal, revocation or material modification.

(x) <u>Regulatory Approvals</u>.  Except for any FERC approvals required in connection with (i) the Lender Parties' exercise of remedies under the Loan Documents and (ii) the consummation of an Acceptable Plan, no

approvals or authorizations from FERC are required to be obtained by any Project Company, the Loan Parties, the Collateral Agent or the Lender Parties with respect to the Loan Documents and the transactions contemplated thereby.

(y) <u>Existing Regulatory Orders</u>.   The Borrower and each Project Company is in full compliance with the terms and conditions of all orders issued by FERC under Section 203 of the FPA and obtained by the Borrower or any Project Company.

(z) <u>PUHCA</u>.  The Borrower is a "*holding company*" within the meaning of Section 1262(8) of PUHCA solely with respect to its ownership of one or more EWGs, and is not subject to or is otherwise exempt from regulation under PUHCA.

(aa)      <u>Patriot Act</u>.  No Loan Party is in material violation of any Anti-Terrorism Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(ii)      Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of <u>Article VI</u> and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(iii)      If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Interim Order or Final Order (as applicable), the making of the Loans, the issuance of any Revolving Letter of Credit or the performance by the Borrower or any Guarantor of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties, the Agents and the Lenders shall be entitled to rely in good faith upon the Interim Order or the Final Order (as applicable), notwithstanding objection thereto or appeal therefrom by any interested party.

The Loan Parties, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the Interim Order or the Final Order (as applicable) has been stayed by a court of competent jurisdiction.

## ARTICLE V

## COVENANTS

70

SECTION 5.01. <u>Affirmative Covenants</u>. Except to the extent prohibited by the Approved Budget (subject to any Permitted Variance) and the Interim Order or the Final Order (as applicable), until a Repayment Event has occurred, the Borrower and each Guarantor will:

(a) <u>Compliance with Laws, Etc</u>. Comply, and cause each of its Subsidiaries to comply with all applicable laws, rules, regulations and orders binding on the Borrower or such Subsidiary, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, other than any such non-compliance which could not reasonably be expected to have a Material Adverse Effect.

(b) <u>Payment of Taxes, Etc</u>. Pay and discharge, and cause each of its Subsidiaries to pay and discharge, before the same shall become delinquent (where provided for therein, in accordance with the Approved Budget, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property (unless, in the case of (i) and (ii), the failure to do so could not reasonably be expected to have a Material Adverse Effect, or to result in a liability of such Loan Party and its Subsidiaries in an amount in excess of $2,000,000 at any time); *provided, however,* that neither the Borrower nor any of its Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and, and only to the extent that, adequate reserves are being maintained.

(c) <u>Compliance with Environmental Laws</u>. Comply, and cause each of its Subsidiaries and, if applicable, take commercially reasonable efforts to cause, all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all material Environmental Permits necessary for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, cleanup, removal, remedial or other action in response to any release, discharge or disposal of any Hazardous Materials from or at any of its properties, to the extent required by, and in material compliance with, all Environmental Laws; *provided, however,* that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings provided appropriate reserves are being maintained with respect to such circumstances.

(d) <u>Maintenance of Insurance</u>. Maintain, and cause each of its Subsidiaries to maintain, insurance in accordance with <u>Schedule 5.01(d)</u>.

71

(e) <u>Preservation of Existence, Etc</u>.  Except as occasioned by the Chapter 11 Cases pursuant to an Acceptable Plan or the Restructuring Support Agreement, preserve and maintain, and cause each of its Subsidiaries to preserve and maintain, its existence as a limited liability company or limited partnership, as applicable, its good standing in the State of Delaware and, to the extent required under applicable law, its qualification to do business and good standing in each other state or jurisdiction in which it operates a material part of its business.

(f) <u>Visitation Rights</u>.   Upon reasonable notice, at any reasonable time and from time to time, permit any of the Agents or any of the Lender Parties, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, the Borrower and any of its Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Subsidiaries with any of their officers or directors and with their independent certified public accountants; *provided* that so long as no Default shall have occurred and be continuing, unless the Borrower shall have consented thereto, neither the Agents nor the Lender Parties shall be entitled to more than one visit at the cost of Borrower to any single Project in any Fiscal Year.

(g) <u>Keeping of Books</u>.   Keep, and cause each of its Subsidiaries to keep, proper books of record and account in accordance with GAAP.

(h) <u>Maintenance of Properties, Etc</u>.  Maintain, preserve and protect, and cause each of its Subsidiaries to maintain, preserve and protect, all of its properties and equipment necessary in the conduct of the business of the Projects in good working order and condition, ordinary wear and tear excepted, and in accordance with Prudent Industry Practices.

(i) <u>Transactions with Affiliates</u>.  Conduct, and cause each of its Subsidiaries to conduct, all transactions otherwise permitted under the Loan Documents with any of their Affiliates on terms that are fair and reasonable and no less favorable to the Borrower or such Subsidiary than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

(j) <u>Covenant to Give Security</u>.  Upon the acquisition of (i) fee title to any property which is leased pursuant to the IDA Lease or (ii) any other property by any Loan Party with a fair market value in excess of $5,000,000 or which is otherwise necessary or desirable for the continued operation of any Project, and such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties, then in each case at the Borrower's expense:

NEWYORK 9071746 v16 (2K)

(i)      within 10 days after such acquisition, furnish to the Administrative Agent and the Collateral Agent a description of the real and personal properties so acquired, in each case in detail satisfactory to the Administrative Agent; and

(ii)      promptly, but in any event within 90 days after such acquisition, take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, estoppel and consent agreements of lessors, documents, instruments, agreements, opinions and certificates with respect to such Property as the Administrative Agent shall reasonably request to create (and provide evidence thereof) a valid and perfected first priority Lien on such Property in favor of the Collateral Agent (for the benefit of the Secured Parties).

(k) Further Assurances.   Without limiting Section 2.17(b) herein, promptly upon request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, estoppel and consent agreements of lessors, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender Party through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents and the Interim Order or the Final Order (as applicable), (ii) without limiting Section 2.17(b), to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Security Documents and (iii) perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens intended to be created thereunder.

(l) Accounts.  (i) Establish and maintain, and cause each other Loan Party to maintain at all times in accordance with the Security Deposit Agreement, the Accounts, (ii) cause all Revenues (as defined in the Security Deposit Agreement) and other amounts payable to it to be deposited into, or credited to, the Accounts, in accordance with the terms of the Security Deposit Agreement and (iii) cause all funds deposited in the Accounts to be applied and disbursed in accordance with the terms of the Interim Order or the Final Order (as applicable) and the Security Deposit Agreement (to the extent not inconsistent with the terms of the Interim Order or the Final Order (as applicable)).

(m) Commodity Hedge Counterparty Security.  Any Loan Party that enters into a Commodity Hedge and Power Sale Agreement that benefits from a Lien permitted pursuant to Section 5.02(a)(i) shall:

(i)      require that the terms and conditions of such Commodity Hedge and Power Sale Agreement provide that if the Commodity Hedge Counterparty thereto

73

ceases at any time to have a Required Rating (including with respect to any Person guaranteeing the obligations of such Commodity Hedge Counterparty), such Commodity Hedge Counterparty will provide collateral in amount and form, and pursuant to documents, customarily provided in comparable transactions to secure its obligations under the applicable Commodity Hedge and Power Sale Agreement; and

(ii)     exercise its rights to enforce such obligations of the Commodity Hedge Counterparty at all times, except to the extent that the Commodity Hedge and Power Sale Agreement in question has a Maximum Potential Exposure of $5,000,000 or less; *provided* that no breach shall arise hereunder if any such exercise is unsuccessful so long as the applicable Loan Party has exercised its rights to enforce.

(n) [Reserved.]

(o) <u>Performance of Material Contracts</u>.  Other than in respect of the commencement of the Chapter 11 Cases, the Loan Parties entering into the Restructuring Support Agreement and the implementation of the Restructuring, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect and enforce each such Material Contract in accordance with its terms unless, in each case, the failure to do so would not reasonably be expected to have a Material Adverse Effect or, in the case of the IDA Lease, the Borrower obtains fee title to the Athens Project as set forth in <u>Section 6.01(m)</u>.

(p) <u>Separateness</u>.  Except in connection with the administration of the Loan Parties in the Chapter 11 Cases in accordance with applicable law, comply with the following:

(i)     Each of the Borrower and its Subsidiaries will act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(ii)     Each of the Borrower and its Subsidiaries will conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (including, without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iii)     Each of the Borrower and its Subsidiaries will obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(iv)     Each of the Borrower and its Subsidiaries will comply with the terms of its certificate of incorporation or formation and by-laws or limited liability company agreement (or similar constituent documents).

74

(q) <u>Maintenance of Regulatory Status</u>. The Project Companies shall maintain EWG status, market-based rate authority under FPA Section 205, FPA Section 204 blanket pre-approval and compliance with previously issued FPA Section 203 orders applicable to the Borrower or Project Company.

(r) <u>Use of Proceeds</u>. Use the proceeds of the Loans only as provided in <u>Section 2.14</u>.

SECTION 5.02.  <u>Negative Covenants</u>.  Except as permitted by the Interim Order or the Final Order (as applicable), until a Repayment Event has occurred, neither the Borrower nor any Guarantor will, at any time:

(a) <u>Liens, Etc.</u>    Subject to <u>Section 5.02(s)</u>, create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist, or permit any of its Subsidiaries to sign or file or suffer to exist, under the UCC of any jurisdiction, a financing statement that names the Borrower or any of its Subsidiaries as debtor, or sign or suffer to exist, or permit any of its Subsidiaries to sign or suffer to exist, any security agreement authorizing any secured party thereunder to file such financing statement, or assign, or permit any of its Subsidiaries to assign, any accounts or other right to receive income, except, and subject in all cases to the limitations and priorities provided in the Interim Order or the Final Order, as applicable:

(i)    (x) Liens under the Pre-Petition First Lien Collateral Documents securing Debt incurred under the Pre-Petition First Lien Credit Agreement and/or (y) Liens securing Debt arising under Commodity Hedge and Power Sale Agreements (whether or not such Commodity Hedge and Power Sale Agreements have been entered into before, on or after the Effective Date); *provided* that, as to clause (y), (A) such Liens (I) are entered into with Commodity Hedge Counterparties, (II) that (x) commit no more than the output of one unit from either Harquahala or Athens (approximately 360MW) for no more than one month, (y) are not secured by pari passu liens with the facilities under the Pre-Petition First Lien Credit Agreement in excess of (A) $80,000,000, prior to the Harquahala Sale, (B) $50,000,000, upon and following the Harquahala Sale, and (C) $40,000,000, upon and following an Asset Sale with respect to Millennium or the Millennium Project, in the aggregate when taken together with the amount of any other Commodity Hedge and Power Sales Agreements then secured by the Collateral, minus, to the extent such amounts are greater than $20,000,000, the aggregate amount of all swap termination payments paid by the Borrower with respect to termination of Commodity Hedge and Power Sales Agreement since July 10, 2012 that exceed $20,000,000, or (z) provide that the obligation to sell power or purchase fuel is contingent upon the subject unit being available for operation, (III) that are not in respect of the Millennium Project and (IV) at the time that any such Commodity Hedge and Power Sale Agreement is entered into, or any Lien in respect of the Collateral is granted in respect thereof, the

75

aggregate amount of claims due and unpaid beyond any applicable cure period under any other Commodity Hedge and Power Sales Agreements secured by the Collateral does not exceed $25,000,000, (B) such Liens are subject to the terms of the Intercreditor Agreement and (C) any lender or issuing bank (or any agent or trustee thereof) with respect to such Debt and any Commodity Hedge Counterparty party to any such Commodity Hedge and Power Sale Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of, a First Lien Secured Party thereunder;

(ii)    Liens created under the Pre-Petition Second Lien Collateral Documents; *provided* that (A) such Liens only secure (1) Debt incurred under the Pre-Petition Second Lien Credit Agreement and (2) obligations under Commodity Hedge and Power Sale Agreements which provide by their terms that they are to be secured by a second priority Lien on the Collateral, (B) such Liens are subject to the terms of the Intercreditor Agreement and (C) any lender or issuing bank (or any agent or trustee thereof) with respect to such Debt and any Commodity Hedge Counterparty party to any such Commodity Hedge and Power Sale Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of a Second Lien Secured Party thereunder;

(iii)    Permitted Liens;

(iv)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower or any of its Subsidiaries in the ordinary course of business (excluding any equipment that is necessary or desirable for the continued operation of any Project) to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (iv) shall not exceed the amount permitted under Section 5.02(b)(iv) at any time outstanding;

(v)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(vi)    Liens arising from precautionary UCC financing statements regarding, and any interest or title of a licensor, lessor or sublessor under, any operating lease;

(vii)    pledges or deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to

NEWYORK 9071746 v16 (2K)

providers of property, casualty or liability insurance in the ordinary course of business; and

(viii)   Liens arising under Capitalized Leases permitted under Section 5.02(b)(vii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the property subject to such Capitalized Leases.

(b) Debt.  Subject to Section 5.02(s), create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Debt, except:

(i)      Debt under the Loan Documents;

(ii)     Pre-Petition Debt;

(iii)    [reserved];

(iv)     Debt secured by Liens permitted by Section 5.02(a)(iv) not to exceed in the aggregate, when taken together with any outstanding Debt permitted to be incurred pursuant to Section 5.02(b)(vii), $25,000,000 at any time outstanding;

(v)      to the extent constituting Debt, payment or guaranty obligations under any Commodity Hedge and Power Sale Agreements to the extent permitted under Section 5.02(l);

(vi)     Debt owed to any Loan Party, which Debt shall (x) constitute Pledged Debt, (y) be on terms reasonably acceptable to the Administrative Agent and (z) be otherwise permitted under Section 5.02(f);

(vii)    (x) Capitalized Leases not to exceed in the aggregate, when taken together with any outstanding Debt permitted to be incurred pursuant to Section 5.02(b)(iv), $25,000,000 at any time outstanding, and (y) in the case of Capitalized Leases to which any Subsidiary of the Borrower is a party, Debt of the Borrower of the type described in clause (e) of the definition of *"Debt"* guaranteeing the Obligations of such Subsidiary under such Capitalized Leases;

(viii)   to the extent constituting Debt, Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and similar obligations incurred in the ordinary course of business and not in connection with Debt for Borrowed Money;

(ix)     other unsecured Debt of (A) Athens in an aggregate amount not to exceed $5,000,000 at any one time outstanding and (B) the other Loan Parties in an aggregate amount not to exceed $25,000,000 at any one time outstanding; *provided* that the aggregate amount of Debt incurred pursuant to this clause (ix) shall not exceed $25,000,000;

NEWYORK 9071746 v16 (2K)

(x)     other unsecured Debt of the Loan Parties issued in settlement of delinquent obligations of the Loan Parties or disputes between the Loan Parties and other Persons under Contractual Obligations of the Loan Parties (other than in respect of Debt);

(xi)     [reserved]; and

(xii)     Guaranteed Debt of any Loan Party in respect of any Debt otherwise permitted to be incurred under this Section 5.02(b).

(c) Change in Nature of Business.  Make, or permit any of its Subsidiaries to make, any material change in the nature of its business as carried on at the date hereof.

(d) Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it, or permit any of its Subsidiaries to do so, except as occasioned by the Chapter 11 Cases pursuant to an Acceptable Plan.

(e) Sales, Etc. of Assets.  Without the prior written consent of the Required Lenders, which consent may be granted or withheld in each Required Lender's sole and absolute discretion, sell, lease, transfer or otherwise dispose of, or permit any of its Subsidiaries to sell, lease, transfer or otherwise dispose of, any assets, or grant any option or other right to purchase, lease or otherwise acquire, or permit any of its Subsidiaries to grant any option or other right to purchase, lease or otherwise acquire, any assets, except:

(i)     sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) power, natural gas, fuel, capacity or ancillary services or other inventory in the ordinary course of such Person's business;

(ii)     sales, transfers or other dispositions in the ordinary course of its business of Property that is surplus (excluding surplus land owned by Harquahala or related to the Harquahala Project, unless the Administrative Agent shall have given its prior written consent to such sale or disposition, which consent may be granted or withheld in the Administrative Agent's sole and absolute discretion), obsolete, defective, worn-out, damaged, or that individually or in the aggregate is not reasonably necessary for the continued operation of any Project, which, in the case of any such sale, transfer or disposition exceeding $1,000,000.00 in value, shall be so certified by a Responsible Officer of the Borrower and agreed by the Administrative Agent;

(iii)     the liquidation, sale or use of Cash and Cash Equivalents;

(iv)     sales, transfers or other dispositions of assets among Loan Parties; and

(v)     sales of (A) all, but not less than all, of the Equity Interest in or (B) all or substantially all, but not less than substantially all, of the Property of, in each case, any Project Company, including to a special purpose vehicle owned by one or more

78

Persons other than the Loan Parties, so long as (1) the Net Cash Proceeds received by the Borrower and the Guarantors in respect of such sale are not less than the Floor Amount in respect of such Project Company, (2) the purchase price for such sale shall be paid solely in Cash, and (3) the Loan Parties shall have terminated or transferred to the buyer or another unaffiliated third party any Commodity Hedge and Power Sale Agreement relating to the Project that is the subject of the sale, only to the extent that such Commodity Hedge and Power Sale Agreement relates solely to the Project that is the subject of the sale; *provided, however,* that for the sale of the last Project remaining as Collateral, the Net Cash Proceeds of such sale must be sufficient to permit the Borrower to immediately satisfy all the conditions of a Repayment Event hereunder and a Pre-Petition First Lien Repayment Event, in which case the applicable threshold stated in the definition of "Floor Amount" will not apply in respect of such sale;

*provided,* that the Borrower may not engage in any Asset Sales unless the proceeds thereof are applied pursuant to and in the manner set forth in the Interim Order or the Final Order (as applicable) and (to the extent consistent with the Interim Order or the Final Order (as applicable)) the Security Deposit Agreement; and *provided, further,* notwithstanding the foregoing, that the Borrower may not sell an undivided interest in any Project or Project Company without the prior written consent of the Required Lenders, which consent may be given or withheld by the Required Lenders in their sole and absolute discretion. For the avoidance of doubt, except as the result of any Asset Sale permitted pursuant to this Section 5.02(e), the Borrower shall not fail to hold, directly or indirectly, 100% of the Equity Interests in each of the Project Companies.

(f) <u>Investments in Other Persons</u>. Make or hold, or permit any of its Subsidiaries to make or hold, any Investment in any Person, except:

(i)      Investments by and among Loan Parties in other Loan Parties;

(ii)      Investments by the Borrower and its Subsidiaries in (A) Cash, (B) direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury of the United States of America) or obligations the timely payment of the principal and interest on which are fully guaranteed by the United States of America and (C) certificates of deposit fully insured by the Federal Deposit Insurance Corporation in national, state or foreign commercial banks whose outstanding long term debt is rated at least A or the equivalent by S&P or Moody's;

(iii)      to the extent constituting Investments, Investments in contracts and agreements (including, without limitation, Commodity Hedge and Power Sale Agreements and interest rate Hedge Agreements), including prepaid deposits and expenses thereunder, to the extent permitted under the Loan Documents;

(iv)      Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business;

(v)      Investments in the Accounts, and Investments permitted pursuant to Section 5.02(f)(ii) on deposit in or credited to the Accounts, or other accounts permitted under the Loan Documents; and

(vi)     loans and advances to officers, directors and employees of any Loan Party for reasonable and customary business related travel expenses, moving expenses and similar expenses incurred in the ordinary course of business of such Loan Party in an aggregate principal amount at any time outstanding not exceeding $1,000,000.

(g) Restricted Payments.   Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Subsidiaries to do any of the foregoing, or permit any of its Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower, except that any Subsidiary of the Borrower may (A) declare and pay Cash dividends to the Borrower or to any Loan Party of which it is a Subsidiary (to the extent permitted under, or necessary to give effect to or facilitate, the making of a payment permitted to be made by the Borrower pursuant to, the Approved Budget) and (B) accept capital contributions from its parent to the extent permitted under Section 5.02(f)(i).

(h) Amendments of Constitutive Documents.   Amend, or permit any of its Subsidiaries to amend, its limited liability company agreement, limited partnership agreement or other constitutive documents, other than amendments occasioned by the Chapter 11 Cases pursuant to an Acceptable Plan and amendments in respect of the constitutive documents of the Borrower that could not be reasonably expected to have a Material Adverse Effect.

(i) Accounting Changes.   Make or permit, or permit any of its Subsidiaries to make or permit, any change in (i) accounting policies or reporting practices, except, with prior written notice to the Administrative Agent, as permitted by GAAP, or (ii) Fiscal Year.

(j) Prepayments, Etc., of Debt.   Prepay, redeem, purchase, defease or otherwise satisfy in any manner, or make any payment in violation of any subordination terms of, any Debt that is expressly subordinated to the Obligations hereunder, or that is secured and the Liens securing such Debt rank behind the Liens created by the Security Documents, or permit any of its Subsidiaries to do any of the foregoing, in each case, except to the extent permitted by: (A) the Interim Order or the Final Order (as applicable); (B) an Acceptable Plan and/or (C) the Approved Budget, subject to any Permitted Variance.

80

(k) Partnerships; Formation of Subsidiaries, Etc. (i) Except with respect to Millennium, become a general partner in any general or limited partnership or joint venture, or permit any of its Subsidiaries to do so or (ii) organize, or permit any Subsidiary to organize, any new Subsidiary.

(l) Speculative Transactions. Engage, or permit any of its Subsidiaries to engage, in any transaction involving commodity options or futures contracts or any similar transactions, other than Permitted Trading Activity (it being understood and agreed that all activities of the Loan Parties under the Energy Management Agreements are subject to this covenant).

(m) Capital Expenditures. Make, or permit any of its Subsidiaries to make:

(i) any Capital Expenditures for Maintenance that are not contemplated by the Approved Budget (subject to any Permitted Variance) or that would cause the aggregate of all such Capital Expenditures for Maintenance made by the Borrower and its Subsidiaries in any period set forth below to exceed the amount set forth below for such period (the "*Base Capex Amount*"):

| Fiscal Year | Base Capex Amount |
|:---:|:---:|
| 2014 | $25,000,000 |

(ii) any Capital Expenditures for Investment using funds from the Operating Account in excess of $1,000,000 per Fiscal Year or the amount set forth therefor in the Approved Budget without the prior written consent of the Administrative Agent, which consent may be granted or withheld in the Administrative Agent's sole and absolute discretion. For the avoidance of doubt, (x) for purposes of the Security Deposit Agreement, Capital Expenditures for Investment in excess of the threshold set forth above or in the Approved Budget (as the case may be) shall not be "Approved Capital Expenditures" or "O&M Costs" unless the Administrative Agent's prior written consent (which may be granted or withheld in the Administrative Agent's sole and absolute discretion) shall have been obtained therefor and (y) the Borrower may make Capital Expenditures for Investment without restriction under this Section 5.02(m) so long as such Capital Expenditures for Investment are not made using funds from the Operating Account or any funds generated from the operation of the Projects.

(n) Amendment, Etc., of Material Contracts. Cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract, waive any default under or breach of any Material Contract, agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract, or permit any of its Subsidiaries to do any of the foregoing, unless (x) such cancellation, termination, amendment, modification or change

81

could not reasonably be expected to have a Material Adverse Effect, (y) such Material Contract has been replaced as set forth in <u>Section 6.01(m)</u> or (z) in the case of the IDA Lease, the Borrower obtains fee title to the Athens Project as set forth in <u>Section 6.01(m)</u>.

(o) <u>Regulatory Matters</u>.   Make or permit to be made any change in the upstream ownership of a Guarantor without first obtaining any necessary authorization under Section 203 of the FPA.

(p) <u>Investments by Depositary</u>.   Direct or permit the Depositary to invest any funds on deposit in or credited to the Accounts under the Security Deposit Agreement to be invested in any Investments other than Investments permitted pursuant to <u>Section 5.02(f)(ii)</u>.

(q) <u>Pre-Petition Payments and Amendments of Pre-Petition Facilities</u>. Other than as permitted under (i) this Agreement, (ii) the Interim Order or the Final Order, as applicable (including the Approved Budget (subject to any Permitted Variance)), (iii) the Restructuring Support Agreement, (iv) an Acceptable Plan or (v) otherwise with the prior written consent of the Administrative Agent, direct or permit to be made (a) any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with orders entered on or prior to the date hereof or other orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Administrative Agent or (b) waiver, amendment, supplement, modification, termination or release of the provisions of any material Pre-Petition Debt (including, without limitation, the Pre-Petition Loan Documents); <u>provided</u> that, notwithstanding the foregoing, fees and expenses payable under an Acceptable Plan, in respect of the Adequate Protection Obligations (as defined in the Interim Order or the Final Order, as applicable), and the Restructuring Support Agreement shall at all times be permitted.

(r) <u>Use of Proceeds</u>. Except as otherwise permitted in the Interim Order or the Final Order, as applicable, direct or permit any of its Subsidiaries to, directly or indirectly, use proceeds of the DIP Facility or any Collateral (including cash collateral) to:

(i)   investigate or pursue any claims, causes of action, defenses, counterclaims, litigation or discovery against the Agents, any of the Lenders, the Pre-Petition Administrative Agent or the Pre-Petition First Lien Lenders (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons); or

(ii)   pay any or all claims for fees and expenses of any other person or entity in connection with the investigation of, the assertion of or joinder in any claim, cause of action, counterclaim, action, proceeding, application, litigation, motion, objection, defense or other contested matter, the purpose of which is to seek or the result

82

of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, any claim, indebtedness, liens and/or security interests of the Administrative Agent, any of the Lenders, any of the Pre-Petition First Lien Administrative Agent or any of the Pre-Petition First Lien Lenders; (y) objecting to or commencing any action that prevents or affirmatively delays the exercise by the Administrative Agent, any of the Lenders, the Pre-Petition First Lien Administrative Agent or the Pre-Petition First Lien Lenders of any of their respective rights and remedies under any agreement or document or the Interim Order or the Final Order; or (z) seeking any affirmative legal or equitable remedy against the Administrative Agent, any of the Lenders, the Pre-Petition First Lien Administrative Agent or the Pre-Petition First Lien Lenders (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons).

(s) Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payments of Claims. Except as otherwise expressly permitted by this Agreement, the Restructuring Support Agreement, an Acceptable Plan, the Interim Order or the Final Order, as applicable, neither the Borrower nor any other Loan Party will:

(i)    at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) the Interim Order or (ii) the Final Order;

(ii)    notwithstanding Section 5.02(b), at any time, seek or consent to a priority for any administrative expense or unsecured claim against the Borrower or any other Loan Party (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the Secured Parties' in respect of the Obligations, except as provided in Section 2.17(a);

(iii)    notwithstanding Section 5.02(a), incur, request authority to incur, or seek authorization to borrow money secured by, any Liens on Collateral that have priority status under the Bankruptcy Code senior or *pari passu* with the Liens granted to the Secured Parties or to the Pre-Petition First Lien Secured Parties pursuant to the Security Documents, the Pre-Petition First Lien Collateral Documents and the Interim Order or the Final Order (as the case may be) until the discharge of all Obligations and all Pre-Petition First Lien Obligations owed to the Pre-Petition First Lien Secured Parties pursuant to the Pre-Petition First Lien Loan Documents, including, without limitation, (A) any Obligations arising as a result of any adequate protection provided to the Secured Parties under the Interim Order or the Final Order (as the case may be) and (B) any Pre-Petition First Lien Obligations arising as a result of any adequate protection provided to the Pre-Petition First Lien Secured Parties under the Interim Order or the Final Order (as the case may be);

(iv)    prior to the occurrence of a Repayment Event, (i) pay any administrative expense claims of the Borrowers except (A) the Obligations then due and payable hereunder or (B) other administrative expense and professional claims then due

83

and payable in the ordinary course of the business of the Borrowers or the Chapter 11 Cases, or otherwise authorized by the Bankruptcy Court, in each case to the extent and having the order of priority set forth in the Interim Order or the Final Order (as applicable) or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations and the Pre-Petition First Lien Obligations (including any applicable Yield Maintenance Fee) to be paid in Cash in full or, with respect to any outstanding Letters of Credit, to be cash collateralized or terminated in a manner satisfactory to the Revolving Issuing Bank and for the Commitments to be cancelled and terminated; and

(v)     seek or consent to a sale of a material portion of the Collateral unless (i) permitted by Section 5.02(e) or (ii) all of the Obligations and the Pre-Petition First Lien Obligations are to be paid (or repaid) in Cash in full or, with respect to any outstanding Letters of Credit, to be cash collateralized or terminated in a manner satisfactory to the Revolving Issuing Bank and all Commitments are to be cancelled and terminated by application of the proceeds thereof pursuant to an Acceptable Plan.

SECTION 5.03.  Reporting Requirements.   Until a Repayment Event has occurred, the Borrower will furnish to the Agents:

(a) Default Notice.  As soon as possible and in any event within five days after the Borrower obtains knowledge thereof:

(i)     the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect or to materially impair or interfere with the operations of any Project Company, a written statement of a Responsible Officer of the Borrower setting forth details of such Default, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto; and

(ii)     any breach or default, any allegation of breach or default, or any event, development or occurrence under the IDA Lease, the PILOT Documents, the Millennium Lease or, only to the extent such breach or default, or allegation thereof is reasonably likely to have a Material Adverse Effect (or to materially impair or interfere with the operations of any Project Company), any other Material Contract, a written statement of an officer of the Borrower setting forth details of such breach, default, allegation, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

(b) Annual Financials.  As soon as available and in any event within 120 days after the end of each Fiscal Year, a copy of the annual audit report for such year for the Borrower and its Subsidiaries, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of KPMG or other independent public accountants of recognized

84

standing acceptable to the Administrative Agent and (ii) a certificate of a Responsible Officer of the Borrower (A) certifying such financial statements as having been prepared in accordance with GAAP and (B) stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

(c) <u>Quarterly Financials</u>. As soon as available and in any event within (i) 45 days after the end of each of the first three quarters of each Fiscal Year and (ii) 60 days after the end of the fourth quarter of each Fiscal Year, a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous fiscal quarter and ending with the end of such fiscal quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

(d) <u>Variance Report and Approved Budget</u>. (i) The Budget Reconciliation and Other Reporting Obligations, each as defined in (and on the terms set forth in) the Interim Order or the Final Order, as applicable, and (ii) on the third to last Business Day of each month, an updated Approved Budget (for the 13-week period commencing with the first Business Day of the immediately succeeding month); it being understood and agreed that each Approved Budget shall be consistent with the immediately preceding Approved Budget and otherwise in form and substance reasonably satisfactory to the Administrative Agent.

(e) <u>Chapter 11 Cases Filings</u>. Except to the extent otherwise to be provided to counsel for the Consenting First Lien Holders (as defined in the Restructuring Support Agreement) in connection with the Restructuring Support Agreement, (i) draft copies of all "first day" motions, applications, and other documents that any Loan Party intends to file with the Bankruptcy Court at least four (4) calendar days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances) and (ii) draft copies of all other material pleadings any Loan Party intends to file with the Bankruptcy Court at least three (3) calendar days prior to filing such pleading to the extent practicable.

85

(f) <u>Litigation</u>.   Promptly after the commencement thereof, notice of all actions, suits, litigation and proceedings before any Governmental Authority of the type described in <u>Section 4.01(g)</u>.

(g) <u>Agreement Notices; Etc.</u>

(i)   Promptly upon execution thereof, copies of any Material Contract entered into by any Loan Party after the date hereof;

(ii)   promptly (but in any event within 10 days) following any Loan Party's entering into of any Material Contract after the date hereof, a Consent and Agreement substantially in the form of <u>Exhibit F-1</u> or <u>Exhibit F-2</u>, as applicable, in respect of such Material Contract; and

(iii)   promptly upon execution thereof, copies of any amendment, modification or waiver of any provision of any Pre-Petition First Lien Loan Documents or Pre-Petition Second Lien Loan Document, or any Material Contracts.

(h) <u>ERISA</u>.

(i)   <u>ERISA Events and ERISA Reports</u>.  (A) Promptly and in any event within 10 Business Days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liability in excess of $5,000,000, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party or such ERISA Affiliate has taken and proposes to take with respect thereto and (B) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information within 10 Business Days.

(ii)   <u>Plan Terminations</u>.  Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(iii)   <u>Multiemployer Plan Notices</u>.  Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability that could reasonably be expected to result in liability in excess of $5,000,000 by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan that could reasonably be expected to result in liability in excess of $5,000,000 or (C) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in <u>clause (A)</u> or <u>(B)</u>.

(i) <u>Environmental Conditions</u>.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance known to the Borrower by any Loan Party or any of its

86

Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect (or to materially impair or interfere with the operations of any Project Company) or (ii) cause any property described in the Pre-Petition First Lien Mortgages to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(j) <u>Real Property</u>.   As soon as available and in any event within 30 days after the end of each Fiscal Year, a report supplementing <u>Schedules 4.01(r)</u> and <u>4.01(s)</u> hereto, including an identification of all owned and leased real property disposed of by the Borrower or any of its Subsidiaries during such Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, and, in the case of leases of property, lessor and lessee thereof) of all real property acquired or leased during such Fiscal Year and a description of such other changes in the information included in such Schedules as may be necessary for such Schedules to be accurate and complete.

(k) <u>Insurance</u>.   Promptly after the Borrower gains knowledge of the occurrence thereof, a report summarizing any changes in the insurance coverage of the Borrower and its Subsidiaries resulting from a change in the insurance markets of the type described in Section 2 of <u>Schedule 5.01(d)</u>. Promptly after the occurrence thereof, notice of any Casualty Event or Event of Eminent Domain affecting any Loan Party, whether or not insured, through fire, theft, other hazard or casualty involving a probable loss of $4,000,000 or more. Promptly after receipt thereof, copies of any cancellation or receipt of written notice of threatened cancellation of any property damage insurance required to be maintained under <u>Section 5.01(d)</u>.

(l) <u>Other Information</u>. Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender Party through the Administrative Agent, may from time to time reasonably request.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.   <u>Events of Default</u>. Except for the filing of the Chapter 11 Cases and any of the following resulting from obligations hereunder with respect to which the Interim Order or the Final Order (as applicable) prohibits any Loan Party from complying, if any of the following events ("***Events of Default***") shall occur and be continuing:

(a) <u>Payment Defaults</u>.   (i) the Borrower shall fail to pay any principal of any Loan when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on any Loan within three Business

Days after the same shall become due and payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (iii) within ten Business Days after the same shall become due and payable;

(b) Misrepresentation. any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; *provided, however*, that if (i) such Loan Party was not aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied, within 60 days from the date on which the Borrower or any officer thereof first obtains knowledge thereof such that such incorrect or false representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such incorrect or false representation or warranty shall not constitute a Default or Event of Default;

(c) Certain Covenants. the Borrower or any Loan Party (as applicable) shall fail to perform or observe any term, covenant or agreement contained in Section 2.14, 2.17, 5.01(d), (e), (i), (l) and (p), 5.02 or 5.03(a), (d) or (e);

(d) Other Covenant. any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 30 days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party;

(e) Cross Default. Any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of (i) any Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount (or, in the case of any Hedge Agreement or Commodity Hedge and Power Sale Agreement, an Agreement Value) of at least $25,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding hereunder) or (ii) any Energy Management Agreement that has a Liability Amount of at least $25,000,000, in each case, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt or Energy Management Agreement; or any

88

other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof except to the extent such "Event of Default" is caused by the commencement of the Chapter 11 Cases, the Loan Parties entering into the Restructuring Support Agreement and the implementation of the Restructuring or by complying with an inconsistent obligation under this Agreement;

(f)  Event of Default under Pre-Petition Facilities. An "Event of Default" under and as defined in the Pre-Petition First Lien Credit Agreement except to the extent such "Event of Default" is waived by the Consenting First Lien Holders (as defined in the Restructuring Support Agreement) pursuant to Section 18(e) of the Restructuring Support Agreement;

(g)  Judgments.   any final Post-Petition judgments or Post-Petition orders, either individually or in the aggregate, for the payment of money in excess of (i) $5,000,000, in the case of judgments or orders that are superior in right of payment to any Obligation under this Agreement, or (ii) $25,000,000, in the case of any other judgment or order, in each case (to the extent not stayed pursuant to Section 362 of the Bankruptcy Code), shall be rendered against any Loan Party or any of its Subsidiaries by one or more Governmental Authorities, arbitral tribunals or other bodies having jurisdiction against such Loan Party and either (x) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (y) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; and *provided, however,* that any such judgment or order shall not give rise to an Event of Default under this Section 6.01(g) if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance in favor of such Loan Party or Subsidiary from an insurer that is rated at least "A" "X" by A.M. Best Company, which policy covers full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order;

(h)  Non-Monetary Judgments. any non-monetary Post-Petition judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 60 consecutive days during which a

89

stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i) <u>Invalidity</u>. any provision of any Loan Document after delivery thereof pursuant to <u>Section 3.01</u> or <u>5.01(j)</u> shall for any reason (except as a result of acts or omissions of the Secured Parties or pursuant to the terms thereof) cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

(j) <u>Collateral</u>. any Security Document or financing statement after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby in accordance with the priorities specified therein and by the Interim Order and the Final Order;

(k) <u>Change of Control</u>. a Change of Control shall occur;

(l) <u>ERISA Event</u>.

(i)    any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds $10,000,000;

(ii)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds $5,000,000 or requires payments exceeding $5,000,000 *per annum*; or

(iii)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $10,000,000;

(m)<u>Material Contracts</u>. (i) any Material Contract shall at any time cease to be valid and binding or in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) or as a result of the commencement of the Chapter 11 Cases or (ii) any Loan Party shall default in any material respect in the performance or observance of any

90

covenant or agreement contained in any Material Contract to which it is a party and such default has continued beyond any applicable grace period specified therein (other than any default caused as a result of the commencement of the Chapter 11 Cases or the Loan Parties entering into the Restructuring Support Agreement and the implementation of the Restructuring and as to which defaults (if any) the relevant counterparty(ies) to such Material Contract cannot exercise remedies except any remedies permitted under the safe-harbor provisions of the Bankruptcy Code), and in the case of (i) or (ii), such event could reasonably be expected to have a Material Adverse Effect or to have an adverse impact on the value of the Collateral in excess of an amount (the "***Material Contract Threshold Amount***") equal to (A) $50,000,000 *multiplied by* (B) an amount equal to (I) one *minus* (II) an amount equal to (1) the sum of the Floor Amounts for each Project or Project Company that has been transferred pursuant to an Asset Sale, if any (and for the avoidance of doubt, if no Asset Sales have occurred, this sum shall be equal to zero), *divided by* (2) $1,050,000,000, unless within 120 days of such termination or default, the applicable Loan Party replaces such Material Contract with a replacement agreement (x) similar in scope to and on terms not materially less favorable to the relevant Loan Party, the relevant Project and the Lender Parties than the Material Contract being replaced or (y) in form and substance reasonably satisfactory to the Administrative Agent, and in each case with a counterparty of comparable or better standing in the applicable industry; *provided* that if at any time during such 120 day grace period the Administrative Agent reasonably determines that the applicable Loan Party is not diligently seeking to replace the applicable Material Contract, an Event of Default shall immediately occur; and *provided, further*, that to the extent the IDA Lease is terminated, no Default or Event of Default shall occur to the extent that concurrently therewith the Borrower obtains fee title to the Athens Project and grants to the Collateral Agent (or the Collateral Agent is otherwise granted) a mortgage in respect thereof as set forth in Section 5.01(j) and no Material Adverse Effect results from the termination of the IDA Lease;

(n) <u>Specified RSA Termination Event</u>. The occurrence of a Specified RSA Termination Event;

(o) <u>Dismissal or Conversion of Chapter 11 Cases</u>. The Chapter 11 Cases shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in Cash of all Obligations, Pre-Petition First Lien Obligations and Letter of Credit Outstandings and the cash collateralization, or return or termination of, any outstanding Letters of Credit in a manner satisfactory to the Administrative Agent) or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Administrative Agent; the Loan Parties shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Administrative Agent; a trustee

91

under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Cases; the board of directors or board of managers, as applicable, of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's business; or an application shall be filed by the Loan Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority Claim ranking senior to the Obligations, and which shall be paid by the Loan Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) in the Chapter 11 Cases which is senior to the claims of the Lenders against the Loan Parties hereunder or under any of the other Loan Documents if it is not used to repay the Obligations in full in Cash and the Pre-Petition First Lien Obligations in full in Cash, or there shall arise or be granted any such senior Superpriority Claim;

(p) <u>Relief from Automatic Stay</u>. Except as provided in the Interim Order or the Final Order, as applicable, the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties that have a value in excess of $5,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect;

(q) <u>Orders</u>. Other than as expressly permitted by (w) this Agreement, (x) the Interim Order or the Final Order, as applicable (including the Approved Budget, subject to any Permitted Variance), (y) the Restructuring Support Agreement, or (z) an Acceptable Plan:

(i)      the Final Order shall not have been entered on or prior to the date that is 30 days after the Petition Date;

(ii)      an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of 10 days or more, vacating or otherwise amending or modifying the Interim Order or the Final Order (as applicable) or any Loan Party shall apply for authority to do so, without the prior written consent of the Administrative Agent;

(iii)      an order with respect to the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Secured Parties in respect of the Obligations;

92

(iv)   an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral except Permitted Liens or as otherwise created or permitted under the terms of the Loan Documents;

(v)   the Interim Order or the Final Order (as applicable) shall cease to create a valid and perfected first priority Lien (subject to Permitted Liens or Liens created or permitted by the Loan Documents, the Interim Order and the Final Order) on the Collateral or otherwise cease to be valid and binding and in full force and effect;

(vi)   any of the Loan Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Secured Parties) of the Interim Order or the Final Order (as applicable);

(vii)   any Loan Party shall seek any modification of the Interim Order or the Final Order (as applicable) without the prior express written consent of the Required Lenders, or assert in any pleading filed in any court that any material provision of the Interim Order or the Final Order (as applicable) is not valid and binding for any reason or otherwise modifying the Interim Order or the Final Order (as applicable) in a manner adverse to the Secured Parties;

(viii)   the period provided by Section 1121 of the Bankruptcy Code for the Loan Parties' exclusive right to file a plan shall expire or terminate; or

(ix)   if any Loan Party is enjoined, restrained or in any way prevented by order of a court of competent jurisdiction that has not been stayed from continuing or conducting all or any material part of its business or affairs; or

(r)   Pre-Petition Payments. Other than as permitted under (i) this Agreement (ii) the Interim Order or the Final Order, as applicable (including the Approved Budget (subject to any Permitted Variance)), (iii) the Restructuring Support Agreement, (iv) an Acceptable Plan or (v) otherwise with the prior written consent of the Administrative Agent, the Borrower shall make (or shall have made) any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with orders entered on or prior to the date hereof or other orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Administrative Agent;

(s)   Invalid Plan. A reorganization plan other than an Acceptable Plan shall be filed by any Loan Party in the Chapter 11 Cases;

(t)   Disgorgement. The Bankruptcy Court shall enter an order that has not been stayed avoiding or requiring disgorgement by the Secured Parties of any amounts received in respect of the Obligations and the Pre-Petition First Lien Obligations;

(u)   Sale of Assets. The Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of all or a material portion of the assets, properties or Equity Interests of any Loan

93

Party pursuant to Section 363 of the Bankruptcy Code, other than as expressly permitted by Section 5.02(e), pursuant to an Acceptable Plan or otherwise with the consent of the Administrative Agent, unless such order or orders contemplate the repayment in full in Cash of and termination in full of all Commitments and Obligations under this Agreement and the repayment in full in Cash of all Pre-Petition First Lien Obligations;

(v) Supportive Actions. Any of the Loan Parties shall take any action in support of any matter set forth in Sections 6.01 (n), (o), (p), (q), (r), (s) and (t) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(w) Material Impairment. Any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or the Agents or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment,

then, subject to the terms, conditions and provisions of the Interim Order or the Final Order (as applicable), and in any such event, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, and without any action or approval of the Bankruptcy Court, after seven days written notice to the Borrower, the United States Trustee for the District of Delaware, counsel to the Pre-Petition Second Lien Lenders and any Committee (a *"Default Notice"*) and, declare the Commitments of each Lender Party and the obligation of each Lender Party to make Loans (other than Revolving Letter of Credit Loans by the Revolving Issuing Bank or Revolving Credit Lenders pursuant to Section 2.03(c)) and each Revolving Issuing Bank to issue Revolving Letters of Credit to be terminated, whereupon the same shall forthwith terminate and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; In addition, upon expiration of the seven day notice period referred to above, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Administrative Agent or the Collateral Agent, as applicable (at the direction of the Required Lenders), shall be entitled, in its sole discretion, to exercise all of its respective rights and remedies under the Loan Documents. For the avoidance of doubt, payment defaults may be cured within the applicable cure period, if any, by, among other things, equity contributions from one or more members of the Borrower without limitation as to the number of such cures.  Upon any acceleration of the unpaid principal balance of any Loan or any termination of any Revolving Credit Commitment pursuant to this Section 6.01 during the Yield Maintenance Period, the applicable Lender shall be entitled to, and the Borrower shall pay as liquidated damages (it being agreed that the amount of damages that such Lender will suffer in each case are difficult to calculate) an amount equal to the Yield Maintenance Fee applicable to the

NEWYORK 9071746 v16 (2K)

Revolving Credit Commitment that has been terminated, in each case in addition to all other amounts due and payable in respect of the Obligations hereunder.

SECTION 6.02. <u>Actions in Respect of the Revolving Letters of Credit Upon Default</u>. If any Event of Default shall have occurred and be continuing, the Administrative Agent may, or shall at the request of the Required Lenders, irrespective of whether it is taking any of the actions described in <u>Section 6.01</u> or otherwise, make demand upon the Borrower to, and forthwith upon such demand the Borrower will, pay to the Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Revolving L/C Cash Collateral Account, an amount equal to 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding; If at any time the Administrative Agent or the Collateral Agent determines that any funds held in the Revolving L/C Cash Collateral Account are subject to any right or claim of any Person other than the Agents and the Lender Parties or that the total amount of such funds is less than 103.0% of the aggregate Available Amount of all Revolving Letters of Credit, the Borrower will, forthwith upon demand by the Administrative Agent or the Collateral Agent, pay to the Collateral Agent, as additional funds to be deposited and held in the Revolving L/C Cash Collateral Account, an amount equal to the excess of (a) 103.0% of the aggregate Available Amount of all Revolving Letters of Credit then outstanding *over* (b) the total amount of funds, if any, then held in the Revolving L/C Cash Collateral Account that the Administrative Agent or the Collateral Agent, as the case may be, determines to be free and clear of any such right and claim. Upon the drawing of any Revolving Letter of Credit for which funds are on deposit in the Revolving L/C Cash Collateral Account, such funds shall be applied to reimburse the Revolving Issuing Bank or the Lenders, as applicable, to the extent permitted by applicable law.

## ARTICLE VII

## THE AGENTS

SECTION 7.01. <u>Authorization and Action</u>.    (a)    Each Lender Party (in its capacities as a Lender and a Revolving Issuing Bank (if applicable)) hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lender Parties and all holders of Notes; *provided, however*, that the Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or applicable law.

(b) The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the the Security Documents or of exercising any rights and

remedies thereunder at the direction of the Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.    The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney-in-fact that it selects in accordance with the foregoing provisions of this <u>Section 7.01(b)</u> in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 7.02.    <u>Administrative Agent's Reliance, Etc.</u>    Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.    Without limitation of the generality of the foregoing, the Administrative Agent:  (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender Party and shall not be responsible to any Lender Party for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03.    <u>Agents and Affiliates</u>.  With respect to its Commitments, the Loans made by it and any Notes issued to it, each Agent and its Affiliates shall have the same rights and powers under the Loan Documents as any other Lender Party and may exercise the same as though each were not an Agent or an Affiliate of an Agent; and the term *"Lender Party"* or *"Lender Parties"* shall, unless otherwise expressly indicated, include each Agent and its Affiliates in their respective individual capacities.  Each Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Agent was not an Agent and without any duty to account therefor to the Lender Parties.  No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

96

SECTION 7.04. <u>Lender Party Credit Decision</u>.    Each Lender Party acknowledges that it has, independently and without reliance upon any Agent or any other Lender Party and based on the financial statements referred to in <u>Section 4.01(i)</u> and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender Party also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05. <u>Indemnification</u>.  (a)  Each Lender Party severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower and without limiting its obligation to do so) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the *"**Indemnified Costs**"*); *provided, however,* that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender Party agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, reasonable fees and expenses of counsel) payable by the Borrower under <u>Section 9.04</u>, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this <u>Section 7.05</u> applies whether any such investigation, litigation or proceeding is brought by any Lender Party or any other Person. Each Agent is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all amounts it receives pursuant to the Loan Documents to or for the credit or the account of any Lender Party against any and all obligations of such Lender Party to such Agent now or hereafter existing under this <u>Section 7.05</u>; *provided* that the foregoing sentence shall only apply if such Lender Party fails to promptly pay such obligation following such Agent's written request for payment; *provided further* that any obligation a Lender Party fails to promptly pay following the Agent's written request for payment shall bear interest at the same rate as Default Interest and the Agent is authorized to set off against any such accrued interest in the manner described above.

(b)  Each Revolving Credit Lender severally agrees to indemnify the Revolving Issuing Bank (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Revolving Issuing Bank in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Revolving Issuing Bank under the Loan Documents; *provided, however,* that no Lender Party shall be liable for any portion of such

97

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Revolving Issuing Bank's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Revolving Credit Lender agrees to reimburse the Revolving Issuing Bank promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Revolving Issuing Bank is not promptly reimbursed for such costs and expenses by the Borrower.

(c) For purposes of Section 7.05(a), (i) each Lender Party's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Loans outstanding at such time and owing to such Lender Party, (B) in the case of any Revolving Credit Lender, such Revolving Credit Lender's Unused Revolving Credit Commitments at such time and (C) in the case of any Revolving Credit Lender, such Revolving Credit Lender's Pro Rata Shares of the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time; and (ii) each Revolving Credit Lender's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Revolving Credit Loans outstanding at such time and owing to such Lender, (B) such Lender's Pro Rata Shares of the aggregate Available Amount of all Revolving Letters of Credit outstanding at such time and (C) such Lender's Unused Revolving Credit Commitments at such time; *provided* that the aggregate principal amount of Revolving Letter of Credit Loans owing to the Revolving Issuing Bank shall be considered to be owed to the Revolving Credit Lenders ratably in accordance with their respective Revolving Credit Commitments and Section 7.05(b). The failure of any Lender Party to reimburse any Agent or any Revolving Issuing Bank, as the case may be, promptly upon demand for its ratable share of any amount required to be paid by the Lender Parties to the such Agent or such Revolving Issuing Bank, as the case may be, as provided herein shall not relieve any other Lender Party of its obligation hereunder to reimburse such Agent or Revolving Issuing Bank, as the case may be, for its ratable share of such amount, but no Lender Party shall be responsible for the failure of any other Lender Party to reimburse such Agent or Revolving Issuing Bank, as the case may be, for such other Lender Party's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender Party hereunder, the agreement and obligations of each Lender Party contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. Successor Administrative Agent. The Administrative Agent may resign as to any or all of the DIP Facilities at any time by giving 15 days' written notice thereof to the Lender Parties and the Borrower and may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders

98

shall have the right to appoint a successor Administrative Agent as to such of the DIP Facilities as to which the Administrative Agent has resigned or been removed. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lender Parties, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent as to less than all of the DIP Facilities, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent as to such DIP Facilities, other than with respect to funds transfers and other similar aspects of the administration of Borrowings under such DIP Facilities, issuance of Revolving Letters of Credit (notwithstanding any resignation as Administrative Agent with respect to the Revolving Letter of Credit Facility) and payments by the Borrower in respect of such DIP Facilities, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement as to such DIP Facilities, other than as aforesaid. If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this Section 7.06 no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent as to any of the DIP Facilities shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent as to such DIP Facilities under this Agreement.

SECTION 7.07. Collateral Agent. Each of the Administrative Agent and the Lender Parties hereby designates and appoints CLMG as Collateral Agent under this Agreement and the other Loan Documents and authorizes CLMG, in the capacity of Collateral Agent, to (A) execute, deliver and perform the obligations, if any, of the Collateral Agent, as applicable under this Agreement and each other Loan Document and (B) take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto; *provided, however,* that the Collateral Agent shall not be required to take any action that exposes the Collateral Agent to personal liability or that is contrary to this Agreement or applicable law.

99

## ARTICLE VIII

## GUARANTY

SECTION 8.01.  <u>Guaranty; Limitation of Liability</u>.  (a) Subject in the case of Athens to the Athens Cap Amount, each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "*Guaranteed Obligations*"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Lender Party in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, subject in the case of Athens to the Athens Cap Amount (to the extent required by applicable law), each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b) Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Lender Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Lender Parties and the Guarantors hereby irrevocably agree that the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c) Subject in the case of Athens to the Athens Cap Amount (to the extent required by applicable law), each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender Parties under or in respect of the Loan Documents.

SECTION 8.02.  <u>Guaranty Absolute</u>. Subject in the case of Athens to the Athens Cap Amount (to the extent required by applicable law), each Guarantor guarantees that the

100

Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Lender Party with respect thereto. The obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a) any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c) any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d) any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e) any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f) any failure of any Lender Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender Party (each Guarantor waiving any duty on the part of the Lender Parties to disclose such information);

(g) the failure of any other Person to execute or deliver this Agreement or any other guaranty or agreement or the release or reduction of

liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

 (h) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender Party or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

 SECTION 8.03. <u>Waivers and Acknowledgments</u>.  (a)  Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

 (b) Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

 (c) Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the obligations of such Guarantor hereunder.

 (d) Each Guarantor acknowledges that the Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Collateral Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

 (e) Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or

102

otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender Party.

(f) Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in <u>Section 8.02</u> and this <u>Section 8.03</u> are knowingly made in contemplation of such benefits.

SECTION 8.04.  <u>Waiver</u>.    Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender Party against the Borrower, any other Loan Party or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower or any other Loan Party directly or indirectly, in Cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in Cash, all Revolving Letters of Credit shall be expired or been terminated, the Commitments shall have expired or been terminated and all Pre-Petition First Lien Obligations shall have been indefeasibly paid in full in Cash.

SECTION 8.05.  <u>Subordination</u>. Each Guarantor hereby subordinates any and all debts, liabilities and other obligations owed to such Guarantor by each other Loan Party (the "***Subordinated Obligations***") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this <u>Section 8.05</u>:

(a) <u>Prohibited Payments, Etc</u>.  Except during the continuance of any Event of Default, each Guarantor may receive regularly scheduled payments from any other Loan Party on account of the Subordinated Obligations in compliance with the Interim Order or the Final Order (as applicable) and to the extent not inconsistent with the Interim Order or the Final Order (as applicable), the Security Deposit Agreement.  After the occurrence and during the continuance of any Event of Default, however, unless the Required Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations other than to the extent payment of such Subordinated Obligations is permitted under the terms of the Interim Order or the Final Order (as applicable) and to the extent not inconsistent with the Interim Order or the Final Order (as applicable), the Security Deposit Agreement and the other Loan Documents.

(b) <u>Prior Payment of Guaranteed Obligations</u>.    In any proceeding under any Bankruptcy Law relating to any other Loan Party, each

103

Guarantor agrees that the Lender Parties shall be entitled to receive payment in full in Cash of all Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Bankruptcy Law, whether or not constituting an allowed claim in such proceeding (*"Post-Petition Interest"*)) before such Guarantor receives payment of any Subordinated Obligations.

(c) Turn-Over.    After the occurrence and during the continuance of any Default, each Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Lender Parties and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d) Administrative Agent Authorization.    After the occurrence and during the continuance of any Default, the Administrative Agent is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

SECTION 8.06.    Continuing Guaranty; Assignments.    This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until a Repayment Event has occurred, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lender Parties and their successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, any Lender Party may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and any Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender Party herein or otherwise, in each case as and to the extent provided in Section 9.07.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Required Lenders, which consent may be granted or withheld in the Required Lenders' sole and absolute discretion.

## ARTICLE IX

## MISCELLANEOUS

NEWYORK 9071746 v16 (2K)

SECTION 9.01.  Amendments, Etc.  (a)  Subject to Sections 5.3(d) and 5.3(e) of the Intercreditor Agreement, the Interim Order and the Final Order (as applicable) and clause (b) below, no amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document (including the Intercreditor Agreement and the Security Deposit Agreement), nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders (or the Administrative Agent on their behalf), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each Lender, do any of the following at any time:

(A)    waive any of the conditions specified in Section 3.01 or, in the case of the Initial Extension of Credit, Section 3.02;

(B)    change (1) the definition of "*Required Lenders*" or (2) the number of Lenders or the percentage of (x) the Commitments, (y) the aggregate unpaid principal amount of the Loans or (z) the aggregate Available Amount of outstanding Revolving Letters of Credit that, in each case, shall be required for the Lender Parties or any of them to take any action hereunder or under any other Loan Document;

(C)    change any other definition in the Intercreditor Agreement or the Security Deposit Agreement in any manner adverse to the Lender Parties;

(D)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lender Parties under the Guarantees) if such release or limitation is in respect of a material portion of the value of the Guarantees to the Lender Parties;

(E)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release any material portion of the Collateral in any transaction or series of related transactions;

(F)    subordinate the Liens of the Lender Parties; or

(G)    amend this Section 9.01,

and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each Lender Party specified below for such amendment, waiver or consent:

(A)    increase the Commitments of a Lender Party without the consent of such Lender Party;

(B)    reduce or forgive the principal of, or stated rate of interest on, the Loans owed to a Lender Party or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender Party without the consent of such Lender;

105

(C)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to <u>Section 2.04</u> or <u>2.07</u>, any or any date fixed for any payment of fees hereunder, in each case, payable to a Lender Party without the consent of such Lender Party;

(D)    impose any restrictions on the rights of such Lender under <u>Section 9.07</u> without the consent of such Lender;

(E)    change the order of application of any reduction in the Commitments or any prepayment of Loans among the DIP Facilities from the application thereof set forth in the applicable provisions of <u>Section 2.05(b)</u> or <u>2.06(b)</u>, respectively, in any manner that materially adversely affects the Lenders under a DIP Facility without the consent of holders of a majority of the Commitments or Loans outstanding under such DIP Facility;

(F)    increase the maximum duration of any Eurodollar Rate Period;

(G)    change the order of application of proceeds of Collateral and other payments set forth in Section 4.1 of the Intercreditor Agreement or Article III of the Security Deposit Agreement in a manner that materially adversely affects any Lender Party without the consent of such Lender Party;

(H)    otherwise amend or modify the Intercreditor Agreement or any Security Document in a manner which disproportionately affects any Lender Party vis-à-vis any other Secured Party without the written consent of such Lender Party;

(I)    amend or modify the provisions of <u>Sections 2.11(a)(i)</u>, <u>2.11(f)</u> and <u>2.13</u> (including the definition of "Pro Rata Share") in a manner that adversely affects any Lender Party without the consent of such Lender Party; or

(J)    amend or modify the final sentence of <u>Section 2.01(a)</u>, <u>Section 2.02(a)</u>, the first sentence of <u>Section 2.03(a)</u>, <u>Section 2.06(b)(i)</u>, <u>Section 2.06(b)(iii)</u>, <u>Section 2.08(b)</u>, <u>Section 5.02(s)</u>, <u>Section 5.03(d)</u>, <u>Section 5.03(e)</u>, <u>Section 9.01(a)(ii)(J)</u>, the second sentence of <u>Section 9.06</u>, or <u>Section 9.17</u> (or the meaning of any defined term as used in any such Section or definition);

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by each Revolving Issuing Bank, as the case may be, in addition to the Lenders required above to take such action, affect the rights or obligations of the Revolving Issuing Banks, as the case may be, under this Agreement; and *provided further* that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

(b) Notwithstanding the other provisions of this <u>Section 9.01</u>, the Borrower, the Guarantors, the Collateral Agent and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender Party:  (i) to cure any ambiguity, defect or inconsistency; (ii) to make any change that would

NEWYORK 9071746 v16 (2K)

provide any additional rights or benefits to the Lender Parties or (iii) to make, complete or confirm any grant of Collateral permitted or required by this Agreement, the Interim Order or the Final Order (as applicable) or any Security Document or any release of any Collateral that is otherwise permitted under the terms of this Agreement, the Interim Order or the Final Order (as applicable) and the Security Documents.

SECTION 9.02.  Notices, Etc.    (a)    All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in Section 9.02(b) and in the proviso to this Section 9.02(a), in an electronic medium and delivered as set forth in Section 9.02(b), (i) if to any Loan Party, to the Borrower at its address at MACH Gen, LLC, 9300 US Highway 9W, Athens, NY 12015, Attention: Garry Hubbard, Fax: (972) 943-3808, E-mail Address: garryh@wbcmllc.com (with a copy sent to Willow Bend Capital Management, 2701 Dallas Parkway, Suite 560 Plano, TX 75093, Attention: Jimmy Teringo, Fax: (972) 943-3808, E-mail Address: jimmyt@wbcmllc.com; and to Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910, Attention: Eric Cada, Fax: (240) 723-2339, E-mail Address: ecada@cpv.com); (ii) if to any Revolving Credit Lender identified on Schedule I hereto, at its Lending Office specified opposite its name on Schedule I hereto; (iii) if to any Initial Lender or Initial Revolving Issuing Bank, at its Lending Office specified in Schedule I attached hereto; (iv) if to any other Lender Party, at its Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender Party; (v) if to the Collateral Agent or Administrative Agent, at its address at 7195 Dallas Parkway, Plano, TX 75024, Attention: James Erwin, Fax: (469) 467-5550, E-mail Address: jerwin@clmgcorp.com; or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided, however*, that materials and information described in Section 9.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent. All such notices and other communications shall, when mailed, telegraphed, telecopied or e-mailed, be effective when deposited in the mails, delivered to the telegraph company, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to any Agent pursuant to Article II, III or VII shall not be effective until received by such Agent. Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b) The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Borrowing (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii)

107

provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as *"Communications"*), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lender Parties by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the *"Platform"*).

(c) THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d) The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the

108

Administrative Agent for purposes of the Loan Documents. Each Lender Party agrees (i) that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents. Each Lender Party agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03.  <u>No Waiver; Remedies</u>.  No failure on the part of any Lender or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.  <u>Costs and Expenses</u>.  (a)  The Borrower agrees to pay on demand (i) all costs and expenses of each Agent and Revolving Issuing Bank in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (B) the monitoring of, and participation in, all aspect of the Chapter 11 Cases and (C) the reasonable fees and expenses of counsel for each Agent with respect thereto, with respect to advising such Agent or Revolving Issuing Bank, as the case may be, as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of each Agent and each Lender Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each Lender Party with respect thereto).

(b) The Borrower agrees to indemnify, defend and save and hold harmless each Agent, each Lender Party and each of their Affiliates and their respective officers, directors, employees, trustees, agents and advisors (each, an "*Indemnified Party*") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case

109

arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the DIP Facilities, the actual or proposed use of the proceeds of the Loans or the Revolving Letters of Credit, the Loan Documents or any of the transactions contemplated thereby or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this <u>Section 9.04(b)</u> applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated thereby are consummated. The Borrower also agrees not to assert any claim against any Agent, any Lender Party or any of their Affiliates, or any of their respective officers, directors, employees, trustees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the DIP Facilities, the actual or proposed use of the proceeds of the Loans or the Revolving Letters of Credit, the Loan Documents or any of the transactions contemplated by the Loan Documents.

(c) If any payment of principal of any Loan is made by the Borrower to or for the account of a Lender Party other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to <u>Section 2.06</u>, acceleration of the maturity of the Loans pursuant to <u>Section 6.01</u> or for any other reason, or if the Borrower fails to make any payment or prepayment of a Loan for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to <u>Section 2.04, 2.06</u> or <u>6.01</u> or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or such failure to pay or prepay, as the case may be, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Loan.

(d) If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender Party, in its sole discretion.

110

(e) Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Sections 2.10 and 2.12 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05.  Right of Set-off.  Subject to the Interim Order or the Final Order (as applicable), upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender Party or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender Party shall have made any demand under this Agreement and although such Obligations may be unmatured.  Each Agent and each Lender Party agrees promptly to notify the Borrower and the Bankruptcy Court after any such set-off and application; *provided, however,* that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender Party and their respective Affiliates under this Section 9.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender Party and their respective Affiliates may have under the Loan Documents, the Interim Order or the Final Order (as applicable) or otherwise.

SECTION 9.06.  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each initial Lender Party that such initial Lender Party has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender Party and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.  This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

SECTION 9.07.  Assignments and Participations.  (a)  Each Lender Party may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Loans owing to it, and the Note or Notes held by it); *provided, however,* that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of any or all DIP Facilities, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender Party, an Affiliate of any Lender Party or an Approved Fund of any Lender Party or an assignment of all of a Lender Party's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than

111

$2,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Default shall have occurred and be continuing at the time of effectiveness of such assignment, the Borrower), (iii) each such assignment shall be to an Eligible Assignee, (iv) no such assignments shall be permitted without the written consent of the Administrative Agent, which consent shall not be unreasonably withheld and (v) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note or Notes (if any) subject to such assignment.

        (b) [Reserved].

        (c) [Reserved.]

        (d) Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender or Revolving Issuing Bank, as the case may be, hereunder and (ii) the Lender or Revolving Issuing Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's or Revolving Issuing Bank's rights and obligations under this Agreement, such Lender or Revolving Issuing Bank shall cease to be a party hereto).

        (e) By executing and delivering an Assignment and Acceptance, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01(i) and such other documents and information as it has deemed

112

appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender or Revolving Issuing Bank, as the case may be.

(f) The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in <u>Section 9.02</u> a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lender Parties and the Commitment under each DIP Facility of, and principal amount of the Loans owing under each DIP Facility to, each Lender Party from time to time (the "**_Register_**"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties shall treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(g) Upon its receipt of an Assignment and Acceptance executed by an assigning Lender Party and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of <u>Exhibit C</u> hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent. In the case of any assignment by a Lender, within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) an amended and restated Note (which shall be marked "_Amended and Restated_") to the order of such Eligible Assignee in an amount equal to the Commitment assumed by it under each DIP Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such DIP Facility, an amended and restated Note to the order of such assigning Lender in an amount equal to the Commitment retained by it hereunder. Such amended and restated Note or Notes shall be dated the

113

effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A.

(h) Each Lender Party may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Loans owing to it and the Note or Notes (if any) held by it); *provided, however,* that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender Party's shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender Party shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom.

(i) Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; *provided, however,* that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender Party.

(j) Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank or Federal Home Loan Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or similar laws and regulations relating to the Federal Home Loan Banks.

(k) Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may, without the consent of the Borrower or any other Person, create a security interest in all or any portion of the Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though

114

such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(l) Notwithstanding anything to the contrary contained herein, any Lender Party (a "*Granting Lender*") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "*SPC*") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender Party would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.10 and 2.12 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender Party of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $500, assign all or any portion of its interest in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.  This subsection (l) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Loans are being funded by the SPC at the time of such amendment.

SECTION 9.08.  Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

115

SECTION 9.09.  No Liability of the Revolving Issuing Banks.  The Borrower assumes all risks of the acts or omissions of any beneficiary or transferee of any Revolving Letter of Credit with respect to its use of such Revolving Letter of Credit.  Neither any Revolving Issuing Bank nor any of its officers or directors shall be liable or responsible for: (a) the use that may be made of any Revolving Letter of Credit or any acts or omissions of any beneficiary or transferee in connection therewith; (b) the validity, sufficiency or genuineness of documents, or of any endorsement thereon, even if such documents should prove to be in any or all respects invalid, insufficient, fraudulent or forged; (c) payment by such Revolving Issuing Bank against presentation of documents that do not comply with the terms of a Revolving Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Revolving Letter of Credit; or (d) any other circumstances whatsoever in making or failing to make payment under any Revolving Letter of Credit, except that the Borrower shall have a claim against such Revolving Issuing Bank, and such Revolving Issuing Bank shall be liable to the Borrower, to the extent of any direct, but not consequential, damages suffered by the Borrower that the Borrower proves were caused by (i) such Revolving Issuing Bank's willful misconduct or gross negligence as determined in a final, non-appealable judgment by a court of competent jurisdiction in determining whether documents presented under any Revolving Letter of Credit comply with the terms of the Revolving Letter of Credit or (ii) such Revolving Issuing Bank's willful failure to make lawful payment under a Revolving Letter of Credit after the presentation to it of a draft and certificates strictly complying with the terms and conditions of the Revolving Letter of Credit.  In furtherance and not in limitation of the foregoing, such Revolving Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in connection therewith, shall adhere to Uniform Customs and Practice for Documentary Credits as in effect as at the time of the issuance of the Revolving Letter of Credit.

SECTION 9.10.  Confidentiality.  Neither any Agent nor any Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender Party's Affiliates and their officers, directors, employees, trustees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender Party, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender Party, (e) in connection with any litigation or proceeding to which such Agent or such Lender Party or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 9.11.  Marshalling; Payments Set Aside.  Neither any Agent nor any Lender Party shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lender Parties (or to Administrative Agent, on behalf of the Lender Parties), or any Agent or Lender Party enforces any security interests or exercise its rights of setoff, and such payment or payments or the

116

proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

SECTION 9.12. <u>Patriot Act Notice</u>.  Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.  The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with the Patriot Act.

SECTION 9.13. <u>Other Loan Documents; Order</u>.  For the avoidance of doubt, but subject to the terms of (including the priorities specified in) the Interim Order or the Final Order (as applicable), for purposes of the Intercreditor Agreement, the Administrative Agent shall constitute a "*Refinancing First Lien Administrative Agent*," the Administrative Agent, the Collateral Agent and the Lender Parties shall constitute "*First Lien Secured Parties*" and the Obligations of the Loan Parties under the Loan Documents shall constitute "*First Lien Obligations*," in each case, under and as defined therein. In the event of any inconsistency between the terms and conditions of: (i) any of the Loan Documents, the Intercreditor Agreement, the Security Deposit Agreement or any other Pre-Petition Loan Document; and (ii) the Interim Order or the Final Order (whichever is in effect at the time of reference thereto), the provisions of the Interim Order or the Final Order, as the case may be, shall govern and control.

SECTION 9.14. <u>Jurisdiction, Etc</u>.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, to the extent the Bankruptcy Court does not have or exercise jurisdiction, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any of the aforementioned courts. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Except as provided in <u>Section 9.17</u>, nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection

117

that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.15.  Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.16.  Waiver of Jury Trial.  Each of the Borrower, the Agents and the Lender Parties irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans, the Revolving Letters of Credit or the actions of any Agent or any Lender Party in the negotiation, administration, performance or enforcement thereof.

SECTION 9.17.  Limitation on Liability.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS: (A) NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL BE LIABLE TO ANY PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THEIR RESPECTIVE ACTIVITIES RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, THE REVOLVING CREDIT LOANS, THE REVOLVING LETTER OF CREDIT LOANS OR OTHERWISE IN CONNECTION WITH THE FOREGOING; (B) WITHOUT LIMITING THE FOREGOING, NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL BE SUBJECT TO ANY EQUITABLE REMEDY OR RELIEF, INCLUDING SPECIFIC PERFORMANCE OR INJUNCTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY; (C) NONE OF THE ADMINISTRATIVE AGENT, THE LENDER PARTIES OR ANY INDEMNIFIED PARTY SHALL HAVE ANY LIABILITY TO THE LOAN PARTIES, FOR DAMAGES OR OTHERWISE, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY UNTIL THE EFFECTIVE DATE; (D) IN NO EVENT SHALL LENDERS' LIABILITY TO THE LOAN PARTIES FOR FAILURE TO FUND ANY REVOLVING CREDIT LOAN EXCEED ACTUAL DIRECT DAMAGES INCURRED BY THE LOAN PARTIES OF UP TO $20,000,000 IN THE AGGREGATE.

SECTION 9.18.  Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of any Loan Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the Lenders and their respective assigns, transferees and endorsees.  Until the Commitments have expired or have been terminated and the principal

of and interest on each Loan and all fees payable hereunder shall have been paid in full or, in respect of outstanding Letters of Credit, cash collateralized or terminated in a manner satisfactory to the Lenders, the Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Cases or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lenders file financing statements or otherwise perfect their Liens under applicable law.   Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

*[Remainder of Page Intentionally Left Blank]*

NEWYORK 9071746 v16 (2K)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

MACH GEN, LLC,
    as Borrower

By _____
    Name:
    Title:

MACH GEN GP, LLC,
    as Guarantor

By _____
    Name:
    Title:

MILLENNIUM POWER PARTNERS, L.P.,
    as Guarantor

By _____
    Name:
    Title:

NEW ATHENS GENERATING
    COMPANY, LLC,
    as Guarantor

By _____
    Name:
    Title:

NEW HARQUAHALA GENERATING
    COMPANY, LLC,
    as Guarantor

By _____
    Name:
    Title:

[Senior Secured Superpriority DIP Credit and Guaranty Agreement]

CLMG CORP.,
   as Administrative Agent

By _____
   Name:
   Title:

CLMG CORP.,
   as Collateral Agent

By _____
   Name:
   Title:

BEAL BANK USA,
    as an Initial Revolving Issuing Bank


By _____
    Name:
    Title:


BEAL BANK USA,
    as an Initial Lender


By _____
    Name:
    Title:


[Senior Secured Superpriority DIP Credit and Guaranty Agreement]

BEAL BANK, SSB,
    as an Initial Lender

By _____
    Name:
    Title:

# EXHIBIT B

## Approved Budget

**MACH Gen, LLC et al.**
**13-Week Cash Flow Forecast**

($ in 000's)

| | 3/7/2014 Week 1 | 3/14/2014 Week 2 | 3/21/2014 Week 3 | 3/28/2014 Week 4 | 4/4/2014 Week 5 | 4/11/2014 Week 6 | 4/18/2014 Week 7 | 4/25/2014 Week 8 | 5/2/2014 Week 9 | 5/9/2014 Week 10 | 5/16/2014 Week 11 | 5/23/2014 Week 12 | 5/30/2014 Week 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Receipts** | | | | | | | | | | | | | | |
| Net Power Generation | $ - | $ - | $ - | $ 6,052 | $ - | $ - | $ - | $ 10,432 | $ - | $ - | $ - | $ - | $ 10,817 | $ 27,301 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | 6,052 | | | | 10,432 | | | | | 10,817 | 27,301 |
| **II. Disbursements** | | | | | | | | | | | | | | |
| a) Excluded Disbursements | | | | | | | | | | | | | | |
| Fuel & Variable O&M | | 2,302 | | 687 | | | 2 | 20 | 2,624 | | 4 | | 555 | 6,194 |
| Variable Cash Flow | - | (2,302) | - | 5,365 | - | - | (2) | 10,412 | (2,624) | - | (4) | - | 10,261 | 21,108 |
| b) Measured Disbursements | | | | | | | | | | | | | | |
| Operating & Capital Expenditures | 457 | 2,120 | 457 | 2,602 | 363 | 595 | 1,143 | 8,465 | 2,762 | 221 | 2,050 | 221 | 2,969 | 24,425 |
| Debt Service & Fees | | | | 10,139 | | | | | | | | | | 10,139 |
| Restructuring Expenses | - | 120 | - | 800 | - | 50 | - | 900 | 750 | 35 | - | 850 | 725 | 4,230 |
| | 457 | 2,240 | 457 | 13,540 | 363 | 645 | 1,143 | 9,365 | 3,512 | 256 | 2,050 | 1,071 | 3,694 | 38,794 |
| **III. Net Change in Cash Before Financing** | (457) | (4,542) | (457) | (8,175) | (363) | (645) | (1,144) | 1,047 | (6,136) | (256) | (2,054) | (1,071) | 6,567 | (17,686) |
| **IV. Beginning Cash** | $ 23,526 | $ 23,069 | 23,527 | 23,070 | 24,895 | 24,532 | 23,887 | 22,743 | 23,789 | 22,653 | 22,397 | 20,343 | 24,272 | 23,526 |
| Net Change in Cash | (457) | (4,542) | (457) | (8,175) | (363) | (645) | (1,144) | 1,047 | (6,136) | (256) | (2,054) | (1,071) | 6,567 | (17,686) |
| Revolver Draw (Paydown) | - | | | | | | | | | | | | | - |
| DIP Draw (Paydown) | - | 5,000 | - | 10,000 | | | | | 5,000 | | | 5,000 | (10,000) | 15,000 |
| Ending Cash Balance | $ 23,069 | $ 23,527 | $ 23,070 | $ 24,895 | $ 24,532 | $ 23,887 | $ 22,743 | $ 23,789 | $ 22,653 | $ 22,397 | $ 20,343 | $ 24,272 | $ 20,840 | $ 20,840 |

1 of 4

**MACH Gen, LLC et al.**
**Derivation of Cash Disbursements Forecast**
**Debt**

($ in 000's)

| | Reference | 3/7/2014 Week 1 | 3/14/2014 Week 2 | 3/21/2014 Week 3 | 3/28/2014 Week 4 | 4/4/2014 Week 5 | 4/11/2014 Week 6 | 4/18/2014 Week 7 | 4/25/2014 Week 8 | 5/2/2014 Week 9 | 5/9/2014 Week 10 | 5/16/2014 Week 11 | 5/23/2014 Week 12 | 5/30/2014 Week 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Term Loan** | | | | | | | | | | | | | | | |
| **a) Term B Loan** | | | | | | | | | | | | | | | |
| Beginning Balance | | $ 483,209 | $ 483,209 | $ 483,209 | $ 483,209 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 481,984 | $ 483,209 |
| Accrued Interest | | - | - | - | 7,357 | - | - | - | - | - | - | - | - | - | 7,357 |
| Interest Payment | | - | - | - | (7,357) | - | - | - | - | - | - | - | - | - | (7,357) |
| Principal Payment | | - | - | - | (1,225) | - | - | - | - | - | - | - | - | - | (1,225) |
| Unused PIK Drawdown | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | 483,209 | 483,209 | 483,209 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 | 481,984 |
| **b) PIK** | | | | | | | | | | | | | | | |
| Capitalized Interest Cap | [a] | - | - | - | - | - | - | - | - | - | - | - | - | - | n/a |
| Amount Capitalized | | - | - | - | - | - | - | - | - | - | - | - | - | - | n/a |
| Available Amount | | - | - | - | - | - | - | - | - | - | - | - | - | - | n/a |
| **c) Summary - Term P&I** | | | | | | | | | | | | | | | |
| Term - Interest Payments | | - | - | - | (7,357) | - | - | - | - | - | - | - | - | - | (7,357) |
| Term - Principal Payments | | - | - | - | (1,225) | - | - | - | - | - | - | - | - | - | (1,225) |
| **Total Term Loan P&I Payments** | | - | - | - | (8,582) | - | - | - | - | - | - | - | - | - | (8,582) |
| **II. Revolver** | | | | | | | | | | | | | | | |
| **a) Working Capital** | | | | | | | | | | | | | | | |
| Beginning Balance | | 96,953 | 96,953 | 96,953 | 96,953 | - | - | - | - | - | - | - | - | - | 96,953 |
| Accrued Interest | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Operating Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepetition Cash Collateral Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer to DIP | | - | - | - | (96,953) | - | - | - | - | - | - | - | - | - | (96,953) |
| Draws | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | 96,953 | 96,953 | 96,953 | - | - | - | - | - | - | - | - | - | - | - |
| **b) LCs** | | | | | | | | | | | | | | | |
| Beginning Balance | | 47,386 | - | - | - | - | - | - | - | - | - | - | - | - | 47,386 |
| Accrued Interest | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Expirations | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer to DIP | | (47,386) | - | - | - | - | - | - | - | - | - | - | - | - | (47,386) |
| Posts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

**MACH Gen, LLC et al.**
Derivation of Cash Disbursements Forecast
Debt

($ in 000's)

| | Reference | 3/7/2014 Week 1 | 3/14/2014 Week 2 | 3/21/2014 Week 3 | 3/28/2014 Week 4 | 4/4/2014 Week 5 | 4/11/2014 Week 6 | 4/18/2014 Week 7 | 4/25/2014 Week 8 | 5/2/2014 Week 9 | 5/9/2014 Week 10 | 5/16/2014 Week 11 | 5/23/2014 Week 12 | 5/30/2014 Week 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **c) Fees** | | | | | | | | | | | | | | | |
| Maximum Borrowing | | 96,953 | 96,953 | 96,953 | - | - | - | - | - | - | - | - | - | - | n/a |
| Ending Borrowed Balance | | 96,953 | 96,953 | 96,953 | - | - | - | - | - | - | - | - | - | - | n/a |
| Unused Balance | | 96,953 | 96,953 | 96,953 | - | - | - | - | - | - | - | - | - | - | n/a |
| | | | | | | | | | | | | | | | |
| Unused Fee Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Upfront Fee Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **d) Summary - Interest & Fees** | | | | | | | | | | | | | | | |
| WC - Interest Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| LCs - Interest Payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Total Revolver Interest & Fees** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **III. DIP Facility** | | | | | | | | | | | | | | | |
| **a) Working Capital** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | 5,000 | 5,000 | 111,953 | 111,953 | 111,953 | 111,953 | 111,953 | 116,953 | 116,953 | 116,953 | 121,953 | |
| Accrued Interest | | | | | 1,163 | | | | | | | | | | 1,163 |
| Interest Payment | | | | | (1,163) | | | | | | | | | | (1,163) |
| Operating Repayments | | | | | | | | | | | | | | | |
| Prepetition Cash Collateral Repayments | | | | | | | | | | | | | | (10,000) | (10,000) |
| Transfer from Revolver | | | | | 96,953 | | | | | | | | | | 96,953 |
| Draws | | | 5,000 | | 10,000 | | | | | 5,000 | | | 5,000 | | 25,000 |
| Ending Balance | | | 5,000 | 5,000 | 111,953 | 111,953 | 111,953 | 111,953 | 111,953 | 116,953 | 116,953 | 116,953 | 121,953 | 111,953 | 111,953 |
| | | | | | | | | | | | | | | | |
| **b) LCs** | | | | | | | | | | | | | | | |
| Beginning Balance | | | 47,386 | 45,986 | 45,986 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | |
| Accrued Interest | | | | | 259 | | | | | | | | | | 259 |
| Interest Payment | | | | | (259) | | | | | | | | | | (259) |
| Expirations | | | (1,400) | | (2,300) | | | | | | | | | | (3,700) |
| Transfer from Revolver | | 47,386 | | | | | | | | | | | | | 47,386 |
| Posts | | | | | | | | | | | | | | 2,000 | 2,000 |
| Ending Balance | | 47,386 | 45,986 | 45,986 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 45,686 | 45,686 |
| | | | | | | | | | | | | | | | |
| **c) Fees** | | | | | | | | | | | | | | | |
| Maximum Borrowing | | 103,047 | 103,047 | 103,047 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| Ending Borrowed Balance | | 47,386 | 50,986 | 50,986 | 155,639 | 155,639 | 155,639 | 155,639 | 155,639 | 160,639 | 160,639 | 160,639 | 165,639 | 157,639 | n/a |
| Unused Balance | | 55,661 | 52,061 | 52,061 | 44,361 | 44,361 | 44,361 | 44,361 | 44,361 | 39,361 | 39,361 | 39,361 | 34,361 | 42,361 | n/a |

**MACH Gen, LLC et al.**
**Derivation of Cash Disbursements Forecast**
**Debt**

($ in 000's)

| | Reference | 3/7/2014 Week 1 | 3/14/2014 Week 2 | 3/21/2014 Week 3 | 3/28/2014 Week 4 | 4/4/2014 Week 5 | 4/11/2014 Week 6 | 4/18/2014 Week 7 | 4/25/2014 Week 8 | 5/2/2014 Week 9 | 5/9/2014 Week 10 | 5/16/2014 Week 11 | 5/23/2014 Week 12 | 5/30/2014 Week 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Week Ending Friday | | | | | | | |
| Unused Fee Payment | | | | | (135) | | | | | | | | | | (135) |
| Upfront Fee Payment | | | | | | | | | | | | | | | - |
| | | | | | (135) | | | | | | | | | | (135) |
| **c) Summary - Interest & Fees** | | | | | | | | | | | | | | | |
| WC - Interest Payment | | | | | (1,163) | | | | | | | | | | (1,163) |
| LCs - Interest Payment | | | | | (259) | | | | | | | | | | (259) |
| Fees | | | | | (135) | | | | | | | | | | (135) |
| Total DIP Interest & Fees | | | | | (1,557) | | | | | | | | | | (1,557) |
| **IV. Total Debt Payments & Fees** | | | | | | | | | | | | | | | |
| Term Loan | | | | | (6,582) | | | | | | | | | | (8,582) |
| Revolver | | | | | | | | | | | | | | | |
| DIP Facility | | | | | (1,557) | | | | | | | | | | (1,557) |
| Total Debt Payments & Fees | | $ - | $ - | $ - | $ (10,139) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (10,139) |
| **V. Liquidity** | | | | | | | | | | | | | | | |
| Revolver Capacity | [a] | $ 96,953 | $ 96,953 | $ 96,953 | | | | | | | | | | | n/a |
| DIP Capacity | | 103,047 | 103,047 | 103,047 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| | | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | n/a |
| Less: | | | | | | | | | | | | | | | |
| Working Capital Usage | [a] | 96,953 | 101,953 | 101,953 | 111,953 | 111,953 | 111,953 | 111,953 | 111,953 | 116,953 | 116,953 | 116,953 | 121,953 | 111,953 | n/a |
| LC Usage | | 47,386 | 45,986 | 45,986 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 43,686 | 45,686 | n/a |
| | | 144,339 | 147,939 | 147,939 | 155,639 | 155,639 | 155,639 | 155,639 | 155,639 | 160,639 | 160,639 | 160,639 | 165,639 | 157,639 | n/a |
| Remaining Borrowing Liquidity | | 55,661 | 52,061 | 52,061 | 44,361 | 44,361 | 44,361 | 44,361 | 44,361 | 39,361 | 39,361 | 39,361 | 34,361 | 42,361 | n/a |
| Cash Balance | | 23,069 | 23,527 | 23,070 | 24,895 | 24,532 | 23,887 | 22,743 | 23,789 | 22,653 | 22,397 | 20,343 | 24,272 | 20,840 | n/a |
| Total Remaining Liquidity | | $ 78,730 | $ 75,588 | $ 75,131 | $ 69,256 | $ 68,892 | $ 68,248 | $ 67,103 | $ 68,150 | $ 62,014 | $ 61,758 | $ 59,704 | $ 58,633 | $ 63,200 | n/a |

Note:
[a] Included in Term B Loan balance.
[b] Includes both prepetition and super-priority postpetition amounts.